# EXHIBIT 4

## JOHN ENOS DEPOSITION TRANSCRIPT

(Including Exhibits 14, 25, 29, 31, 37, 56 and 65)

EXHIBIT 4

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

-o0o-

| | |
|---|---|
| JOHN ENOS, an individual, | : CASE NO. |
| Plaintiff, | : 3:17-cv-00095-MMD-VPC |
| vs. | : |
| DOUGLAS COUNTY, a political subdivision of the State of | : |
| Nevada; et al., | : |
| Defendants. | |

DEPOSITION OF

JOHN MICHAEL ENOS

April 18, 2019

Reno, Nevada

REPORTED BY: LINDA B. SHAW, CCR #123, RPR, CSR

JOB NO.: 537030

A P P E A R A N C E S

FOR THE PLAINTIFF: THE GEDDES LAW FIRM
By: WILLIAM J. GEDDES, ESQ.
8600 Technology Way
Reno, NV 89521

FOR THE DEFENDANT: THORNDAL, ARMSTRONG DELK BALKENBUSH & EISINGER
By: KATHERINE F. PARKS, ESQ.
6590 S. McCarran Blvd., Suite B
Reno, NV 89509

GALLIAN, WELKER & BECKSTROM, L.C.
By: RAELENE K. PALMER, ESQ.
540 E. St. Louis Avenue
Las Vegas, NV 89104

Also Present: DONNA SQUIRES



I N D E X


| EXAMINATION | PAGE |
|---|---|
| By Ms. Parks | 4 |
| By Mr. Geddes | 238 |
| By Ms. Parks | 255 |
| By Mr. Geddes | 258 |


E X H I B I T S


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | 5-24-2010 Notes by Mr. Enos | 26 |
| Exhibit 2 | November 2011 through July 2014 Notes by Mr. Enos | 36 |
| Exhibit 3 | Youth Detention Counselor | 38 |
| Exhibit 4 | Handwritten notes by Mr. Enos | 39 |
| Exhibit 5 | 6-12-13 Accident Notes | 40 |
| Exhibit 6 | Reno Diagnostic Centers | 40 |
| Exhibit 7 | 11-8-13 Progress Notes | 42 |
| Exhibit 8 | 12-16-13 Back Pain Symptoms | 43 |
| Exhibit 9 | Excuse from Work or School | 44 |
| Exhibit 10 | Excuse from Work or School | 45 |
| Exhibit 11 | Excuse from Work or School | 46 |
| Exhibit 12 | 6-17-14 Given to Dr. Coats 7-14-14 | 48 |





| | | |
|---|---|---|
| Exhibit 13 | PLF-00368 Notes by Mr. Enos | 62 |
| Exhibit 14 | Occupational Health Network Prog Report | 62 |
| Exhibit 15 | Juvenile Probation Officer | 76 |
| Exhibit 16 | Employment Application | 79 |
| Exhibit 17 | Intent to Offer Employment | 80 |
| Exhibit 18 | School Program Agreement | 89 |
| Exhibit 19 | Western Nevada College | 91 |
| Exhibit 20 | Job Description PLF303-305 | 102 |
| Exhibit 21 | Chief Deputy Juvenile Probation Officer | 104 |
| Exhibit 22 | Employee's Claim for Compensation | 129 |
| Exhibit 23 | Excuse from Work or School | 129 |
| Exhibit 24 | Progress Notes Angela K. Fluitt | 130 |
| Exhibit 25 | Douglas County Sheriff Statement PLF00371 | 131 |
| Exhibit 26 | Alternative Service Concepts | 132 |
| Exhibit 27 | Physical Limitations/Work Restrictions | 133 |
| Exhibit 28 | 7-23-14 Second Opinion Request | 134 |
| Exhibit 29 | Douglas County Sheriff Statement PLF00372 | 136 |
| Exhibit 30 | Cindy McMurry to John Enos | 137 |
| Exhibit 31 | Shick to Enos Duty Station Assignment | 138 |
| Exhibit 32 | Handwritten Note Detention Center | 143 |
| Exhibit 33 | Tahoe Fracture - Work Status Form | 144 |
| Exhibit 34 | James McCarty Letter to Karen Barbee | 144 |
| Exhibit 35 | Retirement Option Selection | 152 |
| Exhibit 36 | Disability Retirement Application | 154 |
| Exhibit 37 | 4-16-15 PERS Letter to Mr. Enos | 156 |





| | | |
|---|---|---|
| Exhibit 38 | 4-20-15 PERS Letter to Mr. Enos | 158 |
| Exhibit 39 | Disability Retirement Guide | 159 |
| Exhibit 40 | 3-13-15 PERS Letter to Mr. Enos | 161 |
| Exhibit 41 | Sauer-Lamb to Enos Transport Schedule | 161 |
| Exhibit 42 | TTD and VRMA paid on two claims | 162 |
| Exhibit 43 | Behavioral Medicine Consultants | 166 |
| Exhibit 44 | CVMC Occupational Health & Medicine | 183 |
| Exhibit 45 | Important Message for John 9/3 | 186 |
| Exhibit 46 | CVMC Occupational Health & Medicine | 186 |
| Exhibit 47 | Handwritten note from Vicky Sauer-Lamb | 189 |
| Exhibit 48 | Designation Notice FMLA | 190 |
| Exhibit 49 | Tahoe Fracture & Orthopedic 12-10-14 | 191 |
| Exhibit 50 | Reno Diagnostic Centers 12-17-14 | 192 |
| Exhibit 51 | Work/School Excuse Tahoe Fracture 12-17-14 | 192 |
| Exhibit 52 | Work/School Excuse Tahoe Fracture 12-24-14 | 193 |
| Exhibit 53 | Karen Barbee to John Enos 1-6-15 | 194 |
| Exhibit 54 | Specialty Health Return to Work | 195 |
| Exhibit 55 | James McCarty to Karen Barbee | 196 |
| Exhibit 56 | Work/School Excuse Tahoe Fracture | 198 |
| Exhibit 57 | Specialty Health Return to Work | 199 |
| Exhibit 58 | Specialty Health Return to Work | 200 |
| Exhibit 59 | Work/School Excuse Tahoe Fracture | 202 |
| Exhibit 60 | Specialty Health Return to Work | 203 |
| Exhibit 61 | Specialty Work Return to Work | 204 |
| Exhibit 62 | Work Status Form Tahoe Fracture | 205 |

| | | |
|---|---|---|
| Exhibit 63 | Work Status Form Tahoe Fracture | 206 |
| Exhibit 64 | David Eisenhauer Procedures Performed | 207 |
| Exhibit 65 | 10-21-14 Failure of Hardware Procedure | 207 |
| Exhibit 66 | 1-15-15 Dr. Eisenhauer - Carson Valley | 209 |
| Exhibit 67 | Timeline of Events For John Enos | 211 |
| Exhibit 68 | Notes Call to Norma 2-26-15 | 212 |
| Exhibit 69 | Notes Given to Dr. Coats 3-12-15 | 213 |
| Exhibit 70 | PLF 0712-714 Notes by Mr. Enos | 214 |
| Exhibit 71 | 3-9-07 Document comment by Scott Shick | 214 |
| Exhibit 72 | 4-1-08 Fool's Day | 215 |
| Exhibit 73 | Notes from Meeting with Norma 2-17-15 | 215 |
| Exhibit 74 | Go to PERS PLF-0638 | 216 |
| Exhibit 75 | 1-28-15 Notes re Dr. Eisenhauer | 217 |
| Exhibit 76 | Opinion PLF00665 | 218 |
| Exhibit 77 | 1-6-15 Patricia Morales from Barbee | 219 |
| Exhibit 78 | 7-16-15 Tahoe Fracture - Paul Fry | 221 |
| Exhibit 79 | 8-19-15 Tahoe Fracture - Paul Fry | 223 |
| Exhibit 80 | Questions Concerning Activities 9-14-15 | 226 |
| Exhibit 81 | Disability Questionnaire | 227 |
| Exhibit 82 | Position Description Questionnaire | 227 |
| Exhibit 83 | Careers at Americans for Arts | 229 |
| Exhibit 84 | Notes for Week of July 11-15, 2016 | 230 |



BE IT REMEMBERED that on Thursday, April 18, 2019, at the hour of 9:00 a.m. of said day, at the offices of THORNDAL, ARMSTRONG, DELK, BALKENBUSH & EISINGER, 6590 S. McCarran Blvd., Suite B, Reno, NV, 89511, before me, LINDA B. SHAW, a Certified Court Reporter, personally appeared JOHN MICHAEL ENOS, who was by me first duly sworn, and was examined as a witness in said cause.

-oOo-

JOHN MICHAEL ENOS,
called as a witness, having been duly sworn,
testified as follows:

EXAMINATION

BY MS. PARKS:

**Q Could you state your name for the record, please, sir?**
A John Michael Enos.
**Q Mr. Enos, have you ever had your deposition taken before?**
A Yes, I have.
**Q How many times?**
A Once that I can remember.
**Q In what context did you have your deposition taken previously?**
A It was here with Bob Balkenbush.



**Q Was that in connection with your contested Worker's Compensation case?**
A Yes, it was.
**Q Mr. Enos, you have sat through numerous depositions in this case, correct?**
A Correct.
**Q And during the time that you attended these depositions, you heard the attorneys give admonishments about the deposition process. Do you recall those admonishments?**
A Somewhat.
**Q Okay. You understand that the oath you just took is the same oath you would take in a court of law?**
A Yes.
**Q Although we're here in informal settings in my office, it carries with it the same penalty of perjury, are you aware of that?**
A Yes.
**Q And in terms of the deposition procedure today is my opportunity to talk with you and ask you questions but your background, but you personally, to get to know you, to ask you questions about this case.**
**Is there any reason that you can not go forward with your deposition today, including are you currently under the influence of any medications that would impact your ability to remember dates and events?**



A No.
**Q Are you on any medications, as we sit here today?**
A No.
**Q Have you ever filed or been involved in a lawsuit, Mr. Enos, other than the case that we're here to talk about today, and other than your contested Worker's Compensation case?**
A Yes.
**Q And when was that?**
A I believe it was 2000 -- I'm sorry, 1998. I was hit by another vehicle, and there was a lawsuit there. And then I can't remember the year, but a house that I was living in in the Ranchos, the -- the GRGID came out and sprayed the easement next to my house, and a lot of my trees died, so I was in a lawsuit involving with that.
Actually it wasn't a lawsuit, I'm sorry, I put in a recommendation -- I put in a request for replacement of the trees, and they ended up giving me a settlement for that.
**Q The motor vehicle accident that you were in in 1998, where did that accident occur?**
A It occurred on Waterloo Lane, where the Waterloo Lane turns into Toller, and I was traveling down the road when someone backed out of a driveway and hit me.
**Q Were you injured in that accident?**
A Yes.

Q What injuries did you sustain?
A Some contusions to my forehead here and a cut to my finger right here.
Q And did you make a claim for injuries for that accident or did you actually file a lawsuit against the other driver?
A Filed a lawsuit against the other driver.
Q In what jurisdiction was that lawsuit filed?
A There in Gardnerville.
Q Did you have legal counsel?
A Yes.
Q Who was your lawyer?
A Milos Terzich.
Q Did you give a deposition in that case?
A I don't believe I ever did, I believe we settled.
Q You didn't testify in court?
A No.
Q What was your money settlement?
A 5500, I believe, maybe closer to 6. That's what I got. I think it settled for 9 or something like that.
Q Tell me what the acronym GRGID besides General Improvement District, what does GR stand for?
A Gardnerville.
Q And you indicated that you were involved in litigation with the General Improvement District; is that correct?



A Yes.
Q Was there a lawsuit filed or simply a claim made?
A A claim made.
Q What was -- what was the result of that claim?
A They settled. They paid me for the trees.
Q Any other litigation that you've been involved in besides those instances?
A Not that I can recall.
Q Where do you currently reside?
A I currently reside at 3613 Quail Run Way, Wellington, Nevada.
Q How long have you resided there?
A It would have been 3 years in April -- this month, so 3 years.
Q And do you live in an apartment or a single family residence?
A Single family residence.
Q And do you own or did you purchase that property?
A No.
Q You are renting it?
A Yes.
Q Where did you move to 3613 Quail Run Way from?
A From 1184 Sierra Vista Drive in Gardnerville, Nevada.
Q And how long had you resided there?
A 14 years.



Q Did you own or rent?
A Owned.
Q When did you -- so when did you purchase that home?
A It was actually in '04, so it wasn't 14 years, I'm sorry. It was in '04, we moved there in -- I believe 2016, so -- 12 years.
Q In terms of the damages that you are claiming as a result of your separation from employment with Douglas County, is there any element to your damage claim that includes the loss of your home at 1184 Sierra Vista?
A Not that I know of.
Q You are not claiming that you had to sell your home or lost your home as a result of losing your employment with Douglas County?
A No.
Q Why did you move to Wellington?
A We had -- we were in a situation where we had to short sell our house. And the realtor came and looked at it and said this could take months and months. And then the first people that came to look at the house made an offer, and the bank accepted. When the realtor contacted me, she said you have 11 days to move out of your house.
So we looked in the valley for rentals, we needed to get a rental pretty much that day to get everything moved. And one of the only rentals we could find was at that address.



Q How far is Wellington from Minden Gardnerville?
A From Gardnerville roughly 16, 17 miles.
Q Just to be clear, with respect to the reasons why you short sold your home, it is unrelated to any damage claim you are making in this case?
A Correct.
Q Had you ever lived in Wellington before?
A No.
Q When did -- where were you born, sir?
A Redwood City, California.
Q When did you first move to Nevada?
A 1994, I believe, the end of 1994.
Q And your date of birth is what?
A 11-12-1965.
Q What brought you to Nevada?
A A job that was available with the Family Support Council.
Q Family Support Council?
A Yes.
Q Is that what it's called?
A Yes, it's called Family Support Council of Douglas County, but it's not a Douglas County company.
Q Have you ever served in the military, sir?
A No.
Q Are you married?

A Yes.
Q What's your spouse's name?
A Rebecca Enos.
Q How long have you been married?
A Since June of 2004.
Q Were you ever married previously?
A No.
Q Do you have any children?
A Personally, no.
Q Do you have step children?
A Yes, I do.
Q How many?
A Two.
Q Are they adult children?
A Yes.
Q Do any of them reside with you?
A Nicholas is graduating college and will be coming back, but probably living with his father there in Minden.
Q Is your wife employed, sir?
A Not at this time.
Q At the time that you were separated from employment with Douglas County, did your wife work?
A Yes.
Q What did your wife do?
A She was a dental hygienist.



Q And has she retired?
A Yes.
Q What's your wife's age?
A 55.
Q Is your wife on some sort of medical retirement or she just retired --
A No, she had to go out on a disability.
Q So is she currently on disability?
A No.
Q Other than the State of California, where you were born, and the State of Nevada where you reside now, have you resided in any other states?
A In the third -- when I was in the third grade we lived in Salt Lake City for approximately a year.
Q You have siblings; is that correct?
A Yes.
Q How many?
A Well, 3, but one is deceased, so 2.
Q Brothers or sisters?
A Brothers.
Q You have one brother that works for Douglas County; is that correct?
A He worked for Douglas County for the Building Department, and currently works for East Fork Fire and Paramedic District.



Q And what's his name?
A Brook Enos B-R-O-O-K.
Q How long has your brother worked for East Fork Fire Protection District?
A I believe close to a year.
Q Is your brother involved in any sort of litigation with Douglas County over his former employment?
A Not that I know of.
Q Where did you go to high school?
A I went to Granada High School.
Q Granada?
A Yes.
Q Where is that located?
A Livermore, California.
Q What year did you graduate?
A 1983.
Q And after you graduated from high school, did you move on immediately higher education?
A Yes.
Q And give me a summary of the higher education that you obtained after high school?
A In 1983 I went to Chabot Junior College, and graduated in 1986 with an Associate's Degree in general education. I then went to Cal State Hayward in 1986, and in '88, I believe it was, I graduated with a Bachelor of Science in Recreation



with a certificate in Commercial Recreation. And then I began the graduate program, and I got a Master's Degree in Public Administration, and I believe I finished that in 1990.
Q Chabot C-H-A-B-O-T?
A Yes.
Q Junior College?
A Yes or Community College.
Q Community College. The education that you just described to me, were you employed at all during the period of time that you were going to school?
A Just -- yeah, I did construction work. I worked with some friends doing electrical on homes, I did some framing, anywhere I could make some money, extra money, but I didn't have a full-time position while I was going to Hayward.
Q So nothing in your field of study that you worked part-time while you went to school?
A No.
Q After you obtained your Master's degree, describe your employment for me?
A I went to the Alameda County School District, filled out a bunch of paperwork, and became a substitute teacher. So I taught in the local high schools and middle schools and elementary schools as a substitute teacher.
Q How long did you maintain that employment?
A Up until I moved to Gardnerville, so until 1994.

**Q And that was with Alameda County?**
A Yes.
**Q Okay.**
A Also at some point there, Kathy, I worked with a company called Morris Olley Construction, a road construction company.
**Q All right. Did you ever seek employment with Alameda County as a full-time teacher?**
A No, I did not.
**Q So, give me an idea of how many years you substitute taught at Alameda County?**
A Two to 3.
**Q You moved to Douglas County in 1994; is that correct?**
A Yes.
**Q And tell me about your employment after you moved to Douglas County?**
A I began working with the Family Support Council running a group called Choices. I was considered a team coordinator. And I would go to the local middle schools and high schools. And the counselors in the schools would recommend kids that were on the edge of being at risk, and then I would get them in my groups.
And I would run about a 12 week program where every week we discussed a different subject. And then at the end of that group there would be a break, and then I would start up



with a new group, meet new kids and get another group going. That was in the middle schools and in the high school.
**Q Were these counseling services that you would be providing?**
A I guess it could be considered that.
**Q Describe for me what sort of interaction you had with these children, what you did in that position?**
A They would come in to group. I would greet them. And then we would sit down and I had a curriculum, and I can't remember the person's name that put it together.
Every week we would discuss some type of topic, like morals, values, dedication, responsibilities, that kind of thing, just to give them a better outlook for the future and help them with choices and that kind of thing.
**Q Okay. So you weren't, for instance, teaching math, science, reading, you were -- this was more counseling services to assist the children in other aspects of their lives?**
A Yes.
**Q Were you required to obtain any sort of teaching certificate from the State of Nevada in order to engage in that particular job?**
A No.
**Q How long did you work with that agency?**
A Until 1998.
**Q And --**



A No, I'm sorry, until I got the job at China Spring Youth Camp. I worked at both, I worked at family support and also China Spring Youth Camp at the same time for a period of time.
**Q And then in what year did you go to work for China Springs exclusively?**
A 19 -- well, 1995 I started there. Exclusively I believe it would have been 1996.
**Q All right. Did you work for Douglas County as some sort of recreation coordinator before you went to work for China Springs?**
A Yes, I did.
**Q In what year did you first go to work for Douglas County?**
A That was pretty much right as I got there, I went to fundraiser for family support council, and the family support council's head of the Board came to me and said what are you doing. And I said I'm doing 20 hours a week with family support.
And he said have you put in for any other work. And I said I put in for the recreation department, but I haven't heard anything.
And the following Monday they called me and said, hey, we need a team coordinator. So I went in and interviewed with them, and they hired me to run the teen dances out at the



fairgrounds, to transport kids for different trips and things like that.
And then I was also asked to ref in the volleyball league, and also run the open gym on Fridays and Saturday nights for the youth to come in to the schools.
**Q And that is something then that you did while you were also working for the family support?**
A Yes.
**Q Group?**
A Yes.
**Q Okay.**
A When I started with family support I was 20 hours. While I was working with the recreation department, family support also asked me if I wanted to pick up another 20 hours. So I went to a training in Fresno, California, called VORP. It was Victim Offender Reconciliation Program.
And I brought that program back to Gardnerville, and started a mediation program there in Gardnerville, getting juvenile offenders together with their victims and working things out outside of the court.
**Q What year did you go to work exclusively for Douglas County?**
A I believe it was 1996.
**Q And you worked exclusively for Douglas County from 1996 until February of 2015, correct?**

A Correct.
**Q And your last position with Douglas County was senior juvenile probation officer, correct?**
A Yes.
**Q Do you know how many JPO's currently work for Douglas County or work for the Ninth Judicial District Court in Douglas County?**
A Currently I do not.
**Q Are you friends with anyone who continues to be employed as a JPO?**
A Somewhat.
**Q Who?**
A Dominic Hastings Molyneux. I don't know that we're friends now that he's been deposed. I haven't spoken with him.
**Q Are there any other JPO's who you are friends with?**
A No.
**Q When is the last time you spoke with Dominic?**
A Well, when he was here -- when he was deposed recently, and that was just, hello, Dominic, and goodbye pretty much.
**Q Prior to Dominic's deposition being held, before that, when was the last time you had spoken with Dominic?**
A Well, about a year after I was terminated from my position I ran into Dominic and his 2 daughters at Home Depot, and it was good to see him. I hadn't seen any of the juvenile



probation officers at that point. So he said we should get together for lunch. So we met several times for lunch over the next 6 to 8 months, and that was pretty much about it. We talked about getting together and going camping or doing something like that, but we never did end up following through with that.
**Q Other than Juvenile Probation Officers, are you friends with anyone else who works for Douglas County?**
A Yes.
**Q Tell me the names of those persons.**
A Well, I mean, I know all of the probation officers that I worked with, but I just don't ever see them anymore. If I was to run into Tammy Morris and her husband, Scott, I would sale hello to them. I would say hello to any of them that I saw.
But I know Ed Koehler with the Building Department. I know Todd Carlini with the Fire Department. I know Steve Isley with the Fire Department. I know a lot of people in the Fire Department. In the Sheriff's Department. And I know them more as acquaintances than I guess would say friends.
**Q Let me clarify my question in that regard. Do you maintain relationships with anyone in JPO and anyone who works for Douglas County where -- for example, you regularly have lunch or dinner with them, you would consider them friends, who you see routinely?**



A Not really.
**Q Have you talked with Dominic about that your lawsuit?**
A Well, when we had our lunch, yes.
**Q And tell me about your and Dominic's conversation about your lawsuit?**
A Just caught him up. Each time we would get together, he'd say what's the latest. I would tell him what's happening with the lawsuit up top that point.
At one point I said to Dominic, I said, you know, Dominic, I said I'm kind of hurt. And he said why. And I said, well, because I spent more time with you guys than I did with my wife for 17 years. And when I left I never got to even talk to any of you guys, and nobody has ever contacted me or anything.
And he said, well, there's a reason for that, John. And I said why. And he said shortly after you were gone, Scott Shick got us all together and told us that we were no longer allowed to meet with you or talk with you outside of the office. And that was the end of that.
He said that's why you haven't seen anybody. And he said, in fact, I'm taking a risk even talking to you now. And we met out at Wally's Hot Springs out on Foothill Road. It wasn't in a place where anybody would see us having lunch together.



(At this time Exhibit 1 was marked for identification.)

BY MS. PARKS:
**Q Showing you what's been marked as Exhibit Number 1 to your deposition, sir, if you could take a look at that for me, please?**
A Okay.
**Q Do you recognize what's been marked as Exhibit Number 1 to your deposition?**
A I don't recognize it.
**Q This bears Bates Stamp number PLF 00717. At the top of the first page of this is a date 5-24-2010 and it reads: A staff meeting was held on the above date in which juvenile probation staff were notified we would be working detention shifts through the rest of the year into June of 2011.**
**When you look at that, and you see that first paragraph, does that refresh your recollection about whether or not these are notes that you prepared?**
A Not necessarily.
**Q Turn to page 2 of Exhibit Number 1, please?**
A Okay.
**Q Second paragraph or first full paragraph it reads: Your Honors, this budget situation has been stressful on all involved.**
**Do you see that there?**

A Yes, I do.

Q Does that in any way refresh your recollection as to whether these are notes you prepared concerning events that occurred in or about May of 2010?

A That sentence alone, no, it does not.

Q Okay. If you look at the paragraph immediately above that, the last sentence, it says: I returned to my office and typed this letter.

Do you see that there? It's the last sentence of the first paragraph.

A Yes, I do.

Q Do you recognize that or does that in any way refresh your recollection as to whether or not these are your notes?

A It does not. Is there a possibility I could read this?

Q Sure, take your time.

BY MS. PARKS:

Q Having had an opportunity to review what's been marked as Exhibit Number 1, do you recognize this after reading it?

A Yes, I do.

Q What do you recognize this to be?

A Notes that I typed.

Q Okay. This note is dated May 24th, of 2010. Is that commensurate with when you typed these notes?



A Yes.

Q And what was the purpose of you typing up these notes?

A Just protecting the truth.

Q And what did you do with this note or these notes after you typed it up? Is this something you provided to Douglas County back in 2010 or are these your private notes?

A These are my private notes. And I don't even believe or remember if I actually sent the letter to the Judges, but that was my course of action at the time would be to appeal to the Judges, if there was something that I already appealed to my superiors for and didn't agree with.

Q That would have been your general inclination, if you did not agree with a decision that was made by a supervisor, you would notify the Judges?

A Well, like I said --

MR. GEDDES: Vague and ambiguous as to decision by a supervisor.

MS. PARKS: Go ahead.

THE WITNESS: Like I said, I believe I wrote the letter, but I don't believe that I ever took it to the Judges.

BY MS. PARKS:

Q Why not?

A It's just something you don't want to do. You don't want to take that on to have Scott and Vicky angry at you for going above their head.



Q This note is dated May 24th, 2010. That's approximately 3 years before you were injured at the wilderness outing, correct?

A Correct.

Q And if you look at the second -- excuse me, the third paragraph on page one, it appears that what is being discussed in this paragraph relates to certain shifts, and it says at detention. Do you see that?

A Yes.

Q What is at -- what is detention referring to here?

A We have a detention facility up at Lake Tahoe, up on the other side of Kingsbury Grade. And so that's where those detention -- that's the detention facility where we would take shifts at detention.

Q That detention facility, what's the purpose of that detention facility, as apart from the offices of JPO that were in --

A That's where juveniles were detained.

Q Is there a detention facility for juveniles that's actually in Minden or Gardnerville?

A We have a detention cell in juvenile probation, just for temporary holding a juvenile.

Q And I may get my terms wrong when it comes to sort of law enforcement issues in dealing with juveniles, so you can correct me in that regard.

If a juvenile is arrested in Douglas County, if that is an appropriate term to use in terms of an arrest of a juvenile --

A Detained.

Q Detained. Then that individual, if they're going to be detained for more than a short stint of time, will be held at the detention center at the Lake you just described?

A Correct.

Q And is the detention facility for juveniles at the Lake a stand alone detention center or is it a building that is also occupied by another agency?

A It's a building occupied by another agency.

Q And what would that other agency --

A The Douglas County Sheriff's Department and DMV, I believe and the court -- the Justice Court. I think that's that.

Q Okay. If I were to give you, and I will have to find one, you have one, a pen and a piece of paper, would you be able to sketch a diagram for me of the detention center at the Lake?

A Roughly.

Q Could you roughly make such a diagram for me?

A (Witness indicating) so it was a large building, but I'm sure the angles are different on the outside. We would

arrive into this parking area right here, and the detention door was right here. When you went in, there were various cells -- it's actually a wing of the old jail that the detention facility took over.

**Q Okay.**

A And then the rest over here, if you went through this door, this was actually the adult jail, and somewhere in the building there was -- upstairs was Justice Court, DMV, some other places.

**Q All right. So you marked a door there, correct?**

A Right.

**Q Will you write door, please?**

A Sure (witness indicating).

**Q And on the other side of this door that you have just marked, this is Douglas County Sheriff's Department?**

A Yes.

**Q Offices and jail?**

A Jail, yes.

**Q Could you write DCSO or however --**

A (Witness indicating).

**Q And the DCSO jail then that's marked there, that area is staffed by Douglas County sheriff's deputies?**

A Yes.

**Q And you have some hash marks here on the diagram. In the area of these hash marks, is this the area where there were**



**cells for juveniles?**

A Yes, so when you came in there was an area here that had a cage across it. And then there was -- I guess it would be more like right here, there was a door that went into another room that was about like this. And then there were cells, individual cells like that.

I believe there was kind of a shower type thing over here. I know there was a desk here for the school person that helped the kids. And then there was a day room or the day room was pretty much right here as you came in (indicating). There was a control room over here. The day room continued there. And then it went down, there was another room back here that had cells in it, and another room on this side that had cells in it (indicating).

**Q So, juveniles that were detained, not withstanding that there would the common area and a day room, there were actually cells in which a juvenile could be locked in?**

A Yes. There was also -- right out of the day room right here, this was a gym or basketball court, and this was a fenced in area out here with some tables where kids could go to get some outside time.

**Q All right. And you indicated -- could you write control room?**

A Yes (indicating).

**Q In the control room were there cameras that were**



**focused on the various cells and the various areas of the detention center?**

A At the time that we were working up there, they were putting cameras in, yes.

**Q Okay. All right.**

A So you never knew when the older cameras were working or not working, anything like that. But they put a new system in.

**Q And how frequently was the juvenile detention center up there staffed by a JPO?**

A By a JPO, not very frequently, not really at all.

**Q I mean, once a day, once a week, how often --**

A It depended --

**Q Let me finish my question. Once a day, once a week, how often was the detention center staffed?**

MR. GEDDES: Vague and ambiguous as to timeframe.

THE WITNESS: It depended on the history of the detention center. When that detention center began, we had contracts with all of the outer lying counties, and then we had kids there all the time. But it was never staffed by a juvenile probation officer, it was staffed by the detention staff.

And then at a certain point, I don't remember what year it was, we lost all of our contracts with the other counties, and actually thought we were going to lose our



detention facility, because we really didn't have any kids going up there. We still kept it staffed with detention staff.

But there was a new facility in Fallon, and everybody contracted with that facility, so we began just only taking Douglas County kids. So a lot of times there wasn't any kids in the detention facility at all, but it was still staffed by detention staff.

When we went into the recession, and other departments were actually having to lay people off, we went up and worked at the detention facility to help with staffing, and with that kind of thing.

So they put us up there to run detention shifts. Not to run the shifts, but to be a part of the shift. They always had a detention staff run the shift, but you were up there to help them with it.

BY MS. PARKS:

**Q When you say detention staff?**

A Yes.

**Q By whom was the detention staff employed?**

A Douglas County.

**Q I mean, was the detention staff a member of the Douglas County Sheriff's Office or was it a member of the juvenile probation department?**

A I'm not sure of the distinction there, but I know Scott Shick did all of the hiring for that. Just like he kind

of oversaw juvenile -- China Spring Youth Camp, so China Spring Youth Camp was all County employees and detention was County employees.
Q Okay --
A Specifically for detention, I'm sorry.
Q So notwithstanding that there may not have been kids up there, on any given day, the detention facility was staffed?
A Yes.
Q All right. And whether or not there would be juveniles in the detention center depended on if a juvenile were detained, correct?
A Yes.
Q So that -- it would seem to be a fluctuating situation. Would that be fair to say?
A Yes.
Q Looking back to the Exhibit Number 1 to your deposition, it appears from page one, second paragraph, that at some point in time in that 2010, May of 2010, an issue arose with respect to staffing that detention facility; is that correct?
A Yes.
Q And the second paragraph on page one there is a reference to there having been names drawn out of hat to determine who was going to staff the detention center; is that correct?



A Yes.
Q And the issue that arose with respect to staffing the detention center, was this tied to budget issues to your knowledge?
A Yes.
Q From page 1 also of Exhibit Number 1, it appears you did not agree with the decision made to draw names of people or staff members who would then go up and fill shifts at the detention center; would that be correct?
A There were actually several officers that did not agree with that decision.
Q You were one of them?
A Yes.
Q Was there something -- was there something negative in terms of covering a shift at the detention center?
A No, it's just that -- all of the officers wanted to help out in any way they could or we could, but pulling shift at detention was -- it wasn't what we were there for, but everybody was willing to go up and do shifts.
Q And I mean, an officer who covered a shift up at the detention center, there was -- you weren't paid less?
A No.
Q All right.

(At this time Exhibit 2 was marked for identification.)



BY MS. PARKS:
Q Showing you what's been marked as Exhibit Number 2 to your deposition, Mr. Enos, if you could just flip through Exhibit Number 22. This consists of multiple pages. If you want to take a look at that, let me know when you are ready to discuss it.

(At this time a break was taken.)

BY MS. PARKS:
Q I'm not likely to ask you about every single page. Just let me know when you are ready to discuss this document. Okay?
A Okay.
Q The other option that we have with respect to this document, Mr. Enos, is I'm intending to take a break at noon. I can move along, since I'm on a short time schedule today. You can review that over the break, and we can talk about it after. How would that be?
I want you to have an opportunity to review that. But I also need to move along. We can forego discussing this now and you can look at it over the break. Would you be amenable to that?
A Yes, that's fine.
Q I'll go back to this.



(At this time Exhibit 3 was marked for identification.)

BY MS. PARKS:
Q Showing you what's been marked as Exhibit Number 3 to your deposition, Mr. Enos, have you ever seen Exhibit Number 3 to your knowledge?
A No, I have not.
Q Do you recognize, though, what Exhibit 3 is in terms of it being a job description?
A Yes.
Q You've seen documents similar to Exhibit 3 in the past, correct?
A Yes.
Q This document is a job description at the top you see where it says youth detention counselor, do you see that there?
A Yes.
Q At some point during your employment with Douglas County, did you work as a youth detention counselor?
A No.
Q At any time during your career in working with Douglas County, did you ever apply for any such position?
A No.
Q Okay. Looking at page one of Exhibit Number 3, down at the bottom, sir, where it talks about essential functions,

it's the last one, says: Restrains juveniles as needed using approved physical and mechanical restraint methods.

Mr. Enos, are you at all familiar with the physical and mechanical restraint methods that a youth detention counselor might have to employ?

A No.

Kathy, I do know they go through a --

(At this time Exhibit 4 was marked for identification.)

BY MS. PARKS:

Q Go ahead.

A They go through a training called Gyra, but I've never been part of that.

Q As a juvenile probation officer, you were not required to go to Gyra training?

A No.

Q Showing you what's been marked as Exhibit Number 4 to your deposition, Mr. Enos, is that your handwriting?

A Yes.

Q Exhibit Number 4, these are handwritten notes that you took for what purpose?

A Just to have a timeline of events.

Q Okay. And to whom did you provide those handwritten notes?



A I don't recall.

Q I mean, these handwritten notes, are they handwritten notes that you gave to Douglas County prior to February of 2015 or were these your own personal notes?

A My own personal notes.

Q All right.

(At this time Exhibit 5 was marked for identification.)

BY MS. PARKS:

Q Showing you what's been marked as Exhibit Number 5 to your deposition, do you recognize Exhibit Number 5?

A Yes.

Q What do you recognize Exhibit Number 5 to be?

A My notes.

Q So these are similar in nature to Exhibit Number 4, these are your personal notes?

A Yes.

(At this time Exhibit 6 was marked for identification.)

BY MS. PARKS:

Q Showing you what's been marked as Exhibit Number 6 to your deposition. Mr. Enos, if you could take a look at this, it's a document produced by your attorneys in this case from



Reno Diagnostic Center. Do you see that?

A I do.

Q It says exam date 9-12-2013. Do you see that there?

A I do.

Q This seems to refer to an MRI that was done of your right wrist. Do you see that there under exam description?

A I see where it says MR wrist without contrast right.

Q So, this particular MRI was an MRI that you had done following your initial on-the-job injury on June 21st, 2013; is that correct?

A Correct.

Q And the incident of June 21st, 2013 occurred while you were on a wilderness trip; is that correct?

A Correct.

Q What other JPO's were on that wilderness trip?

A Dominic Hastings Molyneux.

Q And you were injured according to the documents I've reviewed in this case, as well as the testimony, when a juvenile fell out of a tree and onto you; is that correct?

A Actually the tree broke and the tree and the juvenile came down on top of me.

Q Sir, can you describe to me the injuries you sustained as a result of that incident on June 21st of 2013?

A Well, what they told me after exams was that I had soft tissue damage in all regions of my back, that I had a



sprained right wrist, which ended up being a torn scapholunate ligament in the right wrist.

Q Scapholunate.

A Scapholunate. And multiple abrasions and bruises.

Q With respect to the injury to your right wrist, you would ultimately have a total of 3 surgical procedures on your right wrist, correct?

A Yes.

(At this time Exhibit 7 was marked for identification.)

BY MS. PARKS:

Q I'm showing you what's been marked as Exhibit Number 7 to your deposition, Mr. Enos, this is a medical note produced by your attorneys and it is dated, at least at the top right, under last update date, as June 26th, 2013.

Do you see that there?

A Yes, I do.

Q And the author of this note is Kara K-A-R-A Cole C-O-L-E.

Do you recall being evaluated or treated by a physician's assistant by that name, after the Worker's Compensation -- after the industrial injury of June 21st, 2013?

A Yes, I do.

Q And what facility was she associated with?

A She was at the -- that's the hospital at the south end of town. Carson Valley Medical Center, I believe, is what it's called.

**Q If you turn to page 2 of Exhibit Number 7, at the very last paragraph it says: He may work at full duty. Next week he will be on a previously planned vacation.**

**Do you see that there?**

A Yes, I do.

**Q Were you scheduled to be on a previously planned vacation some time after June 26th, 2013?**

A I don't recall.

(At this time Exhibit 8 was marked for identification.)

BY MS. PARKS:

**Q Showing you what's been marked as Exhibit Number 8 to your deposition. Do you recognize Exhibit Number 8?**

A Yes, I do.

**Q What do you recognize Exhibit Number 8 to be?**

A My handwriting and a list of my back pain symptoms.

**Q Okay. And Exhibit Number 8, these notes, again, are these your personal handwritten notes you were keeping contemporaneously with your medical treatment?**

A Yes, I believe I wrote these down to give to a doctor for a doctor's appointment.



**Q Okay.**

A So that I would remember, be able to let him know exactly what was happening, rather than just walking in and trying to remember everything.

**Q Did one or more of your medical care providers recommend that you take notes, or you were just doing this so you would recall?**

A Yes.

(At this time Exhibit 9 was marked for identification.)

BY MS. PARKS:

**Q Showing you what's been marked as Exhibit Number 9 to your deposition. Mr. Enos, have you ever seen Exhibit Number 9 before?**

A I'm sure I have, yes.

**Q If you look at Exhibit Number 9 at the top, it says: Excuse from work or school. Do you see that there?**

A Yes.

**Q And in the lower right corner, although the signature is somewhat cryptic, typed out there is Dr. Eisenhower, do you see that on the bottom right, towards the bottom right?**

A Yes.

**Q Next to physician?**

A Oh, yes. His mark or signature.



**Q Right. And to the right of the signature you see it's typed Dr. Eisenhauer there, correct?**

A Yes.

**Q And you saw Dr. Eisenhauer relative to injuries to your right wrist, correct?**

A Correct.

**Q At some point in time did you also see Dr. Eisenhauer for pain or problems with your left wrist?**

A I believe so.

**Q Okay. This note is dated February 28th of 2014, do you see that there at the top?**

A Yes.

**Q And this is a note from Dr. Eisenhauer that says: No use of -- looks like right-hand or wrist again. It's the doctor's handwriting. Do you see that there?**

A Yes.

**Q And during the course of your treatment with Dr. Eisenhauer, he would have occasion to provide you with work excuses and also imposed restrictions on you, correct?**

A Yes.

**Q Are you right-handed, sir?**

A Yes.

(At this time Exhibit 10 was marked for identification.)



BY MS. PARKS:

**Q I'm showing you what's been marked an Exhibit Number 10 to your deposition, sir, this is another document produced by your attorneys, another -- it says: Excuse from work or school. Do you see that there at the top?**

A I do.

**Q It's dated March 7th, 2014. There's a note here, again, that says: No use of your -- and I assume that means right wrist. Do you see that there?**

A I would -- I don't know what it means, but, yeah, I do see what you are pointing out.

**Q Do you recall seeing Dr. Eisenhauer in March of 2014 and him discussing with you that he did not want you using your right wrist?**

A I recall meeting with Dr. Eisenhauer, and if he said I wasn't supposed to use my right wrist, I wouldn't have.

**Q What you are saying is you would have followed his instructions?**

A Yes.

(At this time Exhibit 11 was marked for identification.)

BY MS. PARKS:

**Q Showing you what's been marked as Exhibit Number 11 to**

your deposition, Mr. Enos. This is a document that's similar to exhibits number 9 and 10. It's dated April 2nd, 2014, another document produced by your attorneys. Do you see that there?
A Yes, I do.
Q There is a reference here under -- it says about half way down: Must observe work restrictions as follows. Do you see that -- that heading?
A I do.
Q It says: May return to work as of -- and it says today. Do you see that there?
A M-hm (affirmative).
Q Is that a yes?
A I'm sorry, yes.
Q And then to the left of that section a little bit down it says: No use of right wrist. Do you see that there?
A Yes.
Q It appears as of April 2014, April 2nd, 2014, Dr. Eisenhauer indicated that you could work, but you could not use your right wrist, correct?
A Yes, and it also indicates I have to wear my brace.
Q It does, when did you get a brace?
A I believe probably at this -- I don't really remember when I got the brace.
Q Do you know what kind of brace that you were wearing



for your right wrist?
A At different times I was in like -- like a black brace that went on with -- what do you call that stuff -- I'm sorry.
Q Velcro?
A Yes, thank you very much. Attached with velcro and at another time I had a cast, but I believe he's talking about the brace.
Q Okay.
(At this time Exhibit 12 was marked for identification.)

BY MS. PARKS:
Q Take a look at what's been marked as Exhibit Number 12 to your deposition, Mr. Enos?
A Yes.
Q Do you recognize Exhibit Number 12?
A Yes, I do.
Q What is Exhibit Number 12?
A I believe this is the Incident Report that I was asked to write regarding an incident that took place on a transport.
Q This incident that's being referenced in Exhibit Number 12, this is the incident from which your second industrial injury arose; would that be correct?
A Yes.
Q And the second industrial injury that you had occurred on what date?



A I believe -- June 17, 2014; is that correct?
Q I believe that's true, sir. I know this note is dated June 17th, 2014, and it says today. I want to confirm that?
A Yes.
Q I want to talk a little bit about that incident now. As of June 17th, 2014, what were your -- what were your job restrictions?
A I don't recall.
Q Physical job restrictions?
A I don't recall exactly what they were at that point.
Q As of June 17th, 2014, what sort of duties were you performing?
A I believe at the time I was on light duty, but it had never been described to me what light duty was, and I was doing what I was asked to do.
Q So as of June 17th, 2014, what was your typical day -- what typically did you do for work?
A I believe this was either a Monday or Tuesday, Mondays and Tuesdays we had court. So if we had any kids that were going to court, one of the probation officers would drive up to detention and retrieve the kids. During the staff meeting you bring them back down for court. It just depended.
If I had a kid that was going to court, then I would go up and get -- or a juvenile -- then I would go up and get my juvenile and bring him down. If there were multiple juveniles



and an officer wasn't able to go up and get that juvenile, and in this case, Jordan Wegis was not on my case load. He belonged with Eric Anderson. And Eric Anderson was absent for a training, so Vicky Lamb asked me to transport Jordan down and take him to court for Eric that day.
Q I want to talk about Exhibit Number 12. The first sentence here says: Today I had transported Bailey Skidmore and Jordan Wegis from Lake Tahoe detention to JPO for court; is that accurate?
A Yes.
Q So at least as of June 17th, 2014, Bailey Skidmore and Jordan Wegis were being held at the detention center at Lake Tahoe, correct?
A Yes.
Q And when it says you transported them, you transported them from where to where?
A From the detention facility to the juvenile probation department to go to court.
Q So, the morning of June 17th, 2014, would you have reported to JPO, and then gone up to the Lake to pick up these 2?
A Yes.
Q What sort of vehicle did you use to transport them from Lake Tahoe detention to JPO?
A One of the juvenile probation vehicles. Usually I

drove a little Chevy Blazer, so that's probably what I used, but it could have been any of the juvenile probation vehicles, which are all kind of the same, SUV's.
**Q Do they have -- as would a patrol car that a deputy might drive, is there any sort of separation between the juveniles and the driver of the vehicle?**
A We only have one vehicle that has a cage unit, and it has a cage between the front and back, the rest don't. Typically Bruce Beacham drove the caged vehicle.
**Q When you transported Bailey Skidmore and Jordan Wegis -- first off, when you went to pick up Bailey Skidmore and Jordan Wegis at Lake Tahoe, do you recall if there was an officer that was manning detention at the time?**
A I don't recall.
**Q That you communicated with?**
A I don't recall.
**Q When you transported Bailey Skidmore and Jordan Wegis from the Lake to JPO for court, did you place them in handcuffs?**
A Yes.
**Q So each of them were in handcuffs?**
A Yes.
**Q Were they both seated in the back seat of whatever vehicle you drove?**
A I don't recall.



**Q Would you typically put one in the front and one in the back?**
A Sometimes, yes.
**Q During your drive between the Lake Tahoe Detention Center and JPO that day, did you talk with these juveniles?**
A Yes.
**Q Okay. During the ride from the Lake Tahoe Detention Center to JPO for court, did Jordan Wegis make any threatening statements to you?**
A No.
**Q After you arrived -- so, during the transport from the Lake Tahoe Detention Center to JPO, was that uneventful in terms of your dealing with these juveniles?**
A Just speaking with both of them on the way down, that's a time that we always use to counsel juveniles and talk with them. And the answer to the handcuffing -- sometimes if a kid was going to be released from court that day, we wouldn't handcuff them. We just bring them down. They have no reason to run away or anything like that.
I'm pretty certain they were both in handcuffs. I know Jordan Wegis would have been. They both -- we just had general discussion on the way down the hill, that I can recall.
**Q There were no physical altercations between you and these juveniles between the time you picked them up from Lake Tahoe detention to the time you got to JPO?**



A No, no.
**Q After you arrived -- and I should have asked you this. The JPO offices -- when it refers to JPO for court, where are the JPO offices located?**
A In the Douglas County Law Enforcement Judicial Building.
**Q Are they on a particular floor?**
A Yes, the second floor.
**Q The first floor of that complex is, does that include offices of the Douglas County Sheriff's Department?**
A Yes.
**Q When you say you transported Bailey and Jordan to JPO, after you arrived at JPO, tell me what transpired and where you took these juveniles.**
A Well, typically, we would pull up in front of the building, we had a spot there that we could park in just -- it was kind of a middle spot, and we would use that so we had the kids right by the door.
We would get out, sometimes an officer would come down from juvenile probation to assist, and I don't recall if one did that day or not. But we would call it in to dispatch. Tell them that we had an ending mileage, we were at juvenile probation.
Like I said, sometimes an officer would come down. We would walk them through the secure door of the facility and



then up the stairs and down the hall, right to juvenile probation, and have them take a seat in the detention cell.
**Q The secured door to the facility --**
A Yes.
**Q -- that you are talking about, is that a different door than the members of the public would enter?**
A Yes.
**Q Is it located in close proximity to the door the public would enter and go through the metal detector?**
A No, it's at the opposite end of the building.
**Q All right. Do you recall if -- and you indicated you don't recall if another officer came down to assist you at that point?**
A I don't recall.
**Q You would have or Bailey and Jordan would have been taken then through that secure door up the stairs?**
A Yes.
**Q And to the JPO offices, correct?**
A Yes.
**Q And when you talk about they would be taken to the detention cell, describe for me what sort of cell is located in the JPO offices?**
A Just as you go through our secure door, then you go down the hall to the left. Straight ahead there was a door, there was a window with the wires in it, the safety glass. And

2 -- basically room enough for 2 chairs, for probably 2 kids to sit down, unless you put another chair in there. Sometimes you would put one juvenile in the holding cell, and put the other one out in the hall, if you didn't want them to be conversing or getting themselves in trouble. Something like that. Sometimes we would seat a juvenile in one of the offices.

**Q The cell that's in the detention area of the JPO?**

A Yes.

**Q Is it actually a cell with a door that locks?**

A No.

**Q I'm trying to get an idea if it's secure?**

A No, the door didn't lock --

**Q There is a door, but it doesn't lock?**

A Yes.

**Q And the door has a window in it?**

A No, the door is solid, but next to the door is the window.

**Q Okay. All right. But that particular door did not lock?**

A No.

**Q So there was no secure holding area in the JPO detention center?**

A No.

**Q After you arrived at JPO with Bailey Skidmore and Jordan Wegis, were those 2 juveniles split up somehow or were**



**they both placed in the detention cell?**

A The best of my recollection, I believe that Jordan was in the detention cell and Bailey was in the hall. Right in between our offices or maybe even sitting in my office at the time.

**Q After you placed Mr. Wegis into the detention cell, what did you do?**

A I went into my office to get ready for court, to change into my court clothes, and get my files, so I was ready to go to court.

**Q So that was your next -- what was next up on your agenda was for you to go to court and address your cases, and whatever needed to be done in court, correct?**

A And Jordan Wegis's case, because Vicky requested that I do that that morning.

**Q With respect to Mr. Wegis, you were going to be in court to provide the court with information concerning his case?**

A Whatever he was there for, yes.

**Q All right.**

A And transport both of them over to the courtroom.

**Q When you say transport them to the courtroom, how far is the detention cell to the courtroom?**

A Well, to our office door, down the hall and around the staircase into the courtroom on the corner.



**Q Can you give me an estimate of feet?**

A Not necessarily. It's -- well, from the detention cell to our secured door would be approximately 15 feet, and then from there to our door of the department is probably 10 to 12 feet, the hallway going down to the staircase, approximately 60 feet, from the end of that hall over to the courtroom approximately 35 feet.

**Q Was the courtroom on the first or the second floor?**

A On the second floor.

**Q The courtroom that you were going to transport Mr. Wegis, that was Judge Young's courtroom, correct?**

A Yes.

**Q After you placed Mr. Wegis in the detention area or cell, did you remove his handcuffs?**

A I don't recall.

**Q At some point an altercation occurred, and Mr. Wegis struck you; is that correct?**

A Yes.

**Q Was he wearing handcuffs at the time, to your knowledge?**

A No, he was not.

**Q You don't recall if you or someone else removed his handcuffs?**

A I don't recall.

**Q Okay.**



A Like I said, sometimes we would get another officer to help assist to bring them up, and I may have bent over taking Bailey's handcuffs off, when someone else took his handcuffs off.

**Q Now, the altercation that occurred between you and Mr. Wegis, as well as other JPO's, in what area did that altercation occur?**

A There at the holding cell.

**Q Did it occur inside the holding cell?**

A No, I opened the door and he came out of the holding cell, so it occurred in the hall in front of the holding cell and then back into the holding cell.

**Q That is still within JPO secure offices?**

A Yes.

**Q So not out in an area where the general public is able to access, without being let in?**

A Yes.

**Q Do you know what time the altercation occurred involving you and Mr. Wegis?**

A I believe it would have been some time just before court, which is usually held at 9:30, 10:00.

**Q According to Exhibit 12, in your statement, it appears -- it says here Jordan Wegis was sitting in the holding cell in our department and made a comment to another juvenile who is in the office. Do you see that there?**

A Yes.
**Q Who was that other juvenile?**
A Can I review this will really quick.
**Q Yes.**
A Thank you. Okay, I do remember the night before an off duty deputy had had his duty belt and weapon and everything stolen out of his vehicle, so investigators were up trying to find out where that might have happened.
And I told them that there was a juvenile that might possibly know about that. I got ahold of the juvenile and I believe his grandmother brought him down to the department. So investigators were questioning him in the back room. I think that Bailey and Jordan had overheard some of the conversations in the office, and when that juvenile came out, Bailey said something to him about being a snitch or don't tell them anything, or something like that.
**Q Do you recall the other JPO's that were in the office on the morning of June 17th, 2014?**
A I recall that Dominic Hastings Molyneux was right there, and Bruce Beacham was right there, Vicky Lamb was there, I don't recall if Tammy Morris was. I know that -- I believe that Jessica, our administrative assistant, was there. Scott Shick was not there.
**Q And it appears from your statement that Jordan Wegis began yelling while he was in the detention cell. Would that**



**be accurate?**
A Yes.
**Q And according to your statement it says: When I closed the door, Jordan became irate and began yelling at me that I had disrespected him.**
A Yes.
**Q You said: I opened the door and told him to sit down in the chair and to settle down. Do you see that?**
A Yes.
**Q Why did you open the door in order to communicate that information to him?**
A Because he was inside the holding cell and yelling, and the only way to communicate to the inside of that is like this little metal speaker thing, and they can never really hear you through it. So I opened the door and told him to sit down, and he complied. I said we're about to go see the judge, and you need to be on your best behavior, so he sat down.
**Q So there is some sort of speaker that would allow you to communicate theoretically with somebody in the room?**
A I believe there was. It's not necessarily a speaker, but a vent in the glass. And usually they can't hear you too well through it.
**Q All right.**
A It wasn't customary for us to communicate with the kids through that -- is what I'm saying.



**Q But that's -- that's there and you can communicate with a person on the other side of that door via this vent in some way?**
MR. GEDDES: Objection, asked and answered.
THE WITNESS: I believe it's there, best of my recollection, Kathy, it's there.
BY MS. PARKS:
**Q You opened the door and told him to sit down, settle down, and he did, correct?**
A Yes.
**Q Your statement says: I then closed the door again and walked over to the counter. Vicky Lamb approached me and asked what was going on, and I told her that Jordan was acting up in the holding cell.**
**It says: I then heard him getting irate again, and I went to the holding cell to tell him to sit back down again.**
A Yes.
**Q So he was acting up again, and you did what you had done previously, which is open the door to tell him to settle back down again, correct?**
A Yes.
**Q And it's when you opened that door, it says when I opened the door Jordan burst out of the holding cell, with his shirt off, and hit you?**
A Yes.



**Q All right. So this interaction or this altercation occurred before you were preparing to walk him into court, correct?**
A Correct.
**Q And then he became physically violent with you, correct?**
A Yes.
**Q And it appears that some of the other JPO's also got involved and it took a number of people to subdue him; would that be correct?**
A Yes.

(At this time Exhibit 13 was marked for identification.)

BY MS. PARKS:
**Q Showing you what's been marked as Exhibit Number 13 to your deposition, do you recognize Exhibit Number 13?**
A Yes, I do.
**Q What is Exhibit Number 13?**
A Just notes.
**Q More handwritten notes about your treatment; is that correct?**
A Yes.

(At this time Exhibit 14 was marked for identification.)

BY MS. PARKS:
Q Showing you what's been marked as Exhibit Number 14 to your deposition, Mr. Enos, this is a document produced by your attorneys as part of your disclosures in this case. Do you recognize Exhibit Number 14?
A Yes.
Q What do you recognize Exhibit Number 14 to be?
A Occupational Health Network progress report and disability certification.
Q This is a note, and if you look towards -- this says it's from Carson Valley Medical Center. Do you see that there?
A Yes.
Q It says date of service 6-23-14. Do you see that there?
A Yes.
Q This is after -- this is after the second incident involving Jordan Wegis, correct?
A Yes.
Q And you received treatment at Carson Valley Medical Center after the second incident?
A Yes.
Q If you look under -- towards the bottom of this, it says physician named Carol A. Coats. Do you recall treating with a Dr. Coats?



A Yes, I do.
Q And if you look under the comments section that's just a little bit above where it says physician name, it says: There are certain -- it says not to exceed weight limits. Do you see that there? In the middle it's kind of in a gray shaded area?
A Yes.
Q And it's -- under that area it says: Comments, very limited use of the right hand and wrist. He must avoid potential for combative situations. Do you see that?
A Yes.
Q Do you recall speaking with Dr. Coats about her recommendation that you avoid situations that would involve potential for combative situations?
A To the best of my recollection, yes.
Q Do you recall how long you treated with Dr. Coats?
A I had a lot of doctors' appointments, and I'm not exactly sure when or how long she was my doctor, so I don't recall.
Q Let me ask you this. Sir, are you currently being seen by any medical care provider for injuries related to either of your industrial injuries?
A No. I have an appointment set right now with Reno Orthopaedics for the -- I believe it's the first of next month, to be looked at for all of that stuff, to see how I'm



progressing.
Q All right. Let's talk about that.
You said next month?
A Yes, I believe it's on the first.
Q Of May?
A Yes.
Q All right. And who at Reno Orthopedic Clinic are you scheduled to see?
A Dr. Christensen.
Q Have you seen Dr. Christensen before?
A Yes.
Q Have you seen Dr. Christensen before in connection with your on-the-job injuries?
A Yes.
Q And do you recall what sort of doctor Dr. Christensen is?
A Orthopedic doctor, I believe.
Q And on -- for what medical conditions have you already seen Dr. Christensen?
A I believe it was for the right wrist or -- it may have been for the back, I'm not exactly sure what it was specifically. It may have even been for the left wrist.
Q But you have an appointment on calendar with him for follow-up, correct?
A Yes.



Q And currently as you sit here, what are the physical problems that you are having that you anticipate speaking with Dr. Christensen about?
A Continued pain in my right wrist, continued pain in my thoracic, cervical and lumbar spine. Some issues of stress. My left wrist, still having pain in my left wrist, and both shoulders. He's going to do kind of a comprehensive overview of all of it, from what I understand.
Q Are you being sent to Dr. Christensen as part of your Worker's Compensation claim or claims?
A Yes.
Q I understand from review of the medical records, at least generally, the issues associated with your right wrist. It is not as clear to me how and to what extent you injured your left wrist in either of these industrial injuries. Can you describe that for me?
A Well, they called it a TFCC -- something was torn inside of my wrist, and just with certain flexion of my wrist, I get pain that shoots up through my arm. And I still to this day get that same pain. Nothing was repaired in my left wrist.
At one point I was supposed to receive therapy for my left wrist, but I went in and they did therapy on my right wrist for 6 or 8 weeks, until I said why aren't we doing therapy on my left wrist. And they looked at it and went, oh, golly, we got the wrong wrist.

So they did therapy on my right, which was good. I needed that, but I never received any therapy for my left wrist.

**Q I'm trying to figure out a way in my head to ask this question without sounding confusing.**

**You have an appointment on calendar for May 1st. When is the last time you've seen any of your medical care providers for any injuries related to your industrial accidents or injuries?**

A I would say it's the last -- the last appointment I would have had with Dr. Jay Betz, when he evaluated me for my left shoulder, once it was accepted onto the claim. And he rated it at a certain percentage.

**Q Okay. Was that -- was that this year, would it have been 2019 or prior to this year?**

A Yeah, it would have been prior to this year.

**Q All right. And Dr. Betz evaluated you and gave you a rating for disability?**

A Yes.

**Q All right. Both shoulders, one shoulder?**

A At that time it was just the left shoulder, because both shoulders had been injured, but at a certain point they realized the left shoulder had not been named on the claim. So we asked the shoulder be named on the claim, but it was denied. So we had to fight for that. And then we finally got it added



to the claim. And that's when I would to go see Dr. Betz, to have that one evaluated. Prior to that when I met with Dr. Betz, he evaluated the other injuries.

**Q All right. In terms of your shoulder, your shoulder condition, what is your understanding of any injuries you sustained in your industrial incidents to your shoulders?**

A When my shoulders were injured, we didn't get any MRI's on them immediately, and that was something that I was concerned about. I was sent to therapy, and I went to therapy for both shoulders.

Eventually when I went back to Doctor -- I believe it was Dr. Coats, and I said, look, both of my shoulders still hurt. So she had MRI's ordered and we got the MRI's done.

And then Worker's Comp said, A, you are going to go see a doctor about these MRI's, but you are going to our doctor. And I said that's fine, I don't care, I just want to see a doctor about my shoulders.

And when I went and saw Dr. Morales, Dr. Morales looked at the MRI's. She came in to me and said, golly, John, you've been put through the ringer. She said both your shoulders they have tears in them, and they have this and that. Both shoulders need surgery.

In fact, your left shoulder needs surgery so bad we are going to schedule it right now for February 18th. And she set me up with an appointment to go to the Quail Surgery Center



for presurgery stuff, and I went there and filled out their packet and got examined and all that stuff, and was ready for surgery on February 18th for my left shoulder.

**Q Do you have a recollection of who was going to perform that surgery?**

A I believe it was Dr. Morales that was going to perform that surgery.

**Q Can you give me a description of what that surgical procedure was to be?**

A I can't, I don't even know what it was. She said you have tears in your shoulders.

MR. GEDDES: Can we get clarification on year.

MS. PARKS: 2015. Correct?

MR. GEDDES: You said February 18. I don't think he said a year.

THE WITNESS: I don't recall what year this was, because they put the shoulder off -- no, I'm sorry, it was, it was 2015 -- February 18th of 2015 is when it was scheduled. And I believe I went to the surgery center in January or the first of February.

MS. PARKS: Okay.

BY MS. PARKS:

**Q So, Dr. Morales advised you, at least before February 18th of 2015, that she believed you needed surgery to both your shoulders, correct?**



A Yes.

**Q As we sit here today, have you had any surgical procedures performed on your shoulders?**

A No, I have not.

**Q As we sit here today, do you continue to have pain and problems in both of your shoulders?**

A Yes, I do.

**Q Other than the medical care providers that you have seen in connection with your Worker's Compensation claims, have you sought medical treatment or care from any of your own doctors for conditions -- for pain in your shoulders?**

A No, I haven't.

**Q I guess that was a little bit of a clumsy way to say. The injuries that you sustained in connection with your 2 industrial accidents, all of your medical treatment for those conditions has been under the auspices of your Worker's Compensation claim; would that be accurate?**

A Yes.

**Q In terms of the present condition of your left shoulder -- both of your shoulders, how do your shoulder issues impact your activities of daily living?**

A Just lifting things, sleeping, I wake up in the middle of the night with numb arms. If I sit down and put my arms up on the back of a couch to relax, after a certain amount of time I can't lift my shoulders -- I can't lift my arms off the

couch. I have to pull them sideways, and let them fall down, recover, and then I can use my arms again. Things like that.

**Q When you say lifting things and your shoulders impacting your ability to do that, can you elaborate on that at all?**

A If I reach out to get a cup of coffee, if I reach straight out and lift, it hurts.

**Q How about -- I want to talk a little bit about your hobbies. Tell me about your hobbies currently?**

A I do everything outdoors. I like to fish, I like to hunt, I like to hike. I spend a lot of time with my family, traveling around with my wife. Going to movies is one of my favorite things to do. Spending time with friends.

**Q Let's talk about your outdoor hobbies, fishing, hunting, hiking?**

A Okay.

**Q Have your outdoor hobbies been implicated by injuries that you sustained in your on-the-job industrial incidents?**

A I don't understand the question, I'm sorry.

**Q Are there things that you did in terms of outdoor recreation, prior to June of 2013 and your first industrial incident or injury, that you are not able to do anymore?**

A Not necessarily.

**Q When is the last time that you -- when you talk about one of your hobbies being fishing?**



A M-hm (affirmative).

**Q When is the last time you went fishing?**

A Oh, first of January probably. I go down -- I went down and sat on the shore at Topaz Lake and cast a line out, and I didn't even get a bite.

MR. GEDDES: I'm sorry, what year?

THE WITNESS: This year, 2019.

BY MS. PARKS:

**Q When you talk about hunting, what sort of hunting do you enjoy?**

A Any kind of hunting, deer hunting, elk hunting. I kind of hunt anything, and always have, since I was about 8 years old.

**Q What sort of hunting do you do? Do you use a rifle, do you use a bow, tell me about that?**

A I use a rifle. I use a bow. I just a muzzle loader, a black powder rifle, at times. There's different types of tags you can put in for. I usually try to put in for whatever I can get. Whatever I get, this is how I hunt.

**Q This is not a particular subject matter about which I am very knowledgeable. Tell me about how you go about putting in tags for hunting?**

A Actually, the application is open right now. So they open it up for a certain amount of time, month and a half or something like that. They have different zones in the state



you can put in for, and whatever you are eligible to put in for, you can put in for.

So if you drew an antelope tag the year before, you have to wait 3 years before you can draw another one or before you can apply for it.

You can put in for whatever animals you are eligible for, and then they have a deadline, April 29th, and once that deadline passes, some time in June they put out a -- they used to put out a page where you could see what everybody drew.

Now they send you a notification to tell you if you either drew a tag or did not draw a tag.

**Q Do you have to pay, regardless of whether you get a tag? So you have to sort of apply and you get a tag, if you get it?**

A It's a nominal fee at first, you have to pay the application fees, basically the administrative fees. And if you draw a particular tag, then you pay the fee for that tag and they just take it out of your account at that point.

**Q Understood. Deer, elk, antelope, hooved animals, is that all -- is there one hunting season from a particular month to a particular month that hunting season is open for those sorts of animals?**

A No, there are various seasons.

**Q What is the -- what's deer season?**

A Well, deer season can go anywhere from August all the



way through January, depending on what method of take you are using or what season that is. Sometimes there's rifle season but there's an early season, a mid season, a late season.

**Q How about elk season?**

A The same.

**Q Okay, same. Approximately August through January though. There are periods of the year where you can not go hunt these animals?**

A Absolutely.

**Q Did you do any hunting during the 2018 -- end of 2018, beginning of 2019 season, for deer or elk or antelope?**

A 2018 season?

**Q Well, if it goes from August to January, then I guess the last hunting season for those sorts of animals would have been August of 2018 through January of this year?**

A Yes.

**Q Did you hunt during that season?**

A Yes.

**Q What did you hunt for?**

A I hunted for an antelope and I hunted for a deer. I believe those are the 2 tags I had.

**Q Did you get any?**

A Yes, I got an antelope, I did not get a deer.

**Q So, that was 2018. How about in 2017?**

A Actually, I don't recall right off the top of my head.

Q If you got a tag or if you hunted that season, you don't recall?
A Right.
Q Same question for 2016?
A I don't recall. It would be in the records or I -- if I looked back, I could see, but right this minute I don't recall.
Q What kind of records?
A The Nevada Division of Wildlife records or my e-mails from Nevada Division of Wildlife records or my e-mails, they e-mail you and let you know those things.
Q Your first on-the-job injury that occurred at the Wild Life Camp occurred on June 21st, of 2013.
Do you recall if you hunted during the 2013 hunting season?
A I don't recall right off the top of my head, no.
Q The second industrial incident involving Mr. Wegis occurred June 17th of 2014.
Do you recall if you hunted during the hunting season following that incident?
A I don't recall exactly what tags I had at that time but I -- I believe that I hunted during those years, but I don't recall which tags I had.
Q Are you going to -- have you applied for are you going to put in a tag before the end of April for this coming season?



A I haven't applied this year.
Q Do you intend to?
A I would like to, but I don't know that I'll be able to monetarily.

(At this time Exhibit 15 was marked for identification.)

BY MS. PARKS:
Q Showing you what's been marked as Exhibit Number 15 to your deposition, sir, do you recognize Exhibit Number 15?
A No, I do not.
Q If you look at the top it says: Juvenile Probation Officer. Do you see that there?
A Yes, I do.
Q Does this appear to be similar to documents that you've seen before that are job descriptions?
A Yes.
Q If you look there it says: Revision date July 1, 2015. Do you see that there?
A Yes.
Q Under --
A Yes.
Q As of July 1, 2015, you were not working for Douglas County; is that correct?
A Correct.



Q If you could look at page one of this document, it says: Essential functions. Do you see that there?
A Yes, I do.
Q Under the second bullet point under essential functions it says: Assist with investigations of alleged probation violations, investigates referrals with District Attorney's Office, and arrests probation violators.
Do you see that there?
A Yes, I do.
Q During your time as a probation officer for the Ninth Judicial District Court, did you have occasion to arrest probation violators?
A Yes, I did.
Q If you look at page 3, excuse me, page 4, bottom of page 3, top of page 4 defines the physical demands and working environment. Do you see that?
A Yes, I do.
Q The second paragraph on page 4 describes some physical requirements. In the first line there it says: Traverse difficult terrain, strength and stamina to physically restrain subjects.
Do you see that there?
A Yes, I do.
Q During the time you worked as a probation officer for the Ninth Judicial District Court, did your job description



include that you would need to physically restrain suspects?
A I believe it did. That's something that we did. I don't know that it was actually written into the job description or not.
Q I'm not trying to be coy about it. I'll show it to you in a moment.
A Okay.
Q If you look at line 4, it says: Vision to read printed materials and a computer screen -- excuse me, above that line, it says: Occasionally lift and carry up to 50 pounds, strength to subdue persons, to drag, carry and lift persons and objects.
Do you see that there?
A Yes, I do.
Q As part of the physical requirements of this position.
You applied for a position as a juvenile probation officer in 2017; is that correct, sir?
A Yes, I did.
Q When you applied for the juvenile probation position with Douglas County in 2017, did you do so online?
A Yes, I did.
Q So, you fill out an application online and you are not -- you don't have to send anything in in hard copy or anything, you just do it online?
A Yes, I don't recall if -- yeah, exactly, I don't

recall if I had any attachments to it, resume or anything like that, but yes, you just do it online.

Q At the time that you filled out your application for a JPO position in 2017, did you review any information or did you review the job description that was associated with that position?

A Yes, I believe it was why I applied, because I had seen that it was available, so I believe I would have reviewed all of that.

Q All right. So -- the position that you applied for, that was a juvenile probation officer, correct?

A Yes.

(At this time Exhibit 16 was marked for identification.)

BY MS. PARKS:

Q In looking at Exhibit Number 16, if you could look at that for a moment, you can tell me when you are ready to discuss Exhibit Number 16.

A Okay, yes.

Q Is this the application that you filled out online for the JPO position?

A Yes.

Q If you look at the top right of Exhibit Number 16, it says received, and there's a date there, it says January 6th,



2017. Do you see that?

A Yes.

Q This particular application, is this the first application you filled out online for employment with Douglas County, between the time of your separation from employment and this date?

A Yes.

Q And Exhibit Number 16, is this the only application that you ever filled out for a position with Douglas County after February of 2015?

A Well, it's the only application I ever filled out, although when I met with Ed Howden, Ed Howden put a request in to the County that they hire me back if they had any positions available, and they said that they did not. It wasn't necessarily an application at that point, but we did ask Douglas County to hire -- or bring me back.

Q The answer to my question of whether or not this is the only application that you filled out for employment with Douglas County after February of 2015, the answer to that question is yes, correct?

A Yes.

(At this time Exhibit 17 was marked for identification.)



BY MS. PARKS:

Q Before turning to Exhibit Number 17, looking back at your application of employment for the JPO position, did you -- did you review the salary -- what was it being offered as salary for that position at the time that you filled out this application?

A I believe I would have reviewed all of the information, yes.

Q If you look under preferences on page one of -- excuse me, of Exhibit 16, do you see that there?

A Yes.

Q Before that, looking at the e-mail address, do you see the e-mail address there. It says huntbux B-U-X 22 at G mail dot com; is that your e-mail?

A Yes, it is.

Q It says preferred salary there, and you will see it says $63,564.80 per year?

A Yes.

Q And 30 dollars and 56 cents per hour, do you see that there?

A Yes.

Q Is that information that you entered into your application?

A Yes.



Q At the time that you filled out this application for employment with Douglas County in January of 2017, you were aware, were you not, that this position had certain physical requirements that an applicant be able to perform?

A Yes.

Q Did you review those requirements at the time you filled out this application?

A I believe I reviewed all of the requirements.

Q If you look at the second to last page of Exhibit Number 16, under section 6 there, it says the position requires candidates to periodically climb, hike, Kayak, swim, mountain bike, backpacking, balance and stoop, kneel crouch or crawl and must frequently lift and or carry up to 50 pounds.

Are you able to meet this requirement, it says with, I think it should say with or without, accommodations. And your response to that was yes, correct?

A Yes.

Q And you were being honest and truthful when you provided that information with your application?

A Yes.

Q And other than your application for a JPO position, Mr. Enos, did you ever apply for any other type of jobs with Douglas County?

A No.

Q Did you ever go online -- are you familiar with

Douglas County web page, website?
A Somewhat.
Q Have you been on it?
A Yes.
Q Have you ever gone onto Douglas County's website and looked at job openings and availability?
A Yes.
Q And when is the last time you did that?
A I don't recall.
Q And did you ever look at or pull any information about other jobs in Douglas County, besides the JPO position, that you might want to apply for?
A I saw the other jobs on there but didn't apply for them.
Q Okay. There were no such jobs that interested you or tell me if there was a reason that you didn't apply for any other kind of job?
A Because I was a juvenile probation officer for 17 years, that's what I did. When I saw that this position came open, even though they turned me down once before, I thought maybe I can get my job back, so I applied for it. And that is why I applied for that position.
Q At the times you were on Douglas County's website and looking at other jobs, other jobs that were available, did you read further about any that you thought you might be qualified



for?
A I saw which jobs were available, but I don't recall which jobs they were and I don't recall if I looked any further at them.
Q Please look at Exhibit Number 17 to your deposition. Have you ever seen Exhibit Number 17?
A Yes, I have.
Q What do you recognize Exhibit Number 17 to be?
A This document was generated after I had met with Ed Howden, and Ed Howden put a request in to the County for any other positions, any position with juvenile probation or any other position with the County that I could perform, and we received this back from Kathy Jo Kidd, with the section marked X that says: No, I do not have an appropriate job to offer within the stated limitations.
I understand that since no job is being offered, I do not have to return the enclosed job offer letter. I also understand that full vocational rehabilitation services may be offered to the injured employee. And it was signed by Kathy Jo Kidd on May 2nd, 2016.
Q So a few moments ago in your testimony when you said you had been denied employment before with Douglas County, you referenced Mr. Howden?
A Yes.
Q Is this what you are referring to?



A Yes.
Q All right. So on or about May 2nd, 2016, Miss Kidd signed Exhibit Number 17, and at that point in time you were already working with Ed Howden; is that correct?
A I had just met with him, yes.
Q All right. And in terms of this intent to offer employment, you just read it out loud. It says: I also understand that full vocational rehabilitation services may be offered to the injured employee.
So you see that there?
A Yes, I do.
Q This intent to offer employment advises the employer that if they do not have an appropriate job, within stated limitations, then the employee may be eligible for full vocational rehabilitation services, correct?
A Correct.
MR. GEDDES: Objection, it misstates what it says. It says may be eligible, it says may be offered.
BY MS. PARKS:
Q Okay. You were offered full vocational rehabilitation services; is that correct, sir?
A No.
Q You have received full vocational rehabilitation services, since your separation from employment with Douglas County, correct?



A No.
MR. GEDDES: Objection, vague and ambiguous to the phrase full vocational rehabilitation services.
BY MS. PARKS:
Q Sir, do you have currently an attorney who is assisting you in an open or ongoing Worker's Compensation case?
A Yes, I do.
Q Who is your attorney?
A Jim McCarty with Beckett, Yott, McCarty & Spann.
Q Does that case currently involve whether or not and to what extent you are entitled to additional vocational rehabilitation services?
A Yes, it does.
Q Okay. Currently tell me what it is you are currently seeking with respect to vocational rehabilitation services?
A Well, originally when I met with Ed Howden, he assured me I would get vocational rehabilitation services, and I would get retrained to be something other than a juvenile probation officer.
And shortly after I -- we got a letter that stated that I had marketable skills, because of my college degrees, and that I was not entitled to any vocational rehabilitation program whatsoever. That all I was entitled to was 30 days of job search.
So my attorney put in a request for vocational

rehabilitation, and the court found that because of my disability over -- being over 12 percent, that I was entitled to 18 months of vocational rehabilitation.

And that was for one of the Worker's Comp claims that we had put in. So I was -- we had to fight for it, like I said, Ed Howden wasn't happy that we had involved him in litigation, because he believed I had marketable skills.

But the college degrees, per the NRS, are no good after 7 years after you've earned them. And I had earned them 26 or 28 years prior to that.

So without the skills of juvenile probation and without the college, I basically had zero marketable skills, so we asked for vocational rehabilitation, and we were denied by ASC. So we had to appeal that, and we've appealed it over and over.

But at that point we were awarded 18 months of vocational rehabilitation. Ed Howden wasn't happy about that. We had a 60 day period where Ed Howden was supposed to work with me to set up a program, and he failed to do so. He was to put together a resume for me. The resume came out very short, very insufficient.

With 3 days remaining of the 60 day program to set up vocational rehabilitation, I had to go out and put together my own program. So I went to Western Nevada College, I met with one of the counselors there, and I said, hey, I need training,



I need some kind of training. And she said what would you like to do.

And we looked into graphic arts, we looked into other things, and she said we have a certificate program in criminal justice. So I put together a program to do the certificate program in criminal justice. I proposed that to Ed Howden. He proposed it to ASC, and it was accepted.

So I began that program in January of 2017. And I had a full load of classes from January 17th to the December 2017 --

**Q January what?**

A I think it started January 23rd, or something like that. I'm not exactly sure on the date it began, but it was 2017. I did classes for the spring semester, the summer semester and the fall semester. And in the end of the fall semester, coming towards the end of the certificate program, I registered for, I believe, 4 more classes between WNC and also TMCC.

I did one class at TMCC or 2 classes, and I registered for those classes, and I proposed those to Ed Howden, and Ed Howden denied it. And he said, no, you only get the certificate program, you only get the 11 and a half months, we're not training you any further. So it was denied. I had to drop the classes and pay fees on my own that -- for late fees anyway.



And once that was dropped, my attorney requested more vocational rehabilitation, even the expert report showed that was insufficient vocational rehabilitation to train me for a new job. So we are -- as of this day -- still in appeals. We have an appeal hearing this next month regarding the vocational rehabilitation. We're not -- we're not even done with that at this point. We're not even done with that.

We're asking for the remainder of the 18 months that was in the original, and my attorney also said, John, you never got voc rehab for the second -- or the first -- one of the 2 claims. So we're asking for an additional 18 months of vocational rehabilitation.

MS. PARKS: What was my question. Can you read that back, please?

(The question was read by the reporter.)

(At this time Exhibit 18 was marked for identification.)

BY MS. PARKS:

**Q Sir, are you planning to apply to law school?**

A Am I planning to?

**Q Yeah.**

A No.

**Q Okay. All right. Are you currently in school?**

A No, I am not.



**Q All right. Look at Exhibit Number 18, please. Did you ever voice to Ed Howden or anyone else that you thought it would be appropriate for part of your voc rehab program to include having ASC or the County send you to law school?**

A I asked them about it. He asked me -- he said what are you interested in. What would you like to do. And I said how about law school, Ed, why don't I go to law school.

His response to that was the process to get into law school is a long process. He said during that time ASC is going to cut you off of your disability benefits, you will be receiving nothing. If you want to do that, that's fine, you can do that. And I said fine, let's not do that then. He said what else would you like to do, and we began to explore other avenues.

**Q Take a look at Exhibit Number 18, and tell me if you recognize it?**

A I do.

**Q What is Exhibit 18?**

A It is Ed Howden's school program agreement that he wrote up and had me sign.

**Q Well, this relates to classes that you were going to take, if you look at paragraph one, says to train you in skills that will be required for employment in the criminal justice certificate of achievement program. Do you see that there?**

A Yes, I do.

Q Look at page 2 of Exhibit number 18. And you signed this, correct?
A (Pause).
Q You signed Exhibit Number 18?
A I don't see a signature on page --
MR. GEDDES: Second page.
THE WITNESS: Yes, I signed that.
BY MS. PARKS:
Q On what date did you sign this?
A On November 19th of 2016.
Q And it says your training will begin on an January 23rd, 2017, and run through December 20th, 2017. Do you see that there? That's on page one, paragraph 3.
A I do see that, yes.
Q All right. Did you go to Western Nevada Community College and obtain a criminal justice certificate?
A I took the classes for the certificate. I haven't received the certificate.

(At this time Exhibit 19 was marked for identification.)

BY MS. PARKS:
Q Before turning to Exhibit Number 19, I want to talk to you about the course work and the schooling you did. For



this -- in connection with your vocational rehabilitation program to obtain a certificate in criminal justice.
Did you start school around January 23rd of 2017?
A Yes.
Q Did you take those classes in person or was it online, tell me about your classes?
A Online.
Q All online?
A Yes.
Q And starting in January of 2017, how many courses were you taking?
A Four.
Q And how many days per week were you in class?
A Monday through Thursday, but I was working on school work 8 to 10 hours a day.
Q So you had classes Monday through Thursday?
A Correct, and then for each one of those classes you would have to post a discussion, and then on 3 different days and 3 different discussions, you would have to go on and post responses. So I was constantly working on classes.
Q On school work?
A Yes.
Q Would that be true from really the beginning of your course work through the end, was that --
A With the exception of the summer. In the summer I had



one class and I worked on that extensively.
Q What was the summer period of time? I mean, I'm trying to get an idea of you started in January and you took classes for how much months, and then -- I need -- I'm trying to get an idea of your schedule?
A I believe the fall semester started in late August, and the spring semester would have -- sometime near the end of May, so summer would have been June, July, first part of August.
Q All right.
A And then August through December 17th, 2017.
Q So in total how many weeks of schooling did you attend or have you attended so far?
A I would have to look at the schedule, Kathy, I know it was everything, other than the breaks, between the fall and the summer -- between the spring and the summer, and then the summer and the fall.
Q My question wasn't very good. You talked about 18 -- did you talk about 18 weeks of courses that were going to initially be associated with your vocational rehabilitation program?
A 18 months.
Q See, I was completely doing that wrong.
How many months of schooling have you attended to date?



A 11 and a half.
Q All right. So the current issues associated with your appeal in the Worker's Compensation case, if you've attended 11 and a half months, what is still -- what is still at issue, the additional months up to 18 months?
A Yes.
Q Okay.
A And 18 months on the other claim.
Q So you are looking to have an additional 18 months of schooling under the other claim?
A Correct.
Q Okay.
A Correct, and in the expert's report he even put in there it would take up to 3 years of vocational rehabilitation to get me back to where I could find a job comparable to what I had.
Q You have a Master's Degree, correct?
A Correct.
Q Why don't you have your criminal justice certificate yet?
A It was an issue of money. I tried to apply for it and they said that ASC would not pay the fees for the diploma.
Q So that's what you don't have a copy of, your diploma?
A Pretty much.
Q How much is your diploma?

A 25 bucks, I believe.
Q At least look at Exhibit 19, do you recognize Exhibit Number 19?
A I do not.
Q You've never seen Exhibit 19 before?
A Not that I recall.
Q It starts off: Dear John, congratulations with obtaining a degree or certificate of achievement at Western Nevada College. Do you see that there?
A I do.
Q Your degree and or certificate of achievement has been posted to your transcript. You may obtain an unofficial copy of your transcript, it says there, by logging on to your account. Do you see that there?
A I do.
Q You've done the work, and as far as Western Nevada College is concerned, you've obtained your certificate of achievement in criminal justice, correct?
A Correct. And I didn't just do the work, I did like 96 percent above, I put my heart and soul into the project.
Q I'm not quibbling with your grades, Mr. Enos, I'm trying to find out about your obtaining the certificate?
A Thank you.
Q When did you obtain your certificate of achievement?
A I still don't have the certificate of achievement in



hand, I finished my classes for the certificate.
Q Right.
A In December of 2017.
Q You are aware you have been awarded your certificate of achievement in criminal justice. Notwithstanding the 25 dollars that's not been spent to get a copy of your diploma?
A Right. Now that I see this letter, I am. I had never seen this letter. All I got from Western Nevada College is that you still owe fees.
Q This document was produced by your attorneys, it's Bates stamped PLF 03210.
A Okay.
Q What jobs have you applied for since December of 2017 to the present, now that you will have completed your course work and obtained your certificate of achievement in criminal justice?
A I applied for the juvenile probation job and got turned down for that. I applied for a couple of jobs recently. One was for a security officer, it was part-time. And they sent me a thing back saying that I wasn't selected for the position.
Q Sir, you applied for the juvenile probation officer position in January of 2017, correct?
A Correct.
Q You obtained or completed your course work to be -- to



obtain your certificate of achievement in December of 2017?
A M-hm (affirmative).
Q Correct?
A Yes.
Q What I want to know is what jobs you applied for following the time that you completed this course work and were eligible for your certificate in criminal justice?
A Two jobs that I've applied for. One was a part-time security officer, and the other job I can't even remember what it was. It was just recently. If I could recall -- if I could look at my records, I could tell you what it was. I got turned down for that one also.
Q I'm going to show these to you. We'll see if it helps. I just received these last night as part of a supplemental production of documents by your attorneys. Bates Stamp number PLF03474 is the first Bates number there. And they're documents that are from -- they're e-mails and it's from Indeed.
A Yes.
Q Is that familiar to you?
A Yes, it is.
Q What is indeed dot com?
A A job search company.
Q All right. And the documents that I received last night from -- and that relate to indeed dot com, for example,



PLF 03473 says one new criminal justice job in Wellington, Nevada.
Do you know what job that is referring to on indeed?
A I believe it was referring to a preschool teacher.
Q All right.
A Best I can recall.
Q And it -- this e-mail is dated March 11th, 2019, so that would be last month?
A Yes.
Q So did you apply for that particular job?
A No.
Q And then there's an e-mail dated March 15th, 2019, it says one new criminal justice job in Gardnerville, and -- did you apply for that job?
A I don't know what job you are talking about.
Q Well, it's on -- it says indeed dot com.
A A preschool teacher.
Q Did you apply for that job?
A No, I'm not a preschool teacher, I'm sorry.
Q You were a substitute teacher for a number of years, were you not?
A Yes, I was.
Q You have teaching experience, correct?
A Correct.
Q Is the name Frasco F-R-A-S-C-O, Inc. -- is that -- are

you familiar with that?
A Can I review the document to see what it is?
Q I'm referring to PLF 03476. Yes, I'll show this to you. I don't have additional copies of this at the moment. It's an e-mail it says recruiting at talent dot Paylocity dot com. Talks about surveillance investigator part-time?
A M-hm (affirmative).
Q So are you familiar with whatever job is referred to there?
A Yes, I believe this was the part-time that I said was a security investigator, but it's a surveillance investigator.
Q And that e-mail is dated March something -- March of 2019, is it not?
A Yes.
Q Did you apply for that particular job in March of 2019, so last month?
A Yes, I did.
Q So between the time that you submitted your application to work as a JPO with Douglas County in January of 2017, and the time that you applied for this part-time surveillance position in March of 2019, what other jobs did you apply for?
A Well, I believe in there there is another application, this was application number two, so application number one would have been between those 2.



Q Okay. What other position did you apply for?
A I would have to look at that to see what it was.
Q I'm going to give you these and you can look at them. These are documents that were produced to me last night by your lawyer, if that helps illuminate.
A Thank you. Yes. And this is the letter that turned me down for the job as a surveillance officer. I would have thought there would have been another application number one, but I don't see it here.
Q All right. Let me ask -- let me ask it this way.
We have already talked about the application you filled out online for the JPO position in January of 2017?
A Yes.
Q The documents that I received last night and that we've talked about with respect to new applications for employment?
A Yes.
Q They appear to involve e-mails that are dated March 2019, so last month.
Between that January online application that you submitted and last month, have you applied for any other jobs?
A No.
Q Are you signed up for any courses currently --
A No.
Q -- with respect to this dispute over your vocational



rehabilitation benefits?
A No, I'm not, because last time I signed up for any classes in my efforts to get them approved, they put it off to the point where I had to end up paying fees for dropping the classes late, so I don't want to get in that situation again. So I have not scheduled any further classes.
Q If they -- they being ASC or whoever would ultimately make a decision, such as a hearing officer, if your request for additional vocational rehabilitation benefits are approved, what course work is it that you desire to take?
A I think at that point I would be paired up with a different vocational rehabilitation counselor. I would hope so anyway. And I would work that out with him, and try to figure out what we could do next.
Q What's your goal, what's your hope?
A My goal is to be restored and work, and find a job comparable to what I had as a Juvenile probation officer for 17 years.
Q My question is what specific course work do you envision taking or do you hope to take? We talked about -- you've done 11 and a half months at Western Nevada, correct?
A Yes.
Q You are seeking up to 18 months on one claim and an additional 18 months on another?
A Yes.



Q On the other claim; is that correct?
A Yes.
Q And what you are seeking is that -- what you are going to seek to do is to do more course work, to do more retraining of the type that you've already done?
A I don't know if it would be the type that I've already done or a new type. I don't know exactly what is available to me. I don't believe that Ed Howden provided me with what was actually available to me, so I would be excited to meet with a new vocational rehabilitation officer, and find out -- I mean, counselor, and find out what was available to me to move on with my life.
Q Do you want to go back to school?
A I will go to any kind of training I can to get back to a comparable job from what I had.
Q Have you gone online and looked at any of the courses that are coming up at Western Nevada College?
A No.
Q Have you gone online to UNR or TMCC about any course work?
A No, I have not.
MS. PARKS: I will need to make copies of this. Excuse me for a minute.

(At this time Exhibit 20 was marked for identification.)

BY MS. PARKS:
Q Showing you what's been marked as Exhibit Number 20 to your deposition. Do you recognize what's been marked as Exhibit Number 20?
A Yes, I do.
Q What do you recognize Exhibit Number 20 to be?
A Job description.
Q It's a job description for what?
A Job title, juvenile probation officer senior.
Q You were a juvenile probation officer senior at the time of your separation from employment with Douglas County in February of 2015, correct?
A Yes.
Q Under essential functions if you look on page one of Exhibit number 20, number 4 says: Arrest, detain and transport probationers.
Do you see that there?
A Yes, I do.
Q Part of your essential functions of your job as a juvenile probation officer senior included arrests of detainees -- or probationers, excuse me?
A Yes.
Q If you would please turn to page 3 of Exhibit number 20. Under working environment, do you see that there?



A Yes.
Q Under working environment, about 3 lines from the bottom, says: Requires physical ability to subdue argumentative individuals.
Do you see that there 3 lines up under working environment?
A Oh, up, I'm sorry. Yes.
Q And would you agree with me that being able to subdue argumentative individuals was part of the job functions of a juvenile probation officer senior?
A Yes.
Q And in fact you were injured in June of 2014 by an argumentative probationer, correct?
A Yes.
Q Mr. Wegis?
A Correct.

(At this time Exhibit 21 was marked for identification.)

BY MS. PARKS:
Q Showing you what's been marked as Exhibit 21 to your deposition. Do you recognize Exhibit 21?
A No.
Q Have you ever seen the job description for Chief Deputy, Juvenile Probation Officer?



A No.
Q During the time that you worked for the juvenile probation office, did a position ever become available for Chief Deputy Juvenile Probation Officer?
A Yes.
Q Do you recall how many times such a position became or opened up during your tenure at JPO?
A Just one time.
Q When was that?
A Roughly around 2003.
Q Okay. And who held the position of Chief Deputy Juvenile Probation Officer that was -- at that time?
A Mike Doyle.
Q Mike. Okay. Did you apply for the position of Chief Deputy Juvenile Probation Officer at that time?
A No, I did not.
Q Later on Vicky Sauer-Lamb, she became Chief Deputy Juvenile Probation Officer; is that correct?
A Correct.
Q Do you know when Vicky saw alarm became Chief Deputy Juvenile Probation Officer roughly?
A She was the next one, so I believe 2003.
Q She was next after Doyle?
A Yes.
Q At some point after you worked a JPO did you become



aware Vicky Sauer-Lamb intended to retire?
A Yes.
Q Do you recall when you became aware of the fact that Vicky Sauer-Lamb intended to retire?
A Probably 2 years prior to her retirement, probably even longer.
Q It was general knowledge in the department that Vicky was going to retire from that position, correct?
A Yes.
Q While you were still employed with Douglas County was the job of Chief Deputy Juvenile Probation Officer opened up for applications?
A No.
Q Do you know when -- do you know when Vicky retired?
A July of 2015.
Q Do you have any idea when applications for Chief Deputy Juvenile Probation Officer were -- I don't know how to phrase that, really I'm not doing a very good job on that question.
It was common knowledge Vicky was going to retire for at least 2 years prior to her retirement, correct?
A Correct. At one point she had a party to celebrate the one year anniversary, and I took the tailgate off my pickup truck and brought it up for her party. She wanted to have a tailgate party for her one year almost retired.

Q And Douglas County advertised that the Chief Deputy Juvenile Probation Officer position was going to be open, correct?
A Not that I recall.
Q So after you left Douglas County, you never went on line and applied for the Chief Deputy Juvenile Probation Officer position?
A No.
Q Would you please look at Exhibit 21, please. Page 1 essential functions, 3 bullet points from the bottom, says: Conducts investigations of alleged probation violator, arrests or causes arrests of violators.
Do you see that there?
A Yes, I do.
Q So at least according to this job description, the chief deputy might also be involved in arrests. Do you see that there?
A I do. I also see this was revised in July 1st of 2015. I'm sure that the prior one probably said that, but I don't know.
Q Right. If you look at page 3 of Exhibit Number 21, physical demands and working environment. Do you see that there?
A Yes, I do.
Q Under the second paragraph, it says: Mobility to work



in a typical office setting, use standard office equipment. Stamina to sit for extended periods of time. Do you see that?
A Yes.
Q Presently do you have the stamina to sit for extended periods of time?
A Yes, I do.
MR. GEDDES: Vague and ambiguous as to phrase extended periods of time.
MS. PARKS: Go ahead, you can answer.
THE WITNESS: Yes, I can sit for a period of time.
BY MS. PARKS:
Q For how long can you sit for a period of time before you need to get up and move around?
A I'm not exactly sure.
Q The next paragraph says that the chief deputy physical demands working environment include stamina to physically restrain suspects.
Do you see that there?
A I'm sorry, where is that, Kathy?
Q Paragraph 3 under physical demands?
A Yes, I did.
Q It says: Traverse difficult terrain. And it says: Stamina to physically restrain suspects. And 2 sentences down it says: Occasionally lift and carry up to 50 pounds, strength to subdue persons.



Do you see that there?
A I do.
Q Those physical demands are similar to what we talked about previously, that are applicable to the JPO position, correct?
A Correct.
MS. PARKS: Counsel, let's break for lunch. It's almost 12. And come back at one.
I do want to ask Mr. Enos a few questions about Exhibit 2. I didn't want to belabor that while he was reading it.
(At this time a lunch break was taken.)
EXAMINATION RESUMED
BY MS. PARKS:
Q Mr. Enos, after February of 2015, did you do any research on whether there were open JPO positions with any other counties?
A No.
Q How about with the State of Nevada?
A No.
Q Did you do any research to determine whether or not there were any open positions substitute teaching or otherwise at any School District?
A Not specifically. No.
Q You say not specifically, generally, did you --



A Generally looked for positions that were open, but not in those specific areas, just looked to see if there was any open work.
Q In a School District?
A No. I did job searches with Ed Howden, made contacts through that.
Q Okay. So, you did job searches with Ed Howden and then you also applied for the jobs we already discussed this morning?
A Yes.
Q After February of 2015 and your separation from employment, did you send any written communications or correspondence to either of the Judges of the Ninth Judicial District Court?
A No, I did not.
Q Did you attempt to call either of the Judges on the Ninth Judicial District Court?
A No, I did not.
Q After your separation of employment with Douglas County, did you send any written correspondence to Douglas County or the Ninth Judicial District Court requesting a hearing under Ninth Judicial District Court personnel regulations?
A No, I did not. I didn't know that was an option for me.

Q Had you at any time during your tenure as a JPO reviewed the Ninth Judicial District Court personnel regulations?
A I knew there were regulations, but I don't think really any of us knew everything in the regulations. I had seen them, but didn't take them to memory.
Q Did you have a chance to review Exhibit Number 2 during our break?
A I did.
Q Can you identify what Exhibit Number 8 -- excuse me Exhibit Number 2 is?
A Yes, it's a packet of documentation that I created for dates and times.
MR. GEDDES: Can I just have that copy and you can use -- the marked copy.
BY MS. PARKS:
Q Page one of Exhibit number 2 is dated November 9th, 2011. Do you see that there?
A Yes, I do.
Q Is that date commensurate with when you prepared at least the notes on page one of Exhibit Number 2?
A Yes.
Q Okay. There's discussion on page one of Exhibit Number 2, about a wilderness trip and some issues with a wilderness trip. And it appears that there was a discussion



about how time would be compensated for that wilderness trip; is that accurate?
A Yes.
Q And there's a further discussion of whether or not comp time and or flex time would be used to compensate a JPO, who was working on this wilderness trip, correct?
A Correct.
Q Were there budget issues in November of 2011 that were associated with this issue of the use of comp time or flex time versus overtime for this wilderness trip?
A I don't recall. I didn't do the budget in probation.
Q If you turn to page 3 of Exhibit Number 2, Bates stamped plaintiffs 00722 at the bottom, and if you look at the bottom of page 3, there's an e-mail that says from John Enos to Dominic.
Do you see that there?
A Yes.
Q It says: In the interest of the department and budget constraints. Do you see that there?
A Yes, I do.
Q Does that in any way refresh your recollection as to whether there were budget restraints --
A Yes --
Q Let me finish my question. That there were budget restraints in November of 2011 that were associated with this



wilderness trip?
A Yes, it does. Did that must have been mentioned to me and that's why I wrote it back to Dominic.
Q If you turn to page 5 of Exhibit Number 2, it says Plaintiff 00724 at the bottom, 6 sentences up from the bottom on the left it says -- and it's just an acronym. It says: The BADA B-A-D-A grant. Do you know what that is? It's about 6 sentences up from the bottom?
A I see it. I'm just reading the full sentence for context. I'm sorry. I don't recall what BADA means but it was a grant that we used money for wilderness and that.
Q Could you look, I don't know what page it is. But at the bottom it's Plaintiff 00727. And there is an entry for July 14th of 2014. It's about 3 paragraphs up from the bottom. It starts with: I saw Dr. Coats today.
A Yes.
Q And the second to the last sentence, starting at the third to last sentence says: She said that the ringing in my ears and my recent loss of balance resulting in 3 falls should go away. Do you see that there?
A Yes.
Q Ringing in your ears and balance problems, is that something you developed after the Jordan Wegis incident?
A Yes.
Q And did those conditions or issues resolve?



A The loss of balance resolved, I still have the ringing in my ear.
Q Is that a constant problem?
A Constant.
Q Did you see any doctors for that particular issue?
A Yes, I did.
Q Which ones or one?
A Oh, what was his name. Dr. Jarjes, I believe is the ear doctor in Reno. I saw him and I also saw another hearing doctor.
Q Somebody in your Worker's Compensation case?
A Yes.
Q Did you ever get an explanation from any of the doctors as to what they believed of origin of that problem was?
A From getting my head slammed against the wall in the holding cell.
Q Did they give you any recommendations as to what might be done about that problem?
A No, just that they said it would get better with time.
Q If you could turn 2 pages forward, it's Plaintiff 00729. Top of the page there's an entry for June 25th, 2014.
And the second sentence down says: Scott told me again that it concerned him that I would make a copy of Mike's leave slip.
Who is the Mike that is referenced there, if you know?

A Mike Torres.
Q And had you made a copy of his leave slip?
A Yes.
Q Where did you get Mr. Torres's leave slip?
A It was sitting on the copy machine. On the copy machine.
Q Why did you make a copy of that?
A Because I had gone to Scott's office and I had requested to go to a POST training for supervisory -- supervisor certificate. It was a new certificate and I had gotten into the class, and I went to Scott to ask him if I could do that training. And he said -- he told me that, no, I can't lose an officer for a period of 2 weeks, sorry you just can't do this training.
Shortly after that I found Mike Torres's leave slip signed by both Scott and Vicky that said he was approved for 2 weeks to go to Mexico with his family for a vacation, and I felt that was information that I if took it to Scott and said how can you have him go, but not me, I don't understand.
So I made a copy of it then, and somebody told him that I made the copy, and then he called me down before I could go down to talk to him about it. When I went down to talk to him about it, I said, Scott, you told me you couldn't lose an officer for 2 weeks. That is inconsistent with Mike Torres going to Mexico with his family for 2 weeks.



Then he changed the story, and he said, John, no, I didn't tell you that. I told you that I wasn't going to pay for you to go to training for 2 weeks. He said if you want to go to training for 2 weeks, take your own vacation. If you want to do that, it's fine with me.
So I got a leave slip, filled it out, and he signed that, and I got my time approved to go to training with the POST academy.
Q Did you tell Mr. Torres that you were planning to make a copy of his leave slip?
A No.
Q Looking at the next paragraph down, it says 3 sentences in: I had discussed this with Bruce Beacham on 6-16-14, and showed him a copy of the leave slip. That's referring back again to Mr. Torres's leave slip?
A Yes.
Q And if you look under the paragraph that says it's -- the next paragraph down, June 24th, 2014, it says: I just returned to the office from lunch and found my leave request in my box signed by both Chief Deputy Vicky Sauer-Lamb and Scott Shick for the 2 weeks requested training.
So they signed off on your leave request to do the training?
A Yes.
Q Did you ever look in any of the personnel files of any other JPO's at their leave slips or requests for time off?



A No.
MR. GEDDES: Objection, foundation.
THE WITNESS: No.
BY MS. PARKS:
Q Turn to the next page, please. Looking at the second paragraph down there's some reference to additional training. Says: Scott also asked me if I had received his e-mail regarding the Change Company training that all the PO's are attending. I told him I had not received it.
There is another sentence, and then it says he said there is no problem and I could set up another time with Wendy at China Springs Youth Camp to do the training with their staff.
Do you see that there?
A Yes.
Q What is Change Company training?
A I don't know, I never attended that.
Q Look at the next paragraph down, it says: June 26th, 2014 Vicky Sauer-Lamb asked me if I would write a detention hearing report and take Eric Andersen's detention hearing into court tomorrow, since he will not be here due to his leadership training day.
Eric goes to leadership one day a month for the entire year of 2014 at a cost of about 800 dollars to the department. Eric gets paid to attend this training for a total of 13 days.
What is the significance of you making a note of that?



A Just the fact that's how things were typically done at juvenile probation. When we went to training, we were paid to go to training. So it was inconsistent with my training at the POST Academy, and the fact that Scott Shick did not want me to go to training. And even questioned why I would even want to go to a training like that.
Q While you were working for JPO, did they send you to any training?
A Absolutely, yes, every year.
Q And the training that you were sent to every year, notwithstanding the training that you are referencing here, who paid for that training?
A Douglas County.
Q And the training that you are speaking about -- I'm looking at a copy of Third Amended Complaint and Jury Demand, it's docket number 62. Looking at page 14, it's paragraph 32 of your Complaint, subsection A. It says: In June of 2014, Shick refused to allow Enos to take training while on the job, which was customary for the office to allow other officers to do.
The training that is referred to in that paragraph, is that the same as discussed in Exhibit Number 2, in terms of the training?

A The POST training?
**Q Right.**
A Yes, that is the training that is mentioned there, and Shick did refuse to allow me to take that training while on the job. He said I could only do that if I took my own vacation time.
**Q What other training did Scott Shick refuse to permit you to do, other than that POST training, during your career as a JPO?**
A There was a few different trainings that I proposed that we didn't do, but I don't recall what they were. Most of the time we just got our 24 hours required training in each year, which would consist of like defensive tactics, CPR, first aid, every 2 or 3 years, and whatever other trainings became available to the officers.
But when you go through the POST Academy you come with a basic training certificate and with further education and classes and that, you can apply for an intermediate certificate and an advanced certificate. I had achieved all those. The next one was a management certificate, but you could not get that unless you were already a chief deputy.
A new certificate came open called a supervisor certificate, and this was basically one of the first classes that this was going to be available for. So there was a waiting list of 2 years or something like that to get in. And



I just happened to get into the class.
**Q Okay. You signed up for the class and then you went to Mr. Shick concerning your ability to take that class?**
A Yes.
**Q How much did that class cost? Was there cost associated with it?**
A I don't think there was a cost associated with it that I know of.
**Q Was it --**
A It was through the POST Academy.
**Q Was it a 2 week, 5 day a week class?**
A Yes. Yes.
**Q And Mr. Shick indicated -- did Mr. Shick advise you you had to take vacation time in order to take that class?**
A Yes, I did. I went to him and said, Scott, I got all this set up because I didn't want to come and propose it to you if it wasn't available. So, yeah, I've got it set up and he said, no, I don't want you to go do that. I can't lose an officer for 2 weeks.
After we discussed the leave slip, Mike's leave slip, he said that wasn't what I said. What I said was I'm not going to pay you to go to that training. You want to go to that training, you can do it on your own. You take your own vacation, if you want to go to that training. And he requested why I would want to go to the training.



**Q Have you ever taken a 2 week training course, prior to this proposed supervisor course?**
A Well, the POST Academy was an 8 week training course.
**Q Right. Being POST certified was a requirement of a JPO position, correct?**
A Yes.
**Q And was a Category 2?**
A Yes.
**Q Other than your initial POST certification that was an 8 week course, had you ever taken a training class that was 2 weeks long, other than this proposed supervisor course?**
A I took the leadership class in 2003, I believe it was, and that was an 8 hour day every month for the year. Thinking back and not seeing my training log, I believe we're still waiting on that, to get that into discovery. I can't recall a 2 week training at this point.
**Q The vacation slip that Mr. Torres had put in and that you saw?**
A M-hm (affirmative).
**Q What were the dates?**
A I don't recall.
**Q Were the dates -- did they overlap with the training course that we're talking about?**
A I don't recall. I do know the slip was put in after my request for training. That is what bothered me most.



BY MS. PARKS:
**Q Other than that particular course, the supervisor certificate course through POST, can you tell me any specifics about ever having been denied the opportunity to do training by Mr. Shick?**
A Specifics, no. Just that I had gone and proposed trainings, and typically the trainings would be proposed to Vicky Lamb, and she'd say we'll let you know. And then she'd speak to Scott Shick about it and get back to you and say Scott said he doesn't want you to go to that one. There were several occasions that happened, but I don't have specifics.
**Q Other than the POST training that lasts 8 weeks, that all JPO's have to do, do you know of any other JPO's who underwent a 2 week training course that was done on County time?**
A Well, none of the other officers at that time were at a level where I was to go for another higher certification through the POST Academy. So I can't say that I do, although Eric Anderson was on the leadership when I transported his son -- his kid, his juvenile to court, Jordan Wegis. He was actually out on the leadership training on that day. That's a day a month for the entire year, so that's a total of 12 days training. There were other officers who had done leadership. I can't recall who had done leadership.

Q That class you did in 2003?
A Yes, it's through the County leadership class.
Q I'm not just talking just about the supervisor certificate through POST course, I want to know if you know of any other JPO's who were -- who requested to do any sort of a 2 week training course, and were sent to do that on County time?
A I don't have any information on that. I don't know.
Q Did you do that training course?
A Yes, I did.
Q And do you know when approximately you did that?
A It was prior to my surgery. I believe it was September of 2014. I believe. I'm not positive.
Q If you would look back at the page we were just looking at Bates stamped PLF 00730?
A Yes.
Q Under June 11th, 2014, there is another note about training. The second sentence says: Scott asked me what that was, and I told him that 2 weeks prior to the training I had taken off a week to go on my bull elk hunt here in Nevada.
Do you see that there?
A I don't, I'm sorry. Where is that?
Q Under June 11th, 2014, it's the second full paragraph from the bottom.
A Yes, I do see that.
Q If I'm reading this correctly, you had a week off



scheduled to do a bull elk hunt?
A Yes.
Q And that would have been in -- was that in 2014?
A Yes, and I told him that I would forfeit that time, if it helped the department, so that I could attend the training.
And also I think in the next paragraph down I mention -- is this where it is. With my last performance evaluation, the training at the POST Academy was actually listed under my job specific goals, signed off by Vicky and Scott, so Scott knew the training was available. And had signed off that would be a good job performance goal for me.
Q Did you go on that bull elk hunt in 2014?
A I don't recall. I do recall, Kathy, yes, I did go on the bull elk hunt.
Q Did you get an animal?
A Yes, I did.
Q Were you bow hunting?
A Yes, I was.
Q Why are you or why have you sued Vicky Sauer-Lamb?
A Because she was my direct supervisor and I felt that she should have protected me.
Q Do you believe Vicky Sauer-Lamb had any decision making ability when it came to your separation from employment?
A Absolutely, yes.
Q You believe that she was partly responsible for why



you are no longer employed with Douglas County?
A Absolutely, yes.
Q On what facts do you base that?
A That she and Scott were the supervisors of my department, and that the letter that I got coming from Scott was also tied to Vicky. Vicky was my supervisor. Scott the chief, so that's how I see that relationship, that they were both working on this.
When I called Vicky, when I got light duty from Dr. Eisenhauer, Vicky was the one that I called. And I said, Vicky, I just got released on light duty. I said do I come back to the office or do I go to the library. And Vicky stepped back very defensively and said --
Q Were you on the phone?
A We were on the phone. She said whoa, whoa, no, no, no, no. You don't come back to our office. I don't know what's supposed to happen with you, John. I need to get ahold of HR. I'll have HR contact you.
I was going why is she being like that, why is she being defensive like that. I didn't understand.
Q What other facts upon which you are basing your claims against Miss Sauer-Lamb?
A Well, there was a witch hunt against me for -- they had the video guy -- our IT guy checking video cameras for our building saying that I had come and gotten into a motor vehicle



there, unauthorized, getting into a county vehicle. It was regarding a garage door opener that had gone missing from the visor.
Vicky Lamb, when I was told that I needed to go to the office to get my things, and I had to do it during working hours when are everyone was there. I went there to gather my things from the office, and Vicky Lamb said, hey, let me go down to the car and help you get your things. I said okay. And when we went down to the car, she questioned me on certain items in the vehicle. Is that really your jacket, that kind of thing. I said, yeah, that's my jacket.
And she said, oh, wait a minute, did get your garage door opener off the visor. And I said, Vicky, I got a garage door opener off the visor before I even went into surgery, that was a long time ago. And she goes, oh, okay, I wanted to check and make sure you got that.
And then later I found out there was an investigation, they were checking video cameras to find out if I had been there unauthorized inside a County vehicle, so she was part of that.
Q Okay.
A Kathy also on PLF 00731 there is a note here that says this training is an 80 hour commitment, 8 to 5, Monday through Friday, 2 weeks, there is no cost to the department for the training.

MS. PARKS: I need to have some copies made. I'll be right back.

(At this time a break was taken.)

THE WITNESS: Also, Kathy, on the same page --

MS. PARKS: There is not really a question pending.

THE WITNESS: On the very last paragraph of -- 731: I just spoke with my Chief, Scott Shick, and he said he felt this was a considerable amount of time away from the office, and that he would have to consult with our Chief Deputy, Vicky Lamb, before making a decision.

And I think Scott consulted with Vicky Lamb on all of the decisions, especially decisions regarding her officers that she was directly in supervision of.

BY MS. PARKS:

**Q Did you ever -- you don't have any personal knowledge of that, you are speculating on that.**

**Did you ever sit in as a witness and hear Scott Shick and Vicky Sauer-Lamb talking about your separation from employment?**

A No, I did not.

**Q I don't have other copies of these, I'm looking at your responses to the Defendants' First Set of Request For Production of Documents.**

**Do you remember receiving requests for production of**



**documents through the course of this case?**

A Is that the interrogatories.

**Q No, the request for production of documents?**

A I don't recall.

**Q Well, I can make copies of them, this is a request for production number 4.**

A Okay.

**Q To these, and I can make a copy when we're done. It says: Produce and permit the defendants to inspect and copy any and all audio recordings in your possession which relate to your case.**

**Do you remember being asked to produce such materials?**

A Yes.

**Q And in response there were 4 audio clips produced to my office. And they are Bates Stamp numbered 03211, have you listened to those?**

A Yes, I have.

**Q And how -- by what medium did you record these discussions?**

A On my iPhone.

**Q At the time that you made these recordings, did you advise the other parties to the conversation that you were recording them?**

A No, I did not.



(At this time Exhibit 22 was marked for identification.)

BY MS. PARKS:

**Q Showing you what's been marked as Exhibit Number 22 to your deposition, do you see that?**

A Yes.

**Q Is that your signature there under Employee Signature on Exhibit 22?**

A Yes.

**Q This says: Form C4 employee's claim for compensation, report of initial treatment.**

**And above your signature and in the other top portion of this document it's in -- it's typed. Do you see that there, including "what were you doing at time of accident", and it's typed?**

A Yes.

**Q Did you type the information into this document?**

A No.

(At this time Exhibit 23 was marked for identification.)

THE WITNESS: I believe Vicky Lamb prepared this and I signed it.

BY MS. PARKS:

**Q Showing you what's been marked as Exhibit Number 23 to**



**your deposition, this is a document produced by your attorneys Bates Stamp numbered 00353, excuse from work or school. Do you see that there at the top?**

A Yes.

**Q And, again, if you look to the lower right, as we did with similar exhibits today, Dr. Eisenhauer is typewritten next to his signature. Do you see that?**

A Yes.

**Q This document is dated April 23rd of 2014. And it appears that Dr. Eisenhauer advised that you could return to work light duty, and he instituted a 5 pound lifting maximum. Do you see that there?**

A Yes.

**Q Is that commensurate with your recollection of what Dr. Eisenhauer's restrictions were on you at that time?**

A Only because I'm looking at this document, but yes.

**Q Okay. You don't have an independent recollection of that?**

A No.

(At this time Exhibit 24 was marked for identification.)

BY MS. PARKS:

**Q Showing you what's been marked Exhibit 24 to your deposition. This is another document produced by your**

attorney, PLF 00354. This is a note of someone named Angela Fluitt F-L-U-I-T-T, and next to her name is OT, which I understand means occupational therapist. Do you recall seeing an Angela Fluitt?
A Yes.
Q What sort of treatment did she provide?
A Therapy. Occupational therapy.
Q For what body part?
A For my hand.
Q If you look an under A in these notes, it says: Patient appears to be having a new source of discomfort that does not appear to be related to his surgery.
And I just wondered if you had any recollection or could illuminate me on what this note meant?
A I have no idea.

(At this time Exhibit 25 was marked for identification.)

BY MS. PARKS:
Q Showing you what's been marked as Exhibit Number 25 to your deposition, we looked at something similar before but I just want you to identify this for me, if you can, as to what it is.
A I don't, this is the statement that I wrote for the sheriff's report after the incident. At Scott Shick's request,



I believe.
Q Did you see Dr. Costa during your work comp --
A At some point, sure.
Q -- treatment?
A Yes.
Q What kind of doctor is Dr. Costa?
A I believe pain management.
Q Okay. And how about Dr. Fry?
A Yes.
Q What were you seeing Dr. Fry for?
A Shoulders.
Q Can you tell me the first name of Dr. Fry that you saw?
A I believe Paul.
Q There are several?
A Yes.

(At this time Exhibit 26 was marked for identification.)

BY MS. PARKS:
Q Showing you what's been marked as Exhibit Number 26 to your deposition. Do you at all recognize Exhibit Number 26?
A Yes.
Q What do you recognize it to be?
A A notice of claim acceptance for the second industrial



injury that I received at work.
Q Okay. And in the top right hand corner there there's a reference to body part. Do you see that there?
A Yes.
Q It lists cervical strain, left wrist sprain, right wrist sprain, left chest wall contusion, right shoulder strain, and acute stress reaction. See that there?
A Yes.
Q We talked earlier about your shoulders. Subsequently did you appeal or make a request that your left shoulder also be included in the claim?
A Yes.
Q Ultimately the result of that was?
A That it was accepted into the claim.
Q Okay. Is that still open, that claim?
A No.

(At this time Exhibit 27 was marked for identification.)

BY MS. PARKS:
Q Showing you what's been marked as Exhibit Number 27 to your deposition. At the top of this page it says Sierra Neurosurgery Group. Do you see that there?
A Yes.
Q This Network Restrictions Report, as it's called,



appears to have been prepared by a physician's assistant, Curt Erickson. Do you remember that individual?
A Vaguely.
Q Who at Sierra Neurosurgery Group did you treat with, besides a physician's assistant?
A I believe Dr. Seakhon is there, but I don't know that for sure. I don't really recall exactly who I treated there with.
Q This note is dated July 22nd, 2014 and contains a work status update. It says: Released to full duty as of August 18th, 2014, and it says: Weight restriction limit 25 pounds.
Do you recall talking with anyone from Sierra Neurosurgery Group regarding any physical restrictions?
A I remember going to Sierra Neurosurgery Group. But I can't remember why I was referred there. I believe it was possibly Dr. Demordaunt -- or I got referred by one doctor to another doctor for the injuries they examined. I ended up at Sierra Neurosurgery Group. I don't recall exactly who I saw there, but I know they looked into my spine.
Q So that was related to your back?
A Neck and back, yes.
Q Okay.

(At this time Exhibit 28 was marked for identification.)

BY MS. PARKS:
**Q Showing you what's been marked as Exhibit Number 28, do you recognize Exhibit Number 28?**
A I do.
**Q What is Exhibit Number 28?**
A It appears to be a request for a second opinion.
**Q Okay. And this is an e-mail that appears that you sent to Karen Barbee; is that correct?**
A Yes.
**Q And is it your understanding that Karen Barbee at ASC was the claims handler, handling your Worker's Compensation claim?**
A Yes.
**Q If you look at paragraph one, last sentence, in the sentence you are talking about wrist surgery, it appears. And then the last one says: Whichever surgery I go with, it will be life changing for me.**
A Yes.
**Q Can you tell me what you had been advised about these surgeries and their potential impact on you going forward? I'm trying to get an idea of what prompted you to say "whichever surgery I go with, it will be life changing for me"?**
A Can I read that first?
**Q Sure.**



A I just wanted to find out if we were at the salvage surgery point yet, and it does say we are. Dr. Eisenhauer gave me 2 options, to include a 4 point fusion or a proximal row carpectomy.
He said one will give me some motion with a little grip strength, and the other will give me very little motion with more grip strength. Both procedures involved removing a bone or several bones from my wrist and fusing other bones together.
That's what he had told me. When he told me it would be life changing, meaning I would have less motion in my wrist than I had ever had before, and possibly less grip strength.
**Q So it appears you were requesting a second opinion with a doctor in San Francisco; is that correct?**
A Yes.
**Q Were you ultimately sent for second opinion on this issue?**
A I believe I was. I was sent up to Reno Orthopaedic, I think and saw Dr. Christensen, I think.
**Q Okay. Let's mark this 29.**

(At this time Exhibit 29 was marked for identification.)

BY MS. PARKS:
**Q Showing you what's been marked Exhibit 29 to your**



**deposition. I just want to make sure this is similar to what we looked at previously. Exhibit Number 25. It just appears this one is signed. And I just want to clarify that it's -- this is the report that you gave to the Sheriff's Department concerning the Jordan Wegis incident?**
A Yes.
**Q So that's what that is?**
A Yes.
**Q Okay.**

(At this time Exhibit 30 was marked for identification.)

BY MS. PARKS:
**Q Showing you what's been marked as Exhibit number 30 to your deposition, do you recognize that?**
A Yes, I do.
**Q What do you recognize Exhibit 30 to be?**
A This is the e-mail I received from Cindy McMurry telling me I was not chosen for the juvenile probation job.
**Q Did you call Cindy McMurry and make any further inquiries regarding the reasons why she sent you this letter?**
A No, I did not.
**Q And you didn't call Scott or Vicky or anybody else at JPO about it?**
A I didn't feel that was an option.
**Q You did not call anyone?**



A No.
**Q Okay.**
A Wouldn't have made sense.

(At this time Exhibit 31 was marked for identification.)

BY MS. PARKS:
**Q Looking at Exhibit Number 31, Mr. Enos, do you recognize Exhibit Number 31?**
A Yes, I do.
**Q What do you recognize that to be?**
A I recognize that to be the letter that Scott Shick gave me after our Human Resources meeting. I had a -- I had been requested by Vicky Lamb to transport a juvenile from detention down, while I had a broken screw in my wrist and was awaiting salvage surgery. I voiced my opinion to her I didn't think it was a good idea, and also the doctor's releases it said I shouldn't be in a situation where a juvenile could be combative.
She sent 2 other officers, and then shortly after came down to my office and said Scott Shick wants to see us. And I went down to the office, and Scott Shick informed me there was going to be an HR meeting I needed to be present at.
So I went to the HR meeting. And at the HR meeting Scott and Vicky both made comments. Provoked me, poked at me,

did whatever they could do to try to get me to be upset. I wasn't upset. I tried to make it through the hearing the very best that I could.

And Scott Shick at that point said, well, I think we may put you in detention. At the time I voiced my concern about being in detention, since I wasn't supposed to be around kids that could be possibly volatile.

And when we got back to the juvenile probation department he, I believe, already had this typed up. But he had typed this up and he got it to me right away. I met with him and I said, Scott, I am really concerned about the detention center.

And he said are you telling me you will not go to the detention center, if I send you there. And I looked right at Scott and I said, Scott, I will go down to the AM/PM and clean toilets to keep my County job. And he said I'm glad you said that. And I said I will do this detention facility assignment.

And he asked me, just like he asked me in the letter, to please attend the shift change meeting that would be on Monday morning. I went to juvenile probation on Monday morning, and Vicky Lamb came in and she said, okay, the Crown Vic is all fired up. You can go down there and head for detention.

And I said, you know, Scott asked me to please attend the staff meeting. I'm still a juvenile probation officer in



this department, and I need to know what is happening. Then I'll head to detention.

So Vicky confirmed that with Scott. I went to the staff meeting, and we discussed office things, and he told me to speak with the other officers, and he gave away my case load. He gave it away not on a temporary basis, but on a permanent basis. I lost my case load. I was told that I was going to detention.

Shortly after Scott called me in and he said, hey, John, we don't have any kids in detention, so don't go up to the detention facility. They don't need you there. What I want you to do is work in our office for a couple weeks, help out whatever you can with the other officers. We'll find another light duty assignment.

And shortly after I was notified -- couple weeks later I was notified that I would be going to the library.

BY MS. PARKS:

**Q Exhibit Number 31 is dated July 17th, 2014 from Mr. Shick to you. This indicates that he believed it was in your best interest to be assigned to the Juvenile Detention Facility in a strictly support role, as you work through your medical circumstances.**

A Yes, I do.

**Q You are encouraged to work in a correctional programing or educational capacity with juveniles in the**



**facility. Had you in past done work in an educational capacity with juveniles?**

A Yes.

**Q And this further indicates that you would leave the valley station at 8 a.m. and take the Crown Victoria vehicle as your transportation. The Crown Victoria vehicle then that was one that was JPO, correct?**

A Yes.

**Q It says: You will be in a support role for the primary juvenile detention staff person on duty. Please follow all doctor guidelines for your medical limitations while on duty in the detention facility. Avoid any potentially volatile juveniles that may enter the facility. A staff person will always be on duty with you. And then that's the end of the memo.**

**In terms of a staff person -- a staff person will always be on duty with you. We talked earlier about the detention center and that's what's depicted in Exhibit 32, correct?**

A Yes.

**Q And it was staffed by a detention officer, correct?**

A Yes.

**Q And in addition, this was attached to the Douglas County Sheriff's Office jail, correct?**

A Yes.



**Q You indicated that there was a control room in this facility, correct?**

A Yes.

**Q And was that a control room that was secure that you could lock the doors in?**

A Yes.

**Q Did Mr. Shick ever advise you or are you aware that there would have been any corresponding loss in your pay or benefits, had you been assigned to the duty station?**

A No.

**Q Sorry, the detention duty station?**

A No.

**Q No loss in your seniority?**

A No.

**Q No, you would not have lost seniority, correct?**

A I don't know that I would have lost seniority, I'm assuming I wouldn't have.

**Q You were not -- you were never advised that you were going to be paid less for this particular assignment?**

A No, no.

**Q After February 24th of 2015, did you ever ask or inquire of Scott Shick or Vicky Sauer-Lamb about whether you could go to work at the detention facility?**

A After what date?

**Q After your separation from employment, did you ever**

ask them about the availability of this position?
A I didn't speak with Vicky Lamb or Scott Shick after I was fired from my job.
Q Can you read my question back?
(At this time the pending question was read by the reporter.)
THE WITNESS: After I was fired from my job, I never asked them about the availability of any positions.
BY MS. PARKS:
Q If there were a combative juvenile that was being detained in the detention center, could the detention deputy on staff there, the detention JPO officer on staff, contact the DCSO for help?
MR. GEDDES: Objection to the degree it calls for speculation, incomplete hypothetical.
THE WITNESS: Yes.
MS. PARKS: Go ahead.
THE WITNESS: Yes.

(At this time Exhibit 32 was marked for identification.)

BY MS. PARKS:
Q Could you do me a favor and just sign Exhibit number 32 and date it?
A It's not a very good drawing, I'm sorry. Kathy, what



is the date today?
Q Today is the 18th.

(At this time Exhibit 33 was marked for identification.)

BY MS. PARKS:
Q If you could go back to Exhibit 31 for a moment, please. Make sure I understand your testimony. Did you have concerns about working or being assigned to the detention center from a safety standpoint, in terms of your physical health at that time?
A My concern of not working at the detention center or my concern about working at the detention center was that I was under a doctor's order at the time to not be the presence of a combative youth for that period.

(At this time Exhibit 34 was marked for identification.)

BY MS. PARKS:
Q Showing you what's been marked as Exhibit Number 34 to your deposition. Do you recognize Exhibit 34?
A Yes.
Q And if you look at the bottom it says -- CC and your name appears there?
A Yes.



Q James McCarty, he's your attorney in your Worker's Compensation case, correct?
A Correct.
Q Paragraph two, this letter is dated March 26th, 2015 and it's sent to Alternative Service Concepts, correct?
A Yes.
Q Second paragraph on page one of Exhibit 34 says: Enclosed please find the March 26th, 2015 report of David Eisenhauer, D.O. Dr. Eisenhauer indicates he believes to a reasonable degree of medical certainty that Mr. Enos will no longer be able to perform his job a juvenile probation officer.
Do you see that there?
A I do.
Q If you could turn to the third page of Exhibit Number 34, second to the last paragraph under Assessment and Plan approximately 4 sentences from the bottom, 5 sentences from the bottom, it states specifically under the physical demands and working environment section: Specifically he will likely not have the ability to subdue argumentative individuals.
Do you see that there?
A I'm sorry, Kathy, where is it at?
Q Under Assessment and Plan?
A Okay.
Q If you look -- I was trying to go from the bottom?
A Okay.



Q Look at the third paragraph Assessment and Plan about 5 sentences up, the sentence starts specifically on the left, 6 sentences from the bottom of that paragraph?
A Got it.
Q It says specifically, and then it refers to subdue argumentative individuals. Do you see that there?
A Yes.
Q With respect to your concerns that you had in July of 2014 about being assigned to the detention center, one of your concerns was that you were under doctors orders not to be around combative juveniles, correct?
A Correct.
Q This goes on to say: He may not effectively be able to use his wrist for climbing crawling or lifting 50 pounds. Do you see that there?
A Yes.
Q And this is a note from Dr. Eisenhauer that is dated March 6th, 2015 that's on the second page of this exhibit. Do you see that there?
MR. GEDDES: I think it says March 12th.
MS. PARKS: Office visit.
MR. GEDDES: Page 781 it says March 12th.
MS. PARKS: I'm looking under office visit.
MR. GEDDES: Okay.
BY MS. PARKS:

Q I'm on actually, Mr. Enos, I'm on page 2 of Exhibit Number 34. It's the first page of the note. Right there. It says at the top there: 3-6-2015 office visit.
Do you see that?
A Yes.
Q Do you recall going to see Dr. Eisenhauer or March 6th, 2016?
A I recall seeing Dr. Eisenhauer a lot of times, but I'm not sure that was the date. I'm sure it is looking at this document.
Q I'd like to look down under History of Present Illness. And the third paragraph down it says: John was released to light duty at the last office visit on 1-28-15. That is lifting restrictions of no more than 10 pounds. However, he called in and at his request on 2-18, he was returned to a trial of full duty.
Do you see that there?
A I do.
Q Do you recall being seen by Dr. Eisenhauer on January 28th of 2015 when he imposed certain restrictions, including lifting restrictions of no more than 10 pounds?
A I recall I had an appointment with him, yes. And he released me, and that is the day that I called Vicky Lamb to say, hey, I've been released on light duty.
Q Do you recall the lifting restriction on or about



January 28th, 2015 being no more than 10 pounds?
A Yes, and I called Vicky and she said we need to talk to HR. And HR called me and said we have nothing for you, and we're not going to bring you back at this time.
Q The next sentence says: He called in and at his request on 2-18, he was returned to a trial of full duty.
Did you call Dr. Eisenhauer on the phone on February 18th, 2015 to talk to him about your work restrictions?
A Yes, I absolutely did.
Q Please tell me everything you can recall about your conversation with him?
A Okay. Well, first of all, I had gotten a letter from the County saying I needed to meet with the Human Resources department on the Tuesday following the President's Day weekend. I received that letter about 5 minutes to 5 on a Friday.
I didn't get any sleep that weekend. I went in to see Norma. Norma told me, hey, basically what we're going to do is consider you a voluntarily resignation from the County, if you can't get full releases from your doctors within the next 3 days. And I said how am I supposed to do that. I was supposed to have surgery tomorrow. But it had been canceled.
So she said you need to contact your doctors. Norma Santoyo said you need to contact your doctors and talk to them about their releases.



So I called Dr. Eisenhauer, and I said, hey, Dr. Eisenhauer, I'm getting let go, they're firing me. And he said, John, next week I was going to release you on a trial basis, full duty trial basis. I'll just release you this week on a full trial duty basis. That way you can go back to work and see if you can do your job. I said thank you very much.
I called Dr. Morales, and I said Dr. Morales, your last work order said there was a zero weight limit, that I couldn't push, pull or lift anything at all. And she said no, no, no, no, that's not right. You can lift up to 50 pound. And I said could you please specify that on your work order, and get it to Norma Santoyo --
Q My question -- I don't mean to interrupt you, but my question here was about your conversation with Dr. Eisenhauer. I appreciate you want to tell me about Dr. Morales, and I'm going to give you an opportunity to do that when I ask you a question.
But my question was about the details of your discussion on February 18th of 2015 with Dr. Eisenhauer.
A Okay.
Q So it's your testimony when you talked to Dr. Eisenhauer, it was his idea and he said I was planning to release you to a trial of full duty some time around the time of that call; is that your testimony?
MR. GEDDES: Misstates testimony, objection.



THE WITNESS: No, he told me he was going to release me the following week on a trial basis full duty, to see how I could do at my job. And he said I'll do that for you right now. And I said I appreciate that, could you please get that over to Norma Santoyo. I'm trying to save my job.

BY MS. PARKS:
Q You also testified, and we can go back, but I think I wrote it down correctly. That you had a discussion with Norma Santoyo after you received the letter that you referred to, and you said to Norma you were supposed to have surgery the following day or tomorrow?
A No, I said I had been scheduled for surgery the following day, that had been canceled by Dr. Morales, I believe, on the 10th. She got ahold of me and said we're going to have you lose some weight before you do your surgery, even though I had already been through all of the other pre-op stuff at Quail Surgery Center.
Q I believe I wrote down your testimony where you said you told Norma how am I supposed to get these releases, I'm supposed to have surgery tomorrow. Am I inaccurately --
A Inaccurate, yes.
Q Okay.
A That is not my testimony.
Q Can you go back to please see you can find the

testimony about his discussion with Norma Santoyo?

(The record was read by the reporter.)

BY MS. PARKS:
Q Please go back to page 3 of Exhibit 34. It's Bates Stamped number PLF 00781 on the bottom. Before I turn to that, Mr. Enos, have you attended any of the depositions that were taken in connection with your contested Worker's Compensation case?
A Yes.
Q Did you go to Dr. Eisenhauer's deposition?
A Oh, I'm sorry, no. I thought you the meant this case.
Q No.
A I'm sorry, no, I did not.
Q If you look under Assessment and Plan about -- in the middle in Assessment and Plan it goes back to discussing trial of full duty. It says: However, we have tried a trial of full duty, the patient was not able to physically perform his job, he tells me.
Do you see that there?
A I do.
Q Is that an accurate statement --
A It is not.
Q Please let me finish my question.



A I'm sorry.
Q Is that an accurate statement made by Dr. Eisenhauer? It says: The patient was not able to physically perform his job, he tells me. Is that accurate?
A No, it is not.
Q You never told him that?
A I never told him that.
Q Did you ever ask Dr. Eisenhauer about this particular reference in his note?
A No.

(At this time Exhibit 35 was marked for identification.)

BY MS. PARKS:
Q Showing you what's been marked as Exhibit 35 to your deposition. Do you recognize Exhibit 35?
A Yes.
Q What do you recognize Exhibit 35 to be?
A A retirement option selection and beneficiary designation.
Q If you turn to page 2 of Exhibit Number 35, is that your signature there under your acknowledgment?
A Yes.
Q And it looks like this document, if you look at the date line below, you signed this on February 19th of 2015; is



that correct?
A Yes.
Q And what was the purpose of this document?
A This was to designate my wife as the beneficiary.
Q Your beneficiary for what?
A For a disability retirement.
Q Through PERS?
A Yes.
Q When did you apply with PERS for disability benefits? Was it on or around February 19th?
A It was shortly after my conversation with Norma Santoyo, and she told me I was going to be fired from my job or told me it was going to be a voluntary separation, if I didn't get doctors' releases to her in 3 days.
I looked at Norma, and I said, Norma, I've been pouring my heart and soul into the kids of this community for 20 years. I said you can't push me out the back door because I got heard. And scrunched her face up and said, yeah, we kind of can. I said Norma --
Q Mr. Enos?
A I'm getting to it, Kathy.
Q My question was whether you know the date?
A Norma is the one that suggested I go to PERS.
Q My question --
A I believe February 17th is when I signed the paper



work.

(At this time Exhibit 36 was marked for identification.)

BY MS. PARKS:
Q Showing you what's been marked Exhibit 36 to your deposition. Do you recognize it?
A I do.
Q What do you recognize at least page one of Exhibit 36 to be?
A It's the beginning of the first page of the Disability Retirement Application.
Q The same subject we were just talking about?
A Yes.
Q It's dated February 17th, 2015. Is that the date you applied for such benefits?
A Yes, it is.
Q Please turn to the -- part of this exhibit bearing Bates Stamp number PLF 03 -- excuse me -- 03466. It says: Employee Report.
A Okay.
Q Are you there?
A Yes, I am.
Q I want you to look at the handwriting there that's set forth under section A. Is that your handwriting?

A Yes, it is.
Q Is that your signature there under applicant's signature?
A Yes, it is.
Q If you could turn to the page of this exhibit that says PLF 03469, is that your handwriting there?
A Yes, it is.
Q And you wrote what is set forth there on or about March 10th of 2015?
A Yes.
Q If you could turn to the next page. At the top of the next page, Bates Stamp number 03470, there's some handwriting there. Is that your handwriting?
A Yes.
Q It refers to highlighted areas. If you look below it's a little bit hard to tell here, because it's a copy, but did you highlight particular areas in -- on this page?
A Yes, I did.
Q And you referenced those highlighted sections above and on the page before, correct, where it says the most critical of the highlighted job duties?
A Yes.
Q If you turn to the very last page of that exhibit under physical demands and working environment, there are some additional highlights there; is that correct?



A Yes.
Q And those are areas that you highlighted?
A Yes.
Q And in the second paragraph under physical demands, again, it's hard to tell because it's a copy. It appears that -- one of the highlighted sections says use hands, too; is that correct?
A Yes.
Q And it says handle, is that highlighted?
A Yes.
Q And then it says required to climb. Did you highlight that portion?
A Yes.
Q And then to the right it says crawl and must frequently lift. Did you highlight that portion?
A Yes.
Q Going down into the working environment section, the highlighted section includes -- says may involve personal danger, correct?
A Yes.
Q And requires physical ability to subdue argumentative individuals. That area is highlighted?
A Yes.

(At this time Exhibit 37 was marked for identification.)



BY MS. PARKS:
Q Showing you what's been marked as Exhibit Number 37 to your deposition, do you recognize Exhibit 37?
A I do.
Q What do you recognize that to be?
A It's a letter from PERS regarding my medical retirement or disability retirement.
Q In the first sentence it says: The Retirement Board approved your application for total and permanent disability, correct?
A Correct.
Q Then the last paragraph reads, second to last above the closing paragraph. It says: If you have been awarded Worker's Compensation benefit, due to same disability, please contact us, so that we may determine how it may effect your disability benefits from PERS.
Do you see that there?
A Yes.
Q Did you have discussions or communicate with PERS about any Worker's Compensation benefits you received?
A Yes, they asked me if I was receiving Worker's Compensation benefits at the time I got the medical retirement, and I said no.
Q They asked you if you were --



A It was part of the application.
Q And your response to them was no?
A Yes.
Q This also goes on to say: As a disability retiree you must apply for and receive PERS Board approval before accepting any re-employment, either public or private.
Do your see that there?
A Yes, I do.
Q Have you had anything discussion with PERS regarding any potential re-employment, either public or private?
A No, I have not. The only thing I got from PERS is every year I got a piece of paper that I have to sign saying I have not worked.

(At this time Exhibit 38 was marked for identification.)

BY MS. PARKS:
Q Showing you what's been marked as Exhibit 38 to your deposition. Do you recognize Exhibit 38?
A Yes.
Q What you do you recognize that to be?
A Another letter from PERS regarding the disability retirement.
Q Okay. This is dated April 20th, 2015 and it talks about the amount of your benefits in the first paragraph,

correct?
A Yes.
Q Has the amount of your monthly benefit changed since April of 2015?
A Not that I know of.
Q I didn't know if such benefits are subject to cost of living increases or anything like that. Has it been the same amount consistently since you started to receive that benefit?
A I believe so, yes.

(At this time Exhibit 39 was marked for identification.)

BY MS. PARKS:
Q Before we turn to Exhibit 39. Going back to Exhibit 38. Second to the last paragraph starts: Disability benefits recipients. Says: Disability benefit recipients are prohibited from working in any capacity without first requesting approval from the PERS Board. This includes employment in the public and private sector.
It says: To receive approval from the Board, the position in which you want to be re-employed must not be found to be comparable or similar to the position in which you were found to be disabled.
Did I read that correctly?
A Yes.



Q And was that or is that your understanding regarding the status of your benefits or how your benefits might be implicated by future employment?
A Yes.
MR. GEDDES: Objection, vague and ambiguous, and may call for a legal conclusion.
MS. PARKS: Go ahead.
THE WITNESS: Yes.
BY MS. PARKS:
Q Looking at Exhibit 39 to your deposition, there's some handwriting there with some telephone numbers. Is that your handwriting?
A Yes.
Q If you look at page 2 -- well, first off do you recognize this document just generally?
A Yeah, it looks like a -- brochure from PERS.
Q Okay. Do you recall receiving a document like this from PERS?
A I may have picked it up when I was there.
Q Okay. So page 2 of Exhibit Number 39, there's a discussion of eligibility. Do you see that there?
A Yes.
Q It says: You are eligible to apply for disability retirement benefit if you have 5 or more years of service, and you become totally unable to perform your current job, or a



comparable job due to an injury or mental or physical illness of a permanent nature.
Do you see that there?
A Yes.
Q Is that -- do you understand that to be a requirement of -- in terms of your eligibility for disability benefits?
MR. GEDDES: Objection to the degree it calls for a legal conclusion.
THE WITNESS: Yes.

(At this time Exhibit 40 was marked for identification.)

BY MS. PARKS:
Q This is somewhat out of order, but if you could take a look at Exhibit 40 for me and tell me if you recognize it?
A Yes, I do.
Q What do you recognize Exhibit 40 to be?
A That they're acknowledging that I selected retirement option 2, and that my wife Becky is the beneficiary.
Q So this is correspondence from or with PERS, correct, about your disability --
A Yes.
Q -- benefits.

(At this time Exhibit 41 was marked for identification.)



BY MS. PARKS:
Q Showing you what's been marked as Exhibit 41 to your deposition. Do you recognize Exhibit 41?
A Yes, I do.
Q What do you recognize Exhibit 41 to be?
A It's on -- I'm sorry, it's a memo from Vicky Sauer-Lamb to all of the officers.
Q What is this memo about?
A I was still taking the on-call schedule, so I was the on-call officer that week, and they set up a schedule so that the other officers would provide transports, if I needed a transport done in the middle of the night, or something like that, due to my injury.
Q Okay. So this is a memo from Vicky about schedules of the other JPO's?
A Yes.

(At this time Exhibit 42 was marked for identification.)

BY MS. PARKS:
Q Showing you what's been marked as Exhibit Number 42 to your deposition. If you could just look through this.
Mr. Enos, have you ever seen Exhibit Number 42 before?
A No.

Q This was produced by your attorneys. It's Bates Stamp numbered 03120 through 03123. Do you understand what the term TTD means?
A Temporary total disability.
Q Do you understand what the term VRMA means?
A Vocational Rehabilitation Maintenance.
Q During the time you were deemed temporarily totally disabled in your work comp case, you received certain payments under your work comp claim, correct?
A Yes.
Q Okay. Do you independent of any information contained in your work comp file, have an understanding of how much you have received in terms of payments on your work comp claims?
A No, I don't.
Q At one point or maybe more than one point, you were evaluated or rated by physicians in connection with your Worker's Compensation claims, correct?
A Rated, yes, I was.
Q Rated. Received a disability rating?
A Yes.
Q It's my understanding that those -- at least one of those disability ratings, and it may have been on both claims, but on at least one occasion you received a lump sum payout for what it's called a whole person impairment.
Is that a term that's familiar to you?



A Yes.
Q And in terms of the lump sum payment that you received in connection with your Worker's Compensation claim, can you recall the amount of any such lump sum payment?
A I believe it was somewhere near a hundred thousand dollars, and I got like 70,000 of it.
Q Did the other monies go to your attorney?
A Yes.
Q Was that the only occasion that you received a lump sum payout?
A No, I believe it was just --
Q If you recall. I may have documents.
A Once the left shoulder was approved, I think there was a lump sum out on that, and also the -- the percentage had been changed. We didn't agree with the percentage. And I went back to go Dr. Betz and it was -- came out at a 10 percent or something, and I ended up getting another lump sum on that, but I don't recall what it was.
Q How recently was that?
A I don't recall.
Q And was that on the shoulder?
A I do believe so.
Q Was it -- can you tell me if it's been in the last 12 months?
A No, it was when they did the evaluations, when Dr.



Betz did the evaluations and set the percentages, and the total body disability percentages.
Q During the time you were involved in your vocational rehabilitation program, notwithstanding there may be outstanding issues on that, you received a monthly amount for vocational rehab maintenance, correct?
A Yes.
Q The document that was produced to me by your attorneys, which appears to be a summary of those sorts of benefits, but the -- on page two, starting -- it says under transaction date 1-29-18, and then it goes backwards by date. And it says 3-21-16. So at least according to the information set forth here, you received those vocational rehabilitation maintenance payments starting March 21st of 2016, and ending January 29th, 2018, a small amount there it appears on the last day.
Does that comport with your memory about when you received vocational rehabilitation maintenance payments?
A Yes.
Q You are not still receiving those at this time?
A No I'm not.
Q However, that could be subject to change depending on the outcome of your current work comp appeal, if you will?
A It could, yes.
Q In connection with your Worker's Compensation claim



and specifically the incident involving Mr. Wegis, were you sent to a mental health care provider named Dr. Lewandowski?
A Yes.
Q It says Ph.D., do you know if he's a psychologist or psychiatrist of some sort?
A Some sort.
Q And approximately how many times did you see Dr. Lewandowski?
A I believe these are -- are these his notes of all our meetings?
Q No, this is a document produced by your attorneys and this, from what I can tell, Mr. Enos, is -- are notes related to his -- it says clinical interview and mental status exam. So -- and review of medical records provided. I think this is his summary of his first examination or evaluation of you.
A I believe I saw him maybe 10 or 12 times.

(At this time Exhibit 43 was marked for identification.)

BY MS. PARKS:
Q Okay. I want to turn to page 3 of Exhibit Number 43. About the middle of the page, second paragraph under effects of incident upon emotional characteristics.
There's a reference there that said he stated he has daymares during the day, when he thinks about the assault, and

is emotionally affected.
Are you still having those sorts of issues currently, Mr. Enos?
A No.
Q About how long did those last?
A I don't recall.
Q Two more paragraphs down, there's -- in a sentence that's starts he has been married, the second sentence there it refers to a step-daughter issue.
Do you see that there?
A Yes.
Q Was there some issue involving your step-daughter that was having an impact on your emotional health or mental health at the time?
A Yes.
Q Can you just generally, without belaboring the point, tell me what that was?
A She was living on the streets in Reno addicted to heroin.
Q Is that a circumstance that has improved?
A Yes.
Q Did you ever have occasion to discuss with Dr. Lewandowski his findings or the findings that are documented in this report?
A No, I never -- I don't recall ever discussing any



findings. I would go and I would speak with him. And then he notified me that the ASC had told him we were no longer speaking about the injuries. And I was speaking more about losing my job, so they didn't want to pay for that. And that was the end of our meetings.
Q Did he ask you to fill out any sort of tests or complete any sort of exams in connection with his treatment of you?
A At some point he did, yes, I had to go into a different room and fill out exams.
Q Questionnaires and that sort thing?
A Yes.
Q But you never had occasion to discuss his actual findings of those --
A Not that I recall.
Q Have you seen a copy of Exhibit 43 before today?
A (Witness paused).
Q Just if you recall seeing that?
A I may have, I don't recall reading that.
Q During your employment as a JPO Senior, and before the industrial accident that occurred on June 21st of 2013, can you describe for me typically what your day was like as a JPO, and how you went about your day?
A I'm sorry, could you repeat the question?
Q Sure. I'm trying to get an understanding of what your



day was like. Whether it was spent in the office primarily, whether it was out of the office, just a typical day as a JPO prior to the time that the issues arose with your industrial accidents?
A Well, I think that's one of the things I loved the most about my job is it was very uncertain what was going to happen. Each day we would come in and check into the office, and I may have taken off right away to hit the field and see kids at school or at home, and especially if we got a call that they weren't at school. If it was a Monday or Tuesday, we would be preparing for court. We would be going to a staff meeting.
We would typically work on reports in the mornings or even the afternoons, just depending on when you decided you wanted to work on your reports and split your time going out in the field and seeing kids, and doing that kind of thing. So it was very volatile. It was ever changing, every day was different, with the exception of some things that were certainties.
Q Tell me about -- was doing visits to probationers' homes a typical part of your duties?
A Yes.
Q Was that something that would be a daily occurrence or would it just depend?
A It would just depend.



Q If you had someone else at JPO, whether it be a supervisor or just another JPO that needed to get in touch with you while you were out in the field doing a home visit, how would they typically get in touch with you?
A Typically on a cell phone.
Q Did you ever have a pager or did you have -- was it all cell phone at the time?
A It just changed with technology. Back when the pagers were popular, it was a pager. Then we went -- we even went walkie talkies at one point. Some kind of weird deal, but at the end it was just our cell phones.
Q Did you have to punch in on any sort of a time clock, or how did you account for your time as a member of the Juvenile Probation Department?
A No, we would show up to the office on time and then leave at 5:00.
Q How frequently would you conduct home visits with other officers at the JPO?
A That's really kind of hard to say, it was just like I said every day changed.
Q What would -- is it fair to say that you had your own case load of particular probationers?
A Yes.
Q And those probationers were the juveniles that were under your supervision?

A Yes.
Q And part of your duties would include going to the homes of the juveniles to see how they were doing?
A Yes.
Q Or for whatever reason you might have to go see them?
A Yes.
Q Did you have to drug test juveniles?
A Yes.
Q Is that going into the bathroom with them and get a sample? Is that sort of what that consisted of?
A Yes.
Q Simple at that?
A Not necessarily simple as that. Especially if it was a female, I wouldn't go into the bathroom. We might have the mother do it. We would do something to accommodate that, so we could still get our test.
Q If you had to do a drug test on a female probationer, would you ever ask Tammy Morris to go with you and assist?
A I can't remember a time that I did home visits with Tammy Morris.
Q So how frequently, if ever, I guess I asked you that, you said it was hard to say. What might prompt you to have another officer go with you on a home visit? Under what circumstances would that occur?
A Walking out the door, hey, Eric, you want to go do



some home visits with me. Hey, Bruce, you want to do some home visits with me. Or if there was any possibility of a dangerous situation either with a kid or with a parent. I had one young man that lifted up in the Indian Hills area, and if his father was out of jail and living in the trailer next to the house, I would always have an officer with me, because he had posed possible problem in the past.
But it occurred one time, and after that he was a gentleman, nice guy. But those would be some reasons. Or I may be asked by one of the other officers to go out and do home visits with him.
Q In a typical week, how often would you say you did home visits alone versus with another officer?
A It's just hard to say because there was never really what we would consider a typical week.
Q Was there a schedule drawn up, a written schedule for JPO's?
A No.
Q So there wasn't a schedule that would say today Mr. Enos and Mr. Anderson are going to work together?
A No. Kathy, I do remember at one point we were subject to some studies whereas wherever we went, whenever the pager went off, we had to circle a bubble as to where we were, what we were working on. Some of those things went on. Those were more to try to get grant money kind of thing.



BY MS. PARKS:
Q In terms of your POST certification, you mentioned the 8 weeks initially, and you became a category two, correct?
A Yes.
Q What POST requirements did you have that were annual requirements, you and the other officers, I should say.
A Well, you had to do 24 hours of training every year, and part of that was 4 hours of defensive tactics course, you had to keep up on CPR and first aid. And I believe first aid was every couple of years. And then we would attend whatever trainings Scott brought up or Vicky brought up or if we found a training we would recommend it to them. Sometimes they would send you or sometimes they would send another officer, but we attended seminars.
I know in the very beginning before Scott came on, I was sent to New Mexico for one, Florida for one, things like that.
But once the budget crisis, the recession hit, we scaled back on those and started doing more free training, things in Reno or things in Tahoe.
Q I was sort of thinking of what are the bare minimum. Do you have to become recertified or do a certain amount of hours through POST yearly to maintain that category?
A 24 hours.
Q Okay. Describe the defensive tactics portion of that?



A Defensive tactics, we always did it downstairs in the law enforcement building, and it was taught by one of the Sheriff's Department defensive tactics trainers.
And we went over all of the same things every year, handcuffing techniques, knife retention techniques, gun retention techniques, take down techniques, all that kind of defensive tactic stuff.
And we would usually do it as a department, so we kind of shut the office down and everybody would go down and participate in that together.
Q With the Douglas County Sheriff's Office instructor?
A Yes.
Q What's the name of -- or do you have a primary care physician currently?
A Yes. Leslie McGraw. I believe that's her name. I think that's her name.
Q Do you know what medical facility she's associated with?
A I think in the buildings right across from the Carson Valley Medical Center, but I can't recall what it's called.
Q She's in Gardnerville?
A Yes.
Q Mr. Enos, you've recently had some other health issues come up in the -- at least the last few months, correct?
A Yes.

**Q That have resulted in your hospitalization?**
A Yes.
**Q And for what reasons have you been hospitalized recently?**
A Pancreatitis.
**Q Is this a condition that was fairly recently diagnosed or a more recent problem?**
A Yes.
**Q When did this initially surface?**
A January -- I believe I was in the hospital January 14th through the 17th. And just woke up on the morning of the 14th and doubled over in pain. But I thought I just had a stomach ache, so I endured it until 4:00 in the afternoon, when my wife insisted I go to urgent care. They diagnosed me and said you have an inflamed -- you have acute pancreatitis and said you will be here for up to 7 days. But by the fourth day they released me.
**Q And more recently it's my understanding you were hospitalized in California?**
A Yes, I went to a follow-up appointment with Dr. O'Neil at the Minden Medical Center. He referred me to the GI Consultants in Carson City. They had me do an MR -- I believe it's called an MRCP. It's like an MRI but of your abdomen. I went for a follow up appointment with that GI specialist on Wednesday. He told me everything on the scope looked



beautiful. I was a clean bill of health. So I felt good about that.
On that Friday we traveled to Southern California for my mother's aunt's hundred year birthday party. And the next morning, one hour before the party, I got hit with it again really hard. My wife took me to the hospital, and I ended up in the hospital for 8 days, had my -- gall bladder was removed, the surgeon and the GI specialist came up and said they had spotted a -- an abnormal narrowing of the liver duct, and a curvature of it down towards the shared duct by the pancreas.
And then the next day they did a second procedure where they went down my throat, and cleaned out the duct and made a couple incisions and opened it up, but they believe they fixed it. So I'm hoping that doesn't ever come back, because -- it's a horrible pain.
**Q Do you have any follow up appointments scheduled to be -- followed for this condition?**
A Not at this point.
**Q Have you been given any restrictions by your doctors in terms of your activities or your diet or anything like that with respect to this condition?**
A No. That frustrated my wife, Kathy, because she asked the doctor what can't he eat. And the doctor said he can eat anything he wants, and Becky said don't tell him that.
**Q So, the name of the doctor you saw or the doctors that**



**you saw for this issue down in first Gardnerville, and then you were sent to Carson City. Can I have those names?**
A In Gardnerville?
**Q Sure. You said O'Neil?**
A Dr. O'Neil is who I was sent to for the follow up after I was at the -- it was like a week later or something. And then he referred me up to the GI Consultants in Carson City, and I saw Dr. Collins.
**Q That's the name of the GI Consultants?**
A Yes.
**Q Are you familiar with the name of Dr. Ashe A-S-H-E as somebody that you may have seen during your Worker's Compensation treatment?**
A If that is Ashland Datt D-A-T-T, he's a physical therapist.
**Q These are just some names that I came across and wanted to see if you could --**
A Okay, yes, he's a physical therapist, and he owns Great Basin Therapy across from the Douglas High School.
**Q We talked earlier about your move to Wellington. And you indicated that you had looked for a rental in the Minden Gardnerville area and couldn't find one; is that correct?**
MR. GEDDES: Objection, to the degree it misstates his testimony.
MS. PARKS: Go ahead.



THE WITNESS: No, that's not correct.
BY MS. PARKS:
**Q Why is it that you moved? I thought you had difficulty finding a place to rent in Minden Gardnerville, which prompted your move to Wellington?**
A I was out of town. And the realtor said I'm sorry --
**Q This is the short sale issue, right?**
A Yes.
**Q Okay.**
A She said I'm sorry. I didn't realize your house would sell so quickly. But they took the first offer that came in, and they want escrow to close, and they want you guys to be out of the house in 11 days.
I cut short what I was doing. I called my wife and said we need to find a place to live, and we need to find it quick.
And she said, John, there's hardly anything available here in the Valley. I've been looking around. One of the only things I found is a house that's like 1800 dollars a month, and we can't forward that right now. But she said I did find a place out in TRE for 1200.
And my first comment to her was, Becky, I'm not living out in -- we call if tweakers running everywhere. So it's a law enforcement -- tweakers running everywhere. Is what the law enforcement --

**Q I wasn't sure what that was.**
A Well, it's called Topaz Ranch Estates. But the law enforcement community as a whole refers to it as tweakers running everywhere.
And I said I'm not going to live out there. And she said, John, we don't have many options. I said okay. When I got home we loaded up my car and went out and looked at it, and I said this is going to have to do. And we went to the landlord, and he said you want to rent it already. And I said we need to start moving 10 minutes ago. And he said okay, all right. That's how we ended up there. It was not our choice to live there, but it was where we out of necessity had to be.
**Q How long is the lease that you have signed on that home in Wellington?**
A It was a one year lease and then it switched to 30 day 30 day, so we can notify them and they can notify us.
**Q And that's what you are on now?**
A Yes.
**Q You've been down there for how long now?**
A Three years.
**Q Have you continued to look or looked for anything back in the Minden Gardnerville area?**
A Absolutely not. I'm sorry, not absolutely not. My wife is always looking and asking can we move here or can we move there.



We took 11 days to move 13 years of stuff, and I told my wife, I said, honey, we're in a place we can afford. I don't want to try to move all this stuff again until we're in a better place in our life, where we can afford something better or in the valley. My wife would still like to be able to get back to the valley eventually.
**Q Describe for me currently what are your typical days, how do you spend your days right now?**
A I spend my days looking for whatever work might be available. I spend my days helping out friends and family. I spend my days with my wife at times helping her with her business that she's trying to start in jewelry. She's working on a website and that kind of thing. It's kind of my days.
**Q We talked about what -- you've testified about jobs that you have applied for since you left Douglas County employment. You indicated there in terms of the first thing you do and how you spend your days, you said looking for employment?**
A Yes. Looking at Indeed -- I have 3 different sites I look at, Indeed, it's called Robert Half and Zip Recruiter --
**Q Robert what?**
A Robert Half. I signed up for those -- for alerts. So the first thing I do in the morning is I get up and go to my e-mail and see if I've gotten any alerts to see if any jobs have come in.



**Q Do you put some sort of a geographical area for your searches on these web sites?**
A It's pretty much from Reno to Lyon County and back around to where we're at.
**Q Do you print out the information that pops up?**
A Yes, other than for the last 4 days, and I have a huge list of e-mails from those companies that I haven't attended to for the last 4 days.
**Q Tell me about any and all light duty that you performed at Douglas County following the initial Worker's Comp incident on June 21st, 2013 before the second?**
MR. GEDDES: Objection to the degree it's been asked and answered.
MS. PARKS: It has not. Go ahead.
THE WITNESS: Well, I came back on the light duty, but I just did my job. I did what I did as a juvenile probation officer. I never ran into any situations that would put me in harm's way, and I continued to supervise my case load, I continued to do what Vicky Lamb and Scott Shick asked of me. I was never really placed on any light duty assignment per se.
BY MS. PARKS:
**Q Did you work more in the office than you had previously?**
A No, I just did my job.
**Q When did you work in the library?**



A That was after Scott said there were no kids in the detention center, and to not go there. I worked at juvenile probation for a couple of weeks, and then he notified me my new place of work would be the library, after he gave away my case load. And I went there I believe in September, August, September, somewhere in there of 2014, prior to my surgery.
**Q Up until when, up until the date of your surgery?**
A Yeah, and I believe my surgery was October 18th of 2014.
**Q Did you return to work in any capacity after your surgery?**
A I tried to return to work when I got my light duty, and that's when Vicky Lamb told me I needed to talk to HR. And HR returned my call and said we do not want you to come back right now, so just stay out.
I told the HR person I haven't missed more than 2 weeks in 20 years in my job, I'm concerned about my job. And she said don't worry about it. Just stay out.
**Q Can you read back my question?**
(The question was read by the reporter.)
THE WITNESS: No.
MS. PARKS: I'm sorry?
THE WITNESS: I said no. Well, let me rephrase that because when they told me to come back on the 17th, 18th and 19th, I did return to work. And I wanted to work, and I told

them I was there to work. And Norma Santoyo told me we're not going to let you work. We're going to consider you a -- voluntary resignation after 3 days of abandoning your job. And I said I am not abandoning my job, I am here to work right now, so I did return to work.

MS. PARKS: Got you. Let's take a short break.

(At this time a break was taken.)

(At this time Exhibit 44 was marked for identification.)

BY MS. PARKS:

**Q Showing you what's been marked as Exhibit Number 44 to your deposition. This is a document produced by your attorneys, Bates stamped number PLF 00414. Again, if you look at the bottom of this note, towards the bottom of the note, Mr. Enos, it says: Physician's name Carol Coats.**

**Do you see that there?**

A Yes.

**Q Physician's name Carol Coats?**

A Yes, I do.

**Q And Dr. Coats is a doctor you treated with in connection with your Worker's Compensation claim?**

A Yes.

**Q This is after the second incident, correct, it's dated August 4th, 2014?**



A It says date of injury, 6-21-2013.

**Q Date of service at the top left, kind of the top left, date of service August 4th, 2014. Do you see that there?**

A Yes.

**Q So that's after the Wegis incident, correct?**

A Yes.

**Q And if you look down the page and said release to restricted duty, and then under comments it says: Must avoid potential altercation or physical contact. Do you see that there?**

A Yes.

**Q Do you recall that that is a restriction that Dr. Coats had placed on your job duties?**

A At this time it must have been.

**Q I mean, if you recall.**

A Only because I'm looking at this form, but I don't recall.

**Q You also treated with a doctor named Dr. Demordaunt in connection with your Worker's Compensation case; is that correct?**

A Yes.

**Q What kind of doctor is Dr. Demordaunt?**

A I don't know, I believe he was looking at my back, I don't know what kind of doctor he is.

**Q Rather than attach this as an exhibit, I'm looking at**



**PLF 00416. It refers to Dr. Demordaunt, and it says transfer of care of your pain management treatment.**

**Do you recall having pain management treatment with Dr. Demordaunt?**

A I remember seeing Dr. Demordaunt, but I'm not exactly sure what it was for.

**Q At any point in time during your Worker's Compensation treatment or the treatment you received in connection were your Worker's Compensation case, did you have injections?**

A Yes.

**Q And who was responsible for giving you injections or who did give you injections?**

A I don't recall.

**Q And do you recall where the injections were performed -- as in the location, the place?**

A Right, I know one was in my back, my lower section of my back.

**Q Do you have more than one set of injections, do you recall?**

A I don't recall.

**Q Do you recall being referred to Dr. Merle Bruce?**

A I remember the name Merle Bruce, I believe that was for tinnitus.

**Q Tinnitus?**

A For hearing.



**Q Okay.**

(At this time Exhibit 45 was marked for identification.)

BY MS. PARKS:

**Q Showing you what's been marked as Exhibit 45, do you recognize any of the handwriting in Exhibit 45?**

A Yes, I recognize my writing under message.

**Q Okay. The note, your handwriting here, it's dated September 4th, 2014. It says: Told me I needed a new order from a doctor for light duty or she would have to send me home. I met with Dr. Cole at 11 a.m. and she fax'd order -- over the new order. Do you see that there?**

A Yes.

**Q Then it says signed. Do you see some initials there? Or is that your signature?**

A No, not my signature.

**Q When it says told me I needed -- who were you talking about?**

A I believe it would have been about Sara in HR calling me. There was a message from her the day before at 4:00.

**Q So this is a message that somebody left for you and this is a note you took on that message?**

A I believe so.

(At this time Exhibit 46 was marked for identification.)

BY MS. PARKS:

Q Showing you what's been marked as Exhibit Number 46 to your deposition. This is another note produced by your attorneys in connection with this case, and the date on it.
If you look under date of service at the upper left, it says September 4th, 2014. Do you see that there?
A Yes.
Q And if you look over on the right side, there is a section or a heading that says permanent disability.
Do you see that there?
A Yes.
Q It says comments: Permanent disability is possible. Do you recall having a conversation with Dr. Coats, which included the possibility that permanent disability was possible?
A No, I do not.
Q There's a comment there just underneath that says he needs to get started for shoulders. Do you see that?
A I do.
Q Do you recall if Dr. Coats actually referred you out to anyone for issues associated with your shoulders?
A Yes. After the injury -- after the attack from the juvenile I was treated for both my right and my left shoulders



at Great Basin Physical Therapy, and then recommended for MRI's on both shoulders from the attack.
Q Then looking down under comments it says: No potential physical contact or altercation.
Do you see that?
A Yes.
Q And that's similar to what Dr. Coats had listed or was listed on Dr. Coats' note previously, correct?
A Yes.
Q Do you recall seeing Dr. Berry, a Dr. Berry?
A I would need to look at his record to recall exactly who he was. I can't remember if he was an ear doctor or if he's the one that gave me the injection in my back.
Q That's all right. Just what you recall.
A But I do remember the name Dr. Berry.
Q You had an MRI done on your left wrist following the incident with Wegis at some point. And I'm looking at PLF 00449, and it says exam date September 22nd, 2014. And I've got a lot of exhibits, so I'm trying to make my attachments a little slimmer here.
Do you recall having an MRI on your left wrist?
A I recall having MRI's, yes, I believe I did on my left wrist.
Q Do you recall speaking with any of your doctors about what the findings were of any MRI or what the problems are with



your left wrist?
A I never could really understand what they were saying. They said it was a torn -- what I remember is a torn TMCC, but I think it was a TFCC. I don't know what that meant, but I just know it causes pain.
Q Have any of your doctors recommended surgery on your left wrist?
A Not that I know of.

(At this time Exhibit 47 was marked for identification.)

BY MS. PARKS:
Q Showing you what's been marked as Exhibit Number 47 to your deposition. Do you recognize Exhibit Number 47?
A Yes.
Q Is that your handwriting towards the bottom of Exhibit 47?
A Yes.
Q What's the significance of this note?
A Zach Wadley was the Juvenile District Attorney -- Juvenile Attorney for the District Attorney's Office for our office, and I believe they were taking Jordan Wegis to court, and he wanted me to be there to testify.
Q So this note is from who, Vicky?
A Vicky Lamb, yes.



Q This is indicating Zach Wadley wanted you to be in the courtroom to testify in the Jordan Wegis case?
A Yes.

(At this time Exhibit 48 was marked for identification.)

BY MS. PARKS:
Q Showing you what's been marked as Exhibit 48 to your deposition. Do you recognize Exhibit 48, Mr. Enos?
A Somewhat recognize it, yes.
Q This is a form produced by your attorneys Bates Stamped PLF 00484. This seems to relate to FMLA leave. Would you agree with me on that?
A Yes.
Q And if you look under -- it's dated December 1, 2014. Do you see that there under date, under your name?
A I see 12-01-2014.
Q December 1, 2014?
A Yes.
Q At some point did you fill out an application for Family Medical Leave?
A Not that I recall.
Q Do you recall ever receiving a copy of this or at least this particular page of Exhibit 48?
A I recall prior to going to see Dr. Eisenhauer I was

handed this, by I believe HR, and they said hand this to your doctor, so that's when I did. But I don't recall looking it over or knowing what that meant.

**Q Do you recall in what month you were asked to give that to Dr. Eisenhauer?**

A I have received 12-6-14, so December 6th of 2014.

I'm not sure if this is the actual document that went to him.

(At this time Exhibit 49 was marked for identification.)

BY MS. PARKS:

**Q Showing you what's been marked as Exhibit Number 49 to your deposition. This is another document produced by your attorneys, this one is from -- again, if you look below, it says Dr. Eisenhauer. Do you see that there?**

A I do.

**Q And the date on this work slash school excuse is December 10th, 2014, do you see that?**

A Yes.

**Q Dr. Eisenhauer here has checked a box that says off work until further notice, do you see that there?**

A I do.

**Q Does this comport with your recollection of Dr. Eisenhauer's work restrictions to you as of December 2014,**



**December 10?**

A I'd have to review medical records because I don't recall what this was following, which surgery this would have been following.

**Q Okay.**

A 1210. This was probably following the salvage surgery, but I don't recall when that was.

(At this time Exhibit 50 was marked for identification.)

BY MS. PARKS:

**Q Showing you what's been -- let's do this.**

MS. PARKS: Let's make this page 2 of Exhibit 50. We can get a stapler and staple them together. These can go together.

BY MS. PARKS:

**Q Showing you what's been marked as Exhibit 50, this is 2 pages and these, Mr. Enos, are documents produced by your attorneys, and they're from Reno Diagnostic Centers. They show MRI's having been done of your right and your left shoulder on December 12th, 2014.**

**Do you recall having MRI's of both shoulders around that time?**

A Yes, I do.



(At this time Exhibit 51 was marked for identification.)

BY MS. PARKS:

**Q Showing you Exhibit 51 to your deposition. Again if you look towards the bottom, this is a note produced by your attorneys, and it appears to have been signed by Dr. Eisenhauer. Do you see that?**

A Yes.

**Q And the date is December 17th, 2014. Do you see that?**

A Yes.

**Q There is another -- under this work slash school excuse it says: Off work until -- and that box is checked. It says: -- further notice, cleared by M.D. Do you see that there?**

A Yes.

**Q As of December 17th, 2014, it appears that you were still off work pending further notice. Does that comport with your memory of the events?**

A After looking at Exhibit 49, and then looking at Exhibit 51, I believe I was seeing him weekly to go get checked up on, so if this is following the salvage surgery, that would make sense.

(At this time Exhibit 52 was marked for identification.)



BY MS. PARKS:

**Q Exhibit 52, Mr. Enos, appears to be a similar document. If you look at the bottom it appears to have been signed by Dr. Eisenhauer. Do you see that?**

A I do.

**Q Dated December 24th, 2014. Do you see that?**

A I do.

**Q Again the box is being checked and says: Off work until cleared by M.D. Do you see that?**

A I do.

**Q Does that comport with your memory of the circumstances of your being off work in December of 2014?**

A Again, looking at the previous exhibits and having weekly appointments with Tahoe Fracture, yes, I believe I was off work and probably following the salvage surgery.

(At this time Exhibit 53 was marked for identification.)

BY MS. PARKS:

**Q Showing you what's been marked as Exhibit 53 to your deposition, Mr. Enos, this is another document produced by your attorneys. It's dated January 6th, 2015, and it's addressed to you. Do you see that there. This letter?**

A I do.

**Q The first sentence says: An appointment has been**

scheduled for you with Patricia Morales, M.D. on Tuesday January 20th, 2015 at 11 a.m. for a consultation. Do you see that?
A I do.
Q Does that comport with your memory as to when you began seeing Dr. Morales?
A Yes.

(At this time Exhibit 54 was marked for identification.)

BY MS. PARKS:
Q Looking at Exhibit 54 of your deposition, Mr. Enos, this is a document from -- well, the facility is listed as Specialty Health. Do you see that?
A I do.
Q Dr. Morales worked at Specialty Health, correct?
A Yes.
Q And it appears that you did see Dr. Morales on -- excuse me, January 12th -- January 20th, 2015. Correct?
A Yes.
Q And Dr. Morales was -- you were seeing her for -- for specifically shoulder issues or was there more that Dr. Morales was evaluating you for?
A I believe just the shoulder issues.
Q All right. And following your evaluation by Dr.



Morales, it appears that she prepared this return to work or work restrictions slip, correct?
A Yes.
Q And under current restrictions it says: Light duty with the following restrictions, no lifting, pushing or pulling with his shoulders, above shoulder lifting, no, condition stable, no, pending surgery, correct?
A Yes.
Q We've talked a little bit about surgery to -- a surgical recommendation for your shoulder, but as you sit here, it's not clear to you what exactly she intended to do or what surgery she was going to perform?
A No.
Q How about -- is it your understanding that Dr. Morales recommended that you have surgery on both shoulders?
A Yes.
Q One first and the next at some other time?
A Yes.
Q Some later time?
A Yes.
Q Do you know which shoulder she was going to operate on first?
A The left shoulder.
Q Okay.



(At this time Exhibit 55 was marked for identification.)

BY MS. PARKS:
Q Showing you what's been marked as Exhibit 55, Mr. Enos, this appears to be a letter from your attorney to Alternative Service Concepts, correct?
A Yes.
Q It says in the second paragraph: Mr. Enos was recently seen by Dr. Morales. Claimant is requesting a change of treating physician for Dr. Morales for treatment related to his shoulders.
So this is after you saw Dr. Morales, and did you want to continue treating with her? Is that what I understand? If you know. This could just be a technicality with respect to your Worker's Compensation.
A Right. Do you mind if I just read it real quick?
Q Please.
A So I'm sorry, what was the question?
Q It looks here in the second paragraph it says: Requesting a change of treating physician to Dr. Morales. And says: Approved the transfer of care.
Did you want to transfer from one physician to Dr. Morales? I'm just wondering if you know.
A Yeah, it must have been some kind of a technicality or something, because Dr. Morales was actually -- I was told by



ASC -- yeah, by Karen Barbee that that is the doctor I was going to go to.
And after I met with Dr. Morales, and she was so caring and concerned, I told -- my attorney said do you want to go to a different doctor. And I said no, I think Patricia Morales is great. Let's go with Patricia. So then I think he wrote this letter.
Q All right.

(At this time Exhibit 56 was marked for identification.)

BY MS. PARKS:
Q You do you recognize Exhibit 56 to your deposition?
A I do.
Q What do you recognize that to be?
A This is on January 28th when Dr. Eisenhauer finally released me to light duty.
Q Okay. And it says no lifting greater than 10 pounds with your right upper extremity, correct?
A Correct.
Q It says return to full duty in approximately 3 weeks. Do you see that?
A Yes.
Q Is it your understanding that Dr. Eisenhauer's intent was to return you to a trial period of full duty following this --

MR. GEDDES: Objection, vague and ambiguous as to the timeframe of his understanding.
MS. PARKS: Go ahead.
THE WITNESS: Not at this time. I had never heard of anything about that. This just said full duty in approximately 3 weeks.

(At this time Exhibit 57 was marked for identification.)

BY MS. PARKS:
**Q Showing you what's been marked as Exhibit 57, to your deposition. Do you recognize Exhibit 57?**
A This is a document from Patricia Morales from Specialty Health to return to work.
**Q A return to work slip, this says for visit date February 5th, 2015. Do you see that there under visit date, it's kind of in the middle at the top?**
A Yes.
**Q Under current restrictions it says: Employee is unable to lift, no pushing, no pulling, above shoulder lifting, no, condition stable, no, condition ratable, no, surgery for -- scheduled for surgery on his left shoulder on February 18th, 2015. From February 18, 2015 he will be TTD'd.**
**Do you see that there?**
A I do.



**Q That's the surgery that we discussed previously that was then canceled; is that correct?**
A Yes.
**Q Did Dr. Morales cancel that shoulder surgery, due to the fact that you had had the wrist procedure, and you were still recovering from that?**
A No, Dr. Morales told me out of the blue I was too heavy to do the surgery, and she wanted me to lose some weight prior to having the surgery. I didn't understand that and I asked her about it. And she said that's what we're going to do. So she canceled the surgery, and I was supposed to see her nutritionist to lose 10 pounds before I had the surgery.

(At this time Exhibit 58 was marked for identification.)

BY MS. PARKS:
**Q Showing you what has been marked as Exhibit Number 58 to your deposition. Have you ever seen Exhibit 58 before?**
A Yes, I have.
**Q What do you recognize Exhibit 58 to be?**
A The same as the last document, Specialty Health return to work from Patricia Morales dated -- date of visit 2-17.
**Q Did you ask Dr. Morales to change your work restrictions after you were -- received a letter from Norma Santoyo?**



A No, I did not.
**Q You didn't talk to her about changing the no pushing, no pulling limitations to no greater than 50 pounds?**
A I didn't speak with her specifically about that, but I called her at the behest of Norma Santoyo, in an effort to save my job, I called Patricia Morales. And I said, Doctor, I'm getting fired from my job for not having full doctor's releases. I said you put on your release I could not lift or push or pull any weight whatsoever. And she said what, I put a weight restriction on there, didn't I. And I said, no, you didn't. And she said, John, you can lift up to 50 pounds right now. I'll send that over to them right away. I said thank you very much, Dr. Morales.
**Q Did the physical condition, the actual condition of your shoulder change in any way between the time you saw Dr. Morales on February 5th of 2015 and February 17th, 2015?**
MR. GEDDES: Objection to the degree it calls for a medical conclusion.
THE WITNESS: No, I don't believe that is why she changed the work restrictions, because of a change in my physical ability. She acted as if she had made a typo or made an error on the original one.
She said you can lift up to 50 pounds, I should have put that on there. And I said could you do that now and send it over to Norma Santoyo. She said I'll absolutely do that for you.



MS. PARKS: Would you read back my question, please?
(The record was read by the reporter.)
MR. GEDDES: Objection. Calls for a medical opinion.
MS. PARKS: Did the condition of your shoulders change between the dates that --
THE WITNESS: I don't recall if there was any change.
BY MS. PARKS:
**Q Did you have any sort of subsequent injury between the time that you saw Dr. Morales on February 5th, 2015 and on twenty 17, 2015?**
A No.
MR. GEDDES: I'm sorry, you said 2017 of 2015?
MS. PARKS: February.
BY MS. PARKS:
**Q Did you suffer any sort of injury to your shoulders between February 5th of 2015 and February 17th of 2015?**
A No.

(At this time Exhibit 59 was marked for identification.)

BY MS. PARKS:
**Q Showing you what's been marked as Exhibit Number 59 to your deposition. Do you recognize Exhibit Number 59?**
A Yes.

Q What do you recognize that to be?
A A work release from Dr. Eisenhauer or a document from Dr. Eisenhauer from Tahoe Fracture & Orthopedic.
Q This is dated February 18th, 2015 and it releases you to full duty, correct?
A May return to work unrestricted as of today. Yes.
Q And we already discussed this. You called Dr. Eisenhauer to ask him about your work release, correct?
A Correct.
Q And we've already covered that discussion?
A Yes. Yes.
Q All right. And at the top of this it says: Fax to Norma Santoyo, and there is a number. Do you see that there?
A I sure do.
Q Is that your handwriting?
A That is not my handwriting.
Q Okay.

(At this time Exhibit 60 was marked for identification.)

BY MS. PARKS:
Q Showing you what's been marked as Exhibit 60 to your deposition, Mr. Enos, this is a record produced by your attorneys from Specialty Health.
Do you see that at the top?



A I do.
Q This is a return to work slip from Dr. Morales. Do you see her name there under signed?
A Yes, I do.
Q And this is dated February 24th, 2015. Do you recall seeing Dr. Morales on or about February 24th, 2015?
A I don't recall.
Q Do you recall having any discussion with her about the restriction that she imposed here for overhead lifting?
A I don't recall.

(At this time Exhibit 61 was marked for identification.)

BY MS. PARKS:
Q Showing you what's been marked as Exhibit Number 61 to your deposition. Again, this is a document that is entitled Specialty Health at the top. Has Dr. Morales's signature there. Do you see that?
A Yes.
Q That it says: Date of appointment April 2nd, 2015. Do you recall seeing Dr. Morales around April 2nd, 2015?
A Around, yes.
Q There is a note here that said: Regarding his back injuries. Do you see that there? Regarding his back injuries, employee is unable to lift greater than 20 pounds, kneel, climb or run. Do you see that?



A I do see that.
Q Was Dr. Morales treating you for back issues, as well as shoulder issues?
A I don't recall her seeing me for my back, but she has here TOC for back and wrist.
Q Do you recall having any discussion with Dr. Morales about these physical restrictions?
A I don't recall, no.
Q You don't recall discussing with her why she changed the lifting restrictions in April --
A I don't.
MR. GEDDES: Objection, asked and answered.

BY MS. PARKS:
Q If I said the term optimization program as something that is in Dr. Morales's notes, does that mean anything to you?
A It may be the weight loss program she wanted to put me on with the 2 nutritionists.

(At this time Exhibit 62 was marked for identification.)

BY MS. PARKS:



Q Showing you what's been marked as Exhibit 62 to your deposition, do you recall -- you testified you believe you were treated by Dr. Fry in connection with your Work Comp claim, correct?
A Yes, I was treated by Dr. Fry but -- Michael Fry, but I also went and saw Paul Fry at one point.
Q All right. Do you recall receiving work restrictions that were imposed by Dr. Fry?
A Looking at this document, it looks like there were some work restrictions from Dr. Fry.
Q I might be wrong, it's hard to read. Were Dr. Fry and Dr. Eisenhauer, they must have been in the same practice? If you look at right --
A Yes.
Q I see what this is saying, it's Dr. Eisenhauer on the right. That's Dr. Eisenhauer, but it says signed by Dr. Michael Fry, not sure about that.

(At this time Exhibit 63 was marked for identification.)

BY MS. PARKS:
Q Showing you what's been marked as Exhibit 63 to your deposition. Exhibit 63 it says: Work status form. And it says: Provider, Peter Costa M.D. Again, at Tahoe Fracture & Orthopedic. Dated May 8th, 2014. And Dr. Costa, just remind

me, treated you for what?
A I believe he was a pain management doctor is why I went to see him. That's the best recollection.

(At this time Exhibit 64 was marked for identification.)

BY MS. PARKS:
Q Mr. Enos, the first surgery that you had on your right wrist, that was performed on February 18th, 2014. Does that comport with your recollection?
A Just reviewing this document, yeah, it looks like it was February 18th.
Q That's why I wanted to show you that, just for the timing aspects of it.
A Okay.
Q After you had your surgery, it's my understanding from reviewing the medical records that there was either a complication or a failure of the hardware that was implanted in your wrist during the first procedure. Is that an accurate statement?
A Yes.

(At this time Exhibit 65 was marked for identification.)



BY MS. PARKS:
Q As a result of that failure of the hardware or complication, you were required to have another procedure; is that correct?
A Correct.
Q And it appears that that procedure was also performed by Dr. Eisenhauer, correct?
A Correct.
Q And from the records produced, including what's been marked as Exhibit 65, the date of that procedure was October 21, 2014. Does that sound right and comport with your memory of that?
A The surgery that was done then was from the second industrial injury, when I was attacked by the juvenile, because when the hardware in my wrist went bad, we couldn't determine what had caused that.
But Dr. Eisenhauer said you are the first person we've ever done this procedure on and this screw broke apart in your wrist. There was a ball joint in the middle of the screw, and he said the ball joint came apart, and the second half of the screw bent.
We don't know how that would have happened. We're going to have to go in and cut all of the ligament out and pull the bones out in order to retrieve the second half of the screw. And he said we're going to do a procedure called a



Brunelli technique.
So while I was pending the Brunelli technique is when I was attacked by the juvenile.
So in October when they did this surgery, the Brunelli technique was no longer on the table, it had to be a, quote, unquote, salvage surgery.
Q I wasn't quibbling about the cause, as being related to first or second --
A I'm trying to be thorough.
Q This is the second right wrist procedure you had was on October 21st, 2014. And as a result of the subsequent issue or incident with Wegis, the procedure that Dr. Eisenhauer had hoped to do was no longer available?
A Yes.
Q And he did the procedure that's outlined in Exhibit 65?
A Yes.
Q Okay.

(At this time Exhibit 66 was marked for identification.)

BY MS. PARKS:
Q And then in January, according to Exhibit 66, which is another surgical note that was contained in the records produced by your attorneys, the hardware in your right wrist was subsequently removed; is that correct?



A Yes.
Q On January 15th of 2015?
A Yes.
Q Okay.
A It wasn't the original hardware that had been in my wrist, but when they fused the bones together in my hand, they drilled in and put pins in, and this is when they went in and removed the pins.
Q That is the third and last so far -- or last surgery you've had on your right wrist; is that correct?
A To this point, yes.
Q Is there any sort of recommendation for future surgeries that has been made or given to you?
A Yes. At one point I asked Dr. Eisenhauer, I said is this the final surgery I'm going to get on this wrist. And he said, no, it's not, John. And I said what do you mean by that. And he said anywhere from 5 years on, your wrist is going to be so full of arthritis, we're going to have to go in and fuse your wrist completely, so it won't move up or down. And he said that could be any time in the next 5 to 10 to 15 years. We don't know. We'll keep an eye on it.
Q Okay. So that was sort of Dr. Eisenhauer's last -- last sort of estimate or recommendation of what might need to be done in the future? Recommendation is not even the right word.

A That's how he answered my question when I asked if I had any further surgeries.
**Q Okay.**
MR. GEDDES: Objection to the degree it misstates his testimony with regard to the question saying it was his last estimate. Thank you.

(At this time Exhibit 67 was marked for identification.)

BY MS. PARKS:
**Q And before looking at Exhibit 67, just with respect to your right wrist, Mr. Enos, have -- you haven't been seen by a medical care provider for some time with respect to your right wrist. Would that be fair to say?**
A Yes.
**Q At least a year?**
A Yes.
**Q Has -- did any of your doctors, did Dr. Eisenhauer, give you any like home exercise programs or other sorts of home remedies that you might try that might lessen your pain and increase your range of motion, anything like that?**
A No.
**Q Have you had any improvement over the time since the hardware was removed in January to the present time?**
MR. GEDDES: Objection, to the degree it calls for



medical opinion.
THE WITNESS: I don't know, that's why I'm going in to get evaluated.
BY MS. PARKS:
**Q That's the evaluation you have on May 1st?**
A I think it's May 1st, yeah, I'm pretty sure.
**Q That includes your right wrist?**
A Yes.
**Q If you could take a look at Exhibit 67, I just want you to identify these for me. For the record, if you would. If this is your handwriting, and if you wrote these notes?**
A Yes, this is my handwriting and, yes, I wrote these notes.

(At this time Exhibit 68 was marked for identification.)

BY MS. PARKS:
**Q If you could take a look at Exhibit 68, please, and same question, Mr. Enos, is that your handwriting on that note?**
A Yes, it is.
**Q At the top of this note it says: Call to Norma 2-26-15, 1:15 I spoke with Sara Christensen. Do you see that there?**
A Yes.



**Q And there's a 1 and 2 with topics listed and a 3. And it says COBRA and long term disability. Are those the subjects that you discussed with Sara Christensen at that time?**
A I would imagine they were.
**Q If you can recall?**
A Yeah. I mean looking at this document, I would have noted those after speaking with Sarah Christensen.
**Q Do you recall anything else or anything about your conversation with Miss Christensen on February 26th of 2015?**
A No, I don't.

(At this time Exhibit 69 was marked for identification.)

THE WITNESS: Kathy, would it be okay to take a quick break?
MS. PARKS: Of course.
(At this time a recess was taken.)
BY MS. PARKS:
**Q Looking at Exhibit Number 69, Mr. Enos, do you recognize Exhibit Number 69?**
A Yes, I do.
**Q What's Exhibit 69?**
A It looks like a document that I made to let Dr. Coats know what my current symptoms and pain levels were.



**Q Okay. So this is something that you typed up?**
A Yes.

(At this time Exhibit 70 was marked for identification.)

BY MS. PARKS:
**Q If you could look at Exhibit 70, please. Take a look at it, and then let me know if you recognize Exhibit 70.**
A Okay.
**Q What is Exhibit 70, Mr. Enos?**
A This was from April 24th, 2006, and was a letter of reprimand that I received from Scott Shick.
**Q So these are notes related to something that occurred in 2006, correct?**
A Yes.
**Q And Exhibit 70, these notes, did you type them back in 2006 or is this something you prepared since you filed suit against the County?**
A No, this would have been back in 2006.

(At this time Exhibit 71 was marked for identification.)

BY MS. PARKS:
**Q Same question with respect to Exhibit 71, Mr. Enos.**

If these are -- if you recognize these as notes that you took, and if you took them back in March of 2007?
A Yes.
Q So these notes were taken back in 2007?
A Yes.

(At this time Exhibit 72 was marked for identification.)

BY MS. PARKS:
Q Same question with respect to this Exhibit 72, Mr. Enos?
A Okay.
Q What do you recognize -- do you recognize Exhibit 72?
A Yes.
Q What do you recognize that to be?
A A document that I typed in 2008.
Q So, again, these are your notes that you typed up in 2008?
A Yes.

(At this time Exhibit 73 was marked for identification.)

BY MS. PARKS:
Q If you would take a look at Exhibit 73, Mr. Enos.



Again, just for the record, I would like you to take a look at that and identify Exhibit 73 for me, if you can?
A (Witness paused).
Q Is that your handwriting?
A Yes, it is.
Q The top of this Exhibit 73 says: Notes from meeting with Norma Santoyo on 2-17-15. Do you see that there?
A At Human Resources, yes.
Q These are notes that you took concerning that meeting; would that be correct?
A Yes.
Q These are your own notes, they weren't provided to Douglas County, these were your personal notes?
A Yes.
Q All right.

(At this time Exhibit 74 was marked for identification.)

BY MS. PARKS:
Q Same question, Mr. Enos, if you could please identify this, if it's your handwriting, and what Exhibit 74 is?
A Yes, it is my handwriting and I believe it's the second page of notes from the first one.
Q Okay.
A I can't see the date. Yeah, I believe it's the



same -- it's just the second page to 73.
Q Okay. Very good.
Let's clip that to the back of 75 with a paper clip. I think you are going to tell me that goes with that.

(At this time Exhibit 75 was marked for identification.)

BY MS. PARKS:
Q If you could look at Exhibit 75, same question regarding if you could identify Exhibit 75 and just tell me what it is?
A Yes, these are my notes.
Q If you -- there's a page Bates Stamp numbered PLF 00651. It's the page I attached with a paper clip, Mr. Enos. Does that appear to be -- does that appear to go along with the other pages in Exhibit 75?
A Yes.
Q If you could turn to page 2 of Exhibit 75, towards the bottom of the page there's a reference to February 10th, 2015. It says: 10:15 a.m. appointment. It says: Dr. Morales canceled surgery to allow my right hand to rehabilitate more and had me meet with her nutrition team.
Do you see that?
A Yes.
Q We talked about the nutrition team, that was a weight



loss issue, correct?
A Yes.
Q Do you recall Dr. Morales saying that in part she was canceling the surgery to allow your right hand to rehabilitate?
A I recall now that I see that I wrote it here.
Q Okay. Could you go to the last page of Exhibit 75. It says: 2-18-15 2:05 p.m., and it says me and Norma. It says phone call with Norman Santoyo. This is your handwriting, too, correct?
A Yes.
Q It says: Norma says we need to call Dr. Morales to find out why she changed her restriction.
It says: Karen Barbee at WC is concerned about that.
Do you see that there?
A Yes.
Q And Karen Barbee she's with ASC?
A Yes.

(At this time Exhibit 76 was marked for identification.)

BY MS. PARKS:
Q Showing had you what's been marked as Exhibit Number 76 to your deposition. This was produced by your attorneys Bates Stamp numbered 00665.
And I just wonder if you can tell me what the

significance of this is?
A The reason that I kept this article is that Deputy Anthony Field had gone through the exact same pretty much parallel situation that I did, and he and I were both at the Great Basin Therapy Department healing and working on our injuries. And he told me his story about Sheriff Perini, who is pictured on the far right, and how Sheriff Perini supported him all through there, especially giving him extra time to recover and to get back on the street as a deputy.
This was a picture that was very disheartening to me because as you can see it says Commissioner Chairman Doug Johnson, Deputy Anthony Field, Vice Chairwoman Nancy McDermitt and Sheriff Ron Pierini recognize Field for 20 years of service for Douglas County.
After I was fired from my job I received my plaque in a Fed Ex box in the mail.

(At this time Exhibit 77 was marked for identification.)

BY MS. PARKS:
**Q If you could take a look at Exhibit 77, please. Have you ever seen Exhibit 77 before?**
A Letter to Patricia Morales from Karen Barbee. I don't believe I have ever seen it.



**Q The CC down there says: File, Douglas County, John Enos, Scott Baker. I'm not making a comment on whether you saw it or not. This appears to be Dr. Morales's handwritten notes in response to a question posed to her by Karen Barbee, or questions.**
**Does that appear that way to you as well?**
A Yes.
**Q All right. And it appears on January 6th, 2015 Miss Barbee was asking the question of Dr. Morales including what treatment do you recommend for the industrial condition.**
**And at this time she said I have submitted request for surgery on left shoulder, right shoulder will be later.**
**Do you see that there?**
A Yes, I do.
**Q That comports with your memory of what Dr. Morales recommended?**
A Yes.
**Q Do you recall being referred to Dr. Benjamin Carey, a psychiatrist, by Alternative Service Concepts?**
A Was that the psychiatric evaluation in Sacramento?
**Q It's a Sacramento guy.**
A Yes.
**Q Was that an evaluation that you had on a one time -- you saw him one time?**
A Yes.



**Q To be evaluated in connection with your Worker's Compensation claim?**
A Yes.

(At this time Exhibit 78 was marked for identification.)

BY MS. PARKS:
**Q Showing you what's been marked as Exhibit 78 to your deposition, Mr. Enos, this is a -- appears to be a treatment note from -- it says provider Paul Fry.**
**Do you see that there under provider on the first page?**
A Yes, I do.
**Q And the date is July 14th, 2015. Do you see that there?**
A Yes.
**Q And it says bilateral -- it says: Office visit, references shoulder. Do you see that there?**
A Yes.
**Q There's handwriting on here on page one; is that your handwriting?**
A Yes.
**Q This note of Dr. Fry's, I think it -- signed by Dr. Fry, electronically. It says: Apparently surgery was**



**recommended. He stated that he declined surgery right away. He had bow hunting. He states he still has some pain in his shoulders, but it is improving.**
**And your note relates to that sentence, correct?**
A Yes, because immediately when I read that it made no sense to me whatsoever. I never stated to him that I had ever declined any surgery at all. And right away I made my notes. I called their office, and I said I never told you I declined a surgery. I need you to change those notes.
He said, Mr. Enos, I'm not changing anything, and that was that. It stayed in his notes, but I never told him I declined any surgeries.
**Q And this says not improving. Did you not tell him you were improving either?**
A I don't -- I wrote that I never declined.
**Q Right.**
A And I don't really understand even my notes, as opposed to his notes. I don't know -- he had bow hunting, I don't even know what that means.
**Q Your note says bow hunt could aggravate, not cause. Can you illuminate for me what you meant by that note?**
A I don't recall you.
**Q Do you recall if Dr. Fry was suggesting your shoulder -- you may have had a shoulder issue that was caused by bow hunting?**

A No. Actually, I went to Dr. Fry, I don't even believe this was paid for by ASC. I went there to get a second opinion. I don't know that they paid for this.

**Q If you turn to the last page of Exhibit 78, please. And there is another handwritten -- there's some handwriting there. Is that yours?**

A Yes.

**Q And it says -- the part that is being pointed to there says: He has been improving. And you wrote not improving?**

A Again, I never told him I had been improving.

**Q And that was relative to your shoulders?**

A Yes. And with all of these doctors, one thing that I've noticed is you speak with them, you talk with them, later on they write their notes, and they get them wrong. And he got it wrong.

(At this time Exhibit 79 was marked for identification.)

BY MS. PARKS:

**Q Showing you what's been marked as Exhibit Number 79, is that your handwriting on Exhibit 79?**

A Yes.

**Q And this appears to relate back to what we were talking about from Exhibit 78, and the note of Dr. Fry; is that correct?**



A Yes.

**Q And is this just documenting your telephone call with him?**

A I believe so, yes.

**Q And this goes on to say: I reminded him that he told me that bow hunting would not have caused my injuries but may have aggravated them.**

**Do you see that there?**

A Yes.

**Q And this note you talked to him, it appears, on August 4th, 2015. Does this refresh your recollection about having a discussion with Dr. Fry about bow hunting, and whether that was possibly part of a cause or an aggravation of your shoulder injury?**

A This refreshes my memory that I did speak with Dr. Fry afterwards, and that he was wrong in his notes, as far as denying my surgery. And it was almost as if he decided he wanted to save some face by not being wrong in the other one and refused to change it.

He said that he had never said that. I told him you did, and he said no, I never did that.

**Q Is your note accurate when you said that I reminded him that he told me that bow hunting would not have caused my injuries, but may have aggravated them?**

A Yes.



**Q Is this note in your call with Dr. Fry -- if your call with Dr. Fry was August 4th, 2015, your visit with him was in July.**

**When before that would have been the last time you went bow hunting?**

A This was August 19th of 2015.

**Q Your call looks like it was August 4th, 2015, according to your note. It looks like on 8-4-15 I spoke with him.**

A Right. Then we would have been speaking about the year before, because I don't think there's any seasons prior to that that I can recall.

**Q Okay. Well, Exhibit 79 says you talked with him on August 4th. Exhibit 78 is an office visit dated July 14th of 2015, where you wrote the notes about him getting those notes wrong.**

**Prior to July 14th, 2015, what's the most recent bow hunting you would have done relative to that visit?**

A Kathy, I would have to look back to see, but I don't believe there's any bow seasons prior to August 4th, so it would have been the season prior to that. It would have been the August before that.

**Q 2013?**

A '14. This was '15.

**Q Okay.**



A August of '15, so August of '14. But if I looked back in the records there may be a record of bow season opening on August 1st. I don't recall.

**Q Just what you recall.**

(At this time Exhibit 80 was marked for identification.)

BY MS. PARKS:

**Q If you could flip through Exhibit 80, please, and tell me if that is your handwriting at the top where it says date 9-14-15 and then your name?**

A Yes, it is.

**Q And is this a questionnaire that you completed?**

A I would imagine it is. I don't know where I did this.

**Q There's a note there, it says fax number, and it says James McCarty. Do you see that there?**

A Yes.

**Q Is that your handwriting?**

A Yes.

**Q You have no reason to question that you filled out the boxes, this questionnaire concerning your activities of daily living?**

A Honestly, I don't recall where this form came from, but I dated it, I wrote my name, and I would imagine that I filled it out.

Q All right.
A Is there any source as to where this originates?
Q I'm not sure this moment, Mr. Enos.

(At this time Exhibit 81 was marked for identification.)

BY MS. PARKS:
Q Mr. Enos, Exhibit 81 that says: Disability Questionnaire, it has the same date as the questionnaire that we looked at in 80. Is that your handwriting on page one of Exhibit 81?
A Yes, it is.
Q Okay. And if you could flip to page two, please.
Is this your handwriting on page 2, as well?
A Yes, it is.
Q All right. And flip to page 3?
A (Witness indicating).
Q That's your handwriting as well?
A Yes, it is.
Q I guess the easiest thing to do is would you flip through the remainder of this, Mr. Enos, and tell me if that is your handwriting throughout?
A Yes, it is.
Q Thank you.



(At this time Exhibit 82 was marked for identification.)

BY MS. PARKS:
Q Mr. Enos, this document was produced to me by your attorneys, and I think recently part of some documents I received. Yesterday. And I was wondering if you can please look at that document that's Exhibit 81 and tell me --
MR. GEDDES: Exhibit 82.
MS. PARKS: Exhibit 92. Tell me what it is.
THE WITNESS: Yes, the County had all of us officers, Vicky Lamb instructed us to put together what we felt were our position description questionnaire.
And so we went through, and as a group or a team, myself and the other probation officers, came up with what we felt were good answers to these questions regarding our jobs.
BY MS. PARKS:
Q Okay. So this was something, an internal sort of survey or something that you filled out regarding the JPO position?
A Yeah, they were going to use this to reshape the job performance evaluations and that kind of thing.
Q Understood. This is dated -- at least there's a notation that says April of 2014. Is that your handwriting?
A Yes, it is.
Q Is that when it was filled out?



A I believe so.
Q Okay.
MS. PARKS: I don't have extra copies.
Bear with me for just a second, I'm nearly done.

(At this time Exhibit 83 was marked for identification.)

BY MS. PARKS:
Q If you would just thumb through that, and just -- if you could tell me if that's your handwriting?
A Sure.
Q Okay. And then as you flip through that, if you could just generally indicate to me whether or not you can identify what Exhibit Number 83 is.
A I believe these are job search results for Ed Howden. When he and I were working on job search together.
Q Okay.
A And job contacts that I made that I needed to report to him.
Q In terms of these job contacts, that are referenced in Exhibit Number 83, the job contacts here and the work that was being done to reach out to these contacts, did this predate your starting classes at Western Nevada -- through Western Nevada Community College?
A Yes, it did. There's also two e-mails from Ed in the



back.
Q Okay.

(At this time Exhibit 84 was marked for identification.)

BY MS. PARKS:
Q If you could thumb through that, Mr. Enos, and tell me if Exhibit 84, if that is your handwriting?
A Yes, it is.
Q Can you tell me, identify for me, what is contained in Exhibit 84?
A More work contacts for Ed Howden.
Q And those work contacts, then, that are depicted or set forth in Exhibit 84, did those predate your beginning course work through Western Nevada Community College?
A Yes, it did.
Q I'm going to refer, Mr. Enos, to page 12 of the Third Amended Complaint. There is an allegation on page 12, and it starts at page 11. It's entitled: Defendant's failure to accommodate Enos's disability arising from the first workplace injury.
Paragraph 22 is at the bottom of page 11, and I'm going to ask you a question about the top of page 12.
It says at the top of page 12 that you were required

**to perform your full duties as a juvenile probation officer, including escorting, restraining and subduing juveniles where necessary and lifting weight in excess of applicable weight restrictions.**

**The allegation is that they, it says Scott Shick, Vicky Sauer-Lamb, Judge Gibbons and Judge Young, required you to do these things, despite the physical limitations that were placed on you after June 21st, 2013.**

**My question to you is how many times were you required to escort a juvenile in excess of or violation of any work restrictions placed on you by a physician?**

A Well, from June of 2013 to the -- you are talking up until June -- the second injury?

**Q I want to know for how long, and then -- what I want to know is -- I want details concerning your allegations in this regard.**

**For how long a period of time do you allege that you were required by the defendants named in this paragraph to perform full duties in excess of those imposed by your medical care providers?**

A Actually from 2013, any time that I was on duty. I was never instructed what light duty entailed. And I was just expected to do my job. And with the second injury, I had actually contacted Shick and Sauer-Lamb and told them that the screw had broken apart inside my wrist, and that I was facing



another surgery.

And Vicky Lamb asked me to do that transport for Eric Anderson. And when you are requested to do something like that, you do it. And I brought him down and was attacked.

**Q That's the second Work Comp injury involving Mr. Wegis, correct?**

A Correct.

**Q Paragraph 22 of your Complaint, going onto page 12 from page 11, and this says: Failure to accommodate workplace -- first workplace injury. Required Enos to perform his full duties as a juvenile probation officer, including escorting, restraining and subduing juveniles where necessary and lifting weight in excess of applicable weight restrictions.**

**Your Complaint references the first Work Comp injury here on 6-21, and then it goes down to say second injury. I want to know how many times you were required to escort a juvenile in what you believed to be engaging in work over and above your restrictions, between June 21st, 2013, the first injury, and the second injury involving Mr. Wegis?**

A It would be hard to say, because when I was on duty, I was expected to do my job. They never gave me any light duty restrictions. They never said we don't want you doing this, we don't want you doing that. It was understood I was to do my job. So if a kid had to be taken into custody, I had to do it. If a kid had to be transported, I had to do it.



We transported kids on Mondays and Tuesdays for court. We arrested kids when they violated their probation terms.

**Q You are saying we?**

A I'm referring to all of the officers, I had to do the same things, and I did that right up until I was requested on the first injury to transport a kid with a broken screw in my wrist, and I did that and I got attacked and the second injury occurred --

**Q This is my only opportunity to ask you questions, Mr. Enos, about what you are basing your claim on.**

**How many times after June 21st, 2013 and up until the Wegis incident, how many times did you have to physically restrain a probationer while on duty?**

A I can't give you a number.

**Q More than 10?**

A Yes.

**Q Were you injured between June 21st of 2013 and the Jordan Wegis incident?**

A Was I injured?

**Q Were you injured on the job?**

A I was on light duty whenever the doctor's note said that I was on light duty, yes.

**Q Were you -- did you suffer any sort of injury while restraining a juvenile between June 21st, of 2013 up until the Wegis incident?**



A No.

**Q How many times were you required to lift weight in excess of any applicable weight restrictions between June 21st of 2013 up until the Wegis incident?**

A I don't know, because any kind of restraint could have been over that weight, and I can't give you a number. I don't know how many times I had to take kids into custody or transport or help them up off the ground or do whatever.

**Q If you use force on a juvenile, is there a use of force report prepared?**

A No.

**Q JPO prepares no use of force reports, if force is used on a juvenile?**

A I definitely write something up for myself. But there's very few times you have to use force on a juvenile. We do not have a certain form that we use to document that, unless Scott or Vicky would ask you to write up something, just like I wrote my Incident Report for the Wegis incident.

**Q After June 21st of 2013, and up until the Wegis incident, to whom did you report that you had been asked to work full duty in excess of your doctor's limitations?**

A Reported directly to Vicky Lamb, she was my immediate supervisor.

**Q And you had a discussion with Vicky to the extent that you believed you were being required to work in excess of your**

**doctor's limitations?**
A No.
**Q You did not tell her that?**
A No, I just did my job. But I was never given any light duty restrictions by my supervisor as to how that would work, and when I spoke with her about it, she said: Geez, John, I don't even know what that means to be honest with you. I don't even know how you are navigating all this stuff. Do what can and do your job.
**Q Did you inform any of your medical care providers that you were being asked to work a job or perform duties in excess of the physical limitations that they imposed on you?**
A No.
**Q And then the Jordan Wegis incident occurred on June 17, 2014, correct?**
A Yes.
**Q And can you give me an estimate of how long you worked in the County library in terms of weeks or months?**
A If I had my calendar, I could.
**Q Just an estimate, if you can?**
A 8 to 10 weeks, something like that.
**Q What sort of duties did you perform in the library?**
A They had me scanning books. They had me redo some kind of tiles they had in the back room that had little stickers on them, and I had redo the stickers. They just had



me doing miscellaneous things, but the main thing was to scan books.
**Q Did you report to either of the Judges -- forgive me if I asked this, we're getting late in the day. Did you report to any of the Judge's that you believed you were being asked to work -- perform duties in excess of physical limitations imposed by your doctors?**
A I wouldn't have gone above Scott and Vicky to the Judges on something like that.
**Q Did you take any notes or prepare any sort of diary, which documents the duties that you were required to perform in excess of physical limitations imposed by your doctors?**
A I took a lot of notes and kept track of a lot of things, but I don't recall whether I did that or not.
**Q Did you give all your notes to your attorneys?**
A Yes.
**Q Can you describe any interaction or the interaction you had with Judge Young on June 17th of 2014, after you got to court, after the Mr. Wegis incident?**
A Yes, I went into court and I was sitting at the table with Zach -- I believe somebody was sitting in for Zach Wadley that day. And I went to the back of the courtroom and I was just standing at the back of the courtroom trying to de-escalate at the time. I felt like I should have been at the emergency room, not in court. And there were people sitting in



there for court, the general public.
And from the bench Judge Young said, Mr. Enos. And I said, yes, Your Honor. And he said how are you. And I said, well, I'm fine, Your Honor. I said but I haven't been -- haven't been punched in the face since 6th grade. And he said, well, maybe it's about time it happened, and he smiled and laughed at me.
And I lost all expression on my face, I couldn't believe that he had said that, and people in the courtroom just kind of looked around. And at that point somebody said, hey, they're bringing him in. And that's when they brought Jordan into testimony courtroom and they proceeded.
**Q Did you have a good relationship with Judge Young prior to that time?**
A I would say I did, yes.
**Q Okay.**
A In the context of a judge and a juvenile probation officer, I would see him in court, and every once in a while he would come over to my office just to comment on a report or something like that. He always liked the work that I did.
I also had known Judge Young as a defense attorney, he was on contract with the County for some time. And we were somewhat adversaries at that point, because he argued that a kid didn't need to go to China Springs Youth Camp. And I'd get up and argue that he did.



And Judge Gamble most of the time went along with my recommendation. But he did a good job as a defense attorney. And at one point while he was in my office, I said, gosh, Todd, you ought to run for District Court Judge, I think you'd be great. And he said thank you very much, John. And eventually he did that. Not because of my suggestion, I'm sure. I knew Judge Young, yes.
**Q Were you rated for permanent disability for both of your Worker's Compensation claims?**
A Yes.
**Q Okay. Do you remember you indicated that you believed that you took a lump sum PPD award of an amount, approximately a hundred thousand dollars; is that right?**
A Yes.
**Q Do you remember for what body part that -- or body parts that lump sum was related?**
A I believe that most of it was for my right wrist, but it was a combination of all the different injuries, but I do remember that the right wrist was the most prominent of all.
**Q Do you remember what your whole person impairment rating was?**
A I believe it was 32 percent on one claim, and it was 8 percent on another claim. And then we appealed that and I was re-evaluated to a 10 percent on that one, so I believe it was a total of 42 percent --

Q Did --
A -- disability.
Q Who is Bill Pemberton?
A Bill Pemberton is a friend ever mine down in Bridgeport, California.
MS. PARKS: I have no further questions.
MR. GEDDES: I have some cross. Do you want to go right into it or take a quick break?
MS. PARKS: No, we need to do it now.
EXAMINATION
MR. GEDDES: Just give me a second here, please.
BY MR. GEDDES:
Q Mr. Enos, do you recall you were asked questions earlier today comparing the job descriptions of the chief deputy juvenile probation officer and senior deputy juvenile probation officer?
A Yes.
Q I believe you were asked questions as to whether the requirements for the positions were the same and --
MS. PARKS: Objection, misstates my question, counsel.
MR. GEDDES: I haven't asked my question yet.
MS. PARKS: Don't misstate my questions in your cross, please.
BY MR. GEDDES:
Q At any rate, do you recall being asked questions with



regard to comparing those positions?
A Yes.
Q How would you compare the physical requirements of a senior juvenile probation officer and the chief deputy juvenile probation officer, both with respect to how it is written on paper, and based on your experience, how the real world operates on those positions, based on your experience?
A Based on paper, I would have to actually review the job descriptions. I don't know that --
Q Let's look at these job descriptions just one second. I believe you were looking at Exhibit 21 when you were asked those questions. Let's go to that Exhibit. Exhibit 21 is the Exhibit for Chief Deputy Juvenile Probation Officer. And Exhibit 20 has been marked as a Juvenile Probation Officer Senior.
A Okay.
Q So if you were to compare what's on paper with respect to the physical requirements of the jobs, would they be the same or would they be different?
A They would be different.
Q How so?
A Well, I mean, I could go one at a time here. There's different things on the Chief Deputy Juvenile Probation as there is on a senior juvenile probation.
Q I'm not talking about essential functions, I'm talking



about physical requirements. Physical demands.
A They are written differently. There may be some similarities, but this is written differently.
Q You are saying this, what are you pointing to when you say this?
A The physical demands for a Juvenile Probation Officer Senior. While performing the duties of this job, the employee is regularly required to stand, walk, sit, and drive, use hands to finger, handle, or feel, reach with hands and arms, talk and hear. The employee is occasionally required to climb, balance and stoop, kneel, crouch or crawl and must frequently lift and or carry up to 50 pounds. Specific vision abilities required by this job include close vision, distance vision, color vision, peripheral vision --
MS. PARKS: Slow down a little bit.
THE WITNESS: I'm sorry.
And ability to adjust focus.
Under the Chief Juvenile Probation Officer. Says: Mobility to work in a typical office setting and use standard office equipment, stamina to sit for extended periods of time, vision to read, printed materials and a computer screen, and hearing and speech to communicate it over the telephone and radio systems. Traverse difficult terrain, strength and stamina to physically restrain suspects, running, climbing standing, squatting, and sitting for prolonged periods of time.



Occasionally lift and carry up to 50 pounds, strength to subdue persons to drag, carry and lift persons and objects. Vision to read printed materials and a computer screen, and hearing and speech to communicate in person or over the telephone, vision to read printed materials and hearing and speech to communicate in person or over the telephone, exposure to traffic conditions and external environment when traveling from one office to another, dexterity to write and to shoot a gun.
BY MR. GEDDES:
Q Now, what you are reading from is the job description for Chief Deputy Juvenile Probation that was revised on July 1, 2015, correct?
A Correct.
Q That revision occurred after your separation of employment?
A Correct.
Q And the version that you read for the Senior Juvenile Probation Officer, what version was that?
A That was last updated in November of 2008.
Q Now, did you have an opportunity as a Senior Juvenile Probation Officer to observe the physical demands placed on the Chief Deputy Probation Officer during your tenure?
A Yes, I did.
Q How would you compare the physical demands based on your experience of chief deputy versus a senior with respect to

**physical demands and work out in the field?**

A Much different, because the Chief Deputy Juvenile Probation Officer rarely did any work out in the field. It was a supervisory position, as opposed to a position of -- the only time they would ever need to restrain or help would be like the situation with Wegis.

So most of the time they were just in their office working on the computer or supervising the officers. They were never out doing the other stuff.

**Q Now, when you were asked questions regarding looking -- you talked about Eric Anderson and his request to take a 2 week training course. Do you recall your testimony?**

A I recall that Eric Anderson was involved in the leadership training that was the third Thursday of ever month, I believe, throughout the entire year, which constituted 12 days of training.

**Q I'm sorry, I might be mis-asking about the wrong person. Who was the person that you saw that Scott Shick had approved the leave request?**

A That was Mike Torres, it was not for training. It was not work related, it was for a family vacation.

**Q How did you have an opportunity to learn he was approved?**

A He's leave slip was sitting on the copy machine.

**Q Can you describe what you mean by that, was it on top,**



**was there a top lid to that machine?**

A The copy machine sat right next to the desk. It wasn't on that copy machine to be copied, it was sitting on the copy machine.

**Q Did you go into his personnel file to look at that document?**

A Absolutely not, no.

**Q Do you recall you were asked questions about why you sued Vicky Sauer-Lamb?**

A Yes.

**Q And you gave some testimony about the incident, which led to the second workplace injury. And after that incident you testified regarding Vicky Sauer-Lamb asking you to -- let me ask it this way.**

**What was the incident about which you complained when you believe she was asking you to work in excess of your work restrictions?**

MS. PARKS: Objection, vague and ambiguous, compound.

MR. GEDDES: Do you understand my question?

THE WITNESS: I do.

BY MR. GEDDES:

**Q What was the incident you testified about concerning that?**

A Vicky Lamb told me I was needing to do a transport of a juvenile from the detention center down to juvenile



probation.

At the time I was under doctor's instructions not to be near a combative juvenile. And I voiced to Vicky I didn't think it was a good idea. And I asked her if she could find someone else to do the transport. And she said you can take Bruce with you.

And I said I don't think it's a good idea, if Bruce gets attacked, what am I supposed to do. And she said that's easy, you just step back and call 911. And I said, Vicky, I can't stand there and watch a fellow officer get beat up by a kid. I would have to be involved. And right now my doctors have said I can not be around any juveniles that may be combative.

She kind of just said okay, fine. And I walked down -- she said I'll find 2 other officers to do it. And I went down to my office, and the next thing I know she came down and said you need to come down to Scott Shick's office, we need to talk.

And they told me I needed to go to HR, which is somewhat of a death sentence for any County employee to know when you are going to HR for a meeting like that, it isn't good.

**Q The context of the question you were asked is why you sued Vicky Sauer-Lamb. I don't think you included that. Would you include that incident? Are you alleging that incident was**



**the basis for which you are faulting or suing Vicky Sauer-Lamb?**

A Yes.

**Q Why?**

A I believe at that point I was participating in protected conduct, and she did not give me a reasonable accomodation. She gave me a reasonable accomodation, but then I suffered for it and I was retaliated against for it.

**Q You gave some brief mention towards the end of your examination concerning Vicky's understanding of accomodation. Could you explain that a little better?**

MS. PARKS: Would you read that question back, please?

(The question was read by the reporter.)

MS. PARKS: Objection, vague and ambiguous, calls for speculation as to what Vicky Sauer-Lamb knew or didn't know about the meaning of accomodation.

BY MR. GEDDES:

**Q Let me rephrase my question. I'm happy to do so.**

**Do you recall a conversation with Vicky Lamb about being accommodated under the ADA or your rights and working light duty?**

A Yes, I remember I went into her office and she had made a comment about, golly, I'm glad you have an attorney,

because I wouldn't be able to navigate these waters. And I said, Vicky, it's hard. All these doctor's appointments and everything, I'm just trying to do my job.
And she said, John, I don't even know the first thing about light duty or anything like that. We haven't had anybody like on this or we haven't had anybody that needed accommodations like this in the past.
**Q Do you fault her for lack of knowledge on that matter?**
A Absolutely.
**Q Why?**
A Because I think it's intentional, it's not accidental. She's my supervisor, she should know those things.
**Q Now, you were asked questions about whether you have evidence concerning whether Vicky and Scott -- either met, or however it was phrased, regarding your separation.**
**And I'm not sure if you said that you did or didn't, my take is that you might have not offered evidence. But let me ask you this. Did they meet regarding your cases being transferred away?**
A Yes.
**Q Can you describe that meeting?**
A Well, Scott told me -- again, I was asked to come down to the office, and Scott told me he was going to transfer my cases away to the other officers. He said he didn't want me to see it as a bad thing. I told him I was concerned about it.



And he snapped back at me and said you don't think my officers are good enough to take care of your kids.
And I said, Scott, that's not the case at all. I've never not seen one of my cases to the end, and you want me to give my cases out to everybody else in the office. And Vicky was right there. Vicky said, yeah, you just need to go and you need to brief everybody on these cases, so that they can take them over.
**Q Do you believe that the transferring of your cases was related to your separation of employment?**
A Absolutely.
**Q How?**
A It was a permanent thing. It wasn't like they were transferring my cases off on a temporary basis, they were transferring them away from me for good, and I was being put over at the time library. It was the beginning of the end.
**Q Do you consider that meeting between Vicky and Scott and you to be evidence that they worked together inappropriately causing your separation of employment?**
A Yes.
MS. PARKS: Objection, lacks foundation, calls for a legal conclusion, vague and ambiguous.
MR. GEDDES: Okay, let's go back over the foundation.
BY MR. GEDDES:
**Q Were they in a meeting together?**



A Yes.
**Q Do you believe that they had addressed the issue before you got there?**
A Yes.
MS. PARKS: And totally argumentative with respect to the use of the term unlawful or improper or whatever term was used by counsel.
MR. GEDDES: Let me remove unlawful. Do you believe this meeting was evidence that Vicky Sauer-Lamb and Scott Shick worked together to cause your separation of employment?
THE WITNESS: Yes.
BY MR. GEDDES:
**Q And do you fault them both for that?**
A Yes.
**Q Now, you were asked questions about 4 audio clips that were produced, I believe, as PLF 03211 and you were asked how you recorded them. And I believe your testimony was to the effect you recorded them on the phone.**
**You were asked if you had advised anyone that they were being recorded, and I believe that your answer was no. So I have a question about that.**
**Were you asked by Scott Shick at any time whether you had recorded him or were recording him?**
A In one meeting I went to, I was meeting with he and Vicky. And all of a sudden he stopped the meeting and said are



you recording me right now. And I looked right at him and honestly said, yes, I am. And he said get out of my office. And I got up and I walked down to my office.
Shortly after, Vicky Lamb came down and she said Scott wants to see you. I said, okay, I went back down. I sat down. And he said, John, why are you recording me? And I said because I don't trust you at this point, Scott. I think that you are trying to get rid of me.
**Q Now, there were a lot discussions, a lot of questions during your testimony today, I'm going to ask it in one general question rather than go through every single time you were asked this.**
**You were asked questions about your ability to perform your job, whether you were permanently disabled and the like.**
**Was that information and was your status as disabled and unable to do your job, was that with or without a reasonable accomodation from the County?**
A I believe that I could perform the essential functions of my job right now with a reasonable accomodation.
**Q But the question I'm asking you is during the time that you applied for PERS disability, and you made statements and in documents concerning your permanent disability or an inability to perform your job, what is the context of those statements?**
**Was that -- let me ask my question -- was that an**

inability to do your job with a reasonable accomodation or without a reasonable accomodation?

A Without a reasonable accomodation.

Q You were asked questions regarding your disability benefits, your PERS disability benefits. And I believe you were shown Exhibit 38. Let's go to that.

Miss Court Reporter, do you have Exhibit --

MR. GEDDES: I have it, never mind.

BY MR. GEDDES:

Q And you were shown this, and I believe -- well, I'll ask it this way. Your understanding of your PERS disability was that you could not work in public employment where there was PERS; is that correct?

A If I took a job that was PERS related, I would lose my medical retirement.

Q So it wasn't that you couldn't take a PERS job or a public employment job, it's that if you did so, you would have to give up your PERS benefits?

A Yes.

Q And were you willing to do that?

A If I could have got my job back, yes.

Q It said also there was a restriction for you not doing work -- doing work in the same field or the same work for which you were injured.



Did that prohibit you to your understanding from doing that work in the same field at all or were you allowed to do it if you gave up your PERS?

A I was allowed to do it, if I gave up my PERS.

Q And would you have?

A For another juvenile probation position somewhere else? Yes.

Q You were asked questions regarding Exhibit 79.

MS. PARKS: I have to leave soon. How much more do you have, counselor?

MR. GEDDES: Not much more.

BY MR. GEDDES:

Q You were asked questions about Exhibit 79, regarding a disagreement that you had with Dr. Fry, regarding bow hunting?

A Yes.

Q Do you recall that?

A Yes.

Q Did any doctor at any time ever tell you that it was okay to go hunting with a bow?

A Yes.

Q Who and what were the circumstances?

A Dr. Eisenhauer, and it was prior to going to hunt my bull elk and my cow elk. And I spoke with him and I said could this cause any further damage to my wrist, and he told me no, go ahead and go hunting.



Q Were you able to safely hunt without injuring your wrist?

A Yes, I was.

Q How so?

A I have a release aid that goes around the wrist, right above the wrist, and you hook that to the bow, and when you draw back, you draw straight back with your elbow, and then you just touch a trigger. So there's no use of the hand and there's no use of the wrist.

Q Was there an investigation of that matter that took place by your employer?

A Yes, there was a witch hunt that took place.

Q What was the result of the investigation?

A Honestly, I don't know. I believe it was unfounded that I did anything wrong.

Q Were you ever disciplined by your employer for that incident?

A No.

Q There was some conversation about Exhibit -- well I don't know if it was that Exhibit 84, but it was towards the end of your testimony. But you were asked a question about whether from the time of your first workplace injury to before your second workplace injury, whether you were injured during that period, for example, restraining a probationer or for courts and arrest. And so I think your testimony is unclear in



this regard.

Prior to being injured a second time, you were at some point during that period, after the first injury and before the second injury, you were scheduled to have, I believe, as you described it as a Brunelli surgery --

A Yes, I can't remember the exact date I went to Dr. Eisenhauer. It was somewhere after the slick screw surgery. I went in and he x-rayed my hand, and I could hear him and the nurse out there talking. When he came back in I said, Doctor, what's going on.

And he said, John, we don't know what happened, but that screw inside your wrist popped apart. It didn't break, it popped apart. And he said but the second half of it is bent and we have no retrieval process for that.

And I said, Doctor, how did that happen. And he said I don't know, what did you do. And I said, Doctor, you told me not to lift a cup of coffee. Nothing heavier than a cup of coffee. And I've stuck to that one hundred percent, so I don't know.

He told me, well, we're back to square one, but it's even worse. Because now we have to cut through all of that tendon, I mean all of that ligament, pull the bones up out of your wrist in order to retrieve the second half of that screw. At that point we'll do the Brunelli technique. That we were going to do originally, had we not done the slick screw

surgery.

I did not see that as an injury, because I didn't remember anything happening to it, until the doctor x-rayed it and said the screw had popped apart.

**Q Does that indicate that your injury got worse from the time of your original medical procedure arising from the first workplace injury --**

A Yes.

**Q -- prior to the second workplace injury?**

A The --

MS. PARKS: Objection, calls for speculation, calls for a medical conclusion and opinion.

MR. GEDDES: And you base it on the facts you just stated?

THE WITNESS: Yeah, actually it's in the medical records that Dr. Eisenhauer x-rayed it and made that discovery.

BY MR. GEDDES:

**Q What happened to cause your Brunelli surgery, the intent to perform the Brunelli surgery, and then suddenly to have the salvage surgery?**

A I was awaiting the Brunelli technique, we just found out the Brunelli technique was the next one up. And that's when Vicky Lamb requested that I transport a kid from juvenile probation, and it was Jordan Wegis.

When I brought him down he attacked me, and part of



that attack was he grabbed my hand and tore down on it. Disassociated all of the bones in my wrist. And I went back to Dr. Eisenhauer, he said all of the bones are disassociated in your wrist.

MR. GEDDES: Okay, pass the witness.

FURTHER EXAMINATION

BY MS. PARKS:

**Q What accomodation do you think Douglas County should have provided you following your workplace injuries?**

A Well, there's a lot of things that could have happened. I could have had an officer assigned to me to work with me.

**Q All the time?**

A Sure. Okay.

**Q What else?**

A Sure we have officers --

**Q What else?**

A -- in the department that do that.

**Q What else? What else? What other accommodations?**

A Kathy, I'm not a supervisor and I'm not -- that's not my realm. I'm a juvenile probation officer, so I don't know what other accommodations they could have provided for me.

**Q Well, we had a discussion and your attorney asked you about whether or not, when you were speaking about your**



**disabilities, and your inability to perform the essential functions of your job when it came to your PERS application or otherwise, whether that was with or without accomodation. And you said I believe I could do my job with accomodation, correct?**

A Correct.

**Q So I want to know your lay person opinion of what accommodations you think should -- would have been reasonable under the circumstances to have provided you?**

MR. GEDDES: Vague and ambiguous as to timeframe.

THE WITNESS: Because it would depend on what restrictions I was under at the time.

BY MS. PARKS:

**Q After June 21st of 2013, up until the time of the Jordan Wegis incident, what accommodations should they have provided you in your mind that would have been reasonable?**

A It would depend upon what the doctor's excuses were at the time during that time period. So if there was a 10 pound weight limit, that I would need another officer to be with me. If I could lift up to 50 pounds, at that point I wouldn't need an accomodation.

If I was on light duty, whatever the weight restriction was, I would need help or I would need another officer to go do a transport or do a transport for me.



**Q After the Jordan Wegis incident, the medical records over time up until around February 18th of 2015, talk about you avoiding situations that might involve confrontational juveniles. You would agree with that?**

A When I was at work.

**Q Right.**

A For the most part of that I wasn't at work.

**Q If you had a doctor, such as Dr. Eisenhauer did on March 6th of 2015, who said Mr. Enos can't perform the essential functions of his job, because he can no longer subdue argumentative persons, what accomodation do you think Douglas County could have provided you, which would have addressed that particular restriction?**

A To work with argumentative juveniles?

**Q Just what accomodation do you believe Douglas County could have provided you, if Dr. Eisenhauer determined that you were unable to perform one of the functions of the job, which was subduing unruly --**

A They could have done a complete restructure of my position. I could have worked in the office or did all court work or did office groups with the kids or done anything. They could have gotten me out of that situation, as in a combative situation with a kid.

**Q Did you bring that up to anyone, Vicky Sauer-Lamb or Scott, about these may be some ideas about how my job could be**

**changed?**
A I didn't feel that was my responsibility, but when I did bring up ideas and concerns, I was retaliated against, so, no, I didn't want to.
**Q What ideas?**
A That I shouldn't do a transport, because I have a broken screw in my wrist.
**Q The rehashing, we've already talked about this. You've already testified to this, right?**
A Yes.
**Q Did you ever tell Dominic Molyneux that you intended to milk your Work Comp claim for everything it was worth?**
A Absolutely not.
**Q So if he testifies you did say that, he would be lying?**
A Yes, he would.
**Q Okay.**
MS. PARKS: I have no further questions.
MR. GEDDES: I have just a few more cross.
FURTHER EXAMINATION
By MR. GEDDES:
**Q Mr. Enos, do you believe you requested an accomodation by asking for unpaid leave in a letter that you wrote to Scott Shick?**
A Yes, I did.



**Q Shortly before you were separated from employment?**
MS. PARKS: Objection, calls for a legal conclusion.
MR. GEDDES: Go ahead, answer the question.
THE WITNESS: Yes, I wrote a letter and I asked for unpaid leave. I asked for time to get my medical issues under control. I asked for -- I asked for -- I would take any job in the County, anything to keep my County employment.

BY MR. GEDDES:
**Q So would you include on the list of accommodations that you believe the County could have made and Miss Parks asked you about, unpaid leave?**
A Yes.
**Q Would you add to that list transfer to other available positions for which you qualified in the County?**
A Yes.
**Q How many arrests have you made over the years?**
A Thousands.
**Q How many of those arrests were you assaulted?**
A One -- well, I'm sorry, 2 where juveniles tried to just get away from me. With one being an attack, a personal attack.
**Q And that attack was?**
A Jordan Wegis.
**Q But that wasn't during an arrest?**



A No, it wasn't during an arrest.
**Q I asked about arrests?**
A I was never attacked by a juvenile when I was trying to arrest.
**Q Tammy Morris, does she receive assistance?**
A Yes.
**Q Can you describe what assistance she receives?**
A She doesn't feel comfortable doing home visits, so any time she goes out, she has another officer with her. And especially if it's a male juvenile, so she can test the male juvenile, she always takes another officer with her.
**Q To your knowledge has that been a problem having officers assist her?**
A No.
MR. GEDDES: Go ahead and pass the witness.
MS. PARKS: No further questions.
MR. GEDDES: Mr. Enos, you are going to have an opportunity to review your transcript. Do you want to talk to him about that?
MS. PARKS: No, I don't. I mean, he's -- you want the original sent to --
MR. GEDDES: Yeah, yeah, we can have the original sent to us. He'll have 30 days to review it.
(A discussion was held off the record.)
MS. PARKS: Once the deposition transcript is



prepared, Mr. Enos, you will be notified that it's finished, and you will have an opportunity to review your deposition transcript at Sunshine. And make changes that you believe are necessary, subject to the rule that if you make changes to your deposition on issues that are material, and subsequently testify differently, at trial, I may use that to comment upon your credibility. Are you aware of that?
THE WITNESS: Yes.
MS. PARKS: Just be aware of that when you are reviewing and signing.
MR. GEDDES: Thank you everyone. I'll get a copy.
THE WITNESS: Thank you, Kathy.
MS. PARKS: I'll take a regular, condensed and an e-trans.

(The proceedings concluded at 6:00 p.m.)

STATE OF NEVADA )
) ss.
WASHOE COUNTY )

I, LINDA B. SHAW, a Certified Court Reporter and Notary Public in and for the County of Washoe, State of Nevada, do hereby certify;

That on Thursday, the 18th day of April, 2019, at the hour of 9:00 a.m. of said day, at THORNDAL, ARMSTRONG, DELK, BALKENBUSH & EISINGER, personally appeared JOHN MICHAEL ENOS, who was duly sworn by me to testify the truth, the whole truth and nothing but the truth, and thereupon was deposed in the matter entitled herein;

That said deposition was taken in verbatim stenotype notes by me, and thereafter transcribed into typewriting as herein appears;

That the foregoing transcript, consisting of pages 1 through 262, is a full, true and correct transcription of my stenotype notes of said deposition.

DATED: At Reno, Nevada, this 2nd day of May, 2019.

[signature]

LINDA B. SHAW, CCR #123, RPR, CP



ERRATA SHEET

I declare under penalty of perjury that I have read the foregoing _______ pages of my testimony, taken on _________________________ (date) at __________________(city), _________________(state),

and that the same is a true record of the testimony given by me at the time and place herein above set forth, with the following exceptions:

| Page | Line | Should read: | Reason for Change: |
|---|---|---|---|
| ___ | ___ | _________________________ | ___________________ |
| | | _________________________ | ___________________ |
| ___ | ___ | _________________________ | ___________________ |
| | | _________________________ | ___________________ |
| ___ | ___ | _________________________ | ___________________ |
| | | _________________________ | ___________________ |
| ___ | ___ | _________________________ | ___________________ |
| | | _________________________ | ___________________ |
| ___ | ___ | _________________________ | ___________________ |
| | | _________________________ | ___________________ |
| ___ | ___ | _________________________ | ___________________ |
| | | _________________________ | ___________________ |



ERRATA SHEET

| Page | Line | Should read: | Reason for Change: |
|---|---|---|---|
| ___ | ___ | _________________________ | ___________________ |
| | | _________________________ | ___________________ |
| ___ | ___ | _________________________ | ___________________ |
| | | _________________________ | ___________________ |
| ___ | ___ | _________________________ | ___________________ |
| | | _________________________ | ___________________ |
| ___ | ___ | _________________________ | ___________________ |
| | | _________________________ | ___________________ |
| ___ | ___ | _________________________ | ___________________ |
| | | _________________________ | ___________________ |
| ___ | ___ | _________________________ | ___________________ |
| | | _________________________ | ___________________ |
| ___ | ___ | _________________________ | ___________________ |
| | | _________________________ | ___________________ |

Date: ___________ _______________________________

Signature of Witness

_______________________________

Name Typed or Printed

ERRATA SHEET

I declare under penalty of perjury that I have read the foregoing 262 pages of my testimony, taken on April 18, 2019 (date) at Reno (city), Nevada (state),

and that the same is a true record of the testimony given by me at the time and place herein above set forth, with the following exceptions:

| Page | Line | Should read: | Reason for Change: |
|---|---|---|---|
| 18 | 5 | Morisolli | Wrong Spelling |
| 18 | 18 | "Teen" not "Team" | Wrong Word |
| 20 | 24 | "Teen" not "Team" | Wrong Word |
| 24 | 8 | "To" not "Top" | Wrong Word |
| 104 | 20 | "Sauer-Lamb" not "Saw Alarm" | Wrong Words |
| 113 | 8 | Dr. Harjes | Wrong Spelling |
| 152 | 18 | "Hurt" not "Heard" | Wrong Word |
| 176 | 14 | "Ashwin" not "Ashland" | Wrong Name |
| 238 | 4 | "Of" not "Ever" | Wrong Word |
| 247 | 16 | Remove "Time" | Not Needed |

ERRATA SHEET

Page Line Should read: Reason for Change:

Date: May 29, 2019 [signature]

Signature of Witness

JOHN M. ENOS

Name Typed or Printed

CONFIDENTIAL by Court Order in Enos v. Douglas County, et al., Case No. 3:17-cv-00095 (U.S. Dist. Ct. Nevada)
(Stipulated Protective Order Re Confidentiality of Documents Produced in Litigation, ECF 029, 7/12/2017)

Carson Valley Medical Center
YOUR COMMUNITY HOSPITAL

**CVMC Occupational Health & Medicine**
897 Ironwood Dr - Minden, NV 89423
Phone: 775-782-1615 - Fax: 775-783-8019

# Occupational Health Network Progress Report and Disability Certification

| | | |
|---|---|---|
| Date of Service: **6/23/2014** | No Show: **No** | Date / Time of Next Visit: 07/07/2014 2:30pm |

**Claim Information**

| | |
|---|---|
| Patient Name: **John M Enos** | Claim Number: |
| Employer: **DOUGLAS COUNTY JUV DETENTION** | Date of Injury: **6/17/2014** |
| Insurer / TPA: **Alt Svc Conc (asc)** | ID / SSN: [redacted] |
| Occupation: **Probation Officer** | Diagnosis: **The primary encounter diagnosis was Cervical sprain, initial encounter. Diagnoses of Head injury, closed, without LOC, initial encounter, Left wrist sprain, initial encounter, Contusion of left chest wall, Sprain of left shoulder, initial encounter, Sprain of right shoulder, initial encounter, Right wrist pain, and Acute stress reaction were also pertinent to this visit.** |

**Medical Information**

Related to Industrial Injury? **Yes**

Subjective Complaints: **Pain in the neck, both shoulders, back and both wrists. He has hardware in his right wrist that was scheduled to be removed. He now has increased pain in the right wrist. He is having difficulty sleeping.**

Objective Findings: **Limited range of motion of the cervical spine, thoracic spine and lumbar spine. Edema and tenderness of the right wrist.**

Pre-Existing Condition(s):

Assessment: **Initial Visit**

| | |
|---|---|
| Status: **Additional Care Required** | Permanent Disability: **No** |

Plan:

Diagnostics:

Comments:

**Disability Information**

Status: **Released to Restricted Duty**

| | |
|---|---|
| From: **6/23/2014**<br>Through: **7/11/2014** | Restrictions are: **Temporary** |

**Physical Restrictions**

| | | | |
|---|---|---|---|
| Sitting: | Standing: | Stooping: | Bending: |
| Squatting: | Walking: | Climbing: | Pushing: |
| Pulling: | Other: | Reaching Above Shoulder (L):<br>Reaching Below Shoulder (L): | Reaching Above Shoulder (R):<br>Reaching Below Shoulder (R): |

**Not to exceed Weight Limits**

| | | | |
|---|---|---|---|
| Carrying(hrs): | Weight Limit(lb): **< or = to 25 pounds** | Lifting(hrs): | Weight Limit(lb): **< or = to 25 pounds** |

Comments: **Very limited use of the right hand and wrist. He must avoid potential for combative situations.**

**Repetitive Actions**

Hands: i.e. Fine Manipulations from Grasping:

Feet: i.e. Operating Foot Controls:

Driving / Operate Machinery:

| | | |
|---|---|---|
| Physician Name: **Carol A Coats** | Physician Signature:<br>**e-Sign**<br>**COATS, CAROL A M.D.** | e-Signature: **Dr. Carol Coats, Medical Director** |

| | | | |
|---|---|---|---|
| Clinic Name / Location: | **CVMC Occupational Health & Medicine**<br>897 Ironwood Dr<br>Minden, NV 89423 | Clinic Phone Number: | **Dept: 775-782-1615** |

| | | | |
|---|---|---|---|
| Appointment Time: | **3:45 Pm** | Visit Start Time: | **3:54 PM** |
| Check-In Time: | **3:48 Pm** | Visit Discharge Time: | **4:39 Pm** |

Original–Treating Physician or Chiropractor Page 2–Insurer/TPA Page 3–Employer Page 4–Employee

CONFIDENTIAL by Court Order in Enos v. Douglas County, et al., Case No. 3:17-cv-00095 (U.S. Dist. Ct. Nevada)
(Stipulated Protective Order Re Confidentiality of Documents Produced in Litigation, ECF 029, 7/12/2017)

EXHIBIT 14
depobook.com

7|9|14

Douglas County Sheriff - Statement

Enos, John Michael 11/12/1965 Male 48 6' 240 Brown hair Hazel eyes
1184 Sierra Vista Drive, Gardnerville, Nevada, 89460 775-781-3104
SS# 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 Employment: Douglas County Juvenile Probation 775-782-9815

My involvement in this matter was as follows:

On June 17, 2014, at approximately 1115, I was at the Juvenile Probation Department waiting for Juvenile Court to begin. Jordan Wegis was one of the juveniles waiting to go to Court and was in the holding cell at the end of the hall. Other juveniles were in the Department who were not waiting for Court and I heard Jordan make a comment to one of them from the holding cell. I went to the holding cell and requested that Jordan take off his shoes and place them outside of the holding cell. Once he did, I closed the door of the cell. Jordan got upset and began saying that I had disrespected him. I opened the door to the cell and told Jordan to calm down and to sit down. Jordan complied. I told him that he would be seeing the Judge shortly and that he needed to calm down. I then closed the door again and walked to a nearby counter. Chief Deputy, Vicky Sauer-Lamb approached me and asked what was going on. I told her that Jordan had got upset. About that time, I heard him getting upset again and I went to the holding cell to tell him to settle down again. When I opened the door of the cell, Jordan came out with his shirt off and red in the face and punched me on the left side of my face with a closed right fist. I momentarily lost vision and just moved towards him in an effort to get a hold of him. I got my left arm over his head and my right arm under his left arm in a head lock type hold. Jordan's right hand was still free and he punched me again on the left side of my head and several times in the ribs on my left side, I believe three times. As we spun around to the right, Jordan began to push against me and we went back into the holding cell. I looked behind me and thought we were going to go through the wall at the rate we were going. I hit the wall on my right shoulder and then Jordan began pushing up under my left shoulder with all of his body weight. At this time, JPO Dominic Hastings-Molyneux came into the cell and got a hold of Jordan's right hand and twisted it up behind his back. JPO Beauchamp was down below us trying to get a hold of Jordan's legs. I heard people yelling to call 911. At one point, Jordan got a hold of my right wrist and torqued it downwards in an attempt to break my grip. When I felt Jordan grab my wrist and I felt the pain in my wrist, I released my grip and repositioned my hold on Jordan so he could not get a hold of my wrist again. After holding onto Jordan in this position and wrestling to keep a hold on him, deputies began to arrive to assist. Jordan was then cuffed and was taken out of the Juvenile Probation Department by four deputies. Jordan threatened to kill us all, saying that he had killed before and that he would kill again. He also threatened to go to the Judge's house and kill him and recited the Judge's address to let everyone know that he knew where he lived.

______________________
John M. Enos
Sr. Juvenile Probation Officer

Date: July 9, 2014
Time: 2:22 pm

EXHIBIT
depobook.com
25

Douglas County Sheriff - Statement

Enos, John Michael 11/12/1965 Male 48 6' 240 Brown hair Hazel eyes
1184 Sierra Vista Drive, Gardnerville, Nevada, 89460 775-781-3104
SS# 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 Employment: Douglas County Juvenile Probation 775-782-9815

My involvement in this matter was as follows:

On June 17, 2014, at approximately 1115, I was at the Juvenile Probation Department waiting for Juvenile Court to begin. Jordan Wegis was one of the juveniles waiting to go to Court and was in the holding cell at the end of the hall. Other juveniles were in the Department who were not waiting for Court and I heard Jordan make a comment to one of them from the holding cell. I went to the holding cell and requested that Jordan take off his shoes and place them outside of the holding cell. Once he did, I closed the door of the cell. Jordan got upset and began saying that I had disrespected him. I opened the door to the cell and told Jordan to calm down and to sit down. Jordan complied. I told him that he would be seeing the Judge shortly and that he needed to calm down. I then closed the door again and walked to a nearby counter. Chief Deputy, Vicky Sauer-Lamb approached me and asked what was going on. I told her that Jordan had got upset. About that time, I heard him getting upset again and I went to the holding cell to tell him to settle down again. When I opened the door of the cell, Jordan came out with his shirt off and red in the face and punched me on the left side of my face with a closed right fist. I momentarily lost vision and just moved towards him in an effort to get a hold of him. I got my left arm over his head and my right arm under his left arm in a head lock type hold. Jordan's right hand was still free and he punched me again on the left side of my head and several times in the ribs on my left side, I believe three times. As we spun around to the right, Jordan began to push against me and we went back into the holding cell. I looked behind me and thought we were going to go through the wall at the rate we were going. I hit the wall on my right shoulder and then Jordan began pushing up under my left shoulder with all of his body weight. At this time, JPO Dominic Hastings-Molyneux came into the cell and got a hold of Jordan's right hand and twisted it up behind his back. JPO Beauchamp was down below us trying to get a hold of Jordan's legs. I heard people yelling to call 911. At one point, Jordan got a hold of my right wrist and torqued it downwards in an attempt to break my grip. When I felt Jordan grab my wrist and I felt the pain in my wrist, I released my grip and repositioned my hold on Jordan so he could not get a hold of my wrist again. After holding onto Jordan in this position and wrestling to keep a hold on him, deputies began to arrive to assist. Jordan was then cuffed and was taken out of the Juvenile Probation Department by four deputies. Jordan threatened to kill us all, saying that he had killed before and that he would kill again. He also threatened to go to the Judge's house and kill him and recited the Judge's address to let everyone know that he knew where he lived.

John M. Enos
Sr. Juvenile Probation Officer

Date: July 9, 2014
Time: 2:22 pm

EXHIBIT 29
depobook.com

7/17/14

Juvenile Division

**Ninth Judicial District Court**

**Douglas County**
**State of Nevada**

**Nathan Tod Young**
District Judge
Department One

**Michael P. Gibbons**
District Judge
Department Two

**Scott Shick**
Chief Juvenile
Probation Officer

To: John Enos Senior JPO

From: Scott Shick Chief JPO

Date: July, 17,2014

Re: Duty Station Assignment

Based on our conversation this morning and after evaluating our options I believe it is in your best interest to be assigned to the juvenile detention facility in strictly a support role, as you work through your medical circumstances. Your are encouraged to work in a correctional programming or educational capacity with juveniles in the facility.

Your caseload will be assigned to the other officers in the department. If you could staff each case with the newly assigned officer it would be appreciated.

I am asking you to report for duty at juvenile detention on 7-21-2014. Please attend shift change meeting and work on transferring your cases to the assigned officers prior to leaving for the detention facility.

Typically you may leave the valley station at 8:00Am and take the Crown Victoria Vehicle as your transportation. Take your breaks and lunch at the appropriate times of your shift and give your best effort to be another set of eyes and ears and general support for the facility.

You will be in a support role for the primary juvenile detention staff person on duty. Please follow all doctor guidelines for your medical limitations while on duty in the detention facility. Avoid any potentially volatile juveniles that may enter the facility. A staff person will always be on duty with you.

EXHIBIT 31
depobook.com

**Retirement Board**

Mark R. Vincent
Chairman
Chris Collins
Vice Chairman

Al Martinez
Rusty McAllister
Audrey Noriega
David Olsen
Katherine Ong

PUBLIC EMPLOYEES' RETIREMENT SYSTEM
NVPERS
DEDICATED TO THOSE WHO SERVE NEVADA

**Executive Staff**

Tina M. Leiss
Executive Officer

Cheryl Price
Operations Officer

Steve Edmundson
Investment Officer

April 16, 2015

John Enos
1184 Sierra Vista Drive
Gardnerville, NV 89460

Dear Mr. Enos:

The Retirement Board approved your application for total and permanent disability at the April 15, 2015, meeting. The effective date of your retirement will be the day following your last day of employment or the day following the expiration of your service credit, whichever is later. Your employer is required to submit a termination notice to PERS before your account can be activated. You must terminate employment and begin drawing benefits within 60 calendar days after the date of Board approval or remain on sick leave for the entire period from Board approval to termination. **It is your responsibility to contact your personnel office to arrange for the termination of your employment if you have not already done so. We cannot activate your retirement account until this information is received.**

Nevada Revised Statutes require that you complete and return a Statement of Employment and Earnings Form on an annual basis so that staff can monitor any earnings you may have received after the effective date of your disability retirement. This form will be provided to you at the appropriate time.

If you have been awarded a workers' compensation benefit due to the same disability, please contact us so that we may determine how it may affect your disability benefit from PERS. **As a disability retiree, you must apply for and receive PERS Board approval before accepting any reemployment, either public or private. Upon request, a form will be provided for you to use to apply for approval.**

Should you have any questions, please contact us and ask to speak with a Counseling Services representative.

Sincerely,

Kristina Reyna

Kristina Reyna, Manager
Production Services Division

cc: Douglas County
Attn: Maria Santoyo
P.O. Box 218
Minden, NV 89423

5820 S. Eastern Avenue, Suite 220
Las Vegas, NV 89119
(702) 486-3900
Fax: (702) 678-6934

693 W. Nye Lane
Carson City, NV 89703
(775) 687-4200
Fax: (775) 687-5131

7455 W. Washington Avenue, Suite 150
Las Vegas, NV 89128
(702) 486-3900
Fax: (702) 304-0697

Toll Free: 1-866-473-7768 Website: www.nvpers.org

EXHIBIT 37

depobook.com

CONFIDENTIAL by Court Order in Enos v. Douglas County, et al., Case No. 3:17-cv-00095 (U.S. Dist. Ct. Nevada)
(Stipulated Protective Order Re Confidentiality of Documents Produced in Litigation, ECF 029, 7/12/2017)

1/28/15
782-9808

**Tahoe Fracture & Orthopedic** Medical Clinic, Inc.
*Relieving your pain. Restoring your function. Returning your life.*

Work/School Excuse

COMPREHENSIVE ORTHOPEDIC CARE

- Arthroscopic ankle, knee, shoulder, elbow & wrist repair
- Shoulder & elbow replacement
- Hip & knee replacement
- Sports injury treatment
- Treatment for work-related injuries
- Surgical & complex nonsurgical treatment of spine injuries & disorders, including herniated disc, lumbar instability & spinal stenosis
- Scoliosis evaluation
- Artificial disc replacement
- Basic & complex fracture repair
- Diagnostic digital X-rays
- Outpatient surgery center available

Name: John Enos Date: 1/28/15

To Whom It May Concern:

The above patient attended clinic today please excuse from ___ Work ___ School

Accompanied a patient to clinic today please excuse from ___ Work ___ School

Must observe P.E. Restrictions as follows:
__ May not participate until ________
__ May participate without restrictions as of ________
__ May participate with the following restrictions as of

Must observe work restriction as follows:
__ Off work until ________
__ May return to work unrestricted as of ________
✓ May return to work with the following restrictions
Light duty 1/29/2015 x 3 weeks
lift < 10 lbs c̄ Rt UE

Lifting Maximum (lbs): 0 10 20 50 100
__ Squatting __ Stooping __ Climbing __ Crawling __ Driving
__ Standing __ Walking __ Overhead Reaching __ Bending/Twisting
__ Repetitive Use ( Upper Extremity / Lower Extremity ) __ As Tolerated
Part Time (hours) 2 4 6 Other ________

Other: Return to full duty in approx. 3 weeks

973 MICA DRIVE, SUITE 201
CARSON CITY, NV 89705

EXHIBIT 56
depobook.com

David E. Eisenhauer, D.O.

CENTRAL SCHEDULING: 775.783.6190, PRESS OPTION #2
CENTRAL SCHEDULING FAX: 775.783.6151
WWW.TAHOEFRACTURE.COM

CONFIDENTIAL by Court Order in Enos v. Douglas County, et al., Case No. 3:17-cv-00095 (U.S. Dist. Ct. Nevada)
(Stipulated Protective Order Re Confidentiality of Documents Produced in Litigation, ECF 029, 7/12/2017)

CONFIDENTIAL by Court Order in Enos v. Douglas County, et al., Case No. 3:17-cv-00095 (U.S. Dist. Ct. Nevada)
(Stipulated Protective Order Re Confidentiality of Documents Produced in Litigation, ECF 029, 7/12/2017)



C 143-13-07514-01

**CARSON TAHOE REGIONAL HEALTHCARE** P.O. Box 2168, Carson City, NV 89702-2168

**MR#:** 020158805 **ACCT#:** 1428900230
**NAME:** ENOS, JOHN

**Clinician:** EISENHAUER, DAVID

DATE OF PROCEDURE:
10/21/2014.

PREOPERATIVE DIAGNOSIS:
Failure of hardware, right wrist with subsequent posttraumatic arthrosis.

POSTOPERATIVE DIAGNOSIS:
Failure of hardware, right wrist with subsequent posttraumatic arthrosis.

PROCEDURES PERFORMED:
1. Removal of deep orthopedic hardware, right wrist.
2. Scaphoid excision with 4-corner arthrodesis.
3. Physician directed fluoroscopy less than 1 hour.
4. Extended physician services.

ANESTHESIA:
General endotracheal anesthesia plus regional nerve block.

ANESTHESIOLOGIST:
Hak-Sun Bak, M.D.

FIRST ASSISTANT:
Dawnne Karsky, PA-C.

TOURNIQUET TIME:
Two hours and 20 minutes.

ESTIMATED BLOOD LOSS:
10 mL.

SPECIMENS:
Include broken screw not sent to pathology.

IMPLANTS:
Include 0.062-inch K-wires x3, 0.054-inch K-wire x1.

COMPLICATIONS:
None.

OPERATIVE INDICATIONS:
The patient is a 48-year-old male who presents today 8 months out from scapholunate association procedure with a SLIC screw. The screw dissociated approximately 3 months postoperatively and the patient has had progressive pain and posttraumatic arthrosis since the time of the hardware failure. The patient is consented for the above-described procedure. Consent is signed on the chart. He understands the risks and benefits. We discussed the likely fact in the preoperative holding area that either K-wires or a circular plate may be utilized due to weakness of the lunate bone. The patient understands this. Consent is signed on the chart and we proceeded in the usual fashion.

RECEIVED
OCT 27 2014
asc

OPERATIVE REPORT IN DETAIL:

CONFIDENTIAL by Court Order in Enos v. Douglas County, et al., Case No. 3:17-cv-00095 (U.S. Dist. Ct. Nevada)
(Stipulated Protective Order Re Confidentiality of Documents Produced in Litigation, ECF 029, 7/12/2017)

EXHIBIT 65
depobook.com

CONFIDENTIAL by Court Order in Enos v. Douglas County, et al., Case No. 3:17-cv-00095 (U.S. Dist. Ct. Nevada)
(Stipulated Protective Order Re Confidentiality of Documents Produced in Litigation, ECF 029, 7/12/2017)



**CARSON TAHOE REGIONAL HEALTHCARE** P.O. Box 2168, Carson City, NV 89702-2168

**MR#:** 020158805 **ACCT#:** 1428900230
**NAME:** ENOS, JOHN

**Clinician:** EISENHAUER, DAVID

The patient was brought to the operative suite, placed in supine position and regional nerve block was administered. Next, he was placed under general anesthesia. Well-padded tourniquet was placed and the right upper extremity was prepped and draped in a standard sterile fashion.

A timeout was taken to confirm the correct patient and correct extremity for surgery. Preoperative antibiotics were verified. Surgical and anatomical landmarks were identified. The arm was exsanguinated and the tourniquet set to 250 mmHg. At this point, using the previous midline dorsal skin incision, this was extended slightly distally. Full thickness flaps were developed. There was meticulous dissection needed due to extensive scar tissue formation. The EPL was identified above the retinaculum. The retinaculum was split along the fourth dorsal compartment. Subperiosteal dissection of the second compartment was performed retracting the second compartment radially and the fourth compartment ulnarly. The wrist joint capsule was identified and a capsule sparing capsulotomy was performed with a radial based flap. There appeared to be a healed capsulodesis to the lunate and a significant amount of scar tissue, which was formed in the scapholunate interval. The capitolunate joint was explored at this point with a freer elevator and interestingly the screw did not appear to have entered the joint significantly. The edge of the threads did seem to be subchondral beneath the lunate cartilage. Again, interestingly, there appeared to be ____ along the ulnar margin of the capitate at the articular surface more so than radially. Due to this, we proceeded with hardware removal, scaphoid excision and four-corner fusion.

Next, the scaphoid was split with an osteotome at the level of the screw, one-half of the screw was removed. The scaphoid portion of the screw was explored and there was found to be a blow out of the sidewall at the articulating junction. The screw otherwise was intact. Next, using sharp dissection and a K-wire as a joystick to remainder that is the distal pole of the scaphoid was excised en bloc. The volar radial ligaments were left intact. 20680

At this point, traction was hung through the index and the long finger gapping opened the carpal and mid carpal joints. The radial lunate joint was explored. The articular surface was found to be pristine and intact. The screw at the radial margin of the lunate was identified. A K-wire was placed and the screw was easily removed. The screw had windshield ____ a larger hole in the lunate than the diameter of the screw itself. Due to this and the fact that there were two suture anchors in place, I chose to complete the four-corner fusion with buried wires, which will be removed as opposed to cannulated screws or a dorsal plate. 20680

The articular surfaces of the lunate capitate, lunate triquetrum, triquetrum hamate and hamate capitate joints are denuded of articular cartilage with a 2.3 mm round bur. During removal of cartilage, the surfaces were constantly irrigated and suctioned to decrease thermal necrosis. Once the articular surfaces were prepared, the scaphoid was good quality bone. The articular surface of the scaphoid was removed. The cancellous bone was morselized and packed into the intricacies of the four-corner fusion mass. Next, K-wires were preset in the triquetrum, the hamate and the capitate. A joystick K-wire was placed into the lunate. This was brought out of dorsiflexion to a neutral position and the preset K-wires were driven into their appropriate places.

RECEIVED
OCT 27 2014
asc

147

CONFIDENTIAL by Court Order in Enos v. Douglas County, et al., Case No. 3:17-cv-00095 (U.S. Dist. Ct. Nevada)
(Stipulated Protective Order Re Confidentiality of Documents Produced in Litigation, ECF 029, 7/12/2017)

CONFIDENTIAL by Court Order in Enos v. Douglas County, et al., Case No. 3:17-cv-00095 (U.S. Dist. Ct. Nevada)
(Stipulated Protective Order Re Confidentiality of Documents Produced in Litigation, ECF 029, 7/12/2017)



**CARSON TAHOE REGIONAL HEALTHCARE** P.O. Box 2168, Carson City, NV 89702-2168

**MR#:** 020158805 **ACCT#:** 1428900230
**NAME:** ENOS, JOHN

**Clinician:** EISENHAUER, DAVID

creating a rectangular construct. K-wires were extraarticular at the radiolunate joint. Fluoroscopy was brought in to verify placement of hardware. This was deemed satisfactory. The lunate was neutral in a neutral position, K-wires were cut below the skin and further bone graft was packed into the four-corner fusion area.

Next, the wound was irrigated with copious amounts of normal saline. The capsule was closed with 3-0 FiberWire. The EPL was left transposed and the retinaculum closed over the fourth dorsal compartment. Subcutaneous closure was performed and skin closed with Monocryl. Sterile dressings were applied and the patient placed into a well padded volar resting splint. Tourniquet was deflated prior to skin closure, and bleeders were cauterized. The fingers pinked up nicely.

DISPOSITION:
The patient tolerated the procedure well and was sent to PACU in stable condition. Please note that Dawnne Karsky, my PA was medically necessary throughout the duration of the procedure for retraction and optimal visualization. Note also that extended physician services were required for this procedure secondary to the revision nature of the procedure, extensive amount of scar tissue and meticulous dissection needed.

Assist statement

mod 22 statement

DE:hn
DD: 10/21/2014 14:25:54
DT: 10/21/2014 21:04:21

cc:

RECEIVED
OCT 27 2014
asc 148

CONFIDENTIAL by Court Order in Enos v. Douglas County, et al., Case No. 3:17-cv-00095 (U.S. Dist. Ct. Nevada)
(Stipulated Protective Order Re Confidentiality of Documents Produced in Litigation, ECF 029, 7/12/2017)