# EXHIBIT 5

## DEPOSITION TRANSCRIPT OF WENDY LANG

**(Including Exhibits 4 and 5)**

EXHIBIT 5

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

-o0o-

JOHN ENOS, an individual, Case No. 3:17-cv-00095-MMD-CBC

Plaintiff,

vs.

DOUGLAS COUNTY, a political subdivision of the State of Nevada; et al.,

Defendants.

______________________________/

DEPOSITION OF

WENDY LANG

April 17, 2019

Reno, Nevada

REPORTED BY: CONSTANCE S. EISENBERG, CCR #142, RMR, CRR

Job No. 541264

A P P E A R A N C E S

For the Plaintiff:

THE GEDDES LAW FIRM, P.C.
BY: WILLLIAM J. GEDDES, ESQ.
8600 Technology Way, Suite 115
Reno, Nevada 89521
775-853-9455
Fax 775-853-6899
Will@TheGeddesLawFirm.com

For the Defendant:

THORNDAL, ARMSTRONG, DELK, BALKENBUSH & EISINGER
BY: KATHERINE F. PARKS, ESQ. - a.m. session
AND: BRYAN M. BROWN, ESQ. - p.m. session
6590 S. McCarran Blvd., Ste. B
Reno, Nevada 89509
775-786-2882
Fax 775-786-8004
Kparks@thorndal.com
Bbrown@thorndal.com



INDEX


| EXAMINATION | PAGE |
|---|---|
| WENDY LANG | 6 |
| EXAMINATION BY MR. GEDDES | 6 |


EXHIBITS


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT 1 | Third Amended Notice of Depo | 14 |
| EXHIBIT 2 | Job Description, Juvenile Probation Officer, Senior, PLF-00303 - PLF-00304 | 82 |
| EXHIBIT 3 | Job Description, Juvenile Probation Officer | 84 |
| EXHIBIT 4 | Email, Enos, with employment application, PLF-02879 - PLF-02885 | 126 |
| EXHIBIT 5 | Email, McMurry to Enos, 2/24/17, PLF-02886 | 131 |


Note: Original Exhibits retained in binder at Sunshine Litigation Services.



EXHIBITS FROM SARAH CHRISTENSEN DEPOSITION
REFERRED TO IN THIS TRANSCRIPT


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT 1 | Drawing by Christensen, office layout | 64 |
| EXHIBIT 2 | Court personnel regulations | 71 |
| EXHIBIT 3 | Douglas County personnel regulations | 72 |
| EXHIBIT 4 | Ordinance amending personnel regulations | 72 |
| EXHIBIT 5 | Job description, juvenile probation officer, senior | 81 |
| EXHIBIT 6 | Notice of injury/accident | 86 |
| EXHIBIT 7 | Excuse from work documents | 90 |
| EXHIBIT 8 | Documents regarding incident | 90 |
| EXHIBIT 9 | Notice of injury documents | 93 |
| EXHIBIT 10 | Email, Christensen/Cotter, 2/28/14 | 93 |
| EXHIBIT 11 | Emails, Barbee/Christensen, 3/14/14 | 93 |
| EXHIBIT 12 | Physical limitations report, 7/22/14 | 93 |
| EXHIBIT 13 | Emails ,Barbee/Christensen, 2/5/14 | 93 |
| EXHIBIT 14 | Email, Caviglia/Shick, 7/18/14 | 95 |
| EXHIBIT 15 | Letter to Enos, Duty Station Assignment | --- |
| EXHIBIT 16 | Emails, Christensen/Barbee, 2/24/15 | 97 |
| EXHIBIT 17 | Emails, Barbee/Christensen, 1/20/15 | 101 |
| EXHIBIT 18 | Douglas County position description questionnaire | 102 |
| EXHIBIT 19 | Work excuse, Eisenhauer, 1/28/15 | 103 |
| EXHIBIT 20 | Handwritten note, Christensen | 106 |





| | | |
|---|---|---|
| EXHIBIT 21 | Letter, Santoyo/Enos, 2/13/15 | 109 |
| EXHIBIT 22 | Letter, Enos/Human Resources, 2/17/15 | 110 |
| EXHIBIT 23 | Return to work releases | 115 |
| EXHIBIT 24 | Letter, Barbee/Enos, 2/24/15 | 116 |
| EXHIBIT 25 | Emails, Santoyo/Barbee/Christensen, 2/24/15 | --- |
| EXHIBIT 26 | Letter, Shick/Enos, 2/19/15 | 118 |
| EXHIBIT 27 | Personnel action form | 119 |
| EXHIBIT 28 | Letter to Enos, 2/20/15 | 120 |
| EXHIBIT 29 | Ed Howden & Associates letter, 4/5/16 | 121 |
| EXHIBIT 30 | Job application submittal | 126 |
| EXHIBIT 31 | Emails, Enos/McMurry | --- |
| EXHIBIT 32 | Douglas County job listings | 132 |
| EXHIBIT 33 | Emails, Barbee/Christensen, 9/18/14 | 72 |
| EXHIBIT 34 | Emails, Shick/Young, 2/20/15 | 135 |
| EXHIBIT 35 | Email, Bates/Caviglia, 2/19/15 | 136 |
| EXHIBIT 36 | Email, Caviglia/Santoyo/Shick, 2/19/15 | 136 |
| EXHIBIT 37 | Email, Santoyo/Shick/Caviglia, 2/19/15 | 138 |


Note: Original Exhibits retained in binder at Sunshine Litigation Services.

BE IT REMEMBERED that on Wednesday, April 17, 2019, at the hour of 8:59 a.m. of said day, at the offices of Sunshine Litigation Services, 151 Country Estates Circle, Reno, Nevada, before me, CONSTANCE S. EISENBERG, a Nevada Certified Court Reporter, personally appeared WENDY LANG, who was by me first duly sworn, and was examined as a witness in said cause.

-o0o-

WENDY LANG

called as a witness, having been duly sworn, testified as follows:

EXAMINATION

BY MR. GEDDES:

Q Good morning, ma'am. Could you please identify yourself by first, last name and spell your last name for the record, please.

A Wendy Lang, L-a-n-g.

Q Good morning, Ms. Lang. I'm Will Geddes. I'll be taking your deposition today.

I need to go over the ground rules of depositions so you'll understand the obligations you are under when you testify today. Even though you may already know these rules, I have to go over them to make sure that your deposition is conducted properly.

During this deposition, you'll be testifying under oath



and under penalty of perjury of law of the United States. Therefore, you are required to testify truthfully, completely and to the best of your knowledge, just as if you were testifying in court at trial before a judge and a jury.

Do you understand this?

A I do.

Q And the purpose of this deposition is to allow the parties to become adequately informed of the facts of this case and to enable all of us to prepare for trial. And our purpose here today is to avoid surprise at trial and to elicit truth.

This deposition also provides you with an opportunity to explain away any inconsistencies that may arise in your testimony today, because if, at the time of trial, your testimony is different than it is today, we will comment upon that to a jury in an effort to show that you are not a credible or a believable witness.

Do you understand this?

A I do.

Q Therefore, it's very important throughout your deposition today that if you wish to explain away or clarify any fact, issue or matter of your testimony, today is a more opportune time to do so than the day of trial.

Do you understand this?

A I do.

Q And our purpose here today is not to trick you. We are



not here to confuse you. We're here to allow you to take the time to understand the question so that you can provide truthful testimony.

If you give an answer to a question, we can only assume that you understood the question.

However, it's very common for questions to be poorly phrased and in need of clarification or restating. Therefore, if you don't understand any question at any time, please feel comfortable and say that you don't understand or you would like the question clarified some way so that you can understand it better.

Do you understand this?

A Yes, I do.

Q Today, we are entitled to receive your best testimony based on your best recollection of facts and events and based upon your designation as a witness under Rule 30(b)(6). So it's important that your testimony be reliable.

And if you don't know the answer to a question, you should simply state that you don't know the answer to the question.

Do you understand this?

A I do.

Q Please keep in mind, where you are initially unable to independently recall facts or testify about a matter as a 30(b)(6) witness, we may try to ask follow-up questions or additional



questions or show you documents to try and help you recall facts or events.

Either way, we are entitled to your best efforts at refreshing your recollection so that you can give truthful, accurate and complete testimony today.

Do you understand these things?

A Yes, I do.

Q Sometimes, it's appropriate to give your best estimate, even though you are not completely certain of matters, such as distance, time and size.

An example that's given is, the length of this conference room table, you may be able to look at and give a reasonable estimate.

If we asked you to estimate the size of the conference room table at our office, assuming you've never been there, that would be something that you would be required to speculate about. And we request that, today, you don't speculate on any matter.

Do you understand these things?

A I do.

Q There's a court reporter here seated to your right, and she has the difficult task of taking down everything that's spoken today.

And so, to make sure that she can do that, it's important that you and I not speak over one another. I will allow you to finish your answer before I ask my next question. And if

you can try to allow me to finish the question before you give your answer, that would be helpful.

Also, please understand today, you are testifying with words, not gestures, which are useless to the court reporter. So please verbalize your responses.

Rather than nod your head, please say "yes." Rather than shake your head, please say "no." As well as sounds like "uh-huh" and "huh-uh" are useless to the court reporter, so please remember to use words.

Do you understand these things?

A I do.

Q Okay. Now, Ms. Parks represents Douglas County, Scott Shick and Victoria Sauer-Lamb, who are defendants in this action. And I represent the plaintiff.

From time to time, depending on who is asking the questions, you may hear one of the attorneys make objections to the question that's asked. Unless you are specifically instructed not to answer a question, you are still required to answer the question, even though an objection has been made.

Do you understand this?

A I do.

Q Okay. In order to ensure that your testimony is reliable, we have to ask if you are currently under the influence of any medication, drug, alcohol or substance.

A I am not.



Q Is there any reason that you'll not be able to understand my questions today?

A No, there's not.

Q Is there any reason you won't be able to give your best testimony today?

A No, there's not.

Q Okay. Did you bring any documents with you today?

A Yes, I did.

Q Okay. What documents have you brought with you?

A If you'll give me just a moment to pull them out.

Q Sure.

A I brought with me the court personnel regulations -- I believe this number at the bottom is referred to as a Bates stamp, if that helps -- PLF 00146.

Q Okay.

A I've brought with me an ordinance from 2004, PLF 00089.

Q Okay.

A An ordinance from 2000, PLF 00057.

A job description for juvenile probation officer, senior, PLF 00303.

Q Okay.

A An application for employment from John Enos for juvenile probation officer, PLF 02879.

Q Okay. Is that it?

A I have one more. It's a list of vacancies or posted



positions at Douglas County. And it's DC 005284.

Q Okay. May I see those documents, please.

A Yes, you may.

Q Thank you.

A You are welcome.

Q What did you do to prepare for your deposition today?

A I reviewed the information -- sorry, I won't know the official terms, but the documents that sought my deposition and the subject matters that I would need to be able to speak to.

Q Approximately how long did you spend preparing for your deposition?

A Six hours.

Q Who did you speak with in preparation for your deposition today?

A I spoke with Ms. Parks, the attorney for Douglas County.

Q Anyone else?

A No.

Q All right. Where do you live?

A Minden, Nevada.

Q How old are you?

A Thirty-five.

Q And are you married?

A I am.

Q Do you have any children?

A Yes, I do.



Q How many children do you have?

A Four.

Q How old are they?

A My children are 15, 11, 7 and 2.

Q And where did you go to school?

A I received my master's degree from West Texas A & M University.

Q What was your master's in?

A Business administration.

Q And when did you graduate?

A I believe I graduated in 2008 or '9.

Q What are your hobbies?

A I enjoy camping, reading, hiking.

Q Have you ever been convicted of a crime?

A I have not.

Q Have you ever been arrested?

A I have not.

Q Have you ever been a party to a litigation?

A I have not.

Q Have you ever testified in a deposition before?

A Yes, I have.

Q Approximately how many times?

A One.

Q Okay. And what was that regarding?

A An action taken by my employer on a previous employer.

Q So it was employment related?
A Correct.
Q You were a witness?
A Correct.
MR. GEDDES: All right. What I would like to do, if we can, please, Ms. Court Reporter, is mark as Exhibit 1 the deposition notice in this case.
(Exhibit 1 marked for identification.)
BY MR. GEDDES:
Q Showing you what's been marked as Exhibit 1, if you'll please take a moment and look at that.
A Okay.
Q Have you seen that before?
A Yes, I have.
Q Did you review that in preparation for your deposition today?
A I read the document when I received it, I believe, last week.
Q And you understand that to be your deposition notice for today?
A Yes, I do.
Q Now, you've been designated by Douglas County as a Rule 30(b)(6) witness, knowledgeable on certain subjects noticed in your deposition notice; is that correct?
A Yes.



Q Let's talk a little bit about those different topical areas.
Are you prepared to testify today on behalf of Douglas County as to information known or reasonably available to Douglas County as to the following documents previously produced by the parties in this litigation?
The first document is Bates-stamped PLF 146 to 163.
A Did you want me to answer with each individual document?
Q Yeah.
A Yes, I am.
Q And then with respect to -- the same question, please, with respect to PLF 57 to 72.
A Yes, I am.
Q Same question, please, with respect to PLF 89 to 109.
A Yes, I am.
Q And the same question, please, with respect to PLF 303 to 305.
A Yes, I am.
Q And the same question, please, with respect to PLF 2879 to 2886.
A Yes, I am.
Q And with respect to the document that has been Bates-stamped DCO 5284 to 5301?
A Yes, I am.
Q Okay. Are you prepared to testify today on behalf of



Douglas County about the information known or reasonably available to Douglas County as to the circumstances and reasons for the termination of John Enos?
MS. PARKS: Counsel, let's go off the record for a moment, please.
(A discussion was held off the record.)
MR. GEDDES: Go back on.
Can you please read back the question.
MS. PARKS: Sorry to interrupt you, Counsel.
(The question was read by the reporter.)
THE WITNESS: To some extent, as I was not party to that employment decision.
BY MR. GEDDES:
Q Okay. Do you have any personal or direct knowledge as to the subject matter?
A Of Mr. Enos's termination from employment?
Q Yeah.
A Not personal or direct, no.
Q We'll get into the time frame of your employment which may or may not overlap with some of this information.
Did you have any personal involvement as an employee as to this subject matter?
A No, I did not.
Q And what information was made available to you, if any, separate and apart -- well, I think you have testified that you



didn't have any direct or personal knowledge on the subject matter or any personal involvement, so put that to one side.
What information did you receive to inform you as to that subject matter?
A I believe any knowledge that I have of the subject matter has come about as a result of producing documents from files and producing emails.
Q To your knowledge, who other than you would be -- well, I guess who would be more informed than you about this subject matter?
MS. PARKS: About the termination of Mr. Enos from employment?
MR. GEDDES: Right.
MS. PARKS: Objection, calls for speculation.
THE WITNESS: I believe Norma Santoyo or Sarah Christensen were involved and, I believe, Justina Caviglia from the District Attorney's Office.
BY MR. GEDDES:
Q So your thoughts are, your opinion is -- and I understand Counsel's objection -- but to your understanding or knowledge, you believe that Norma Santoyo, Sarah Christensen and Justina Caviglia would have more information regarding this matter than you?
A Yes.
Q Are you prepared today to testify on behalf of

Douglas County about information known or reasonably available to Douglas County as to John Enos's efforts to become reemployed by Douglas County after his employment separated in 2015?
A Yes.
Q Do you have any personal direct knowledge as to this subject matter?
A Could you clarify the subject matter you are referring to.
Q Yes, the subject matter of John Enos's efforts to become reemployed by Douglas County after his employment separated in 2015.
A Yes.
Q Did you have any personal involvement as an employee as to that subject matter?
A Yes.
Q And separate and apart from any personal knowledge or involvement that you may have or had regarding this same subject matter, what other information did you receive to inform you as to the subject matter for your testimony today?
A I don't believe I received any other information.
Q Separate and apart from any personal knowledge or involvement you may have had regarding this subject matter, with whom did you communicate to inform you as to this subject matter for your testimony today?
A Ms. Parks is the only person I've communicated with.



Q To your knowledge, who other than you is more informed about this subject matter?
A Perhaps the recruiter for Douglas County, Cindy McMurray.
Q Are you prepared to testify today on behalf of Douglas County about information known or reasonably available to Douglas County as to the circumstances and reasons regarding Douglas County's denial of John Enos's reemployment efforts in the years 2015 and 2016?
A Yes, I am.
Q Do you have any personal or direct knowledge as to that subject matter?
A Some limited information, some direct knowledge.
Q And do you have -- did you have any personal involvement as an employee in that matter?
A Some, yes.
Q Separate and apart from any personal knowledge or involvement you may have had or have regarding this subject matter, what other information did you receive to inform you as to this subject matter for this testimony today?
A The only information I would have received would have been information I saw or reviewed in gathering documents that were requested.
Q And separate and apart from any personal knowledge or involvement you may have or had regarding this subject matter,



with whom did you communicate to inform you as to this subject matter for your testimony today?
A I have only communicated with Ms. Parks regarding my testimony.
Q To your knowledge, who is more informed about this subject matter than you are?
A Can you repeat one more time the subject matter.
Q Yes. The subject matter is the circumstances and reasons regarding Douglas County's denial of John Enos's reemployment efforts in the year -- applications efforts in the year 2015 and 2016.
A Most likely, Cindy McMurry and Kathy Jo Kidd.
Q Are you prepared to testify today on behalf of Douglas County about information known or reasonably available to Douglas County as to the availability of Douglas County jobs for which John Enos may have been qualified to work, whether by transfer to that job or rehiring, during the period of June 21, 2013, to the present date?
A I can only testify back to late January 2014 as I was not employed by Douglas County prior to that date.
Q You say as to January 2014 and then moving forward to the present date?
A Correct.
Q Do you have any personal knowledge, personal direct knowledge, on this subject matter?



A Yes, I do.
Q And did you have any personal involvement as an employee as to the subject matter?
A Yes, I did.
Q Separate and apart from any personal knowledge or involvement that you may have or had regarding this subject matter, what other information did you receive to inform you as to this subject matter for your testimony today?
A Information that I gathered, reports that I produced from my recruiting software in response to requests for documents.
Q And what requests for documents was that?
A The requests for production that Ms. Parks asked our office to produce.
Q That's just historically in the life of this litigation, or specific --
A Correct, for this litigation.
Q And that wasn't specific for your deposition today?
A No.
Q Separate and apart from any personal knowledge or involvement you may have or had regarding this subject matter, with whom did you communicate to inform you as to the subject matter for your testimony today?
A I've only communicated with Ms. Parks in preparation for today.
Q To your knowledge, who is more informed about this

subject matter than you?
A Douglas County's recruiter, Cindy McMurry.
Q Are you prepared to testify today on behalf of Douglas County about information known or reasonably available to Douglas County as to Douglas County's practices and policies regarding the deeming of Douglas County employees as automatically resigning and being terminated from service for unauthorized absences under Title II, Chapter 2.02 of the county personnel regulations, 2.02.08(J), and Section 6.062 of the order establishing court personnel regulations during the period of 2014 to the present?
A Yes.
Q Do you have any personal and direct knowledge as to this subject matter?
A Yes.
Q And did you have any personal involvement as an the employee as to this subject matter?
A Yes.
Q Separate and apart from any personal knowledge or involvement you may have or had regarding this subject matter, what other information did you receive to inform you as to this subject matter for your deposition today?
A I have received documents in providing them in response to the requests for production of such documents.
Q And that was just during the ordinary course of this



litigation, not in specific preparation for your deposition today?
A That's correct.
Q And separate and apart from any personal knowledge or involvement you may have had or have regarding this subject matter, with whom did you communicate to inform you as to this subject matter for your deposition today?
A Ms. Parks.
Q Anyone else?
A No.
Q To your knowledge, who is more informed about this subject matter than you?
A At this point, there's probably not anyone that's more informed than I am.
Q Are you prepared to testify today on behalf of Douglas County about information known or reasonably available to Douglas County as to the number of employees Douglas County employed in the years 2014 to 2016?
A Yes.
Q Are you prepared to testify today on behalf of Douglas County about information known or reasonably available to Douglas County as to the joint involvement of Douglas County and the Ninth Judicial District Court personnel, including judges, concerning the hiring, firing, disciplining, training, supervision, notices and reinstatement of employees of the Douglas County, slash, Ninth Judicial District Court juvenile



probation department and of John Enos, including due process procedures for the same, during the relevant time period stated in paragraphs 14 and 97 of the Third Amended Complaint?
A Yes.
Q Do you have any direct -- I'm sorry. Do you have any personal or direct knowledge as to this subject matter?
A Some, yes.
Q Did you have any personal involvement as an employee as to this subject matter?
A During the years that I've been employed with Douglas County, I have.
Q And what period would that be, please?
A January 2014 to present.
Q Separate and apart from any personal knowledge or involvement you may have or had regarding this subject matter, what other information did you receive to inform you as to this subject matter for your deposition today?
A I don't believe I received any other information.
Q And separate and apart from any personal knowledge or involvement you may have or had regarding this subject matter, with whom did you communicate to inform you as to this subject matter for purposes of your deposition today?
A I've only spoken with Ms. Parks.
Q Who other than you, to your knowledge, is more informed about this subject matter?



A Scott Shick, Chief Juvenile Probation Officer.
Q Are you prepared to testify today about information known or reasonably available to Douglas County as to Douglas County's employment practices, policies and procedures regarding personnel matters concerning ADA issues and accommodating employees with ADA disabilities, including John Enos, during the relevant time periods stated in paragraphs 14 to 97 of the Third Amended Complaint?
A Yes.
Q Do you have any personal direct knowledge as to this subject matter?
A Yes.
Q Did you have any personal involvement, as an employee, as to this subject matter?
A During the course of my employment with Douglas County since late January 2014.
Q To present?
A Correct.
Q Separate and apart from any personal knowledge or involvement you may have or had regarding this subject matter, what other information did you receive to inform you as to this subject matter for your deposition today?
A I don't believe I received any other information.
Q Separate and apart from any personal knowledge or involvement you may have or had regarding this subject matter,

Page 26

**with whom did you communicate to inform you as to this subject matter for your deposition today?**
A I've only communicated with Ms. Parks in preparation.
**Q To your knowledge, who is more informed about this subject matter than you?**
A It's probably no one.
**Q Are you prepared to testify today on behalf of Douglas County about information known or reasonably available to Douglas County as to the pay scale range and benefits offered to Douglas County juvenile probation officers for the period of January 1 to the present?**
A Yes.
**Q And the same question, please, for the subject of the wages, pay, salary and benefits earned by John Enos in the years 2014 and 2015.**
A Yes.
**Q And are you prepared to testify today as to your job duties, personal involvement and knowledge of day-to-day operations of the Douglas County Human Resources Department and the Douglas Juvenile Probation Department during 2014 to the present?**
A Yes.
**Q And are you prepared to testify today on behalf of Douglas County as to your personal involvement in matters of communications regarding John Enos during the period of 2014 to**

Page 27

**the present?**
A Yes.
**Q I would like to switch gears a little bit here, if we can.**
**Why was John Enos's employment with Douglas County separated or terminated in February of 2015?**
MS. PARKS: Objection, calls for speculation.
THE WITNESS: I only know what I've seen. And I believe he was released because he was absent from work.
BY MR. GEDDES:
**Q What were the circumstances of his absence, to your knowledge?**
MS. PARKS: Objection, calls for speculation on the part of this witness, who has been called as a PMK and who was not working for Douglas County at the time of Mr. Enos's separation from employment.
BY MR. GEDDES:
**Q Go ahead.**
A My understanding is he was unable to perform the duties of his position and was not cleared to work, medically.
MS. PARKS: Counsel, let's go off the record, please, for a minute.
(A discussion was held off the record.)
MR. GEDDES: We can go on the record.
MS. PARKS: If there are other objections that are

Page 28

reasonable, I'll make them.
MR. GEDDES: There has been some discussion about whether it's appropriate to ask this witness, a 30(b)(6) witness, questions concerning Mr. Enos's employment.
Our position is that under Rule 30(b)(6), without regard to whether a particular designated witness has personal knowledge, was involved in the matters noticed in a deposition, that the entity in this case, Douglas County, is obligated to designate someone and to bring them up to speed, that personal knowledge is not required under Rule 30(b)(6).
MS. PARKS: Well, I guess my objection on the record and my standing objection with respect to this witness being asked questions about Mr. Enos's separation from employment, is that it calls for speculation.
This witness did not work for Douglas County at the time.
With respect to Douglas County's obligations to bring someone up to speed or otherwise produce a witness with knowledge on that subject matter, plaintiff's counsel has already deposed the HR director for Douglas County at the time of Mr. Enos's separation from employment.
BY MR. GEDDES:
**Q Okay. Ms. Lang, you testified that you only know what you've seen and these are documents that you've seen?**
A Yes.

Page 29

**Q Okay. And you state that the circumstances of his absence or his termination was that he was unable to perform the duties of his position. Are you able to provide any specifics on that?**
A No, I'm not. I'm sorry.
MS. PARKS: You don't have to apologize. It's just what you know.
BY MR. GEDDES:
**Q Okay. Now, did John Enos try to become reemployed by Douglas County after his employment separated?**
A Yes, he did.
**Q And how do you know that?**
A Because I have seen his application for employment for juvenile probation officer vacancy.
**Q When did he first apply to be reemployed?**
A I'm not sure if it was the only or the first attempt at employment, but I believe in January of 2017.
**Q Okay. Do you have any knowledge as to efforts made by Mr. Enos or on his behalf to obtain employment with Douglas County in connection with his vocational rehabilitation counselor, Mr. Howden, in 2016?**
A I believe that he did, Mr. Howden did make a request of Douglas County about available opportunities, but I didn't respond personally to that.
**Q Okay. Now, were Mr. Enos's -- to your knowledge, were**

Page 30

his employment efforts rejected -- reemployment efforts rejected?
A Yes.
Q Why?
A In which scenario?
Q Well, do you have information as to the first scenario of 2016 regarding Ed Howden's request?
A I do not.
Q Do you have information about the attempt that you described as of January 2017?
A Yes, I do.
Q Why was his -- why were his reemployment efforts in 2017 rejected?
A Because Mr. Enos was applying for the position of juvenile probation officer, and at that point in time, I was aware that his ability to perform that position had already been evaluated and it was determined he was not able to perform that position.
Q And who made that evaluation?
A I don't know who made that evaluation.
Q Do you know what the particular evaluation or what the inability was?
A No, I don't.
Q Do you know who would have more information on this?
A Norma Santoyo, the previous HR director, or ASC, who was the point of contact for that evaluation, which is a third-party

Page 31

administrator to Douglas County.
Q But you are not -- you don't have information today to testify as to the specifics of this evaluation or this inability?
A No, I don't.
Q During the three-month period leading up to Mr. Enos's separation of employment in February of 2015, what, if any, Douglas County jobs were available for which John Enos may have been qualified to work, including by transfer to that job?
A I don't know off the top of my head what jobs were available during that period or Mr. Enos's qualifications.
Q Same question with respect to the period six months after his employment separated. What, if any, Douglas County jobs were available for which Mr. Enos may have been qualified to work?
A I don't know what jobs were available without referencing that information, and I don't know Mr. Enos's qualifications.
Q For the period of 2014 to 2015, can you please summarize Douglas County's practices and policies regarding the deeming of Douglas County employees as automatically resigning and being terminated from service for unauthorized absences under Title II, Chapter 2.02 of the county personnel regulations, 2.02.08(J)?
A Can you repeat the question, please.
MR. GEDDES: Yeah. It was a rather long one.
Are you able to read that back, please.
(The question was read by the reporter.)

Page 32

THE WITNESS: The county code states an unauthorized absence from work shall be treated as leave without pay and may be cause for disciplinary action, up to and including termination, and goes on to state that an unauthorized absence for three consecutive days would be regarded as an automatic resignation and termination from county service.
BY MR. GEDDES:
Q So other than just reading the statute, are you able to summarize how Douglas County implemented this, and types of situations where this was typically implemented?
A Typically, it would be no-call/no-show or job abandonment or an unauthorized absence where approval was not granted and the employee was not at work.
Q To your knowledge, did this apply to medical situations where the County requested that the employee get a full medical release and the employee did not have a full medical release?
A Potentially, I think it could.
Q Well, are you aware of any applications of that rule in that manner regarding the medical situations that I've just described?
A I can't think of any specifics.
Q And the same question, please, for -- when I say the same question, could you please summarize the practices and policies for that same issue under Section 6.062 of the order establishing court personnel regulations.

Page 33

A It's the same.
Q Okay. And your answer would be the same as for -- the policy generally applies to no-call/no-show and job abandonment?
A Correct.
And actually, I would add on to that, that unauthorized absence is generally considered to be the case if an employee is on leave without pay that has not been previously authorized.
Q Okay. And then the portion of your answer that you gave for the county personnel regulation as applied here to 6.62 of the court personnel regulations regarding medical situations, that if a particular employee wanted to return to work, but could not obtain full medical releases, if that was demanded by the County, you are not aware of any particular applications of the rule, this Rule 6.062 regarding that scenario?
A No, I can't think of any specific examples.
Q How many employees did Douglas County employ in the year 2014?
A Approximately 600.
Q And, please, the same question for 2015.
A Approximately 600 to 630.
Q Same question, please, for the year 2016.
A Approximately 630.
Q Same question, please, for the year 2017.
A Approximately 630.
Q Same question, please, for the year 2018.

A Approximately 650.
Q Same question, please, so far for 2019.
A Approximately 675.
Q What was the pay scale range -- what was the pay scale range of officers of the juvenile probation department -- let me say it this way.
For the year 2014, what was the pay scale range of officers -- juvenile probation officers, slash, senior juvenile probation officers for Douglas County?
A I don't have that information with me.
Q Where would that information be available?
A On -- Douglas County has historical records of that information.
Q What about the year 2015?
A I don't have that information with me.
Q 2016?
A I don't have that with me.
Q 2017?
A I don't have that with me.
Q 2018?
A I don't know it off the top of my head.
Q 2019?
A I don't know it off the top of my head or have it with me.
Q The period of 2014 to 2015, can you summarize, please,



Douglas County's personnel practices, policies and procedures regarding accommodating disabled Douglas County employees under the ADA.
A Douglas County follows the regulations in the Americans with Disability Act and other applicable regulations, receiving the employee's restrictions related to their job and engages in the interactive dialogue process.
Q So with regard to these policies, is it the same for the Ninth Judicial District Court as it is for Douglas County?
A Yes.
Q For court personnel?
A Yes.
Q You said that you talked about receiving restrictions. What does that mean?
A We ask for information from the physical -- medical provider regarding what functions the employee is unable to perform.
Q And you mentioned you follow the regulations of the ADA. What does that mean?
A We engage in the interactive dialogue process and we address the other components of the law.
Q So when -- you talked about an interactive process, what did you mean by that?
A Engaging with the employee to identify options to address their disability and how it can be accommodated or may not



be accommodated.
Q And who typically does that?
A Human Resources.
Q Does the department of the employee in question have any involvement?
A Yes.
Q What involvement does the department have?
A The department would need to weigh in on whether something is a reasonable accommodation or not, whether it's feasible.
Q What function does the HR have in that regard?
A Engaging with the employee, reviewing the essential functions of the job as compared to the restrictions, and consulting with the department.
Q Did Douglas County register requests for accommodation or track them or monitor them?
A No.
Q What triggered -- what triggered a request for an accommodation under these policies, do you know?
A Typically, it's triggered by an employee going to their supervisor and saying that they have a need.
Q So that would be a request orally, or does it have to be in writing?
A They can initiate it orally, but we will require the employee to follow up with the specific written restrictions from



the physician.
Q And can a request for an accommodation under these policies be triggered by the provision of medical records in a workers' compensation claim where the doctor listed the work restrictions or modified duties for the employee, such as weight restrictions on the employee lifting items?
A I'm not aware of one where it has.
Q But does the policy permit that?
A I don't know that there's a specific policy outlining that scenario.
Q So is it your testimony that if an employee, away from work in a workers' compensation claim, and were returned to work with work restrictions by the workers' compensation doctor, those work restrictions would be provided to Douglas County; isn't that correct?
A Yes.
Q They are typically provided?
A Yes.
Q And in the providing of those medical records where the doctor has ordered work restrictions for that employee on the workers' compensation claim, wouldn't that amount to a request for an accommodation under the ADA, according to Douglas County policies?
A No, it would not.
Q Why not?

A Because ADA covers permanent disabilities. And typically, and particularly, a stage that you are referring to is light-duty accommodation during the process of the employee rehabilitating and is not a permanent disability.

**Q Is it your testimony, then, that the ADA or the ADAAA, which is the amendment act, does not cover employees having temporary disabilities?**

A Off the top of my head, without evaluating a specific situation or element of the laws, generally, it's referring to permanent, life-altering disability.

**Q And how are you defining a permanent disability?**

A One that's not temporary.

**Q Is there a time frame?**

A No.

**Q Can you summarize Douglas County and Ninth Judicial District Court policies for how requests for accommodations are evaluated.**

A Can you be more specific.

**Q Well, you discussed an interactive process, and you discussed the HR's role. And I think you discussed the department's weighing in -- I think you used the word "weigh in" -- and they look at what's feasible.**

**Do you know how those requests are evaluated for feasibility or to ascertain whether they are unduly burdensome on Douglas County?**



A I think that depends greatly on each situation.

I think every scenario requires different components to be considered, cost and impact to operations to the taxpayers, to the services provided, our ability to fulfill the services, and whether it alters the essential function of a position or not.

**Q Is someone in charge of performing that analysis? Is that the HR's role or is that the department's role? Who does that?**

A I would say they do it in conjunction. The department needs to bring their expertise of the operation.

**Q That's the department and the HR collaborate on that?**

A Yes.

**Q Does the District Attorney's Office get involved in any of this?**

**When I refer to the "District Attorney's Office," I'm talking about the Douglas County District Attorney's Office.**

A The Douglas County District Attorney's Office provides consultative services to Human Resources.

**Q Do they get involved in evaluating requests for accommodations for the benefit of Douglas County's HR department?**

A Yeah, from a consultative standpoint.

**Q What I'm trying to get at, is there a streamlined or standardized procedure, a regulation or an unwritten policy that evaluations for accommodation are conducted in a certain manner by these particular entities, whether it's the DA, the department,**



**the HR, and these are the processes and the criteria that they evaluate? Is there anything like that?**

A No.

**Q How, according to the policies of Douglas County and the Ninth Judicial District Court, how is the ADA interactive process triggered?**

A Typically, when an employee indicates that they have a need.

**Q But that would exclude the scenario that we talked about earlier where a worker is out on workers' compensation, his medical provider provides a return-to-work order with medical restrictions. That, in and of itself, would not trigger an interactive process under the ADA according to Douglas County and Ninth Judicial District Court policies?**

A There could be other scenarios where the process would be triggered.

**Q But I'm asking about that specific one. Would that specific scenario trigger an obligation by Douglas County and the Ninth Judicial District Court to engage in the interactive process regarding --**

MS. PARKS: Objection --

BY MR. GEDDES:

**Q -- regarding an accommodation for disability under the ADA?**

MS. PARKS: Objection, asked and answered.



Go ahead.

THE WITNESS: Depending on where we were in the workers' comp process. And typically, workers' comp restrictions are just temporary light-duty accommodations.

BY MR. GEDDES:

**Q So is it your testimony, then, in some circumstances, if a worker is on workers' compensation leave and a doctor issues an order returning the employee back to work with work restrictions, that that, in some instances, could trigger the interactive process obligations of Douglas County and the Ninth Judicial District Court under the ADA, according to the policies of Douglas County and the Ninth Judicial District Court?**

A I don't think it would be likely, but it's possible.

**Q Do you know what the wages paid and salary and benefits of John Enos were for the year 2015?**

A No, I don't.

**Q Same question for 2015.**

A No, I don't.

**Q Can you please summarize your job duties, your personal involvement and your knowledge of the day-to-day operations of Douglas County Human Resources Department during 2014 to the present.**

A Yes, I can.

It has changed.

I began my employment with Douglas County in late

January 2014 as a senior human resources analyst. I was primarily responsible for employee classification; writing, crafting job descriptions and determining the appropriate rate of pay for each of those classifications of employees, and training.

In approximately May of 2015, I took on additional responsibilities during the absence of the human resources director and held those temporary responsibilities until January of 2016, at which time, I took those responsibilities on a full-time basis.

As director of human resources, I have the overall responsibility for the functions of our department. And that's the administration of recruitment, training, benefits, as well as risk management, which is workers' compensation and liability and property insurance.

**Q Can you please summarize your personal involvement in matters and communications regarding John Enos during the period of 2014 to the present, if any.**

A I don't believe I have had any personal involvement in communications regarding Mr. Enos.

Sorry. Let me clarify.

I think my personal involvement and communications regarding Mr. Enos would have mainly been relevant to this litigation and perhaps some limited communication regarding his seeking employment in 2016 and 2017.

**Q Have you ever received education or training in the**



**subject of employment discrimination?**

A Yes.

**Q Can you please summarize what that is.**

A I've attended a number of classes, seminars, and read articles in periodicals on a regular basis.

**Q Do you know what seminars you are referring to here?**

A I don't have a list specifically off the top of my head.

**Q Do you have any general recollection of the seminars, what they were, what the context of them were?**

A No, I don't.

**Q What about the periodicals that you are referring to?**

A I review information and attend -- emails and publications from professional human resources organizations.

**Q What organizations are those?**

A The Society for Human Resources Management, primarily.

**Q And the seminars that you attended, when did you attend those?**

A I attended a conference in June of 2018. I've attended various trainings throughout my career and while I was obtaining my bachelor's degree and master's degree.

**Q Do you have a time frame for those trainings that you are talking about?**

A Since I've begun my education in human resources in about 2003 to the present.

**Q What types of discrimination are you referring to here,**



**that you received training and education on?**

A Illegal discrimination of individuals and protected classes under the Civil Rights Act; Title VII, the various other laws that protect employees in the State of Nevada, as well as federally, with regard to race, color, national origin, gender, military status, pregnancy, disability, along those lines.

**Q Approximately how many hours of education or training have you received on employment discrimination matters, over all, of any variety, combined?**

A Probably a hundred.

**Q And are you able to break that down as far as Title VII and ADA?**

A I don't think so.

**Q Let's talk about the places that you've worked.**

**Can you please -- let's go over where you currently work. You are currently working in Douglas County?**

A Correct.

**Q And your job title?**

A Human resources director.

**Q And when did you begin as the human resources director?**

A I think it was late January of 2016.

**Q Okay. And then prior to beginning the HR director at Douglas County, what was your job title?**

A Senior human resources analyst.

**Q And you were that until January, but when did you start**



**that?**

A Late January 2014.

**Q And why did you switch?**

A There was a vacancy and I applied for that position.

**Q Prior to being the senior HR analyst beginning in late January of 2014, were you working with the County at that time?**

A No.

**Q So where did you work prior to Douglas County?**

A I worked for Aramark Corporation, Zephyr Cove Resort.

**Q I'm sorry, say that again.**

A Aramark Corporation at Zephyr Cove Resort.

**Q Can you spell the corporation.**

A Aramark, A-r-a-m-a-r-k.

**Q What did you do there?**

A I was the human resources manager.

**Q And when did you work there?**

A November 2012 through January of 2014.

**Q And then prior to Aramark, where did you work?**

A I worked for James Hardy.

**Q That's Judge Hardy?**

A No, James Hardy Manufacturing.

**Q And what did you do there?**

A I was a human resources -- I don't remember the exact title.

**Q You were an HR employee then?**

A Correct.
**Q And when did you work there?**
A I think it was February of 2012 through November of 2012.
**Q Prior to working at James Hardy, where did you work?**
A SOC, LLC.
**Q What did you do there?**
A I was in human resources there.
**Q And when did you work there?**
A I started there in August of 2006.
**Q And you worked there through February of 2012?**
A Correct.
**Q And prior to SOC, where did you work?**
A I worked for Hilton Hotels.
**Q When did you work there?**
A I think it was November of 2005.
**Q To August --**
MS. PARKS: Will, I need to use the ladies room.
BY MR. GEDDES:
**Q To August of 2006?**
A Correct.
MR. GEDDES: Thank you. Going off the record.
(A recess was taken.)
BY MR. GEDDES:
**Q All right. Prior to Hilton Hotels -- oh, I'm sorry.**



**What was your job title at Hilton Hotels? What was your title?**
A Human resources manager.
**Q Prior to Hilton Hotels, where did you work?**
A California State University, Stanislaus.
**Q When did you work there?**
A June 2005 through November 2005.
**Q What was your job title there?**
A Human resources assistant.
**Q And prior to Cal State -- was that the first job that you --**
A I was a student prior to that.
**Q As a senior HR analyst, what were your job duties, at Douglas County?**
A At Douglas County, I was primarily focused on employee classification, crafting job descriptions, determining appropriate compensation and training.
I had some involvement in recruitment as well during that period.
**Q Did you have any supervisory role when you were a senior HR analyst?**
A No, I didn't.
**Q Who was your supervisor at the time?**
A Norma Santoyo.
**Q When you were a senior HR analyst, did you work on any matters involving the ADA?**



A No.
**Q Were you involved in any issues or matters involving discrimination claims involving Douglas County employees?**
A No.
**Q You talked a little bit about documents that you produced in the course of litigation -- of this litigation. Have you read any of the legal pleadings of this lawsuit, the complaint or any of its amended versions or any of the answers to the complaints by any of the defendants in this case?**
A I've skimmed through some of the legal pleadings.
**Q When did you do that?**
A When we would receive them in our office.
**Q So when you received them in the office, what was your job title at that time?**
A I believe I've been the human resources director since -- during the entire course of that.
**Q Okay. I'm not asking for a legal conclusion or opinion, but what is your understanding of this lawsuit, whether your understanding is correct or incorrect?**
A My understanding is it's a wrongful termination suit.
**Q Mr. Enos has sued the County for wrongful termination?**
A Correct.
**Q Any other understanding of what the lawsuit is about?**
A No.
**Q Do you know John Enos?**



A I do not.
**Q You've never met him?**
A Not that I recall.
**Q It's your understanding his employment ended in about February of 2015?**
A That's my understanding, yes.
**Q But you had no personal involvement with regard to his separation of employment from Douglas County?**
A No, I didn't.
**Q Did you have any personal involvement in connection with any effort by Mr. Enos to become reemployed with Douglas County?**
A Limited.
**Q Can you tell us what that was.**
A In 2017, he applied for juvenile probation officer vacancy that was posted. And I had some conversation with Cindy McMurry about his application and his qualifications for the position.
**Q When was that?**
A I believe it was in January, February of 2017 time frame.
**Q And what was conversation with Cindy McMurry?**
A She questioned whether she would be able to -- whether she should consider his application for employment based on the feedback she received from the hiring managers for the position, that Mr. Enos had previously worked in the position.

Q Anything else?
A I don't think so.
Q So she questioned whether she should consider it based on the feedback that she got from hiring managers regarding his prior employment; is that right?
A Correct.
Q And who were the hiring managers that you are referring to here?
A Scott Shick.
Q What did Scott Shick tell Cindy McMurry, based on what Cindy McMurry told you on that conversation or conversations?
A Based on what Cindy McMurry told me from Scott Shick, that Mr. Enos had been determined unable to perform that job previously.
Q And so what happened with the application?
A It didn't move forward in the process.
Q Was there any consideration of whether or not this alleged inability to perform his job should be reevaluated to see if there was a change in his circumstances or condition?
A I don't recall if there was or not.
Q At the time of that application, was there any evaluation performed by Douglas County or the Ninth Judicial District Court to determine whether or not he could perform the essential functions of his job upon a rehire with a reasonable accommodation?



A No.
Q Did you talk to Scott Shick about this matter?
A I don't believe so.
Q Can you describe, if you know, the process of receiving applications and what happens to them when they are received, typically.
A When applicants apply for positions with Douglas County, they're often moved within our software to the next step, which has a supplemental score assigned to the application based on the specific questions on the application specific to that position and points assigned -- values assigned to each answer.
Q Well, what does the HR do? Does the HR field the applications and then send them out to the various departments?
A Yes.
Q So the conversation that you are talking about here, based upon your conversation with Cindy McMurry, is that the application was sent to the department, and upon reviewing it, Scott Shick had a conversation that you described with Cindy McMurry?
A I believe so. I don't know.
Q Well, I guess my question is, he would have had to have known that there was an application for him to comment on it.
A Correct.
Q And your policy, your standard operating policy is to take the applications and send them out to the departments.



A Correct.
Q So under the standard policy, Scott Shick would have gotten this.
A Yes.
Q Do you know Scott Shick?
A Yes, I do.
Q How do you know him?
A I know him from working with him as the chief juvenile probation officer.
Q And you've known him as long as you worked there?
A Correct.
Q Would you characterize your relationship with Scott Shick as personal, personal and professional, or strictly proposals?
A Strictly professional.
Q Have you had any conversations with Scott Shick about this lawsuit?
A No, I haven't.
Q As for your knowledge of Scott Shick's involvement in connection with Mr. Enos's separation of employment, did you obtain on your own any knowledge about that?
A No.
Q As between you and Ms. Santoyo, would she have more knowledge than you do as to Mr. Scott Shick's involvement in connection with Mr. Enos's separation of employment from



Douglas County?
A She absolutely would.
Q Do you know Vicky Sauer-Lamb?
A Yes, I do.
Q Who is she?
A She is the former deputy chief juvenile probation officer.
Q And you know her only through work?
A Correct.
Q And how would you characterize your relationship with her, personal, personal and professional, or strictly professional?
A Strictly professional.
Q And she is no longer employed at Douglas County, correct?
A Correct.
Q After she's left her employment at Douglas County, have you spoken to her or had any communications with her?
A I have not.
Q And have you had any communications with Ms. Sauer-Lamb about this lawsuit?
A I have not.
Q Have you had any conversations with her about Mr. Enos?
A No, I have not.
Q And you know Norma Santoyo?

A Yes.
Q Who is she?
A She was the human resources director when I started at Douglas County.
Q So she was your boss?
A Correct.
Q And do you know her only through work?
A Yes.
Q Would you characterize your relationship with her as personal, personal and professional, or strictly professional?
A Strictly professional.
Q After she left her employment at Douglas County, have you had any communications with her?
A A couple of times, yes.
Q What were they regarding, personal matters, professional matters?
A Professional matters. We had lunch once, I think primarily just to catch up on where she was at in her career and --
Q Have you spoken to Ms. Santoyo regarding this lawsuit?
A I have not.
Q Have you spoken with her regarding Mr. Enos?
A No, I have not.
Q Do you know Justina Caviglia?
A Yes, I do.



Q Who is she?
A She was a Deputy District Attorney in the DA's Office.
Q And have you known her only through work?
A Correct.
Q And how would you characterize your relationship with her, personal, personal and professional, or strictly professional?
A Strictly professional.
Q And she no longer works in the Douglas County District Attorney's Office, does she?
A No, she doesn't.
Q After she left her employment with Douglas County, have you had any communication with her?
A I don't -- I think I've bumped into her one time.
Q Have you spoken with Ms. Caviglia about this lawsuit?
A No.
Q Have you spoken with her about Mr. Enos?
A No, I have not.
Q Do you know Sarah Christensen?
A Yes.
Q Who is she?
A She was a human resources analyst at Douglas County.
Q You were her supervisor?
A At the end of her employment, yes.
Q And do you know her only through work?



A Yes.
Q Would you characterize your relationship with her as personal, personal and professional, or strictly professional?
A Strictly professional.
Q Have you had any communications with Ms. Christensen about this lawsuit?
A No, I have not.
Q Have you had any communications with her regarding Mr. Enos?
A No, I have not.
Q Do you know Nathan Tod Young?
A Yes, I do.
Q Who is he?
A District Court judge.
Q And do you know him only through work?
A Yes -- I'm sorry. No.
He was the attorney for one of my children when they were in foster care. He represented the biological father.
Q Is your current relation -- well, is your relationship with him personal, personal and professional, or strictly professional?
A Strictly professional.
Q Have you had any conversations or communications with Judge Young, Nathan Tod Young, regarding this lawsuit?
A No.



Q Have you had any communications with him regarding Mr. Enos?
A No.
Q Do you know Michael Gibbons?
A Yes.
Q Who is he?
A He's a former District Court judge in Douglas County.
Q And do you know him only through work?
A Yes.
I'm sorry. He was the judge that presided in the foster care case and the adoption of my son.
Q Okay. So it wasn't Judge Young, it was Judge Gibbons?
A Young was the father's attorney at the time before he was appointed to the bench, and Gibbons was the judge on the bench.
Q And you know him -- well, your relationship with him, is it personal, personal and professional, or strictly professional?
A Strictly professional.
Q Have you had any conversations with Judge Gibbons regarding this lawsuit, or Mr. Enos?
A No.
Q Do you know Kathy Jo Kidd?
A Yes, I do.
Q Who is she?
A I hired her as a senior human resources analyst in 2016.

Q And at that time, you were the director?
A Correct.
Q And so you were her supervisor?
A Yes.
Q Do you know her only through work?
A Yes.
Q And she no longer works there; is that correct?
A That's correct.
Q After she left her employment at Douglas County, have you spoken with her?
A Yes, I have.
Q Regarding personal or professional matters?
A Personal.
Q Do you consider her -- is your relationship with her personal, personal and professional, or strictly professional?
A Personal and professional.
Q Have you had any conversations with Kathy Jo Kidd regarding this lawsuit or John Enos?
A No, I have not.
Q Do you know Cindy McMurry?
A Yes.
Q Who is she?
A She's a human resources analyst responsible for recruitment at Douglas County.
Q And you are her supervisor?



A Yes, I am.
Q And you know her only through work?
A Yes.
Q Would you characterize your relationship with her as personal, personal and professional, or strictly professional?
A Strictly professional.
Q Have you had any conversations with Cindy McMurry regarding this lawsuit or John Enos?
A Just logistical conversations about her needing to take a role in the lawsuit or get -- helping me gather documents that were requested.
Q So her -- your communications with her arose in the course of responding to this litigation?
A Correct.
Q Has she had any communications with you regarding the matter of John Enos's termination --
A No.
Q -- any details or information?
A No, she has not.
Q Do you know Darcy Worms?
A Yes.
Q Who is she?
A She's a former human resources manager for Douglas County.
Q And you know her only through work?



A I actually didn't work with her, I just know of her, and I met her on one occasion.
Q Okay. I take it you haven't had any communications with her about Mr. Enos or this lawsuit?
A No, I have not.
Q Do you know Sheila Dugan?
A No, I don't.
Q Do you know Kimmy Johnson?
A Yes, I do.
Q Who is she?
A She was a former Deputy District Attorney for our DA's Office.
Q Do you know her only through work?
A Yes.
Q Is your relationship with her personal, personal and professional, or strictly professional?
A Strictly professional.
Q Have you had any conversations with her about John Enos or this lawsuit?
A Ever?
Q Yes.
A I believe she was the one representing Human Resources when this lawsuit was first filed.
Q I'm not interested in any communications you would have had with her after the lawsuit was filed.



Have you had any communications with her about this lawsuit -- well, about John Enos prior to the filing of this lawsuit?
A I don't believe so.
Q Have you had any communications with Kimmie Johnson regarding Mr. Enos's efforts to become reemployed after the lawsuit -- well, efforts to be reemployed in 2016?
A I may have limited conversation with her in 2016 about him.
Q Did she provide you any information as to the basis for Mr. Enos's request for vocational placement in Douglas County -- or, placement of employment in Douglas County through his vocational counselor? Do you have any information about that?
A I don't recall being directly involved at the time.
Q Did you all discuss that?
A I don't think so. I delegated that situation to Kathy Jo Kidd at the time.
Q But even though you delegated it to Kathy Jo Kidd, you were still her supervisor at that time?
A I was, but I was preparing to go out on a three-month leave of absence at that time.
Q Do you know Cynthea Gregory?
A Yes, I do.
Q Who is she?
A She's the Deputy District Attorney in the DA's Office

that represents Human Resources currently.
Q You would characterize your relationship with her as personal, personal and professional, or strictly professional?
A Strictly professional.
Q Have you had any conversations with her about John Enos or this lawsuit?
A Yes.
Q Does that just relate to the legal defense of the lawsuit after it was filed?
A Correct.
Q No conversations with her prior to the lawsuit regarding Mr. Enos's termination?
A No.
Q And no conversations with her regarding the matter of John Enos seeking reemployment?
A I don't believe so.
Q Do you know who Karen Barbee is?
A Yes.
Q Who is she?
A I believe she's a claims adjuster for ASC.
Q Is your relationship with her personal, personal and professional, or strictly professional?
A Strictly professional.
Q Have you had any communications with Karen Barbee regarding John Enos or this lawsuit?



A I don't believe so.
Q All right. Can you describe or explain what overlap existed in supervision of the court personnel and the supervision as it existed between the HR department, on the one hand, and the Ninth Judicial District Court on the other, of court personnel, supervision of court personnel.
A Human Resources is not responsible for supervision of personnel outside of our department, so there wouldn't have been any overlap of supervision.
Q And then what about the overlap in supervision between the judges -- we're talking about the supervision of juvenile probation officers by the juvenile probation department, on the one hand, and the judges of the Ninth Judicial District Court, on the other.
Those employees are court personnel, is that correct, the juvenile probation officers?
A Yes.
Q And so can you describe how they are supervised with regard to, well, Scott Shick, for example, being in the juvenile probation department and the judges being -- when they are acting in their administrative capacity over court personnel.
A My understanding is that it's a chain of command, a hierarchy, that Scott Shick reports directly to one or both judges, I'm not sure, and that he is the authority to hire, fire and delegate the day-to-day supervision of the various employees



of the juvenile probation department.
Q What, if any -- to your knowledge, what, if any, involvement do the judges typically have in the hiring and firing of employees who are court personnel?
A I don't know whether they do or what level they are involved in.
Q Now, physically, where did you work, what building?
A I work in the Minden Inn. It's at 1594 Esmeralda Avenue.
Q Do you work in Norma Santoyo's old office?
A I do not.
Q Where do you work?
A I work in an office that I've held since I started there. I guess, Norma potentially could have worked in it at one point. I don't know.
Q I'll show you what's been marked as Exhibit 1 to Sarah Christensen's deposition. Please take a look at that.
A Yes. Yes.
Q Do you recognize that diagram generally?
A Yes.
Q What does that depict, to your understanding?
A The office or desk space occupied by human resources staff.
Q That's in the Minden Inn?
A Correct.



Q Do you see where it says "1 Norma"?
A Yes.
Q And it says "2 Norma"?
A Yes.
Q And "3 KJ"?
A Yes.
Q Where on that diagram, if anywhere, was your office?
A My office is where it says "1 Norma."
Q Okay. Can you summarize, please, the HR department's involvement, if any, in the handling of worker compensation claims for employees of the juvenile probation department.
A Human Resources would receive notification and file the appropriate paperwork and monitor the progress of the claim and work restrictions.
Q And that was true in the year 2014 and '15?
A To the best of my knowledge. I wasn't directly involved then.
Q But you don't have an understanding that the policies have changed?
A No, I don't.
Q When you talk about monitoring the progress, was that -- is that something that ordinarily is shared with the juvenile probation department?
A Yes.
Q How so?

A Both Human Resources and the department would be kept abreast and stay in communication regarding the status of any restrictions or ability to perform the job.

**Q Who is responsible for firing employees of the juvenile probation department?**

A The chief juvenile probation officer.

**Q Does he have to get approval from the judges to fire someone?**

A I don't know.

**Q Does the DA's Office typically have any involvement in the firing of employees, Douglas County employees?**

A Yes.

**Q Can you describe that, please.**

A They will typically review the statement of charges or the decision prior to the implementation.

**Q When you say "statement of charges," are you referring to "specification of charges"?**

A Yes.

**Q And that's the charges that are outlined in the County and -- county personnel and the Ninth Judicial District Court personnel regulations?**

A Yes.

**Q Now, when the DA's Office reviews that, is that as a matter of course, or does the department have to specially request or the HR have to specially request that the DA get involved?**



A It's just as a matter of course.

**Q Have you personally been involved in matters involving the termination of employees at Douglas County?**

A Yes.

**Q As the director of HR, can you generally describe what your involvement consists of typically.**

A Yes, we typically consult with the department on the decision. And situations where a specification of charges is relevant, we review that and work with the District Attorney's Office to review the documentation.

**Q And to your understanding, that policy hasn't changed in recent years?**

A That's correct.

**Q Have you had any personal involvement in matters where employees of the County who are terminated appealed their terminations through a grievance process? Have you been involved in that?**

A Yes.

**Q Does that involve the departments in general, or are you thinking of any particular department?**

A I'm sorry, can you clarify the question.

**Q Yeah.**

**What departments have you had that involvement with?**

A I've been involved with a variety of departments across the County.



**Q Can you just name some departments.**

A The Recorder's Office, the Community Services Department, the Town of Minden.

**Q Anything else come to mind?**

A Nothing is coming to mind right now.

**Q Did you have any involvement in that type of matter -- have you ever had any involvement regarding an appeal of a termination for anyone who is considered to be court personnel?**

A I don't believe I have.

**Q Is your understanding that the process is the same countywide without regard to the department, "the process" being the appeal process?**

A It is not the same.

**Q Is the appeal process for court personnel a process where a specification of charges with proposed discipline is issued, the employee has an opportunity to request a panel or a board hearing where there are three persons on that board, number one, a person who is the head of the department other than the department of the employee for whom the proposed discipline applies, and two supervisors, and that they conduct a hearing, and at the conclusion -- or, after that hearing and their ruling, if the employee is dissatisfied with that, the court personnel employee can then appeal to the judges or the judge of the Ninth Judicial District Court, whose decision on that is final?**

**Is that a fair description of the process involving the**



**disciplining and termination of court personnel?**

A Generally, yes. There are situations where it doesn't apply.

**Q What situations does it not apply to?**

A It does not apply to at-will employees. They are often referred to as unclassified. It does not apply to probationary employees.

I think that's it.

**Q And you don't recall having been involved in any of those types of matters regarding court personnel?**

A No.

**Q And you are not personally aware of any involvement by a Ninth Judicial District Court judge in matters concerning hiring an employee? Even if it's a matter of referring or recommending, you are not aware of that, of referring or recommending the hiring of court personnel?**

A I'm sorry. Can you rephrase the question.

**Q Yeah.**

**Are you aware of any situation where the judge is -- a judge of the Ninth Judicial District Court has been involved in any aspect of hiring a -- court personnel, including recommending the hiring of court personnel?**

A I'm not certain whether they have been involved or not in any of those hires.

**Q Do you have personal knowledge of that?**

A No.
Q Same question, but with regard to disciplining court personnel.
A The only court personnel that I'm aware of that they have been involved in the discipline of are those that report directly to the judge.
Q Okay. Can you give me examples of who -- what class of workers or what jobs you are referring to, reporting directly to the judge.
A Like, Mr. Shick, the chief juvenile probation officer, or the heads of the other departments or functions that they supervise or oversee.
Q Okay. But not chief deputy juvenile probation officers?
A I don't believe so.
Q And not juvenile probation officers or senior juvenile probation officers?
A I don't know.
Q So during the period of 2014 and 2015, the hiring, disciplining, firing of court personnel was governed by either the Douglas County Human Resource -- sorry, the Douglas County personnel rules or the Ninth Judicial District Court rules or a combination of them?
A I believe so.
Q Is it your understanding that the county personnel rules would apply except where the court personnel regulations sort of



occupy that area?
A Yes.
Q And the Douglas County personnel regulations and the Ninth Judicial District Court personnel regulations lay out what their various scope of application is?
A Yes.
Q Okay. I'm going to show you what's been marked as Exhibit 2 to Sarah Christensen's deposition. I think it may correspond to a document you brought today.
Please take a moment and look at that.
A Okay.
Q Have you seen that document before?
A Yes.
Q What is that document?
A It's the court personnel regulations dated September 2006.
Q And that was in effect through February of 2015, correct?
A I believe so.
Q And it has since been amended, correct?
A Yes.
Q Do you know when that amendment was made effective?
A I don't know off the top of my head.
Q Now, in 2015, February of 2015, juvenile probation officers were classified employees, correct?



A I would have to consult the document.
Q All right. Do you want to look at Exhibit 2?
A I'm okay with the copy I have.
Q Just identify what -- if you need to identify the pages, you can refer to the Bates-stamped page.
A Okay.
I believe so, because -- the Bates-stamped page is PLF 00150 -- doesn't specifically call them out as unclassified.
Q Okay. I would like to show you what's been marked as Exhibit 33 to Sarah Christensen's deposition. Please look at that.
A Okay.
Q All right. I want to try and keep these separated. So I'm going to hand you what's been marked as Exhibit 4 to Sarah Christensen's deposition.
A Okay.
Q If you could look at that, please.
A Okay.
Q All right. Do you know what Exhibits 3 and 4 are to Sarah Christensen's deposition?
A Yes.
Q What are they, please?
A Exhibit 3 is Douglas County Code, Title II. I'm not sure at what point in time.
Exhibit 4 is an ordinance amending Chapter 2, Title II



of the Douglas County Code, dated 2007 -- I'm sorry, 2000.
Q Okay. So Exhibit 4 was the county personnel regulations that were in effect in February of 2015?
A Okay.
Q I'm asking.
A I don't know.
Q All right. If I may have those back, please.
A Sure.
Q But in your line of work as the HR director, you are familiar with the Douglas County personnel regulations and the Ninth Judicial District Court regulations?
A Yes.
MS. PARKS: Objection, asked and answered.
BY MR. GEDDES:
Q When the HR department got involved in disciplinary matters, including terminations, that you have talked about, was it necessary to refer to those regulations, both the county regulations and the court regulations?
A Yes.
Q Now, we talked earlier about juvenile probation officers and senior juvenile probation officers being classified positions in 2015, in February of 2015.
What does "classified position" mean? What does that mean?
A It's a position -- I really don't know. I mean, the

definition that's stated here, it's a position that has been established, essentially.

Q But is it your understanding that classified positions are distinguished in some way from at-will positions?

A Yes.

Q What's the basic distinction?

A An at-will position is a position that's not entitled to due process or any sort of rights to their employment.

Q But classified positions do have those rights and protections?

A Yes.

Q And one of the protections for a classified position is that they can be fired -- they can only be fired for cause?

MS. PARKS: Objection, lack of foundation.

THE WITNESS: No.

BY MR. GEDDES:

Q Okay. What -- on what basis can a classified position be terminated, for no reason or a mistake? Is it an at-will?

A It is not an at-will position, no. But there's a variety of reasons, performance, attendance, policy violations, a lack of need for the position any longer.

Q Well, let me ask it this way.

Would you agree that, generally speaking, if the firing of an at-will employee doesn't violate a law, that they can be fired for no reason, a dumb reason or a mistake?



A Yes.

Q Is the same true for a classified position?

A Essentially, no.

Q The due process protection that you talked about for classified positions, does that -- does that due process involve -- or does it involve determining whether there's a good reason to fire a classified employee?

A Yes.

Q Were you involved in Vicky Sauer-Lamb's -- in the hiring or replacement of Vicky -- were you involved in the process of hiring the replacement for chief -- or, deputy chief juvenile probation officer, when Vicky Sauer-Lamb vacated that position?

A No.

Q Were you the senior analyst or were you the director at the time that her position became -- was being replaced?

A I don't know. I don't know when her position was filled.

Q But you were involved in recruiting before you became a director?

A Some recruitments.

Q But you didn't have any knowledge -- as you sit here, you don't have any knowledge of her --

A No, I don't.

Q -- the hiring of her replacement now?

A No.



Q Did you attend any interviews for any positions within the juvenile probation department? Have you ever attended any interviews?

A No, I haven't.

Q To your knowledge -- I know that you've talked about the general process for people who apply for positions with the County. Applications are then sent to the departments. And you've talked about that.

Do you know if the Douglas County DA's Office gets involved in matters where someone applies for a job?

A Not usually, no.

Q To your knowledge, did the Douglas County DA's Office have any involvement in Mr. Enos's request for reemployment or efforts to be reemployed in either 2016 or 2017?

A I believe so, yes.

Q What was that?

A Providing legal counsel to Human Resources and the course of action with those applications.

Q Do you have any specifics about the 2016 efforts with regard to a recommendation by the legal counsel or the DA's Office as to whether to hire or not hire Mr. Enos?

A No, I don't.

Q And the same question for the 2017, the effort to be rehired in 2017.

A Do I have any specifics as to what the DA's Office



recommended?

Q Yeah.

Did the DA's Office have a recommendation regarding Mr. Enos's application to be reemployed in 2017?

A Yes.

Q What was their recommendation?

A That Mr. Enos's application should not be considered.

Q Why?

A Because he had previously held the position and we were aware that he was no longer capable of performing the functions of that job.

Q And who specifically made that recommendation?

A I believe it was Cynthea Gregory.

Q Did she give specifics as to the idea that he was no longer capable of performing that position?

A I don't recall.

Q And was there any discussion as to whether he should be evaluated to determine whether he could perform that -- capable of performing that position since the time of his firing, given that time had passed?

A I don't believe there were discussions as to whether he should be evaluated. I believe it had been less than one year since we were notified and requested whether we had other positions available to him.

Q We may be talking about two different periods.

There's a 2016 letter, and we'll get into the specifics a little bit later. I'll show you documents. But there was a 2016 effort through Ed Howden --
A Correct.
Q -- and then there was a 2017 effort in response specifically to the position of juvenile probation officer.
A Right. But the 2017 effort was less than a year following the 2016 effort. And the 2016 effort was on the basis that he was no longer capable of performing the juvenile probation officer job, so what other opportunity might be available, I believe.
Q Okay. So there wasn't any discussion of whether to evaluate him for a changed -- changed circumstance or changed condition?
A I don't believe so.
Q Was there any consideration given to the fact, to your knowledge, that Mr. Enos -- well, let me ask it this way.
Was there a determination made that Mr. Enos was not eligible for reemployment by Douglas County for any reason?
A I don't believe so.
Q Now, the way it works, if I understand -- correct me if I'm wrong -- the DA's Office makes recommendations, but it's up to either the HR or the department in question to accept or reject that recommendation. Is that how that works?
A Yes, that's correct.



Q So you stated that -- I'm sorry, I didn't write her name down. Who was the DA that you had referenced?
A Cynthea Gregory.
Q Thank you.
Cynthia made that recommendation that he not be considered. Do you know to whom she made that recommendation? Did she make that to you, or did she make that to Scott Shick?
A Generally, me. All communications funnel through Human Resources from the District Attorney's Office to the department regarding employment matters.
Q So Cynthea Gregory made that recommendation to you?
A Most likely.
Q You don't have any specific recollection of it?
A It was either probably myself or the recruiter. I'm not sure.
Q Who would the recruiter have been?
A Cindy McMurry.
Q Do you know -- I mean, you are obviously here testifying about it today. How did you get the information -- on what are you basing this information, if you don't recall that that recommendation was made to you? Is there a written document or --
A No. And I know that there were conversations, I just don't remember specifically the chain of communication.
Q Okay. But ultimately, the decision was yours?
A No. I think, ultimately, the decision is the juvenile



probation department's.
Q Okay. Scott Shick. Okay.
So Scott Shick -- to your understanding of how things work, if Scott Shick wanted to reject that advice, he could have?
A Yes.
Q He could have considered hiring John Enos and he could have hired him?
A Yes.
Q Do you know who ultimately was hired for that position?
A I believe I do.
Q And who was that?
A I believe it was Brent Koontz.
Q Okay. And were you -- during this process, did you evaluate his qualifications for the position?
A I did not.
Q Are you aware of what Mr. Enos's current physical status is with regard to any restrictions that might -- he might have as far as lifting capacity?
A Not off the top of my head, no.
Q Do you know whether he has been rated as disabled?
A I believe he has.
Q And what's your understanding of his disability rating?
A I don't know that information directly.
Q Would his disability rating, in and of itself, preclude his eligibility for hire with Douglas County?



A No.
Q To your knowledge, did -- in connection with his 2007 application, was there an effort by Douglas County or the DA's Office to inquire as to any work restrictions that he might have had in the year 2017?
A No.
Q And the same question for 2016.
A I don't know about the 2016.
Q When John Enos applied for work in 2017, by that time, he had already filed a lawsuit against the County, correct?
A Yes.
Q So any knowledge that you might have gained concerning any workplace injuries by Mr. Enos, those were gathered only in reviewing documents in connection with this litigation?
A Yes.
Q Let's take a look at what's been marked as Exhibit 5 to Sarah Christensen's deposition.
Please take a look at that.
Okay. Have you seen that document before?
A Yes.
Q I think you gave testimony earlier that as part of your job duties, you help work on job descriptions. Is that right?
A Yes.
Q That was as an analyst, but not as a director; is that correct?

A Correct.
Q Is that -- the document that we've shown you, Sarah Christensen's Exhibit 5, that's the job description for the juvenile probation officer and senior juvenile probation officer; is that correct?
A It's a part of it.
Q Is it missing something?
A It's missing a page.
Q Which page is it missing?
A Page 2.
Q Okay. And page 2 can be found at PLF 304?
A That's correct.
MR. GEDDES: I would like to -- what exhibit are we on? So if we could mark this as Exhibit 2.
(Exhibit 2 marked for identification.)
BY MR. GEDDES:
Q If you can please look at what's been marked as Exhibit 2.
MS. PARKS: Let me see that one again, please.
BY MR. GEDDES:
Q So I want to be clear. I'm not trying to ask you the same question over again, ma'am. Ms. Parks is free to object.
What I'm trying to understand is, when you testified earlier that Cynthea Gregory made a recommendation of not considering his application because he previously held the



position and it was determined that he could no longer -- no longer capable of performing that position, are you referring to anything particular in this job description that he was unable to perform?
A I am not, because this job description is not the job description that was posted as a vacancy that he applied to in 2017.
Q Okay. Are you aware of what differences there were?
A I don't know specifically. I know that all job descriptions were updated in 2015 and that this job description before me is for a juvenile probation officer senior, as opposed to a juvenile probation officer, which is what was posted in 2017.
Q Is there a difference between the senior position and the non-senior juvenile probation department?
A Yes.
Q Is there a difference in physical requirements?
A I don't know off the top of my head.
Q The position that is currently -- the job description that's currently posted on Douglas County's website for this position or made available through the Internet, is that one the same one that was in effect for the position that Mr. Enos applied for in 2017?
A I believe so.
Q Do you know where that -- what website that's available on?



A Yes.
Q What website is that?
A I think it's DouglasCountyNV.gov. I'm not certain off the top of my head of the website, web address.
MR. GEDDES: Why don't we go off the record, take a break here. It's 11:30.
(A discussion was held off the record.)
MR. GEDDES: Mark this as 3.
(Exhibit 3 marked for identification.)
BY MR. GEDDES:
Q All right, Ms. Lang. I'm showing you what's been marked as Exhibit 3. And I will represent to you that I went to the website that you directed me to. It's -- the website address is listed at the bottom of Exhibit 3. If you could just take a moment and look at this, please.
There's a blank page in my copy. Is there a blank page in yours?
A Yes, there is.
Q I'll just pull this out.
Have you seen this document before?
A Yes, I have.
Q This is the current job description for a juvenile probation officer for Douglas County?
A That's correct.
Q And we had talked earlier about salary ranges. And you



stated that you didn't have salary ranges, didn't have that information.
If we go to the website for Douglas County and type in "jobs," the salary range would be listed in the document as it's listed here; is that correct?
A Yes.
Q Okay. So if we look at Exhibit 3, is there anything in Exhibit 3 that -- well, let me take a step back.
You gave testimony previously about Mr. Enos's efforts to become reemployed in 2017 and that Cynthea Gregory had made the recommendation not to consider his application because he previously held the position and he was no longer capable of performing that position.
Do you recall that testimony?
A Yes.
Q Is there anything in Exhibit 3 that related to that statement or belief by Ms. Gregory regarding his inability to perform that position?
MS. PARKS: Objection, calls for speculation.
THE WITNESS: I'm not certain. I believe it was related to the physical requirements of the position. And the recruitment process, the first steps were a physical agility test, which required all candidates to demonstrate their ability or not to perform those physical requirements.
///

BY MR. GEDDES:
Q Is there a weight, pound requirement of being able to lift or carry a certain weight in Exhibit 3?
A Yes.
Q And what is the pounds on that?
A 50.
Q Up to 50 pounds?
A Correct.
Q Okay. All right. What I want to do, I'm going to show you a document -- first, I want to put these back. Let's see.
I'll show you what's been marked as Exhibit 6 to Sarah Christensen's deposition. It's not necessarily one document. It's, I believe, a collection of documents with different Bates stamps.
A Okay.
Q Have you seen any of the pages of those documents before?
A I have not.
Q Do you know whether Mr. Enos pursued a workers' compensation claim for an injury or injuries at Douglas County?
A I believe he did.
Q What's your understanding of that?
A I don't really know any of the details of it.
Q But your understanding was he was injured and he pursued workers' compensation claims?



A Yes.
Q Was that for one injury or two injuries?
A I believe it was for two.
Q Do you know if light duty was provided to Mr. Enos in connection with those workers' compensation claims?
A I don't.
Q Do you know if he had work restrictions in connection with those work -- I'm sorry, in connection with those workers' compensation claims?
A I'm not sure.
Q Are you aware of an issue arising at Douglas County where there were layoffs in the County and workers in those departments where there were layoffs complained that light duty was being given to employees from other divisions, anything like that?
Have you heard of anything like that, or are you aware of anything like that?
A I'm not familiar with that, no.
Q In your job as the human resources director, are you able to summarize how light duty is given to employees who have workers' compensation claims? How does that work?
A Generally, the work restrictions are provided by the treating physician.
The department, first, will identify whether they can make an accommodation temporarily for those work restrictions.



And if they can, then they provide what that is and it's offered to the employee.
If they can't, then we seek -- by "we," I mean Human Resources usually will orchestrate seeking light-duty opportunities in other departments.
Q And since you've been the director, you haven't run into the issue where there has been resistance or conflict or a problem getting workers from one department, light duty in a different department, for the reason that they didn't want workers from other departments taking light-duty positions in departments where people have been laid off?
A Since I've been the director, I haven't seen any light-duty cross departments at all. So I don't -- I wouldn't have had an issue one way or the other.
Q I see. Is it possible that there haven't been cross-department light duty for the very reason that there's an agreement or a policy not to do that, given that workers from other departments don't want workers from foreign departments being given light duty in their departments?
Does that make sense?
A It makes sense.
I've never run into that or heard that consideration, myself, no.
Q Do you know why there haven't been cross-department light-duty positions since you've been director?



A I can only speculate.
Q I don't want you to speculate, but I'm trying to understand what you're saying.
You're saying that -- let's use the juvenile probation department as an example.
If a worker is injured or has a workers' compensation claim, you said that the department first tries to see if they have light duty?
A Correct.
Q That would be light duty to perform work in that department?
A Correct.
Q And then if they are unable to provide temporary light duty, then the HR department tries to find light duty?
A Correct.
Q Where would you -- you, obviously, would try to find light duty outside of that department?
A Correct.
Q So -- but you haven't been able to find light duty for people in other departments since you've been the director?
A I've not had a department ask or decline the ability to find light duty within their own department since I've been the director.
Q Okay. So if a worker were a juvenile probation department worker and he or she was given light duty in the

library, is that considered a different department?
A Yes.
Q To your knowledge, since you've been the director, have there been light-duty assignments in the juvenile probation department?
A I don't know.
Q I would like to show you what's been marked as Exhibit 7 to Sarah Christensen's deposition, if you could please look at that. It's two pages.
A Okay.
Q Have you seen those documents before?
A No, I have not.
Q Showing you what's been marked as Exhibit 8 to Sarah Christensen's deposition, would you please look at that.
A Okay.
Q Have you seen those documents before?
A No, I haven't.
Q Now, you are familiar with what work restrictions from doctors can look like, what they typically look like, work restrictions in the workers' compensation context?
A Yes.
Q I would like to show you what's been marked as Exhibit 9 to Sarah Christensen's deposition. Please look at that.
A Yes.
Q Have you seen those documents before?



A No, I haven't.
Q The DCO 1526 on this Exhibit 9 states that it's a notice of injury or occupational disease. Do you see that?
A Yes.
Q Are you generally familiar with what that type of a document is?
A Yes.
Q Is that document called a certain type of document, like a C4 or C2?
A I always get those mixed up.
It's not the C4. It's not the C3.
It might be C2, but I'm not certain.
Q Okay. But this type of document, is this the type of document that's filled out when a worker is injured and they are giving notice of an injury or an occupational disease?
A Yes.
Q And this document sort of kicks off the process of seeking a workers' compensation -- making a workers' compensation claim?
A Yes.
Q Do people fill this out if they are not pursuing a workers' compensation claim generally?
A I believe that that form is filled out whether you seek treatment, which the treatment is what would actually initiate it to be a claim for workers' compensation.



If no treatment is sought, there's no claim, but there is a report of injury filed.
Q Well, on this particular page, it says "To file a claim for compensation, see reverse side, section entitled 'Claim For Compensation,' Form C4."
So is it your understanding that a Form C4 is what triggers the pursuit of a workers' compensation claim?
A Yes, the C4 would.
Q Okay. Thank you.
I'm showing you in that same exhibit what's been marked as DC 1528 -- I believe this is a C4 form -- and 1529. But I just want to confirm that this is the type of form that you are referring to.
There's a third page, DC 1530. I think you can see the word "Form C4" at the top, underneath the box. So on the right side, Form C4.
A Yes, looks like it.
Q You previously mentioned, I believe, Karen Barbee.
Showing you what's been marked in that same exhibit as DC 1196, have you seen a document before with that letterhead?
A Yes.
Q Is Alternative Service Concepts the third-party administrator for workers' compensation claims for Douglas County?
A They are not currently, but they have been previously.
MR. GEDDES: Okay. Go off the record. Thank you.



(A recess was taken.)
BY MR. GEDDES:
Q All right, Ms. Lang. You understand that you are still testifying under oath?
A Yes, I do.
Q Okay. I'll have you take a look at what's been marked as Exhibit 10 to Sarah Christensen's deposition. I'll have you take a look at that.
A Okay.
Q Have you seen that document before?
A I have not.
Q Okay. Showing you what's been marked as Exhibit 11 to the Sarah Christensen's depo. If you could look at that and tell me if you've seen any of the emails of this document before?
A No, I have not.
Q Okay. Take a look at Exhibit 12. Same question, please.
A I have not.
Q Same question for Exhibit 3 -- I'm sorry, 13 to Sarah Christensen's deposition.
A No, I have not.
Q Okay. What is your general understanding -- I'm not asking for a legal conclusion. But as it relates to HR matters for which you are the director, what's your understanding of how FMLA leave operates with respect to employees?

A Generally, FMLA is a benefit that's mandated by federal law for employers to provide to employees in most circumstances. Some of the conditions are that the employee has to have worked there for 12 months.

There's an allotment of 12 weeks per year, depending how the employer calendars it. That can be rolling or from a certain point in time forward.

And it's job protection leave that's available to employees for meeting qualifying medical health conditions, that they are entitled to up to 12 weeks of leave without change to their position.

**Q Do you have an understanding one way or another whether Mr. Enos was protected with FMLA leave in 2014?**

A I don't, no.

**Q Ordinarily, would an employee who is out on a medical leave who still has FMLA leave -- that person would ordinarily not be -- would not be fired in connection with that person's workplace injuries during that FMLA protected period; is that correct?**

A I'm sorry, can you rephrase the question.

MR. GEDDES: Maybe if you read it back.

(The question was read by the reporter.)

THE WITNESS: Generally, no. I mean, there's a lot of circumstances and caveats to that.

///



BY MR. GEDDES:

**Q Let's take a look at Exhibit 14 to Sarah Christensen's deposition. If you could please look at this document and say if you have seen any of the emails of that document before.**

A No.

**Q Okay. When you worked in the human resources department as a senior analyst, where were you in connection -- were you in one of the cubicles?**

A I've always had the same office during my tenure at Douglas County.

**Q As a senior analyst, then, you went right into Norma Santoyo's old office and you've stayed there since?**

A Yes.

**Q And you were a senior analyst beginning in late January of 2014?**

A Yes.

**Q And during this period of -- during the period of -- reference to Exhibit 14 to Sarah Christensen's deposition, this is an email from Justina Caviglia to Scott Shick on Friday, July 18th, 2014.**

**You would have been in Norma Santoyo's old office then; is that right?**

A Yes.

**Q Who was the director at that time?**

A July of 2014? Norma Santoyo.



**Q Okay. Now, the office that you have, is that the same size as the office that was, at one time, shared with Kathy Jo Kidd and Sarah Christensen?**

A No, it's not.

**Q Which is bigger?**

A The shared office.

**Q Okay. And so being in your office, you could sometimes see people coming in and having meetings? There is a conference room in there; is that right?**

A There's an adjacent conference room to the office, yes.

**Q So if there's a meeting being held, you can sometimes see people going in to meetings, right?**

A Sometimes, yes.

**Q Do you recall seeing Justina Caviglia down in your office in -- in or around July of 2014 regarding personnel matters?**

A I'm sure she would have been.

**Q I would like to direct your attention, if I can, in this Exhibit 14 of Sarah Christensen to Bates-stamped 5596. There's a discussion regarding duty station assignment. Do you see that?**

A Yes.

**Q Do you have any information about that subject matter?**

A None at all.

**Q So you never heard whether there was an effort to have John Enos work at the juvenile detention center in connection --**



**well, having him work at the juvenile detention center?**

A I'm not familiar with that.

**Q Do you know what the juvenile detention center is?**

A Yes.

**Q What familiarity do you have with that?**

A I know it's a facility in Douglas County that Scott Shick oversees. And it's located at the lake. I think it's adjacent to the Lake branch of our Sheriff's Office and Lake jail.

**Q Have you ever actually visited it?**

A I have not.

**Q To your knowledge, has any -- well, let me take a step back.**

**I think your testimony is, you are not aware of any instance where -- under your tenure as the director, you are not aware of any instance where a person who worked in the juvenile probation department had a workers' compensation issue. Is that correct?**

A That's correct.

**Q So you are not aware of any light-duty placements to the detention center?**

A No, I'm not.

**Q I would like to show you what's been marked as Exhibit 16 to Sarah Christensen's deposition, if you could take a moment and look at that.**

A Okay.

Q All right. Have you seen this document before?
A No.
Q In the time frame of February of 2015, you were still a senior analyst, is that right, HR analyst?
A Correct.
Q And Sarah Christensen was also an HR analyst?
A Correct.
Q And you were her supervisor?
A No.
Q Were you familiar with any of the work that she was doing in the time frame of February of 2015?
A Not really.
Q Well, this particular document states -- this is an email from Sarah Christensen to Norma Santoyo. And it reads "John Enos" -- Sarah Christensen is writing this.
Well, let me take a step back.
There's a second email in the middle of DC 5351 that reads -- it's from Karen Barbee to Sarah Christensen.
It says "Hi Sarah. I need to send a TTD check to John today depending on your answers to questions below."
And there were questions below from Karen Barbee to Sarah Christensen sent on February 23rd, 2015, which read "Hi, Sarah. As you know, the last return-to-work note from Dr. Morales dated 2/17/15 indicated that John's restrictions were no lifting greater than 50 pounds, no pushing greater than 50 pounds, no



pulling greater than 50 pounds, no overhead shoulder lifting greater than 35 pounds.
"I realize he was terminated last week, but I need to determine if we will still continue his TTD and to document whether or not he would be able to work with those restrictions.
"Do these restrictions fit within his usual and customary job duties? If not, would the County have light duty available for him if he had not been terminated?"
And you are not familiar with any of that discussion or any inquiry?
A No, I'm not.
Q And so Sarah Christensen responds at the top of this document, DC 5351. And she writes "John Enos was terminated from Douglas County on February 19, 2015. John's FMLA time was exhausted and he was unable to return to work with no restrictions as stipulated."
Do you know what she's referring to there?
A No, I'm not.
Q Since you've been the director of HR, has there ever -- has there been a stipulation imposed by the County, to your knowledge, of a county employee that they must return to work with no medical restrictions?
A No.
Q Does the ADA require that a worker, in order to continue working, have medical -- have doctors' notes that have no medical



restrictions?
Do you understand my question?
MR. BROWN: I'm going to object to the extent it's calling for a legal conclusion. She can give you her opinion based upon her understanding.
BY MR. GEDDES:
Q And do you understand the question?
A No. Can you please give it to me again.
Q Yeah.
This document states that he didn't have any FMLA time left. So that would -- that would indicate that he didn't have FMLA protection. And this further states that he was unable to return to work with no medical -- or, no restrictions as stipulated.
So my question to you is, does the FMLA require -- I'm sorry. Does the ADA require full medical releases of an injured employee in order for them to be able to work with Douglas County -- or, to return to work at Douglas County?
MR. BROWN: Same objection.
THE WITNESS: I'm not aware of that, no.
BY MR. GEDDES:
Q And you testified earlier that Douglas County and Ninth Judicial District Court policy was to comply with the ADA requirements. Is that correct?
A Yes.



Q Have you seen what's been marked as Exhibit 17 to Sarah Christensen's deposition?
A No, I have not.
Q Now, at this time, on January of 2015, you were still the senior analyst; is that correct?
A Yes.
Q Do you know what "TTD" means?
A Yes, I do.
Q What does that mean?
A Temporary total disability.
Q And what is that?
A It means that an employee's injuries are such that they are totally disabled, totally unable to report to work.
Q Is that temporary or a permanent condition?
A Temporary.
Q And is that bodywide, or is it body part?
A That, I don't know.
Q So you said that a person is unable to return to work. Are you saying, then, that if a person had a TTD on one body part or some body parts, that that, in and of itself, precludes the person from being able to return to work?
A My understanding is TTD applies when the injuries are such that the employee cannot work at all.
Q And does that include they cannot work with a reasonable accommodation under the ADA?

A My understanding is that if someone can work, it's a TPD, a temporary partial disability.

Q My question is a little different.

Could a person with a TTD work with a reasonable accommodation under the ADA?

MR. BROWN: I'm going to object to the extent it calls for a legal conclusion and it's also an incomplete hypothetical.

THE WITNESS: I don't know.

BY MR. GEDDES:

Q I would like to show you what's been marked as Exhibit 18 to Sarah Christensen's deposition. Take a look at that, please.

A Okay.

Q Have you seen that particular document before?

A Yes, I have.

Q What's this document?

A It's a position description questionnaire. It was used for one of the projects I oversaw in 2014, which was revising job descriptions throughout the County.

Q And so you actually received this particular one. You've seen this particular one. It says employee's name is John Enos; Bruce Beauchamp, or "Beecham"; Tamara Morris, Eric Anderson and Douglas Albertson as senior juvenile probation officers?

A I believe so, yes.



Q The portion on 3214 -- PLF 3214 that asks -- well, let's take a step back.

What did the questionnaire aim to do?

A The questionnaire was one of many tools used in crafting revised job descriptions.

Q And it was based on the input from the people who actually had those jobs?

A This particular tool was, yes.

Q And was there a follow-up investigation with any of these workers who filled out this questionnaire, or was the questionnaire taken -- was the information taken for what it was and there was no follow-up investigation?

A Follow-up conversations were held with the supervisors.

Q Okay. And so given that this is the juvenile probation department, who were the conversations -- who did you have the conversations with, the follow-up ones?

A It was not actually me, it was a consulting firm that we utilized, that had follow-up conversations. I don't know specifically, but I would imagine it was Vicky Sauer-Lamb or Scott Shick.

Q Okay. Have you seen Exhibit -- what's been marked as Exhibit 19 to Sarah Christensen's deposition before?

A No, I don't think so.

Q You gave testimony earlier about workers' compensation. I believe you talked about how the HR monitors workers'



compensation matters.

Do you recall that testimony earlier?

A Yes.

Q And you also testified that the department also is kept abreast of that information. Is that correct?

A Yes.

Q So you may not have seen this particular document that we just showed you, Exhibit 19. This particular document is a work/school excuse from Tahoe Fracture and Orthopedic regarding Mr. Enos. It's dated January 28th, 2015.

And there's a section at the bottom that says return to full duty in approximately three weeks.

Now, in tracking an employee's workers' compensation cases, is that the type of instruction -- the one, return to full duty in approximately three weeks -- that would typically cause the HR department to plan ahead and say, hey, this guy might be coming back or this gal might be coming back in three weeks and sort of an expectation would be alerted to the departments typically?

A Theoretically, I guess so.

Q Well, maybe you can -- what -- in the ordinary situation, when a work restriction has that notation with an expectation of returning to full duty in a time frame, does HR do anything with that information typically?

A Update the records and notify the appropriate party any



time there's an update to a claim or a note.

Q Okay. And how does HR get these records? They get it from the third-party administrator?

A Sometimes from the third-party administrator, sometimes from the employee, sometimes from the supervisor of the employee, sometimes from the physician.

Q So your ordinary expectation is that this being this type of document, if it's saying that an employee would be returning -- returned to full duty in approximately three weeks, that's not information that the HR department would typically sit on, but typically, it would give it to the department in a timely manner?

A Correct.

Q And then from that, the HR and the department would be able to plan for the return; is that correct?

A I'm not sure what you mean by "plan," but --

Q Well, in an instance where the work/school excuse says return to full duty in approximately three weeks, does -- do you, as HR director, and does the department to whom this applies for the employee, do they make plans to say, oh, we have an expectation now this person is returning?

A I can't speak for what the department would do, but I would take that information as a current status. I wouldn't rely upon that information.

Q Okay. Well, what function is served by monitoring a

person's workers' compensation status that you talked about earlier? Why is that done?
A A variety of reasons. We're managing cases, managing costs, managing that everyone's fulfilling the roles that they need to fulfill, the status, the employee's needs are being met, the department's needs are being met, things are being done in a timely manner.
Q Is it also to help manage expectations for scheduling when an employee might be returning?
A To some degree. But with workers' compensation, it's very difficult to plan or forecast what's going to happen.
Q Why is that?
A It changed frequently.
Q But in any instance, the ordinary routine is to give this to the particular department for whom the employee works; is that correct?
A Yes, or a lot of times it comes from that department because the employee gives it to them directly.
Q Do you have any reason to suspect that the juvenile probation department was not given a copy of this?
A I would have no idea whether they were or not.
Q But if they were following ordinary protocol, your expectation would be that they had received it?
A I would think they had received it, yeah.
Q I show you what's been marked as Exhibit 20 to



Sarah Christensen's deposition. Would you please look at that.
Okay. Have you seen this document before?
A I have not.
Q This document is -- do you recognize that handwriting?
A I think it might be Sarah Christensen's.
Q Okay. This document reads "Left message for John 1/30/15. Told him we have no work that could accommodate his doctor notes."
Do you have any information about that?
A No, I don't.
Q Then the second part of this is dated 1/30/15. It states "Discontinued key card."
Do you have any information about that?
A I can make an assumption.
Q What's the assumption?
A In Douglas County, we use key cards to access certain buildings and doors, and I assume that's what she's referring to.
Q Well, who is responsible for -- when I say "responsible," I mean as between HR and a particular department, who is responsible for discontinuing an employee's key card usually?
A HR.
Q But they wouldn't do that on their own, would they, typically? Would they be required to receive some kind of prompting from the department requesting that, or is that



something that HR would do on its own?
A No, they would do not that on their own.
Q I'm sorry?
A No, they would not do that on their own.
Q So the HR wouldn't do that on its own. So normal protocol is, if you are going to discontinue a key card from an employee, the department would request that; is that correct?
A I would assume so, yeah.
Q Well, what would happen nowadays typically? Have you -- has, to your knowledge, has the HR discontinued someone's key card on its own?
A No.
Q And in the instances where key cards were discontinued, that was done at the request of a department; is that correct?
A Yes.
Q And you are not aware of any instance where the HR discontinued a key card without a request from the department within which the employee works; is that correct?
A It could come from another department, perhaps the county manager or the District Attorney's Office in certain circumstances that merited that.
Q But normally, a person's key card is continued after they no longer are working there; is that right?
A No.
Q What is a situation when a key card is discontinued, to



your knowledge?
A Key cards are discontinued when an employee no longer needs to access that building, either because they don't work there, they've left the county, they have left that department, they have a different role.
They may be discontinued when somebody is on a leave of absence. I don't think that's typical, though.
Q Have you any information concerning a belief by anyone or a concern by anyone at Douglas County that Mr. Enos presented a danger or a threat or a safety risk to Douglas County or its building or employees when he was out on leave?
A I don't know any information about that.
Q I'll show you what's been marked as Exhibit 21 to Sarah Christensen's deposition. Please look at this and tell me if you have ever even this document before.
A I think I've seen it in gathering documents for this litigation.
Q Okay. Do you have any information about the matter set forth in Exhibit 21 to Sarah Christensen's deposition?
A No, I don't.
Q As the director of Human Resources, have you or any of your subordinates issued a letter to an employee ordering them back from their leave because their FMLA was going to expire or had expired?
A Not for all the specific circumstances that you just

laid out, no.

Q Well, what are you thinking of that's similar to that or like that?

A I've sent letters ordering people to work because they've not shown up to work for various reasons, or there's other circumstances, but not specifically because FMLA has expired, that I can recall.

Q Okay. Now, the human resources department tracks FMLA matters, correct, and the usage? If someone is out on FMLA leave, that's something that the human resources department tracks?

A Yes.

Q In a manner similar to tracking the workers' compensation issues, workers' compensation leave, employee is out on that type of leave?

A Yes.

Q So it's the ordinary procedure, isn't it, for the human resources department to send out a letter to an employee who is out on FMLA leave before the FMLA leave expires, letting him know that their FMLA leave will be expiring by a certain date; is that correct?

A I don't believe we do that, no.

Q All right. I'll show you what's been marked as Exhibit 22 to Sarah Christensen's deposition. Please look at this document and tell me if you have ever seen it before.

A I believe I've seen it in my gathering of documents in



preparation for this litigation.

Q Okay. But not before the litigation was commenced?

A No.

Q This particular document, Exhibit 22 to Sarah Christensen's deposition, is a handwritten note from John Enos. And he writes, "On Friday, February 13th, 2015, a letter was delivered to my home at 4:45 p.m. I received it at 5:25 p.m.

"The letter informed me that I must provide the County with a doctor's release and a return to work on 2/17/15 at 8 o'clock a.m.

"I returned to work at 8 o'clock a.m. to Norma Santoyo's office at Human Resources unable to get a full release from my doctor over the President's Day weekend."

Now, I'll pause there.

You have no information about that?

A No.

Q When you worked there, you didn't overhear conversations about any of this?

A No.

Q And you didn't see emails, you weren't CC'd on any emails about that?

A No.

Q He writes, continuing on in this exhibit, "I am requesting an extension of time in order to get more information



from my doctor regarding my ability to return to a full duty as a probation officer."

Now, I'll pause there.

Would you agree with me that that constitutes a request for an accommodation under the ADA?

A Can you repeat the sentence from the letter.

Q Yes. "I am requesting an extension of time in order to get more information from my doctor regarding my ability to return to full duty as a probation officer."

A Would I agree that it constitutes a request for an accommodation?

Q Under the ADA.

A I struggle with it because an employee, to me, asking to go and get information from their doctor is not a reasonable accommodation. Accommodation would be accommodating the disability, not the logistics of preparing to gather that information.

Q Let me ask it this way.

Is it true that unpaid leave can be a form of accommodation under the ADA?

A Yes.

Q And here, in the context of this letter, you would agree that Mr. Enos was on leave, and he received the letter to return back to work off of leave. And he's told that he has to return to work with full releases from his doctors.



And he's requesting an extension of time to do that, to get more information from his doctor regarding his ability to return to full duty as a probation officer.

So my question is, if you received this currently, as the director of HR, would you construe that to be a request for an accommodation under the ADA?

A No.

Q Then he writes, "Pursuant to the county policy regarding leave of absence, Number 200.40, I'm also requesting a leave of absence in order to receive necessary medical treatment for injuries I received while on the job and to recover from these injuries in order to return to my job as a probation officer at full capacity."

Is that a request for a reasonable accommodation under the ADA?

A I don't think so.

Q Why not?

A Because, again, there's no discussion of the disability or what the restrictions are. It's a logistical concern.

Q Well, in the context of the County knowing what his restrictions are because he's on workers' comp leave, and knowing exactly what his restrictions are because, as you said, you monitor that, and in the context of the County ordering him back with full doctors' releases and him requesting a leave of absence, do you still contend that that is not a reasonable -- a request

for an accommodation under the ADA?
MR. BROWN: Objection. It's argumentative, it's compound, and it's an incomplete hypothetical.
BY MR. GEDDES:
Q You can answer.
A Based on the information I have in front of me, I don't think it is.
Q Okay. So if you received this request, as the director of the HR, would you -- would that trigger the interactive process to find out more?
A The interactive process, no; the search for further information, perhaps.
Q So my question then is, if the County knew what his work restrictions were based on monitoring his workers' compensation, as you testified that that's what the HR does, and it was aware of his work restrictions, and it was aware that a letter had been sent to him ordering him back to work and he requested a leave of absence, that would not amount to a request for an accommodation if that were presented to you as the director of HR?
A It would depend on the circumstances. I don't know.
Q But you would agree that it might constitute a request for an accommodation?
MR. BROWN: Objection, speculation.
THE WITNESS: It might.
///



BY MR. GEDDES:
Q Then there is an asterisked section at the bottom that reads "Also, if it is found that I will not be able to return to full duty as a probation officer, I will accept any other position with the County that I can perform."
Would that constitute a request for an accommodation under the ADA?
A In theory. It's really -- seems like, you know, a single-sided conversation that's not taking place with all the relevant information in this letter.
Q Well, you would agree, though, that transferring an employee who cannot perform the essential functions of his or her job where they work, transferring that person to an available position for which he or she qualifies, is a form of a reasonable accommodation that might be given, correct, under the ADA?
A Yes.
Q And you have no information about that particular matter, regarding John Enos?
A No, I don't.
Q I'll show you what's been marked as Exhibit 23 to Sarah Christensen's deposition, if you could please look at that.
Have you seen either of these documents before?
A I may have seen it in gathering documents for this litigation.
Q But not before the lawsuit was filed?



A No.
Q The first page is a return-to-work order for Mr. Enos. And it's dated, with a fax banner stamp as well, February 17th, 2015, and it reads "Return to work For John Enos." And it lists the date of injury and it lists restrictions.
And it reads "Employee is unable to lift greater than 50 pounds, no pushing greater than 50 pounds, no pulling greater than 50 pounds."
Would you agree that that -- this means that he could lift up to 50 pounds in those particular categories?
A Yes.
Q And as far as you can recall, the job requirements for that position are lifting 50 pounds?
A Yes.
Q Then if we look at 350 -- I'm sorry, the next page, DCO 1496, this is a letter from -- it's a work/school excuse from Tahoe Fracture and Orthopedic that says "John Enos," on February 18th, 2015, "may return to work unrestricted as of today."
And you have no information about either of these -- either -- no information about the information contained in either of these records?
A That's correct.
Q I'll show you what's been marked as Exhibit 24 to Sarah Christensen's deposition, if you could you please look at



that.
Okay. Have you seen this document before?
A No, I have not.
Q This is a letter from Karen Barbee, senior claims adjuster for Alternative Service Concepts. It's dated February 24th, 2015, and it's to John Enos.
And the first paragraph reads "A review of your claims referenced above indicates that you have been given a full-duty release from Dr. Eisenhauer effective February 18th, 2015.
"And Dr. Morales has decreased your restrictions to no lifting greater than 50 pounds, no pushing greater than 50 pounds, no pulling greater than 50 pounds, no overhead shoulder lifting greater than 35 pounds, effective February 17, 2015.
"We have been advised that the restrictions given by Dr. Morales are compatible with your regular job duties. As such, you are no longer eligible for temporary total disability benefits. No further TTD payments will be made."
Do you have any information about this?
A No, I don't.
Q Isn't this letter saying that as of February 18th, 2015, your work restrictions are compatible with your regular job duties such that you could have gone back to work? Isn't this what this is saying?
MR. BROWN: Objection, letter speaks for itself, incomplete hypothetical.

THE WITNESS: From what you stated, it sounds as though that's what it's saying, yeah.

BY MR. GEDDES:

Q And it states that you are no longer eligible for temporary total disability, TTD benefits. What does that mean?

A That the employee would no longer be compensated for not being able to work.

Q I'll show you what's been marked as Exhibit 26 to Sarah Christensen's deposition. Will you tell me if you have ever seen this document before.

A I believe I've seen it in gathering documents in preparation for litigation.

Q So you hadn't seen this prior to the filing of the lawsuit?

A No.

Q Okay. This states "Regarding leave of absence." It's from Scott Shick to John Enos, dated February 19th, 2015. Now, that was the day of his separation of employment.

And it reads "Dear Mr. Enos, I have received and seriously considered your request for leave of absence dated February 17th, 2015, pursuant to Douglas County Policy 200.40. However, after considerable deliberation, your request is being denied."

You have no information about this?

A No.



Q Do you know what Douglas County Policy 200.40 is?

A Not off the top of my head.

Q In your experience as a director of HR, are you aware of whether requests for a leave of absence have ever been made by employees from Douglas County?

A No, I'm not aware of any.

Q Do you know what the procedure is or what needs to be considered for a leave of absence pursuant to Douglas County Policy 200.40?

A I don't know that information without looking at the policy.

Q Let's take a look at -- well, we'll actually get to those questions a little bit later.

I don't want to get these documents all confused.

Okay. Showing you what's been marked as Exhibit 27 to Sarah Christensen's deposition, if you could tell me if you have ever seen this document before.

A No, I have not. Well, it looks like I actually signed it.

Q I'm sorry?

A That looks like my signature at the bottom. I must have signed it in the absence of Norma Santoyo, so I guess I have seen it.

Q So in the absence of Norma Santoyo -- was she just out that day, or did she leave on a leave and you were acting --



acting director or supervisor?

A I was not acting. I would have just been signing it in her absence at a meeting or on a day out of the office.

Q Now, this document is a Douglas County personnel action form. Section 1 is the requesting department. Effective date, 2/19/15; employee name, John Enos. The department is the juvenile probation department.

What is this form? What does it function to do?

A It functions to change the employee's status in our HR payroll software.

Q And this states "Change of status or explanation: Three days absent without approval. Per county code 2.02.082, employee automatically resigned."

And you had no information about that?

A No.

Q I show you what's been marked as Exhibit 28 to Sarah Christensen's deposition. Will you tell me if you have ever seen this document before.

A I think I've only seen this document -- it may have been attached to that personnel form when I signed it, but I'm not familiar with it.

Q Okay. This letter is a letter from Scott Shick effecting the separation of employment for John Enos. It's dated February 20th, 2015.

And it reads "Dear Mr. Enos, due to your absence from



work for three consecutive days, Douglas County Juvenile Probation accepts your resignation pursuant to Title II, Chapter 2.02 of the county personnel regulations, 2.02.080(J) and Section 6.062 of the order establishing court personnel regulations, which provide unauthorized absence, 2, an unauthorized absence for three consecutive days shall be regarded as an automatic resignation and termination from County," and in brackets, it says "court," slash, judicial service.

"Please contact me as soon as possible to arrange the removal of your personal items from the juvenile probation and return of any county property currently in your possession."

And it's signed by Scott Shick.

You have no information about these matters?

A No.

Q Showing you what's been marked as Exhibit 29 to Sarah Christensen's deposition, if you can please take a look at that document.

A I believe I've seen this once.

Q Did you see this prior to litigation or after litigation?

A I don't know when the litigation commenced.

Q Well, when do you recall generally seeing this, what time frame?

A When we received it in our office.

Q Okay. Let me take a step back.

If I go back to Exhibit 28, I'll show you again what Exhibit 28 was. That was the separation of employment letter from Scott Shick regarding the unauthorized absence.
Do you have any information one way or another as to whether Mr. Enos attempted to return to work by physically coming to Douglas County HR office and speaking to Norma Santoyo on the Tuesday, Wednesday and Thursday on which -- the day on which he was separated from employment?
A No, I don't have any information.
Q So he might have done it, but you don't know about it, and he might not have done it, but you don't know about it?
A Correct.
Q Turning to 29, what do you recall about this document?
A I recall that I asked Kathy Jo Kidd to work with the District Attorney's Office and Ms. Christensen and to respond accordingly.
Q Anything else?
A No.
Q This letter, Exhibit 29, Sarah Christensen's letter, is a letter from Ed Howden & Associates. Do you know who he is?
A I think he's a local rehab specialist with ASC.
Q Do you have any familiarity with receiving these types of documents?
A No.
Q So to your recollection, this was the first type of this



letter that you had seen?
A Yes.
Q And it states that -- it states "Ms. Enos's," which I think is a typographical error for "Mr. Enos."
His limitations are no lifting above shoulder with right extremity and no lifting greater than 50 pounds.
Now, if he's able to lift 50 pounds, that's compatible with the requirements of the position, correct, the juvenile probation officer position?
A Yes.
Q And this document requested that certain steps be taken. One of the courses of action listed on DCO 2146 was to, within 30 days of the date of this letter, return the completed intent to offer employment form, or within 10 days of sending the intent to offer employment form, if you'll be offering a job, please call me for assistance in creating formal written -- a formal written job offer.
And I'm not reading everything. I'm trying to move along here.
Under Item 3, it talks about appeal rights, and under Item 4, it talks about an offer of employment meeting guidelines.
And then it has attached to it a form that reads "Intent to Offer Employment."
And it lists, "Injured Worker, John Enos," and there are two choices that can be checked. One is, "Yes, I will be able to



provide a job for the injured employee that's within the physician's stated limitations. I understand this form must be sent to Ed Howden & Associates by 30 days from the date of the letter."
And then the paragraph check box below it is a different alternative. And it reads, "No, I do not have an appropriate job to offer within the stated limitations. I understand that since no job is being offered, I do not have to return the enclosed job offer letter.
"I also understand that full vocational rehabilitation services may be offered to the injured employee."
So your testimony is that you gave this to Mary (sic) Jo Kidd to work with the Douglas County District Attorney's Office, to respond to this?
A I gave it to Kathy Jo Kidd to work with the District Attorney's Office.
Q I'm sorry. Did I say the wrong name?
A Yes.
Q Thank you for correcting me. I'm sorry. Okay. Kathy Jo Kidd.
Did you have an instruction as to which of the selections to make?
A No.
Q So you left that to their discretion?
A Yes.



Q And did you understand that this letter was requesting work, anywhere countywide, it wasn't limited to work at the juvenile probation department?
A Yes.
MR. BROWN: Objection. The document speaks for itself.
BY MR. GEDDES:
Q Yeah. What I'm interested in is what you understood.
So then what happened, do you know, in the aftermath?
A No, I don't.
Q Did you speak to Kathy Jo Kidd or the District Attorney's Office about this?
A I don't recall.
Q So according to the last page of this exhibit, DC 87, it reads "Employer, Kathy Jo Kidd," signed 5/2/16, and she selected the "no" option.
She didn't report to you that that is what happened and that was being sent out as a "no"?
A She may have told me the end result. I don't recall specifically.
Q Do you recall what investigation or evaluation was done to lead to that conclusion that said "no, I do not have an appropriate job to offer within the stated limitations"?
A I don't know the specifics, no.
Q Who from the District Attorney's Office at that time frame of April 5th, 2016, to May of 2016, would have worked with

Kathy Jo Kidd?

A Kimmie Johnson.

Q And your understanding is that the District Attorney's Office would only make a recommendation if it did, but it wouldn't actually make that decision; is that correct?

A Yes.

Q And that decision was made by Kathy Jo Kidd?

A Yes.

Q And she had sufficient authority from you, as your subordinate, to make that decision?

A Yes.

Q Where did she get that authority? Did you give that to her, or did she have that just from her own job?

A I gave that to her.

Q I would like to show you what's been marked as Exhibit 30 to Sarah Christensen's deposition. One second.

Okay. If you could take a look at that.

Have you seen that document before? That's Sarah Christensen Exhibit 30.

A No, I have not.

MR. GEDDES: Okay. I would like to mark as the next exhibit, 4.

(Exhibit 4 marked for identification.)

BY MR. GEDDES:

Q If you would please look at Exhibit 4.



MR. BROWN: Do you have an extra copy around?

MR. GEDDES: I might. Let me look.

THE WITNESS: I do.

BY MR. GEDDES:

Q Okay. So Exhibit 4 is a copy of a document you brought today?

A Right.

Q It starts off PLF 2879 and it ends at PLF 85?

A Yes.

Q Have you seen this document before?

A Yes.

Q Okay. What is this document?

A It looks like it's an application for employment or -- I'm not really sure why it's in an email format with John Enos at the top, but it looks like it's a copy of an application for employment.

Q Okay. And this type of formatting looks familiar to you as far as a job application?

A Reasonably, yeah. It's a little bit different.

Q This is for the position of juvenile probation officer, and it was received on January 6th, 2017, if you look at the top front page --

A Yes.

Q -- at 10:47 a.m.

Okay. And so we talked about this, I think, earlier.



This is John Enos applying for a job that was available at that time at Douglas County for the position of juvenile probation officer, correct?

A Yes.

Q And had you -- did you lay eyes on this at the time? Had you ever reviewed this document contemporaneously when it was sent in?

A I think so, yes.

Q And so what did you do -- how did you get this document to review?

A I have access to all applications that are submitted to Douglas County.

Q Well, is there, like, a bell alert on your software or did someone alert you to it? I mean, what prompted you to look at this for the first time?

A Cindy McMurry, our recruiter, asked me to look at this.

Q Okay. And what did she say to you? What, did she see it as a problem? How -- what prompted her to ask you to look at it?

A She said that she had been made aware that Mr. Enos had previously been deemed unable to perform this job and asked me if she should move forward with progressing him into the next step in the process, because that next step was a physical agility test. And she was concerned whether his previous physical limitations would permit that.



Q And how did you respond to that?

A I consulted with the District Attorney's Office. And we determined that our recommendation was not to move it forward based on the information that we had received in about nine months prior from Mr. Howden, that he was unable to perform this job.

Q Well, the letter from Mr. Howden said that he could lift up to 50 pounds, correct?

A Yes, and it also said he was clearly unable to return to this job.

Q Well, let's look at that. If you could look at Exhibit 29, page 3, line 1, it does not say he was clearly unable to return to his job. It reads it appears that Mr. Enos will not be able to return to the preinjury job.

Is that what he wrote?

A Correct. It says "It appears that he will not be able to return to preinjury job. I encourage you to consider him for a permanent modified job."

Q And your testimony is that you hadn't considered him for a modified job; is that correct?

A No.

Q He was considered for a modified job?

A I don't know what analysis Kathy Jo Kidd did in responding to that.

Q What physical agility test are you referring to when you say that's the next step?

A It's a physical agility test that's consistent with the Nevada POST standards to evaluate candidates for positions.
Q So if we wanted to look that up, what would we look for, POST certification agility?
A Uh-huh.
Q What is it called?
A I don't know the official name.
Q And who -- who performs that evaluation?
A I think the juvenile probation department.
Q But you would agree that the Americans with Disabilities Act would require a reasonable accommodation, including of an application process for application procedures, correct?
A Yes.
Q That would include potentially the agilities test?
A I think it would have to be evaluated. I don't know whether it would be included or not. It's a mandatory requirement to be peace officer certified in the State of Nevada.
Q And that's -- to your understanding, the ADA would require that that policy or rule be accommodated if it's not unreasonably burdensome on the employer; is that correct?
A Correct.
Q And your understanding is that federal law of the ADA would trump a state policy?
MR. BROWN: Objection, calls for a legal conclusion.
THE WITNESS: I really don't know, quite honestly, but I



know it's a matter of safety. So I didn't think it would be an extensive analysis.
MR. GEDDES: Let's look at, if we can, please, the next exhibit, 5.
(Exhibit 5 marked for identification.)
BY MR. GEDDES:
Q All right. If you can please look at Exhibit 5.
A Okay.
Q You've seen Exhibit 5 before, haven't you?
A Yes.
Q This is one of the pages you brought in today, Bates-stamped PLF 2886?
A Yes.
Q Do you know what this document is?
A Yes.
Q What is this document?
A This is a standard template letter that is sent to applicants who are not selected for positions of employment.
Q So this is a form letter?
A It is.
Q And this was sent to John Enos from Cindy McMurry?
A Yes.
Q And when you say it's a form letter, this was the same letter that was sent to the other applicants who didn't -- weren't successful in their application, with the exception that their



names and addresses would have been different, and maybe the date?
A I assume so. I have not verified that information personally.
Q All right. Do you know anything about an investigation of Mr. Enos for pictures posted on his Facebook, anything about that?
A No, I don't.
Q I'll show you what's been marked as Exhibit 32, Sarah Christensen's deposition. Would you please have a look at that.
I don't know if you've seen that exact printout, but I'm interested if you have seen that type of document before, if you know what it is.
A Yes, this is what appears to be a listing of job postings from the Douglas County jobs application.
Q Where does the information come from that's recited on that exhibit?
A Our software called NEOGOV.
Q And who populates the data in that database?
A A variety of people. It's initiated by a hiring manager. And the job is -- job posting is created by Cindy McMurry, our recruiter, with information relevant to the job posting.
Q Okay. In your time with the County as the -- as either an analyst or the HR director, have you ever heard of a situation



where an accommodation was provided to a county worker who had a disability, an accommodation was provided under the ADA in the form of a transfer to a job, to a different job for which that employee was qualified?
A No, not that specific accommodation.
Q Okay. In connection with trying to find light duty, does the HR department have access to this information on demand?
A Yes.
Q So you described a scenario, I believe, earlier, where you said that in your experience as the director, it hasn't come to the matter of trying to find light duty from one -- a worker of one department or division to another department or division, because in all instances where light duty was implicated, that light duty was filled from within the worker's own department. Is that correct?
A Yes.
Q Now, if the department -- if that were not true in an instance and the department did not have light duty, I believe your testimony was to the effect that then HR would get involved and try to find light duty work outside of that person's department, correct?
A Yes.
Q And you would have access to this information of Exhibit 32, I mean, not literally the same listings because it changes over time, but you would have access to this database that

lists job openings for the various divisions of the County, correct?
A Yes.
Q Okay. And what would you typically do to try to match jobs to that employee? I mean, what process would be involved?
A I can't really speculate because I've not done it.
Q Okay. But you believe, at a minimum, it would require matching the employee's qualifications with the requirements of the positions listed?
A Yes.
Q I'm going to show you what's been marked as Exhibit 33 to Sarah Christensen's deposition. Will you tell me if you have seen this document or any emails of that document?
A No.
Q I'm sorry, you said no?
A No, I have not.
Q This email thread between Karen Barbee and Sarah Christensen from September 18th at 11:10 a.m. to September 18th at, looks like, 11:18 a.m. regarding John Enos, talks about an internal investigation -- or, it talks about "I have reviewed the internal investigation reports that you sent and they are quite sufficient for our purposes."
Do you have any information about an internal investigation regarding Mr. Enos?
A No, I don't.



Q And you don't know what is meant by "they are quite sufficient for our purposes"?
A I don't, no.
Q I show you what's been marked as Exhibit 34 to Sarah Christensen's deposition, if you can please look at that document.
Have you seen this document before?
A No.
Q This is an email from Scott Shick to Judge Young regarding John Enos. It's dated Friday, February 20th, 2015, the day after his employment separated.
And Scott Shick starts off at the bottom of this document, saying "John Enos has been separated from employment with Douglas County as of 8:00 a.m. this morning, February 20th, 2015. I will find some time with you today."
And in response, Judge Young writes "I understand. I'm back on Monday."
And Scott Shick replies "See you then."
Do you have any information about any communications to Judge Tod Young regarding Mr. Enos's separation of employment?
A No, I don't.
Q Do you think it would be usual or unusual that the District Court judges would be notified of the separation of a juvenile probation officer?
A I really couldn't say whether it was usual or not.



Q I show you what's been marked as Exhibit 35 to Sarah Christensen's deposition, if you could please look at that.
Okay. Have you seen any email on this document before?
A I might have seen it in gathering documents for this litigation.
Q Do you have any information concerning video of the south parking lot and to whether John Enos was reported to be going through a JPO vehicle parked in the first spot across from the judges' reserved spots, or anything like that?
A No, I don't.
Q The end result of this comes from Alan Bates. This is, again, Exhibit 35 to Sarah Christensen's depo.
It says -- he responds to Justina Caviglia and says "There was nothing on the recordings that showed someone accessed the vehicle. I have disabled John's account and John's email.
"Any files that need to be retrieved from the file server or on" -- "or the PC on John's desk can be gotten at any time that an investigator needs them."
Do you have any knowledge as to the files, the status, or what happened to the files on John Enos's computer at work?
A No, I don't.
Q I show you what's been marked as Exhibit 36 to Sarah Christensen's deposition.
Have you seen any email on this document before?
A No.



Q This document is from Norma Santoyo, at the bottom. It's to Scott Shick and Justina Caviglia regarding John Enos.
And it reads "John will get the letter from ASC tomorrow denying his request to include his left should," which I presume means "shoulder," "into the claim and that no further treatment will be authorized pending further investigation.
"John has 70 days to appeal the decision."
Is it unusual for HR to be sending emails to departments concerning the handling of a workers' compensation claim with respect to a granting or denying claims of an injured worker?
A I don't know that I would say it's unusual. I don't know that it's a common practice.
Q Well, ordinarily, aren't the communications -- that you described at any rate so far in your deposition, you have described a process where HR keeps tabs, monitors -- I think that was your word -- monitors the status of a worker's workers' compensation claim and sends that information to the department.
But does that usually involve a sneak-preview glance at what the third-party administrator is going to do in the future about denying claims? It doesn't usually involve that, does it?
A I don't know that it would be classified as a sneak preview. If a decision had been made to deny a claim, it's not uncommon to communicate that to other parties in the organization that may have an interest.
Q Before the denial has occurred?

A I don't think it says the denial hasn't occurred. I think it says the employee hasn't received the notice yet.

Q And then it says "I just wanted to give you a head's-up because of the sensitivity of the situation."

What does that mean?

A I have no idea what that means.

Q Then it reads below that note, "I highly recommend we take care of his personal items today before he receives additional negative news."

Do you know what that means?

A No, I don't.

Q I'll show you what's been marked as Exhibit 37 to Sarah Christensen's deposition, if you could take a moment and look at that.

Okay. Have you seen Exhibit 37 before?

A I think I might have seen it in the gathering of documents for this litigation.

Q This is an email from Norma Santoyo to Scott Shick and Justina Caviglia on the day that John Enos's employment separated. It's actually the morning of the day his employment separated. It was sent at 9:27 in the morning.

And it reads "For your information, notes from phone call to John Enos. February 18th, 2015, call to John from Norma at 4:45 p.m." And it lists the phone number.

And it states "Hi, John. I'm calling you as promised



with an update. FMLA, I have reviewed your FMLA usage by pulling the timesheets for the time you referenced earlier.

"You were on FMLA starting February 18, 2014, through March 14, 2014, for a total of approximately four weeks.

"You were then on FMLA starting October 21, 2014, to January 21, 2015, for approximately four weeks.

"You were then on FMLA starting on October 21, 2014, to January 21, 2015, for a total of twelve weeks.

"You were then on leave after that from January 21, 2015, to present. That is an additional four weeks.

You have received more than the 12 weeks you are entitled to under the law as you have received approximately 20 weeks of job protected leave in the last 12 months.

"Under the law, you are entitled to 12 weeks of job-protected leave in a rolling 12-month period measured backward.

"Under the rolling 12-month period, each time you take FMLA leave, the remaining leave entitlement is the balance of the 12 weeks which has not been used during the immediately preceding 12 months.

"Based on this, you have exhausted the FMLA protections."

And then it reads, "Do you have any questions or is there anything else I can provide you on the FMLA?"

And in parens, it reads "John, this is over my head. I



explained the FMLA" -- "I explained FMLA process again and included discussion of how" -- "on how workers' compensation runs with FMLA."

Now, if an employer wanted to allow an employee to take unpaid leave, even though his or her FMLA had expired, they could do so as an accommodation under the ADA, correct?

A Yes.

Q Then it goes on to read "Okay. I also want to tell you that I spoke to Chief Shick about your request for an extension and your request for a leave of absence for Policy 200.40.

"Scott did share that he has carefully considered your request, but is denying your request. He'll be sending you a written response."

So you would agree that that decision was made prior to the sending of this email on February 19th at 9:27 a.m., correct?

A Yes.

Q It reads "Also in response to the doctor's note from Dr. Morales and Dr. Eisenhauer, at this point, we do not have valid and concrete information that you are able to return to full capacity. The County does not have any light-duty positions available for you."

Now, is it your understanding that that means that there are no light-duty positions available within the juvenile probation department and in another department?

A Yes.



Q And do you have any information as to what, if any, search was done by anyone in other departments for light-duty work?

A No, I don't.

Q It reads, in parentheses, "John questioned why the County could not provide him a light-duty assignment when the doctor has changed his restrictions. He asked why you can't return to the library.

"I explained the County does not have a position available for him. He stated wow."

These light-duty positions that are offered, are they typically open positions that need help, or are they simply extra help in a department where there's not really a vacancy?

A It could be both.

Q Do you have any information about any inquiry regarding a light-duty assignment to the library in or about February of 2015 for John Enos?

A No, I don't.

Q "John, based on the information I've shared, your leave is classified as unapproved leave and is governed under county code Article 2, which was referenced in the letter you received Friday and is covered in the copies of the code I provided you yesterday where, after three days, it will be considered an automatic resignation.

"Based on this, the third day will be Thursday and you

will be considered a voluntary separation after that, and the County will send you a letter stating that."

And it reads in parens, "John, wow. Okay. The attorney I just met with, Norma said if they are hell bent on getting rid of you, they are going to do it and there's no way you can get out of it. It's really unfortunate situation for me."

And then it's signed by Norma Santoyo.

Do you have any information about any of the matters on this exhibit?

A No.

MR. BROWN: Could we take a break for just a minute?

MR. GEDDES: Sure.

(A recess was taken.)

MR. GEDDES: Okay. We're back on the record.

BY MR. GEDDES:

Q I would like to look, if we can, at what's been marked Exhibit 4 to Sarah Christensen's depo, if you would please look at that.

A Okay.

Q Now, you brought, I guess, a copy of this document, PLF 5772. Is that correct?

A Yes.

Q I think earlier, we had asked you -- or, I had asked you if John Enos, senior juvenile probation officer, in February of 2015, was a classified worker.



And I think your -- you looked at a list and saw from a subtractive analysis that he wasn't on a list of, I guess, nonclassified workers.

So your take was that he was a classified worker at the time?

A Correct.

Q Okay. If we look at C, Subsection -- I'm sorry, 2.02.20 (C), Subsection C, it's on the first page, 57.

And it says that "The provisions of this chapter establish policies, procedures and standards to achieve the stated purpose and to apply to all employees of the County under the direct and indirect jurisdiction of the Board of County Commissioners except as otherwise provided in Chapter 2.03."

And then it reads, in italicized and emboldened text, "Employees of the District Court, juvenile probation, juvenile detention and China Springs Youth Camp are employees of the judicial branch and are subject to the personnel regulations and policies established by the District Court."

Does this language mean, then, that juvenile probation officers and senior juvenile probation officers are governed by the Ninth Judicial District Court personnel regulations, as compared to the Douglas County personnel regulations?

A Yes.

Q Okay. You look at -- you may have brought a copy of your own exhibit, but it's Exhibit 3 to Sarah Christensen's



deposition. And it is -- it's PLF 1 to 22. I don't know if you have that version of it.

A I don't.

Q Okay. Have you seen Exhibit 3 to Sarah Christensen's deposition before?

A Is this the current Douglas County code?

Q I don't know that it's -- I don't know if that's Douglas County. I think that's the Ninth Judicial District Court personnel regulations, is it not?

A No, it's Douglas County code. Title II is Douglas County code.

Q Thank you. I've got the wrong document. I'm looking for -- if I can find it. Thank you. I meant Exhibit 2. Yes, 2.

Exhibit 2 is -- I think, corresponds to a document you brought today, Bates-stamped PLF 146 through 163. But I'll show you what's been marked as Exhibit 2 to Sarah Christensen's deposition.

A Okay.

Q All right. You've seen this document before, yes?

A Yes.

Q Okay. Now, if we look at Section 2.04 -- do you have a copy there?

A Yes.

Q Okay. If we look at Section 2.04, this document reads "These rules supersede policies, procedures and standards of all



county agencies and departments with respect to classified personnel of the Ninth Judicial District Court."

And then if we turn to PLF 148, Section 3.09, it defines "classified position." It means "all positions regulated by the Ninth Judicial District Court personnel regulation. Each will be assigned a class within the classification plan and will be defined by class specification."

And if we turn to PLF 150, Subsection 3.41, it defines "unclassified position," means "a position in the judicial service which, unless otherwise specified, is not provided the protection as outlined in Section 7 of this document.

"The following positions have been designated as unclassified:

"1, judicial assistants to the District Court.

"2, law clerks.

"3, court reporter.

"4, court information systems manager.

"5, CASA program administrator.

"6, director of juvenile camp services.

"7, youth facility managers.

"8, chief juvenile probation officer.

"9, chief deputy juvenile probation officer.

"10, juvenile probation detention supervisor."

Now, is this the list that you were reading earlier when you concluded that a juvenile probation officer and a senior

**juvenile probation officer were classified positions because they are not on this list of unclassified positions?**

A Yes.

MR. GEDDES: Okay. Will you find Exhibit 1, 2, 3. Do you have Exhibit 1?

Okay. Thank you.

I'll go ahead and pass the witness.

MR. BROWN: I don't have any questions.

MR. GEDDES: Okay. One of the admonitions or discussion points about the rules of depositions that sometimes people give at the beginning of a deposition, but I usually give it at the end, because it's easier to remember, is the following:

You'll have 30 days to review your transcript, to make corrections to errors contained in the transcript.

People may have different takes on what that exactly means.

My take is this: That that gives you an opportunity to correct mistakes in the transcription.

If you make substantive changes to your testimony, we may comment on that to a jury to suggest that you are trying to shift in your testimony or say something that you didn't say in your deposition, to change your testimony, which is, in my opinion, not the purpose of correcting the record, which contains errors.

So you'll have an opportunity, though, to review the



transcript.

Ms. Court Reporter, are you able to send a copy -- Brian, do you want to -- are you able to facilitate a reading of that so she will have a copy of that?

MR. BROWN: Yes, I can do that.

MR. GEDDES: Perfect.

And then you can get a -- what will happen is, there's a page that they give, and you cite the line and -- the page and the line where there's an error and a correction that should be there.

And then you, of course, can waive that, but you have the opportunity and the right to review the transcript and correct errors in the record.

And then once you are done, you can send that, I guess, back to Brian or do that reading in Brian's office. I'm not sure.

But other than that, I thank you for coming down today. I appreciate your testimony. Thank you very much.

THE WITNESS: Thank you.

MR. BROWN: And we'll take a transcript. I'm going to wait to make sure you have all the exhibits.

(The proceedings concluded at 3:00 p.m.)

-oOo-



REPORTER'S CERTIFICATION

I, CONSTANCE S. EISENBERG, a Certified Court Reporter in and for the State of Nevada, do hereby certify;

That on Wednesday, April 17, 2019, at the hour of 8:59 a.m. of said day, at 151 Country Estates Circle, Reno, Nevada, personally appeared WENDY LANG, who was duly sworn by me to testify in the within-entitled proceedings;

That said deposition was taken in verbatim stenotype notes by me and thereafter transcribed into typewriting as herein appears;

That I am not a relative nor an employee of any of the parties, nor am I financially or otherwise interested in this action;

That the foregoing transcript, consisting of pages 1 through 148, is a full, true and correct transcription of my stenotype notes of said deposition.

DATED: At Reno, Nevada, this 7th day of May, 2019.

Constance S. Eisenberg

________________________________________

CONSTANCE S. EISENBERG, CCR #142, RMR, CRR



ERRATA SHEET

I declare under penalty of perjury that I have read the foregoing _______ pages of my testimony, taken on _________________________ (date) at __________________(city), __________________(state),

and that the same is a true record of the testimony given by me at the time and place herein above set forth, with the following exceptions:

| Page | Line | Should read: | Reason for Change: |
|---|---|---|---|
| ___ | ___ | ______________________ | ________________ |
| | | ______________________ | ________________ |
| ___ | ___ | ______________________ | ________________ |
| | | ______________________ | ________________ |
| ___ | ___ | ______________________ | ________________ |
| | | ______________________ | ________________ |
| ___ | ___ | ______________________ | ________________ |
| | | ______________________ | ________________ |
| ___ | ___ | ______________________ | ________________ |
| | | ______________________ | ________________ |
| ___ | ___ | ______________________ | ________________ |
| | | ______________________ | ________________ |

ERRATA SHEET

Page Line Should read: Reason for Change:

___ ___ __________________________ ____________________
__________________________ ____________________
___ ___ __________________________ ____________________
__________________________ ____________________
___ ___ __________________________ ____________________
__________________________ ____________________
___ ___ __________________________ ____________________
__________________________ ____________________
___ ___ __________________________ ____________________
__________________________ ____________________
___ ___ __________________________ ____________________
__________________________ ____________________
___ ___ __________________________ ____________________
__________________________ ____________________

Date: ___________ ________________________________
Signature of Witness

________________________________
Name Typed or Printed

From: **John Enos** huntbux22@gmail.com
Subject:
Date: October 25, 2017 at 11:31 AM
To:

JE

# EMPLOYMENT APPLICATION

**Douglas County (NV)**
**P O BOX 218**

**Minden, Nevada - 89423**
http://www.douglascountynv.gov
**Enos, John M**
**Juvenile Probation Officer**

**Received:** 01/06/2017 10:47 AM
**For Official Use Only:**
QUAL:________
DNQ:________

- Experience
- Training
- Other:________

# PERSONAL INFORMATION

**POSITION TITLE:**
Juvenile Probation Officer

**NAME:** (Last, First, Middle)
Enos, John M

**Former Last Name:**

**ADDRESS:** (Street, City, State, Zip Code)
3613 Quail Run Way
Wellington , Nevada , US - 89444

**Job Number:**
16/17-00062

**SOCIAL SECURITY NUMBER:**

**Date And Month Of Birth:**
-

**HOME PHONE:**
7757813104

**DRIVER'S LICENSE:**

- Yes
- No

**ALTERNATE PHONE:**

**DRIVER'S LICENSE:**
**State: Number:**

**EMAIL ADDRESS:**
huntbux22@gmail.com

**LEGAL RIGHT TO WORK IN THE UNITED STATES?:**

- Yes
- No

# PREFERENCES

**PREFERRED SALARY:**
$63564.8 per year ; $30.56 per hour

**SHIFTS YOU WILL ACCEPT:**
Day,Evening,Night,Rotating,Weekends,On Call

**WHAT TYPE OF JOB ARE YOU LOOKING FOR?**
Regular

**TYPES OF WORK YOU WILL ACCEPT:**
Full Time

**OBJECTIVE:**

My objective is to continue to serve the people of Douglas County as I have for many years in the past.

# EDUCATION

**DATES:** **SCHOOL NAME:**

EXHIBIT H
Witness: Lang
C. EISENBERG, CCR 142

From March/1999 To May/1999

Peace Officer Standards and Training

**DID YOU GRADUATE?**

- Yes
- No

**LOCATION:(City , State)**
Carson City, Nevada

**DEGREE RECEIVED:**
Certification

**MAJOR:**
Basic Certificate

**UNITS COMPLETED:**

**DATES:**
From August/1988 To June/1990

**SCHOOL NAME:**
California State University, Hayward

**DID YOU GRADUATE?**

- Yes
- No

**LOCATION:(City , State)**
Hayward, California

**DEGREE RECEIVED:**
Master's

**MAJOR:**
Public Administration

**UNITS COMPLETED:**
140

**DATES:**
From August/1986 To May/1988

**SCHOOL NAME:**
California State University, Hayward

**DID YOU GRADUATE?**

- Yes
- No

**LOCATION:(City , State)**
Hayward, California

**DEGREE RECEIVED:**
Bachelor's

**MAJOR:**
Recreation

**UNITS COMPLETED:**
140

**DATES:**
From August/1983 To May/1986

**SCHOOL NAME:**
Chabot Junior College

**DID YOU GRADUATE?**

- Yes
- No

**LOCATION:(City , State)**
Livermore, California

**DEGREE RECEIVED:**
Associate's

**MAJOR:**
General Education

**UNITS COMPLETED:**
96

**DATES:**

**SCHOOL NAME:**
Granada High School

**DID YOU GRADUATE?**

- Yes
- No

**LOCATION:(City , State)**
Livermore, California

**DEGREE RECEIVED:**
High School Diploma

**MAJOR:**

**UNITS COMPLETED:**

# WORK EXPERIENCE

**DATES:**
From June/1998 To February/2015

**EMPLOYER:**
Douglas County

**POSITION TITLE:**
Sr. Juvenile Probation Officer

**ADDRESS:** (Street, City, State, Zip Code):
1616 8th Street
Minden , Nevada , US - 89423

**COMPANY URL:**

**MAY WE CONTACT THIS EMPLOYER?**

- Yes
- No

**PHONE NUMBER:**
7757829811

**SUPERVISOR:**
Victoria Sauer-Lamb

**HOURS PER WEEK:**
40

**SALARY:**
$5297/month

**# OF EMPLOYEES SUPERVISED:**
0

**DUTIES:**

Supervised a caseload of juvenile probationers. Conducted home visits and drug tested juveniles. Made disposition recommendations to the Courts and held probationers accountable. Assisted probationers in the completion of their probation terms. Arrested probationers for violations of their probation terms as well as for new offenses. Participated in the Outdoor intervention Program with probationers taking them on wilderness trips with the Outdoor Coordinator. Basically did all of the things that are listed in the current job description for this position.

**REASON FOR LEAVING:**

I was injured on the job two times and was released from employment. However, I am able to perform the essential functions of this job with or without a reasonable accommodation.

**DATES:**
From February/1996 To June/1998

**EMPLOYER:**
Douglas County

**POSITION TITLE:**
Youth Counselor

**ADDRESS:** (Street, City, State, Zip Code):
1616 8th Street
Wellington , Nevada , US - 89444

**COMPANY URL:**

**MAY WE CONTACT THIS EMPLOYER?**

- Yes
- No

**PHONE NUMBER:**
7757825350

**SUPERVISOR:**
Steve Thaler

**HOURS PER WEEK:**
40

**SALARY:**
$2350/month

**# OF EMPLOYEES SUPERVISED:**
0

**DUTIES:**

Supervised residents at the youth camp. Also supervised an individual caseload of juveniles and made weekly contacts with parents and probation officers.

**REASON FOR LEAVING:**

Accepted a position as a Douglas County Juvenile Probation Officer.

**DATES:**
From February/1995 To August/1996

**EMPLOYER:**
Douglas County

**POSITION TITLE:**
Recreation Leader I

**ADDRESS:** (Street, City, State, Zip Code):
1616 8th Street
Minden , Nevada , US - 89423

**COMPANY URL:**

**MAY WE CONTACT THIS EMPLOYER?**

- Yes
- No

**PHONE NUMBER:**
7757829898

**SUPERVISOR:**
Val Sonneman

**HOURS PER WEEK:**
5

**SALARY:**
$185/month

**# OF EMPLOYEES SUPERVISED:**
10

**DUTIES:**

Assisted in providing alternative activities for Douglas County teens including open-gym and teen dances at the Carson Valley Middle School and at the fairgrounds.

**REASON FOR LEAVING:**

My Supervisor at China Spring Youth Camp told me I needed to stop working at the Recreation Department since I was already putting in 40 hours per week at the Camp.

# CERTIFICATES AND LICENSES

Nothing Entered For This Section

# SKILLS

**OFFICE SKILLS:**
Typing:
Data Entry:

**OTHER SKILLS:**
Nothing Entered For This Section

**LANGUAGE(S):**
Nothing Entered For This Section

# SUPPLEMENTAL INFORMATION

**TYPE:**
Honors & Awards

**DESCRIPTION:**
1998 - Outstanding Dedicated Service Award - China Spring Youth Camp 1999 - Above Average Rating - POST Academy Class XXII - Basic Certificate 1999 - Firearms Honorable Mention Award - POST Academy Class XXII 2004 - Juvenile Probation Officer of the Year Award - Douglas County JPO 2007 - Nevada POST Academy Intermediate Certificate 2007 - Nevada POST Academy Advanced Certificate 2010 - Certificate of Appreciation - 15 years dedicated service to Douglas County 2013 - Juvenile Probation Officer of the Year Award - Douglas County JPO 2014 - Completed 80 Hour Training at Nevada POST Academy/Supervisor Certificate 2015 - Dedicated Service Award - Douglas County - 20 Continuous years

# REFERENCES

**REFERENCE TYPE:** Professional
**NAME:** Merril Smoak
**POSITION:** Pastor/Music/Youth
**ADDRESS:** (Street, City, State, Zip Code)
PO Box 2168
Livermore , California - 94550
**EMAIL ADDRESS:**
**PHONE NUMBER:** 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

**REFERENCE TYPE:** Personal
**NAME:** Joe McNealy
**POSITION:** Tea
**ADDRESS:** (Street, City, State, Zip Code)
4248 Las Positas Road
Livermore , California - 94238
**EMAIL ADDRESS:** joemcnealy@yahoo.com
**PHONE NUMBER:** 925-200-6437

**REFERENCE TYPE:** Personal
**NAME:** Jeff Smoak
**POSITION:** Sergeant Oakland Police Department
**ADDRESS:** (Street, City, State, Zip Code)
2690 Farnsworth Drive
Livermore , California - 94551
**EMAIL ADDRESS:** jsmoak@oaklandnet.com
**PHONE NUMBER:** 925-858-4145

**Agency - Wide Questions**

1. **What is your gender?**
   Male
2. **Date of Birth**

2. November 12, 1965
3. **Affirmative Action Data:**
White or Caucasian (Not Hispanic/Latino)
4. **Are you a disabled veteran?**
No
5. **Are you a veteran of the Vietnam era?**
No
6. **Have you ever been employed by Douglas County?**
Yes
7. **Are you related to a current or former employee of Douglas County?**
Yes
8. **If yes, please list name(s), and departments where employed:**
My brother, Brook Enos, works in the building Department as a Building Inspector.
9. **Have you EVER been convicted of, pled guilty or nolo contendere to (no contest), or been granted deferred adjudication (deferred judgment) for a felony or misdemeanor crime, other than a minor traffic violation. A conviction or guilty plea will not necessarily disqualify you from this job. If yes, list all such offenses and provide date, name of court, and disposition. Failure to disclose all convictions, pleas of guilty, pleas of nolo contendere (no contest), or have been granted deferred adjudication (deferred judgment), other than a minor traffic violation, is a violation of Title 2 of the County Personnel Regulations, Section 2.02.090, and if hired may result in termination of employment.**
No
10. **If yes, state the date, location and nature of the offense**
11. **Have you ever been discharged or terminated from any place of employment?**
Yes
12. **How were you referred?**
Other
13. **If yes, please explain.**
I was discharged from employment with Douglas County Juvenile Probation as a result of my workplace injuries. Although, I have always maintained that I could perform the essential functions of my job with or without a reasonable accomodation.
14. **MILITARY SERVICE Have you ever been a member of the Armed Forces**
No
15. **If yes, please list BRANCH, RANK, DISCHARGE TYPE and duties:**
16. **By clicking on the yes button, I hereby certify that every statement I have made in this application is true and complete to the best of my knowledge. I understand that all offers of employment and all information regarding compensation and other terms and conditions of employment will be made in writing, verbal statements may not be relied upon. Employment will be at will unless specifically stated to be otherwise. "At will" means Douglas County may terminate my employment at any time with no advance notice and for any reason or no reason. I understand that I will have to verify any and all information given on this application. I understand that this completed application is the property of Douglas County and will not be returned and will become part of my personnel file if I am hired. I authorize Douglas County to investigate my references and to make an independent investigation of any character, conduct and employment records; including, but not limited to, criminal and traffic records. I hereby release all employers, schools, or persons from all liability in responding to inquiries in connection with my application. I understand that any misrepresentation, falsification or material omission of information may result in my failure to receive an offer, or if I have been hired, in my dismissal from employment, regardless of length of employment. I will be required to successfully complete a criminal background check and a drug test for select positions. I understand that I must notify Human Resources of any changes in my name, address, or phone number. Douglas County participates in E-Verify. Federal law requires all employers to verify the identity and employment eligibility of all persons hired to work in the United States. In the event I am employed by Douglas County, I agree to comply with all rules and policies.**
Yes

**Job Specific Supplemental Questions**

1. **What is you highest level of education?**
   Master's Degree
2. **Do you have any of the following training?**
   Defensive Tactic Training
3. **How many years of professional level experience in providing probation and casework/counseling services to juveniles do you possess?**
   6 years or more
4. **Will you be able to provide a current valid Driver's License and DMV history report (10 year) if offered employment?**
   Yes
5. **Do you hold current any of the following certifications?**
   None of the above
6. **The position requires candidate's to periodically climb, hike, kayak, swim, mountain bike, back packing, balance and stoop, kneel, crouch, or crawl and must frequently lift and/or carry up to 50 pounds. Are you able to meet this requirement with our without accommodation's.**
   Yes
7. **Do you possess any of the following skills?**
   Organize outdoor experiential education activities including day and overnight multi-seasonal camping trips and field trips., Organize effective community service events.
8. **Is your degree in any of the following major?**
   Other closely related field
9. **Do you hold a current POST Certificate? Category I Certificate in the State of Nevada or from any state with recognized reciprocity?**
   N/A
10. **If you selected "other closely related field" from question 2 please list all relevant information.**
    Master's in Public Administration
11. **In a brief statement, please tell us why you are interested in joining Douglas County's Juvenile Probation Department.**
    Because I enjoy working with juveniles and I have over 20 years of experience in doing so. I can perform the duties of this position with reasonable accommodations.
12. **Please list any foreign language skills, including level of proficiency (Fluent, Good, Fair) for each of the following: speak, read, write.**

By clicking on the 'Accept' button, I hereby certify that every statement I have made in this application is true and complete to the best of my knowledge. I understand that all offers of employment and all information regarding compensation and other terms and conditions of employment will be made in writing, verbal statements may not be relied upon. Employment will be at will unless specifically stated to be otherwise. "At will" means Douglas County may terminate my employment at any time with no advance notice and for any reason or no reason. I understand that I will have to verify any and all information given on this application. I understand that this completed application is the property of Douglas County and will not be returned and will become part of my personnel file if I am hired. I authorize Douglas County to investigate my references and to make an independent investigation of any character, conduct and employment records; including, but not limited to, criminal and traffic records. I hereby release all employers, schools, or persons from all liability in responding to inquiries in connection with my application. I understand that any misrepresentation, falsification or material omission of information may result in my failure to receive an offer, or if I have been hired, in my dismissal from employment, regardless of length of employment. I will be required to successfully complete a criminal background check and a drug test for select positions. I understand that I must notify Human Resources of any changes in my name, address, or phone number. Douglas County participates in E-Verify. Federal law requires all employers to verify the identity and employment eligibility of all persons hired to work in the United States. In the event I am employed by Douglas County, I agree to comply with all rules and policies.

This application was submitted by Enos, John M on 01/06/2017 10:47 AM

Signature________________________________________

Date________________________________________

From: <cmcmurry@douglasnv.us>
Date: Fri, Feb 24, 2017 at 2:56 PM
Subject: Juvenile Probation Officer
To: huntbux22@gmail.com

February 24, 2017

John Enos
3613 Quail Run Way
Wellington, NV 89444

Dear John:

Thank you for the time you took to complete the application for Juvenile Probation Officer with Douglas County Juvenile Probation Department. We were fortunate to have several qualified candidates apply for this position, making the decision very difficult. However, after careful consideration, the department has selected another applicant.

We encourage you to apply for any future openings with Douglas County for which you have an interest. All available positions are posted on our web site at www.douglascountynv.gov You may also sign up for future vacancies that you would be interested in with "The Job Interest Card". When a job announcement is posted you will receive an email notice.

Please accept our best wishes and thank you for your interest in employment opportunities with Douglas County.

Sincerely,

Cindy McMurry
Douglas County (NV) Human Resources Department

EXHIBIT
5
Witness: Lang
C. EISENBERG, CCR 142