# EXHIBIT 7

## DEPOSITION TRANSCRIPT OF NORMA SANTOYO

**(Including Exhibits 10 and 12)**

EXHIBIT 7

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

--oOo--

**CONDENSED**

JOHN ENOS, an individual,

Plaintiff(s),

vs. No. 3:17-cv-00095-MMC-VPC

DOUGLAS COUNTY, a political subdivision of the State of Nevada; VICTORIA SAUER-LAMB, Chief Juvenile Probation Officer of the Juvenile Probation Department; VICTORIA SAUER-LAMB, Supervisor of the Juvenile Probation Department; et al.,

Defendant(s).

________________________________/

DEPOSITION OF NORMA SANTOYO

August 29, 2018, at 10:05 AM

Deposition Officer:

LISA S. COELHO, CSR #9487

Taken in the Offices of:

PALERMO REPORTING SERVICES

1301 G Street, Suite A

Modesto, CA 95354

INDEX
--oOo--

EXAMINATION: PAGE
By Mr. Geddes 7

--oOo--

EXHIBITS: DESCRIPTION PAGE
FOR THE PLAINTIFF:
Exhibit No. 1 LinkedIn Home Page for Norma Santoyo, four pages 20
Exhibit No. 2 6/21/13 Notice of Injury or Occupational Disease, Employee's Claim for Compensation/Report of Initial Treatment, and Alternative Service Concepts Notice of Claim Acceptance, DC001482, DC001524 and 25, and DC001537 87
Exhibit No. 3 Excuses From Work or School dated 2/28/14 and 3/17/14 from Dr. Eisenhauer, DC001580 AND DC001585 98
Exhibit No. 4 6/17/14 Notice of Injury or Occupational Disease, Employee's Claim for Compensation/Report of Initial Treatment, and Alternative Service Concepts Notice of Claim Acceptance, DC001526 through 1530 and DC001196 100
Exhibit No. 5 July 17, 2014 note to Enos from Shick, Re: Duty Station Assignment, DC000088 107
///
///



INDEX (Cont.)
--oOo--

EXHIBITS: DESCRIPTION PAGE
FOR THE PLAINTIFF:
Exhibit No. 6 10/31/14 and 12/10 14 Excuse from Work or School and January 20, 2015 e-mail to Christensen from Barbee, Re: John Enos, DC001667, DC001672, AND DC000463 118
Exhibit No. 7 1/28/15 Work/School Excuse, DC001698 121
Exhibit No. 8 Handwritten Note, DC000486 123
Exhibit No. 9 List of Jobs by Class Code and Title, DC005284 through DC005301 131
Exhibit No. 10 February 13, 2015 letter to Enos from Santoyo, DC001304 136
Exhibit No. 11 Job Description for Juvenile Probation Officer - Senior, Job Code 2410, DC000332 and DC000333 and Juvenile Probation Officer Job Description, Class Code 2400, DC000353 through DC000356 154
Exhibit No. 12 2/17/2015 Handwritten letter to Human Resources from Enos, DC000435 162
Exhibit No. 13 Return to Work Notes from Specialty Health Clinic and Tahoe Fracture & Orthopedic, DC001495 and DC001496 166
Exhibit No. 14 February 24, 2015 letter to Enos from Alternative Service Concepts, DC001522 172
///



INDEX (Cont.)
--oOo--

EXHIBITS: DESCRIPTION PAGE
FOR THE PLAINTIFF:
Exhibit No. 15 February 19, 2015 letter to Enos from Shick, Re: Leave of Absence, DC001801, and February 20, 2015 Letter to Enos from Shick, Re: Resignation, DC001802 178

--oOo--



APPEARANCES OF COUNSEL:

WILLIAM J. GEDDES, of the law firm of THE GEDDES LAW FIRM, P.C., 8600 Technology Way, Suite 107, Reno, NV, 89521, appeared as Counsel for and on behalf of the Plaintiff.

RAELENE K. PALMER, of the law firm of GALLIAN, WELKER & BECKSTROM, L.C., 540 East St. Louis Avenue, Las Vegas, NV, 89104, appeared as Counsel for and on behalf of the Plaintiff.

KATHERINE F. PARKS, of the law firm of THORNDAL ARMSTRONG DELK BALKENBUSH & EISINGER, 6590 South McCarran Boulevard, Suite B, Reno, NV, 89509, appeared as Counsel for and on behalf of the Defendants.

ALSO PRESENT:
JOHN ENOS
LOREN D. BOGART, Videographer

--oOo--

THE VIDEOGRAPHER: Good morning. This is the video recorded deposition of Norma Santoyo taken on behalf of the plaintiff in the matter of John Enos vs. Douglas County, et al. This case is venued in the U.S. District Court, District of Nevada. Case number is 3:17-cv-00095-MMP -- I'm sorry, that may be MMD -- VPC.

This deposition is being held at 1301 G Street, Modesto, California. The date is August 29th, 2018. The video operator is Loren D. Bogart. I'm here with P.E.S. Video Service. Our main office is located in Fresno, California. The court reporter is Lisa Coelho of Palermo Reporting Services located here in Modesto, California.

We are going on the record at approximately 10:06 AM. Will the counsel please state their appearances for the record.

MR. GEDDES: Will Geddes, counsel for Plaintiff, John Enos.

MR. ENOS: John Enos, Plaintiff.

MS. PALMER: Raelene Palmer.

MS. PARKS: Katherine Parks on behalf of the defendants.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

///

///



NORMA SANTOYO,

a Witness herein, having been duly and regularly sworn, deposed and testified as follows:

MR. GEDDES: This is the date and time set for the deposition of Norma Santoyo, a nonparty witness in the matter of Enos vs. Douglas County, et al., Case 3:17-cv-95, now pending in the U.S. District Court for the District of Nevada.

EXAMINATION

BY MR. GEDDES: Q. Ma'am, could you please identify yourself by first and last name and spell your last name for the record?

A. Sure. I'm Norma Santoyo, S-A-N-T-O-Y-O.

Q. Good morning, Ms. Santoyo. I'm attorney Will Geddes, and I'll be taking your deposition today. Ms. Santoyo, I apologize if you already know the rules of a deposition, the ground rules; however, it's my duty to ensure that you understand how this deposition will proceed today and the obligations you are under when testifying today.

Now, the following explanations are not given in any underestimation of your intelligence or knowledge; rather, I'm required to give these at the beginning of any



deposition to ensure that your deposition is properly conducted. Even if you already know these ground rules, I still need to go over them with you for the record.

Do you understand this?

A. I do.

Q. During this deposition you'll be testifying under oath and under penalty of perjury under the laws of the United States so, therefore, you are required to testify truthfully, completely, and to the best of your knowledge just as if you were testifying right now in front of a judge or a jury at trial.

Do you understand this?

A. I do understand.

Q. The purpose of this deposition is to allow the parties to become adequately informed of the facts and issues of the case and to enable us to prepare for trial. Now, my purpose here today is to avoid surprise at trial and to elicit truth. This deposition also gives you an opportunity to explain away any inconsistencies in your testimony given today, because if at the time of trial your testimony is different than it is today at your deposition, we will certainly call attention to that to a jury in an effort to show that you are not a credible witness.

Do you understand that?



A. Yes.

Q. Therefore, it's very important to remember throughout your deposition today that if you wish to explain away or clarify any issue, fact, or matter regarding your testimony today, today is the best time to do it, not the time of trial.

Do you understand that?

A. Yes.

Q. Okay. Now, my purpose here is not to trick you or to confuse you but to allow you to take your time to understand the question so that you can provide truthful testimony. If you give an answer to a question, we can only assume that you understood the question. However, sometimes questions can be very badly phrased, confusing, or unclear; therefore, if you do not understand any question, it is incumbent on you to tell me or the questioning attorney so that we can rephrase the question or break it into smaller pieces that make better sense.

Do you understand this?

A. Yes.

Q. Now, today we're entitled to receive your best testimony based on your best recollection of the facts and events. In this vein, it's very important that your testimony be reliable and based upon facts that you are independently able to recall. But if you don't know the

Page 10

answer to a question, you should simply state that you don't know the answer.
Do you understand this?
A. Yes.
Q. However, keep in mind where you are initially unable to independently recall facts or events, we may try to refresh your recollection either by asking additional questions or showing you documents. Alternatively, you may have brought documents here today yourself which might help you recall facts or events. Either way, we are entitled to your best efforts at refreshing your recollection and getting your best testimony.
Do you understand that?
A. Yes.
Q. Okay. Now, sometimes it's appropriate to give your best estimate even though you're not completely certain, and this would concern matters that are capable of judgment by ordinary people concerning things such as time, size, sequence, distance, and things like that. However, you should never speculate at any time during your deposition whatsoever because, again, we're after reliable testimony. And you can give reasonable estimates if you have an informed basis for doing so, but please just don't speculate or guess at answers.
Do you understand this?

Page 11

A. Yes.
Q. Okay. And so a common example that we often give in depositions is if I asked you to estimate a size of something, which is permissible versus speculating, would be the following example.
If I asked you to guess the size of this table here where your deposition is being taken, based on your powers of observation and your estimate of distance, you could give an informed opinion. If I asked you the size of the conference room in -- the large conference room at my office and I asked you what the size of that was, you would not be able to give an answer without completely guessing or speculating, presuming that you've never seen it before.
Do you understand the difference?
A. Yes.
Q. Now, there's a court reporter here who is seated to your right, and she has a very difficult task today. She has to take down every single word that is spoken. So that the record is clear, it's important that we not speak over one another. Please wait until I finish a question before answering, and I will wait till you finish your answer before I begin the next question. I want to give you a heads-up that some of my questions are rather long, so please bear with me and try not to jump in if you think

Page 12

the question's ending. You'll know because there will be a pause.
It's also important to realize that today you're testifying with words, not gestures. And it's useless to court reporters; they can't capture gestures. So rather than nod your head, please say "yes," and rather than shake your head, please say "no." As well, sounds like "uh-huh" or "huh-uh" are not clear as words, so please remember to use words.
Do you understand this?
A. Yes.
Q. Now, are you represented by counsel today?
A. I'm assuming yes.
Q. Well --
A. I'm no longer a county -- Douglas County employee, so --
Q. You're not a party to the case.
A. Oh, then I'm not.
Q. Well, what I'm getting at is do you have an attorney here who's representing you?
A. No.
Q. Okay. So just that -- so that we're clear, Attorney Katherine Parks is seated to your left. She represents other codefendants -- and she represents the codefendants in this matter, but she's not representing

Page 13

you. That's your understanding?
A. That's my understanding.
Q. Okay. Thank you. Now, you're not a party to this litigation, but there are lawyers --
(Telephonic interruption.)
THE WITNESS: I'm sorry.
MR. GEDDES: Q. Okay.
A. I thought I turned that off.
Q. All right.
A. Excuse me. Is that me? It is me. I apologize. I guess I turned one off.
Q. You're not a party to this lawsuit, but there are lawyers here who are representing parties. Ms. Palmer identified her earlier. She didn't mention who she's co-representing. She represents Mr. Enos with me.
A. Ah, uh-huh.
Q. Ms. Parks represents Douglas County and Scott Shick and Victoria Sauer-Lamb, and I apologize if I pronounced those names incorrectly. As well, Mr. John Enos is here, and you may recall him. He is the plaintiff in this action, and as a party in this case, he's entitled to attend all proceedings of this case.
Now, during the course of this deposition, if I'm asking questions, you might hear Ms. Parks make an objection to the question that I ask, and that's perfectly

ordinary and normal. Attorneys are required to make objections to preserve certain types of objections for trial. If they don't, they waive certain types of objections, and I won't bore you with the details.

But what I want you to keep in mind is just because an attorney is making an objection -- I might make an objection, for example, to an objection or, you know, if and when Ms. Parks asks you questions, you may hear me make an objection -- you're still required to answer the question unless the question calls for testimony that is protected by a privilege. And the most common one in depositions is attorney-client privilege, but you're not represented by an attorney here, so I don't believe that's going to be an issue.

So the bottom line to take away from an objection is wait for the objection to be stated, and then when the objection has cleared the air, you can understand -- if you understand the question, you can begin to testify in answer to it.

Now, in order to ensure the reliability of your testimony today, I have to ask if you're currently under the influence of any medications, alcohol, drug, or any substance.

A. No.
Q. Okay. Now, is there any reason you won't be able



to understand my questions today?
A. No.
Q. Okay. Is there any reason you won't be able to give your best testimony today?
A. No, other than just the time that's lapsed.
Q. Okay. And what I want to do is take a little bit of time up front here to identify any documents that you might have brought with you today.

Your deposition subpoena requested the following documents: any documents concerning or relating to John Enos, a former employee of Douglas County, from any source whatsoever including, but not limited to, his employment at Douglas County, his workplace injuries, his suspension from employment, his medical leaves, his requests for accommodation of his disabilities, his termination from employment at Douglas County, and his efforts to be reemployed with Douglas County.

Did you bring any documents today?
A. No.
Q. So you have no documents concerning this case; is that correct?
A. That's correct.
Q. Okay. Now, were you presented with any documents in preparation for your deposition today?
A. No.



Q. What did you do to prepare for your deposition today?
A. I came here physically.
Q. Did you meet or confer with Ms. Parks in preparation for your deposition today?
A. No. Clarify. I did come early and we chatted a little bit, but not really about the case.
Q. Okay. Thank you. All right. So what I want to do is I want to start with talking about your personal background. What is your current address?
A. My current address is -- physical address or work address?
Q. Yes, physical address.
A. Okay. My primary residence is still in Minden, 2584 Mackay Way, Minden, Nevada, 89423.
Q. Are you a resident of Minden, Nevada, or are you a resident of Modesto, California, or some --
A. I'm a resident of Minden, Nevada.
Q. Okay. So just to be clear then, if we subpoena you for trial, you are considered to be a resident in Minden, Nevada; is that correct?
A. Yes.
Q. Okay. Can you please summarize your educational background? We're going to talk about schools and degrees and education and training that you might have received.



So where did you go to high school?
A. Douglas High School in Minden, Nevada.
Q. And when did you graduate?
A. 1994.
Q. Were there any special programs or curricula that you took there?
A. Just general high school curriculum.
Q. Okay. Now, what about college?
A. I did an associate's degree at Western Nevada College. I can't tell you what year I graduated from there, but --
Q. Do you remember the approximate time frame?
A. Maybe 2000.
Q. Okay. Now, did you do any postgraduate work?
A. Bachelor's degree from University of Nevada at Reno; graduated in 2002. And master's degree from University of Phoenix in 2010.
Q. Okay. Your bachelor's degree, what did you --
A. Business administration.
Q. Okay. And your master's degree in business administration, where was that?
A. University of Phoenix at the Reno campus.
Q. Okay. Now, as part of your college or postgraduate work, did you study or receive training in the subject of employment discrimination?

A. Yes.
Q. Can you summarize what that training was?
A. I am -- well, other than my formalized education I've cited, I have a certification in human resource management which includes employment discrimination, and I have a plethora of different trainings on the subject as well, which I can't date or --
Q. We'll get to the training you might have --
A. Okay.
Q. -- received through employment, but I'm talking only here about your college and --
A. Okay.
Q. -- your master's work. Did you receive training in --
A. Yes.
Q. -- discrimination? Okay.
And did any of that training involve matters concerning the Americans with Disability [sic] Act?
A. Yes.
Q. Did you have any -- I'm not sure of the timing of the year that the Americans with Disability Amendment Act came out or the Americans with Disability Act Amendment Act, ADAAA, A, but did you have training with the Amendment Act as well?
A. Within my --



Q. The American with Disability Amendment Act?
A. Not within my bachelor's or master's but afterwards.
Q. Okay; great. Thank you. Now let's talk about your employment background since you graduated your master's program. So we'll start backwards in time. What was -- where did you first work when you graduated with your master's degree?
A. I think I was with the State of Nevada.
Q. Okay. And what did you do with the State of Nevada?
A. Sorry. I'm debating whether I was still with -- I was the person -- or chief personnel officer for Nevada Department of Public Safety.
Q. Okay. And what time frame was that?
A. From 2008 to 2013. I -- approximately.
Q. Okay. So what I want to try to do is go farther back in time. Weren't you the personnel technician of the State of Nevada from January of '93 to March of 2003?
A. That's when I started my employment.
Q. Oh, you just said 2000 -- I think you said 2003.
A. I apologize. I thought you said right when I graduated from my master's degree.
Q. I did say that. Or you graduated from your master's degree --



A. In 2010.
Q. Oh, okay. So then I apologize. I made a false assumption here.
Let's start with your job at the State of Nevada as a personnel technician in '93.
A. Ah, okay. Yes. In 1990 -- I think in '93 I was still an administrative office assistant, and it wasn't until '94 or '95, approximately, that I was promoted to a personnel technician.
Q. Okay. What I want to do is I want to mark as Exhibit 1 a document that I'll represent to you I just printed up yesterday.
Can we go ahead and mark this as Exhibit 1?
(Exhibit No. 1 marked for identification.)
MR. GEDDES: Q. Okay. Have you seen this document before?
A. Yes.
Q. Or the representation of what's on this document before?
A. Yes.
Q. What is this?
A. This looks like my LinkedIn home page.
Q. Okay. So what I'd like to do is if we could go to the last page -- I'm sorry. It's not the last page.



It's the page that describes personnel technician and analyst. Do you see that? January of '93 to March --
A. Yes.
Q. -- 2003?
A. Uh-huh.
Q. Okay. The description of the work that you did is rather short. I don't mind reading it. It's: "Led staff responsible for all personnel and payroll functions for approximately 800 employees; assigned work, conducted performance evaluations, disciplinary actions, training, and motivational techniques; ensured timely and accurate processing of pay actions, administered FMLA and workers' compensation process, developed and implemented recruitment and selection plans, developed and delivered comprehensive payroll and personnel training, assisted in internal investigations, counsel management on performance management, corrective and disciplinary actions."
Did I read that correctly?
A. Yes.
Q. And does that accurately summarize the duties you

had at the State of Nevada as a personnel technician in this job?
A. Yes.
Q. Okay. Is there anything missing from that that's significant in the description?
A. Not that I recall.
Q. Okay. And so what -- can you tell us what supervisory role you had? I know that you talked about leading in this narrative, but what supervisory role did you have?
A. As a personnel technician III, I led and managed a team of five, combination of person -- lower-level personnel technicians and administrative support staff. In the analyst level, I managed and led similar job classifications in a different agency, as well as lower-level analysts.
Q. Okay. So your -- you gained experience in supervising staff and watching what they were doing and what was going on; is that correct?
A. Yes.
Q. Okay. Now, while working here, did you receive any training or study, including work training and seminars and -- for attorneys, for example, it's continuing legal education. But any continuing education type things? Did you -- did you do that for employment



discrimination?
A. I would only be making an assumption. It's been many years back.
Q. Okay. So you don't recall.
A. I don't recall.
Q. Okay. So let's move to your next job. The next job, chief administrative officer, Carson City Sheriff's Office, that was from August 2003 to March 2008; is that correct?
A. That is correct.
Q. And the narrative that's written here reads as follows:

"Appointed by the Sheriff, managed the Sheriff's Employment Development and Human Resources functions. Directed and coordinated a variety of services designed to enhance organizational excellence and personal/professional growth of employees, managed and led the department's human resources and training functions, administered compliance of federal and state peace officer standards and training requirements, managed and coordinated the work of sworn and nonsworn



personnel, worked with command staff to continually evaluate administrative systems with respect to quality, efficiency, and performance, guide managers and supervisors on personnel actions, to include: corrective action, motivation, discipline and grievance resolution."

Did I read that correctly?
A. Yes.
Q. And does that accurately and truthfully state or summarize your job duties and functions as the chief administrative officer at Carson City Sheriff's Office?
A. Yes.
Q. Is there any significant aspect of your job that is left out of that description?
A. No.
Q. And what supervisory role did you have in -- in this job?
A. I led -- well, direct supervision of a couple civilian employees, and any sworn officer that was placed on light duty or work restrictions through workers' compensation was put under my supervision.
Q. Okay. And in that regard, when you worked in the area involving workers' compensation, were you aware at



the time that there is a dual area sometimes called the hidden aspect of workers' compensation relating to the Americans with Disabilities Act?
MS. PARKS: Objection. Calls for a legal conclusion.
MR. GEDDES: Q. To your knowledge. Did you gain an understanding that the Americans with Disability Act was also an aspect of injured workers?
MS. PARKS: Same objection.
THE WITNESS: I don't recall.
MR. GEDDES: Q. Okay. When you -- when you resolved issues concerning -- you worked on workers' compensation aspects of employees; is that correct? When they had workers' compensation claims, you were involved in that?
A. Yes.
Q. And did that -- what did that -- what did that entail? What types of things would you do when you worked on those matters?
A. They're all very specific examples. I actually do not recall any particular employee or --
Q. Did you --
A. -- example.
Q. Did you -- did you receive and monitor medical records?

A. Yes.
Q. Did you receive and monitor what the employer's insurance company -- the insurance company's handling of the workers' compensation claim? Were you in the loop on those communications?
A. Yes.
Q. Okay. And were you keeping tabs on the work restrictions of the worker?
A. Yes.
Q. And were you -- you mentioned light duty. Can you explain to me what role or function you had with light duty?
A. Particularly sworn personnel assigned to the detention facility that were unable to perform their functions, I found alternative work -- work for them that didn't involve sworn duties.
Q. Okay.
A. As an example, being placed in our observation bubble, I guess, to monitor the facility without engaging in sworn officer duties or office type of assignments.
Q. Why were you putting workers on light duty who had workers' compensation claims?
A. We received medical information that informed us that the individual was not able or could -- had limitations and was not able to perform specific functions



that included sworn duties.
Q. And did you have any experience at the Carson City Sheriff's Office as the chief administrative officer of dealing with ADA issues for these employers who had workers' compensation claims?
A. I don't recall specific examples, but that would have been -- I don't think I had an example actually that we had to do ADA accommodations for.
Q. Okay.
A. I don't remember actually.
Q. Now --
A. I don't recall, to correct myself there.
Q. All right. Well, when working at Carson City Sheriff's Office as the chief administrative officer, did you study or receive training, including work training, seminars in the subject of employment discrimination?
A. Yes.
Q. Okay. Can you summarize what that was?
A. I don't recall the specifics. I do recall going to seminars sponsored by our -- POOL/PACT.
Q. Okay. Did any of those seminars involve the Americans with Disability Act?
A. Yes.
Q. And do you know if they also involved the Americans with Disability Act Amendment Act?



A. I don't recall when the amendment went into place. Was that in --
Q. If you don't recall, that's --
A. I don't recall.
Q. Okay. Now, while working there, approximately how many employment discrimination matters did you handle? Approximately.
A. Approximately three.
Q. Okay. And how many of those three were ADA types of discrimination? And let me take a step back. I'll represent to you that there are many different types of discrimination cases. There might be Title VII, sex discrimination, et cetera. I'm only focusing here on the ADA.
Of those discrim -- three discrimination matters that you handled, how many involved ADA issues?
A. None.
Q. Okay. Now, did you resign from this job or were you terminated?
A. No.
Q. I'm sorry?
A. No.
Q. You did not resign?
A. I'm sorry. Yes, I resigned.
Q. Okay.



A. I missed the "or."
Q. Okay. And why did you resign?
A. I took another position with the State of Nevada.
Q. Okay. And so that would be your next job listed on your -- on Exhibit 1. That's the State of Nevada chief personnel officer which you worked approximately from March of 2008 to January of 2013; is that correct?
A. Yes.
Q. And a very brief description that you've given here is:

> "Reporting to the Director and Deputy Director, led up to 19 staff providing recruitment and selection, classification, compensation and benefits, heart and lung, employee relations, workers' compensation, special leave, training, labor relations, health and safety, and related services for over 1400 sworn and civilian employees throughout the State of Nevada. Handled high-profile personnel cases related to discrimination, hostile work environment, employee misconduct, grievances, and mediation."

Did I read that accurately?
A. Yes.
Q. And does this accurately summarize what your job duties were as the State of Nevada chief personnel officer?
A. Yes.
Q. Is there anything significant that is missing from this description?
A. No.
Q. Okay. And so you say that you led up to 19 staff. Can you just summarize what your supervisory role was at this job?
A. Sure. I led -- well, the -- as -- I led the background investigation unit that was staffed with civilian background investigators. I led the recruitment team that worked closely with divisions to recruit and attract talent. I led our corrective action/disciplinary team in helping command staff with disciplinary and corrective actions, and that included high-level HR analysts as well as HR managers both in Northern Nevada and Las Vegas.
Q. Okay. And while working here, did you study or receive training, including work training and seminars, in the subject of employment discrimination?
A. Yes.



Q. Can you summarize that, please?
A. I don't recall the specifics, but I did attend several of the offerings of -- through the employment development and training office of the State of Nevada as well as -- no, I don't recall if I did it then. That's it.
Q. Do you know if any of that training involved the matter or subject of Americans with Disabilities Act or Amendment Act?
A. Yes.
Q. And while working there, how many employment discriminations of any variety -- how many matters of employment discrimination did you handle approximately?
A. Oh, approximately eight to ten.
Q. Okay. And of those eight to ten discrimination matters, how many related -- how many had ADA or ADAAA issues?
A. I don't recall an exact number.
Q. Okay. Would there be more than -- would there be one at least?
A. At least one, yes.
Q. And was it most of them or less than half of them do you think?
A. Less than half of them.
Q. Okay. Now, did you resign from this job or were



you terminated?
A. I resigned.
Q. And why did you resign?
A. I joined Douglas County.
Q. Okay. And that's the next item listed here, I believe. Your next job was with Douglas County as the human resources director from approximately January of 2013 to July of 2015; is that correct?
A. Yes.
Q. Okay. And you've written in your Exhibit 1 the following summary of your job description. You've written:

"Reporting to the County Manager, plan, direct, and administer all County human resource functions, including recruitment and selection, job classification and compensation, EEO and ADA issues, risk management and liability programs, training and development, employee and labor relations including collective bargaining, and benefits administration."

Did I read that correctly?
A. Yes.



Q. And does this truthfully and accurately reflect and describe what your job functions and duties were while you were the human resources director at Douglas County?
A. Yes.
Q. Now, throughout this deposition I may be showing you documents, and the documents may describe your title a little differently --
A. Yes.
Q. -- "human resources manager." Can we agree that throughout this deposition, "human resources director" and "human resources manager" can be used interchangeably to describe this job that you had?
A. Yes.
Q. Okay. Now, you have -- you've specifically written "ADA issues" here in a summary. What did -- what types of ADA issues did you work with that you've referenced here?
A. I don't recall the specific cases.
Q. Would one of those cases have involved the subject litigation that this case is, Enos vs. Douglas County, or are you thinking of other cases? Or other matters, I should say.
A. I don't recall specifically.
Q. Okay. And when you worked here for Douglas County as the human resources director, did you study or

receive training, including work training and seminars, in the subject of employment discrimination?
A. Yes.
Q. And can you summarize that training?
A. I attended the human resource management conference that included within it several seminars on the topic.
Q. Approximately how many hours of training do you think that was?
A. Probably just a couple.
Q. Okay. And with regard to the training that you're describing here, did any of it involve the Americans with Disability Act or Amendment Act?
A. I believe -- I'm assuming it would have. I don't --
Q. You don't specifically recall?
A. I don't.
Q. Okay.
A. They would have had to have included it in the training.
Q. Okay.
A. I don't recall.
Q. You think they have, but you don't recall the specifics?
A. I don't recall the specifics.



Q. Now, working -- while working there, how many employment discrimination matters overall did you handle approximately?
A. Maybe a couple.
Q. Okay.
A. Estimating.
THE VIDEOGRAPHER: Pardon me, ma'am. I believe your microphone is --
THE WITNESS: Oh.
THE VIDEOGRAPHER: There we go. Thank you.
MR. GEDDES: Were you able to pick up her last --
THE VIDEOGRAPHER: Yes.
THE WITNESS: I said probably a couple.
MR. GEDDES: Q. Okay. And when you say, "a couple," you mean two?
A. Yes.
(Ms. Parks exits the room.)
MR. GEDDES: Q. Okay. And of -- of the couple of matters, how many related to ADA issues?
A. I apologize. I meant -- I thought you meant how many ADA issues. I was specifically saying maybe a couple ADA issues were there.
Q. I mean matters. For example, let me be clear. It's a bad question so I'll rephrase it.
So you have this job and six employees or 12 or



22 say to you -- they complain to HR: We've got this type of discrimination matter, of any variety. And of that number, how many involved ADA matters? And I believe your testimony was when it came to discrimination matters, there were two matters that you dealt with. And then my question was of the two overall for discrimination, how many related to the ADA?
(Ms. Parks returns.)
THE WITNESS: Ah, okay.
MR. GEDDES: Q. So if you need me to clarify --
A. So I misunderstood the question.
Q. Okay.
A. Overall discrimination complaints are approximately five.
Q. Okay.
A. Of those, a couple -- I am guessing; I'm estimating --
Q. Estimating.
A. -- estimating are ADA related.
Q. And was one of those couple -- when you say "couple," you mean two?
A. Yes.
Q. Are you thinking when you answer that that one of the two was Mr. Enos's case, or separate and apart from this litigation?



A. I -- I do not recall the individual employees.
Q. Okay. So the two --
A. I just --
Q. -- could include this case?
A. It could.
Q. Okay. Now, according to your exhibit, Exhibit 1, your description of your background, the next position that we see is director of human resources and administration, Nevada -- oh, I'm sorry. I apologize. I got ahead of myself.
Did you resign from the Douglas County human resources director job, or were you terminated?
A. I resigned.
Q. Okay. And why did you resign?
A. I took NRHA's offer.
Q. Okay. So that being the next job on your description here. That's the director of human resources at -- and administration at the Nevada Rural Housing Authority; is that correct?
A. Yes.
Q. And your description here reads, "Responsible for the overall development, administration, coordination and evaluation of the agency's human resource and administrative functions and programs."
Did I read that correctly?

A. Yes.
Q. And is that an accurate description of what you did?
A. Yes.
Q. And is there anything significant that's missing from that description?
A. No.
Q. So did you have a supervisory role there, and what was it?
A. Yes, I had a couple of employees under me.
Q. Okay.
A. Primarily doing -- well, let me take that back. I had HR specialists under me, and I also oversaw our technology specialists.
Q. Okay. And while working there at this job, did you study or receive any training, including training and seminars, in the subject of employment discrimination?
A. Yes.
Q. Could you summarize that, please?
A. I also attended that year the annual Society For Human Resource Management conference, and within it, it included seminars related to the subject.
Q. Okay. And approximately how many hours of education and training did you receive in matters of employment discrimination?



A. Approximately eight hours.
Q. Okay. And of that -- did that training include the subject of Americans with Disability Act and/or the Americans with Disability Act Amendment Act?
A. I again would assume it did, but I don't recall specifically.
Q. Okay. All right. Now, while working at this job, approximately how many employment discrimination matters overall did you handle, approximately?
A. Three.
Q. And of those, how many were ADA, slash, ADAAA matters or involved ADA/ADAAA matters?
A. I don't recall if either of them did.
Q. Okay. Did you resign from this job or were you terminated?
A. I resigned.
Q. And why did you resign?
A. I moved to -- I moved job -- well, I accepted City of Modesto.
Q. Okay. So the next job described here is the human -- director of human resources, City of Modesto, from November of 2016 to the present; is that correct?
A. Yes.
Q. And the description is not listed in your LinkedIn document, but -- and I won't introduce this as an



exhibit.
A. That's strange.
Q. I went ahead and looked online for the City of Modesto, and so I think I found something that describes -- describes what you do. I'm going to read a description to you, and if you could just tell me if that accurately states what you do -- what you do at this job.
A. Okay.
Q. "To plan, organize, direct, and review the activities and operations of the human resources department, including personnel services, recruiting and testing, payroll processing, performance management, employee training and development, risk management, Equal Employment Opportunity, employee benefits, employee relations, and labor relations; to provide leadership to the department and city organization; to serve as the city's chief negotiator in contract negotiations; to coordinate assigned activities with other city departments and outside agencies; and to provide highly responsible and



complex administrative support to the city manager and deputy city manager."
Does that accurately summarize what you do?
A. Yes.
Q. Okay. I'm going to read to you a further description that's provided, and I'd like to know if you think this is an accurate statement of what an aspect of your current job is.
"Oversee the equal opportunity and diversity functions of the city, including recruitment, outreach, training, state and federal reporting, referral of complaints for investigation and consultation with supervisors and managers."
A. I apologize. You want me to affirm that I understand that or --
Q. Is that -- is that accurate?
A. That's accurate, yes.
Q. Okay. Thank you. Okay. I'm going to read to you from page 3 of 4 of the same job description the following, and tell me if it accurately states what you do.
"Minimum qualifications: knowledge of pertinent federal, state, and local laws, codes, and regulations."

Does that accurately describe a requirement that you satisfied as a minimum qualification?
A. Yes.
Q. Okay. And, to your knowledge, does pertinent federal, state, and local laws, codes, and regulations include compliance with federal discrimination law?
A. Yes.
Q. Including the ADA and ADAAAA [sic]?
A. Yes.
Q. Okay. Thank you. So at this -- at the job that you have now, the director of human resources at the City of Modesto, did you -- can you describe what your supervisory role is?
A. Yes. You want me to describe it to you?
Q. Yeah, just generally just summarize it.
A. Sure. I lead a team of 20 -- approximately 202 employees that are responsible for providing any HR-related expertise to all of the City of Modesto employees and the public. That includes recruitment and selection. That includes benefit administration, team, onboarding, offboarding, risk management which includes workers' compensation, liability, limited liability, the DOT, administration of the program, ADA, industrial retirements.
I'm sure I'm missing something --



Q. Okay.
A. -- but that gives you a little...
Q. So -- and while working -- when you said "ADA" just a second ago, you mean the Americans with Disability --
A. Americans with Disability --
Q. Okay.
A. -- accommodations and so forth.
Q. Okay. Now, working here, did you study or receive any training, including work training and seminars, in the subject of employment discrimination?
A. Yes.
Q. Can you summarize that, please?
A. I have attended California employment law seminars related to the subject.
Q. Okay. Approximately how many hours of training are you describing here for employment --
A. For that particular subject, maybe -- approximately eight hours.
Q. Okay. Is that including studying the Americans with Disability and its Amendment Act?
A. Yes.
Q. Okay. Now, while working here at this job, approximately how many employment discrimination matters overall have you handled approximately?



A. I don't handle them directly. My team does.
Q. Okay.
A. But I am responsible for them. Maybe 30 approximately.
Q. Okay. And of that number, approximately how many are ADA/ADAAA issues?
A. I -- let me take that back. I keep on -- I'm misunderstanding your question. 30 ADA-related cases.
Q. Okay. And approximately how many discrimination overall matters? And when we say "case," just to be clear, it doesn't necessarily mean that a matter has evolved to formally becoming a case or filing a complaint. It can just be informal. That's -- that's my question.
A. I understand.
Q. Okay. And that's -- and that's been the answer that you've given is with that understanding?
A. Yes.
Q. And the answers in your deposition so far, the same?
A. Yes.
Q. Okay. So approximately how many discrimination matters have you handled in general at your current job?
A. Approximately 80.
Q. Okay. And would you -- would you -- is it -- is it true -- is it fair and accurate to say that your



knowledge of the ADA in your current job is better than it was when you were the direct -- the Douglas County human resources director?
A. Can you repeat the question for me?
MR. GEDDES: Yes. Can you read that back, please?
(Record read.)
THE WITNESS: Yes.
MR. GEDDES: Q. Okay. All right. Have you ever been convicted of a crime?
A. No.
Q. Have you ever been a party to a lawsuit?
A. Yes.
Q. Can you list the cases that you've been a party to a lawsuit?
A. I've been a party to a lawsuit in 1994 against my home builder.
Q. Okay. Any other matters?
A. (Shakes head.)
Q. Okay. Now, separate and --
A. No.
Q. -- apart from this lawsuit, which you're a witness right now testifying, have you ever been a witness in any lawsuit?
A. Yes.

Page 46

Q. Okay. Can you list them?
A. No.
Q. How many were there?
A. I don't recall them, but I have been.
Q. Approximately how many?
A. Approximately six.
Q. And were they government-type lawsuits?
A. Yes.
Q. Okay. So in your functions as an employee, you were called as a witness regarding lawsuits against the government employer; is that accurate?
A. Yes.
Q. Okay. Now, have you read any legal pleadings of this lawsuit?
A. No.
Q. Okay. What is your understanding of this lawsuit?
A. I'm assuming Mr. Enos disagrees with the result of his employment with Douglas County. I don't know what the bases of his lawsuit are.
Q. Okay. So you haven't communicated -- you haven't talked to anyone about what this lawsuit's about?
A. I have not.
Q. Okay. Now, do you know John Enos?
A. No.

Page 47

Q. Okay. The -- he's seated to my right, but you recognize him?
A. I actually did not recognize John.
Q. Okay.
A. I apologize.
Q. Don't. Just whatever the truth is.
Okay. So -- but you understand that Mr. Enos here is the plaintiff in this lawsuit?
A. I do.
Q. Okay. Now, is it fair to say that you would characterize your relationship with Mr. Enos as once strictly professional, but since then you've pretty much forgotten who he is? Because you didn't recognize him, so I want to accurately characterize what your relationship with him is.
A. Yes.
Q. Okay. So you were never -- it wasn't a personal -- you never had a personal friendship with Mr. Enos?
A. No.
Q. Okay. Now, during your employment at Douglas County human re -- as the human resources director, how familiar were you with Mr. Enos?
A. I'm --
Q. Did you see him frequently?

Page 48

A. No.
Q. Did you talk to him? No? You had little contact with him?
A. Very little --
Q. Okay.
A. -- contact with him.
Q. All right. Now, after your leaving -- after leaving your employment as the Douglas County human resources director, you didn't have any communications with Mr. Enos; is that correct?
A. That's correct.
Q. Okay. Do you know a person named Scott Shick?
A. Yes.
Q. How do you know him?
A. Also professional relationship from Douglas County.
Q. And who is he?
A. He is or was -- I don't know if he is still -- the chief of the division. I don't recall the name of the division.
Q. Okay. And you understand that Mr. Shick is a defendant in this lawsuit?
A. From your notification to me previously, yes.
Q. Okay. And how would you characterize your relationship with Mr. Shick? Personal, personal and

Page 49

professional, or strictly professional?
A. Strictly professional.
Q. Okay. And after leaving your employment as the Douglas County human resources director, did you have any communications with Mr. Shick?
A. I saw Mr. Shick -- Shick at -- at the court facility once and said hi.
Q. And that was it?
A. That was it.
Q. So it's fair to say you don't speak to Mr. Shick nowadays; is that correct?
A. That's correct.
Q. Do you know a person named Victoria Sauer-Lamb?
A. I recall the name.
Q. Okay. Do you know how you know her?
A. I believe she was in the -- the No. 2 under Scott.
Q. Okay. And do you --
A. I don't recall her title.
Q. Do you understand that she's a defendant in this lawsuit?
A. From your previous notification, yes.
Q. Okay. And how would you characterize your relationship with Ms. Sauer-Lamb? Personal, personal and professional, or strictly professional?

A. Strictly professional.
Q. And after leaving your employment as the Douglas County human resources director, did you have any communications with Ms. Sauer-Lamb?
A. No.
Q. Okay. And have you heard of a person named Nathan Tod Young?
A. Yes.
Q. Who is he?
A. He was at the -- he's the district court judge.
Q. Okay. And how do you know him? From work?
A. From work.
Q. Okay. And you understand that Judge Young is also a defendant in this lawsuit? And when I say that, technically either there's -- whether the person is a dismissed defendant who can be reinstated on appeal, I don't make that distinction. You understand that he's involved in this lawsuit?
A. I didn't know this before, but --
Q. Okay.
A. -- if you're telling me, I understand.
Q. How long have you known Judge Young?
A. From when he was appointed district court judge and I was in HR at the County.
Q. Okay. And how would you characterize your



relationship with Judge Young? Personal, personal and professional, or strictly professional?
A. Strictly professional.
Q. All right. After leaving your employment with Douglas County human resources as the human resources director, did you have any communications with Judge Young -- Judge Young?
A. No.
Q. And do you know a person named Michael Gibbons?
A. I don't think I've ever met him.
Q. Okay. Do you know that he is a judge, Judge Gibbons or Justice Gibbons?
A. That's what came to mind is the Judge Gibbons, but I don't recall meeting him.
Q. Okay. And you've never spoken to Judge Gibbons about -- since you left your employment as Douglas County human resources --
A. No.
Q. -- director? Okay.
Now, in this deposition I'll be describing Mr. Enos's separation of employment as a senior juvenile probation officer from Douglas County, I'll be describing that as his being fired. Now, I know that others may claim that he was not fired, that he was deemed to have voluntarily resigned by operation of personnel regulations



or whatever, but the -- my point is is I want you to understand that when I use the phrase "fired" or "being fired" here in your deposition, I'm referring to Mr. Enos's separation of employment as a senior juvenile probation officer from Douglas County on or about February 19, 2015.
So can we agree to those terms, that when I'm describing -- when I'm using the phrase "firing," you understand that to mean the separation of employment without regard to the dispute the parties may have as to how to characterize it?
A. I understand.
Q. Okay. Thank you. Now, are you aware that Mr. Enos was fired?
MS. PARKS: And I'm going to object, and I'm simply going to state that I think that that misstates the evidence. But with the qualification that counsel put on the record, it's fine.
MR. GEDDES: Q. You understand he no longer works with the County?
A. I do know now.
Q. Okay.
A. Yes.
Q. Okay. When did you first learn that Mr. Enos no longer worked with the County?



A. I don't recall.
Q. Okay. Did you know before he was separated from employment or, as I'm calling it, fired?
A. Can you clarify the question?
MR. GEDDES: Yeah, can you read back the question, please?
(Record read.)
THE WITNESS: Did I know what?
MR. GEDDES: Q. That he was being fired, or are you learning it for the first time in this deposition?
A. I -- well, I have a lot of cases. I don't recall exactly Mr. Enos's case. I recall discussions about Mr. Enos's employment -- separation, I guess -- early on.
Q. Okay.
A. Earlier or before --
Q. But before you came into your deposition today, were you aware that Mr. Enos no longer worked for the County, that his employment had separated?
A. Yes.
Q. Okay. Now, what is your understanding of why Mr. Enos was fired?
A. I don't recall the details.
Q. Okay. What is your understanding of -- well, do you have a recollection as to whether or not Mr. Shick had any involvement in Mr. Enos's firing?

A. I do recall him being involved in the -- in discussions or meetings. I don't recall the specific conversations or discussions.
Q. Were those meetings that you had and Mr. Shick was present there or Mr. Shick had the meetings and you were present there?
A. Yes.
Q. And approximately how many meetings are you recalling here?
A. I don't recall.
Q. Was Mr. Enos at any of those meetings?
A. I don't remember.
Q. Now, what is your understanding of Ms. Sauer-Lamb's involvement, if any, in Mr. Enos's firing?
A. Similar to Scott.
Q. You recall being at meetings --
A. I recall a meeting -- I don't recall her -- I don't remember what she looks like or anything like that, but I just recall a meeting. And I don't recall how many.
Q. All right. Now, the parties have made arguments in this case I don't want to get too deeply into, but just generally speaking, there's a question of what oversight function the court has in addition to the County over juvenile probation officers.



Was it your understanding when you were the human resources director at Douglas County that the judges, including Judge Young and Judge Gibbons, had an administrative oversight role over the Douglas County juvenile probation officers?
A. Yes.
Q. Okay. And can you summarize what your understanding was?
A. Exactly what you just said. It was -- the juvenile probation falls under the court and under -- I don't recall what -- I'm assuming it was Judge Young. He had responsibility over that unit.
Q. And since you were the human resources director, your job involved hiring and firing and disciplining employees; correct?
A. My involvement was consultation, guidance, and advice, not the decision maker.
Q. Okay. Who was the decision maker?
A. It would have -- from my recollection of the administrative oversight, it would have been the chief or the judges. I don't recall specifically.
Q. Do you ever recall sitting in personnel meetings with any of the judges present in their administrative role?
A. Repeat that question for me.



MR. GEDDES: Can you please read back the question?
(Record read.)
THE WITNESS: Related to this case?
MR. GEDDES: Q. No, just in general.
A. Yes.
Q. Okay. Could you summarize how that worked?
A. I don't recall one specific to this case, but I do recall another meeting in which we had dialogue about the issue at hand. I don't remember what the issue at hand is. And typically it would be -- you know what? I'm just speculating because I don't recall the details of that conversation.
Q. Well, let me ask it this way. Is it your recollection that the judges would periodically meet with human resource personnel to address matters concerning juvenile probation officers?
A. I don't recall that.
Q. Do you recall having to make recommendations to the judge for a firing and the judge would have final say, or did Douglas County human resources have free reign to -- to terminate employment of juvenile probation officers?
A. Human resources does not have free reign -- or did not have free reign to terminate.



Q. Who did?
A. It would -- I don't -- I don't remember the administrative process for Douglas County.
Q. Okay. Now, after Mr. Enos was fired, were you instructed by anyone who worked at Douglas County or the State of Nevada not to speak with Mr. Enos?
A. I don't recall that.
Q. Now, when I refer to the State of Nevada, the reason why I mention the State of Nevada is I'll just represent to you that some of the parties here believe that the judges are elected officials for the State of Nevada. So when I'm referring to the State of Nevada, I'm referring to the judges and any oversight or overlapping role they may have with the County to co-supervise the juvenile probation officers. Can we agree that's what I mean when I say, "the State"?
A. Now I understand.
Q. Okay.
A. I didn't understand that before, so you can ask me that question again.
Q. Okay. But you un -- you agree that when I say, "the State," that's what I'm referring to?
A. You're referring to the judges --
Q. The judges and their --
A. -- as State employees.

Q. As State employees who might share in responsibilities --
A. I understand.
Q. -- with the County. Okay.
A. Uh-huh.
Q. So my question was simply: After Mr. Enos was fired, were you instructed by anyone at Douglas County or the State of Nevada not to speak with him?
A. I don't recall that.
Q. Okay. Now, you were the Douglas County human resources director prior to the time when Mr. Enos was fired; isn't that correct?
A. Yes.
Q. And what was your involvement in connection with Mr. Enos's firing?
A. I recall having discussions with Mr. Shick and Ms. Sauer-Lamb and the district attorney's office for consultation, and I -- and I wish I remembered more. That was my involvement is conversation and discussion. I don't recall if I had a position or a recommendation.
Q. How many -- approximately how many meetings are you describing here?
A. I would be speculating. I don't recall.
Q. More than one?
A. Yes, more than one.



Q. More than five?
A. I do not know.
Q. Okay. Can you describe -- you started to talk about it earlier. Can you describe the chain of command in the human resources department at that time? How did the hierarchy flow, according to your knowledge?
A. So HR director, slash, manager reports directly to the County manager.
Q. That would be you reporting to the County manager?
A. I report to the County manager. That's my hierarchy. County manager --
Q. And then below you --
A. -- reports to the Board of Supervisors.
Q. I'm sorry?
A. Then the County manager reports to the Board of -- the commissioners.
Q. Okay. And --
A. Below me?
Q. Yes.
A. Below me I had several personnel technicians and a few analysts, I believe.
Q. What's a personnel technician?
A. They are responsible for processing personnel transactions, recruiting, posting jobs and also processing



workers' compensation claims and so forth.
Q. Who was in charge of --
A. I don't remember the titles.
Q. -- I'm assuming, the personnel reviews for juvenile probation officers?
A. I'm sorry. Repeat that.
MR. GEDDES: Can you read that back?
(Record read.)
MR. GEDDES: Q. Who was in charge of doing the performance reviews of the juvenile probation officers?
A. Their -- who was in charge of doing their personnel performance reviews --
Q. Performance reviews.
A. -- for juvenile probation officers?
Q. Yes.
A. Their supervisors.
Q. Okay. And so I want to be clear then. If we're going to talk about the typical supervision and interaction that you had with the Douglas County folks, if we focus on Scott Shick, Mr. Shick, on Douglas County personnel matters, what authority did you have over Mr. Shick?
A. I had no authority over Mr. Shick.
Q. Okay. You couldn't compel him to comply with HR personnel rules?



A. Well, he could -- I don't have the power to compel him to comply with personnel rules.
Q. Okay. And on Douglas County personnel matters, what authority did Mr. Shick have over you?
A. It would be the same.
Q. Okay.
A. He would not have any authority over me.
Q. All right. I think you've described this already, but on Douglas County personnel matters, can you describe your function and role as the human resources director in connection with Mr. Shick?
A. My role in connection to Mr. Shick. We -- I saw -- from my recollection, we're colleagues. He has a level of expertise in juvenile detention, and I have an expertise in HR. So he would consult with me for recommendations, suggestions, or guidance on HR-related matters. I'm not sure if that answers your question.
Q. Okay. And you attended meetings with Mr. Shick on personnel matters; is that correct?
A. Yes.
Q. And you communicated with Mr. Shick on personnel matters, including by phone and e-mails; is that correct?
A. Yes.
Q. So you were involved -- or you sat in on meetings or witnessed decision-making -- the decision-making

process when -- when Scott Shick took adverse action on a juvenile probation officer; isn't that correct?
MS. PARKS: Objection. Lack of foundation. Misstates her testimony.
MR. GEDDES: Q. You can answer the question.
A. Can you repeat the question?
MR. GEDDES: Yeah, can you read it back, please?
(Record read.)
THE WITNESS: I assume I did. I don't recall the specific conversations.
MR. GEDDES: Q. But that would have been your function?
A. That -- yes.
Q. Okay.
A. Yeah.
Q. And just so the record is clear, here when I use the phrase "adverse action," I mean disciplining, suspending, firing, and not rehiring an employee. Is that your understanding of the phrase that I've used, "adverse action"?
A. Yes.
Q. Okay. Do you recall specifically Mr. Shick being involved in any decision-making process concerning Mr. Enos?
A. In my role I would assume I was there and there



was, but I don't recall the specifics.
Q. You don't recall. Okay. All right. But it would be your ordinary function to be there; you just don't recall specifics. Is that correct?
A. That's correct.
Q. Okay. So if we switch gears a little bit and the same line of questioning for Ms. Sauer-Lamb. On Douglas County personnel matters, what authority did you have over Ms. Sauer-Lamb?
A. I had no authority over Ms. Sauer-Lamb.
Q. And on Douglas County personnel matters, what authority did Ms. Sauer-Lamb have over you?
A. No -- none.
Q. And on Douglas County personnel matters, the same question as before. Could you describe your function and role as the human resources director in connection with Ms. Sauer-Lamb? Is it the same --
A. It would be the --
Q. -- as it was for Mr. Shick?
A. -- same as --
Q. Okay.
A. -- Mr. Shick.
Q. Thank you. And so you attended meetings with Ms. Sauer-Lamb on personnel matters?
A. Yes.



Q. And you communicated with Ms. Sauer-Lamb on personnel matters, including by phone and e-mails?
A. I don't recall.
Q. Okay. Would it have been your -- you may not recall specifics, but would it have been your ordinary function to communicate with Ms. Sauer-Lamb on personnel matters, including by phone and e-mails?
A. It would have normally been Scott.
Q. Okay. So were you involved or did you witness the decision-making process on taking adverse action on a juvenile probation officer with regard to Ms. Sauer-Lamb?
A. I -- I need that repeated, please.
(Record read.)
THE WITNESS: I don't recall.
MR. GEDDES: Q. Okay. So you -- it's your testimony that you didn't have any authority over the -- the admin -- the judges at Douglas County who performed the administrative role, either Judge Gibbons or Judge Young; is that correct?
A. That's correct.
Q. What authority did they have over you concerning personnel matters?
A. How do I -- well, they didn't have any authority over me. They had the authority to make the decision over personnel matters that impacted their -- the functions



they over -- they are responsible for.
Q. And would that have been written out in regulations that described that authority? Do you recall?
A. I -- I believe so.
Q. Okay. Do you recall whether any of the judges -- well, you attended -- do you recall ever attending meetings with the judges on -- on the issue of taking adverse action against a juvenile probation officer?
A. I don't recall that.
Q. So you don't recall any specific meet -- attending any specific meetings with Judge Gibbons or Judge Young concerning any juvenile probation officers?
A. I don't recall a meeting with them about the subject in question.
Q. All right. Now, to your knowledge, did Mr. -- and when I -- when I'm asking you questions about the ADA, I'm not asking you for legal conclusions because attorneys can argue over it, and ultimately it's going to be up to a jury or a judge --
A. Uh-huh.
Q. -- to make the ultimate decision. I'm just asking you what your understanding was, whether your understanding is right or wrong.
So to your knowledge, did Mr. Enos have a disability protected under the ADA or ADAAA at the time of

Page 66

his termination?
A. I don't recall. I don't know.
Q. And prior to Mr. Enos's termination, to your knowledge, did anyone at Douglas County or the State of Nevada ever address the question on whether Mr. Enos had a disability under the ADA or ADAAA?
A. I don't recall that specifically, no.
Q. Prior to Mr. Enos's termination, to your knowledge, did anyone at Douglas County or the State of Nevada ever consider what Mr. Enos could be -- whether he could be fired in light of the possible rights he might have under the ADA? And just so that we're clear, when I say "ADA" from now on, I mean the ADA and ADA Amendment Act. That way it's shorter. So I'll read that back.
Prior to Mr. Enos's termination, to your knowledge, did anyone at Douglas County or the State of Nevada ever consider whether Mr. Enos could be fired in light of the possible rights he might have under the ADA?
A. I apologize. I just don't recall all the details of Mr. Enos's case.
Q. So you don't recall?
A. I don't recall.
Q. Okay. And prior to the time of Mr. Enos's firing, what was your understanding of an employee's rights under the ADA?

Page 67

A. An employee has a right to an interactive process with the employer if the individual has a qualifying ADA condition that -- where he can still -- he or she can still perform the essential functions of the job.
Q. Is that with or without a reasonable accommodation or --
A. Well, with or without a reasonable accommodation.
Q. Yes. Okay. And so you had that understanding at the time of Mr. Enos's firing; is that correct?
A. I would assume I did.
Q. You don't know?
A. I do -- I did.
Q. You did?
A. In general.
Q. Okay.
A. I don't recall specifics of Mr. Enos.
Q. But you had a grasp of that concept --
A. Yes.
Q. -- of Mr. Enos or anyone's rights under the ADA --
A. That's correct.
Q. -- if they had a qualifying disability?
A. Yes.
Q. Okay. Now, prior to the time of Mr. Enos's firing, what was your understanding of whether an employee

Page 68

had a disability under the ADA?
A. What was my understanding of whether an employee had a disability under the ADA?
Q. Stated another way, what was your understanding of what qualified as an employee disability under the ADA?
A. Well, there's a long list of conditions, but ultimately it would be a condition that would be -- that would limit one or more life function due to a physical or psychological condition, whether it be visible or not visible, and -- well, I think I answered your question.
Q. Okay. And so would you agree then that under the ADA, a disability means a physical or mental impairment that substantially limits one or more major life activities of the individual?
A. Yes.
Q. Okay. And would you agree that the phrase "major life activities" includes the activities of performing manual tasks, walking, grasping, standing, lifting, bending, and working?
A. Yes.
Q. Okay. Now, prior to the time of Mr. Enos's firing, what was your understanding of Mr. Enos's job position at Douglas County?
A. I do recall him being a juvenile detention officer. That's all I recall.

Page 69

Q. Okay. What -- prior to the time of Mr. Enos's firing, what was your understanding of Mr. Enos's essential job functions as a senior juvenile probation officer with Douglas County?
A. To be clear, my understanding of what -- a juvenile detention officer may not come from what I recall his duties were, just from being in HR for a long time and knowing the classification. Does that matter?
Q. Well, I'm interested in what you knew at the time. You may know more now but --
A. I know --
Q. -- did you have an understanding -- you may not have had one. Whatever your answer is, but did you have an understanding of what his essential job functions were at the time when he was a senior juvenile probation officer?
A. I believe I did.
Q. I'm sorry?
A. I believe I did at the time.
Q. Okay. And you don't specifically recall now what that was?
A. Well, I believe -- well, if I -- he had the responsibility of, I guess, leading or mentoring or taking care of juveniles in the detention program, which included the ability to, assuming, verbal judo, have the physical

requirements to restrain, if necessary, and I'm sure there's a long list of other things. I don't recall specifically what I --
Q. Okay. Now, prior --
A. -- knew at the time.
Q. Prior to the time of Mr. Enos's firing, what was your understanding of how other officers in the juvenile probation office -- juvenile probation department assisted other juvenile probation officers when carrying out their work?
A. What was my understanding of what the other officers had? Responsibility?
Q. Basically, what was your understanding of the assistance provided from some officers to others?
A. Oh, okay. I believe they had to, if I recall correctly, assist each other when they're dealing with multiple juveniles in -- either in a detention facility or outside in a -- outside. I'm assuming they backed each other up where needed for physical altercations or transports or anything like that, but --
Q. So is it fair to say that prior to the time of Mr. Enos's firing, your understanding of this was that probation officers assisted others when making arrests, transporting probationers, or confronting combative situations?



A. It's my understanding they assisted, but it's also -- I recall there being an essential need to be independent. And there are times when, if I remember -- now this is coming back to me. I don't think there was enough officers, but I recall there being a need to also act and function independently of other officers.
Q. Do you recall a probation -- juvenile probation department officer named Tammy Morris?
A. I do not. The name sounds familiar, but I don't recall her.
Q. Do you recall whether Tammy Morris used a backup officer to assist her in the field when she performed home visits of probationers and when drug testing male probationers?
MS. PARKS: Objection. Calls for speculation. Witness said she doesn't recall.
THE WITNESS: I --
MR. GEDDES: Q. Does that refresh your recollection as to who Tammy Morris is?
A. It does not, no.
Q. Do you ever recall whether the workload at the juvenile probation department was sufficiently slack to allow other staff persons to provide assistance to other officers from time to time?
A. I don't recall. Vaguely recall maybe not enough



staff, but I am not positive.
Q. Prior to the time of Mr. Enos's firing, you understood that Mr. Enos suffered workplace injuries?
A. Yes.
Q. And what was your understanding of those workplace injuries?
A. I actually don't remember if this was Mr. Enos or somebody else, but what comes to mind is a juvenile falling and landing on an officer. I don't recall if it was Mr. Enos.
Q. So your -- the first workplace injury that's alleged in the Third Amended Complaint is that on June 21st, 2013, Mr. Enos was injured, the first workplace injury, in the line of duty during a wilderness trip where he supervised juveniles. He was helping a juvenile get down from a tree while standing at the base of the tree; however, the juvenile and a portion of the tree crashed down on Mr. Enos injuring his neck, thoracic, lumbar, and cervical regions of his spine and his right wrist.
Is that what you're describing here?
A. That sounds familiar, yes.
Q. Okay.
A. The other thing that came to mind was an incident at -- well, maybe it was somebody else. I just don't recall if it was Mr. Enos.



Q. Do you recall an incident where Mr. Enos was attacked while escorting a juvenile to court?
A. I don't recall that one. I was thinking of something else.
Q. The second workplace injury that's described in the Third Amended Complaint on page 12, lines 11 to 25, describe that on June 17, 2014, Mr. Enos was supposed to be on light duty. He was injured. He was transporting a juvenile to the court, and during that transport, the juvenile attacked and assaulted Mr. Enos. He sustained injuries to both his shoulders, left wrist, head, right ear, and left side, and he reaggravated his prior injuries to his neck, spine, and right wrist which were sustained in the first workplace injury.
Does that refresh your recollection as to what you recall?
A. I do not recall that.
Q. Prior to the time of Mr. Enos's firings, did you understand that either and/or his first and/or second workplace injuries amounted to physical disabilities within the meaning of the ADA?
A. I don't recall that for certain.
Q. You had talked a little bit about this earlier. I'm going to follow up. Prior to the time of Mr. Enos's firing, what was your understanding of an employer's

obligation to engage in the interactive process with regard to providing a reasonable accommodation to a disabled employee under the ADA?
A. Can you ask me the question again?
Q. Sure.
A. It's the same question you asked me before? Can you repeat that for me?
(Record read.)
THE WITNESS: If there is a qualifying condition, the employer has an obligation to invite or reach out or ask the employee if they're interested in participating in the interactive process, which would include conversations about the disability and what limitations and what, if any, alternative jobs are available that that person can perform, obviously with or without reasonable accommodations.
MR. GEDDES: Q. Okay. Prior to the time of Mr. Enos's firing, was it your understanding that once an employer becomes aware of a need for a disability accommodation, that the employer has a mandatory obligation under the ADA to engage in that interactive process with the employee to identify and implement appropriate and reasonable accommodations?
A. Yes.
Q. Okay. So prior to the time of Mr. Enos's firing,



it was your understanding that under the ADA, an employer's awareness of a need for a disability accommodation could be triggered by the employer receiving an injury report showing that a worker had injuries that substantially affected one or more of his or her daily life activities; isn't that correct?
MS. PARKS: Objection. Misstates her testimony.
MR. GEDDES: Q. Do you understand the question?
A. Can you repeat that, please?
MR. GEDDES: Yes. Can you read that back, please?
(Record read.)
THE WITNESS: That's possible, depending on what information is on the reports.
MR. GEDDES: Q. And prior to the time of Mr. Enos's firing, was it your understanding that the interactive process required communication and good faith exploration of possible accommodations?
A. I'm sorry. Will you repeat that?
(Record read.)
THE WITNESS: Yes.
MR. GEDDES: Q. Prior to the time of Mr. Enos's firing, what was your understanding of an employer's responsibilities to determine whether a job function is an essential function for accommodation of a disability under



the ADA?
A. What is my understanding of --
Q. What was your understanding prior to the time of his firing of the employer's obligations or responsibilities to determine whether a job function is an essential job function for accommodating a disability under the ADA?
MS. PARKS: Calls for a -- objection. Calls for a legal conclusion.
MR. GEDDES: Q. Just so that we're clear, all of your testimony -- I'm just asking for your understanding, whether it's right or wrong.
A. My understanding of how we determine whether a job function is essential or not?
Q. Well, I guess what I'm really asking you is did an employer have the responsibility to determine whether a job function was an essential function or a nonessential function when evaluating accommodation of a disability under the ADA?
MS. PARKS: Same objection.
THE WITNESS: Yes, we would need to know what is the essential function of the job.
MR. GEDDES: Q. And so I think you started to give examples before, but I want to follow up on it here. Prior to the time of Mr. Enos's firing, what was your



understanding of the types of reasonable accommodations that could be provided to a disabled employee under the ADA?
A. There's a long list of accommodations depending on the job --
Q. Can you --
A. -- and the --
Q. Can you summarize the different types?
A. Well, that's a long list of different types. I wasn't -- I don't recall ever wanting to open up to give you a long list of types of accommodations.
Q. Well, let me ask it this way. Job restructuring, is that one of them?
A. As long as the essential functions of the job are met.
Q. Well, let me --
A. And are able to be performed.
Q. Job restructuring -- job restructuring including modifications such as reallocating or redistributing marginal job functions that an employee is unable to perform because of a disability and altering when or how a function essential or marginal is performed. Does that sound -- was that your understanding of one possible accommodation that could be done under the ADA?
MS. PARKS: Objection. Calls for a legal

conclusion.
THE WITNESS: Nonessential job functions can be modified, I guess, and that could be a -- an accommodation.
MR. GEDDES: Q. What about permitting use of leave, whether unpaid or paid? Is that a type of accommodation that can be provided under the ADA?
A. Within reason, as long as it is -- the business need is still met, it could be.
Q. Okay. What about reassignment to a vacant position if the employee is qualified for that reassignment?
A. If there is a vacant position, an employee qualifies and meets the criteria and goes through the process, that's also an alternative -- potential accommodation.
Q. Would you agree that under this accommodation of transferring, that the employee doesn't need to be the best qualified individual in order to obtain as a reassignment?
MS. PARKS: Objection. Lack of foundation. Calls for a legal conclusion.
MR. GEDDES: Q. Well, let me -- let me -- let me root this, and then we'll take a quick break here.
Was it your understanding at the time -- prior to



the time of Mr. Enos's firing that the issue of reassignment under the ADA as an accommodation, that the employee who is being reassigned does not need to be the best qualified individual for the position in order to obtain it as a reassignment?
A. No.
Q. That's not your understanding?
A. No.
Q. Okay.
A. Well, at the time.
Q. Okay. We need to take a break for the -- and I forgot to mention if you need to take a break at any time, let us know.
A. Okay.
MR. GEDDES: Thank you.
THE VIDEOGRAPHER: This ends media No. 1 in the deposition of Norma Santoyo. We're off the record at 11:31.
(Recess.)
THE VIDEOGRAPHER: This begins media No. 2 in the continuing deposition of Normo -- Norma Santoyo. We're on the record at 11:45.
MR. GEDDES: Q. Okay. You understand, Ms. Santoyo, you're still under an oath to testify truthfully?



A. Yes.
Q. Okay. Now, you had given some discussion about your understanding of whether or not certain accommodations had to be made, and we'll just leave it to the transcript for that; I don't want to get into that. But my line of questioning picks up on that. So, again, I'm just interested in your understanding of your obligations in HR matters, not necessarily whether you're correct or not on the law.
Prior to the time of Mr. Enos's firing, what was your understanding, if you had any, regarding the concept of undue hardship in connection with the question of whether an accommodation would be reasonable to a disabled employee under the ADA?
MS. PARKS: And I'm going to object that it calls for a legal conclusion. I also want to clarify, Counsel, you're not speaking about Mr. Enos specifically? You're asking a hypothetical question, or are you relating this to Mr. Enos?
MR. GEDDES: I'm not asking this at all about Mr. Enos. The only reference to Mr. Enos is a time frame. And the question is prior to the time of Mr. Enos's firing as a general proposition regarding employers' duties, and that's what my line of questioning is.
MS. PARKS: Okay. And as we start, did we do a



new disc or a new --
MR. GEDDES: Yes.
MS. PARKS: As we start that, I'm going to object to the use of the term "firing," that it misstates the evidence in the case and lacks foundation.
Go ahead.
THE WITNESS: Undue hardship?
MR. GEDDES: Q. Yes.
A. What is undue hardship? Is that your question?
Q. Did you have an understanding prior to the time of Mr. Enos's firing of the concept of undue hardship, what that meant in connection with the question of whether an employer had an obligation to provide a reasonable accommodation under the ADA?
A. Yes, I had an understanding of the concept of undue hardship. The meaning of undue hardship is dependent on each particular scenario.
Q. Okay. And so was it your understanding that an employer does not have to provide an accommodation that would cause an undue hardship to the employer?
A. Yes.
Q. Okay. And I think you started to say this, but let me just confirm this is what you're saying. Was it your understanding, right or wrong, that generalized conclusions wouldn't suffice to support a claim of undue

hardship; that instead, the undue hardship must be based on an individualized assessment of the current circumstances?

MS. PARKS: Objection. Calls for a legal conclusion.

THE WITNESS: My general understanding, that is correct.

MR. GEDDES: Q. Okay. So a case-by-case assessment had to be made regarding undue hardship; that was your understanding?

A. That is my understanding.

Q. Okay. And was it your understanding that a determination of undue hardship should be based on several factors, including the nature and cost of the accommodation needed?

A. That's part of the consideration, yes.

Q. And also the overall financial resources of the facility making the reasonable accommodation?

A. That's also included.

Q. And was your understanding, did it also include the number of persons employed at the facility?

A. I don't recall that being -- I don't know.

Q. Okay. Was it your understanding at the time that it -- another consideration is the effect on expenses and the resources of the facility?



A. Yes.

Q. Was it also your understanding that a factor regarding undue hardship would also include the overall financial resources, size, and number of employees?

A. You need to clarify. You said was it my understanding. You're not talking about specifically this -- Mr. Enos's case?

Q. No.

A. You're talking about in general.

Q. As a general human resource matter.

A. Can you repeat that last question?

MR. GEDDES: Yeah, the last one, if you could read that back, please.

(Record read.)

MS. PARKS: Objection. Calls for a legal conclusion, and it is an improper hypothetical to this witness.

THE WITNESS: I don't recall.

MR. GEDDES: Q. Okay. Now I want to focus on Mr. Enos here. We're leaving the realm of general understanding of matters, you know, as a general principle and focusing on Mr. Enos.

Prior to the time of Mr. Enos's firing, to your knowledge, did anyone at Douglas County or the State engage in the interactive process with Mr. Enos to



determine whether a reasonable accommodation could be made to him for his disability?

A. I don't recall an interactive process.

Q. And prior to the -- when you say you don't recall, you don't recall whether someone did that or are you saying you don't recall that it was done?

A. I don't recall it, period.

Q. So whether it was or it wasn't, you don't recall, or are you saying your recollection is that it wasn't done?

A. I don't recall -- well, can you ask the question again, please?

MR. GEDDES: Sure.

(Record read.)

THE WITNESS: I don't recall that.

MR. GEDDES: Q. Okay. And when you say -- and I apologize for my not understanding your answer. When you say you don't recall that, are you saying you don't recall one way or another or that you don't recall that it occurred?

A. I don't recall one way or the other.

Q. Okay. Thank you.

A. I don't recall -- well, you're asking me a specific question, so I answered I don't recall.

Q. Prior to the time of Mr. Enos's firing, to your



knowledge, did anyone at Douglas County or the State assess whether job restructuring could constitute a form of reasonable accommodation for Mr. Enos's disability?

A. I don't know. I --

Q. You don't recall?

A. I don't remember.

Q. Okay. Prior to the time of Mr. Enos's firing, to your knowledge, did anyone at Douglas County or the State assess whether job provide -- that whether providing unpaid leave to Mr. Enos, including to obtain medical treatment, rehabilitation services, therapy, or recuperation, could constitute a form of reasonable accommodation for Mr. Enos's disability?

A. I don't recall that.

Q. Prior to the time of Mr. Enos's firing, to your knowledge, did anyone at Douglas County or the State assess whether providing job restructuring to Mr. Enos could constitute a form of reasonable accommodation for Mr. Enos's disability?

A. I apologize; I do not remember.

Q. Okay. And do you know one way or another whether anyone considered as an accommodation for Mr. Enos's disability to allow him to return to his position as a probation officer but allowing other officers to assist him when making arrests, transporting probationers, or

Page 86

confronting combative situations?
MS. PARKS: Objection. Calls for speculation.
THE WITNESS: I do not remember that.
MR. GEDDES: Q. These questions I'm asking you to your knowledge.
A. (Shakes head.)
Q. You do not recall?
A. I do not.
Q. Okay. Prior to the time of Mr. Enos's firing, to your knowledge, did anyone at Douglas County or the State assess whether job -- I'm sorry -- whether reassignment, job reassignment, for Mr. Enos could constitute a form of reasonable accommodation for his disability?
A. I just don't recall the --
Q. Okay.
A. -- conversations, discussions.
Q. So I want to switch gears here a little bit and start going through some of these documents. I'm going to mark as the next exhibit -- I believe it will be Exhibit 2.
MS. PARKS: Are you marking this, Counsel?
THE REPORTER: It was Exhibit 1.
MS. PARKS: Okay. Thank you.
THE WITNESS: I don't know what to do with it. Just leave it there?

Page 87

MS. PARKS: Uh-huh.
THE WITNESS: Okay.
MR. GEDDES: All right. We'll mark this as Exhibit 2, please.
(Exhibit No. 2 marked for identification.)
MR. GEDDES: Q. All right. I'd like, if you can, to take a look at these documents. They've been marked as Exhibit 2. If you could look at -- on the bottom right-hand side, those are Bates stamp page numbers. So this, for example, has DC1482. And the second page is 1524, third page is 1525, and the last page is 1537.
All right. So if you can just take a moment and look at these documents, and let me know when you've had a chance to review them.
Okay. Have you had a chance to look at them?
A. Yes.
Q. Okay. Have you seen these documents before?
A. Probably, but I don't recall specifically.
Q. Okay. Do you know what they are?
A. They are workers' compensation claim forms for an on-the-job injury for Mr. Enos.
Q. Okay. Do you recognize any signatures or initials on these documents? If we look at, for example,

Page 88

1482 on the bottom left side, above the words "Supervisor's Signature," can you make out who that name is?
A. Scott Shick.
Q. Okay. Have you seen his signature before?
A. I don't recall but probably.
Q. Okay. And Scott Shick was Mr. Enos's supervisor; is that correct?
A. I actually don't know if he was the direct supervisor or a couple layers above his direct supervisor. I'm not sure. I don't --
Q. Okay. Take a look at DC1524. It's the second page.
A. Uh-huh.
Q. Nine rows down there's a box that reads "Supervisor to whom injury or O/D reported," and the name "Scott Shick - Chief" is there; is that correct?
A. Uh-huh.
Q. Does that refresh your recollection as to whether or not Scott Shick was a supervisor to Mr. Enos?
A. He was the chief in command, so he was in the supervisory chain, yes.
Q. Okay. And if you could go to, please, DC1537.
A. Uh-huh.
Q. What is this document?

Page 89

A. Our third-party administrator that approves, disapproves, and processes our workers' compensation.
Q. So that's Alternative Service Concepts?
A. Alternative Service Concepts. It's a notification to Mr. John that his claim has been accepted.
Q. Now, when you were the human resources director --
A. I think. Let me see.
Q. When you were the human resources director at Douglas County, what was your -- what was your role in interacting with Alternative Service Concepts?
A. I was responsible for them, but directly one of my employees dealt with them more on a direct --
Q. Who was that?
A. -- basis. Vickie Durner (phonetic).
Q. Vickie Durner?
A. Durner? I think it's Durner.
Q. And -- but you would monitor communications from Alternative Service Concepts when they sent them in?
A. Vickie was responsible for that.
Q. Okay. If she had an issue or a question, she would come to you?
A. Yes.
Q. Okay. All right. Do you recognize the name on this document, "Karen Barbee"? Do you know who that is?

A. Well, she was a senior claims adjuster. I don't remember her.
Q. Okay. And do you see the cc there below Karen Barbee's signature?
A. Yes.
Q. And the second line down reads, "Employer: Douglas County."
A. That's correct.
Q. Is it -- is it true that Alternative Service Concepts would send copies of documents sent to the injured worker to Douglas County as a routine matter?
A. Yes.
Q. Okay. So Douglas County would have a lot of these letters if there are a lot of letters that were sent; is that correct?
A. Yes.
Q. Okay. And can you explain, if you know, the process of where in Douglas County a letter from Alternative Service Concepts would go? How was it routed?
A. Sure. This particular letter is a confidential document that would stay -- should stay within the workers' compensation file in human resources. After we were -- received our copy from Alternative Service Concepts, Vickie Durner or whoever was responsible for workers' compensation at HR would interact or connect with



the supervisors to let them know of any limitations or restrictions.
Q. And supervisor here would mean you?
A. No, the sup -- the direct supervisor to the employee.
Q. Okay. And so would these letters come in and be handled without necessarily you having laid eyes on it?
A. Yes.
Q. Okay. When would you get involved in a matter or a letter --
A. If there --
Q. -- typically?
A. If there are any irregular -- any -- any information outside of the norm or there are other employment-related matters that are being addressed, dealt with.
Q. Do you -- did you have any involvement in connection with this document, this letter, 1537?
A. I don't --
Q. Either in receiving it or reviewing it or taking action?
A. I don't remember.
Q. Okay. Do these documents confirm -- collectively this exhibit, do they confirm that Mr. Enos suffered a workplace injury on or about June 21, 2013?



A. They do confirm that there is an approved work-related injury.
Q. Okay. And do these documents confirm that Mr. Enos pursued a workers' compensation claim for this injury?
A. Yes.
Q. Okay. All right. So were these documents made in the course of Douglas County's regularly conducted business activity?
MS. PARKS: Well, I'm just going to object. I'm going to object and ask which documents you're referring to.
MR. GEDDES: We can go one by one.
MS. PARKS: Well, because one of the documents was apparently prepared by Alternative Service Concepts.
MR. GEDDES: Okay.
MS. PARKS: Not Douglas County.
THE WITNESS: Medical provider, so --
MR. GEDDES: Q. Let's go with 1482.
A. Okay. Can you give me --
Q. Was this document made in the course of Douglas County's regularly conducted business activity?
A. Well, the employee filled this form out. I wouldn't call it a regular business activity, but --
Q. Well, did --



A. -- this is --
Q. When workers get injured at --
A. This is a regular -- yes.
Q. Okay. So your answer --
A. Form required.
Q. -- is --
A. Yes.
Q. Okay. And was it the regular practice of Douglas County to make such incident reports for workers injured on the job?
A. Yes.
Q. And was this incident report made at or near the time of Mr. Enos's injury?
A. Within days, yes.
Q. Okay.
A. From -- from looking at the dates on the document.
Q. All right. We can go to the next page, DC1524. Are there portions of this page that are prepared by Douglas County, or is this entire page prepared by another party?
A. This is prepared by -- well, should be prepared by the employer.
Q. Okay. So the entire page?
A. Yes.

Q. Okay. And so was this document made in the course of Douglas County's regularly conducted business activity?
MS. PARKS: I'll stipulate that this document was -- would have been prepared and it's the type prepared by Douglas County regularly in the course of their business.
MR. GEDDES: Okay. Can we just stipulate then that this page satisfies the business records exception?
MS. PARKS: Yes, that's fine.
MR. GEDDES: Okay.
MS. PARKS: And, Counsel, if you'd like to go through some other documents off the record and see if there's any other stipulations --
MR. GEDDES: Okay.
MS. PARKS: -- that we can reach, that would be fine.
MR. GEDDES: That's great. Can we -- all right. Let's go off the record for a second.
THE VIDEOGRAPHER: We're going off the record at 12:05.
(Discussion off the record.)
THE VIDEOGRAPHER: We're back on the record at 12:05.
MR. GEDDES: Okay. I believe that off the record



counsel and -- the counsel has agreed that this exhibit, Exhibit 2, satisfies the business records exception to the hearsay rule such that an objection won't be made on that at trial; is that correct?
MS. PARKS: That's correct.
MR. GEDDES: Okay. Thank you.
Q. Okay. Do you know if the judges of -- in their administrative role regarding the juvenile probation officers, whether the judges in their administrative capacity also monitored the status of workers' compensation claims relating to juvenile probation officers?
A. I'm -- I do not know.
Q. Okay. All right. Did you have an understanding one way or another at the time -- or let me take -- let's take a step back. You don't recall specifically any involvement with monitoring any of the workplace -- or the workers' compensation documents for Mr. Enos; is that correct?
A. I don't recall, no.
Q. To your knowledge, did anyone at Douglas County or the State conclude that or proceed as if this workplace injury amounted to a disability under the ADA?
A. I would not have accepted -- that would not be enough to determine whether it's an ADA-qualifying



condition.
Q. Right. So my question is a little different.
A. Okay. Please clarify.
Q. My question is, to your knowledge, did Douglas County conclude or proceed as if Mr. Enos's first workplace injury, the injury addressed in Exhibit 2, whether that amounted to a disability under the ADA?
A. I don't believe so.
Q. When you say you don't believe so, you're saying, to your knowledge, Douglas County did not conclude or proceed as if --
A. Actually, I don't recall. That's a loaded question. I don't recall that it was.
Q. You don't recall one way or another?
A. Right. I actually don't know --
Q. Okay.
A. -- if it was.
Q. So in your role as Douglas County human resources director, would you have been involved in matters concerning ADA claims?
A. Yes.
Q. Okay. Can you summarize what your role would have been?
A. Again?
Q. Well, in connection with a workers' compensation



claim that also presents an ADA claim.
A. Okay.
MS. PARKS: And this is a hypothetical question?
MR. GEDDES: Q. Yeah, this is not pertaining to Mr. Enos necessarily. Just as a general matter.
A. I would have -- hypothetically, if we had enough information to lead us to think that there was an ADA-qualifying condition, I would have engaged the division leadership to see if there was any -- well, to initiate the interactive process. That document in and of itself does not tell me that it's an ADA-qualifying condition.
Q. Right. And I'm certainly not even asking about this document, per se.
A. Okay.
Q. I'm just asking as a general matter the question. So I think your answer is -- but I want to clarify. Are you saying that if --
Can you read back her answer, please?
THE WITNESS: If you don't mind reading the question first and then my answer, if you don't mind.
MR. GEDDES: That's fine.
(Record read.)
MR. GEDDES: Q. And when you say that you would have engaged or -- engaged or initiated with others to

engage in the interactive process, would you have been the one who would have started the ball rolling or would someone else have done that?
A. It would have been me starting the ball rolling.
Q. Okay. Then do you have any specific recollection of ever initiating such a process for Mr. Enos's workplace injuries?
A. I don't recall that.
Q. Okay. I'm going to go ahead and mark as the next exhibit Exhibit 3.
(Exhibit No. 3 marked for identification.)
MR. GEDDES: Q. Okay. Take a moment, if you could, and just review that.
Have you seen these documents before?
A. I don't recall seeing them.
Q. Do you -- did you receive these types of documents when you were the human resources director at Douglas County?
A. These types of documents, I would have received or seen them.
Q. Okay. And does this document excuse Mr. Enos from work and put him on light duty? Can you tell from looking at this document?
A. Yes.



Q. Okay. And do you know if anyone of your -- at your office -- is there any indication, any stamp on here that indicates whether or not your office or Douglas County received this? For example, if we look at 1580, it says, "Received March 6, 2014 ASC." Isn't that Alternative Service Concepts?
A. I believe it is. There is no marking that says Douglas County HR received it.
Q. Okay. But you believe that this is a document that Alternative Service Concepts received?
A. I would be making an assumption.
Q. Okay. Let's look at the next page. On the very bottom it says, "Received By Karen Barbee ASC at 9:27 AM, March 10, 2014." Does that signify anything to you based on your experience working with ASC?
A. I don't recall their stamp, but I would have no reason to believe that it's not authentic stamp.
Q. In the top right corner of page 1585, it says, "Received March 10, 2014 Human Resources." Is that the stamp for Douglas County resources [sic]?
A. I believe so.
Q. Does that indicate to you that Douglas County did receive this document?
A. It does.
Q. And it says, "May return to work March 17, 2014,



light duty." Do you see that?
A. Yes, I do.
Q. And ordinarily -- not necessarily with respect to Mr. Enos but ordinarily, when Douglas County received this type of instruction from a medical provider, what typically would be done with regard to a notation "may work" as a certain date and then the words "light duty" appear?
A. The action would depend on the case them -- itself because there's a lot of complexities. I don't recall if Mr. Enos was off or already on light duty, how long he had been out. On its face -- when we get something like this, we would make sure we contact supervision to ensure that the employee, if and when returning, would not be put in a position where they would aggravate the injury.
Q. Okay. All right. I can then mark as the next exhibit, please, Exhibit 4.
(Exhibit No. 4 marked for identification.)
MR. GEDDES: Q. All right. If you could just take a moment and look at these documents. And while you're doing that, if we could just go off the record.
THE VIDEOGRAPHER: We're going off the record at 12:16.



(Discussion off the record.)
THE VIDEOGRAPHER: We're back on the record at 12:17.
MR. GEDDES: Q. Have you had a chance to look at these documents?
A. Briefly, yes.
Q. Okay. What are these documents?
A. Workers' compensation -- an incident report, an employer's report, medical form of initial treatment.
Q. Okay. Do you recognize any signatures on these documents?
A. Well, I don't recognize them, but I can read Vicky Sauer-Lamb's signature.
Q. Okay. And that's on 1526?
A. 1526.
Q. Okay.
A. 1527 is Sarah Christensen.
Q. And we haven't talked about her yet. Who is Sarah Chris -- who was Sarah Christensen?
A. An employee of the HR department in Douglas County. Vickie Durner left and she was put in as a backup.
Q. Okay.
A. I believe.
Q. Do you recall any communications with Sarah

Page 102

Christensen about Mr. Enos?
A. No, I don't.
Q. Okay. All right. Do these documents confirm that Mr. Enos suffered a workplace injury, which I'm calling the second workplace injury, on June 17th, 2014?
A. Yes.
Q. And do these documents confirm that Mr. Enos pursued a workers' compensation claim for this second workplace injury?
A. Yes.
Q. And you were the human resources director of Douglas County on June 27, 2014, when Mr. Enos was injured in the second workplace injury; isn't that right?
A. Yes.
Q. So what specific oversight or role did you have concerning Mr. Enos's workers' compensation claim for this second workplace injury?
A. The same process I've described before.
Q. Okay. Do you recall reviewing documents received in connection with Mr. Enos's workers' compensation claims for the second workplace injury?
A. I don't recall.
Q. Okay. If we can turn to pages DC1526 and 1527 and 1528 and 1529. We'll leave off at 28, so 1526 to 1528. Were these documents made in the course of Douglas

Page 103

County's regularly conducted business activity?
A. Yes.
Q. And was it the regular practice of Douglas County to make these documents for workers injured on the job?
A. Yes.
Q. And were these documents made at or near the time of Mr. Enos's second injury --
A. Yeah.
Q. -- on June 17, 2014?
A. Yes.
Q. Now, if we turn to 1529, I think, I believe -- well, it appears that 1529 continues onto 1530, and I'm happy to take it one by one.
So if we look at 1529, was any portion of 1529 prepared by Douglas County?
A. I can't read it, but...
Q. If you can't read it --
A. I don't believe so.
Q. Okay.
A. I'm not sure actually.
Q. What about 1530? Same question: Was any of this prepared by Douglas --
A. No.
Q. -- County? Okay. And the last page, 1196, this is a Notice of Claim Acceptance confirming that this

Page 104

claim, this workers' compensation claim for the second injury, was accepted; is that correct?
A. Yes.
Q. And you previously gave an answer about how you would have typically handled a situation where a claim was potentially both a workers' compensation claim and an ADA claim. Is your testimony the same as you gave for the other document as it was for this?
A. Yes. Again, this in and of itself put -- would normal -- or could have -- doesn't necessarily trigger the ADA process.
Q. Okay. But if -- in situations where a workers' compensation claim did, you would have initiated a process with other folks to engage potentially in interactive process; is that correct?
A. If there was enough information to lead us to think that there was an ADA condition, yes.
Q. And that would have been you who would have initiated it?
A. Yes, and it provides me an opportunity to clarify.
Q. Okay.
A. My office worked very closely with the attorney's office, the dis -- district attorney? Not city attorney's office. So it would be -- it would have been a --

Page 105

together, I guess. Some -- some -- they handle some things; sometimes we handle them; sometimes we handle it collectively.
Q. Okay. Now, I'm not asking you -- at least at this point I'm not asking you for attorney-client communications, but what I'm asking you for, if you know, are the identities of attorneys that you worked with, if you recall, on Mr. Enos's case.
A. I recall working with Justina -- I don't remember her last name.
Q. Is it -- does it begin with a C? Cava --
A. Oh.
Q. One second. I think I can find it for you.
A. Justina.
MS. PARKS: Justina Caviglia --
THE WITNESS: There you go.
MS. PARKS: -- worked for the district attorney's office --
THE WITNESS: Justina.
MS. PARKS: -- at the time in question.
MR. GEDDES: Okay. All right. Thank you.
Q. All right. Do you know -- to your knowledge, did Douglas County conclude or proceed as if this second workplace injury amounted to a disability under the ADA?
A. I don't recall.

Q. Okay. And if it did, you would have been involved; isn't that correct?
A. Yes.
Q. Were you present at a meeting between Mr. Shick, Ms. Sauer-Lamb, and Mr. Enos after his second workplace injury where the topic of his light-duty status was discussed?
A. I don't remember.
Q. Did you ever learn of such a meeting?
A. I don't recall.
Q. Did you ever observe or receive information that Mr. Shick and/or Ms. Sauer-Lamb were hostile to Mr. Enos in any meetings regarding light-duty status?
A. I don't remember.
Q. Do you ever -- did you ever observe or receive information that Mr. Shick and/or Ms. Sauer-Lamb attempted to persuade, intimidate, or bully Mr. Enos into quitting his job after his first or second workplace injury?
A. No.
Q. Did you ever observe or receive information that Mr. Shick and/or Ms. Sauer-Lamb transferred Mr. Enos's cases away to other juvenile probation department workers after his second workplace injury?
A. I don't recall that.
MR. GEDDES: Okay. If I could go ahead and



please mark the next exhibit, 5.
(Exhibit No. 5 marked for identification.)
MR. GEDDES: Q. If you could take a moment and review this, please.
Okay. Have you seen this document before?
A. I don't recall seeing the document.
Q. Okay. Are you able to tell from looking at it what it is?
A. Yes.
Q. Okay. What is this document?
A. It's a memo from Chief Shick to Officer Enos related to a duty station assignment.
Q. And what is a duty station assignment?
A. Well, it's titled "Duty Station Assignment." It's notifying him of a change in his duty due to the medical circumstances at hand at the time. And he's to report to duty -- let's see. Asked to report to duty on July 27th -- 21st, 2014.
Q. Okay. Now, did you receive a copy of that document?
A. I don't know.
Q. Were you involved in any discussions with anyone about this document?
A. I don't recall specifically.



Q. Given your title as the --
A. It's possible I could've --
Q. -- director of human --
THE REPORTER: I'm sorry.
MS. PARKS: Can you not interrupt her? The court reporter is having a hard enough time.
MR. GEDDES: I think I was in the middle of actually a question when I got interrupted, but that's okay. We'll work better to stop interrupting each other.
Q. Tell me when you're ready for my question.
A. I'm ready for your question.
Q. All right. Thank you. Given your title as the human resources director of Douglas County, would it be ordinary and customary for you to receive this type of document?
A. Yes, but I don't always, so...
Q. Okay. All right. Does a duty station assignment of the magnitude set forth in this document trigger a concern for ADA interactive process?
MS. PARKS: Objection. Calls for speculation. Calls for a legal conclusion.
MR. GEDDES: Q. Do you understand the question?
A. Can you repeat the question?
Q. Yes.
(Record read.)



THE WITNESS: No.
MR. GEDDES: Q. Okay. Why not?
A. This stand alone, it doesn't. Employees unfortunately get injured often in a job, and there are restrictions that typically are limited in duration. For me to say -- to say this is an ADA -- triggers the ADA process, I would need to look at the totality of the circumstances related to Mr. Enos's medical circumstances.
Q. And that would have been your job to do?
A. I would have been a part of it.
Q. To your recollection, is it -- was it common for a caseload to be assigned to other officers for insignificant injuries?
MS. PARKS: Objection. Lack of foundation. Calls for speculation on the part of this witness as to what was done by JPO.
THE WITNESS: And I don't know if it was an insignificant injury, so...
MR. GEDDES: Can you answer the question, please?
(Record read.)
MS. PARKS: Same objection.
THE WITNESS: To my recollection, is it -- to -- can you repeat that for me?
(Record read.)
MS. PARKS: Calls for speculation on the part of

this witness.
THE WITNESS: I can't answer that question. You're asking me specifically for Enos, whether his injury was insignificant?
MR. GEDDES: Q. No. I'm happy to rephrase it.
A. Please rephrase it because insignificant is --
Q. Are you -- do you understand --
(Reporter interruption.)
THE WITNESS: I apologize.
MR. GEDDES: We'll start over.
Q. All right. Was it uncommon based on -- let me say it this way. Based on your experience and what you witnessed and observed, did you observe it to be common or uncommon that a juvenile probation officer's caseload was transferred away?
MS. PARKS: Objection. Calls for speculation on the part of this witness as to what the --
THE WITNESS: I don't recall.
MS. PARKS: Let me finish my objection, please. Okay.
THE WITNESS: Sorry about that.
MS. PARKS: Go ahead.
MR. GEDDES: Q. Go ahead. I didn't hear your answer.
A. If it was common for caseload to be assigned out



to others?
Q. Let me -- let me ask it this way. Is it --
A. I'm not understanding your question.
Q. As the human resources director of Douglas County, did you ever observe instances where a juvenile probation officer's caseload was transferred away?
A. No.
Q. Do you know whether or not Mr. Enos actually ever worked in the capacity stated in this letter, in a support role for the primary juvenile detention staff person on duty?
A. No.
Q. Do you know what that phrase even means?
MS. PARKS: What phrase?
MR. GEDDES: Q. The phrase "support role for the primary juvenile detention staff person on duty."
A. No. I can only make assumptions as to what that means.
Q. The last line reads, "A staff person will always be on duty with you."
Do you know what that means?
A. No.
Q. So you don't know whether that means you'll be working in an environment where other people are, or, on the other hand, someone will be on duty to assist you?



MS. PARKS: Objection. Asked and answered. She said she does not know what that means.
MR. GEDDES: Q. You can answer the question.
A. Can you repeat the question?
Q. Yes.
(Record read.)
MS. PARKS: Same objection.
THE WITNESS: I do not know.
MR. GEDDES: Q. Okay. Now, do you know one way or another whether Mr. Enos ever got his cases back that are referenced in this letter as being transferred away?
A. I do not know.
Q. Now switching gears here, did Douglas County or the State of Nevada ever assign Mr. Enos to a light-duty post working in the County library?
A. I don't know. I should correct that. I don't recall.
Q. Okay. What involvement, if any, would you have in the process of assigning a worker a light-duty position in a County library?
A. What involvement would I have. Well, I don't recall specifically discussions or anything related to Mr. Enos's case, but if there are -- if somebody needs to come back to work and there's light duty, I would have been in the conversation with the supervisor in



identifying light-duty assignments, whether it be within their department or potentially other departments, if -- if -- if there are other opportunities.
Q. How does that work? Is a light-duty assignment an assignment where a position is open or is -- can it be an assignment to a position that doesn't have any openings but they'll put someone on there to help out? Do you understand the question?
A. Uh-huh.
Q. How does that work? How did that work at Douglas County juvenile probation -- or I should just say Douglas County. How did that work?
A. Just Douglas County in general?
Q. Yes.
A. It doesn't have to be an allocated or budgeted position.
(Ms. Parks exits the room.)
THE WITNESS: So if there's work tasks that can be done while on workers' compensation, it's preferable to return somebody to work on a light duty than have them be off if they're able to perform some kind of function. So it doesn't have to be an open position. It could be a special project. It could be another job if it's available.
(Ms. Parks returns.)

THE WITNESS: There's just a variety of light-duty assignments that can be used.
MR. GEDDES: Q. So if a worker, for example -- based on your testimony, if a worker is assigned to a library for light duty, it might be that there's an opening in that position or it might be that there's no published opening in that position; there's just a project that needs to be done there that that worker can help with; is that correct?
A. There's work that can be performed without aggravating the worker's injury.
Q. Okay. But my specific question is it doesn't -- it isn't necessary that there be a vacant job opening at that position; it could just be that there's work to be done there?
A. Yes, on a limited duration period of time.
Q. And how do you go about typically evaluating what light-duty positions are available? Or how did you go about typically?
A. Typically -- typically it would be a conversation with the department or division managers. Sometimes supervisors or managers would report there's work beforehand, so it's just being aware through communication of the entire organization what the needs are of other departments and divisions or within those, so...



Q. And sometimes would you pick up the phone and do cold calling, call around to see if there's light duty available?
A. I would not, no.
Q. Would someone in -- under your direction or supervision do that?
A. It would not be customary, no.
Q. So are you relying then on the information that you know about beforehand as to what's open?
A. We're relying on continuous communication amongst department directors and managers on the -- what is going on in each of the departments, which happened on a regular basis.
Q. Are there -- were there ever situations where these types of folks, managers and whatnot of these various other departments or divisions, would say, "I don't want that worker on light duty"?
A. I don't recall that ever happening.
Q. Okay. And you don't recall ever actually engaging in efforts to obtain light duty for Mr. Enos; is that correct?
A. I don't recall that, no.
Q. And you don't recall whether anyone else did; is that correct?
A. That's correct.



Q. Now, is the process -- was the process the same for evaluating light-duty positions for workers, whether it was prompted by a workers' compensation claim or whether it was an ADA claim? Was the process the same for both?
A. The process is not the same for both.
Q. Okay. What process was followed at Douglas County when attempting to find light work, light-duty work, for a worker under the ADA as compared to a workers' compensation claim?
A. Well, a workers' compensation claim typically would be limited in duration so that the work assignment could be temporary or limited with an expected end date while the person recovers from the injury and is able to come back to full function. Typically a person with an ADA-qualifying condition, it's -- well, it's a longer term or potentially lifelong limitation where there would be -- potentially it could be short-term or long term but mostly it's long term, so you're looking for long-term placement so -- or accommodations.
Q. So --
A. I mean, it's more in-depth than that for each, but in a nutshell.
Q. Generally speaking, is the process for obtaining light duty for an ADA claim more involved and more



in-depth than typically that is for a workers' compensation claim?
A. Yes, I would agree with that.
Q. Did you ever observe or receive information that Mr. Shick and/or Ms. Sauer-Lamb expressed that they or anyone at Douglas County were not happy with Mr. Enos's light-duty assignment?
A. I don't remember that.
Q. Did you ever observe or receive information that Mr. Shick and/or Ms. Sauer-Lamb refused to allow Mr. Enos to take training while on the job?
A. I'm not aware of that.
Q. Do you know one way or another whether it was customary at the office to allow officers to take training courses while on the job?
A. I would only assume that it would be.
Q. I don't want you to assume.
A. So I don't re -- I don't know. I don't remember.
Q. All right.
(Telephonic interruption.)
MR. GEDDES: Q. Okay. Do you recall whether Mr. Enos took medical leave in October, late October of 2014, to obtain further medical treatment or recuperation for his injuries or disabilities arising from his workplace injuries?

A. I don't recall that.
Q. Okay. What we'll do is we'll mark this as the next exhibit. This will be Exhibit 6.
Actually you have two. Maybe you have two.
MS. PARKS: I have two.
MR. GEDDES: Yeah, thank you.
(Exhibit No. 6 marked for identification.)
MR. GEDDES: Q. Okay. If we could focus on the first two pages ending in 1677 and 1672. Have you seen these documents before?
A. I assume -- I don't recall seeing them.
Q. Okay. All right. Let's turn to the third page, 463. Have you seen this document before?
A. 463?
Q. Yes.
A. I don't recall seeing this document.
Q. The bottom portion of 463 is from Sarah Christensen, and that would be someone who works at Douglas County under your supervision?
A. Yes.
Q. And do you recall whether that's her e-mail address, SChristensen@douglasnvus?
A. Yes.
Q. And this was sent to Karen Barbee; is that



correct?
A. Appears so.
Q. The text of the e-mail is very short. It says, "Hi Karen. John Enos has exhausted his FMLA. We are looking for information on where he is in the worker's comp process, when he might be evaluated to see if he will be able to perform his job duties or not."
Based on your handling of workers' compensation claims, do you have an understanding of what that means?
A. Yes.
Q. Can you tell me what your understanding is?
A. Because he has exhausted his FMLA-entitled leave, the -- Sarah, who was responsible, I'm assuming, at this time for workers' compensation is just looking -- getting a status check on where he's at with the workers' comp process.
Q. What is -- what is the phrase "to see if he will be able to perform his job duties or not" mean?
A. To determine if he has been -- if he is -- what's the phrase? -- evaluated to see if he's going to be permanently limited in doing his performance tasks or if there is a continued need for light duty. I don't recall where -- I don't know where he was at in the process at this point.
Q. What were Sarah Christensen's job duties?



A. At this time she was the liaison for workers' compensation, and I do not recall what other functions she had at the time.
Q. Okay. And so the -- the top portion of this reads:
"Hi, Sarah. I would prefer to give you a better estimate after we receive Dr. Morales's report. If he has shoulder surgery, it will probably be six more months at the least, unless the County has light duty for him. Right now, he is TTD for the wrist. I'll let you know when we have that report from Dr. Morales."
Based on -- based on your job functions and experience as the human resources director, do you have an understanding of what that means?
A. Yeah. He's waiting on his shoulder surgery, and that as far as his wrist, he's -- I think it's total temporary -- temporary disabled use of the wrist.
Q. So this document, nowhere does it reference evaluating whether Mr. Enos could perform his essential job functions with a reasonable accommodation; isn't that correct?
A. Yes.



Q. Did anyone at Douglas County or the State of Nevada evaluate whether the County had light duty for him as referenced in this document?
A. I don't know. I don't recall.
Q. Okay. We'll mark as the next exhibit, please, Exhibit 7.
(Exhibit No. 7 marked for identification.)
MR. GEDDES: Q. If you could please look at this document.
A. Just looking at the dates.
Q. Have you seen this document before?
A. I don't recall seeing it, but I probably --
MS. PARKS: Don't guess.
THE WITNESS: Oh, I don't recall seeing it.
MS. PARKS: It's whether you saw it or not was the question.
THE WITNESS: Okay.
MR. GEDDES: Q. Do you recall the question of whether or not a doctor had stated that Mr. Enos could return to work on light duty on January 29th, 2015?
A. I don't recall that, no.
Q. And do you recall whether or not a doctor had sent an order indicating that Mr. Enos could return to full duty in approximately three weeks from the date of

January 28th, 2015?
A. I don't recall.
Q. Okay. Let's turn to a different area here. To your knowledge, did Mr. Enos contact Ms. Sauer-Lamb on or about January 28th, 2015, to inform her of his doctor's release of him back to light duty?
A. No.
Q. I'm sorry. You're saying he did not -- to your knowledge, he did not do that or you don't know?
A. Well, to my knowledge, which I don't remember it, so it's not to my knowledge. I don't remember that.
Q. You don't recall?
A. (Shakes head.)
Q. Okay. To your knowledge, did Mr. Enos ask Ms. Sauer-Lamb if he should report to the County library for light duty?
A. I have no knowledge of that.
Q. Do you recall whether Ms. Sauer-Lamb ever contacted you or anyone in HR concerning the matter of Mr. Enos returning to the County library for light duty?
A. I don't recall.
Q. Now, Sarah Christensen was the Douglas County human resource manager; isn't that correct?
A. No. She was a human resource technician.
Q. Okay. Do you know whether or not Ms. Christensen



called Mr. Enos to discuss these matters on or about January 28th, 2015?
A. I do -- I do not recall that.
Q. Do you know one way or another whether Ms. Christensen called him back and left a voicemail for him or a message requesting that he call her to discuss the matter the following day, January 29th, 2015?
A. I don't recall that.
Q. All right. Let's go ahead and mark as the next exhibit Exhibit 8.
(Exhibit No. 8 marked for identification.)
MR. GEDDES: Q. All right. If you could take a look at this document, please.
All right. Have you seen this document before?
A. I don't recall seeing this document.
Q. Do you recognize the handwriting on this document as belonging to anyone?
A. It looks like Sarah's handwriting.
Q. Sarah Christensen?
A. Yes, but I am not positive.
Q. Okay. The first part of the message is dated January 30th, 2015, and it appears to read, "Left message for John 1/30/15. Told him we have no work that could accommodate his doctor's notes." Does that appear to be



what it says?
A. Yes.
Q. Do you have any understanding as to what that meant?
MS. PARKS: Calls for speculation.
THE WITNESS: Only what it says, could not accommodate his restrictions. Which I don't know what those are unless I look at the documents.
MR. GEDDES: Q. But you said that Sarah Christensen worked in workers' comp; is that correct?
MS. PARKS: Objection. Asked and answered.
MR. GEDDES: Q. Is that correct?
A. I'm sorry. Say that again.
(Record read.)
THE WITNESS: That was part of her job function for a short period of time.
MR. GEDDES: Q. So if this message were written by Sarah Christensen based on your recognition of her handwriting which appears to be hers, would she have been making that note from the perspective of workers' compensation?
MS. PARKS: Objection. Calls for speculation. Misstates her testimony as to whether or not she certainly recognized this as Ms. Christensen's handwriting.
MR. GEDDES: Q. Do you understand the question?



A. Yes, but I would be making an assumption.
Q. Well, based on her involvement and based on your supervision of her in your department -- you're the human resources director and she works underneath you --
A. Uh-huh.
Q. -- was it your understanding -- I think you testified earlier that her involvement related to workers' compensation. Would this conversation have delved away from workers' compensation potentially into ADA or would it have been limited to workers' compensation based on her role and function, if you know?
MS. PARKS: Objection. Lack of foundation. Calls for speculation on the part of this witness.
THE WITNESS: I don't know.
MR. GEDDES: Q. Okay. Did Sarah Christensen have job duties concerning ADA accommodation?
A. Yes.
Q. Can you summarize them?
A. In HR everybody has to be aware of the basics. And in workers' compensation, part of it is being aware of the ADA.
Q. Okay. So -- but you don't know that -- this message left for John uses the phrase "could accommodate his doctor's notes." You don't know whether that means could accommodate a disability under the ADA; is that

correct?
A. That's correct.
Q. Now, there's a note right below that that says, "1/30/15, Discontinued key card." Do you see that?
A. Yes.
Q. What does that mean?
A. I'm assume -- well, discontinued key card is what that means.
Q. Does that mean John Enos's authorization to enter the building?
MS. PARKS: Calls for speculation.
THE WITNESS: I don't recall what accesses -- I'm assuming it would be to discontinue access to some facility. I don't know what that is.
MR. GEDDES: Q. Okay. And doesn't this note essentially mean that Mr. Enos was denied key card access on that day to the work facility?
MS. PARKS: Objection -- objection. Calls for speculation on the part of this witness.
THE WITNESS: I can't answer that solely based on this.
MR. GEDDES: Q. Did you ever have a conversation with anyone regarding Mr. Enos's key card access?
A. I don't recall that.
Q. And based on your experience and knowledge and



function as the human resources director of Douglas County, are there situations when an employee's key card access is discontinued? Were there situations?
A. Yes.
Q. And did some of those situations involve scenarios where an employee was on medical leave?
A. I don't recall that.
Q. What were -- what were the scenarios where a key card would be discontinued based on your experience and knowledge?
A. Either a separation from service for various reasons, whether it be voluntary or not. Putting somebody out on leave pending either an investigation or -- I think that wraps it up in a nutshell.
Q. The first part of your answer involving separation of employment, to your knowledge, were discontinuation of key cards ever carried out before the separation of employment?
A. Yes.
Q. And why would that be?
A. If the individual's out away from work and not authorized to be back to work for any reason while the process is finalized for separation.
Q. So it would be a discontinued key card pending the termination or separation; is that correct?



A. In -- not specific to Mr. Enos because I don't recall. That is a scenario that's possible.
Q. And do you know based on your experience as the human resource director who is typically involved in that decision-making process to discontinue a key card before the actual separation of employment occurs?
A. If I recall correctly, in Douglas it would be the HR director, the division or department head or high-level manager, and the city attorney's office. Not the city attorney's office. That's my -- district attorney's office.
Q. So when you're describing a high-level manager, would that be -- if this were relating to Mr. Enos, that would be somebody like Mr. Shick?
A. Yes.
Q. Okay. That would be Mr. Shick?
A. Yes.
Q. Did you have any involvement in the discontinuation of Mr. Enos's key card as indicated here on 1/30/15?
A. I don't recall.
Q. Do you know whether Mr. Shick had any involvement in the discontinuation of Mr. Enos's key card?
A. I just don't remember.
Q. Do you have any knowledge as to whether



Ms. Sauer-Lamb had any involvement in the discontinuation of the key card here?
A. Same answer. I don't -- I don't remember.
Q. And would you have the same answer for Judge Young and Judge Gibbons?
A. Yes.
Q. Do you know whether Mr. Enos called Ms. Christensen back on January 29th, 2015, at or about 8:00 o'clock in the morning?
A. I --
MS. PARKS: Objection. Calls for speculation.
MR. GEDDES: Q. Okay. My question specifically is do you know.
A. I don't know.
Q. And do you know whether Ms. Christensen told Mr. Enos in a phone call on January 29th, 2015, words to the effect that Douglas County could not accommodate his disabilities or provide him with light duty?
MS. PARKS: Objection. Lack of foundation. Calls for speculation.
MR. GEDDES: Q. You can answer the question.
A. I don't know. I don't recall.
Q. Do you know whether Ms. Christensen advised Mr. Enos words to the effect that although his doctor had released him, a different doctor for Mr. Enos named

Page 130

Dr. Morales issued an order for light duty with no pulling, pushing, or lifting?
MS. PARKS: Objection. Lack of foundation. Calls for speculation.
THE WITNESS: I -- can you repeat that, please?
(Record read.)
THE WITNESS: No.
MR. GEDDES: Q. What if any evaluation of providing a reasonable accommodation for Mr. Enos did anyone at Douglas County or the State of Nevada perform in connection with denying him accommodation or light duty here?
MS. PARKS: Objection. Calls for speculation. Lack of foundation.
THE WITNESS: I don't remember.
MR. GEDDES: Q. In connection with his injury, do you know whether anyone at Douglas County or the State of Nevada evaluated whether providing Mr. Enos with assistance from other probation officers would be a reasonable accommodation for a disability?
A. Apologize. I just don't remember.
Q. To your knowledge, did anyone -- did you or anyone at the Douglas County or State of Nevada inquire as to alternate jobs that were available at Douglas County for which Mr. Enos might be qualified to be transferred to

Page 131

as an alternative to him losing his employment altogether?
A. I don't remember.
Q. Let's go ahead and mark the next exhibit. This will be Exhibit 9.
(Exhibit No. 9 marked for identification.)
MR. GEDDES: Q. All right. I don't know that you would have ever had an opportunity to see this document in its current form, but do you recognize what this document is?
A. I don't -- yes.
Q. What is this document?
A. I don't remember seeing it in -- back then, but I'm familiar with the system because I have the same system in Modesto. It looks like it is the -- a job listing of all the positions that have been open or advertised -- opened or recruited for going back to August of 2014 to -- or it's just all over the map, I guess, the dates.
Q. And in your capacity as the human resources director at Douglas County, did you have from time to time an opportunity to take a look at what jobs were available in this database?
A. Yes.
Q. And why would you do that?

Page 132

A. Why would I do that?
Q. (Nods head.)
A. Sorry. I'm overthinking the question probably. But as a director of HR, I'm responsible for helping managers and directors fill their vacancies. So attracting and retaining talent and being aware of what positions are vacant and what our previous recruitment efforts were is -- will help better support the County.
Q. And during your entire tenure at Douglas County as the human resources director, did you ever consult this database to evaluate whether an employee who had a disability could be accommodated by transferring or rehiring to positions listed in the database?
A. I don't recall that, but I would have been aware of open positions. In Douglas County -- I've never seen this document in Douglas County that I recall.
Q. I'm not sure if I understand your answer. Let me ask again. Do you specifically recall ever having consulted the database that produces these listings in Douglas County to evaluate whether an employee with an ADA disability could be transferred to an available position in the database?
A. No.
Q. So that's you don't recall or you didn't do it?
A. I did not refer to this database, whichever that

Page 133

database is that I would see this information, in determining whether it was something I could use for the ADA accommodation process, unless you want to rephrase the question.
Q. Well, how many databases were there, to your knowledge, that contained a listing of open positions at Douglas County?
A. One. I think why I'm mixed up is we don't call it database but okay. The listing of job openings at Douglas County.
Q. That's what you would consult or that's what's available?
A. What's -- yes, that's one of the things we would look at.
Q. Okay. And so when I'm saying "database," I'm saying that the information exists in a computer file, a database of listings, however it's produced. Here it's produced on paper; it could be reproduced on a computer screen.
My question to you was how many databases existed which listed openings in Douglas County? Is it one database that folks from different departments can access, or is there more than one database?
A. One database.
Q. Okay. And is there a name for that database?

A. NEOGOV.
Q. NEOGOV?
A. NEOGOV.
Q. NEOGOV. Okay. Is this document, to your understanding, a publication of openings from the database NEOGOV? Can you tell one way or another?
A. It looks that way, yes.
Q. Okay. So did you ever consult the NEOGOV database to evaluate whether an ADA disability could be accommodated by transferring the disabled worker to an open position listed in the NEOGOV database when you were at Douglas County?
A. I don't recall a specific example of that, but it is a process in the traditional ADA accommodation process.
Q. But your testimony here is you don't recall having done that?
A. I don't recall having done that.
Q. Do you recall directing anyone to do that?
A. I do not.
Q. Do you recall whether Mr. Shick did that, consulted a database, the NEOGOV database, to determine whether there was an open position for which an employee with an ADA disability could be transferred as an accommodation for --
MS. PARKS: Objection. Calls for speculation.



THE WITNESS: No.
MR. GEDDES: Q. Okay. I'm not asking you whether you are a mind reader and know whether he secretly did it behind --
A. No, I don't recall. You asked if I recalled. I don't recall.
Q. All right. I'm saying do you have knowledge about whether he did or not.
A. I do not.
Q. Okay. And so the same question to keep it -- to keep it quicker, same question for Ms. Sauer-Lamb. Do you have any knowledge that she did such things?
A. I do not have -- recall that.
Q. Do you have any knowledge that Judge Young or Judge Gibbons did that?
A. Same answer. I don't know.
Q. Okay. Now, do you recall writing a letter to Mr. Enos in February of 2015 advising him that he needed to report back to work?
A. No. I don't recall.
Q. Okay. All right. Let's look at the next exhibit. This is going to be Exhibit 9.
THE REPORTER: 10.
MR. GEDDES: Oh, you're right. Thank you. Exhibit 10.



(Exhibit No. 10 marked for identification.)
MR. GEDDES: Q. All right. If you could take a moment and look at this, please.
Okay. The -- I believe we have to do something with the videotape here, so we'll take a quick break, five minutes. Thank you.
THE VIDEOGRAPHER: This ends media No. 2 in the deposition of Norma Santoyo. We're off the record at 1:12.
(Recess.)
THE VIDEOGRAPHER: This begins media No. 3 in the continuing deposition of Norma Santoyo. We're on the record at 1:24.
MR. GEDDES: Q. Ms. Santoyo, we just took a break. You understand that you're still under oath to testify truthfully?
A. Yes.
Q. Okay. Now, I had shown you before the break Exhibit 10. It's been Bates stamped DC1304. Have you seen this document before?
A. Sorry. It's like I should have -- I know I wrote it, but I don't recall seeing it. But, yes, it's my document, I guess.
Q. Okay. So that's your signature and you wrote



this?
A. That's my signature, yes.
Q. And you wrote this?
A. Yes.
Q. Okay. And you cc'd at the bottom of this document Mr. Shick and Justina Caviglia, deputy district attorney; isn't that correct?
A. Yes.
Q. Who directed you to write this letter?
A. Nobody. I don't recall, but I wouldn't have been directed.
Q. What prompted you to write this letter?
A. As a director or HR manager, I'm responsible for overseeing our FMLA program, and so this is notifying Mr. Enos of his FMLA status.
Q. Well, the first sentence reads, "Our records indicate that you have been on Family Medical Leave since October 21, 2014. As you know, the FMLA provides employees up to 12 workweeks of job protected leave for absences caused by a serious health condition. Since your serious health condition is under a workers' compensation claim, your FMLA has run concurrently to that claim.

This notice does not impact your
workers' compensation claim."
What did you mean when you wrote, "Since your serious health condition is under a workers' compensation claim, your FMLA claim has run concurrently to that claim"?
A. An employee out on a health condition that limits his or her ability to do the work, whether it be on the job or off the job, would still fall under the 12 work -- 12 workweek -- 12 -- the FMLA umbrella.
Q. And so when writing this, you concluded that his -- his condition, his health condition, was a serious health condition; is that correct?
A. That's what the letter says, yes.
Q. And so do you know whether his serious health condition that you're referencing there triggered an obligation, to your understanding, to accommodate his disability under the ADA?
A. It doesn't necessarily mean that it is an ADA-qualifying health condition, so I don't recall any work on that end. I -- this letter in front of me tells me he's notified of his FMLA status, not an ADA status.
Q. Okay. And the second paragraph reads, "Our [sic] indicates your leave entitlement under the FMLA has expired effective January 21, 2015." Now, this notice is



provided on February 13th, 2015, so how does -- how did that work? His FMLA expired, but you still -- the County still kept him employed beyond that; is that correct?
A. I -- when did -- I don't recall -- when did he -- I don't recall actually. I'd have to see the dates in front of me to answer that.
Q. Is it -- do you ordinarily send letters regarding the expiration of an FMLA after it's expired or do you normally give -- did you normally give employees warning before it expired?
For example -- and this is just a typical example. I'm not asking you about Mr. Enos. "Hey, Jane Doe. Your FMLA is going to expire in two weeks. Please make arrangements to return to work," something like that. Tell me how that worked.
A. When possible, advanced notice is -- is preferred depending on -- but not always depending on when the information makes it to -- to me, I guess, in this position.
Q. Okay. So here it would have been preferable then to give Mr. Enos notice of the expiration of his FMLA prior to January 21, 2015; is that correct?
A. Preferable, yes. I don't know if it occurred or not.
Q. Is there any reason to believe that you did not



know or that Douglas County did not know before January 21st, 2015, that his FMLA was expiring on January 21st, 2015?
A. Can you repeat the question, please?
(Record read.)
THE WITNESS: Not that I know of.
MR. GEDDES: Q. And if you'd look again at Exhibit 8, please. Exhibit 8 indicates that Douglas County was aware that he was on leave; isn't that correct? As of June 30th, 2015?
MS. PARKS: Objection. Lack of foundation.
THE WITNESS: I would be assuming based on the written note here.
MR. GEDDES: Q. Well, Douglas County monitored its employees who were out on FMLA; isn't that correct?
A. Yes.
Q. And as part of that monitoring process, they keep tabs of when the FMLA is going to expire; isn't that correct?
A. Ideally, yes.
Q. Now, this letter is dated February 13th, and it's calling him back to work four days later on February 17th; isn't that correct?
A. Yes.
Q. Was it normal for you to give employees such



little notice to return to work in these types of situations regarding the expiration of FMLA?
A. No. However, there could have been phone conversations or phone calls. I don't recall.
Q. But you don't --
A. Prior to the letter.
Q. But you don't recall any such phone calls, do you?
A. I don't recall.
Q. And you don't recall any such other letters, do you?
A. I don't recall them. Doesn't mean it didn't happen. I don't recall them.
Q. Now, if they did happen, would you have been notified of that?
A. It's possible. We had staff changes at the time with Vickie and Sarah. I'm not sure of the timing of that.
Q. Do you know when Ms. Christensen began work?
A. In this area?
Q. Yes.
A. I don't know the specifics. From my recollection, it was after Vickie left, she was brought in to fill in, but -- and there was a gap I think in -- in the transfer of knowledge.

Q. It reads, the second paragraph, again: "Our records indicate that your leave entitlement under the FMLA has expired effective January 21, 2015. Accordingly, you are expected back at work and must return on February 17th, 2015, at 8:00 AM. You are expected to provide a full medical release prior to returning to work. Please deliver the release to human resources not later than February 17th, 2015, at 8:00 AM."

So were you basically saying here show up to work on the 17th with full releases. Isn't that what you're asking him to do?

MS. PARKS: Objection. The letter speaks for itself.

MR. GEDDES: Q. You can answer the question.

A. Say that again.

MR. GEDDES: Can you read back the question, please?

(Record read.)

THE WITNESS: That's what -- yes, that's what the letter says.

MR. GEDDES: Q. Okay. Now, when you say, "the letter," just to be clear, you wrote this letter; correct?



A. It has my signature on it, so --

Q. So that's what you said --

A. -- I assume it is.

Q. -- correct?

A. Yes.

Q. But you don't specifically recall what prompted you to write this letter; is that correct?

A. That's correct. Well, I became aware that he has exhausted his FMLA, but I don't recall specifically how that came about.

Q. Who did you consult regarding writing this letter?

A. I would be speculating. I don't recall.

Q. Who -- in writing these types of letters, who would you ordinarily consult?

A. Our attorney.

Q. Would you be consulting any -- any of the staff at Douglas County other than attorneys?

A. My staff who oversees the FMLA to gather all the information. That would be a typical process.

Q. What about supervisors of the employee in question? Would you be in communication with them about writing such letters typically?

A. Typically, yes.

Q. So do you know -- do you recall speaking with



Mr. Shick about this letter, about the matter of this letter?

A. I do not recall.

Q. Do you recall speaking with Ms. Sauer-Lamb about the issues of this matter, this letter?

A. I don't recall that.

Q. Or Judge Young or Judge Gibbons?

A. I don't recall.

Q. Now, the next paragraph reads: "Please note that any absence beyond February 17, 2015, will be deemed an unauthorized absence pursuant to Douglas County Code 2.02.080 and may subject you to automatic separation or disciplinary action up to and including termination."

What does that mean?

A. That if he's not back at work by the indicated date, absences after that will be unauthorized and will fall under the referenced code which provides for employment separation or -- and/or further disciplinary action up to and including employment termination.

Q. So I think you're saying that if he doesn't show up on February 17, 2015, with the medical releases, he's going to be fired; isn't that correct?



A. It says it will be deemed unauthorized and then the steps pursuant to that code can be followed. May be -- he may be subjected to those.

Q. Including termination meaning firing?

A. Including employment separation, yes.

Q. Termination meaning firing; right?

A. Yes.

Q. So if he shows up and says, "I'm ready to work," but he doesn't have those medical releases and he wants to work, the same result will occur; is that correct? Is that what this letter means?

A. Can you say that again?

MR. GEDDES: Can you read that back, please?

(Record read.)

THE WITNESS: I don't -- I don't -- if he shows up and he doesn't have the releases to go to -- to come back to work, that -- say that again. I'm a little --

MR. GEDDES: Sorry. If you can read that back again, please.

THE WITNESS: Can you rephrase that? I'm not understanding the question.

MR. GEDDES: Q. Well, the question is it isn't -- it isn't sufficient that he show up and be ready to work. He's got to show up and have those medical releases. And even if he wants to work, if he doesn't

have those medical releases, the same result listed in the paragraph will occur; isn't that right?
A. That's a potential. I can't be -- I can't --
Q. Okay. But --
A. -- guess.
Q. -- the same potential result would apply; is that correct?
A. I believe so.
Q. Okay. Now, you also write in the last paragraph, "Please contact me in advance of your scheduled date of return if there are additional circumstances that may be relevant or that you wish to bring to our attention regarding your absence." What did that mean?
A. If there's something that we haven't considered or need to consider, it's his duty to bring it to our attention.
Q. So if he brought to your attention that he wanted an accommodation under the ADA, that would alter this?
MS. PARKS: And objection. Assumes facts not in evidence. Lack of foundation.
MR. GEDDES: We'll get to the evidence and the foundation.
Q. Do you understand the question?
MS. PARKS: Counsel, I can make my objections for the record without having you comment upon them in that



way.
MR. GEDDES: Q. Do you understand the question?
A. I would like to have the question repeated.
MR. GEDDES: Okay. Go ahead.
(Record read.)
MS. PARKS: Same objections.
THE WITNESS: Alter what?
MR. GEDDES: Q. The last sentence you just gave.
Can you read back her answer as to what that last paragraph meant?
(Record read.)
THE WITNESS: And then the question is again?
(Record read.)
THE WITNESS: Yes, it could alter this.
MR. GEDDES: Q. Okay. Now, this -- if we go to the paragraph that reads, "Accordingly, you are expected back at work and must return on February 17th, 2015, at 8:00 AM. You are expected to provide a full medical release prior to returning to work. Please deliver the release to human resources office no later than February 17th, 2015 at 8:00 AM."
When you wrote this, you weren't considering the ADA dimension or the potential ADA dimension of this case;



isn't that right?
A. I don't recall that.
Q. It doesn't reference the ADA, does it?
A. I don't see it referenced in that paragraph.
Q. And to your knowledge -- I'm not asking you for a legal conclusion, but to your knowledge, the ADA doesn't require a full medical release in order for a worker to keep his or her job; isn't that correct?
MS. PARKS: Objection. Calls for a legal conclusion.
THE WITNESS: I don't know.
MR. GEDDES: Q. So are you telling me that at the time you wrote this letter, you didn't have an opinion one way or another as to whether the ADA required medical releases in order for a worker to keep his or her job?
A. At the -- can you restate the question or reread the question, please?
(Record read.)
THE WITNESS: I don't recall what I was thinking at the time.
MR. GEDDES: Q. So when you wrote this letter requesting that he provide full medical releases prior to returning to work, what were you basing that directive on?
A. I don't recall what I -- I don't have all the information. All I have is this letter before me, and I



don't recall the details that led up to this letter.
Q. Okay. So just so that we're clear then, the sentence that reads, "You are expected to provide a full medical release prior to returning to work," you don't know why you wrote that; is that correct?
A. I wrote it because there -- well, I would be making an assumption. I just -- that's correct.
Q. When you wrote this letter, did you have an understanding of what the essential functions were of Mr. Enos's job?
A. I would hope so, but I don't recall that.
Q. Did you consult any listing or publication by Douglas County as to what the essential functions of Mr. Enos's job were before writing this letter?
A. I don't recall that.
Q. And, to your knowledge, did anyone at Douglas County or the State of Nevada consult any listing or publication by Douglas County as to what the essential functions of Mr. Enos's job were before writing this letter?
A. I don't recall that.
Q. And, to your knowledge, did you or anyone at Douglas County or the State of Nevada evaluate whether Mr. Enos could perform the essential functions of his job with a reasonable accommodation before writing this

letter?
A. I don't recall that.
Q. Why was it required that he obtain a full medical release prior to returning to work?
A. Because he had exhausted his FMLA rights, and he needed to be back at work and be fully functioning. And he had not made any notification to the County, I'm assuming, of any need for an accommodation. That's why that last paragraph was included on here. He had a duty to provide that, and there was not enough information prior to indicate that there was an ADA-qualifying condition.
Q. Okay. I want to -- I want to be very clear here in your deposition. Are you testifying under oath and under penalty of perjury that Douglas County did not have sufficient information to make a determination that an ADA accommodation evaluation was triggered?
MS. PARKS: Objection. Calls for speculation on the part of this witness.
THE WITNESS: I did not say that.
MR. GEDDES: Q. I'm asking you the question.
A. Okay. Let me hear the question again.
(Record read.)
THE WITNESS: No, I'm not testifying that.
MR. GEDDES: And can you please read back her



prior answer as to why? I asked her why it was required that he obtain a full medical release before returning to work.
(Record read.)
MR. GEDDES: Q. Okay. So when you testified that you're assuming he didn't make any such ADA notification, you don't know one way or another whether he did. Is that what your testimony is?
A. I'm going to correct myself. I don't recall any of the details, so my answer should be I don't remember the details of what happened.
Q. And what, if any, involvement did Mr. Shick have -- what input or involvement did he have in matters of the second paragraph regarding providing a full medical release prior to returning to work?
A. What involvement he had?
Q. What involvement or input did he have in these matters?
A. I don't recall.
Q. And what involvement or input did Ms. Sauer-Lamb have in the matters discussed in that -- in those lines of that paragraph?
A. I don't recall either.
Q. Now, if we look at the paragraph -- paragraph three, that cites the Douglas County Code 2.02.080. Do



you see that?
A. Yes.
Q. All right. Based on your knowledge and understanding as the human resources director, isn't it true that the juvenile probation officers, including the senior juvenile probation officers, were governed at least in part by the Ninth Judicial District Court of Nevada regulations?
A. I don't recall. I would make an assumption.
Q. Okay. You previously testified words to the effect --
A. I guess.
Q. -- earlier today that the judges had some oversight or role regarding the firing or hiring of juvenile probation officers. Do you recall that?
A. I do.
Q. Okay. And you don't recall whether or not it's Douglas County Code regulations that would apply here or the Ninth Judicial District Court of Nevada regulations?
A. I do not recall that.
Q. Was it your understanding at the time of writing this letter that Mr. Enos was an at-will employee who could be fired without cause?
A. Was it my understanding?
Q. (Nods head.)



A. No, I don't recall that.
Q. Did you have an understanding one way or another whether he was at will or a classified worker?
A. I would be making an assumption based on my knowledge now, but at the -- I don't recall thinking about --
Q. And as part of your job as the human resources director, wouldn't you be required to know whether an employee is an at-will employee or classified employee before writing these types of letters?
MS. PARKS: Objection. Argumentative. Improper hypothetical to this witness.
THE WITNESS: Can you repeat that, please?
MR. GEDDES: Can you repeat that, please?
(Record read.)
THE WITNESS: I would be required to know that, not necessarily before writing these types of letters.
MR. GEDDES: Q. If Mr. Enos were a classified employee, wasn't it required, to your knowledge, that he be terminated for just cause?
A. I don't recall the policies or regulations of Douglas County.
Q. Well, let's do it this way. Was it your general understanding that at-will employees could be fired for no reason, a dumb reason, or a mistake?

A. Yes.
Q. And at the time was it your understanding that a classified worker did not fall under such liberal -- liberal rules where you could fire them for no reason, dumb reason, or a mistake; instead, a classified worker could only be fired for cause. Was that your general understanding at the time?
A. In general, yes, with...
Q. Did you consult the Ninth Judicial District Court regulations when preparing this letter?
A. I don't recall doing that. Or not doing that.
Q. Okay. I'd like to mark, please, as the next exhibit -- is it Exhibit 11?
THE REPORTER: 11.
MR. GEDDES: Thank you. Exhibit 11.
(Exhibit No. 11 marked for identification.)
MR. GEDDES: Q. If you could take a moment, please, and review these documents.
Okay. Do you recall -- oh, let me ask you this. What are these documents?
A. They're --
Q. I -- I will apologize. There are actually two documents here. They're stapled separately.
A. They're job descriptions, two versions -- well,



just the formatting is different, but it looks like the content's the same, to a certain extent -- of the juvenile probation officer, senior, their job description.
Q. Okay. So the first document Bates stamped DC332 and 333, that's a job description for a senior juvenile probation officer, and the document of 353 --
A. Oh, uh-huh.
Q. -- to 356 is for a juvenile probation officer, not a senior; is that correct?
A. Yes.
Q. Okay.
A. That looks to be the case.
Q. All right. Did you consult either of these documents prior to writing the letter of Exhibit 10?
A. I don't recall.
Q. Okay. All right. But as part of your job as a human resources director, it would have been part of your job duties to evaluate essential functions when evaluating ADA claims; is that correct?
A. Yes.
Q. Are you able to look at this document here, and based on your time at -- the time of writing your letter, can you tell me what part of the job description required Mr. Enos to obtain a full medical release?
A. No.



Q. Let's turn back to your letter, please, of Exhibit 10. To your knowledge, did anyone at Douglas County or the State of Nevada evaluate whether Mr. Enos could perform the essential functions of his job with a reasonable accommodation before writing this letter?
A. I don't recall that.
Q. Now, if you look at Exhibit 10, the date is February 13, and I'll just represent to you -- and I don't think it will be an issue for trial because we'll ask for judicial notice of this fact, but I'll represent to you that February 13th, 2015, was a Friday before a three-day weekend. And in that year on February 16th, the Monday, that was Presidents' Day, and that was -- I'll represent to you as well that was a state holiday. So that means that this letter was dated on a Friday before a three-day weekend, and this letter essentially gave Mr. Enos an ultimatum to return to work on the Tuesday after Presidents' Day with full medical releases by 8:00 AM or he would be subject to termination.
So my question to you is would you admit that if you sent the letter on Friday, February 13th, 2015, he didn't have much time to receive the letter and obtain medical releases before the next workday; is that correct?
A. Yes.
Q. So why did this letter give such little notice?



A. I don't recall the details before the letter, so...
Q. What was the hurry?
MS. PARKS: Objection. Asked and answered.
THE WITNESS: I don't recall all the details that led up to the letter.
MR. GEDDES: Q. Isn't it true that this letter gave Mr. Enos such little notice to set him up for failure so that he couldn't comply and, thus, you would have an excuse to fire him?
MS. PARKS: Objection. Argumentative. Calls for speculation on the part of this witness. Lack of foundation.
MR. GEDDES: Q. You can answer the question.
A. I need that question repeated again.
(Record read.)
THE WITNESS: I would have to -- I don't remember. I don't recall.
MR. GEDDES: Q. Who was involved in setting this short deadline for compliance?
A. I don't -- the letter is from me.
Q. Did anyone -- did anyone suggest or direct you to use that short deadline?
A. I don't remember.
Q. Isn't it true that on February 17th, Mr. Enos

showed up to work in response to this letter advising your human resources department that he was reporting for duty?
A. I don't remember.
Q. Didn't he meet with you on that day?
A. I apologize. I just don't remember.
Q. And you told him that he exceeded his FMLA leave. You don't recall that?
A. No.
Q. Didn't you tell Mr. Enos on February 17th, 2015, that Mr. Shick was requesting to fill Mr. Enos's position with another employee?
A. I don't remember.
Q. You don't remember any conversations with Mr. Shick about Mr. Enos's position and filling it with another employee?
A. I don't recall that. I vaguely is -- remember a sit-down with John, but I don't recall when that was and what the conversation was.
Q. When you say, "a sit-down with John," who's John?
A. I remember meeting -- I'm sorry. Mr. Enos.
Q. Okay.
A. But I -- I don't recall when it was and what was discussed.
Q. Do you recall in this discussion that you vaguely remember -- maybe this will refresh your recollection --



that you told Mr. Enos that essentially his three days were ticking and that if he didn't get that full doctor's release within three days or by the end of Thursday -- because he came on a Tuesday, Wednesday, Thursday would be the third day, the end of Thursday -- February 19th, 2015, the County would consider Mr. Enos to have abandoned his post for three days, which would constitute a voluntary resignation by Mr. Enos?
A. Can you repeat that, please?
(Record read.)
THE WITNESS: I don't recall the conversation.
MR. GEDDES: Q. Do you recall a conversation -- any part of any conversation with Mr. Enos that day where Mr. Enos strenuously disagreed with you, stating that he was not abandoning his post, not resigning from his job, and that he was ready, able, and willing to return to work right there and then?
A. I don't remember.
Q. Do you recall suggesting to Mr. Enos that he could request an extension of time for the deadlines imposed in the letter?
A. No.
Q. Do you recall any aspect of any conversation with Mr. Enos on that date?
A. I remember meeting him. I just don't remember



what we talked about. I'm sorry. I just...
Q. Where did you meet him?
A. On the -- well, it would be an assumption. Probably in my office or in the HR department somewhere.
Q. What time of the day? Do you recall?
A. No.
Q. Was it the morning?
MS. PARKS: Objection. Asked and answered.
THE WITNESS: I don't recall.
MR. GEDDES: Q. Did you work a certain time of the day that you were available more than at other times of the day?
A. I don't -- I don't remember what days I was more available than others in Douglas County.
Q. Now, when you suggested that Mr. -- well, let me take a step back. If you suggested that Mr. Enos request an extension for a leave of absence -- well, let me take another step back.
Have you ever done that to an employee, telling them that they could request an extension for a leave of absence regarding medical matters where they're required to come back to work with a full doctor's release?
A. In my career?
Q. Yes.
A. Yes.



Q. Okay. And would it have been unusual for you to have suggested to Mr. Enos to request an extension for a leave of absence?
A. I don't think it would have been unusual.
Q. And if you had told him to request or suggested that he request an extension for a leave of absence, would it be your understanding -- whether you're right or wrong, but would it have been your understanding that when he did that, that was a request for an accommodation under the ADA?
MS. PARKS: Objection. Misstates her testimony. Lack of foundation.
THE WITNESS: I need that repeated again.
(Record read.)
THE WITNESS: No, not necessarily. Again, it's hypothetical. I -- from my -- just don't remember that conversation. I'm sorry.
MR. GEDDES: Q. Do you recall in a conversation with Mr. Enos that day that he requested a reassignment to any other position with Douglas County for which he was qualified to perform?
A. I do not recall.
Q. Let's go to the next exhibit. One second.
This will be Exhibit 12?
THE REPORTER: Yes.

(Exhibit No. 12 marked for
identification.)
THE REPORTER: Here you go.
MR. GEDDES: Q. Have you seen this document before?
A. I vaguely recall seeing the document.
Q. What is it?
A. It's a letter dated February 17th, 2015, from -- well, to human resources recapping the receipt of the letter and requesting a leave of absence per County policy 200.40. While -- in order to receive necessary medical treatment for injuries he received on the job, any further -- states at the bottom -- I'm assuming this is John Enos, the signature -- that he will be -- if he's unable to return to full duty as a probation officer, he's willing to accept any other job or position within the County that he can perform.
Q. So let's -- if we can focus, please, on -- it's about the fifth line down. It reads, "I returned to work at 8:00 AM to Norma Santoyo's office at human resources unable to get a full release from my doctor over the Presidents' Day weekend."
Now, reading that, does that refresh your recollection of where and when you met with Mr. Enos?
A. Well, it must have been during that period of



time.
Q. Does it refresh your recollection though?
A. It's the same recollection. I know we met. I don't recall that -- this tells me that it was on that date at that time, but...
Q. Do you have any reason to disbelieve that he actually spoke to you --
A. No.
Q. -- at or about 8:00 AM regarding this?
A. No.
Q. He writes, "I am requesting an extension of time to get more information from my doctor regarding my ability to return to full duty as a probation officer." He also is requesting a leave of absence in order to receive necessary medical treatment for injuries he received while on the job and to recover from these injuries in order to return to his job as a probation officer at full capacity.
Accepting that this letter was written and that you received it, would it have been your understanding at the time -- or was it your understanding at the time that that was a request for an accommodation under the ADA?
MS. PARKS: Objection. Calls for a legal conclusion.
THE WITNESS: I don't recall. I mean, this looks



familiar, but I don't recall what -- what happened at the time.
MR. GEDDES: Q. Ordinarily if an employee wrote this kind of letter and made that kind of request, would that have triggered an effort by you to engage in the interactive process under the ADA?
A. Yes.
Q. But you don't recall whether you did that; is that correct?
A. I do not.
Q. And at the bottom, the asterisk which reads, "Also, if it is found that I will not be able to return to full duty as a probation officer, I will accept any other position with the County that I can perform."
At the time, assuming that you received this letter, would you have taken that to be a request for an accommodation under the ADA?
A. We still haven't -- well, it would at least trigger a review of it in normal -- because we would still need to -- I don't even know if we did the determination if he has an ADA-qualifying condition or not.
Q. But you're saying it ordinarily would have triggered --
A. At least --
Q. -- the --



A. -- at least a -- it ordinarily would have or should have triggered at least some steps --
Q. It would have --
A. -- to determine that.
Q. And it would have triggered the --
A. But I don't remember.
Q. It would have triggered the evaluation process?
A. It would have triggered a process of review whether it was ADA-qualifying or not.
Q. And you don't recall whether this did or not?
MS. PARKS: Objection. Asked and answered.
THE WITNESS: I do not.
MR. GEDDES: Q. Now, on February 17th when you spoke with Mr. Enos, do you recall telling him that it would help if he could get updated work reports from his doctors?
A. I do not remember that.
Q. Do you recall whether Mr. Enos actually faxed additional medical releases to your office that day, on February 17th, 2015?
A. I do not.
Q. Do you recall having a conversation with him the following day confirming the receipt of those documents?
A. I do not remember.
Q. Let's go ahead and mark as Exhibit 13.

(Exhibit No. 13 marked for identification.)
MR. GEDDES: Q. Okay. Have you seen these documents before?
A. Again, I don't recall seeing them, but probably have.
MS. PARKS: Don't guess.
THE WITNESS: I don't recall seeing them. Thank you.
MR. GEDDES: Q. The second page has language up on top. The words are "Fax to Norma Santoyo 775 782" -- it appears to be -- "9083." Was that your fax number?
A. I don't recall my fax number.
Q. All right. If we look at DC1495, the first page, this is a document that on its face represents or purports to be from Patricia Morales, M.D. Do you see that on the bottom?
A. Uh-huh. Yes.
Q. And this appears to be a medical release for Mr. Enos to return to work with light -- a light duty restriction, having a lifting capacity up to 50 pounds; is that correct?
A. Yes.
Q. So do you know what the lifting capacity was for the position of senior juvenile probation officer?



A. Not off the top of my head.
Q. Okay.
A. But they have it here.
Q. Let's take a look at Exhibit 11 at DC333 at paragraph two under the Physical Demands section. Do you see that?
A. Yes.
Q. If you could read that second paragraph and tell me whether you're able to determine what the lifting requirements were on the physical demands for the position of junior -- I'm sorry -- juvenile probation officer, senior.
A. "Must frequently lift and/or carry up to 50 pounds."
Q. So the 50 pounds' clearance that was given by Dr. Morales, does that appear to satisfy that requirement of the job?
A. The employee is unable to lift -- what is it? What -- does it say lift up to 50 pounds or no more than 50 pounds?
Q. Well, there's "Employee is unable to lift," and it has a greater-than sign, "50 pounds."
A. Okay. If that's what that means, then -- say that question again.
Q. Yes.



Can you read back the question, please?
(Record read.)
THE WITNESS: As I'm looking at it, it appears like it would.
MR. GEDDES: Q. So if we look at the second document, DC1496, if you could look at that, please. This is a medical release for Mr. Enos to return to work unrestricted as of 2/18/15; isn't that correct?
A. It appears that way, yes.
Q. So at least with respect to Dr. Eisenhauer's release, that satisfied -- that qualified as a full medical release; correct?
A. I don't -- this is for all the conditions or just one? I'm not sure.
Q. Well, if you don't know, you don't know.
A. I don't know.
Q. I'm asking. Okay.
A. I don't know.
Q. Did you review these documents at any time?
A. I don't recall. I don't recall them.
Q. Ordinarily as the director of human resources, did the expression "May return to work unrestricted as of today," have a particular meaning to HR, to you?
A. That the employee can return to work full duty with no restrictions.



Q. Can you tell from the markings on this document to whom this document -- these documents were sent for Exhibit 13, either 1495 or 1496?
A. Who they were sent to?
Q. Yes.
A. Other than the note, the handwritten note, at the top that says it went to Norma Santoyo's fax number?
Q. That's on 1496. What about --
A. 1496. And then --
Q. DC1495, it's somewhat cut off, but it appears to be Karen Barbee at the bottom of that document.
A. I'm sorry. I lost you. 1495?
Q. Yeah, 1495 at the very bottom, it says, "Scanned 2/18/15," and then it's kind of broken up, hidden below a label, but it appears to say, "Karen Barbee." Do you see that?
A. I see a label over part of a name.
Q. If -- ordinarily when you were at the -- Douglas County as the human resource director, when documents were faxed to HR, ordinarily would you have faxed them or sent them to the -- ASC, the administrator for workers' compensation, including Karen Barbee?
A. It would -- I would not have done that, so I don't know.
Q. Would someone on the staff do that?

A. It was usually -- yes, yeah.
Q. Can you explain that process?
A. Well, typically the form actually comes from our third-party administrator to the employer, or if the employer gets it first, then they are shared also with the third-party administrator.
Q. All right. Do you recall having conversations with anyone about either of these releases?
A. I do not recall.
Q. Do you recall Mr. Shick having any input or involvement concerning the matters of these documents?
A. I don't remember.
Q. Same question for Ms. Sauer-Lamb?
A. Same answer.
Q. For Judge Young and Judge Gibbons?
A. Same answer.
Q. Do you recall that on the following day, February 18th, 2015, in the morning you met -- or Mr. Enos again reported to the human resources department and stated that he was reporting for duty?
A. I don't remember that.
Q. Did you have a conversation with Mr. Enos on February 18th confirming the receipt of the two medical releases, DC1495 and 1496, the prior day?
A. I don't recall that.



Q. If he claims that you did, would you have any reason to disbelieve that?
A. I don't have any reason to disbelieve that.
Q. Do you recall stating words to him regarding the provision of these medical releases that getting those releases was good news?
A. I don't remember that.
Q. Do you recall telling Mr. Enos that you had sent his request of February 17th and specifically Exhibit 12 --
A. Yes.
Q. -- to Mr. Shick and you were waiting -- awaiting his response?
A. I don't recall that.
Q. If Mr. Enos recalls that, would you have a reason to disbelieve that?
A. No.
Q. Do you recall Mr. Enos asking you if there was anything further to do -- that he needed to do that day and you advising him there was nothing further to do?
A. I don't recall that either.
Q. If he claims that you did tell him that, do you have any reason to disbelieve it?
A. I do not.
Q. Do you recall having any conversations whatsoever



with Mr. Enos on February 18th?
A. I recall a conversation. I just don't recall the date and the content of our conversation.
Q. Do you recall later in the day on February 18th, 2015, you called Mr. Enos and told him words to the effect that, one, his FMLA had expired; two, that Mr. Shick denied Mr. Enos' request for an extension of time and leave of absence; and, three, although he obtained releases from his doctors, the Douglas County officials did not consider them to be full releases?
A. I don't remember that conversation.
Q. All right. Let's take a look at the next exhibit. 14?
THE REPORTER: Yes.
MR. GEDDES: Thank you.
(Exhibit No. 14 marked for identification.)
MR. GEDDES: Q. Okay. If you can take a moment and look at that.
Go off the record for a second.
THE VIDEOGRAPHER: Going off the record at 2:20.
(Discussion off the record.)
THE VIDEOGRAPHER: We're back on the record at 2:20.
MR. GEDDES: Q. Okay. Have you -- what is --



have you seen this document before?
A. I don't recall seeing the document before.
Q. See at the bottom it says, "cc: Employer: Douglas County"?
A. Yes, that's what it says.
Q. Okay. And this is from Alternative Service Concepts. And ordinarily -- ordinarily your office would receive this document?
A. Yes.
Q. Okay. This document reads, "Dear Mr. Enos: A review of your claims referenced above indicates that you have been given a full duty release from Dr. Eisenhauer effective 2/18/15, and Dr. Morales has decreased your restrictions to 'No lifting greater than 50 pounds, no pushing greater than 50 pounds, no pulling greater than 50 pounds, no overhead shoulder lifting greater than 35 pounds,' effective 2/17/15."
Second paragraph.
"We have been advised that the restrictions given by Dr. Morales are compatible with your regular job duties. As such, you are no longer

Page 174

eligible for temporary total disability benefits. No further TTD payments will be made, period."
And that's the end of that. So ordinarily Douglas County would have communications with Alternative Service Concepts regarding workers' compensation matters of its employees and former employees; isn't that correct?
A. Yes.
Q. And what this letter written by Karen Barbee, who's a senior claims director, is saying is that the two medical releases that we've referenced in Exhibit 13 clear you to return to regular job duties; isn't that right?
A. I don't know because I can't say that those are the two letters they're referencing.
Q. All right. Well, "A review of your claims referenced above indicates that you have been given a full duty release from Dr. Eisenhauer effective 2/18/15."
If we look at 1496, isn't 1496 a full duty release from Dr. Eisenhauer effective 2/18/15?
A. It appears that way.
Q. And then her reference to "Dr. Morales decreasing your restrictions. 'No lifting greater than 50 pounds, no pushing greater than 50 pounds, no pulling greater than 50 pounds, no overhead shoulder lifting greater than 35 pounds,' effective 2/17/15," isn't that document -- isn't

Page 175

that set forth in DC1495?
A. It appears that way, yes.
Q. Okay. So it appears that this document -- I'm sorry. It appears that Exhibit 14 is reflecting on the fact that Exhibit 13 cleared Mr. Enos for regular job duties as referenced in the following sentence: "We have been advised that the restrictions given by Dr. Morales are compatible with your regular job duties."
Would you agree with that?
A. I'm sorry. I lost you. Can you repeat that?
Q. Sure.
Can we get a readback, please?
(Record read.)
THE WITNESS: Yes, it appears that way.
MR. GEDDES: Q. Okay. You do not know who at Douglas County received this document?
A. I -- it would be -- I don't know for sure.
Q. Ordinarily when these types of documents came in in the period of February 24th, 2015, who would receive them?
A. It would have been Sarah Christensen --
Q. Okay.
A. -- or myself.
Q. All right. Now, the sentence that starts off -- and I've already read it; I'm not going to read the whole

Page 176

sentence -- about being compatible with his regular job duties, it's the first sentence of the second paragraph. The first four words are "We have been advised." Do you see that?
A. Yes.
Q. Doesn't that suggest that Douglas County advised them?
MS. PARKS: Objection. Calls for speculation.
THE WITNESS: I -- I don't know.
MR. GEDDES: Q. Okay. Do you -- -- do you have any opinion one way or another who advised Alternative Service Concepts of this matter as referenced in that sentence?
A. I do not know who or...
Q. Would it be unusual for Douglas County human resources department to have so advised?
A. It would not be unusual.
Q. Do you have any -- any knowledge about Douglas County taking efforts to -- Douglas County or just anyone at Douglas County or the State taking efforts to make no -- make no further temporary total disability benefits as referenced in the second paragraph of Exhibit 14? Do you have any knowledge of that?
A. That's a long question.
Q. Right.

Page 177

THE WITNESS: Can you repeat that?
(Record read.)
THE WITNESS: No.
MR. GEDDES: Q. And you weren't involved in efforts to stop temporary total disability benefits to Mr. Enos; is that correct?
A. I don't recall that. It would normally be an Alternative Service Concept decision, I believe.
Q. Now, do you recall that on the following day, February 19th, Mr. Enos showed up again at the human resources department in the morning and stated that he was there to work?
A. I don't recall.
Q. Do you recall having a conversation with Mr. Enos on February 19th that there was no light-duty work available for him, and you refused to let him work that day?
A. I do not remember that.
Q. Did you tell Mr. Enos on that day that as of 5:00 PM that day, Mr. Enos would no longer be employed -- or no longer be an employee at the juvenile probation department?
A. I don't remember that.
Q. But Mr. Enos's last day was February 19th, 2015; is that correct?

A. I don't -- I don't recall that.
Q. Okay.
MS. PARKS: Do you need some more to drink?
THE WITNESS: I'll take some more coffee -- or more water. Thank you.
MR. GEDDES: All right. Mark as the next exhibit Exhibit 15.
(Exhibit No. 15 marked for identification.)
(Ms. Parks exits the room.)
MR. GEDDES: Q. If you could take a look at Exhibit 15, that would be great.
(Ms. Parks returns.)
THE WITNESS: Thank you.
MS. PARKS: Uh-huh.
MR. GEDDES: Q. Okay. Have -- have you seen these documents before?
A. I don't recall seeing them.
Q. Okay. The first document, 1801, DC1801, that's a letter on the letterhead of the Juvenile Division of the Ninth Judicial District Court and Douglas County, State of Nevada. Do you see that?
A. Yes.
Q. And on the left we have the District Judge Tod Young and Michael Gibbons, and on the right we have Scott



Shick. Do you see that?
A. Yes.
Q. Okay. And it's regarding a leave of absence, and it reads:
"Dear Mr. Enos: I have received and seriously considered your request for a leave of absence dated February 17, 2015, pursuant to Douglas County Policy 200.40. However, after considerable deliberation, your request is being denied."
Do you see that?
A. Yes.
Q. Does that refresh your recollection as to any conversations or communications you had with Mr. Shick regarding Mr. Enos's request for a leave of absence or an extension of time?
A. I'm sorry. It just does not.
Q. Do you see on the bottom there where it reads, "cc: Norma Santoyo, Human Resources Manager"?
A. Yes.
Q. Did you receive this document?
A. I must have. But I don't recall it.
Q. To your knowledge, did Mr. Shick seriously consider Mr. Enos's request for a leave of absence?



MS. PARKS: Objection. Calls for speculation.
THE WITNESS: I don't know.
MR. GEDDES: Q. Now, this letter confirms that Mr. Shick's consideration of the matter is based on Douglas County Policy 200.40. To your knowledge, was Mr. Shick's consideration performed under the framework of the ADA?
MS. PARKS: Objection. Calls for speculation. Calls for a legal conclusion.
THE WITNESS: I don't know.
MR. GEDDES: Q. What if any input or involvement in the decision-making process did you have for the matters reflected in Exhibit 15 at DC1801?
A. I don't recall. I was at meetings, and I don't recall the details of those conversations.
Q. Well, how do you know you were at meetings?
A. Well, just like I remember meeting with Mr. Enos, I just -- you know, I've -- I do that for hundreds and, if not, thousands of employees in the last -- in my career, so I apologize. I don't remember the details of the conversations. I just recall meetings regarding Mr. Enos, and I don't recall the details or the dates or what was said or what I said or...
Q. Do you recall meetings with Mr. Shick about this matter?



A. I recall meeting with Mr. Shick. I -- yes.
Q. And you don't recall anything that he said about it?
A. I do not remember the details of them, no.
Q. And do you have any knowledge as to who Mr. Shick consulted regarding these matters set forth in 1801?
A. I know it would have been myself and Justina, and I don't -- I don't know whom -- who else.
Q. If we go to the prior day or the day of February 17th, do you recall Mr. Enos reminding you that when he worked at the County library on light duty, his doctor's work restriction had a ten-pound weight limit restriction, whereas now he had a much higher capacity?
A. I don't -- I vaguely remember something, but I don't remember the details of it.
Q. If he testifies that that was a conversation he had with you, do you have any reason to disbelieve it?
A. No.
Q. Do you recall saying to Mr. Enos words to the effect that the counsel -- Douglas County's legal person had decided that Mr. Enos was too much of a liability for Douglas County to keep employed?
A. No.
Q. If he testifies that you did say that to him, would you have any reason to disbelieve that?

A. Yes.
Q. Why?
A. That's something I would not say.
Q. But you don't recall not saying that?
A. I don't recall saying it and I don't recall not saying it, but in my professional experience, I would not say that.
Q. Did you tell Mr. Enos on February 18th that the County intended to terminate him the following day, February 19th?
A. I don't recall that.
Q. To your knowledge, Mr. Shick didn't actually consider transferring Mr. Enos to another job for which he qualified as requested in his letter of Exhibit 12; isn't that correct?
MS. PARKS: Objection. Calls for speculation.
THE WITNESS: I don't know.
MR. GEDDES: Q. But you don't have any knowledge that he attempted that; isn't that --
A. I don't recall either one way or the other.
Q. So if you had a conversation with Mr. Enos on February 18th which -- and he testifies that that conversation happened, the conversation where you had told him that Mr. Shick had denied his request for an extension, then you would agree that the decision made a



day earlier didn't indicate that Mr. Shick gave considerable deliberation to the request?
MS. PARKS: Objection. Vague and ambiguous. Calls for speculation. Lack of foundation.
THE WITNESS: I can't get into his head. I don't know.
MR. GEDDES: Q. But you would agree that the matter of transferring Mr. Enos to another available position with the County that he can perform, that matter is not referenced in DC1801; is that correct?
A. Can you repeat that question, please?
Q. Sure.
Can you please read back?
(Record read.)
MR. GEDDES: Q. That's the top letter.
A. Yes, I have it.
Q. Oh, okay.
A. It is not referenced in the letter; that is correct.
Q. And if we look at 1802, this letter states, "Due to your absence from work for three consecutive days, Douglas County Juvenile Probation accepts your resignation pursuant to Title 2, Chapter 2.02 of the County Personnel



Regulations and Section 6.062 of the Order Establishing Court Personnel Regulations, which provide: Unauthorized absence. 2: An unauthorized absence for three consecutive days shall be regarded as an automatic resignation and termination from county [court/judicial] service. Please contact me as soon as possible to arrange the removal of your personal items from the Juvenile Probation and the return of any County property currently in your possession."
And the cc on this letter is Norma Santoyo and Justina Caviglia. So when was the decision to terminate Ms. Enos first made and by whom?
A. I don't recall. I don't remember.
Q. What was your input or involvement in the review, handling, or decision-making process for this document or matters discussed in this document? And I'm referring to 1802.
A. I just don't remember.
Q. And do you -- the same question for Mr. Shick?
A. I'm sorry?



Q. The same question for Mr. Shick?
MS. PARKS: You're asking --
MR. GEDDES: Q. What was his input or involvement? Aside from writing this, did he actually -- was he the decider of this? Was he the one who decided that this separation of employment would occur?
MS. PARKS: Objection. Calls for speculation.
THE WITNESS: I don't -- I don't know the details. His signature is on the letter. I mean --
MR. GEDDES: Q. What about Mrs. Sauer-Lamb? Do you know what if any input or involvement in the review, handling, or decision-making process for the matters of this document? Do you know?
A. I do not.
Q. And the same for Judge Young and Judge Gibbons?
A. I don't, no.
Q. Now, do you have any information that Mr. Enos resigned from his position? Aside from this legal characterization of the effect of his medical releases, do you have any information that Mr. Enos voluntarily resigned his position?
A. I don't have any information.
Q. If Mr. Enos states that he never resigned his position and had no intention to resign his position, do you have any reason to disbelieve that?

A. If he states that? I have no reason to disbelieve that.
Q. So his separation of employment pursuant to -- according to this letter, was something triggered by a regulation and not something that he volitionally came forward and said, "I resign"; is that correct?
A. That's my understanding.
Q. And in your experience as the director of human resources for Douglas County, had you seen this process occur before?
A. I -- I don't recall it being with Douglas County. I have seen this process several times in my government career, however.
Q. So did you receive any information from any source concerning any efforts by Mr. Enos to obtain reemployment or reinstatement at any time after he was fired?
A. I don't remember that.
Q. Did you receive any information from any source concerning Mr. Enos's efforts to obtain reemployment with Douglas County in any available position for which he was qualified through his vocational rehabilitation counselor in or about April of 2016?
A. I don't remember -- I wasn't with County in April of '16.



Q. Yeah, and I see that from your time line, but do you have any information about that?
A. I do not.
Q. Did you receive any information from any source concerning Mr. Enos's efforts to obtain employment with Douglas County for the open position of juvenile probation officer in or about January of 2017?
A. I don't have any knowledge of that.
MR. GEDDES: Okay. Let's take a quick break. Thank you.
THE VIDEOGRAPHER: This ends media No. 3 in the deposition of Norma Santoyo. We're off the record at 2:43.
(Recess.)
THE VIDEOGRAPHER: This begins media No. 4 in the deposition of Norma Santoyo. We're on the record at 2:54.
MR. GEDDES: Q. Ms. Santoyo, we went on -- we went on break and now we're back. You understand you're still under an obligation and under oath to testify truthfully; is that correct?
A. Yes.
Q. Okay. Do you recall having a conversation with Mr. Enos on February 17th? That was the day -- we asked you questions -- that was the day when from prior questioning we asked you questions about whether you told



Mr. Enos that he could request an extension, so that time frame of when we are asking about. Okay?
A. You mean the leave of absence or --
Q. Well, when Mr. -- when Mr. Enos wrote Exhibit 12 --
A. Okay.
Q. -- when he requested a leave of absence and if he's not able to return to full duty, if he will accept any other -- he will accept any other position with the County that he can perform. I'm referring you to that time frame.
A. Okay.
Q. Did you have a conversation in a meeting with Mr. Enos at or about that time where he went into your office and you had previously said, "Look, by Thursday if you don't have the full releases, then we're going to consider you having abandoned your position for three days and it will be a voluntary resignation." That's not my question. I'm just referring you again to that meeting.
My question is about do you recall a point when Mr. Enos said words to the effect, "Norma, I've poured my heart and soul into this community and the kids in this community. You can't just push me out the back door because I got hurt."
Do you recall him making that statement to you?



A. I do not recall that.
Q. If he claims he made that statement to you, would you have any reason to disagree with that?
A. No.
Q. Then do you recall in response to that scrunching up your nose or making a facial expression of some sort and saying, "Yeah, we kind of can"? Do you recall making that statement?
A. I do not.
Q. If Mr. Enos recalls that statement, would you have any reason to disbelieve it?
A. I would.
Q. And why?
A. I don't think I would have done that. But, again, it would be -- I -- it would be an assumption.
Q. But you don't recall one way or another whether --
A. No.
Q. -- you made that statement?
I'll go ahead and pass the witness. Thank you.
MS. PARKS: I have no questions.
MR. GEDDES: Okay. How do you -- we can go off the record and do this, at least discuss it before we put it on the record, but I want to put on the record the procedure that's going to happen. Generally speaking,

you're going to have an opportunity to review the transcript of your deposition today, and you will have an opportunity to make changes to the transcript.

Now, I'm free to -- I'm happy to get other explanations from other people, but my take on it is this. That if you make, you know, grammatical changes such as it wasn't Elway, it was Ellsway. You know, there's a word that's -- that didn't come out right, those types of grammatical things or word-type things. Those changes may or may not be explainable.

Our -- my position -- our position will be if you make substantive changes to your deposition such as in your testimony you said the red light was red and you change it to it being green. Just be on notice that we will potentially make adverse inferences to a jury that you're changing your testimony. And the reason why I give this admonition is because you're free to correct the record of your testimony, but what you're doing is correcting it to the truth of what was communicated.

And so you'll have an opportunity to do that, and then you'll have an opportunity to sign a certification sheet for those changes and return it to the court reporter. What I'm not clear about is the time frame of that. Sometimes it's two weeks or 30 days, but you will have an opportunity to review your transcript for



accuracy.

Ms. Parks, I don't know if you had a better explanation. I'm sure you do.

MS. PARKS: I don't particularly. I mean, she is a nonparty. She -- you guys can send her deposition for her review.

I think you can waive that. You can waive your review of it if you want, but you -- or you can review it.

Where do you -- and do you e-mail it to her or what's the easiest way?

THE REPORTER: We can.

MS. PARKS: Yeah, because your home address is in Minden.

THE WITNESS: It's best if you e-mail it to me.

MS. PARKS: Okay.

MR. GEDDES: Okay. Great. I want to thank you very much for coming today, and that concludes our deposition. Thank you.

THE VIDEOGRAPHER: This concludes the video recorded deposition of Norma Santoyo. The total number of media used was four. We're off the record at 2:59.

(Time noted: 2:59 PM.)



--o0o--

I have read my deposition transcript, made those changes and corrections that I deem necessary, and approve the same as now true and correct.

Dated the day of , 2018.

NORMA SANTOYO



STATE OF CALIFORNIA, )
)
COUNTY OF STANISLAUS. )

I, LISA S. COELHO, a Certified Shorthand Reporter of the State of California, do hereby certify:

That on August 29, 2018, at the hour of 10:05 AM thereof, the witness herein named, NORMA SANTOYO, appeared before me for the purpose of giving deposition testimony; that after the witness was duly sworn by me in all respects as required by law, I took down in shorthand notes the said witness' testimony and the proceedings had at the time of the giving of such testimony; that I thereafter transcribed my shorthand notes of such testimony by computer-aided transcription, the above and foregoing being a full, true, and correct transcript of all proceedings had and testimony given.

Before completion of the deposition, review of the transcript [X] was [ ] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not interested in the outcome of the action.

LISA S. COELHO, CSR #9487
Certified Shorthand Reporter

September 12, 2018

NORMA SANTOYO
2584 Mackay Way
Minden, NV 89423

RE: JOHN ENOS vs. DOUGLAS COUNTY, et al.
No. 3:17-cv-00095-MMC-VPC
U.S. District Court, District of Nevada

DEAR NORMA SANTOYO:

The original transcript of your deposition in this case is available for reading, correcting, and signing until October 17, 2018, pursuant to Federal Rule 30(e)(1). Because the attorneys at your deposition did not stipulate otherwise, the original deposition transcript must remain in our possession, and can be read at our office:

PALERMO REPORTING SERVICES
1301 G Street, Suite A
Modesto, CA 95354
Phone: (209) 577-4451

Our office is open from 9:00 AM to 4:00 PM, Monday through Friday. You do not need an appointment to review your deposition. Please bring this letter and some identification (e.g. driver's license or passport) with you.

If you have access to a copy of the transcript, we can provide you with correction forms and you may make changes by mail.

It is not required that you read, correct or sign your deposition transcript, but you are given that right. This letter only informs you that the transcript has been prepared and is available for your review until the date mentioned above.

Sincerely yours,

Timothy Rishwain, Production Manager

cc: Original transcript
WILLIAM J. GEDDES, Attorney at Law
KATHERINE F. PARKS, Attorney at Law

STATE OF CALIFORNIA, )

)

COUNTY OF STANISLAUS. )

I, LISA S. COELHO, a Certified Shorthand Reporter of the State of California, do hereby certify:

That on August 29, 2018, at the hour of 10:05 AM thereof, the witness herein named, NORMA SANTOYO, appeared before me for the purpose of giving deposition testimony; that after the witness was duly sworn by me in all respects as required by law, I took down in shorthand notes the said witness' testimony and the proceedings had at the time of the giving of such testimony; that I thereafter transcribed my shorthand notes of such testimony by computer-aided transcription, the above and foregoing being a full, true, and correct transcript of all proceedings had and testimony given.

Before completion of the deposition, review of the transcript [X] was [ ] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not interested in the outcome of the action.

LISA S. COELHO, CSR #9487
Certified Shorthand Reporter

p.5

DOUGLAS COUNTY
GREAT PEOPLE GREAT PLACES

# HUMAN RESOURCES

1594 Esmeralda Ave
P.O. Box 218
Minden, NV 89423

(775) 782-9860 FAX (775) 782-9083

February 13, 2015

John Enos
1184 Sierra Vista Dr.
Gardnerville, NV 89460

Dear Mr. Enos:

Our records indicate that you have been on Family Medical Leave (FMLA) since October 21, 2014. As you know, the FMLA provides employees up to 12 workweeks of job protected leave for absences caused by a serious health condition. Since your serious health condition is under a workers' compensation claim, your FMLA has run concurrently to that claim. This notice does not impact your workers' compensation claim.

Our records indicate your leave entitlement under the FMLA has expired effective January 21, 2015. Accordingly, you are expected back at work and must return on February 17, 2015 at 8am. You are expected to provide a full medical release prior to returning to work. Please deliver the release to the human resources office no later than February 17, 2015 at 8am.

Please note that any absence beyond February 17, 2015 will be deemed an unauthorized absence pursuant to Douglas County Code 2.02.080 and may subject you to automatic separation or disciplinary action up to and including termination.

Please contact me in advance of your scheduled date of return if there are additional circumstances that may be relevant or that you wish to bring to our attention regarding your absence.

Sincerely,

Norma Santoyo
Human Resources Manager

RECEIVED
MAR 09 2015
asc

cc: Scott Shick, Chief Juvenile Probation
Justina Caviglia, Deputy District Attorney

EXHIBIT 10
Santoyo
9/29/18 9487
PENGAD 800-631-6989

DC001304

EXHIBIT 12 Santoyo 6/29/18 9487

2/17/2015

Human Resources:

On Friday, 2/13/15, a letter was delivered to my home at 4:45pm. I received it at 5:25pm. The letter informed me that I must provide the County with a Doctor's Release and Return to work on 2/17/15 at 8:00am. I returned to work at 8:00am to Norma Santoyo's office at Human Resources unable to get a full release from my doctor over the 'Presidents' Day Weekend. I am requesting an extension of time in order to get more information from my Doctor regarding my ability to return to full-duty as a Probation Officer. Pursuant to the County Policy regarding "Leave of Absence", Number 200.40, I am also requesting a "Leave of Absence" in order to receive necessary medical treatment for injuries I receive while on the job, and to recover from these injuries in order to return to my job as a Probation officer at full capacity.

Sincerely,

[signature]

*Also, if it is found that I will not be able to return to full duty as a Probation Officer, I will accept any other position with the County that I can perform.