# EXHIBIT 8

## DEPOSITION TRANSCRIPT OF SARAH CHRISTENSEN

**(Including Exhibits 16 and 39)**

EXHIBIT 8

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

-o0o-

JOHN ENOS, an individual, :

Plaintiff, :

vs. :

DOUGLAS COUNTY, a political subdivision of the State of Nevada; VICTORIA SAUER-LAMB, Chief Juvenile Probation Officer of the Juvenile Probation Department; et al., : Case No. 3:17-cv-00095-MMD-CBD

Defendants. :

==========================================================

VIDEOTAPED DEPOSITION OF SARAH CHRISTENSEN

THURSDAY, JANUARY 24, 2019

RENO, NEVADA

REPORTED BY: ERIN T. FERRETTO, CCR #281

JOB NO.: 520801

A P P E A R A N C E S

FOR THE PLAINTIFF: THE GEDDES LAW FIRM, PC
Attorneys at Law
By: WILLIAM J. GEDDES
8600 Technology Way
Suite 107
Reno, Nevada 89521

GALLIAN, WELKER & BECKSTROM
Attorneys at Law
By: RAELENE K. PALMER
540 W. St. Louis Avenue
Las Vegas, Nevada 89104

FOR THE DEFENDANTS: THORNDAL, ARMSTRONG, DELK & EISINGER
Attorneys at Law
By: BRIAN BROWN
6590 S. McCarran Boulevard
Suite B
Reno, Nevada 89509

Also Present: John Enos



I N D E X


| EXAMINATION BY | PAGE |
|---|---|
| Mr. Geddes | 5 |
| Resume p.m. | 130 |

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Diagram office by deponent | 37 |
| Exhibit 2 | Order Establishing Court Personnel Regulations | 55 |
| Exhibit 3 | Title 2, Administration and Personnel | 56 |
| Exhibit 4 | Ordinance 2000-907 | 57 |
| Exhibit 5 | Job Description - Juvenile Probation Officer, Senior | 89 |
| Exhibit 6 | Notice of Injury or Occupational Disease | 92 |
| Exhibit 7 | Excuse from Work or School | 98 |
| Exhibit 8 | E-mails w/attachments | 103 |
| Exhibit 9 | Notice of Injury or Occupational Disease | 104 |
| Exhibit 10 | E-mail | 110 |
| Exhibit 11 | E-mails | 112 |
| Exhibit 12 | Physical Restrictions/Work Restrictions Report | 115 |
| Exhibit 13 | E-mails | 118 |
| Exhibit 14 | E-mails | 121 |
| Exhibit 15 | Memo Enos/Shick | 123 |
| Exhibit 16 | E-mails | 130 |




INDEX, continued...


| | | |
|---|---|---|
| Exhibit 17 | E-mails | 133 |
| Exhibit 18 | Douglas County - Position Description Questionnaire | 146 |
| Exhibit 19 | Work/School Excuse | 153 |
| Exhibit 20 | Handwritten note | 157 |
| Exhibit 21 | Letter Enos/Santoyo | 168 |
| Exhibit 22 | Letter Human Resources/Enos | 182 |
| Exhibit 23 | Specialty Health - Return to Work | 186 |
| Exhibit 24 | Letter Enos/Barbee | 191 |
| Exhibit 25 | E-mails | 195 |
| Exhibit 26 | Letter Enos/Shick | 202 |
| Exhibit 27 | Douglas Co. - Personnel Action Form | 204 |
| Exhibit 28 | Letter Enos/Shick | 205 |
| Exhibit 29 | Letter Christensen/Howden | 207 |
| Exhibit 30 | E-mail | 212 |
| Exhibit 31 | E-mail | 214 |
| Exhibit 32 | Douglas County job list | 218 |
| Exhibit 33 | E-mail | 219 |
| Exhibit 34 | E-mail | 221 |
| Exhibit 35 | E-mail | 223 |
| Exhibit 36 | E-mail | 225 |
| Exhibit 37 | E-mail | 226 |
| Exhibit 38 | E-mail | 226 |
| Exhibit 39 | E-mail | 229 |
| Exhibit 40 | E-mail | 231 |
| Exhibit 41 | E-mail | 237 |
| Exhibit 42 | E-mail w/Facebook pages | 240 |
| Exhibit 43 | E-mail | 241 |




BE IT REMEMBERED that on Thursday, January 24, 2019, 9:20 a.m., at the offices of Sunshine Litigation Services, 151 Country Estates Circle, Reno, Nevada, before me, ERIN T. FERRETTO, Certified Court Reporter, personally appeared SARAH CHRISTENSEN, who was by me first duly sworn, and was examined as a witness in said cause.

-oOo-

VIDEO TECHNICIAN: This is the beginning of Media No. 1 in the deposition of Sarah Christensen in the matter of Enos versus Douglas County, held at Sunshine Litigation Services on January 24, 2019, at approximately 9:19 a.m.

The court reporter is Erin Ferretto. I am Kellan Adams, the videographer and employee of Sunshine Litigation Services.

This deposition is being videotaped at all times, unless specified to go off the record.

Would all present please identify themselves, beginning with the witness?

THE WITNESS: Sarah Christensen.

MR. BROWN: Brian Brown on behalf of defendants.

MR. GEDDES: Will Geddes co-counsel for

plaintiffs.
MR. ENOS: John Enos, the plaintiff.
MS. PALMER: Raelene Palmer, counsel for plaintiff.
VIDEO TECHNICIAN: Would the court reporter please swear in the witness?
(Witness sworn.)
MR. GEDDES: This is the date and time set for the deposition of Sarah Christensen in the matter of Enos versus Douglas County, Case No. 3:17-cv-95 now pending in the U.S. District Court for the District of Nevada.

SARAH CHRISTENSEN
called as a witness, having been duly sworn,
testified as follows:

+++ EXAMINATION +++

BY MR. GEDDES:
Q Good morning, ma'am.
A Good morning.
Q Could you please identify yourself by first and last name, and spell your last name for the record?
A Sarah Christensen; C-H-R-I-S-T-E-N-S-E-N.
Q Good morning, Ms. Christensen. I'm Will Geddes.



I'll be taking your deposition today.
I apologize if you already know the ground rules of depositions but I have to go over them to make sure that --
A I do not.
Q Okay -- to make sure that your deposition is taken properly and to let you know the obligations you're under when you're testifying today.
During this deposition, you'll be testifying under oath and penalty of perjury under the laws of the United States, therefore you're required to testify truthfully, completely, and to the best of your knowledge just as if you were testifying in court in front of a judge or jury.
Do you understand this?
A Yes.
Q The purpose of this deposition is to allow the parties to become adequately informed of the facts and issues of the case and to enable us to prepare for trial.
Our purpose here today is to avoid surprise at trial and to elicit truth, and your deposition today provides you with an opportunity to explain away any inconsistencies in your testimony, because if at the time of trial your testimony is different than it is today at your deposition, we will draw attention to that inconsistency to the jury in an effort to show the jury



that you're not a credible witness.
Do you understand this?
A Yes.
Q Therefore, it's very important to remember throughout your deposition today that if you wish to explain away or clarify any issue, fact or matter regarding your case, what you recall, what you don't recall, and your testimony, then today is the best day to do so, not the day of your trial.
Do you understand this?
A Yes.
Q Now, my purpose here today is not to trick you. I'm not here to confuse you. I'm here to allow you to take your time to answer the questions and to understand the questions before you answer them. We want you to understand the questions so you can provide truthful testimony.
Now, if you give an answer to a question, we can only assume that you understood the question. Sometimes, however, questions are very unclear. Lawyers are famous for asking bad questions, including myself. So if you don't understand any question, it's very important that you let us know that you don't understand the question and then we'll repeat it or rephrase it or give you time --



A Thank you.
Q -- to take your -- take your time with different parts of the question that make better sense. But, remember, it's incumbent on you to let us know that you don't understand the question.
Do you understand this?
A Yes.
Q Now, today we are entitled to receive your best testimony based on your best recollection of facts and events. It's very important that your testimony be very reliable and that it's based on facts and events that you can independently recall.
However, if you don't know the answer to a question, you should simply state that you don't know the answer. And --
Do you understand this?
A Yes.
Q Now, please keep in mind that where you're unable initially to independently recall facts or events, we may try to refresh your recollection, and that's commonly done, for example, by asking additional questions or showing you documents. Alternatively, you may have brought documents here today that might help you recall facts or events. Either way, we're all entitled to your best efforts at refreshing your recollection so that you

can give truthful, accurate and complete testimony today.
Do you understand this?
A Yes.
Q Now, sometimes it's appropriate to give your best estimates, even though you're not completely certain on matters capable of judgment by ordinary people, and that would typically involve matters of time, size and distance. For example, if somebody asked you -- this is a silly example, but if somebody asked when your grandson got a bicycle, you may not remember the date but you may remember it was around Thanksgiving before his birthday if that's when his birthday is.
So you may not know exactly when something happened but to the degree you can -- you can give your estimate as to time of the year or, you know, I remember this happened when the President got impeached, or something like that --
A Okay.
Q -- an event that was linked to it can help -- help you remember, and that type of testimony is appropriate if you can't remember the exact seem -- the exact time.
The other type of -- the other type of matter that it's appropriate for you to give estimates for are size and distance, and -- but it's important also to remember you should never speculate as to any matter whatsoever



during your deposition. And you can give reasonable estimates, we just don't want you to speculate. And so an example that's commonly given is if I asked you to look around and look at this conference room table and to estimate the size of it, you might be able to do that based on your powers of perception and your experience in the world and estimating distances. But if I asked to you estimate the size of the conference room back at my office, assuming you've never been there, you wouldn't be able to do that --
A Right.
Q -- without speculating, so that's the difference between proper estimates and improper speculation.
So there is a court reporter here and she's seated to your right, and she has a difficult job. She has to type in her notation every word that is spoken today, and so that the record is clear it's very important that we not speak over one another.
So if you could please do your best to wait until I complete the question before answering, I'll also try to do my best to wait until you finish your answer before I ask the next question. Then that way the court reporter won't have to yell at us for speaking over one another.
A Okay.



Q And please remember that today you're testifying with words, not gestures. Gestures are useless to a court reporter but they're very natural, and we shrug our shoulders or we shake our head but that gets lost in the translation, so please verbalize your responses.
A Okay.
Q Rather than nod your head, please say yes; rather than shake your head, please say no. As well, sounds like um-hum and huh-uh are not clear, so please remember to use words.
Do you understand these things?
A Yes.
Q Okay. Now, there are attorneys present here and they introduced themselves at the beginning of your deposition. Ms. Palmer and I represent the plaintiff, John Enos, and Mr. Brian Brown here represents the defendants in this case, the county and Vicky Sauer-Lamb and Scott Shick. So throughout the deposition today, from time to time you may hear attorneys make objections to the questions that are asked. It's -- it's important, though, to keep in mind that unless someone instructs you not to answer a question, you're still required to answer the question. And I won't bore you with the details as to why objections to the form of a question are made but generally the objections are put in there to preserve



rights at trial. It doesn't relieve you of the obligation to answer the question in your deposition.
Does that make sense?
A Yes.
Q And if you refuse to answer a question and it's not based on any instruction to not answer a question, then understand that any one of the parties can go to the court and file a motion to compel your answer. Alternatively, if there's a reason why an attorney might want to do it, they could move to exclude the refused information at trial which, in my estimation, in either scenario is not a good situation, so you really want to answer the questions --
A Okay.
Q -- that you can unless there's a privilege involved.
Now, in order to ensure the reliability of your testimony today, I have to ask if you are currently under the influence of any medication, alcohol, substance or drug?
A No medication that would --
Q Okay. Is there any reason you won't be able to understand my questions today?
A I don't think so.
Q Okay. And is there any reason you won't be able

to give your best testimony today?
A I'll do it as truthfully and knowledgeably as I possibly can.
Q Okay. Did you bring any documents with you today?
A No.
Q Okay.
A Just the subpoena.
Q All right.
A I -- I'm retired so I don't have access.
Q Okay. Ms. Christensen, what, if anything, did you do to prepare for your deposition today?
A Nothing.
Q Okay. Did you speak with anyone in preparation for your deposition today?
A No.
Q Where do you live?
A Gardnerville.
Q How long have you lived there?
A Twenty years.
Q Do you plan on moving your residence in the next two years?
A Thinking about it.
Q Okay. That question is important because if there's a trial in this case, we need to determine whether you'll be more than a hundred miles from Reno.



Do you think you're going to be --
A We're hoping to move to Carson City.
Q Okay. So you'll be within a hundred miles?
A Yeah.
Q Okay. Thank you.
Please don't be offended when I ask you, how old are you?
A Sixty-six.
Q Are you married?
A Yes.
Q Do you have any children?
A Yes.
Q Where did you go to school?
A I went -- well, I went -- I completed high school in Kremmling, Colorado, and I've taken classes at different -- like Truckee Meadows, Douglas -- or Western Nevada.
Q Okay. You're retired?
A Yes.
Q Okay. And when did you retire?
A March 1st, 2017.
Q Okay. And we'll get into where you worked and what you did but when you retired, you retired from Douglas County?
A Yes.



Q Okay. What are your hobbies?
A Crafts. I do water aerobics. Other than that, you know, not a lot.
Q Okay. Have you ever been convicted of a crime?
A No.
Q Okay. Have you ever been arrested?
A No.
Q Have you ever been a party to a lawsuit other than -- well, you're not a party in this lawsuit, but have you ever been a party to a lawsuit?
A No.
Q Okay. Have you ever testified in a deposition before?
A No.
Q Okay. Have you ever testified at a trial before?
A No.
Q Have you ever testified at, say, an administrative hearing?
A No.
Q Okay. Now, have you ever received education or training in the subject of employment discrimination?
A No.
Q Let's talk about the places where you've worked, can you list them? You worked for the county for a while; is that right?



A About 18-and-a-half years.
Q Okay. So can you list maybe if you had -- the three jobs that you had before the county?
A I worked for -- well, for about 10-and-a-half years I worked for SE Rykoff who sold to Rykoff who sold to US Food Service. And prior to that I worked for Abbott Supply, which was another food distributor. And before that I worked for Larimer County Assessor's Office in Colorado.
That's going back a lot of years.
Q That's fine. All right.
Now, in Douglas County, what was your job at Douglas County?
A I worked in Human Resources.
Q And what was your job title?
A When I left, it was an HR Analyst.
Q Okay.
A And I can't remember the exact title right before that.
Q Okay. Was it HR Technician?
A Could have been.
Q Okay. What was the time period that you worked in Douglas County Human Resources Department?
A November of '98 until I -- my retirement.
Q March of 2017?

A Yes.
**Q Okay. Now, your prior job to that, I'm going to butcher it but I thought you said Rykoff and it moved into US Food?**
A Yeah. We were sold several times.
**Q When did you work there?**
A Well, my ending date would have been right when I started with the county. I think I went to work there in '88.
**Q 1988, okay. And can you remember Abbott, is that too far back, or do you remember when you worked there?**
A Probably '82 until '88.
**Q Okay. And what about Larimer County Assessor's Office?**
A Approximately '80 to '82, '79 to '81, somewhere in there.
**Q Okay. All right. So we can look at documents later but my understanding as to what your title was at Douglas County Human Resources Department, at least for a portion of the time that you're there, was called a Human Resources Tech 1; does that ring a bell?**
A Yes.
**Q And would that -- that would -- was that the job you had before you retired?**
A No. I was an HR Analyst.



**Q Okay. All right.**
**Can you tell me what the difference is, please, between the analyst and the technician or the tech?**
A I took -- I took on some different job -- like workers' comp and -- I can't remember what was added. Things changed around, we did some reorganization and stuff --
**Q When was that reorganization?**
A -- and it was title.
**Q I'm sorry.**
A I can't remember exactly. I think it was right after Norma Santoyo became manager.
**Q Okay. And do you remember the different -- when were you a technician and when did you become an analyst?**
A To be quite honest, I really don't remember exact times. It was after Norma Santoyo became manager and she was only there about two years, if that. Because we went through kind of a reorg and name -- they kind of renamed positions and --
**Q Well, is it your recollection that you were a Human Resources Analyst for only two years before you retired?**
A That sounds probably about right.
**Q And before then you were the technician?**
A Yes.



**Q And you were the technician from '98 until the time you became an analyst?**
A No. I had -- there was a bunch of different titles in there. I really can't even remember all of them.
**Q Okay.**
A I was --
**Q What were your job duties?**
A From -- well, they changed over the years in 18 years.
**Q Okay. Well, if we could just sort of go back in phases.**
A I started basically as front desk and did newsletter and did, you know, paperwork and helped the counter a lot.
**Q Okay. And what changed after that?**
A Well, let's see. This is really taking my memory back.
**Q Take your time.**
A I worked in the front office a lot of the years. I did a lot of tracking of documents, filing -- I can't even remember when I started doing tracking of fingerprints and -- honestly, I can't remember all my duties.
**Q Okay. We'll go through some categories but I wanted to see what your recollection was.**



**Is there anything other than when you worked at the front desk, did the newsletter and paperwork, worked at the counter, tracked documents, tracked fingerprints, anything else that you remember what your duties were prior to the time you retired?**
A Well, before I retired I was doing workers' comp --
**Q Okay.**
A -- fingerprinting, FMLA tracking -- gosh, when I left the county, I kind of shut the door.
**Q Okay. When you say "workers' comp," what kind of work did you do for workers' comp?**
A Got the paperwork together and sent it off to the third-party administrator.
**Q Do you remember the name of the third-party administrator?**
A I can remember the name of the person I dealt with.
**Q Okay. Who was that?**
A I can't think of the name -- it was Karen Barbee, I think is what it was.
**Q And so what about FMLA tracking, what does that mean?**
A Getting paperwork together, tracking time, time

off and, you know, making sure the correct paperwork got out to the person, you know, see if -- making sure with my manager and stuff that it was to be approved.
Q Okay. Anything else come to mind?
A Not off the top of my head, no.
Q Did you have a supervisory role when you were working in the HR Department?
A No.
Q Who supervised you?
A Usually the manager.
Q Okay. You mentioned Norma Santoyo, was she your supervisor?
A For a period of time, yes.
Q Then prior to Norma Santoyo, who was your supervisor?
A Darcy Worms.
Q Okay.
A Prior to Darcy was Sheila Dugan.
Q Okay. All right.
Have you ever received training in matters concerning the Americans with Disabilities Act or the ADA?
A Went to seminars on it.
Q Okay. Do you remember when you went to those?
A No, I don't.



Q Do you remember how many seminars you went to?
A Probably two or three.
Q Okay. And was that when you were an HR Analyst or a Technician?
A Probably Technician.
Q Okay. All right.
When you worked in HR, did you ever handle any matters involving the ADA?
A No. The manager usually took care of those things.
Q Okay. Have you read any documents of this lawsuit, the pleadings or any motions?
A No.
Q What is your understanding, if you have one, of this lawsuit?
A That -- well, I was told that it's a wrongful termination lawsuit. Is that correct?
Q Well, when were you told that?
A I think you told me that on the phone when I called.
Q Anyone else talk to you about the lawsuit?
A No.
Q Okay. Well, I'm not sure I said it was a wrongful termination lawsuit.
MR. BROWN: Objection; argumentative.



MR. GEDDES: My recollection of our conversation was more about --
THE WITNESS: I -- I asked you what it was about.
MR. GEDDES: Okay.
BY MR. GEDDES:
Q What's your recollection of our conversation?
A I just told you that I didn't remember too much, and I asked you what it was regarding and you said it was John Enos, and I thought you said wrongful termination.
Q Okay. So let's turn to John Enos. Do you know John Enos?
A Well, I recognize him.
Q And you know him from when he worked at Douglas County?
A Yes.
Q Okay. And you understand he's the plaintiff in this lawsuit?
A Yes.
Q And you know what a plaintiff is --
A Yes.
Q -- and what a defendant is? Okay.
How long have you known Mr. Enos?
A Actually -- I mean, he was an employee there. We saw him, you know, if he came in the office or --
Q Okay. So as long as you worked there and he



worked there, you've generally known him?
A Sort of, yeah.
Q How would you characterize your relationship with Mr. Enos, personal, personal and professional, or strictly professional?
A Professional.
MR. BROWN: Objection; foundation.
MR. GEDDES: Go ahead.
THE WITNESS: Professional.
MR. GEDDES: Okay.
BY MR. GEDDES:
Q And after Mr. Enos left his employment with Douglas County, did you have any communications with Mr. Enos?
A Not that I remember.
Q Okay. Were you ever instructed by anyone not to speak to Mr. Enos after he left his employment with Douglas County?
A Not that I remember.
Q Okay. Do you know someone named Scott Shick?
A Yes.
Q Who is he?
A He would have been his manager or director.
Q At the Juvenile Probation Department --
A Yes.

Q -- for Douglas County?
A Yes.
Q And how long have you known Scott Shick?
A As long as he was at the county; he came after I worked there.
Q It's the same question I have, your relationship with him in connection with your work, would you characterize it as personal, personal and professional, or strictly professional?
A Professional.
Q And after you left your employment at Douglas County, did you have any communications with him?
A I ran into him one time and I happened to be on the sidewalk in front of a friend's house that just lost her husband and he lived a couple of doors down.
Q Okay. Did you have any communications with him about work or Mr. Enos?
A No.
Q How frequently do you speak to Mr. Shick nowadays?
A That's the only time I've seen him since I retired.
Q Okay. Do you know someone by the name of Vicky Sauer-Lamb?
A Yes.
Q Okay. Who is she?



A She worked in Juvenile Probation, I don't remember her title.
Q Okay. How long have you known her?
A The whole time I worked at the county.
Q Okay. The same question about your relationship, would you characterize it as personal, personal and professional, or strictly professional?
A Professional.
Q Okay. And after she -- she no longer works for the county; correct?
A I don't know.
Q Did she retire before you did?
A I don't remember.
Q Okay. Have you had any conversations with Ms. Lamb about this lawsuit?
A I have not seen her.
Q You haven't had those conversations?
A No.
Q Do you know someone by the name of Justina Caviglia?
A Yes.
Q Who is she?
A She was a Deputy DA.
Q For Douglas County?
A Yes.



Q How long have you known her?
A The years that she worked there. She came quite a bit later than I did, I'm not sure when.
Q Okay. The same question about your relationship with her, was it personal, personal and professional, or strictly professional?
A Personal and professional.
Q The personal aspect, tell me about that. How -- what gave rise to a personal relationship with her?
A She -- she was our HR DA and she was friends with my manager at the time.
Q Norma?
A Darcy.
Q Oh, Darcy. Okay. Did you -- would you ever socialize with her outside of work?
A On rare occasions, like at the Parade of Lights at Christmastime we'd all stand together, and like Darcy's birthday we'd have dinner together out someplace.
Q All right. So after you left your employment at Douglas County, have you had any communications with Justina Caviglia?
A Facebook. I haven't actually run into her.
Q You guys are friends on Facebook?
A Yes.
Q Okay. How frequently would you say that you



interact with her either through Facebook or communicating with her nowadays?
MR. BROWN: Objection; foundation; vague as to interact.
BY MR. GEDDES:
Q Interact would be communicate. So if you're, for example, giving her a like on a post in Facebook, I consider that to be a communication, or a message or anything like that.
Do you understand the question?
A Well, yes. As far as Facebook, probably -- because she posts a lot -- probably a few times a week --
Q Okay.
A -- a like.
Q And what about do you actually communicate in comments on Facebook, like comment on her Facebook postings?
A Rare occasion.
Q What about messages through Facebook or texting or any other kind, e-mail or --
A I have texted her. Mainly the one that comes to mind is I asked her for a suggestion for an attorney for a trust or a will, and she made a suggestion to me.
Q Okay. Have you ever -- since you left Douglas County, have you had any conversations with Ms. Caviglia

about Mr. Enos?
A No.
Q Have you had any conversations with Ms. Caviglia about this lawsuit?
A No.
Q Do you know Nathan Todd Young?
A Doesn't sound familiar at all.
Q The judge, Judge Young?
A Oh, Judge Young. Not really, no.
Q Okay. You didn't interact with him very much when you worked in HR --
A No.
Q -- at Douglas County? No. Okay.
What about Michael Gibbons?
A I knew who he was. I never talked to him personally, that I remember.
Q Okay. He was the judge at the time at the Ninth Judicial District Court?
A He was, I believe.
Q But you say you've had no communications with him?
A No.
Q Okay. Norma Santoyo, I think you mentioned her, she was your supervisor?
A Yes.
Q Do you recall generally when she became your



supervisor?
A Maybe six years ago. I don't remember exactly.
Q Did she retire before you did?
A She left the county; she didn't retire.
Q I'm sorry. Did she leave her employment at Douglas County --
A Yes.
Q -- before you did? Okay.
Do you know where she went?
A I heard that she went to Nevada Rural Housing.
Q So how would you characterize your relationship with her, personal, personal and professional, or strictly professional?
A Professional.
Q And after she left her employment with Douglas County, did you have any communications with her?
A None whatsoever.
Q Okay. Do you know -- I think you mentioned this person, Karen Barbee?
A Yes.
Q Okay. And your recollection is that she is the third-party administrator for workers' compensation claims for Douglas County?
A Yes. And I wish I could remember the name of the company, I can't.



Q Okay. How would -- how long have you known her?
A I dealt with her probably a couple of years.
Q How frequently would you interact with her, talk to her on the phone, or communicate with her?
A Sometimes daily, sometimes not for a week or two, just depended what we had going as far as workers' comp.
Q Okay. How would you characterize your relationship with her, personal, personal and professional, or strictly professional?
A Professional. I never actually met her, it was all over the phone.
Q Okay. After you left your employment with Douglas County, did you have any communication with her?
A No.
Q Do you know someone by the name of Kathy Jo Kidd?
A Yes.
Q Who is she?
A She was the HR Analyst Senior or -- I believe. She was second in --
Q Sorry?
A -- second in command, I guess is --
Q Underneath Norma?
A Yes -- well, no. She was under Wendy Lang. Wendy Lang was under Norma, and then when Norma left Wendy Lang became manager.



Q Well, you describe her as an Analyst Senior, how did that differ from your position when you became an Analyst?
A She had a lot more responsibility.
Q Okay. What is your understanding of what her responsibilities were?
A Well, I don't really know what she dealt with exactly.
Q Was she a supervisor to you?
A No. She was under Wendy Lang, who was the Manager, but she -- she -- well, she was a supervisor when Wendy Lang was out on maternity leave.
Q How long had Wendy Lang worked at the HR?
A While I was there, probably three-and-a-half, four years --
Q So three-and-a-half to four years --
A -- because she was hired -- Norma hired her.
Q Okay. So basically your recollection is she worked there three-and-a-half to four years of your final years there?
A Yeah.
Q Okay. Do you know what -- what were Wendy's job duties as the Manager -- she was the HR Manager?
A Yes.
Q And what were her job duties; do you know?

A She dealt with most of the legal issues and everyday proceedings, I guess, and oversaw all of us. She dealt with insurance and oversaw all of the departments of hiring and -- or not departments but divisions of the HR Department.

**Q Okay. And after you left your employment with Douglas County, did you have any communications with her?**

A No.

**Q How frequently do you speak to her nowadays, if you do?**

A I've run into her once since I retired.

**Q Have you had any conversations with her about this lawsuit?**

A No.

**Q All right. Now, typically where did you work, at what building?**

A Well, I worked in two different buildings.

**Q Okay.**

A We started out -- when I started out, we worked in the old courthouse, which was on 8th Street, and then -- I can't even remember what year we moved over to the Minden Inn.

**Q Where is HR now, in the Minden Inn?**

A I believe it's still in the Minden Inn.

**Q Okay. But for the time when you were an Analyst**



**you worked at the Minden Inn?**

A Yes.

**Q Okay. Now, the HR Department, you worked in an area where Norma worked and Kathy Jo Kidd worked --**

A Yes.

**Q -- and others, could you -- I'm trying to get a visualization of what the office layout was, could you draw a quick sketch of where your office -- did you work in a cubicle or an office?**

A Well, both actually. I worked in a cubicle for a while and then the last year maybe I was -- shared an office with Kathy Jo.

**Q Could you -- are you able to just draw where your cubicle and office were, and where Norma Santoyo's office was?**

A Okay. Well, when Norma first came, she was in this office.

**Q Okay.**

A Then I sat here.

**Q Okay?**

A And then Norma moved into this office. Then after a while, I moved to this cubicle. And then about the last year or so, the Manager, Wendy, moved down here and Kathy Jo Kidd and I were in this office.

**Q Okay. So maybe what we could do to make things**



**simpler is because that -- that's not going to make any sense to anyone other than you and I reading it, can you mark down a 1 and then put Norma's name in her office when --**

A When she started?

**Q Right. But you put a 1 so that's the first time.**

A (Witness complies.)

**Q And then 1 at your cubicle when you were right outside.**

A (Witness complies.)

**Q Okay. And then a 2 for when Norma moved there and a 2 for your cubicle?**

A I can't remember, you know, how long I was in this --

**Q Right, it could have been 2 or 3, but at some point you moved so that would be you again.**

A (Witness complies.)

**Q And then if you could just put a 3 by the office, and then you can just write down your name and the person you were with in the third spot?**

A (Witness complies.)

**Q And you want to put a 3 by Kathy Jo; right?**

A Oh, okay.

**Q Yeah. That's perfect. And can you just -- could you just sign your name and date that, please?**



A (Witness complies.)

**Q Today is the 24th. Thank you very much.**

MR. GEDDES: Could we please mark this as Exhibit 1?

(Exhibit 1 was marked.)

BY MR. GEDDES:

**Q So from time to time -- now, I'm imaging, so if this isn't true, let me know it's not true -- but from time to time you could hear conversations in the office; correct?**

A Well, you always do, but for the most private conversations doors were closed so you couldn't really hear much.

**Q When Ms. Santoyo's door was closed, either office 1 that you've marked here or office 2 that you've marked here, could you sometimes hear conversations if voices were elevated?**

A You couldn't really hear what was -- any -- you could hear noise.

**Q Okay. And given that your cubicle was so close to Norma's office No. 1, and Norma's office No. 2, could you sometimes see people going into Norma's office?**

A Yes.

**Q And sometimes Norma left her door open and you could hear conversations as well?**

A On rare occasions she might have --
**Q Okay.**
A -- depending on who was in there.
**Q Okay. Thank you.**
**So I'd like to focus on the last -- maybe from the period of time -- you retired in March of 2017, if we could focus a little bit here on the time period of 2014, 2015, 2016, so the last four years --**
A Okay.
**Q -- to 2017, what was your typical workday like? I'm interested in knowing what types assignments you worked on. You talked already about tracking and worker's comp, but what would your typical daily life be?**
A Well, come in, usually I was -- usually I was the first one there, you know, open up the office, sit down, just -- every day was different --
**Q Right.**
A -- because, you know, there's always something different going on in HR, as you probably well know.
I would try to go through fingerprinting because it would -- you know, if we had fingerprints come in that was for volunteers and stuff and to be able to get them to working, or employees.
**Q So that's your background check?**
A Yes.



**Q Okay.**
A It was part of background check and a lot of times I helped with background checks.
**Q Okay.**
A Disperse the mail when it came in, you know, people walking in the door, you answer questions for them or directed them to the person who they needed. Depending on if workers' comp came in, do paperwork, get it off to the third-party administrator, just depending on what paperwork came in during the day or, you know --
**Q Right.**
A -- whatever came -- arose.
**Q Anything else that you recall as a typical day in the life of Sarah Christensen in the last four years?**
A I don't think there was a typical day.
**Q Okay. Was there a front counter area that people had -- like if employees had to come down and talk to HR or was it they had to make an appointment and come in and see one of you, how did that work?**
A The door was always open. They could come in, there was the three cubicles there, and they would all have countertops on them. You know, I sat at the one right at the front of the door until I moved into that far office.
**Q Okay.**



A And then the gal who took insurance sat next to me, then our recruiter sat next to her.
**Q So if employees had issues with workers' comp or if they had other types of things that were being worked on by HR, they were free to walk in the door and come to one of those counters and chat with you all?**
A Yes.
**Q If somebody had to come down to talk to Norma given that she was in an office, how would that work? They'd come to one of the -- they'd come to one of the counter cubicles and then ask to see her?**
A They would either do that or they would go over -- the county manager worked as kind of a counter for us, and they would call over to see if somebody was free.
**Q So if people had conversations with Norma in the HR office, would that necessarily be in her office or did she have an opportunity to come out to one of the cubicles and talk to them, say, at your counter or someone else's counter at those cubicles?**
A She --
MR. BROWN: Objection; foundation; speculation. Go ahead.
THE WITNESS: She would have them in her office or take them in the conference room that was beyond her office.



MR. GEDDES: Okay.
THE WITNESS: Or, you know, depending on what they came in for, you know. If it was a question she could answer that wasn't confidential or something, she would come to the cubicle.
**Q Okay. So you mentioned -- you mentioned Kathy Jo Kidd, Norma and you, who else -- what are the names of the people who worked in the area of your office in the cubicles, who were the other people?**
A Cindy McMurry.
**Q Did she work anywhere on this drawing, did she have a cubicle? I'll give you --**
A Well, she --
**Q -- a pen.**
A Okay. So -- let's see.
**Q Okay. So this -- thank you. On this exhibit you have drawn a 1 Cindy and a 2 Cindy, and that means --**
A We switched cubicles.
**Q Okay. And then you have someone by the name of Anita in the middle, who is Anita?**
A Anita McGillivray; she does insurance.
**Q Okay. And what did Cindy -- Cindy --**
A McMurry.
**Q Cindy McMurry, what did she do?**
A Recruiting.

Q Okay. Thank you.
Do you know if she still works there?
A As far as I know, Anita and her both do.
Q Okay. So what I'm going to try and do is save a little bit of time, but if I'm -- if I say anything incorrect, please stop me and correct me. It sounds like on the fingerprint work you did, that was assisting recruiting; is that correct?
A Yes.
Q So you worked with Cindy to help figure out if job applicants were going to be hired?
A Yes.
Q So you worked with -- who did you work with on workers' comp matters?
A The Manager.
Q Norma Santoyo or her predecessor?
A Yes.
Q You mentioned, however, that Wendy Lang was the HR Manager, did you work with her as well?
A Yes.
Q If you had to approximate in that time period of 2014 to the time you left, did Wendy Lang and the person who was either Norma Santoyo or who took her position, did they share that workers' comp work evenly or was it mainly done by Wendy; do you know?



A Can you --
Q Sure. I'm imagining there's workers' comp work to be done?
A Uh-huh.
Q Are they assigned cases or do they both work on the same projects, do they share in that; how did that work?
A Wendy and --
Q And Norma Santoyo or the person in her position.
A Norma pretty much oversaw everything I did. Wendy -- when Norma was there, Wendy was the HR Analyst Senior.
Q But who does more work on workers' comp matters, would it be Norma or --
A Norma did.
Q Okay. Now, in that -- let's broaden the time frame just a little bit, 2013 through 2016, you would communicate with Norma Santoyo or the person in her position on roughly a daily basis; correct?
A Yes.
Q Okay. And you would communicate typically with Kathy Jo Kidd roughly on a daily basis; is that correct?
A Basically because we shared an office.
Q Okay. But you also helped -- well, you shared an office you said, I think, in the, what, last few years?



A Just the last year maybe.
Q Okay.
A Norma -- or Kathy Jo wasn't there that long --
Q Okay.
A -- before I retired.
Q All right. But did you also work on assignments with Kathy Jo Kidd?
A Not too much.
Q Okay. Now, do you recall working yourself -- personally working on any matters involving John Enos?
A I tracked his FMLA and did the paperwork for his workers' comp and sent it to the third-party.
Q Okay. And in your work -- we'll get into more detail a little bit later, but in your work with the third-party administrator, Karen Barbee, did you actually yourself contact doctors that may be treating for a worker's comp case, or did you just work with the third-party administrator and if that was -- if that were done, she would do that?
A The third-party administrator usually dealt with the doctors.
Q Okay. Now, when you say you tracked Mr. Enos' FMLA time, can you explain that better, what does that mean?
A Any time that was on -- once they got the



paperwork that they were accepted for FMLA, time off was marked on their timecards, and it was considered FMLA and I just tracked the amount of time to know how much time they've had off.
Q To your knowledge, recollection or understanding, was there a certain order; for example, a worker has vacation time, sick time, and what you're tracking, FMLA time --
A Uh-huh.
Q -- if a worker is out, say, on a workers' compensation leave, is one taken before the other typically; do you recall?
MR. BROWN: Objection; vague; compound.
BY MR. GEDDES:
Q Do you understand the question?
A If you can rephrase it, I'd appreciate it.
Q Sure. What was -- what was the priority of deducting a worker's time for workers' compensation leave; for example, if a worker has vacation time accrued, a worker has sick leave accrued, and a worker has FMLA time left, was there -- was there a policy or an order in which it was taken?
MR. BROWN: Objection; vague; foundation.
BY MR. GEDDES:
Q Do you understand the question?

A To an extent.
Q Okay. Let me give you an example.
A Okay.
Q I used to work at the Attorney General's Office and I had FMLA time for the birth of my son, and they had certain rules that you could take time off but first it has to come from your vacation time or your sick leave time, and then FMLA credit or deduction kicks in later or it's concurrent. I don't actually remember what it was for me when I worked under that system, but do you have an understanding --
A If I remember correctly, FMLA came out of your sick bank first --
Q Okay.
A -- and then you'd go into your vacation time.
Q Okay. And so how many -- to your recollection, how many weeks a year does a worker get FMLA time or credit that you're tracking?
A You're really pushing my memory here. I believe it's 12 weeks.
Q Okay. And so to understand what you're explaining then, if a worker -- and basically FMLA says if you have FMLA time, that person is guaranteed that -- their job, they can't lose their job?
MR. BROWN: Objection; calls for a legal



conclusion.
MR. GEDDES: Okay.
BY MR. GEDDES:
Q So I'm not asking for a legal conclusion, I'm asking for your understanding. Maybe you could explain what you understood FMLA to do as far as protecting someone's job.
A It could -- my understanding, as I remember it, because a lot of this stuff I haven't dealt with for quite a while, was that they did have the right to 12 weeks of time off, paid or unpaid, and we took sick leave, and a lot of people had that much time accrued, or sick leave, vacation leave, leave without pay.
Q Okay. I think I understand. So if a person is out on FMLA -- I'm trying to see if I understand you, so --
A Okay.
Q -- correct me if my understanding doesn't match yours --
A Okay.
Q -- my understanding from what you're saying is if a worker has FMLA leave time and there is sick time on their books to take, then that time is taken first, and if they have -- I'm sorry, you said vacation came first or sick leave?



A Sick.
Q Sick leave. And then --
A If I remember right --
Q Okay.
A -- and I'm pretty sure I do.
Q Okay. And if sick leave is no longer available but they have vacation time, and they're still out on FMLA but then it's drawn down from vacation. And then if and when that -- there's no more of that, then it's leave without pay?
A Yes.
Q So then in the first two categories, sick leave and vacation, they're paid, but in the third category when they run out and they're still under FMLA, they're not paid but they still have a job?
A Yes.
Q Okay. Now, the HR Department is involved in matters of hiring and firing county workers; isn't that correct?
A Yes.
Q Okay. Can you describe typically what the HR's involvement is in hiring the county workers?
A The involvement?
Q Yes.
A They run the recruit -- the departments submit



they need to hire someone and they -- the HR Department, you know, gets with them, finds out what they need, runs a, you know, recruitment or an ad.
They will then send the applicants to the department, and the department chooses who they want to interview. And then sometimes HR sets up the interviews or sometimes the department does.
Q Okay. Thank you.
Now, that typical involvement that you described for Douglas County workers, that would be the same for the hiring of employees in the Douglas County Juvenile Probation Department; correct?
A I believe so, yes.
Q Okay. Now, you've described the HR's involvement in hiring someone, isn't the HR also involved in disciplining county workers if they're going to get write-ups and things like that?
A I wasn't involved in any disciplinary --
Q Was --
A -- that was pretty much the Manager.
Q Okay. When you say "the Manager," someone like Norma Santoyo?
A Yes.
Q Do you have an understanding one way or another -- and your understanding may not be correct -- but do you

have an understanding as to how the HR Department, through its Manager, Norma Santoyo, would get typically involved in disciplining matters of county employees?

MR. BROWN: Objection; foundation.

MR. GEDDES: Let's take a step back.

BY MR. GEDDES:

Q You said that the HR Department, through its Manager, would handle disciplinary matters of county workers; correct?

A I couldn't say handles totally; departments a lot of times.

Q Okay. But they had some involvement?

A I would think usually, yes.

Q Okay. So what I'm asking here is what your understanding is as to what that procedure was?

A I -- I was not involved with disciplinary.

Q Okay. And you never had a conversation with Norma Santoyo about disciplinary matters?

A Not usually.

Q Do you recall any specific ones?

A No.

Q Okay. Do you know whether or not certain personnel rules applied regarding employees of the county; for example, were there county personnel rules that had to be followed?



MR. BROWN: Objection; vague; foundation.

THE WITNESS: Such -- I --

BY MR. GEDDES:

Q So employees -- let's take a step back. The Human Resources Department, what does it do?

You've mentioned recruiting, you've mentioned workers' comp, you've mentioned background checks, you've mentioned a little bit about disciplining, hiring, and so do you know when doing these things did the HR Department follow certain rules; for example, county personnel rules?

A I assume they did.

Q Okay.

A I mean, I wasn't in on disciplinaries, usually our Deputy DA would help with a lot of those.

Q But when you did your work, did you have to rely on or look at personnel rules?

A I'm trying to think if there was --

Q Take your time.

A -- a book or -- I mean, we had rules but I can't remember the specifics of -- you know, we had protocols and stuff basically but I don't know -- I can't remember.

Q Do you know what those -- where those protocols came from?

A I'm trying to think if there were -- no, I don't



remember.

Q Okay. Did the HR Department typically get involved in the firing of county workers?

A That was something out of my league, usually.

Q Okay. Do you have an understanding, though, whether the department itself performed any function assisting the other departments who had employees that were being terminated?

A They did. I know the Manager assisted in a lot of them.

Q That would be Norma Santoyo?

A Yes.

Q Okay. Have you ever -- have you ever heard that certain employees had to go by court personnel rules rather than county personnel rules -- have you ever heard that?

A I believe, yes, the courts did have separate -- they had a different list of rules.

Q And did those separate rules apply to juvenile probation officers, to your knowledge?

A I believe they were under the court rules.

Q So those --

A I believe they were.

Q Okay.

A And go back -- can we go back?



Q Yeah, sure. Absolutely.

A There was a -- there was a Douglas County handbook.

Q Okay.

A In fact, there was two volumes of it.

Q Okay. And what -- the handbook was regarding rules?

A Different procedures.

Q Okay.

A And you reviewed those before?

A Oh, yeah.

Q And did you have to comply with those rules?

A Yes.

Q Okay. Now, the court personnel rules, was that part of the two-part volume or the volumes that you're describing here?

A I believe it was in there. It was a whole separate section. And there was Douglas County Code, too.

Q Okay.

A I think that's what it was called.

Q So you described a process earlier that you described the HR Department's typical involvement in hiring someone and, you know, the way -- the way you described it was helpful. You said that the department

basically submits a need to hire and the HR Department gets with them and finds out what their needs are. And then the HR Department does recruiting and you mentioned ads. And then you mentioned that the HR Department sends to the department the applications or the applicants materials, and that the department chooses who to interview and that the department or HR sets up those interviews.
Have I fairly characterized your testimony?
A Yes.
Q Okay. Did -- do you recall specifically, did Douglas County Juvenile Probation Department have any involvement in hiring juvenile probation officers and senior juvenile probation officers?
A I can't remember offhand if we did. I would assume we did but --
Q I'm sorry, the Juvenile Probation Department separate and apart from the Human Resources Department, I mean, they would fall under your general description?
A And they would -- I believe they came to us, yes.
Q Okay. Now, given that the -- there was special court rules that applied to some workers. Do you know whether the judges of the Ninth Judicial District Court in, say, an administrative capacity, not acting as a judge in trial but in an administrative matter, did they



have any involvement in personnel matters involving court personnel?
A I don't know.
Q Okay. You never dealt with them on that?
A I did not.
Q You never saw them in Norma's Santoyo office or in the HR Department --
A The judges?
Q -- either Judge Young or Judge Gibbons?
A Off the top of my head, no, I don't remember.
Q Okay. Does that seem like something that -- that if it happened you would remember?
A Well, I would think, but a lot of times Norma went to their offices, too.
Q Do you know one way or another whether she actually communicated with the judges concerning personnel matters?
A I don't.
Q Okay.
MR. GEDDES: What I'd like to do, please, is mark Exhibit 2.
(Exhibit 2 was marked.)
BY MR. GEDDES:
Q If you could please just take a moment and look at that document. You actually -- I won't trouble you to



actually study every line --
A Okay.
Q -- if you could just generally look that over, because there's a lot of pages there and I don't want to keep you here too long.
What my basic question is is, have you seen this document before; does it seem familiar to you?
A I believe -- I'm not positive but I think this was in our handbooks.
Q Okay. So these seem as if they're the -- court personnel regulations that you were talking about?
A Yes.
Q Okay. Now, do you recall a separate set of regulations? We talked about it earlier but I wanted to see if I understand you correctly. Do you recall there being Douglas County personnel regulations as well?
A Yes.
Q Okay. All right.
So if we could -- and you also mentioned -- did you mention ordinances or -- I'm sorry, city --
A Douglas County Code.
Q Douglas County Code. Thank you. Okay.
Let me look at the next two documents. If we could mark this, please, as Exhibit 3.
(Exhibit 3 was marked.)



MR. GEDDES: While you're looking at that, I'm going to mark the next exhibit as Exhibit 4, please.
(Exhibit 4 was marked.)
BY MR. GEDDES:
Q So without looking at every page, does Exhibit 3 look familiar? Have you seen this before? Do these look like the Douglas County personnel regulations?
A It -- it looks familiar.
Q Okay. And then if you can just glance at Exhibit 4, this is a document which states that it's an ordinance amending the Douglas County Code relating to personnel matters. Does this seem like it's a code document that you were referring to with respect to things in the binders regarding the rules HR followed?
A I believe so.
Q Okay.
A Doesn't look like the binder because things are crossed out. Looks like a -- something that was in progress.
Q Okay. Now, to your understanding, and I know that you've testified you really weren't involved in disciplinary or firing --
A Right.
Q -- but you did some work in hiring and you did some work in workers' compensation and so there may be

some crossover, but if there's not just let me know.
My question specifically is, to your knowledge, in that time frame of 2014 and 2015, to your understanding weren't the Juvenile Probation Officers and the Senior Juvenile Probation Officers considered to be classified positions as opposed to at-will positions?
MR. BROWN: Objection; foundation.
THE WITNESS: I honestly don't know.
MR. GEDDES: Okay.
BY MR. GEDDES:
Q Do you know, when you worked in HR did you ever work with the idea that some jobs were classified positions and some jobs were at-will?
A Yes.
Q And whether or not you're correct or not, it's not what I'm after, and I'm not asking for a legal conclusion, I'm just asking in your understanding, what was your understanding of a classified position?
A Boy, I can't even remember how they were.
Q Well, as a general matter, was your understanding that at-will employees could be fired for no reason, just fired at-will; whereas, classified positions, or employees in classified positions, could be fired for cause -- is that your general understanding?
MR. BROWN: Objection; leading.



THE WITNESS: I honestly don't remember.
BY MR. GEDDES:
Q Do you -- do you have a recollection that classified employees have more protection than at-will employees?
MR. BROWN: Objection; foundation.
THE WITNESS: I -- I don't remember what the difference was between them.
MR. GEDDES: Okay.
BY MR. GEDDES:
Q Now, let's turn to Vicky Sauer-Lamb for a second. She retired; is that correct?
A I -- I don't remember.
Q Okay. Do you recall recruiting anyone to fill a position for the Chief Deputy Probation -- Juvenile Probation Officer?
A I don't remember. I wasn't involved in -- at that time, I wasn't involved very much besides fingerprints in the recruitment.
Q Okay. So you don't recall one way -- you don't recall having any --
A I don't remember.
Q Okay. And you don't even --
A I don't remember being involved in it.
Q Okay. And you don't even recall whether she



retired?
A I don't remember.
Q Okay.
A Well -- I don't remember for sure. I --
Q Let's --
A I vaguely remember she did retire or was going to retire but I don't remember --
Q Okay.
A -- remember when.
Q Okay.
A Whether it was before or after me.
Q If we looked at the chain of command of the juvenile probation office, to your recollection, Scott Shick was on top; is that correct?
A Yes.
Q He was the --
A Director.
Q -- the chief?
A Or chief, I guess, yeah.
Q And then who was beneath him, was that Vicky Sauer-Lamb, was she the Deputy Chief; do you recall?
A I believe so.
Q Okay. And your testimony is you -- you may -- you might recall that she retired but you're not sure?
MR. BROWN: Objection; asked and answered.



THE WITNESS: I can't remember whether she was just talking about retirement, whether she retired before I left or if she was just talking about it.
BY MR. GEDDES:
Q But you definitely don't recall being involved in hiring or replacement; is that correct?
MR. BROWN: Objection; asked and answered.
THE WITNESS: I do not remember.
BY MR. GEDDES:
Q Okay. All right.
So I'd like to focus a little more on what you talked about earlier -- actually, let me take those exhibits and give them to the court reporter so we don't actually walk away with them. Let's see, 4, 3, 2, 1. Thank you.
And I'm not trying to repeat questions, I'm trying to just drill down on some detail, so I apologize if they sound repetitive, but the HR Department, to your understanding, was responsible for reviewing and processing workers' compensation claims for injured workers; correct?
A Processing them, yes.
Q And you performed these types of tasks, yes?
A I did for a while, yes.
Q Who else did? You said Norma Santoyo --

A She was the Manager -- I did the -- I basically processed the paperwork; if any issues came up, then she was involved.
Q Okay. And sometimes you would get the medical records themselves; correct?
A Usually the third-party administrator got them.
Q But if there were an issue, the third-party administrator would sometimes send them to your office; isn't that right?
A I mean, we got doctors' excuses --
Q Okay.
A -- and stuff that was filed within the workers' comp files that were logged.
Q And what -- what's a doctors' excuse, what does that mean?
A You know, that they were going to be off of work for so long, or they couldn't do this or --
Q So those are types of documents that you and the third-party administrator would get; is that correct?
A Yes.
Q Okay. Was the HR Department involved in finding light duty for injured workers?
A If there was any available, yes.
Q Okay. Can you describe what that process was?
A Depending on what restrictions were on the person.



Q Okay.
A You know, if there was anything available that would fit those restrictions in the county, we would try to place them back.
Q Who is we?
A The department or -- if we could get them back in the department, we would.
Q Get them back into their own department?
A On light duty, yes. Sometimes we could get them in other departments, you know, on a -- some sort of matter if they -- a department was willing to do that or if they had need for it.
Q Was there a database of here are all the light duty positions, anyone --
A No.
Q So you had to research those and track them down?
A Pretty much.
Q Okay. And you performed those types of tasks -- I mean, you actually --
A At times, yes.
Q -- would find light duty work; correct?
A Yes.
Q Okay. Who else in the HR Department would look for light duty work?
A Sometimes Norma, I would think.



Q And what about some of the other folks that you mentioned, Kathy Jo Kidd, did she sometimes look for light duty work?
A I don't remember.
Q What about Cindy McMurry?
A No.
Q She wouldn't get involved in that?
A No. She was a recruiter.
Q What about Anita?
A No.
Q Okay. Now, was the HR Department, to your understanding, involved in complying with ADA requirements for workers having disabilities?
A Yes.
Q And so can you describe what that process was?
A That was done by the Manager.
Q Norma Santoyo?
A Yes.
Q Did you personally do any work regarding compliance with ADA requirements?
A Not that I recall. Not that I remember.
Q Who else besides Norma Santoyo would do that type of work?
A Possibly Kathy Jo.
Q But you don't know, you're saying possibly?



A I don't know.
Q Okay. So other than Norma Santoyo, you don't have any knowledge about the matter?
A Not that I remember doing.
Q Now, I think you've described it already but HR was responsible for monitoring the status of injured workers who were on medical leave relating to their injury --
A Yes.
Q -- isn't that right?
And you described, for example, tracking FMLA time, that's one way you've monitored it. I think you described work excuses; is that a way that you also monitored it?
MR. BROWN: Objection; vague; compound.
THE WITNESS: Can you -- yeah. Can you explain that?
BY MR. GEDDES:
Q So when we talked about the monitoring the status of an injured worker who is on workers' compensation leave relating to their injuries, if a -- this is a typical example, I'm not giving you -- I'm not asking you about a certain instance but, typically, if a doctor sends in a work excuse and says, this worker will be on light duty for three weeks, and then you get one that

says, this person can return to work as of and gives a date, is that something that you would track with an expectation that the worker is coming back?
A Yeah.
Q Okay. And how would you track it? Did you have a chart, an Excel spreadsheet, did you write it down, did you have a calendar, how would you organize that information?
A Give me a minute to remember this.
Q Okay. Take your time.
A Um. I believe we did it on the spreadsheet but I can't remember exactly.
Q Okay. And was there a person or persons in charge of tracking that so that they could inform departments when their workers were coming back?
A Myself.
Q Okay.
A And -- well, I kept Norma informed.
Q Okay. Do you recall monitoring the status of John Enos and when he might be coming back to work?
A Yes.
Q Okay. And can you generally describe what your recollection is about that?
A This has been a while.
Q Take your time.



A I remember doing a letter when his time was getting close to the end and giving it to Norma Santoyo, and from there she took it.
Q When you say "his time was coming to an end," what does that mean?
A When he had exhausted -- when he was getting close to exhausting.
Q His FMLA leave?
A Yes.
Q Okay. Do you recall what Norma Santoyo did with the letter that you gave her?
A I believe she sent it Certified Mail to him -- that's what I believe.
Q All right. And in the time that you've worked for the county, have there been instances -- we're not talking about Mr. Enos here, so if it happened to him, excluding Mr. Enos -- have there been instances where workers used up their FMLA time and their employment became separated as a result of that?
A I believe so.
Q And you were involved in that, that's your recollection?
A To an extent, yes.
Q Okay. Can you describe what that process was? You sent out a letter and then what typically happened in



those other instances?
MR. BROWN: Objection; foundation.
THE WITNESS: When they had exhausted their time, we -- two weeks before we would send a letter, certified mail, notification that this is when their time was exhausted, and if they cannot return to work they could be -- their job could end.
BY MR. GEDDES:
Q Now, return to work, was there a condition put on the return to work; for example, return to work with full medical releases?
MR. BROWN: Objection; foundation.
THE WITNESS: On -- I -- well, we didn't have a lot of them. Off the top of my head, I can only remember one, and I believe that was the -- I'm sure -- I think there was probably more. Off the top of my head, I can only remember one other, and I believe it was full release.
BY MR. GEDDES:
Q Okay. You're not talking about Mr. Enos --
A No.
Q -- you're talking about another instance?
A Yes.
Q Did that person's employment end?
A Yes.



Q Do you recall one way or another whether that person appealed it or complained or protested it or --
A To my knowledge, no.
Q Okay. Now, if I'm understanding you correctly, the county isn't going to fire someone when they have that FMLA time available; correct?
A Can you be more specific?
Q Right. If a person is out on workers' compensation leave but they have FMLA time still available, they're not going to get one of those letters?
A Right.
Q Okay. And I think you've described the HR Department performed the function of communicating with the third-party administrator for workers' compensation claims. I think the company's name that you're trying to remember, does Alternative Service --
A Yes.
Q -- Concepts ring a bell?
A Yes.
Q That's who Karen Barbee works for?
A Yes.
Q Okay. All right. Now, did the HR Department communicate with Justine Caviglia or anyone at the Douglas County DA's Office regarding workers' compensation claims or FMLA matters?

A On occasion -- well, yes.
Q So she was Deputy District Attorney assigned to the H -- the Human Resources Department which was the client; is that right?
A Yes.
Q And that is through the county DA's office?
A Yes.
Q So you had communications with Justina Caviglia on these types of matters; correct?
A Usually my conversation was with the manager, with Norma, and she would communicate with Justina.
Q Did you ever sit down and have meetings with Justina?
A I remember a couple of them with Norma and Justina.
Q Okay. The reason why I ask this is that, you know, again, I talked earlier about working at the AG's Office, I had a lot of government clients myself so I just remember going and, you know, meeting with them, sometimes individuals, but your recollection is you did have some meetings with Justina?
A I was included on some.
Q Okay. Do you ever recall having meetings with Justina Caviglia about Mr. Enos?
A I believe she was involved, yes.



Q And do you recall what those matters were about?
A It was about FMLA time --
Q Right.
A -- exhausting it.
Q And what about it?
A That it was going to be exhausted.
Q And that -- did Justina Caviglia have any input on the letter that you gave to Norma?
A I don't know.
Q Is that something you recall or was it so common of an event that you wouldn't recall it?
A Norma may have had conversations with her about the letter, I don't know.
Q And you don't recall any specific conversations with Ms. Caviglia about the letter that you're describing, Mr. Enos' --
A Not that I remember.
Q I'm sorry -- Mr. Enos' FMLA time running out, you don't recall that?
A No.
Q Do you recall having any communications in any form, e-mails, memoranda, anything like that?
A With Justina?
Q Yes.
A Myself, no.



Q Okay.
A Or let me rephrase that. I don't remember.
Q Okay. If we focused on -- back on the issue of the other aspect of what you did, the hiring part of what you assisted with, I know you testified that you did fingerprint work on background checks, and you described the hiring process, where were those notices? You talk about advertisement, what kind of advertisement was done for open positions in county departments?
A I don't know what system we were on at that time, I don't remember. A lot of times it was -- a lot of them went to Indeed, they put ads in the paper, the Record Courier in some places
Q You said "Indeed"?
A Indeed, I think it was.
Q Indeed?
A Indeed.
Q Okay. What is that?
A I don't know. The recruiter did all the advertising.
Q Okay. And the recruiter --
A And I know it was all of them posted on our website usually.
Q Okay. And Mary Jo Kidd was the recruiter?
A No. Cindy McMurry.



Q Oh, I'm sorry. Thank you.
Now, were the resumes and job applications sent to the HR Department and then you'd gather them up and they would be forwarded to the departments to screen; how did that work?
A I'm trying to think of the system we were on and I think it was New World systems -- no, that's not right. I can't think of the recruiting system we were on because a lot of those were -- most applications -- we finally went to a system where all applications were done online, and then she could release those to the department to look at.
Q And when you say "she," you're talking about Cindy McMurry?
A Yeah.
Q Well, let's do this, let's focus on 2016 -- 2015 to 2017, that last two-year period that you worked at the county, what I'm trying to understand is did the HR Department do screening and say, "No," "Yes," "Yes," "no," "Okay, we'll send these good guys and gals over to the departments," or did you say, "Hey, guys, here's what we've got, you -- you screen them out," who did the initial screening?
A The system -- if -- and I'm pretty sure we were on this system, and I can't think of the name of the

Page 74

system -- you put the -- Cindy put in the criteria of what the recruitment was or the -- I'm not saying this right -- the criteria for hiring and some departments wanted to see all the applications, some of them would take just what was filtered out or filtered, you know, so it -- I don't know. I didn't --
Q Filtered out by Cindy?
A Yeah -- well, by the system, by the criteria that the hiring managers wanted.
Q Okay. Do you recall there ever being an instruction from anyone not to accept applications from John Enos?
A I do not remember anything like that.
Q Okay. And do you recall whether John Enos ever applied for work with the county, not necessarily just the Juvenile Probation Department, after his initial separation of employment happened in 2015?
A I don't remember anything like that, and a lot of that I just didn't deal with.
Q Okay. On your background checks you said that you did fingerprints, did you do anything else for background check work?
A On occasion, if we were really backlogged, I would call references.
Q Okay. Do you recall actually ever doing any

Page 75

background check on John Enos for any position?
A No -- not that I remember anyway.
Q Would the HR Department be involved in interviewing -- I know you talked about scheduling, but actually being a part of the job interview process?
A Depending on the department, they would -- some of them would have an HR person sit in on an interview or sometimes they didn't.
Q What about the Juvenile Probation Department?
A I don't remember, and I wouldn't be the one sitting in so...
Q Did the HR Department do anything like processing scorecards or notes or evaluations if those were done in an interview?
A Can you explain that more?
Q Yeah, my understanding, but if it's not your understanding, then whatever the truth is. But my understanding is sometimes when the governments hire people they have a scoring system and they ask certain questions and they rate the employees or the applicants, and that way people feel like, well, there's more fairness because there's a scoring sheet. Do you know whether Douglas County did scoring sheets for any of these job interviews?
A I know on the few interviews that I did sit in on

Page 76

personally, we did have a list of questions with a scoring system that you added up and each interviewer, and there was usually three there -- three up, however many, would use that.
Q So did the HR Department -- for example, if the Juvenile Probation Department used that system but the Juvenile Probation Department was really busy and said "Hey, HR, will you guys just add all these up and process this?"
What I'm trying to ask is did the HR get involved in processing those rankings or scores, or was that something the departments typically handled?
A I think if the HR person was there, they got involved. I don't know --
Q Okay.
A -- exactly.
Q Do you know if the HR Department got involved in notifying the applicants as to whether they were hired or not?
A Depended on the department.
Q Okay. So sometimes?
A Sometimes, sometimes not.
Q Okay. Do you know for the Juvenile Probation Department which that was?
A I do not know.

Page 77

Q Now, you testified that you weren't involved in disciplinary matters, do you know one way or another whether the department got involved -- you said the manager was involved, but do you know whether the department was involved in sending out letters, disciplinary letters or termination letters, or was that something handled in the department?
A I don't know.
Q Did the HR Department that you worked at, did they hold office meetings?
A Yes.
Q How frequently were they held?
A Depended on the manager.
Q Okay. Well, what would -- what would be typical per manager? I mean, there weren't that many managers; were there?
A Well, I was under four different managers in my time there.
Q Okay. So in 2013 to 2016, that's my question then, limit it to that.
A Norma's were sporadic, you never knew. Wendy usually tried to have weekly ones.
Q Who attend these meetings that Norma and Wendy held?
A All of us in the office.

Q So everyone that you've described --
A Yes.
Q -- in the diagram here --
A Yes.
Q -- Exhibit 1? Okay.
Do you know if people from the outside came to those meetings ever?
A Not that I remember.
Q So you don't recall any of the judges attending regarding any of the court personnel matters?
A Not that I remember.
Q What about anyone from the Juvenile Probation Department, Scott Shick or --
A Our office meetings were the office.
Q Okay. Would Justina Caviglia or anyone from the DA's Office attend those?
A Not that I remember. If -- it wasn't a regular thing if she did or if any of them did.
Q Sorry. How long were those meetings typically?
A Anywhere from 15 minutes to an hour.
Q Do you know if minutes were kept of those meetings?
A I don't know.
Q Were they video recorded or audio recorded?
A No.



Q Okay. So we can take a break -- do you want to take a break?
A Please.
Q Okay. Sure. Absolutely. Take ten minutes. It's about -- it's five of, if we can be back by five after, thank you very much.
VIDEO TECHNICIAN: We are going off the video record at 10:56 a.m.
(Off the record.)
VIDEO TECHNICIAN: We are going back on the video record at 11:08 a.m.
BY MR. GEDDES:
Q Okay. Ms. Christensen, we're back on the record. You understand that you're still testifying under oath, the penalty of perjury?
A Yes.
Q Now, during the 2013 to '16 time frame, was John Enos injured in a workplace injury?
A Yes.
Q What do you recall about that?
A I believe there was something about a camping trip and a tree.
Q Okay.
A I don't remember if he fell out of the tree or the tree fell on him or the kid fell on him, I don't remember



the details.
Q Okay. Was there another workplace injury that occurred after that, to your recollection?
A There was an incident with a juvenile over in the sheriff's -- the JPO office, I believe, or outside of it.
Q What's your recollection of what happened there?
A That the juvenile became combative.
Q Okay. And did Mr. Enos pursue a workers' compensation claim for the first workplace injury that you've described?
A Yes.
Q What about the second workplace injury?
A Yes.
Q Do you recall when they occurred?
A No.
Q Do you remember whether Mr. Enos took FMLA time off -- that's a difficult concept, FMLA time off. Do you know whether Mr. Enos' FMLA leave was applied to any time that he may have taken off for either workplace injury?
A I believe so.
Q Was --
A I can't remember about the first one --
Q Okay.
A -- but I believe -- I'm sure -- I'm trying to remember -- but, yes, there was FMLA time involved.



Q Now, we talked earlier about what the HR Department gets involved in. Does the HR Department get involved in performing investigations of workers in connection with their workers' compensation claims?
A That's the third-party administrator.
Q Okay. What's your understanding of those investigations?
A I'm trying to think. I believe the third-party administrator would make calls and stuff and we'd -- of course we always went off the reports that the department sent over and the individuals.
Q I'm sorry, what department?
A The department that the employee worked in.
Q Well, investigation, what I'm asking is are there situations where the HR Department gets involved in an investigation as to the legitimacy of a workers' compensation claim?
A That's usually the third-party administrator that handled that.
Q That was my question. So what is your understanding of what the third-party administrator would typically do in that situation?
A Honestly, I don't remember.
Q Okay. Do you recall whether there was an investigation as to Mr. Enos -- John Enos about the

**validity of any of his workplace injuries?**
A I don't remember.
**Q Do you recall whether there was an investigation into his background as to what he was doing when he was on workers' compensation leave?**
A I don't remember what -- rephrase that.
**Q Yeah. Do you recall any investigation or anyone looking into what John Enos was doing physically when he was on workers' compensation leave?**
A Outside of the office?
**Q Right, doing aerobics, doing Karate --**
A Oh. I don't -- I don't remember.
**Q -- engaging physical activity that was consistent with his work injuries?**
A I honestly don't remember.
**Q Okay. And you weren't involved or you didn't overhear anyone doing any investigations about what his Facebook activity was, whether he was hunting or anything like that?**
A It came back to me with that little phrase.
**Q Okay. What do you recall?**
A I remember that -- and Justina and Norma were involved with this -- that there was some pictures of him hunting while he was on leave, and I believe it was elk or deer.



**Q And what was the significance of that in connection with why they were looking into that?**
MR. BROWN: Objection; foundation; calls for speculation.
THE WITNESS: Con -- as I remember -- and this is vague, because when I left the county I pretty much shut the door -- that he had shoulder or arm surgery, if I remember correctly, and that holding a gun and holding an elk -- or doing -- you know, shooting a gun with his shoulder and everything, someone wanted that investigated, and I can't remember who brought us the information.
BY MR. GEDDES:
**Q Well, you mentioned Justina and Norma, do you know if -- what the result of that investigation was?**
A I don't remember.
**Q But your recollection is that he wasn't disciplined or fired for that; isn't that correct?**
A I don't believe so.
**Q Okay.**
**Q So, as you sit here now without looking at documents, are you able to recall when Mr. Enos took time off relating to workers' compensation and his injuries?**
A Not time periods, no.
**Q Okay. Do you generally recall when his FMLA ran**



**out?**
A I can't even tell you the time of year it was.
**Q Okay. Do you know one way or another whether he tried to return to work as an employee off of his leave?**
A I think the day that it was exhausted he brought in some sort of release to Norma, but I don't believe it was a full release that we requested.
**Q Okay. And who requested the full release?**
A Norma.
**Q Okay. Do you know why?**
A No, I do not know why.
**Q Isn't it true that Scott Shick had wanted to fill that position for some time prior to the date of Mr. Enos' actual separation of employment?**
MR. BROWN: Objection; foundation.
THE WITNESS: I don't know.
MR. BROWN: Calls for speculation.
MR. GEDDES: Okay.
BY MR. GEDDES:
**Q Do you know why Mr. Enos' employment with Douglas County ended?**
A It was my understanding because it was -- he couldn't get a full release back to work and his time was exhausted.
**Q Okay. And what do you base that understanding on?**



A Just what I remember.
**Q You were involved in sending out a letter?**
A I did.
**Q Were you involved --**
A Well, I --
**Q Go ahead?**
A I typed up the letter, I believe Norma Santoyo made some changes to it, I don't even remember what -- if I ever saw it after that, and she was the one who would have sent it out.
**Q And did you have any involvement after the fact -- so the letter has gone out, did you have any interaction with anyone after the letter went out prior to Mr. Enos' separation of employment regarding the matter?**
A I don't remember.
**Q Do you remember whether Mr. Enos actually came to the HR Department and tried to return to work in response to the letter that you've described?**
A I believe it was the last day, I believe he was in there with us, I think we had some sort of meeting.
**Q Who is we?**
A I -- I believe it was Norma, Justina, and I can't remember who else was in there, maybe Scott Shick.
**Q And were you in there?**
A I was.

Q And what happened at that meeting?
A I believe he was just informed about the termination. I can't remember the details now, because Norma was heading the meeting, Norma and I think Justina.
Q Was Mr. Enos in that meeting?
A I believe he was.
Q Now, to your knowledge, during these meetings did anyone -- did the topic of the ADA come up, or was it strictly FMLA and his workers' compensation release?
MR. BROWN: Objection; foundation --
THE WITNESS: I --
MR. BROWN: You used the word meetings and I think she described one.
THE WITNESS: Yeah.
MR. GEDDES: Well, let me be even more broad than meetings.
THE WITNESS: Okay.
BY MR. GEDDES:
Q To your knowledge, was the topic of the ADA or John Enos' rights under the ADA ever considered or discussed by anyone, to your knowledge?
MR. BROWN: Objection; foundation.
THE WITNESS: To be honest, I don't remember ever having the ADA discussed.
MR. GEDDES: Okay.



BY MR. GEDDES:
Q What is your recollection of the topic of John Enos being given light duty?
A Honestly, I really can't remember.
Q Do you -- do you recall actually yourself finding light duty work for Mr. Enos?
A I don't remember.
Q Do you recall searching for light duty work for Mr. Enos?
A I don't remember. I placed some people over at the library for a period of time but I can't remember exactly who they were.
Q Okay. How did you go about doing that?
A Seeing if they had anything that was available for the restrictions of people.
Q So you sent workers over there?
A On occasion.
Q Okay. And you don't recall whether that included Mr. Enos?
A I don't recall.
Q Now, you talked about the letter that went out that explained his FMLA leave was exhausted and he needed to return with a full medical release, what about the idea of allowing him to return on light duty, was that considered, to your knowledge, by either you or anyone at



Douglas County?
MR. BROWN: Objection; compound; calls for speculation as to other people.
BY MR. GEDDES:
Q Do you understand my question? I'm not asking you to be a mind reader and know what people were saying outside of your knowledge, I'm only interested in your understanding, whether it's flawed or not.
A Okay.
Q To your knowledge, did either you or anyone in Douglas County or the DA's Office or the judges, to your knowledge, was the idea of John Enos returning with less than a full medical release after his FMLA leave was exhausted but returning to light duty, was that considered?
MR. BROWN: Objection; compound.
THE WITNESS: I don't remember exactly. It's a possibility. I don't -- I don't remember.
BY MR. GEDDES:
Q But you don't recall it being --
A I don't recall it.
Q Okay. And you're aware of -- you don't recall a specific individual who, from your view, was considering that; is that correct?
A Right.



Q To your knowledge, was the topic of John Enos being too much of a liability regarding his injuries or workers' compensation issues ever considered or discussed by anyone?
A I don't remember that, no.
Q To your knowledge, was the topic of John Enos being rehired by Douglas County in any capacity, was that ever considered or discussed by anyone?
A I -- I never -- I do not remember ever hearing anything of that.
Q And you understand my question to mean after his separation --
A Yes.
Q -- of employment occurred? Okay.
To your knowledge, did John Enos apply for reemployment with Douglas County at any time after his separation of employment occurred?
MR. BROWN: Objection; asked and answered.
THE WITNESS: I do not know -- I do not ever remember hearing of anything like that.
MR. GEDDES: What I want to do is mark Exhibit 5, please, this document.
(Exhibit 5 was marked.)
BY MR. GEDDES:
Q If you can take a moment, and you don't need to

pour over every detail --
A Right.
Q -- if you could just have a general look at that document.
Now, while you're doing that, let me just make a representation to you, on the bottom corner on the right side of documents that are exhibits, sometimes these documents have a DC followed by six digits, and this example it's DC 000332. I'll represent to you that documents that have that configuration of DC followed by a six-digit number are documents that were produced by Douglas County as discovery in this lawsuit.
A Okay.
Q So my question is, looking at this document, have you seen this document before?
A I've seen documents like this. I don't know if I've seen this one specifically.
Q Okay. Well, this one is actually signed by Mr. Enos -- or I'll represent to you that it's signed by Mr. Enos on that second page --
A Okay.
Q -- but I think you've answered my question and that is, you've seen this type of document before?
A Yes.
Q Okay. And when I say "this type of document," a



Douglas County job description for a particular job?
A Uh-huh.
Q Now, do you recall ever looking at the Douglas County job description for the title of Juvenile Probation Officer Senior?
A Over all the years I worked there I may have, I don't know.
Q But you don't have a specific recollection?
A No.
Q Okay. Now, you described a letter that went out to Mr. Enos requesting full medical releases and letting him know that his FMLA leave had expired. When preparing that letter, did you consult this job description?
A I don't remember.
Q Okay.
A Because the letter would have stated basically his -- that his time was exhausted. I don't know if I would have gone back to the job description or not.
Q But the portion of the letter that you've described at least talked about getting full medical releases, why was it important to get full medical releases?
A I don't remember. Norma Santoyo made that determination.
Q Did she explain what her reasoning was?



A Not that I remember.
Q Do you recall whether Mr. Enos ever had medical restrictions from his doctor relating to his workplace injuries?
A I'm sure there were, because he -- he had surgery on his shoulder or arm or something so I vaguely remember there being restrictions.
Q Okay.
MR. GEDDES: Go ahead and mark as Exhibit 6, please.
(Exhibit 6 was marked.)
BY MR. GEDDES:
Q If you could glance at that -- these are non-consecutive pages, they're not necessarily the same document, but they are bundled together in a single exhibit.
A Right.
Q Okay. Do you recognize any signatures on this document -- or on this exhibit?
A Scott Shick and John Enos.
Q Okay.
A I don't -- I don't recognize this one.
Q On the second page, you don't't?
A No. Just John's on that one?
Q Before you leave 125 -- Bates stamp 125 on the



bottom, are you familiar --
A Third page?
Q Yeah, 125 -- are you familiar with that -- that stamp, you may have seen lots of it, it says, "Received June 11, 2013, ASC," isn't that Alternative Service Concepts' stamp?
A I would think. I'm not sure.
Q Okay. Then the last page --
A Yes.
Q Okay. Now, there -- the last page is from Alternative Service Concepts from Karen Barbee, it's Notice of Claim Acceptance for the date of injury 6/21/2013, for the body parts cervical strain, thoracic strain, lumbar strain, right wrist strain, multiple abrasions.
Do you see that on the --
A Yes.
Q -- top right corner? Okay.
And then down below Karen Barbee's name it reads, "cc" and of those is Employer Douglas County; do you see that?
A Uh-huh.
Q Can you explain your understanding of what that -- like when you got cc'd on these types of documents, who was in charge at Douglas County receiving them and

Page 94

putting them in a file; would that have been you?
A Me.
Q Okay. So now when you received these, was it part of your duties to review these or just to simply throw them in a folder in a file?
A I reviewed them.
Q Okay.
A Basically what we were looking for was claim acceptance or not.
Q Okay. Now, what would -- to your recollection, what would the department's involvement be? You described what your monitoring and your involvement is of a worker who is out on workers' compensation or has an injury or is pursuing a workers' compensation claim, but what are the individual departments, how do they monitor, to your knowledge, what is going on?
A They were basically letting HR know the times they were gone, the -- we would let the departments know the restrictions, if they had anything that they could -- a job that they can accommodate those restrictions with or not.
Q That's for workers' compensation purposes?
A Early or -- light duty, yes, they would -- they did the initial paperwork for us, like Scott Shick, and get it over to us.

Page 95

Q And then you would monitor a doctor's work restrictions, you tracked when they could return, you tracked their FMLA, but what -- how would the departments keep tabs of that, keep in touch or keep updated with the HR Department on the status of their employees?
A I would let them know when they could come back to work, when we had a release in hand.
Q So if the release says that this person can come back in three weeks, would you let the department know three weeks in advance, "Hey, your guy is going to be back," or "your gal is going to be back in three weeks"?
A I would let them know when they were supposed to be back to work --
Q Okay.
A -- or -- you know, and a lot of times that changed.
Q Right. Okay. And so do you recall specifically -- well, let me ask it this way. Do you recall specifically you communicating with the Juvenile Probation Department about matters concerning John Enos?
A I'm sure I did.
Q Now, if the department had issues or concerns about timing of when their employees are coming back, would they communicate with the HR Department those concerns?

Page 96

A Can you --
Q Well, for example, if the department is under a heavy burden and needs manpower or woman power --
A Uh-huh.
Q -- and needs an employee back, do they ever get antsy and call down to HR and say, "What is going on? Can't we get this person back?" Do those types of things ever happened?
A They did.
Q Do you recall that ever happening in the Juvenile Probation Department?
A I can't remember specific on it.
Q Okay. And you don't recall that ever happening about Mr. Enos returning?
A I think they call and say, you know, "Is there an update," but I can't remember specifics on it at all.
Q And you spoke with Karen Barbee frequently about these types of matters; correct?
A If there was anything -- yeah, I did --
Q What --
A -- depending on caseload and stuff at the time.
Q Did -- did Karen Barbee ever communicate with you as to whether or not a claim would be accepted or not; for example, if an initial claim is accepted, say, your wrist --

Page 97

A Uh-huh.
Q -- and then there's a sequelae or something happens and then the worker wants to add in the shoulder, and the third-party administrator is evaluating them separately -- so, in this example, the wrist is covered and then there's a request to cover the shoulder -- and let's say in this example the third-party administrator says no coverage on the shoulder, only on the wrist, is that a type of thing that happened when you worked for the county?
A Not often.
Q Would -- would the third-party administrator share with you what the status of a claim would be before the notice of acceptance or denial was actually sent out?
A Usually I got the letter.
Q Do you recall any time where that wasn't the case, where you were told in advance what the decision was going to be?
A Offhand, I -- I don't remember.
Q Okay.
A I do remember on -- maybe once that I was told something wasn't going to be accepted, but I can't remember whose it was or -- but some little --
Q Would it make a difference if -- from the perspective of the letter that you sent out where you

said, "FMLA is gone, full medical release or you could lose your job," that letter that I'm describing --
A Uh-huh.
Q -- does it make a difference whether the person is on workers' compensation leave or is under a workers' compensation claim --
A No.
Q -- or does that offer no particular protection?
MR. BROWN: Objection; foundation.
MR. GEDDES: I'm sorry.
BY MR. GEDDES:
Q Do you understand the question?
A I think I do --
Q Okay?
A -- if you want to rephrase it --
Q I just want your testimony. I'm sorry, I didn't -- I didn't hear you, what you were saying.
A I don't think it made a difference.
Q Okay.
MR. GEDDES: If we could mark, please, Exhibit 7.
(Exhibit 7 was marked.)
BY MR. GEDDES:
Q If you could please take a look at that document. Okay. Have you seen this document before?
A Offhand, I don't remember.



Q Okay. If we look at the second page, DC 1585, in the top right corner there's a stamp that says "Received" and there's a date, and it says "Human Resources"; isn't that --
A That would be -- I -- I probably saw it and faxed it. I just don't remember.
Q But that's the stamp --
A Yes.
Q -- of the Douglas County Human Resources Department?
A Yes.
Q And who is in charge of stamping these documents when they come in?
A Well -- oh, it was received, I'm not sure who would have done that.
Q Okay. So it was the ordinary practice, to your understanding, of the third-party administrator, ASC, to send to your office excuses from work or medical records pertaining to an employee's workers' compensation claim; correct?
A A lot of times the employees brought them in.
Q Okay. But sometimes -- but you got them also from ASC; is that right?
A I'm trying to remember if we actually got the paperwork or if -- usually I sent this type of paperwork



to Karen Barbee.
Q I see. And where would you get it from?
A The employee, or it could have come over on a fax from the doctor's office.
Q Okay. All right. Do you see on the first page, DC 01580, where it says the date is 2/28/14, John Enos is the name, and it states that he:

Attended clinic today.
Please excuse him from work.
Must observe work restrictions as follows: Off work until 3/10/2014.

Did I read that correctly?
A Yes.
Q Then it reads:

May return to work as above -- as of above light duty.

Didn't that mean he's off work until 3/10/14 but then he can come back to work with light duty; isn't that what that means?
A That's what it looks like.
Q Okay. And you testified earlier that you were -- you know, you would track what's going on with these people --
A Uh-huh.
Q -- when they're expected to come back, so if you



received a document like this, what would you do? Would you go to your database and update -- if the information was different, the part that says, "Off work until 3/10," would you go and update and say, "All right, this is a moving target," this is when John can come back and he can have light duty," I mean, is that something you would typically do?
A Normally, yes.
Q Do you recall specifically doing that here?
A I don't remember.
Q Do you have any reason to believe that you didn't do that here?
A There's no reason why I wouldn't have done that.
Q Okay. And then the second page is -- that first page was from Dr. Eisenhauer. The second page is also from Dr. Eisenhauer, and that has a later date of March 7, 2014. And down towards bottom it says:

May return to work as of 3/17/14 light duty.

Now, this is different than the first page, which basically says he's off work until 3/10, this is a page that says he can return as of 3/17, is that an example of what you described earlier when you said sometimes it changes?
A Of course, yeah.

Page 102

Q Okay. So when you got the second page, it sounds like from your testimony but correct me if I'm wrong, when you got this, this was a moving target and you would update it when you got this?
A Yes.
Q So what was once an expected return date of 3/10/14 became an expected return date of 3/17/14?
A Yeah.
Q Okay. And do you specifically recall updating -- or do you specifically recall receiving this second page ending in 585?
A Specifically, I don't remember.
Q But you have no reason to doubt that you did receive it and update the --
A I have no reason.
Q Okay. So is it fair to say then that on March 10, 2014, the information received by Human Resources updated John Enos' expected -- expected return as to March 17, 2014?
A That would be my belief, yes.
Q Okay. And he would return to light duty?
A Yes.
Q Okay.
MR. GEDDES: I'm trying to figure out what's going on with my battery here.

Page 103

(Discussion off the record.)
BY MR. GEDDES:
Q Just so that we're clear, I know that you -- you worked in this area but when we say "light duty" that means you're not doing your regular full duties; correct?
A Correct.
Q Okay. Now, do you know whether he was on light duty after the first workplace injury, before the second workplace injury?
A I don't remember.
Q All right.
MR. GEDDES: Let's take a look at Exhibit 8, please.
(Exhibit 8 was marked.)
BY MR. GEDDES:
Q If you can just generally look at this, this is a long document, I don't want to spend a lot of time on this but my understanding from this -- I can short circuit a lot of questions by just telling you what my understanding is, and if that's your understanding you could let me know.
My understanding is this is an example where you requested documents from the department, here the Juvenile Probation Department, regarding a workplace incident or workers' compensation claim, and Scott Shick

Page 104

sent them to you on Wednesday, September 14, 2014. He says:
Sarah: Here are the documents you requested. Scott Shick.
And then the documents that we have in sequential order are Incident Reports for an assault by a juvenile, but I don't want to testify here, but does that seem correct to you?
A I would think so, yes.
Q Okay. And so some of the documents that you're getting in addition to -- well, some of the documents you're getting are medical records here. If you look at 5566, and there is a Law Supplemental Narrative, supplemental reports about what happened. On 5579 there's a statement form and those continue on, handwritten statements about what happened.
So my question is this: Is this typically the types of documents you would get when you request them from a department concerning a workplace injury?
A We didn't have too many like this where it was multiples --
Q Right.
A -- because, if I remember right, several people were injured in this.
Q Okay.

Page 105

A So, yes, we will get statements if it was something --
Q Okay. It wasn't --
A -- this extensive.
Q It wasn't unusual for you to get these types of documents, including the medical records?
A True.
Q Okay. Now, to your knowledge, did his second workplace injury re-aggravate injuries from the first workplace injury?
A If I remember right, yes, but that's not a for sure on my part.
Q Do you recall actually ever speaking with Mr. Enos about any of these claims?
A I believe I've spoke to him on the phone.
Q Okay. And what would you -- what do you recall about that conversation?
A Oh, boy. You know, maybe informing him of what he needed to give me or, you know -- I can't remember specifically.
Q Okay.
MR. GEDDES: Go ahead and mark this as Exhibit 9, please.
(Exhibit 9 was marked.)
/ / / /

BY MR. GEDDES:
Q All right. If you could have a look at that --
A Sure.
Q Do you recognize any signatures on this document -- on any of these documents?
A Mine.
Q Where is your signature?
A Right down here on the second page.
Q On 15 -- the document ending in 1527?
A Yes.
Q Okay.
A I recognize John's signature. I don't recognize the signature on the first page, the supervisor's signature -- oh, it must be -- oh, it's Vicky Sauer-Lamb.
Q Okay.
A Some people just can't -- aren't recognizable. Okay.
Q All right. So this is a -- the -- there's an Incident Report on 1526, the first page --
A Yes.
Q -- and this is for a workplace injury that occurred on June 17, 2014?
A Yes.
Q And this is the incident you had previously described about being attacked by a juvenile. It says,



"What is the nature of the injury" on this document, it says, "Battered by a juvenile in custody."
A Yes.
Q What is an incident report, what does that do?
A An incident report is what the department fills out and gets me -- or would get to me.
Q Okay. The second page is what is called a "C-3 Form"; is that correct?
A Yes.
Q And that's the Employer's Report of Industrial Injury for that same workplace injury that occurred June 17, 2014; correct?
A Yes.
Q And what is the purposes of a C-3 Form?
A That's was we would -- we sent to the third-party administrator.
Q Okay.
A Well, we sent all of them to the third-party administrator.
Q Is there medical information on this second package, 1527, the form C-3?
A Yes.
Q If you look at the section that says, "Injury or Disease"; do you see that?
A Yes.



Q And -- and who fills that out?
A I'm trying to remember.
Q There's a name there that says "Lance Orr" as the "Treating Physician/Chiropractor Name," do they fill that part out or does someone from Douglas County fill that out?
A I think somebody from Douglas County filled it out.
Q Okay. And then the third page is a Form C-4; is that correct?
A Yes.
Q What does a Form C-4 do, what's that?
A That, I believe, is the form filled out by the treating physician or facility.
Q Okay. Now, if we look at the last page, 1196, that's a letter from Douglas County's insurer, ASC, accepting his claim for that second workplace injury that occurred on June 17, 2014; correct?
A Yes.
Q And the body parts that are listed -- cervical sprain, left wrist sprain, right wrist sprain, left chest wall contusion, right shoulder strain, acute stress reaction -- is that -- is that what's covered in the claim? How does that work?
A To my recollection, that is what is covered in the



claim.
Q Okay.
A But you -- to be quite honest, you'll have to ask Alternative Service Concepts --
Q Well, what I'm interested in is --
A -- but I --
Q -- when you work with these things what your understanding was.
All right. One second here.
Do you know from the documents that you've seen so far whether Mr. Enos' had medical work restrictions as a result of the second workplace injury; does it say in these documents?
MR. BROWN: I'm going to object. There's no -- there's -- it's clear she didn't read every piece of information on this --
MR. GEDDES: That's fine.
MR. BROWN: -- in these exhibits and these documents that you're referring to.
MR. GEDDES: That's okay.
MR. BROWN: And the documents speak for themselves for what they say and do not say. If you want her to go back and try to find it and take the time --
MR. GEDDES: No, no, I'm just -- I'm trying to get your general understanding.

Page 110

BY MR. GEDDES:
Q For his second workplace injury, he had work restrictions?
A Yes.
Q Okay. And he was -- was he -- you talked about library, work in the library, you don't recall whether he actually was given work in the library?
A I can't remember.
Q Okay.
MR. GEDDES: Let's take a look at these exhibits, Exhibit 10.
(Exhibit 10 was marked.)
BY MR. GEDDES:
Q If you can, please look at Exhibit 10.
A Okay.
Q All right. This is an e-mail from you to someone by the name of Helga Cotter regarding John Enos; correct?
A Uh-huh.
Q You sent the e-mail on Friday, February 28th, 2014, and the subject is John Enos, and it reads:
Hi, Helga. John Enos went out on workers' comp 2/18/14.
You wrote that; correct?
A Yes.
Q What does that mean?

Page 111

A That was notifying the Payroll Department.
Q And when you say he "went out on workers' comp," what did that mean?
A That he was off of work on sick time, basically.
Q Okay. Do you know if it was FMLA leave time or sick time, or both?
A Offhand, I don't remember.
Q Do you know -- go ahead.
A Usually first week was undetermined as to what it was going to be.
Q Now, do you know -- do you recall why he went out on workers' comp leave?
A I don't remember.
Q Okay. Who was Helga, payroll?
A Yes.
Q Do you know -- do you know what her -- does she still work there; do you know?
A No, she left. She left before I did.
Q Prior to this workers' comp leave on 2/28/14, was John Enos on light duty?
A I don't remember the dates exactly when he was out.
Q Was he expected to return to light duty?
A I don't remember.
Q So if John Enos were on light duty before he went

Page 112

out on workers' comp leave on February 18, 2014, and he was expected to return, would he typically return -- would a worker typically return to the light duty post they were on or would that have to be reinvestigated from scratch?
A It would have to be reinvestigated depending on what restrictions or if he had no restrictions.
Q Do you know whether -- do you recall that being done in this case, that --
A I don't remember.
Q Well, let me finish my question, please.
A I'm sorry.
Q -- whether -- whether an inquiry was made as to the availability of light duty for Mr. Enos after he went out on workers' comp on February 18, 2014?
A I honestly do not remember.
Q Was it difficult typically to get light duty work for workers?
A It all depended on restrictions and sometimes it was hard to find a department that might need someone.
Q And let's look at Exhibit 11.
(Exhibit 11 was marked.)
BY MR. GEDDES:
Q Thank you. If you can look at this --
A Okay.

Page 113

Q Okay. In this exhibit, this is an e-mail thread between Karen Barbee and you; correct?
A Yes.
Q And in the first e-mail of this thread, it's Friday, March 14, 2014, it's an e-mail from Karen Barbee to you regarding John Enos and a date -- DOI is date of injury?
A Yes.
Q Date of injury is 6/21/13, "Hi, Sarah," it reads:
Can you tell me if Mr. Enos' department put him back to work at light duty.
Thanks.
Then the next page has her name, Karen.
So Karen sent you this e-mail, to your understanding?
A That's what it looks like.
Q Okay. And then you responded with the middle thread on the same day at 12:13, you wrote to Karen regarding John Enos, Date of Injury 6/21/13, you wrote:
He will be back to work light duty Monday.
Correct?
A Correct.
Q And so then after that Karen Barbee writes:
Thanks, Sarah. Have a wonderful

vacation.
By the way, what vacation were you taking; do you recall? No?
A No.
Q Okay. All right.
So -- so when you wrote this on March 14th, you had an understanding that Mr. Enos would return to work on light duty; correct?
A Uh-huh.
Q And he would -- your understanding was he would return on Monday March 17, 2014; correct?
A Apparently, yes.
Q Okay. Do you know what that understanding was based on?
A It would have to have been off a doctor's report.
Q Okay. Why were you writing -- was it unusual for Karen Barbee to be writing you these questions?
A No.
Q And do you know why she would typically write you these questions?
A Just updating statuses and stuff.
Q Okay. Now, what light duty was he -- was he -- was he expected to return to on that Monday?
A That was five years ago, I have no idea.
Q Okay. Did it refresh your recollection as to any



efforts that you underwent to get him light duty, if at all?
A I don't remember.
Q Do you know if he actually did return on that Monday?
A I don't know.
Q Okay. So --
MR. GEDDES: Let's go off the record for a second.
VIDEO TECHNICIAN: We are going off the video record at 12 o'clock p.m.)
(Off the record.)
VIDEO TECHNICIAN: We are going back on the video record at approximately 12:04 p.m.
MR. GEDDES: Okay. Mark Exhibit 12, please.
(Exhibit 12 was marked.)
BY MR. GEDDES:
Q If you could take a look at Exhibit 12, these are -- this is a document which has the writing of Sierra neurosurgery group, Physical Limitations/Work Restrictions. It's dated July 22nd, 2014, by Curt Erickson, and it states that there's an evaluation, exam notes state:
Date of Evaluation, July 22nd, 2014;
Released to Full Duty on 8/18/14.
And so this is a document that has the stamp of



ASC.
Now, do you recall ever receiving this document?
A I -- I don't recall, no.
Q Okay. But if you did receive this document and it says, "Release to full duty on 8/18/14," it would be -- it would be your expectation, according to the procedures that you've described, that you would update his expected return as being two things, one, to full duty and, two, on 8/18/14 --
A Uh-huh.
Q -- is that --; that correct?
A Except there is a physical restriction of weight limit on it.
Q Well -- are you looking at the second document or the first document?
A No, the first one.
Q Okay. Weight Restriction: 25 pounds. I see.
So -- so if you got this document, your understanding of it would be return to full duty on 8/18/14 with a weight limit of 25 pounds, what would you do in a situation like that, would that be considered a return to full duty or not?
A He still has a restriction on it and I probably would have talked to Karen Barbee about that --
Q Okay.



A -- but I don't know if I did or not. You know, that's a long time ago.
Q But Karen Barbee isn't from the county, would you have talked to someone else, to the county, as to whether or not he could come back to work with that weight restriction?
A I possibly could have but I don't know for sure if I did. I -- I would probably have relayed that to Scott Shick or --
Q Okay.
A -- Vicky.
Q And then the second page is ending in 16 -- I think it's 1667. This is a document dated October 31st, 2014. It's an Excuse From Work for John Enos. It says that he, "Attended clinic today," 10/31/14, "Please excuse him from work," "Must observe work restrictions as follows: Off work until further notice."
Would -- do you know whether or not this means he came back to work with regard to the first page, but then something happened where he was taken off work until further notice?
A That's what it looks like. I don't remember exactly.
Q Okay.
A Or whether it even pertains to the same thing or

not.
Q Okay.
MR. GEDDES: Let's mark Exhibit 13, please.
(Exhibit 13 was marked.)
BY MR. GEDDES:
Q If you could have a look at Exhibit 13, please, this exhibit, Exhibit 13, is an e-mail string. And the first one from Karen Barbee to you on February 5th, 2014, regarding John Enos, DOI, Date of Injury 6/12/13, it reads:
Good morning, Sarah. John Enos will soon have surgery on his wrist. Please send us a D-8 so we can compute his TTD rate. Also, please let me know if he's still working for the time being.
Thanks.
And then the follow-up page is Karen from Alternative Service Concepts; do you recall receiving this e-mail?
A (No audible response.)
Q You may not, but I'm asking --
A I don't recall, but obviously I did.
Q Okay. So what does -- what is a D-8?
A A D-8 was a form that you put -- went to payroll, actually, filled it out on their last so many weeks



of compensation, their paychecks.
Q Okay. And TTD, that stands for?
A I can't remember.
Q Is it temporary total disability?
A Yes.
Q Okay. Then it asks if -- let her know if he's still working for the time being. Now, in the second thread in the middle of the page 5396, you wrote her back on Wednesday, February 5th, later in the day, at 10:07 a.m. and you wrote -- regarding the same subject of John Enos, Date of Injury 6/12/13, you wrote:
Hi, Karen. I'm working on the D-8 and he working until the surgery. He said he's having an MRI on his back today for the same WC.
What does that mean?
A That he was having an MRI for the the same workers' comp.
Q But there's a part that says, "he working until the surgery"?
A Well, he's working.
Q Okay. So he was back at work?
A Apparently.
Q Okay.
A A little typo there.



Q So if we can, please, if you could go back to -- I think it's two exhibits previous to this, it's Exhibit 11 --
A Okay.
Q Exhibit 11, you are writing -- one second here -- on Exhibit 11, you are telling Karen Barbee that he'll be back to work light duty on Monday the 17th, that's in March, and yet in February you're saying he's still working. So is it fair to gather from these documents that he worked and then he went off work and he was expected to -- he worked -- he was working in February at or around February 5th, 2014, and then he went out -- if you look at Exhibit 10 -- he went out on workers' comp on February 18th; do you see that?
A Uh-huh.
Q And then he was expected to return on March -- March 17th, 2014; is that a fair timeline from these records?
A That's what it looks like.
Q Okay. Do you recall after the second workplace injury, Scott Shick, Norma Santoyo, Ms. Sauer-Lamb, they had a meeting with John Enos about the issue of his workplace injuries and light duty?
A Offhand, I do not remember.
Q All right.



MR. GEDDES: That's Exhibit 14.
(Exhibit 14 was marked.)
BY MR. GEDDES:
Q If you can glance at that, it's a lot of pages, if you can just scan that.
Okay. Have you seen any of these documents before?
A Not that I remember, no.
Q Okay. If we look at 5597 to 5600, this involves a meeting being set up to discuss John Enos workers' compensation claim; is that your understanding from these documents?
A That's what it looks like, yes.
Q Okay.
A Well, it's a meeting with him, it doesn't say what for.
Q Well, let's find that, actually. It's on page 5599 from Norma Santoyo, original appointment?
A Oh, okay.
Q It says, "To review workers' compensation case"; do you see that?
A Yes.
Q And then to the last page, 5600, it says the same thing, "To review workers' compensation case"?
A Okay.

Q Does that refresh your recollection as to whether there was a meeting held by these folks regarding the workers' compensation claim?
A There could have been.
Q Okay. Then there are -- if we look at -- but you don't recall the meeting and who attended it?
A Not offhand, no.
Q You don't know whether it was held in the HR Department's office or?
A I don't remember.
Q Okay. And was it unusual that they would have a meeting for such things --
A No.
Q -- with HR? Okay.
Let's look at 5593 to 5596, that's the first part of this exhibit.
A Okay.
Q This appears to be a memo that resulted from that meeting, and what I'm referring to is if you look at 5596 --
A Uh-huh.
Q -- it's a draft of a memo or it's a memo, it's to John Enos from Scott Shick, regarding duty station assignment, dated July 17, 2014, it says:
Based on our conversation this morning



in evaluating our options --
And then it goes on to talk about assigning him to the Juvenile Detention Center; does that ring a bell to you?
A Not offhand, no.
Q Okay. Would -- would it -- would you have a need to know -- based on your role in the HR Department and tracking who is doing what, would you have a need to know whether or not an employee is assigned to a certain station while they're on workers' compensation?
A No.
Q Okay. And you don't specifically recall any -- any information or communications regarding John Enos being transferred to work at the Juvenile Detention Center?
A I don't remember that.
Q Okay. So you don't know when he actually did work at --
A No.
Q Okay. All right. Let's look at Exhibit 15.
(Exhibit 15 was marked.)
BY MR. GEDDES:
Q If you could have a look at 15 and let me know if you've seen this document before.
A I don't remember seeing it.



Q Okay. Do you recall a discussion with anyone or any information about John Enos' cases being transferred away to other workers?
A I don't remember anything about that.
Q Do you recall whether anyone from HU or anyone from HR evaluated what job duties Mr. Enos could do after his first or second workplace injury?
A I don't remember anything specifically about that, no.
Q Did you ever hear anything about Mr. Enos resisting or complaining about a job reassignment?
A I don't remember that, but that doesn't -- you know, I don't remember.
Q Okay. Do you know, after the second workplace injury, was there an expectation of how long Mr. Enos would work light duty, it would be until his FMLA ran out?
A I don't remember specifically if there was an expectation on how long he'd be on light duty or -- I just don't remember the details.
Q Okay. So then let's talk about typically. When you would -- when you were involved in setting up light duty --
A Uh-huh.
Q -- when you set them up, you don't always know how



long --
A You don't.
Q -- they're going to be on light duty; right?
A No.
Q And so it wasn't required when you would set up light duty to tell the person at the library or wherever where the light duty is, "Hey, I need this much for this worker," it was just, "Do you have light duty work," and they wouldn't ask you for how long; is that right?
A Sometimes they would maybe tell us how long they would be able to do it for.
Q Okay.
A You know, we have a job and it may take a week, it may take ten days, or they might have been able to accommodate whatever we needed.
Q Okay. Do you recall one way or another whether any light duty given to Mr. Enos had a time limit on it, a length of time when --
A I don't recall that.
Q Would you write that down typically in a -- in a -- anywhere in your documents when you're tracking all these things when the light duty is going to end?
A I probably would have.
Q And if --
A I don't know.

Q And if there's no reference in the documents, would that suggest to you based on your normal practices that they didn't give an end date when you set it up?
A Probably.
Q Okay. Now, when you got workers -- you talked about getting workers light duty in the library, you used that as an example, was that makeshift work or was there actually a need for them?
A It was usually something that the department needed someone to do that they didn't have someone for that, you know, whether it was a special project or catchup work or, you know -- it wasn't -- they didn't create a position.
Q Okay. Do you know how workers were paid, what budget they were paid under when they were --
A They were paid -- I -- if I remember correctly, they were paid out of that department.
Q So if a person from Juvenile Probation were sent to work light duty in the library, the library is not paying them, it's coming out of the same budget when the worker worked in the Juvenile Probation Department?
A If I remember that correctly, yes.
Q But if it's workers' compensation, they're not making their full -- full salary; is that correct -- it's two thirds?



A It would be two thirds. But that's if workers' comp is paying them.
Q Okay. So when they come back on light duty, does workers' comp pay them or --
A No. If I remember correctly, they went back to their regular wages but I'm not sure.
Q Is that why -- is that why Karen Barbee needed that information because if John Enos were back on light duty --
A Yes.
Q -- then workers' comp isn't paying it, the county is paying for it?
A Yes.
Q Okay. Was there ever a time when the county got into a dispute with any third-party administrator saying, "Hey, look," you know, "you're trying to -- you're trying to have us pay him by having him come to light duty, we'd rather have him on workers' comp and then you pay him," was there ever an issue --
A I don't -- I don't ever remember that.
Q Okay.
A Doesn't mean it didn't happen but I don't remember.
Q Now, did you have any interaction with anyone at the Ninth Judicial District Court regarding Mr. Enos,



given that his position was a court personnel position?
When I say "interaction," I'm talking about his workers' compensation issues and medical restriction issues?
A Who are we talking -- like the judges?
Q Well, two -- I'm asking you, I mean, who would the HR Department -- let me lay a foundation here. Who would the HR Department interact with, if anyone, from the court regarding these types of matters for court personnel?
A Probably his direct -- or like Scott Shick.
Q Okay. And -- and -- but you don't recall the judges, any communications with the judges or judges' assistants regarding any of their court personnel?
A I don't remember personally ever dealing with the judges.
Q Okay. Do you -- all right. Now --
A That's not to say that Norma or Justina could have done that. I don't know.
Q When -- when you -- when you found light duty for workers in the library, did you have the expectation or did you ask about whether the workers would be lifting books and whether that would violate their work restrictions; would you look --
A Yes.



Q -- into that?
A Yes.
Q Okay. Do you recall -- to your knowledge, was there ever any discussions by anyone regarding transferring Mr. Enos to a different job position other than the library and other than the detention center, which we talked about in one of those exhibits?
A I don't remember that, no.
Q To your understanding or knowledge, when did the county first consider separating Mr. Enos' employment after his second workplace injury?
MR. BROWN: Objection; foundation.
THE WITNESS: I would say when his FMLA came close to being exhausted.
BY MR. GEDDES:
Q What do you base that on?
A Just general knowledge what we did with others.
Q And, as you sit here now, you don't actually recall when his FMLA leave expired?
A I don't.
Q Okay.
MR. GEDDES: So let's go off the record.
VIDEO TECHNICIAN: We are going off the video record at approximately 12:26 p.m.
(Off the record.)

-o0o-

RENO, NEVADA, THURSDAY, JANUARY 24TH, 2018, 1:35 P.M.

-o0o-

VIDEO TECHNICIAN: We are back on the video record at approximately 1:35 p.m.

MR. GEDDES: Okay, great.

+++ EXAMINATION +++

(Resumed)

BY MR. GEDDES:

Q Ms. Christensen, you understand you're still testifying under oath after our break?

A Yes, I do.

Q Okay.

MR. GEDDES: I'd like to mark, if we can, please, Exhibit 16.

(Exhibit 16 was marked.)

BY MR. GEDDES:

Q Go ahead and look at that. Okay, this is an e-mail between -- it's an e-mail thread having you, Norma Santoyo and Karen Barbee regarding John Enos. So if we look at the bottom half of this thread, the first part,



that's an e-mail from Karen Barbee to you regarding John Enos. And in the first paragraph it says:

Hi, Sarah. As you know, the last return-to-work note from Dr. Morales dated February 17, 2015, indicated that John's restrictions were no lifting greater than 50 pounds, no pushing greater than 50 pounds, no pulling greater than 50 pounds, no overhead lifting greater than 35 pounds. I realize he was terminated last week but I need to determine if we will need to continue his TTD and to document whether or not he would be able to return with these work restrictions.

Due to these -- do these restrictions fit within his usual and customary job duties? If not, would the county have light duty available for him if he had not been terminated?

Then the top of this document reads -- it's an e-mail from you to Norma Santoyo dated February 24th, 2015, and it states:

John Enos was terminated from Douglas County on February 19, 2015. John's FMLA



time was exhausted and he was unable to return to work with no restrictions as stipulated.

Now, you wrote that; correct?

A Yeah, apparently. I don't remember it.

Q You don't dispute that you wrote that?

A Not from what it says on the paper, no.

Q Okay. And so if we focus on Karen Barbee's e-mail to you at the bottom of the first page, did -- did Dr. Morales' return-to-work note from February 17, which indicated his restrictions were no lifting greater than 50 pounds, wasn't that consistent with what his -- his job requirements were?

A I'd have to look back. I don't know.

Q Okay. Well, let's -- if you can, let's look at his job description, and that's way back --

A That was in the stack two back.

Q Yeah, it's one of your -- it's like the third or fourth exhibit. You have the marked ones.

A I --

Q Oh, I'm sorry. Thank you. Exhibit 5. There you go.

Actually, I don't think this document lists it. One second here.

A Here it is.



Q I don't think the weight restrictions were listed in this one. Okay.

So I won't -- but did you review what the essential functions of his job were when answering that e-mail?

MR. BROWN: I'm going to object; it misstates the e-mail.

THE WITNESS: I -- I have no idea at this point --

MR. GEDDES: Okay.

THE WITNESS: -- exactly what I did.

BY MR. GEDDES:

Q All right.

MR. GEDDES: Let's look at Exhibit 17, if we can, please.

(Exhibit 17 was marked.)

BY MR. GEDDES:

Q Take a look at 17, please.

All right. This is an e-mail string between you and Karen Barbee regarding John Enos --

A Uh-huh.

Q -- and the lower portion of this is the first e-mail on Tuesday, January 20th, 2015, at 4:06 p.m. You write to Karen Barbee:

Hi, Karen. John has exhausted his FMLA. We are looking for information on

where he is in the workers' comp process, when he might be evaluated to see if he will be able to perform his job duties or not.

You wrote that; correct?

A Yes.

Q Then at the top of the page, Karen Barbee wrote to you:

Hi, Sarah. I would prefer to give you a better estimate after we receive Dr. Morales' report. If he has shoulder surgery, it will probably be six more months at the least unless the county has light duty for him. Right now he is TTD for the wrist.

So why are you writing -- why did you write what you wrote on this e-mail?

A I can't tell you why I did that this many years ago.

Q Well, what does this mean, We are looking for information on where he is in the workers' comp process, what does that mean?

A I would assume it's because he didn't have -- well, let me think a minute.

I can only speculate. I don't know.



Q Well, what does -- I guess my question is: When you did your job at Human Resources, what did it mean when you were trying to figure out where a worker was in the workers' comp process, what does that phrase typically mean? I mean, you wrote this, what did that mean?

A Well, probably -- we probably hadn't got doctors' notes, probably just wondering when he might be released, what the situation was totally.

Q Released back to work --

A Yeah.

Q -- without medical restrictions? Because you write in the second half of this, when he might be evaluated to see if he will be able to perform his job duties or not.

A Workers' comp did evaluations to see where -- where the doctors might think he would recuperate to, a point, whether it was full recuperation or, you know, a percentage of certain mobilities or whatever. And I would assume that's -- that they were setting him up for such an evaluation or had talked --

Q So she, in her response, says, I can give you -- the question was from you, where he is in the process, when he might be evaluated to see if he'll be able to perform his job duties or not, and she writes that she



can give you a better estimate after she receives Dr. Morales' report, and if he had shoulder surgery it would be six more months at the least.

So was it your understanding when you received that, the information you requested was perhaps six months out?

A I would say so.

Q And then in the meantime, she's -- she's asking if the county has light duty for him, but that he was total temporary disability for the wrist, so what would that mean for the county in getting that information back from Karen?

A That he would -- well, if we had light duty for him, that he could have come back -- pardon me -- or whatever, then TTD would change.

Q TTD -- temporary total disability would change because --

A His -- his payments would change --

Q Okay.

A -- or not exist.

Q And then the county in taking him back would put him back on the payroll?

A Right.

Q Now, when this was written on January 20, John Enos had already exhausted his FMLA; correct?



A I don't -- I don't remember what day it exhausted.

Q Well, you wrote, "John Enos has exhausted his FMLA," and that's written on January 20, so doesn't that tell us --

A Apparently then.

Q Okay. And so -- so you described a process earlier where a letter was written out saying, you've exhausted your FMLA, report back to work with no medical restrictions or you might get separated from your employment, why didn't that happen on January 20 if he had already exhausted his FMLA?

A I don't know at this point.

Q Is it true that sometimes workers who have exhausted their FMLA -- workers at Douglas County who exhausted their FMLA who hadn't quite returned to work with full medical releases, isn't it true that sometimes they were allowed more time after that, that they weren't necessarily terminated?

A There was probably cases.

Q So what was it about John Enos' case that caused that letter to be sent out to him?

MR. BROWN: Objection; foundation.

BY MR. GEDDES:

Q Let's take a step back. You've testified --

A I don't know.

Q -- let me ask --
A Norma made a lot of these decisions.
Q Well, there's been a foundation objection so I want to cure --
A Okay.
Q -- cure any potential problems with the question.
You've testified that your recollection is that you gave a letter to Norma that essentially told John Enos, your FMLA is exhausted, you need to come back by this date with full medical releases or you could lose your job; am I misstating your testimony?
A No.
Q Okay. With that in mind and with your other testimony in mind that sometimes, sometimes workers aren't given that ultimatum, my question to you, which drew the objection of foundation, is why was there a difference between the way John Enos was treated and the way others were treated where sometimes they weren't given that ultimatum?
A And I can't really state who or -- we had very few that exhausted FMLA, it wasn't an overwhelming amount, by any means. And I may be wrong. They may -- most of them came back by the date, if not way before. But I could be wrong that anybody was let go over and they may have, it may have been a judgment on the department.



Q You write in here, "We are looking for information," who is we?
A Probably Norma.
Q And in this question that you ask, who is the person or persons that you had expected or questioned about who is evaluating John in this e-mail, when he might be evaluated, what does that mean? Who is evaluating him?
A Well, I would assume that Karen Barbee had told me that he was going to be evaluated, probably for a settlement, is usually why they were evaluated.
Q Is that a workers' compensation settlement?
A Yeah.
Q But -- but do -- in those situation, who does the evaluating?
A That's up to the third-party administrator, they --
Q I guess my question is --
A -- they schedule all that.
Q -- is it a doctor --
A Yes.
Q -- or medical professional? I see.
So what evaluation is done by the county to see if that person can perform the essential functions of their job, is that something that doctor tells them or is it



something you guys evaluate on your end based on medical reports?
A It comes from the doctors whether they -- you know, what the restrictions are or if they'll --
Q So this isn't an all-or-nothing equation, they either have restrictions or they don't, and if they have restrictions then they don't get to come back, but if they don't have restrictions then they can come back; is that what you're saying here?
A It's kind of -- it's hard to say this many years out from everything. Sometimes it depends on the job, I suppose. I don't know.
Q But you agree that when you wrote this at the time, to your knowledge, John Enos needed to be evaluated to determine whether he could perform his job duties or not?
A Yes.
Q Okay. And when you're talking about job duties, what are you referring to, job duties listed somewhere?
A In his job description and -- yeah.
Q Okay. Give me one second here.
Okay. I made a mistake earlier when I said it doesn't appear to be in this document, it actually is in this document. If you could please turn, I think he said it was Exhibit 5, it's the one with the Job Description



words on top. Okay.
So when you say in his job description, you're saying you would refer to this document, which is Douglas County's job description --
A Yes.
MR. GEDDES: I don't have my microphone on, is that going to be a problem?
VIDEO TECHNICIAN: It's not, because I can hear you.
MR. GEDDES: Okay. I apologize.
VIDEO TECHNICIAN: I did miss that, though. That's okay.
BY MR. GEDDES:
Q So this is the job description you're talking about that's on DC 332 and 333?
A Yes.
Q Okay. Let's look at that, because there's a section here under the second page ending in 3333 that says "Physical Demands"; do you see that?
A And can I ask you a question?
Q Yeah, yeah.
A Is this the latest job description? Because we went through a reclassification I believe after this.
Q I -- my understanding is that -- it was changed. My understanding, and I'll represent to you for purposes

Page 142

of my question that this was the job description in effect at the time frame we're talking about.
A Okay.
Q All right. And we can predicate your answer on the assumption that that's correct. If it turns out to be incorrect, then it's incorrect.
A Okay.
Q But assuming that this is the job description that was in effect for John Enos at the time of his separation of employment, my question is: If this is the document that you would go to when I --
A Yes.
Q Okay. So let's look at the Physical Demands, the second paragraph has a line on the second sentence that says:
The employee must occasionally -- is occasionally --
I'm sorry, I'm misreading that. It says:
The employee occasionally is required to climb, balance and stoop, kneel, crouch or crawl, and must frequently lift and/or carry up to 50 pounds.
So if he had doctors' releases that said he could lift up to 50 pounds, would that be important when evaluating whether he could perform his job duties

Page 143

duties?
A To be honest, I don't know the answer to that because when it got up to that point, Norma Santoyo pretty much took over the rest of things.
Q Well, let's go back to --
A I was more gathering paperwork than anything else. Where did you find that? What line was that on?
Q It's on the second page --
A Oh, second page. Okay.
Q "Physical Demands," paragraph two --
A Thank you.
Q -- sentence two.
Well, let's go back to the exhibit. It's DC005351, it's a Sarah Christensen and Norma Santoyo and Karen Barbee e-mail exchange.
A Uh-huh.
Q At the top it's dated, "Christensen, Sarah, February 24th, 2015" are you looking at that?
A Yes.
Q Okay. From Karen Barbee at the bottom it reads:
As you know, the last return-to-work note from Dr. Morales indicated that John's work restrictions were no lifting greater than 50 pounds.
So that does comply with his job description;

Page 144

wouldn't you agree?
A I would agree.
Q But your recollection -- I might be misunderstanding your testimony, so please correct me if I'm wrong -- I think what you're saying is that by this time you weren't handling the matter doing the evaluation of his job duties, this whole matter was handled by Norma Santoyo?
A Uh-huh.
Q Is that as a yes?
A Yes. I'm sorry.
Q Okay. Because you're nodding your head.
A I'm sorry. I'm getting tired.
Q I understand.
So do you know whether she evaluated what his job duties were?
A I can't -- I don't know.
Q So, to your knowledge, you don't know whether anyone in the Juvenile Probation Department or in the Human Resources Department actually evaluated what his job duties were when -- when you wrote that e-mail?
A I would assume she had his job description.
Q Did you have any communications with her about it?
A Honestly, I can't remember exact conversations with her over these things.

Page 145

Q Now, was there any evaluation as to how frequently a juvenile probation officer or senior juvenile probation officer actually performed the lifting that is listed in the Physical Demands?
A I can't answer that. I don't know.
Q Well, when you say you wanted to make -- you wanted to see if he could do his job duties, were you describing all job duties or core essential duties, what was in your mind when you wrote that?
A Probably the duties described in here --
Q Okay. And so --
A -- and I'm sure I did it on the instruction of Norma Santoyo.
Q Did what, wrote the e-mail?
A Uh-huh.
Q Okay. So now you -- you -- would it matter if the juvenile probation officers actually didn't do lifting, would that matter as far as what their job duties were?
MR. BROWN: Objection; foundation.
BY MR. GEDDES:
Q Do you understand the question?
A I wasn't -- I understand the question. I wasn't the one who set up the job duties so I don't know.
Q My question is this. It may be written on paper, lift up to 50 pounds, but was any inquiry actually made

of the probation officers -- juvenile probation officers, "Hey, do you actually do any of this? Do you ever lift anything up to 50 pounds" -- I mean, was that inquiry ever made?
MR. BROWN: That question has been asked and answered.
THE WITNESS: I don't know.
MR. GEDDES: I'm sorry.
THE WITNESS: I don't know.
MR. GEDDES: Okay.
BY MR. GEDDES:
Q What about the idea of allowing other people to help Mr. Enos do some of these duties, was that ever considered, to your knowledge?
A I don't know.
Q All right.
MR. GEDDES: Let's look at Exhibit 18, please.
(Exhibit 18 was marked.)
BY MR. GEDDES:
Q If you could take a moment, please, and look at this document.
MR. GEDDES: Did I hand you a copy? I'm sorry.
MR. BROWN: You didn't.
THE WITNESS: Okay.
/ / / /



BY MR. GEDDES:
Q All right. Have you ever seen this document before?
A Not this particular document. I believe it was -- had to do with re -- they did a reclassification study or whatever and they send out these questionnaires to all employees -- or departments, groups.
Q Was the HR Department the one behind this? Who actually sent this out?
A I -- I'm not positive. I think we had a company do it for us.
Q Let me turn --
A I don't remember.
Q Okay.
A I wasn't directly involved with it.
Q If you look at 3214, it's the third page in --
A Uh-huh.
Q Now, this -- I apologize, I'll go back. This is a Douglas County Position Description Questionnaire for the position of Senior Juvenile Probation Officer and it applies to John Enos, Bruce Beauchamp, Tamara Morris, Eric Anderson and Douglas Albertson, and it reads in the first paragraph:
This form is designed to assist you in describing your position. You are asked



to fill out this form because you know the duties and responsibilities of your position better than anyone else.
And if we look at 3214, the question asks:
How much weight are you required to manually lift at any one time?
And it reads:
50 pounds.
Do you see that?
A Yes.
Q And the next it says:
Is the lifting done regularly?
And the answer is:
No.
And then below that it reads:
How much weight are you required to manually carry at any one time?
And it says.
50 pounds.
And it says:
Is the carrying done regularly?
And the answer is:
No.
Do you see that?
A Yes.



Q Would you agree that that's -- that should be considered in evaluating whether Mr. Enos can perform his job duties in the e-mail that you sent?
MR. BROWN: I'm going to object to foundation. She stated that she sent the e-mail at the request of someone else and wasn't involved in the decision-making process. You keep asking her all these questions and she --
MR. GEDDES: Well, okay. So --
THE WITNESS: I wasn't -- this is dated April 14th, the job description you're saying we went off of was dated in '08.
BY MR. GEDDES:
Q Okay. So we can -- we can -- I want you to assume that the job description was in effect --
A Which one?
Q The one that is from 2008 --
A Uh-huh.
Q -- and my question is: Do you believe that the information as to how frequently a Juvenile Probation Officer lifts up to 50 pounds, based on this questionnaire, is that relevant, in your mind, to addressing the issue of whether or not Mr. Enos could perform his job duties in the e-mail that you sent?
MR. BROWN: Objection; foundation.

THE WITNESS: My personal opinion is yes, because if he had to do that once and hurt himself, it's relevant.

BY MR. GEDDES:

**Q And so if he had work restrictions that cleared him to lift 50 pounds, would that also be relevant?**

A I would say so, yes.

**Q Do you know if a copy of these documents, these questionnaires, were ever sent to HR?**

A I don't know.

**Q But you personally didn't work with these documents?**

A No. We had to fill them out also for our jobs.

**Q I'm sorry, you said you filled them out for your job as well?**

A Oh, yeah. If I remember right, it was a county-wide study.

**Q So why did Norma Santoyo ask you to write this e-mail to Karen Barbee where you're asking where you are in the workers' comp process?**

MR. BROWN: Objection; calls for speculation.

THE WITNESS: This is long after, I don't remember.

BY MR. GEDDES:

**Q Isn't it true that in January or early February**



**the county was trying to get rid of John Enos, they were trying to fire him?**

MR. BROWN: Objection; calls for speculation.

THE WITNESS: I don't know.

BY MR. GEDDES:

**Q No one talked to you about that?**

A I don't remember talking to anyone about it, no.

**Q You don't remember having conversations with people letting them know that, "Hey, John -- I saw John today and I want to document what we said," "He wants his job back," "We made these phone calls," you don't remember any of that?**

A I don't remember talking about losing his job. I was taking care of the FMLA part of it as far as tracking and stuff. Trust me, most of the legal end stuff was done between the manager and the Deputy DA.

**Q Do you know who Dr. Morales was?**

A It runs in the back of my mind he was a doctor that Alternative Sentencing used, but I can't remember exactly.

**Q When this letter -- e-mail was written on January 20th, did anyone have the expectation that they would wait up to six months to evaluate John Enos to see if he could do his job duties or not?**

MR. BROWN: What exhibit are you referring to,



counsel?

MR. GEDDES: It's the exhibit -- the DC 463, the e-mail you wrote on January 20th where you're asking for information on where he is in the workers' comp process.

THE WITNESS: Can you repeat the question?

MR. GEDDES: Yes. Please, can you read that back?

(The question was read by the Reporter as follows:

QUESTION: When this letter -- e-mail was written on January 20th, did anyone have the expectation that they would wait up to six months to evaluate John Enos to see if he could do his job duties or not?)

BY MR. GEDDES:

**Q To your knowledge, did anyone at Douglas County?**

A I have no idea. I can't answer for anybody else.

**Q What about you?**

A I -- I would highly doubt it to hold a position that long after somebody has exhausted.

**Q Do you recall having a conversation with anyone in or around January of 2015, early February of 2015, specifically the library, to see if John Enos -- if there were any light duty positions available for John Enos?**

A I can't remember that now.



**Q Do you recall having any phone conversations with John Enos about that?**

A I -- I can't remember.

**Q Do you recall leaving any voicemails for John Enos regarding such matters?**

A I don't remember.

**Q Did you evaluate or anyone in HR, to your knowledge, evaluate what the staffing demands were for the Juvenile Probation Department at any time?**

A I don't remember anything about that. Norma may have; I didn't.

**Q All right. Let's look at Exhibit 19.**

(Exhibit 19 was marked.)

BY MR. GEDDES:

**Q Please look at this document. Thank you.**

**This is a Work Excuse dated January 28, 2015, and it says that John Enos can return to work with light duty restrictions for three weeks, and he can return on January 29th, 2015, and he -- it says he'll return to full duty in approximately three weeks.**

**Do you recall receiving this document?**

A I can't remember but I'm -- I probably did.

**Q So three weeks from January 28, I'll represent to you, is February 18, 2015. So this would -- this would establish an expectation that John Enos could return to**

work full duty by February 18, 2015; correct?
A That's what it looks like.
Q You track these things?
A Uh-huh.
Q We've talked about that. So according to your normal procedure, you would have informed Juvenile Probation of that fact; correct?
A Yes.
Q And as well, this -- this school excuse document says that he can actually return to work right away with work restrictions; correct?
A Well, in three weeks -- oh, that's full duty. Sorry.
Q Yeah. It says --
A Yes --
Q Okay.
A -- on the 29th.
Q Okay. So did anyone look for light duty work for Mr. Enos so that he could return to work with light duty on January 29th, 2015, to your recollection?
A I can't remember.
Q Do you recall whether Mr. Enos tried to come back to work on the 29th or thereabouts of January --
A I don't remember.
Q -- 2015?



Isn't it true that Mr. Enos contacted Ms. Sauer-Lamb on January 28, 2015, and let her know of this doctor's release back to light duty?
A I don't know --
MR. BROWN: Objection; calls for speculation.
THE WITNESS: -- who he contacted.
MR. GEDDES: I'm sorry?
THE WITNESS: I don't know who he contacted.
BY MR. GEDDES:
Q Ms. Sauer-Lamb didn't tell you that?
A I don't remember.
Q To your recollection, did anyone have a conversation with John Enos about this?
MR. BROWN: Objection; calls for speculation.
THE WITNESS: I don't know.
BY MR. GEDDES:
Q Was Mr. Enos' keycard to the office building -- they had keycards to get in; right -- the Juvenile Probation?
A Yeah.
Q Yes?
A Yes.
Q Did somebody deactivate or instruct his keycard to be deactivated or discontinued?
A Possibly.



Q Do you know who ordered that?
MR. BROWN: Objection; vague as to time.
THE WITNESS: I -- I don't know who ordered it.
BY MR. GEDDES:
Q Do you know about -- do you know whether Mr. Enos' keycard was actually deactivated before he left the employment of Douglas County?
A I can't remember when it was deactivated.
Q Was it typical for an employee's access card to be deactivated before they were separated from employment?
MR. BROWN: Objection; foundation.
THE WITNESS: On occasion, yes.
BY MR. GEDDES:
Q And what would be the reasons for that?
A If they were out for a long time, yeah, we would -- we would deactivate --
Q And wouldn't it essentially --
A -- because they could be reactivated at any time needed.
Q But wouldn't it suggest that if a person is getting their keycard deactivated right before they're terminated that the decision to terminate was actually made when the keycard was deactivated?
MR. BROWN: Objection; calls for speculation.
THE WITNESS: I don't know when it was deactivated.



MR. GEDDES: Let's take a look at Exhibit 20.
(Exhibit 20 was marked.)
BY MR. GEDDES:
Q All right. If you can look at that, please.
Okay. This is a note that you wrote; is that right?
A It is.
Q Okay. It reads --
A It's my handwriting anyway.
Q
Left message for John 1/30/15.
Now, I don't want to take an attempt at your handwriting, I might not get it correct. Could you read that, please?
A Looks like it's -- well, the copy isn't very good or the ink wasn't very good.
Told him we had no work that could accommodate his doctor notes.
Q And then on 1/30/15 another note is written, what does that say?
A
Discontinued keycard.
Q So didn't you discontinue his access card?
A Well, I was --

Q I'm sorry --
A -- the one who -- I'm sorry. I'm sorry.
Q Didn't you deactivate or discontinue his keycard on or about January 30, 2015?
A According to this, yes.
Q And this doesn't refresh your recollection as to what happened?
A That was -- that was a few years ago.
Q Do you --
A I did discontinue keycards and stuff on the instruction of whoever -- probably Norma, or whoever told me to, you know. I was down the food chain a little there and did what I was told.
Q Was it common for you to discontinue keycards or was it uncommon?
A It happened, yeah.
Q How many times would you do it in a month?
A Oh, in a month? It's hard to say.
Q More than ten times?
A No.
Q How about in a year, more than ten times?
A I mean, I couldn't even tell you, because we discontinued them on terminations, on -- you know, if people were on an extended leave. It was mainly for safety issues.



Q Why is that?
A Just so if the card was left anywhere or anything, somebody couldn't get in.
Q Was there ever a concern that John Enos would do something improper by accessing the building?
MR. BROWN: Objection --
THE WITNESS: That --
MR. BROWN: -- calls for speculation.
THE WITNESS: -- I have no idea.
BY MR. GEDDES:
Q The reason why I ask about how frequently you did this is this isn't something that you would remember, discontinuing John Enos' keycard?
MR. BROWN: Objection; argumentative.
THE WITNESS: I don't -- I mean, I did a lot of things. I mean, this was minute in size of everything I did, you know. I activated keycards, I deactivated keycards, I --
BY MR. GEDDES:
Q Now, you said this was done at the insistence of someone else because you're lower down on the food chain; what does that mean?
A I did not deactivate or create keycards without higher authority.
Q So that would have had to come from Scott Shick?



A Scott Shick or Norma. Norma is probably who told me to do it. I wouldn't do it without my managers.
Q Isn't it fair to say that this is close enough in time when Mr. Enos actually separated his employment, that doing this on January 30, '15, signaled that they had no expectation that he would be coming back?
MR. BROWN: Objection; calls for speculation.
THE WITNESS: I can't -- I can't speculate on that because I don't know.
BY MR. GEDDES:
Q Well, what was your understanding? On January 30th, 2015, when you left a message for John Enos that said you had no work that could accommodate his doctor's notes and you discontinued his keycard, isn't it fair to say that your expectation was that he wasn't coming back to work?
MR. BROWN: Objection; argumentative.
THE WITNESS: It -- I don't remember what I thought about it.
BY MR. GEDDES:
Q Now, do you recall leaving -- I asked you if you recall leaving voicemails with Mr. Enos. Does this refresh your recollection as to -- when you say "left messages," is that a written message, is it a voicemail?
A It was probably a voicemail, but I don't remember



doing it per se but -- I left all kinds of people messages.
Q And when you said, "I've -- told him we had no work that could accommodate his doctor's notes," what did you do to figure that out? What was the basis on which you made statement?
A I probably called around for light duty.
Q I'm sorry, you called around for light duty?
A To see if anybody could accommodate.
Q Do you recall specifically who?
A No.
Q You've talked about Norma Santoyo, what was her involvement in these two tasks that you're reporting?
A What was her what? I'm sorry.
Q Involvement.
A She probably had me call around for light duty, and I would assume she was the one who instructed me to discontinue the keycard.
Q Because you wouldn't do those things on your own and you would get instruction to do that?
A Yeah -- the light duty, yeah, I would say she probably told me.
Q What about the keycard?
A The keycard I know I wouldn't do on my own, that I had to have instruction from Norma.

**Q So you called Mr. Enos on January 29th; correct? I'm sorry.**
**On January 29th Mr. Enos called the HR to discuss this matter, he spoke with Norma Santoyo; isn't that right?**
A He spoke with Norma?
**Q Yes.**
A I don't know.
**Q Do you know how many phone calls you made to John Enos leaving messages for him on or about January 28th, 29th, 30th --**
A No, I don't.
**Q -- 2015? All right.**
MR. GEDDES: Let's go off the record for a second.
VIDEO TECHNICIAN: We are going off the video record at approximately 2:21 p.m.
(Off the record.)
VIDEO TECHNICIAN: We're going back on the video record at approximately 2:28 p.m.
BY MR. GEDDES:
**Q Ms. Christensen, we're going to play you two recordings which I'll represent to you are voicemails in Mr. Enos' voicemail and some may be -- some portion may be difficult, so if you could listen carefully to see if you understand what is being said --**



A Okay.
**Q -- and then we can ask questions about it. And the court reporter may have to stop us or if it's indecipherable -- if what she does is type in Indecipherable, that's what it is and we'll take it from there.**
MR. BROWN: I'm not trying to interject into your deposition, but I think if we could have perhaps your client identify the date and time that he's playing -- of the message --
MR. GEDDES: That's fine.
MR. BROWN: -- that's on his phone for each one.
MR. GEDDES: Okay.
MR. BROWN: And then I don't think you want anyone other than the court reporter to talk. Don't explain while this is playing, wait until it's done.
MR. GEDDES: That's fine.
MR. BROWN: Okay.
MR. GEDDES: So, Mr. Enos, if you could just state before you play that what it is you're playing, what the date stamps are or what have you.
MR. ENOS: This is a message from January 28, 2015, at 4:45 p.m.
(Audio recording played from cellphone and transcribed as follows:



Hi, John. This is Sarah in Human Resources. Um, I'm calling because we've been going over your, um, return-to-work, she has two of them. Um, they're very conflicting. You know, the light duty on your wrist and it says, um, no lifting over ten pounds, but your shoulder is the one that's concerning. It's no lifting, pushing or pulling with your shoulders. We don't have any light duty that can accommodate that. So give me a call, 782-9865. Thanks.)
MR. ENOS: And this one was sent January 30, 2015, at 8:47 a.m.
(Audio recording played from cellphone and transcribed as follows:
Hi, John. This is Sarah in Human Resources. Just called to let you know, I don't think I got back to you yesterday, I talked to [indecipherable] and they just don't have anything that can accommodate your situation right now.
I also talked to Karen Barbee and everything, so you'll remain on temporary disability off work for now. Um, keep me



abreast of anything that is going on with your new surgery, and I will talk to you soon. If you have any questions, 782-9865. Thanks.)
THE REPORTER: Okay. I didn't understand a name maybe.
THE WITNESS: I think that part you couldn't understand was I checked with the library.
MR. GEDDES: Was it Luise at the library?
THE WITNESS: Luise at the lib -- she works -- Luise works at the library, and her name is spelled L-U-I-S-E.
MR. GEDDES: All right. Thank you.
BY MR. GEDDES:
**Q Do you recognize that as your voice on both recordings?**
A Yes. Yes, I do.
**Q Okay. Does this refresh your recollection as to phone calls, voicemails that you left for Mr. Enos?**
A Well, to remember everything, no, but I obviously did.
**Q Now, in that first voicemail you talked about a shoulder injury and a wrist injury, what was the issue with that?**
A There was two separate issues, I know, and the

Page 166

restrictions were different on both of them, I believe.
Q But what did that have to do with light duty work?
A Restrictions, whether he -- well, the light duty, we didn't have any, obviously, because I checked with the library and that was the only place that was offering light duty around that time, apparently -- I think, if I remember right, and they just didn't have anything available.
Q Does that refresh your recollection as to whether you contacted anyone to see if there was light duty available?
A Apparently I did talk to Luise about it.
Q And what -- what did you ask Luise?
A If she had any light duty available.
Q Did you give her more information than that?
A I probably told her the person had whatever restrictions that were listed.
Q Did you mention it was the same worker that already had light duty in the library?
A I don't remember.
Q Did you check anywhere else other than the library to see if there were light duty work available for him?
A I don't remember that either.
Q You mention in the voicemail that you spoke to Karen Barbee, what did you speak to Karen Barbee about?

Page 167

A I don't know.
Q Well, you said in one of your voicemails words to the effect that you'll remain on --
A On TTD.
Q -- TTD, is that what you would have talked to Karen Barbee about?
A Probably, if I could -- I may have notified her that we didn't have any light duty available.
Q When you're looking for light duty for a worker, being that you work in the Human Resources Department, how many places do you typically check?
A Usually call several departments, and a lot of them just don't have light duty at all, or never offered it, and others it's on and off whether they have anything available.
Q Isn't it true that you didn't check with anyone else other than the library because if you did you would have left it in the voicemail?
A I can't even tell you that at this point. I don't know.
Q On that date that you left voicemails, Mr. Enos' FMLA had already expired; hadn't it?
A I don't remember the exact date that it expired. Is that in here?
Q Yeah, we'll find it. Actually, it's coming up in

Page 168

an exhibit which I can ask you about in just a second.
A Okay.
Q I think we had talked about it before as well -- oh. Let's go to Exhibit 17. Exhibit 17 doesn't actually state when his FMLA expired but it establishes that you wrote on January 20th, 2015, in your e-mail, quote, "John Enos has exhausted his FMLA." So his FMLA would have been exhausted when you left those voicemails; isn't that right?
A It should have been.
Q Yet you didn't mention that in the voicemails; was that important?
A At this point, I don't remember.
Q Let's go ahead and, if we can, please -- I think it's 21.
(Exhibit 21 was marked.)
BY MR. GEDDES:
Q If you could please take a look at this.
A Okay.
Q All right. Previously you testified about a letter that you wrote, gave to Norma Santoyo, that essentially said three things; one, John Enos, your FMLA is expired; number two, you have to return to work with -- without medical restrictions; and, three, if you can't, you could lose your job.

Page 169

Do you recall that testimony?
A Yes.
Q Is this -- this exhibit, Exhibit -- is this Exhibit 21 -- 21, is this exhibit the document that you're referring to?
A Yes. Norma apparently added some to it, I believe, or --
Q The framework for this -- I'm sorry, were you finished? I don't want to interrupt you.
A Said she kind of revamped.
Q Okay. Now, this document was built on the framework of the document that you gave to Norma Santoyo; correct?
A Yes.
Q All right. Now, this letter dated February 13, 2015, it's written to John Enos and it reads:
Dear Mr. Enos:
First paragraph.
Our records indicate that you've been on Family Medical Leave, FMLA, since October 21, 2014. As you know, the FMLA provides employees up to 12 workweeks of job protected leave for absences caused by a serious health condition. Since your serious health condition is under a

workers' compensation claim, your FMLA has run concurrently to that claim. This notice does not impact your workers' compensation claim.
The second paragraph is:
Our records indicate your leave entitlement under the FMLA has expired effective January 21, 2015. Accordingly, you are expected back at work and must return on February 17th at 8:00 a.m. You are expected to provide a full medical release prior to returning to work.
Please deliver the release to Human Resources no later than February 17, 2015, at 8:00 a.m. Please note, that any absence beyond February 17, 2015, will be deemed an unauthorized absence pursuant to Douglas County Code 2.02.080, and may subject you to automatic separation or disciplinary action up to and including termination.
Please contact me in advance of your scheduled date of return if there are additional circumstances that may be relevant or that you wish to bring to our



attention regarding your absence.
What portions of this letter did you submit and what portions were added by Norma Santoyo, or whoever wrote it after you gave it to Norma.
A I can't remember specifically. I know the first paragraph is mine. I think she added the Douglas code into it, and I believe she reworded and added to the second paragraph.
Q Your testimony is you never saw this again after you sent --
A I did not.
Q -- it out until now? Okay?
A (No audible response.)
Q That's a yes?
A Yes. I'm sorry.
Q All right. So if we compare Exhibit 17 to Exhibit 21, you wrote on January 20th that John Enos had exhausted his FMLA but in Exhibit 21 it says his -- his FMLA had expired January 21st, so that's about the same day, so do you have any reason to doubt, based on these documents, that Mr. Enos' FMLA had expired on or about January 20th or 21st of 2015?
A No. I believe that's correct.
Q Okay. Now, this letter, Exhibit 21, has Scott Shick cc'd on it and Justina Caviglia cc'd on it; do you



see that?
A Yes.
Q Did you have any communications with Scott Shick about the matters set forth in Exhibit 21?
A I believe Norma did. I don't believe I did.
Q What would make you think that Norma did?
A She cc'd him.
Q Okay. What about --
A But it was normal to cc the manager of the department the employee was in and our DA.
Q Okay.
A That was just --
Q But you're not aware of any specific communications from either Mr. Shick or Ms. Caviglia regarding the matters set forth in Exhibit 21?
A Not that I remember.
Q Now, the date that this letter is written is February 13th and he's being ordered back to work on February 17th, so about four days. Is that normal, do you normally give that much lead time or do you give more lead time than that?
A I created this earlier than that; Norma must have changed the date.
Q Okay. What date did you put in?
A Honestly, I can't remember an exact date, but



usually I did them usually two weeks before exhausting.
Q Before exhausting. So is it your recollection then that this letter was actually submitted by you, the portions you submitted, before his FMLA expired?
A Yeah.
Q So you would have submitted that to Ms. Santoyo before January 21st, 2015?
A I would -- I would assume so.
Q That's based on your customary practice?
A Yes.
Q Now, if we go back to -- if we go back to DC 1698, that's the work excuse dated 1/28 --
A What exhibit was that --
Q We're going to find that for you right now. It's the one that has Tahoe Fracture on the top left. I'll show it to you.
A I'm looking for it.
MS. PALMER: 19.
MR. GEDDES: Exhibit 19.
THE WITNESS: Oh. I just picked up two at once. Okay.
BY MR. GEDDES:
Q All right. The work excuse by Dr. Eisenhauer says he's going to return to full duty in approximately three weeks. So based on Exhibit 19, Mr. Enos wasn't expected

to return to full duty until February 18, yet he's being ordered back to work a day before that on February 17.
Do you see that?
A Uh-huh.
Q Do you recall anyone having a discussion about why they wanted him to return on the 17th?
A I don't remember anything on that.
Q All right. If we look at this Exhibit 21, Bates stamp 1304 --
A Uh-huh.
Q -- this is dated February 13, 2015, I'll represent to you that February 13, 2015, was a Friday before a three-day weekend.
A Okay.
Q February 16 was President's Day. That means this letter gave Mr. Enos an ultimatum to return to work on the Tuesday after a three-day weekend and he was getting this on the Friday. So he was expected to get full medical releases by 8:00 a.m. or he would be subjected to automatic separation or disciplinary action, up to and including termination.
You've never seen that little amount of time given to a worker before; have you -- to respond to --
A I don't remember it ever being that short, no.
Q Okay. Isn't it true that the reason why he was



given so little time to respond was he was being set up for failure by either Scott Shick or Justina Caviglia or Norma Santoyo, that they wanted him to fail and they wanted an excuse to get rid of him -- isn't that true?
MR. BROWN: Calls for speculation; calls for speculation.
THE WITNESS: I can't even speculate on that.
BY MR. GEDDES:
Q Now, let's go back to the phrase on 21 that says it may subject you to automatic separation; do you see that?
A Yes.
Q Isn't it true that automatic separation has an adverse impact on that employee's ability to obtain work again with Douglas County?
MR. BROWN: Objection; calls for a legal conclusion.
MR. GEDDES: Well --
THE WITNESS: I don't know.
BY MR. GEDDES:
Q So you're not aware of a rule -- working at HR that there's an HR Rule, or some rule or a statute that says if you separate employment through an unauthorized absence you cannot -- you cannot obtain work again with the county -- are you aware of such a rule?



A I'm not sure if it's just in that department. A lot of times, if you're terminated from one department, you can apply at other departments.
Q Well, my question is: Does the unauthorized absence stigma or penalty or rule cause someone an inability to work again for Douglas County?
A I don't think so but I'm not positive.
Q But when you worked at HR, you never became aware of such a rule?
A No.
Q Now, the part that says, "may subject you to automatic separation or disciplinary action including termination," what's the difference between automatic separation and a disciplinary action up to and including termination, what's the distinction there?
A I don't really know.
Q But you didn't write that paragraph anyhow?
A No.
Q Norma Santoyo did?
A (No audible response.)
Q Do you recall whether Mr. Enos received this letter?
A I don't recall.
Q Do you know one way -- go ahead.
A I would assume someplace there is certification --



certified returns if she sent it certified; if not, I don't know. She could have sent it with a process server. I don't know --
Q Okay.
A -- how it was done.
Q Do you know -- do you know whether after receiving this letter Mr. Enos hightailed it over to the Human Resources Department and said words to the effect, "No way, I'm here. I want to work. Don't fire me, don't separate my employment"; did that occur?
A I can't remember.
Q Now, this -- this third paragraph that you attribute to Norma Santoyo mentions Douglas County Code 2.02.080; isn't that correct?
A Yes.
Q But isn't it true that the juvenile probation officers, as you testified earlier, were governed by the court personnel regulations?
A I believe the county code overrides both personnel and -- that's -- I -- that's me, that's what I think.
Q What do you base that on?
A What I remember anyway, that county code overrides personnel and the court. And I could be wrong about that, but why -- I can't tell you why Norma did what she did.

Q Just give me a second here.
Okay. If you could please turn to -- I think it's Exhibit 4, the Ordinance 2000-907; do you see that?
A Yes.
Q Okay. If I could direct your attention, please, to PLF-059, and if you go all the way down to the definition of Unclassified position and subsection (b), it reads:
All positions under the jurisdiction of the district court judges, including juvenile probation, juvenile detention, and China Springs Youth Camp are governed by Court Personnel Regulations.
Do you see that?
A Yes.
Q Do you still have the opinion that the county code would override the Court Personnel Regulations?
A Well, no, but I didn't put the code in the letter to begin with.
Q Do you know whether the judges were consulted about Mr. Enos --
A I do not.
Q -- I'm sorry -- and his separation of employment prior to his separation of employment?
A I do not know.



Q Have you ever had a situation where a juvenile probation officer was terminated when you worked at Douglas County?
A Gosh, I don't remember any, but that doesn't mean it didn't happen.
Q Were you -- were you ever -- were you ever trained or instructed to make sure that the court was notified if -- if a termination or separation of employment was happening with one of the court personnel?
A I didn't usually deal with termination, that would be my manager and the DA, Deputy DA assigned to us.
Q Okay. Isn't it true that on February 17, 2015, Mr. Enos showed up to work in response to this letter of Exhibit 21 advising your department that he was reporting for duty?
MR. BROWN: Objection; asked and answered. She already said she didn't know.
THE WITNESS: On the 17th?
MR. GEDDES: February 17, 2015.
THE WITNESS: The day he was supposed to come back, I believe he did show up.
BY MR. GEDDES:
Q Okay. What do you recall?
A I remember -- I believe he was -- went in with Norma, maybe Justina, I believe I was in there but I was



just kind of an observer, maybe Vicky. I can't remember exactly.
Q Well, what transpired in that meeting?
A That his -- the only thing I do remember is that Norma was saying that his doctor's release was not a full release like requested.
Q Okay. Anything else you remember?
A Not offhand.
Q Do you recall a conversation where Norma Santoyo told Mr. Enos that Scott Shick wanted to fill that position?
A Hmm. Trying to think back on the meeting. I don't remember.
Q Do you recall that Ms. Santoyo told Mr. Enos that if he couldn't get full doctors' releases within three days or by the end of Thursday, February 19, 2015, that the county would consider Mr. Enos to have abandoned his post for three days which would constitute a voluntary resignation by Mr. Enos?
A Vaguely. I don't remember the exact dates mentioned but --
Q And who instructed Ms. Santoyo to give him that ultimatum?
A I don't know.
Q Do you recall that Mr. Enos strenuously disagreed



with that idea, stating that he was not abandoning his post, not resigning from his job, and that he was ready, able and willing to return to work right there and then?
A I don't remember that specifically, no.
Q Do you remember him resisting or opposing the things that Norma Santoyo was saying?
A I think he was upset.
Q Do you recall him disagreeing with the idea that he was abandoning his post?
A I -- specifically, no.
Q Do you have any idea how long Mr. Enos had worked for the county, whether China Springs or some aspect of the county work at that time?
A I don't remember specifically. I know he'd been there quite a while.
Q It was about 20 years. Do you recall that Ms. Santoyo told Mr. Enos that he could request an extension of time for the deadlines imposed in the letter?
A I don't recall that, no.
Q Isn't it true that Mr. Enos actually did that, he requested an extension for a leave of absence to comply with the ultimatum to obtain a full medical release?
A I -- I honestly do not remember all those specifics, because Norma was dealing with the majority of

it.
Q But you were in a meeting with them and you heard the gist of what was said, you may not recall exact language but you may be able to recall, I don't know, but you may be able to recall the general tenor of what was said.
Do you recall Mr. Enos requesting a reassignment to any other position in Douglas County for which he was qualified to work?
A That -- that does not ring a bell at all, it does not.
MR. GEDDES: I believe we're on 22.
(Exhibit 22 was marked.)
BY MR. GEDDES:
Q Thank you. All right, Ms. Christensen, if you can look at that, please.
A Uh-huh. Okay.
Q All right. Do you recall seeing this letter?
A I don't remember seeing this letter.
Q Okay. This letter is dated February 17, 2015. It's directed to Human Resources. It's rather short. It reads:
On Friday, 2/13/15, a letter was delivered to my home at 4:45 p.m. I received it at 5:25 p.m. The letter



informed me that I must provide the county with a doctor's release and return to work on 2/17/15 at 8:00 a.m. I returned to work at 8:00 a.m. to Norma Santoyo's office at the Human Resources unable to get a full release from my doctor over the President's Day weekend. I am requesting an extension of time in order to get more information from my doctor regarding my ability to return to full duty as a probation officer pursuant to the county policy regarding leave of absence, No. 200.40. I'm also requesting a leave of absence in order to receive necessary medical treatment for injuries I received while on the job and to recover from these injuries in order to return to my job as a probation officer at full capacity.
Sincerely, John M. Enos.
Then there's an asterisk at the bottom.
Also, if it is found that I will not be able to return to full duty as a probation officer, I will accept any other position with the county that I can



perform.
Having looked at this letter and now just reading it, does this refresh your recollection as to any of these matters set forth in Exhibit 22?
A I do not remember seeing this letter, probably went straight to Norma. So what is your specific question again? I'm sorry, I'm getting tired.
MR. GEDDES: Could you please read back the question?
(The question was read by the Reporter as follows:
QUESTION: Having looked at this letter and now just reading it, does this refresh your recollection as to any of these matters set forth in Exhibit 22?)
THE WITNESS: Not really.
MR. GEDDES: Okay.
BY MR. GEDDES:
Q Do you have any information -- did you actually, yourself, try and find work for Mr. Enos in any other position with the county after -- on or about or after February 17, 2015?
A No.
Q Are you aware as to whether anyone at Douglas County did such a thing?



A I am not aware.
Q Have you ever handled a request from a Douglas County employee for more time to return to work with a full doctor's release in any of the days that you worked -- in all of your days that you worked at Douglas County?
A I'm trying to remember if there was anything specific or --
Q Take your time.
A I can't remember.
Q Now, on or about February 17th, 2015, when Mr. Enos spoke to Norma Santoyo didn't she also inform him that it would help him if Mr. Enos could get an updated work report from his doctor?
A She may have.
Q Didn't Mr. Enos actually do that?
A I can't remember specifically. I believe he would have.
Q Well, isn't it true that Mr. Enos -- his doctors faxed additional medical releases to Douglas County that day or the next day giving him -- one doctor giving him a full medical release and the other saying we'll give you a medical release up to 50 pounds of lifting; don't you recall that happened?
A I remember Norma getting some information from a

doctor on him, I don't remember exactly what it said.
Q All right.
MR. GEDDES: Let's mark as Exhibit 23 --
(Exhibit 23 was marked.)
BY MR. GEDDES:
Q If you could please look these over.
A Okay.
Q Have you seen these documents before?
A I may have. I'm not sure.
Q But these are the type of documents you've testified you would work with; right --
A Yes.
Q -- work releases? Okay.
Well, the first document Bates stamped DC 01495 is a Return to Work order from Specialty Health Clinic by Dr. Morales for John Enos; isn't that correct?
A That's what it says.
Q And this is dated February 17, 2015; isn't that right -- up in the middle?
A 2016?
Q No, that's a 15. Well, let's look at the banner stamp. Do you see the fax banner stamp --
A Yes.
Q -- February 17, 2015?
A Yes.



Q And so it describes the date of the injury as happening in 2014?
A Yes.
Q And it says:
Employee is unable to lift greater than 50 pounds, no pushing greater than 50 pounds, no pulling greater than 50 pounds.
Then the next -- the next page is a document from Tahoe Fracture and Orthopedic, and it's dated February 18, 2015. At the top it reads, "Fax To: Norma Santoyo," and it says, "Work Excuse," and it says:
May return to work unrestricted as of today.
So let's take the second page first, DC 1496. According to the terms of the second page, as far as this doctor, Dr. Eisenhauer was concerned, John Enos had a full medical release from Dr. Eisenhauer; isn't that correct?
A That's what it looks like.
Q The second -- the first page from Specialty Health, this gives him clearance to lift up to 50 pounds; isn't that right?
A That's the way I would read it.
Q And that was a job requirement listed in his job



duties that he would be able to lift up to 50 pounds; correct?
A Yes.
Q Now, the -- do you recall whether Norma Santoyo discussed these documents with anyone?
A No.
MR. BROWN: Objection; speculation.
THE WITNESS: I don't know what she discussed with anyone.
BY MR. GEDDES:
Q She didn't discuss this with you?
A Not that I recall.
Q Based on the way your offices were laid out and your cubicle next to her office, you didn't overhear any conversations with anyone talking about this with Norma?
A No.
Q And you don't recall any conversations with anyone about these medical releases?
A No -- not specifically, no.
Q Well, generally or any other way, what is your recollection?
A Well, there's something running in the back of my mind but I can't -- I don't want to say anything because I can't remember the specifics on it.
Q Now, on the following day, February 18, 2015,



didn't Mr. Enos again report to the Human Resources Department of Douglas County stating that he was reporting for duty?
A He may have.
Q And you've done a good diagram of what the office looked like -- I mean, if he -- if he came to your office, you likely would have seen him if you were there; is that correct?
A If I was there.
Q Because you were the first cubicle?
A Yeah.
Q And your counter was facing the door where they walked in; right?
A Yes -- well, depending. We had two doors.
Q Okay. If Mr. Enos testifies at trial that he absolutely did go to the Human Resources Department on February 18, 2015, in the morning, and that he reported to the Human Resources Department and stated that he was reporting for duty, you wouldn't have any information or knowledge to disagree with that; isn't that right?
A I wouldn't disagree with it or -- I would -- state exactly what time or -- I believe he did come in but beyond that --
Q What -- what do you base that belief on?
A I'm -- just a vague recollection that he did come

in at 8 o'clock, that he was there.
Q On the 18th?
A Well, one morning.
Q Well, you've given testimony about him coming in the 17th and having a meeting with Norma, this is on the following day, is your -- is your recollection that he also came on the following day, on February 18 in the morning?
A You know, I can't be specific on that. I -- I just don't remember.
Q Do you recall that Ms. Santoyo told Mr. Enos that she did receive those two medical releases that we talked about in Exhibit 23?
A She -- she may have.
Q But you don't recall?
A I don't recall offhand.
Q You don't recall Ms. Santoyo saying words to the effect that, getting these medical releases was good news?
A I don't remember that, no.
Q Do you know whether Ms. Santoyo -- is it Santoyo or Santoya?
A I can't remember.
Q Okay. Do you know if Ms. Santoyo forwarded information to Scott Shick regarding these medical



releases?
A That I do not know.
Q Do you recall that on February 18 Ms. Santoyo called Mr. Enos and told him words to the effect that his FMLA had expired and that Mr. Shick denied his request for an extension of time and for a leave of absence?
A Vaguely remember something about that, not specifics.
Q What is -- what is -- what is your vague recollection on that? Maybe you can describe it.
A That -- I remember her talking to him or saying that she had talked to him.
Q Him being Scott Shick?
A John Enos.
Q That she had talked to John Enos?
A Yeah.
Q And --
A Regarding there wouldn't be an extension.
Q Isn't it true that Karen Barbee disagreed and thought that Mr. Enos could return to his regular job duties based on the medical releases of Exhibit 23?
A I don't remember.
Q Well, let's look at Exhibit 24.
(Exhibit 24 was marked.)
/ / / /



BY MR. GEDDES:
Q Please look at that.
A Okay.
Q Did you ever see this document before?
A I may have. It looks vaguely familiar.
Q This is a letter from Karen Barbee to John Enos dated February 24th, 2015, that was shortly after he was terminated, and it reads:
Dear Mr. Enos: A review of your claims referenced above indicates that you have been given a full duty release from Dr. Eisenhauer effective 2/18/15 and Dr. Morales has decreased your restrictions to no lifting greater than 50 pounds, no pushing greater than 50 pounds, no pulling greater than 50 pounds, no overhead shoulder lifting greater than 35 pounds effective 2/17/15.
We've been advised that the restrictions given by Dr. Morales are compatible with your regular job duties. As such, you are no longer eligible for temporary total disability benefits. No further TTT -- TTD payments will be made.
Then it goes on to talk about if he disagrees he



can appeal.
So you would agree with me then that at least Karen Barbee believed that the medical releases of Exhibit 23 amounted to statements by doctors saying that Mr. Enos could perform his duties as a juvenile probation officer; correct?
A That's what it looks like it says.
Q And you don't recall Ms. Barbee talking that over with you or sending an e-mail about that?
A I don't -- I would -- I probably -- I got this at some point.
Q And you got that because it says on the cc list, "Employer Douglas County"?
A Right.
Q Well, would you agree that it's a bit odd on the one hand he's being told he can't return to work because he doesn't have a full medical release, then on the other hand he's being told, you can return to work and because you can and you don't work there, we're cutting off your TTD; wouldn't you agree with me that's a bit odd?
MR. BROWN: Objection; incomplete hypothetical; misstates the testimony and it's argumentative.
MR. GEDDES: Well, let's -- let's go over this a little bit.
/ / / /

BY MR. GEDDES:
Q You agree that Mr. Enos was terminated because he -- his FMLA ran out and he did not obtain full medical releases; isn't it true?
MR. BROWN: Objection -- I'm sorry.
BY MR. GEDDES:
Q Isn't that correct?
MR. BROWN: Objection; foundation.
BY MR. GEDDES:
Q Let's take a look at Exhibit 16. I think the foundation --
A Sixteen?
Q -- was established a long time ago.
Yes, let's look at 16? You wrote the following words:
On February 24th, 2015, John Enos was terminated from Douglas County on February 19, 2015. John's FMLA time was exhausted and he was unable to return to work with no restrictions as stipulated.
So that's the foundation for my question.
So would you agree with me that there is -- there is a disconnect or a tension between the position that you stated in Exhibit 16 and the position that Karen Barbee took in Exhibit 24?



A Yes.
Q Did you know that they actually cut off his TTD benefits?
A According to this letter, yes.
Q Did you know that Mr. Enos had to fight to get those back?
A No, the third-party administrator did not.
Q Did the third-party administrator advise you that the court -- the administrative tribunal overruled Ms. Barbee and reinstated his TTD rights; did you know that?
A I don't remember that at all, no.
Q What happens when an employee leaves the employment of Douglas County, do you still monitor those workers' compensation benefits or is it pretty much off your plate at that time?
A It's off.
Q I'm sorry?
A It's up to the administrator.
Q So you don't review it after that time?
A No.
MR. GEDDES: Let's please mark 25.
(Exhibit 25 was marked.)
MR. BROWN: About time for another break pretty soon?
MR. GEDDES: Yeah, we can do a break after this



one.
MR. BROWN: She said she was tired 30 minutes ago.
MR. GEDDES: We'll look at this and then we'll take a break.
THE WITNESS: I was tired after lunch.
BY MR. GEDDES:
Q All right. If you can look at that, please.
Okay. Have you seen this document or a portion of this document before?
A Vaguely remember it.
Q Okay. My recollection -- my understanding, and it could be incorrect, but my understanding is that this is actually a two-part document, that a portion of this was written as questions by Karen Barbee and then Norma Santoyo wrote back and responses are interlineated in some of these paragraphs. And the reason why I say that, if my recollection is correct, I believe that was what was established before.
But, at any rate, didn't you actually supply some of the information that is produced on Exhibit 25?
A I may have, but I believe that I forwarded this to Norma and she responded.
Q Okay. Well, you're a cc on both parts of this e-mail; correct?
A Yes.



Q Okay. And there's a part where she asks:
As you know, the last return-to-work note from Dr. Morales dated 2/17/15 indicated that John's restrictions were no lifting greater than 35 pounds -- I'm sorry -- 50 pounds, no pushing greater than 50 pounds, no pulling greater than 50 pounds, no overhead shoulder lifting greater than 35 pounds. I realize he was terminated last week but I need to determine whether we will continue his TTD and to document whether or not he will be able to return to work with these restrictions. Do these restrictions fit within his usual and customary duties?
Now, the next line reads, and it appears to be the answer to the question:
Based on Dr. Morales' note, the restrictions fit within his usual and customary job duties.
You wrote that; correct?
A No, that was in Karen's -- isn't that part of --
Q Just one second.
A -- from Karen Barbee.
Q I think what would help is if we pulled up the

Page 198

original from Karen Barbee. Give me a second here, I'm looking for it.
Take a look at -- I didn't write what exhibit that was -- it's DC 5351, it is a February 24th e-mail from Sarah Christensen to --
MR. ENOS: Exhibit 16.
MR. GEDDES: Exhibit 16, thank you.
BY MR. GEDDES:
Q We think this is Exhibit 16. So if you could compare 16 with Exhibit 25, you can see that what appears to be written by Karen Barbee is -- the portions of Exhibit 25 which are paragraph 1, paragraph 2 -- those are the same, between the two exhibits, Exhibits 16 and 25 -- paragraph 3 is where they start to diverge. Exhibit 16 says:
Do these restrictions fit within his usual and customary job duties? If not, would the county have light duty available for him if he had not been terminated?
But in Exhibit 25 it's different. It says:
Do these restrictions fit within his usual and customary job duties?
Then there's new language, which I just read:
Based on Dr. Morales' note, the

Page 199

restrictions fit within his usual and customary job duties.
Do you see that?
A Uh-huh.
Q Didn't you write that?
MR. BROWN: Counsel, she's already told you --
THE WITNESS: It looks like --
MR. BROWN: Hang on a second. I'm objecting. She already told you she forwarded this to Norma. Norma did the responses and then cc'd back her on the responses.
MR. GEDDES: Let me be clear.
BY MR. GEDDES:
Q Are you saying then that Norma, to your understanding, wrote, "Based on Dr. Morales' note, the restrictions fit with his usual and customary job duties"?
Because the reason I ask, and I'll just lay more of a foundation, is you've testified in your deposition that sometimes you sent things to Norma and then Norma forwarded them out. So my question to you is: Did you write that sentence that says, Based on Dr. Morales' note, the restrictions fit within his usual and customary job duties"?
A I don't know.

Page 200

Q Okay. Then the next sentence reads:
However, the note from Dr. Eisenhauer dated 2/10/15 indicates weight restrictions of less than 10 pounds.
Did you write that, to your recollection?
A Not to my recollection.
Q Okay. Then there's a part at the bottom of DC 1497 where the question, it's the same in Exhibit 25 and in Exhibit 16:
If not, would the county have light duty available for him if he had not been terminated?
Then there's the response that exists in Exhibit 25 which is not in Exhibit 16, which reads:
The county does not have light duty available.
Did you write that sentence, to your recollection?
A Where is -- oh, right here.
MR. BROWN: This.
THE WITNESS: I believe Norma wrote those --
BY MR. GEDDES:
Q Okay. And so --
A -- because I --
Q Go ahead. I'm sorry.
A I'll tell you why I think this, is because I would

Page 201

have sent a separate e-mail addressing, a return e-mail; she has filled in under each question.
Q That wasn't your typical practice?
A (No audible response.)
Q Do you know whether that -- I'm sorry, you nodded your head or shook --
A I'm sorry. No.
Q Okay. And do you know -- did you know Norma Santoyo to use that practice of interlineating like that?
A Yes.
Q Now, this is going to sound like a repetitive question so I want you to listen it to very carefully. This is not the same question that you've been asked.
This -- the question says -- sorry. The response says, "The county does not have light duty available." So my question -- that's a present tense statement after John Enos had left, February 24, 2015, is when this e-mail is apparently written -- do you know after Mr. Enos left whether Norma Santoya -- Santoyo made a new or independent determination after he left his employment as to whether the county had light duty available?
A I do not.
Q Okay.
MR. GEDDES: We can take a break if you want.
VIDEO TECHNICIAN: We are going off the video

record at approximately 3:29 p.m.
(Off the record.)
VIDEO TECHNICIAN: We are going back on the video record, at approximately 3:44 p.m.
MR. GEDDES: All right. What I will do is I will mark the next exhibit, which -- Exhibit 26.
(Exhibit 26 was marked.)
BY MR. GEDDES:
Q If you could take a look at that document, please.
A Okay.
Q All right. Have you seen this document before?
A I'm not sure. I don't think so.
Q Okay. This is a letter dated February 19, 2015, and it's from Scott Shick and it's cc'd Norma Santoyo and Justina Caviglia, very short, it says:
Dear Mr. Enos: I received and seriously considered your request for a leave of absence dated February 17th, 2015, pursuant to Douglas County policy 200.40. However, after considerable deliberation, your request is being denied.
Do you recall Scott Shick deliberating over a request for a leave of absence by Mr. Enos?
A I don't remember that, no.



Q And Norma Santoyo, who was cc'd on this, she never talked to you about this?
A There was a lot of things Norma didn't talk to me about.
Q What does that mean?
A She didn't always share everything back.
Q So you don't recall if she spoke to you about this?
A No.
Q Now, do you remember that Mr. Enos -- we talked about him showing up on the 17th, we talked about him showing up to the HR on the 18th, do you recall that Mr. Enos actually showed up again to Douglas County Human Resources on February 19 at 8 o'clock in the morning and he told Ms. Santoyo that he was showing up for work -- do you recall that?
A I do recall that one.
Q Do you recall Ms. Santoyo telling Mr. Enos on or about February 19th, 2015, that as of 5 o'clock p.m. on the 19th of February, Mr. Enos would no longer be an employee of the Juvenile Probation Department?
A I remember hearing her not say it, but she did tell me about it.
Q Okay. So what do you recall about that?
A She just stated it to me.



Q She recounted to you having told Mr. Enos that?
A Yes.
Q And -- do you know if Norma Santoyo was involved in writing the letter which we've shown you as Exhibit 26 or contributing to those ideas -- do you recall anything about that?
A I do not know anything about it -- I can't remember anything about it anyway.
Well, 26 was written by Scott --
Q Right.
A -- Shick.
Q Right. That's right. I -- my question was: Do you recall whether Norma Santoyo contributed to --
A I don't know.
Q Okay. Have you personally, yourself, when you worked in the HR Department, did you ever work with considering requests for leave of absence from Douglas County employees?
A Usually it was -- there was a couple, most of them were FMLA that I dealt with, though. Leaves of absences were rare actually, and usually the managers stepped in on those.
MR. GEDDES: We'll mark this Exhibit 27.
(Exhibit 27 was marked.)
/ / / /



BY MR. GEDDES:
Q Thank you. If you can please look at that.
Okay. Have you seen this document before?
A No.
Q Okay. Do you recognize any -- any handwriting or signatures or initials on this document?
A Wendy Lang.
Q Okay. That's at the bottom in Section III?
A Yes, under the "HR Manager."
Q Okay. Do you see the part that says, "I've been notified in the above personnel action," and there's a signature line for an employee but it says, "Refused to sign"; do you see that?
A Yes.
Q Do you have any information about this matter, Mr. Enos refusing to sign this document?
A I know nothing about that.
Q Let's take a look at the next exhibit, please, 28.
(Exhibit 28 was marked.)
BY MR. GEDDES:
Q Oh, I'm sorry.
A That's okay, I'm a little short to reach.
Q No worries.
A Okay.
Q Okay. Have you seen this document before?

A No.

Q Okay. It's cc'd to Norma Santoyo and Justina Caviglia, do you recall whether they discussed this with you?

A I don't remember this being discussed with me.

Q And it is signed by Scott Shick. It says:

Dear Mr. Enos: Due to your absence from work for three consecutive days, Douglas County Juvenile Probation accepts your resignation pursuant to Title 2, Chapter 2.02 of the County Personnel Regulations 2.02.080(J) and Section 6.062 of the Order Establishing Court Personnel Regulations, which provide: Unauthorized absence. (2) An unauthorized absence for three consecutive days shall be regarded as an automatic resignation and termination from county, court/judicial service.

In the entire time that you worked at Douglas County, was there ever a situation like this, other than Mr. Enos, where a worker had a workers' compensation injury and could not return to work in a manner satisfactory to Douglas County and Douglas County then construed that as an unauthorized absence for three days?



A I do not remember anything like that, but I only did deal with workers' comp for two or three years.

Q Have you -- do you recall a situation where anyone was terminated for an unauthorized absence for any reason other than Mr. Enos?

A Vaguely remember one or two.

Q And didn't that involve somebody just basically not showing up for work and abandoning work? It didn't involve a medical issue like this; isn't that right?

A I can't remember exactly what the situations were.

Q Okay.

MR. GEDDES: Mark this, please, as Exhibit 29.

(Exhibit 29 was marked.)

BY MR. GEDDES:

Q If you could please take a look at that --

A There's two of them there.

Q -- you don't have to read every word, just if you could basically scan that.

A Boy, obviously I got this but I don't remember it.

Q And you say that because it's directed to you, "Attention: Sarah Christensen"?

A No, I just don't -- well, yeah. I mean, it must have been sent to me but I -- off the top of my head, I don't remember this.

Q Okay. This is a letter written from Ed Howden &



Associates dated April 5th, 2016, and according to this letter he is writing to you on behalf of Alternative Service Concepts as the vocational rehabilitation counselor assisting both you and John Enos in returning him to work. And it's stated that:

Mr. Enos has recently completed his medical treatment and Dr. Morales has released him with permanent restrictions, Mr. Enos' limitations are: No lifting above the shoulder with right extremity and no lifting greater than 50 pounds.

Then it goes onto talk about steps that can be taken regarding subsequent reemployment with the county. Do you recall any discussions with anyone about this matter?

A Well, I don't remember this at all.

Q Okay.

A I'm not saying it didn't happen, by any means. I'm just -- I may have passed it on to Legal.

Q Okay. There's a page here, DC 2146, which is the second page in, and it says -- they're citing the rules concerning the injured worker and they're citing the ADA. And on the top of 2146 it reads:

Return-to-work within your company is the best option, if at all possible. I'm



always available to discuss with you various options for returning Mr. Enos back to work. However, if you are unable to provide physically appropriate work, vocational rehabilitation services may be provided for the injured employee.

Then it asks you to take the following steps.

Within 30 days of the date of this letter, return the completed Intent to Offer Employment Form --

And that, by the way, is attached as DC 2148.

Okay. So do you recall -- if we look at 2148, do you recall that form? Have you ever seen that type of form before in your line of work?

A No.

Q Okay.

A Not -- had I seen it, I probably would have given it to my supervisor.

Q But in your line of work with workers' comp, do you deal with vocational rehabilitation counselors making these kinds of requests?

A You know, in the time -- I'm sorry.

Q -- in making these kinds of requests about intents to offer employment?

A In the time that I did it, I did not deal with

Page 210

many of these, if any --
Q Okay.
A -- that went that far --
Q All right.
A -- besides --
Q And you have no specific recollection of receiving this other than you may have received it, and if you did you would have forwarded it, you think, to Legal?
A Well, the next page, Kathy Jo Kidd signed that intent of offer.
Q Right. We'll get into that, but my question is --
A So --
Q Okay. Go ahead.
A -- I would say I gave it to my manager, who at this time I believe would have been Wendy Lang.
Q On April 5th, 2016?
A I think so. I think Norma was gone by then. I can't remember exact dates.
Q Okay. All right.
A When. And she probably passed it over to the one under her, Kathy Jo --
Q Okay. So --
A -- to deal with.
Q Thank you for looking at this page, because DC 87 is the next area I want to ask you about. So this is the

Page 211

same form as DC 86 but it's got more information filled out, and do you recognize that signature is from Kathy Jo Kidd?
A Yes.
Q And she's checked box -- there's two boxes that can be checked. It says, "Injured Worker: John Enos," and then it talks about the claim and date of injury and the employer, and then there's two options to check. It says -- the first one is:

Yes, I will be able to provide a job for the injured employee that is within the position stated limitations. I understand this form must be sent to Ed Howden & Associates by 30 days from the date of the letter.

And then there is a box that says:

No, I do not have an appropriate job to offer within the stated limitations. I understand that since no job is being offered, I do not have to return the enclosed job offer letter. I also understand that full vocational rehabilitation services may be offered to the injured employee.

So she checked that; correct?

Page 212

A That's what it shows.
Q Okay. But if we go back to DC 2145, the very first page of this, the second paragraph says he can lift up to 50 pounds, so do you know why Kathy Jo Kidd said that they didn't have an appropriate job to offer within the stated limitations; wasn't that the limitations?
MR. BROWN: Objection --
THE WITNESS: I -- I can't tell you.
MR. BROWN: -- calls for speculation; compound.
BY MR. GEDDES:
Q But wasn't that the limitations of the juvenile probation officer?
A Yes.
Q Did you have any communications with anyone about Kathy Jo Kidd sending this back in and saying, "No, I don't have an appropriate job offer"?
A I don't remember.
MR. GEDDES: If we can please mark this as 30.
(Exhibit 30 was marked.)
MR. BROWN: Has this been provided before? I notice it doesn't have any Bates stamps.
MR. GEDDES: We actually did produce this. I don't know why this one doesn't have a Bates stamp.
MR. BROWN: Okay.
MR. GEDDES: That's a good point. I wish -- maybe

Page 213

I -- no, I didn't produce the one with the Bates stamp on it.
BY MR. GEDDES:
Q Okay. Have you seen this -- does any of the information contained in this e-mail -- do you have any information about it?
A No. GovernmentJobs.com is one of the -- it might be the software they were using; other than that, no.
Q Okay. I'll represent to you that Mr. Enos in 2017 had applied for an open position that was advertised for a juvenile probation officer. He actually submitted his application and that's what this document is.
My question to you is, having looked at this, does this refresh your recollection as to whether Mr. Enos sought reemployment back with the county after his employment was separated?
A I -- the only thing that I dealt with recruitments was basically the fingerprints after someone was hired.
Q Okay.
A It was a very rare occasion, especially after we went into this new software system, that I ever dealt with recruiting.
Q So you never personally received or processed any application on behalf of -- or from or on behalf of John Enos for reemployment with the county; is that right?

A No.
Q Other than what you testified to with respect to the vocational rehabilitation?
A Yes.
Q Okay. Well, let's look -- let's look at Exhibit 30 in a little more detail. It's an e-mail to John Enos dated January 6 -- well, it's not dated that but it's to John Enos --
MR. BROWN: It's not to John Enos either.
MR. GEDDES: Well, no. This has been forwarded, is what it is.
MR. BROWN: Yeah.
BY MR. GEDDES:
Q But the -- there's a section in there -- one second. Okay. I see why I have extra copies here, and I apologize. There's a second part to this exhibit. Can we -- are you stapling exhibits? I don't know. You're not. Can we add this -- well, let's just make it a new exhibit. We'll make this 31.
(Exhibit 31 marked.)
MR. GEDDES: Okay. Thank you.
BY MR. GEDDES:
Q If you could please look at Exhibit 31 --
A Okay.
Q All right. Have you ever seen the contents or any part of Exhibit 31 before?



A Not to John Enos, no.
Q Okay. This is -- this is an e-mail and it was sent on Friday, February 24th, 2017, regarding the juvenile probation officer -- that's the subject line, it's from Cindy McMurry, Douglas County Human Resources Department.
You worked until March of 2017 so you would have still been with the county when this was sent; isn't that right?
A I had probably already turned in my resignation.
Q Okay.
A My last day was March 1st.
Q Okay. This e-mail from Cindy McMurry, you testified earlier that she was the one that handled --
A Recruitment.
Q -- recruitment. It reads:
Dear John: Thank you for the time you took to complete the application for the Juvenile Probation Officer with Douglas County Juvenile Probation Department. We were fortunate to have several qualified candidates for this position making the decision very difficult. However, after careful consideration, the department has selected another applicant.



Does this refresh your recollection as to whether or not Mr. Enos applied for work with Douglas County after he was separated from employment?
A I have no recollection of it because I didn't work in recruitment.
Q You didn't overhear conversation or see e-mails about it?
A No. We were way too busy.
Q Do you know -- do you recall whether that position was -- was open at that time?
A I don't -- I can't recall what -- I rarely checked on openings.
Q Did you process any fingerprinting or do any background check for the position of Juvenile Probation Officer after Mr. Enos' employment had ended?
A The fingerprints probably wouldn't have been back in yet by the time I left, depending on what the hire date was for that position because fingerprints take three to six weeks to get back.
Q Do you know what position became available and why, who left?
A I have no idea.
Q Now, what -- based on your testimony, what you've talked about, applications would come in and then HR would send them out to the department. Do you know whether there was any special rule where applications were not supposed to be forwarded to Juvenile Probation Department, or do you think they followed these rules?



A I have no idea.
MR. BROWN: Objection; calls for speculation.
BY MR. GEDDES:
Q What's that?
A I have no idea.
Q You have no reason to believe that the Juvenile Probation department wouldn't follow the same procedures that other departments followed; is that correct?
A I -- I don't know. I would assume they do.
Q Okay. Do you know someone by the name of Dan Hamer or Hamer, H-A-M-E-R?
A I know of Dan Hamer.
Q Who is he?
A He worked at China Springs Youth Camp.
Q Didn't he actually become a juvenile probation officer after Mr. Enos' employment was terminated?
A Possibly.
Q Do you recall working on an application or any paperwork for him to get that position?
A Not off the top of my head, but he -- I think he does work over there now. I don't know exactly when he

went to work there, though.
Q All right. I'm going to show you what we'll mark as Exhibit 32.
(Exhibit 32 was marked.)
BY MR. GEDDES:
Q If you could just scan this, you don't have to look at every page.
A Okay.
Q Have you seen this type of a document before? Do you know what this is?
A Not off the top of my head.
Q Well --
A I'm thinking it's --
Q Go ahead.
A -- jobs available -- or not jobs available, jobs filled.
Q Well, this is a document produced by Douglas County, and my understanding of it is it lists jobs that were advertised by Douglas County within its various departments. Was there a database that you had access to that listed jobs county-wide?
A They were listed on the website.
Q Okay. All of the jobs?
A Any jobs open in the county that were being advertised for or open to be hired for.



Q Was it one website that listed them all or are you saying that a person could go to all these departments and see what they were hiring?
A No. In Human Resources website -- or Douglas County Department of Human Resources, it has a job listing.
Q Okay. And did you consult that job listing with respect to trying to find either light duty or a transfer position for Mr. Enos at any time?
A I don't remember.
MR. GEDDES: Okay. I'm going to show you what we'll mark as Exhibit 33.
(Exhibit 33 was marked.)
BY MR. GEDDES:
Q All right. If you could take a look at this --
A I keep forgetting I have to read from the bottom of these.
Q Take your time.
A Okay.
Q All right. These -- this is an e-mail string having two e-mails. The first one is from you to Karen Barbee -- I'm sorry -- scratch that. There's three e-mails on here. The first one is from Karen Barbee to you dated September 18, 2014, so this would have been the September before Mr. Enos was terminated, and the subject



is John Enos. And Karen Barbee writes:
Hi Sarah: I reviewed the internal investigation reports that you sent and they are quite sufficient for our purposes. We will not need iUnlimited to get any further statements. So, we will not need to contact Scott Shick. Do you think I should call him anyway? Karen.
And then you write back the same day, two minutes later to Karen Barbee:
I will call him and let him know.
Then she writes back to you the same day, six minutes later, and writes:
Thanks, Sarah.
You wrote these responses; correct?
A I would assume I did.
Q You wrote the first e-mail and -- I'm sorry -- you wrote the second e-mail that says, "I will call him and let him know"; correct?
A Yes.
Q Now, when Karen Barbee wrote you and said, "I reviewed the internal investigation reports that you sent, they are quite sufficient for our purposes," what investigation reports were those?
A Offhand, I don't know. I believe it was probably



the investigation reports on his first workers' comp.
Q What investigation reports do you mean, what would that mean?
A Like what happened and --
Q His incident?
A -- where and everything, because I believe it was in California.
Q Okay. So you're saying because the incident happened in California, there are internal investigation reports?
A Well, I think there was -- I can't remember offhand. I think there was more paperwork because it was out of state for some reason.
Q Did this have anything to do with Facebook or questioning the authenticity of his injuries or any investigation done that suggested that perhaps Mr. Enos wasn't really injured or was performing physical activities inconsistent --
A Not that I remember.
Q Okay.
MR. GEDDES: Go ahead and mark this, please, as 34.
(Exhibit 34 was marked.)
BY MR. GEDDES:
Q If you can take a look at this, please.

Page 222

A Okay.
Q All right. This is an e-mail string between Scott Shick and Judge Nathan Young regarding John Enos. The first is an e-mail thread written from Scott Shick to Judge Young and it reads:

Good morning. John Enos has been separated from employment with Douglas County as of 8:00 a.m. this morning February 20, 2015. I will find some day -- I'm sorry -- I will find some time with you today. Scott Shick.

And then the response from Judge Young -- so that I'm clear, I may have just misspoken. The e-mail from Scott Shick is February 20, 2015, at 12:36 p.m. The response came that day, apparently -- I'm not sure why it's sent at 10:50 a.m., but at any rate -- maybe different time zones can account for it -- but, at any rate, Judge Young writes back:

I understand. I'm back on Monday.

And then Scott Shick replies:

See you then.

Do you have any information about what -- any communication given to the judges concerning Mr. Enos' separation of employment.
A I do not.

Page 223

Q And do you have any understanding one way or another whether Scott Shick would communicate with the judges concerning the separation of employment of court personnel?
A I believe that they were under one of the judges. I'm not sure. I'm trying to remember back. I think that Scott kind of was to report to one of the judges --
Q Do you have --
A -- if I remember right, but --
Q Okay. Do you -- do you have any information about anyone speaking to the judges --
A No.
Q -- about Mr. Enos' separation?
A Huh-uh.
MR. GEDDES: Thirty-five.
(Exhibit 35 was marked.)
THE WITNESS: May I ask you a question?
MR. BROWN: Yes.
MR. GEDDES: Go off the record for a second. Can we go of the record?
VIDEO TECHNICIAN: Going off the video record at 4:20 p.m.
(Off the record.)
VIDEO TECHNICIAN: We are going back on the video record at approximately 4:24 p.m.

Page 224

BY MR. GEDDES:
Q All right. If you can please look at Exhibit 35.
A Okay.
Q All right. Were you in the office the day that Mr. Enos -- his last day, were you -- did you go to the Juvenile Probation Department or did he go there?
A I did not go to Juvenile.
Q Okay. This is an e-mail from Justina Caviglia to a person named Alan Bates; do you know who Alan Bates is?
A Alan Bates was the court's IT person.
Q Okay. And it reads:

Alan: Can you pull the video from the south parking lot from last night around 5:35 to 6:30? John Enos was reported to be going through the JPO vehicle parked in the first spot across from the judge's reserved spots. Also, we need to either get a copy of or have you pull the hard drive off his assigned computer so we it, in case we need to send it out to have the encrypted password protected files reviewed.

The response given by Alan Bates on February 19 at 2:54 p.m. states:

There was nothing on the recordings

Page 225

that showed someone access the vehicle. I have disabled John's account and John's e-mails. Any files that need to be retrieved from the file server on the -- or the PC on John's desk can be gotten at any time that an investigator needs them.

Do you have any knowledge or information about any of the matters in Exhibit 35?
A No.
MR. GEDDES: 36.
(Exhibit 36 was marked.)
BY MR. GEDDES:
Q If you can please --
A Okay.
Q All right. This is an e-mail from Norma Santoyo to Scott Shick and Justina Caviglia dated February 19, 2015, and Norma writes that:

John will get the letter from ASC tomorrow denying his request to include his left shoulder --
It says should but I think it means shoulder.
-- into the claim and that no further treatment will be authorized pending further investigation. John has 70 days to appeal the decision. I just wanted to

give you a heads up because of the
sensitivity of the situation. Note, I
highly recommend we take care of his
personal items today before he receives
additional negative news. Thanks, Norma.
And then in response Justina writes:
I agree. Scott, you should try to
schedule this ASAP when you get back from
your meetings.
Do you know anything about these matters?
A No.
MR. GEDDES: Exhibit 37.
(Exhibit 37 was marked.)
BY MR. GEDDES:
Q If you could glance at that, please.
A Okay.
Q All right. Have you seen this e-mail from Norma Santoyo to Scott Shick and Justina Caviglia dated Thursday, February 19, 2015?
A No.
Q No? Do you have any information regarding any of these matters set forth in Exhibit 37?
A Not that I know of.
MR. GEDDES: Thirty-eight.
(Exhibit 38 was marked.)



BY MR. GEDDES:
Q I'm sorry. Look at that, please.
A Okay.
Q All right. If we look at the bottom half of this document at 5498 to 5499, it's an e-mail from Norma Santoyo to Scott Shick and Justina Caviglia, and the subject is "Enos Leave Request"; Date: Tuesday, February 17 at 2:10 p.m. -- that's February 17, 2015, at 2:10 p.m.; Attachments: Enos Leave Request 2/17/15, and it simply says:
Please see attached. Signed Norma
Santoyo.
And then the attachment is that letter that we talked about earlier, it was the handwritten exhibit from John Enos which is Exhibit 22.
So earlier you testified -- I believe you testified, and if you think I'm misquoting you, let me know, but I think you said you think that Norma Santoyo may have forwarded this. So looking at this, does this confirm for you that Norma Santoyo forwarded Exhibit 22 to Scott Shick and Justina Caviglia on February 17, 2015?
A That's what it appears.
Q Okay. And then if we look at the front part of this exhibit, it's an e-mail from Norma Santoyo to Scott Shick and Justina Caviglia, the subject is Enos Leave



Request, and it says:
Please see attached.
And then above that there's an e-mail from Justina Caviglia to Norma Santoyo and Scott Shick, regarding Enos Leave Request, dated Tuesday, February 17, 2015. Attachments, it reads "Resignation doc." And then Justina Caviglia writes:
Thank you. Here is a draft of the
letter that was sent out to the last
employee who exhausted their FMLA leave.
If we look to the next page, the attached letter that Justina is referring to, it reads:
Dear --
It's the John Enos letter talking about his resignation due to his absence from work for three consecutive days, Douglas County Juvenile Probation accepts your resignation pursuant to Title 2, Chapter 2.02 of the County Personnel Regulations, and then it goes on.
Now, my question to you is, you previously testified as to a letter that was given to Norma that said, return to work by this date with no work -- no medical restrictions or you could lose your job, and your testimony was that you think it was sent before to another employee. My question is: Do you have any



information as to whether or not the letter to John Enos that is at DC 5497, because there's a reference to, here is a draft of the letter that we sent out to the last employee who exhausted FMLA, is that related to what you did?
A No.
Q Did you have any input at all on the letter of DC 5497?
A No.
MR. GEDDES: Thirty-nine. Thank you.
(Exhibit 39 was marked.)
BY MR. GEDDES:
Q Let's take a look at the lower half. It's an e-mail from Norma Santoyo sent Tuesday, February 17th, 2015, 9:45 a.m. to Scott Shick, Justina Caviglia and it's cc'd to you, Sarah Christensen, the subject is Enos. And it's very short, it reads:
John was here at 8:00 a.m. this morning
and just left my office. I have to run
to the SO for a meeting at 10:00. Are
you available at 10:30 to meet and
discuss? Essentially he's stressed
out -- he's stressed about losing his job
and wants to do anything possible to
retain it. I explained the process and

gave him the leave of absence policy. He will be requesting a leave extension as he has been told by his doctors that he will be able to return to full capacity in the near future. I also discussed the medical retirement process and urged him to contact NV PERS.
And then in response Justina Caviglia writes:
Yes.
So you received at least the bottom portion of this; isn't that correct?
A Apparently so, yes.
Q Do you recall anything about this matter other than what you've testified to?
A No.
Q Now, you testified previously that you were in a meeting when John came in and you were with Norma Santoyo, do you believe that this is the meeting that she's describing in that second paragraph?
A No.
Q And why not?
A Because this would have been -- looks like it would have been over at Justina's office because she was over at the sheriff's office, and I never went over there.



Q Well, but just one second. This is -- the lower half is written by Norma Santoyo and she's writing to Scott Shick and Justina and to you. She says:
John was here at 8:00 a.m. this morning and just left my office.
A Right. The meeting I was in -- on was with Justina, Scott, John. This looks like it was just her.
Q Oh, I see. So -- okay. And this was on Tuesday, February 17. Now, looking at that, does it refresh your recollection about John Enos coming in on February 17 -- that was the day after the President's Day weekend -- does it refresh your recollection about seeing -- maybe seeing him go into her office and trying to talk to her about these things?
A He very well could have. I don't -- I can't be specific on dates.
MR. GEDDES: Exhibit 40, please.
(Exhibit 40 was marked.)
BY MR. GEDDES:
Q Can you look at that, please?
A Okay.
Q All right. I want to ask you if you've seen this document before, because I can do this more quickly if I just ask questions about this document. This is a series of e-mails and the threads kind of overlap, some of them



are the same, some of them aren't so it's a bit confusing, so let me just cut to the chase here.
A Okay.
Q All right. If we go to DC 5522 --
A Okay.
Q -- an e-mail from Norma Santoyo to Justina Caviglia and Scott Shick regarding, Serving Enos. The date is Friday, February 13, 2015. This is before he was terminated. And the attachments are: Enos FMLA exhausted letter. And if you look at the following page, 5523, that's that letter that we talked about earlier.
Do you recognize that letter?
A Yes.
Q Okay. So Norma writes on 5522:
Since I didn't get a chance to finalize the notice and we haven't served it yet, do you mind if we move the return date to February 23rd? I've modified the letter. Please let me know your thoughts. Thanks, Norma.
So the return date is what we talked about earlier, the February -- come back by February 17th --
A Uh-huh.
Q -- and this is saying, do you mind if we move the return date to February 23rd, which is five days later,



and Norma writes she modified the letter. So do you recall a discussion about moving the return date to February 23rd of the letter that is at 5523?
A Maybe vaguely remember.
Q Tell me what you remember.
A A little bit that Norma didn't get it finished when she should have, I think is why they moved the date.
Q Well, they didn't actually move the date, they were considering moving the date. John Enos was told to come back by February 17th. This suggests that the return date might get moved out to February 23rd?
A Which it did in the letter.
MR. BROWN: I think this is a draft.
THE WITNESS: Oh.
MR. GEDDES: Yeah. I'm sorry. Thank you.
THE WITNESS: Okay.
BY MR. GEDDES:
Q 5523 is a draft.
A Oh, okay.
Q All right. But you -- so you vaguely recall a discussion about moving out the date?
A I think so.
Q Now, Justina Caviglia writes on 5519:
As long as he is served today --
This is on February 13th.

-- or the 17th, prior to his surgery, on the 18th where he could claim he was on medication and didn't understand, I don't mind pushing it back to the 23rd. However, since we can have him served today, why wait until the 23rd, instead of demanding he come back the next working day since he is out of time?

Do you see that?

A Uh-huh.

Q So what is your understanding reading this -- I mean, I have an understanding but what is your understanding of what this means?

MR. BROWN: I'm going to object as to speculation. I mean, the document speaks for itself, it doesn't show that she was cc'd.

THE WITNESS: Yeah, I really can't.

MR. GEDDES: Okay. Well, let me do it this way.

BY MR. GEDDES:

Q Do you recall any conversation of -- about getting him served with this letter, return-to-work letter on the 17th -- do you recall any of that discussion?

A I think that was between Norma and Justina.

Q Isn't this prior to his surgery on the 18th? Did you know that John Enos was scheduled for surgery on the



18th?

A I may have known that at the time, I can't remember it now.

Q She writes, "where he could claim he was on medication and didn't understand," doesn't this suggest that they didn't care what he understood, they wanted him to get him served and get him out the door?

MR. BROWN: Objection; calls for speculation. You're asking her questions about her opinions about what other people's thoughts are.

MR. GEDDES: You can answer the question.

BY MR. GEDDES:

Q Do you understand the question?

A I do understand the question. The way I see it is they wanted to serve him so he did understand it before he could be -- would be on medication and stuff so he could not understand it.

Q But he was being asked to return on the 17th prior to his scheduled surgery on the 18th. If he's going to have surgery after the day he was told to come back with no medical restrictions, they knew that he couldn't possibly came back on the 17th with no medical restrictions; doesn't that make sense?

A I suppose so.

Q Let's turn to -- let's turn to 5515. There's a



discussion on this e-mail thread about Steve Shultz serving it after lunch if they can get that letter to him soon, and do you see where it from Scott Shick to Justina Caviglia and Norma Santoyo, "Let's get this done today, please"; do you see that?

A Yes.

Q Do you recall that Scott Shick was in a hurry to -- to send that letter out without any delay?

A Most of these conversations were between the three of these people.

Q So that means you don't recall it?

A No, I don't.

Q Let's look at 5513, an e-mail from Scott Shick to Justina Caviglia and Norma Santoyo, he writes:

I do not agree with pushing this back --

Or he's misspelled this but --

I do not agree with pushing this back to the 23rd. Let's get this done, please.

You don't recall Scott Shick ever telling the HR Department that they wanted John Enos' separation to happen sooner rather than later?

A Well, it looks to me like most of these e-mails were done between the three of them and I wasn't privy to



a lot of things --

Q That may be --

A -- at their level --

Q I'm sorry.

A -- so no.

Q Okay. But my question is, do you have any information about that, whether or not you were privy to the e-mails?

A No.

Q Okay. That was Exhibit 40; right?

A Yes.

Q All right. Thank you.

MR. GEDDES: Okay, 41.

(Exhibit 41 was marked.)

BY MR. GEDDES:

Q Have you take a look at this, please.

A Okay.

Q All right. Some of these documents -- these are a list -- these are e-mail threads and some of this actually includes you. Let's take a look at DC 5536 towards the back; do you see that?

A Yes.

Q It says:

Original Appointment.

From: Norma Santoyo.

Sent: Thursday, February -- Thursday, February 5th, 2015.
To: Norma Santoyo, Scott Shick, Justina Caviglia and Sarah Christensen.
Subject: John Enos next steps.
When: Tuesday, February 10, 2015, 3:30 to 4:30.
Where: Minden Inn, Room 104.
It just says:
Meeting to discuss John Enos' employment status and next steps.
Does this refresh your recollection as to the meetings that you were testifying about earlier?
A No. I believe it was a meeting to discuss about his FMLA being exhausted.
Q Okay. And you described a meeting that you were at --
A Yes.
Q -- and that wasn't the same meeting because you were at a meeting when John was in that meeting; right?
A I was thinking John was in there, but maybe he wasn't.
Q Well, are they separate meetings or the same meeting? Meaning, did they have the meeting that you recall and then there was a separate meeting without John



as described in 5536?
A I'm thinking there was probably two, because I know -- I'm thinking that John was in one of the meetings.
Q Okay. But this -- this meeting was scheduled for February 5th, which was before the time when John Enos received his return-to-work letter; correct?
A Yeah, the return-to-work letter was -- what date was it?
Q That was on the President's Day weekend, the Friday before the Tuesday of the 17th.
A Okay.
Q So -- so my question is, what do you recall about this meeting? You attended this meeting; right?
A I believe I did.
Q And what was discussed?
A About his FMLA being exhausted.
Q And what were the next steps that were discussed?
A About sending the letter, as far as I can remember.
Q And Scott Shick was at this meeting; correct?
A That's what it looks like.
Q And Justina Caviglia was there, and you were there and Norma Santoyo was there; correct?
A Yes.



Q How long did that meeting last?
A I don't remember.
MR. GEDDES: Let's take a look at the next exhibit, please, 42.
(Exhibit 42 was marked.)
THE WITNESS: Okay.
BY MR. GEDDES:
Q All right. This is an e-mail from Justina Caviglia to you dated Wednesday, November 12, 2014. Attachments: Enos Facebook.pdf. And the e-mail Justina reads:
I'll try to find them on my own to get better dates. The post on the first page is from Quintyn Madsen mentions him on November 8.
And then Quintyn Madsen on page two is at the top of this document, and looks like -- all right -- and then if you look at DC 5558, in the middle there there's a picture of John Enos on this Facebook page, what was this about? What do you recall about this?
A It was a hunting trip he took while he was off work.
Q Okay. And what was the concern? Was there a concern about that?
A The injuries he was off of work for shouldn't have



been consistent with hunting because it was his shoulder and his wrist.
Q And an investigation was performed and he was cleared of any wrongdoing; isn't that right?
A I don't remember. I wasn't -- after -- after the initial stuff, I didn't get a lot of feedback sometimes.
Q But your understanding is you heard nothing more about this after -- after this e-mail; is that right?
A Right.
MR. GEDDES: We'll mark this Exhibit 43.
(Exhibit 43 was marked.)
BY MR. GEDDES:
Q Okay. If we look at 5592, there is an e-mail from Scott Shick to Norma Santoyo. The subject is "Urgent HR dialog regarding employee Enos"; Date: Tuesday, September 2nd, 2015, and it reads:
Norma: It is imperative that we discuss Mr. Enos' off-duty activity. Do you have time for me today? Scott Shick.
Do you see that?
A Uh-huh.
Q Do you recall Scott Shick meeting with Norma Santoyo about this?
A I believe so.
Q Okay. What do you recall?

A I'm trying to think of where Scott was that he saw -- it was the Sports Authority or -- I don't know the names of those places, but he was in one of those where there was a book on sort of bragging rights on their hunting and found some stuff that John Enos was in there.

**Q And so what was the result of that meeting between Norma and Scott?**

A I don't remember what the result was. I think she took all the information down from him and probably forwarded it on to Justina.

**Q Let's take a look at 5595 at the front of this exhibit, it's from Justina to you and it says:**

**Subject: Pics from Facebook, Enos.**

A Oh. These were the -- these were Facebook ones? They're really not easy to see.

**Q Is this the subject matter you were just talking about with respect to Exhibit 42?**

A There was -- they might be vice versa actually. I can't remember. No, they're both Facebook, I guess, because Scott Shick found some, he happened to be in one of the sporting places.

**Q Well, my question is, do you -- was this one investigation or was there separate investigations into --**

A No, I think it was one investigation.



**Q Okay. And your -- your understanding is after your involvement in Exhibit 43 and 42, you don't know of any particular outcome on this?**

A No, I don't.

**Q And you don't recall any subsequent conversations with anyone about this as a basis to deny Mr. Enos benefits or to reprimand him or to terminate him?**

A I believe that we sent these along to Alternative Sentencing but I think, if I remember right and I'm not exactly sure, but I think they determined from a doctor's point that he could do what he did without injury.

**Q Okay.**

MR. GEDDES: Take a very quick break, I think we might be done. Just a quick second.

VIDEO TECHNICIAN: We are going off the video record at 4:59 p.m.

(Off the record.)

VIDEO TECHNICIAN: We are going back on the video record at approximately 5:07 p.m.

MR. BROWN: Before we get started, I think she wants -- she misspoke on her last answer that probably went over your head and I know she didn't realize it. She said that those documents in Exhibit 43 were sent to Alternative Sentencing and she meant to say Alternative Services, and I'm sure that's probably what you even



heard.

BY MR. GEDDES:

**Q Can you --**

A One is a department, one is -- you know, a workers' comp.

**Q All right. So --**

A Sorry about that.

**Q Can you clarify your testimony so it's coming from you?**

A Yes. In my last statement I said "Alternative Sentencing" in stead of "Alternative Services."

**Q And you meant?**

A Alternative Services.

**Q Okay. All right.**

MR. GEDDES: At this time I would pass the witness.

MR. BROWN: I don't have any questions.

MR. GEDDES: Okay. So then what we will do, Ms. Christensen -- first of all, thank you for your time and your testimony today. I just want to go over the ground rule about what happens now.

You will have 30 days once you are notified of the availability of your transcript to review your transcript. And you will have -- included in the transcript you're given you'll have a document, a sheet,



a page with lines on it, and you can make corrections to errors that are contained in the record, but I want to be very clear about what that means.

So what you're doing is you're not changing testimony, you're not saying, "Oh, I meant to say that," "I should have said that and that would have been better if I said that."

THE WITNESS: Right.

MR. GEDDES: That's not what the purpose of this is. This is if a name has been misspelled, if, you know, the text reads, "through it out the window" and it's spelled T-H-R-O-U-G-H instead of T-H-R-E-W, or it happens sometimes with names, you get spellings of names wrong, anything that you review that you see as an error, something that was not something that you said, it's misstating what you said, you are free to make these changes.

The caution I give you is that at the time of a trial in this case, if you make substantive -- if you make what we all consider to be substantive changes; that is to say you're shifting in your position or you're trying to change what you said, then we will probably argue that you're trying to change your testimony. So it's -- it's an opportunity for you to correct the record to preserve the truth of what was spoken today, it's not

an opportunity for you to change what you said.

But you have that time and once you have made those changes, then it goes back to the court reporter and then the court reporter sends it to the parties. If you don't do that within 30 days -- you don't have to -- but if --

THE WITNESS: But I have to request it?

MR. GEDDES: Well, I think the court reporter will send -- well, actually you're not a party to this litigation.

Ms. Court Reporter, how would you do that to a non-party witness, would you send that to Kathy Parks' office since Ms. Christensen is a former employee of Douglas County or would you send it to her directly?

(Discussion off the record.)

MR. GEDDES: It so sounds like what will happen here is the court reporting service will notify you. Do you have her contact information?

Counsel, do you want her to contact her through your office, or do you want --

MR. BROWN: That's fine.

MR. GEDDES: -- her to take a phone number and contact her directly?

MR. BROWN: Either way.

THE WITNESS: But I'd have to come in here to do



that?

MR. GEDDES: That sounds like that's what would happen, you would come and do a review here.

THE WITNESS: Yeah, that probably won't happen.

MR. BROWN: Well, I'm going to tell you, I'm going to order a copy of it, and I don't know if you're comfortable sending it to me to me and have her review it for me, but I'm going to order a copy.

MR. GEDDES: It's okay with me. Whatever.

Okay. So it sounds like the agreement we have is it will go to Mr. Brown's office and you will be notified, given an opportunity, I don't know how -- he can either send a copy, invite you to his office, but you'll have an opportunity to review -- review the transcript with the possibility to make those corrections.

If there's nothing else, again, I thank you for your time and have a good evening.

THE WITNESS: Thank you.

VIDEO TECHNICIAN: This concludes the deposition of Sarah Christensen on January 24th, 2019. We are going off the video record at approximately 5:12 p.m.

(At 5:12 p.m., the deposition concluded.)



CERTIFICATE OF REPORTER

STATE OF NEVADA )
) ss.
WASHOE COUNTY )

I, ERIN T. FERRETTO, Certified Court Reporter for the State of Nevada, do hereby certify;

That on Thursday, January 24, 2019, at Sunshine Litigation Services, 151 Country Estates Circle, Reno, Nevada, personally appeared SARAH CHRISTENSEN, who was duly sworn by me to testify the truth, the whole truth and nothing but the truth, and thereupon was deposed in the matter entitled herein;

That said deposition was taken in verbatim stenotype notes by me, and thereafter transcribed into typewriting as herein appears; that the foregoing transcript, consisting of pages 1 through 248, is a full, true and correct transcription of my stenotype notes of said deposition.

That I am not related to or employed by any parties or attorneys herein, nor financially interested in the outcome of these proceedings.

DATED: This 24th day of February, 2019.

______________________________
ERIN T. FERRETTO, CCR #281, RPR



ERRATA SHEET

I declare under penalty of perjury that I have read the foregoing _______ pages of my testimony, taken on _______________________ (date) at _________________(city), _________________(state),

and that the same is a true record of the testimony given by me at the time and place herein above set forth, with the following exceptions:

| Page | Line | Should read: | Reason for Change: |
|---|---|---|---|
| ___ | ___ | ______________________ | _________________ |
| | | ______________________ | _________________ |
| ___ | ___ | ______________________ | _________________ |
| | | ______________________ | _________________ |
| ___ | ___ | ______________________ | _________________ |
| | | ______________________ | _________________ |
| ___ | ___ | ______________________ | _________________ |
| | | ______________________ | _________________ |
| ___ | ___ | ______________________ | _________________ |
| | | ______________________ | _________________ |
| ___ | ___ | ______________________ | _________________ |
| | | ______________________ | _________________ |

ERRATA SHEET

Page Line Should read: Reason for Change:

___ ___ _______________________ _________________

_______________________ _________________

___ ___ _______________________ _________________

_______________________ _________________

___ ___ _______________________ _________________

_______________________ _________________

___ ___ _______________________ _________________

_______________________ _________________

___ ___ _______________________ _________________

_______________________ _________________

___ ___ _______________________ _________________

_______________________ _________________

___ ___ _______________________ _________________

_______________________ _________________

Date: __________ _____________________________

Signature of Witness

_____________________________

Name Typed or Printed

**Raub, Harry**

**From:** Christensen, Sarah
**Sent:** Tuesday, February 24, 2015 9:22 AM
**To:** Santoyo, Norma
**Subject:** FW: John Enos

John Enos was terminated from Douglas County on February 19, 2015. John's FMLA time was exhausted and he was unable to return to work with no restrictions as stipulated.

**From:** Karen J. Barbee [mailto:Karen.Barbee@ascrisk.com]
**Sent:** Tuesday, February 24, 2015 9:18 AM
**To:** Christensen, Sarah
**Subject:** FW: John Enos

Hi, Sarah. I need to send a TTD check to John today, depending on your answers to the questions below. Please advise. Thanks.

Karen

**Alternative Service Concepts**
**Loyalty • Integrity • Flexibility • Expertise**

2014 BUSINESS INSURANCE BEST PLACES TO WORK

**Karen Barbee** – Senior Claims Adjuster
539 Isbell Rd., #390, Reno, NV 89509
Office phone: (775) 329-1181 Office fax: (775) 329-7418
karen.barbee@ascrisk.com www.ascrisk.com/

**CONFIDENTIALITY NOTICE: This communication and any documents, files or previous e-mail messages attached to it, constitute an electronic communication within the scope of the Electronic Communication Privacy Act, 18 USCA 2510. This communication may contain non-public, confidential or legally privileged information intended for the sole use of the designated recipient (s). The unlawful interception, use or disclosure of such information is strictly prohibited under 18 USCA 2511 and any applicable laws. If you are not the intended recipient or have received this communication in error, please notify the sender immediately by reply e-mail and delete all copies of this communication, including attachments, without reading them or saving them to disk. Thank you.**

**From:** Karen J. Barbee
**Sent:** Monday, February 23, 2015 8:20 AM
**To:** 'Christensen, Sarah'
**Subject:** John Enos

Hi, Sarah.

As you know, the last return-to-work note from Dr. Morales dated 2/17/15 indicated that John's restrictions were : No lifting greater than 50 lbs, No pushing greater than 50 lbs, no pulling greater than 50 lbs, no overhead shoulder lifting greater than 35 lbs.

I realize he was terminated last week, but I need to determine if we will need to continue his TTD, and to document whether or not he would be able to return to work with these restrictions.

Do these restrictions fit within his usual and customary job duties?
If not, would the county have light duty available for him if he had not been terminated?

Δ π EXHIBIT 16
Deponent______
Date____ Rptr.____
WWW.DEPOBOOK.COM



DC005351

Thanks.

Karen

Alternative Service Concepts
Loyalty • Integrity • Flexibility • Expertise

2014 BUSINESS INSURANCE BEST PLACES TO WORK

Karen Barbee – Senior Claims Adjuster
639 Isbell Rd., #390, Reno, NV 89509
Office phone: (775) 329-1181 Office fax: (775) 329-7418
karen.barbee@ascrisk.com www.ascrisk.com/

**CONFIDENTIALITY NOTICE:** This communication and any documents, files or previous e-mail messages attached to it, constitute an electronic communication within the scope of the Electronic Communication Privacy Act, 18 USCA 2510. This communication may contain non-public, confidential or legally privileged information intended for the sole use of the designated recipient (s). The unlawful interception, use or disclosure of such information is strictly prohibited under 18 USCA 2511 and any applicable laws. If you are not the intended recipient or have received this communication in error, please notify the sender immediately by reply e-mail and delete all copies of this communication, including attachments, without reading them or saving them to disk. Thank you.

**From:** Caviglia, Justina
**To:** Santoyo, Norma
**Subject:** RE: Enos
**Date:** Tuesday, February 17, 2015 9:58:55 AM

---

Yes

Justina Alyce Caviglia
Deputy District Attorney
Douglas County District Attorney's Office
P.O. Box 218
Minden, Nevada 89423
(775) 782-9803
(775) 783-6490 (fax)
jcaviglia@douglas.nv.gov
www.dcnvda.org

CONFIDENTIAL AND PRIVILEGED ATTORNEY/CLIENT COMMUNICATION AND WORK PRODUCT: This communication, including attachments, is for the exclusive use of addressee and may contain proprietary, confidential and/or privileged information. If you are not the intended recipient, any use, copying, disclosure, dissemination or distribution is strictly prohibited. If you are not the intended recipient, please notify the sender immediately by return e-mail, delete this communication and destroy all copies.

PUBLIC RECORD: Any communication within this email may be subject to monitoring and disclosure to third parties.

> **From:** Santoyo, Norma [mailto:nsantoyo@douglasnv.us]
> **Sent:** Tuesday, February 17, 2015 9:45 AM
> **To:** Shick, Scott; Caviglia, Justina
> **Cc:** Christensen, Sarah
> **Subject:** Enos
>
> John was here at 8am this morning and just left my office. I have to run to the SO for a meeting at 10. Are you available at 10:30 to meet and discuss?
>
> Essentially he's stressed about losing his job and wants to do anything possible to retain it. I explained the process and gave him the leave of absence policy. He will be requesting a leave extension as he has been told by his doctors that he will be able to return to full capacity in the near future. I also discussed the medical retirement process and urged him to contact NVPERS.
>
> Norma

Δ π EXHIBIT 39
Deponent
Date Rptr.
WWW.DEPOBOOK.COM