# EXHIBIT 9

## DEPOSITION TRANSCRIPT OF
## JUSTINA CAVIGLIA

**(Including Exhibits 36 and 39)**

EXHIBIT 9

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

-o0o-

JOHN ENOS, an individual, Case No. 3:17-cv-00095-MMD-CBC

Plaintiff,

vs.

DOUGLAS COUNTY, a political subdivision of the State of Nevada; et al.,

Defendants.

_____________________________/

VIDEOTAPED DEPOSITION OF

JUSTINA CAVIGLIA

January 30, 2019

Reno, Nevada

REPORTED BY: CONSTANCE S. EISENBERG, CCR #142, RMR, CRR

Job No. 520804

A P P E A R A N C E S

For the Plaintiff:
THE GEDDES LAW FIRM, P.C.
BY: WILLLIAM J. GEDDES, ESQ.
8600 Technology Way, Suite 115
Reno, Nevada 89521
775-853-9455
Fax 775-853-6899
Will@TheGeddesLawFirm.com

and:

GALLIAN WEKER & BECKSTROM, L.C.
BY: RAELENE K. PALMER, ESQ.
540 E. St. Louis
Las Vegas, Nevada 89104
702-892-3500
Fax 702-386-1946
Rpalmer@vegascase.com

For the Defendant:
THORNDAL, ARMSTRONG, DELK, BALKENBUSH & EISINGER
BY: KATHERINE F. PARKS, ESQ.
6590 S. McCarran Blvd., Ste. B
Reno, Nevada 89509
775-786-2882
Fax 775-786-8004
Kparks@thorndal.com

The Videographer:
KELLAN ADAMS
Sunshine Litigation Services



INDEX


| EXAMINATION | PAGE |
|---|---|
| JUSTINA CAVIGLIA | 7 |
| EXAMINATION BY MR. GEDDES | 7 |


EXHIBITS


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT 1 | Drawing by Christensen, office layout | 62 |
| EXHIBIT 2 | Court personnel regulations | 82 |
| EXHIBIT 3 | Douglas County personnel regulations | 84 |
| EXHIBIT 4 | Ordinance amending personnel regulations | 84 |
| EXHIBIT 5 | Job description, juvenile probation officer, senior | 113 |
| EXHIBIT 6 | Notice of injury/accident | 115 |
| EXHIBIT 7 | Excuse from work documents | 115 |
| EXHIBIT 8 | Documents regarding incident | 116 |
| EXHIBIT 9 | Notice of injury documents | 118 |
| EXHIBIT 10 | Email, Christensen/Cotter, 2/28/14 | 122 |
| EXHIBIT 11 | Emails, Barbee/Christensen, 3/14/14 | 122 |
| EXHIBIT 12 | Physical limitations report, 7/22/14 | 122 |
| EXHIBIT 13 | Emails,Barbee/Christensen, 2/5/14 | 124 |
| EXHIBIT 14 | Email, Caviglia/Schick, 7/18/14 | 125 |
| EXHIBIT 15 | Letter to Enos, Duty Station Assignment | 129 |





| | | |
|---|---|---|
| EXHIBIT 16 | Emails, Christensen/Barbee, 2/24/15 | 130 |
| EXHIBIT 17 | Emails, Barbee/Christensen, 1/20/15 | 130 |
| EXHIBIT 18 | Douglas County position description questionnaire | 134 |
| EXHIBIT 19 | Work excuse, Eisenhauer, 1/28/15 | 136 |
| EXHIBIT 20 | Handwritten note, Christensen | 140 |
| EXHIBIT 21 | Letter, Santoyo/Enos, 2/13/15 | 156 |
| EXHIBIT 22 | Letter, Enos/Human Resources, 2/17/15 | 188 |
| EXHIBIT 23 | Return to work releases | 195 |
| EXHIBIT 24 | Letter, Barbee/Enos, 2/24/15 | 207 |
| EXHIBIT 25 | Emails, Santoyo/Barbee/Christensen, 2/24/15 | 212 |
| EXHIBIT 26 | Letter, Schick/Enos, 2/19/15 | 215 |
| EXHIBIT 27 | Personnel action form | 220 |
| EXHIBIT 28 | Letter to Enos, 2/20/15 | 221 |
| EXHIBIT 29 | Ed Howden & Associates letter, 4/5/16 | 223 |
| EXHIBIT 30 | Job application submittal | 227 |
| EXHIBIT 31 | Emails, Enos/McMurry | 228 |
| EXHIBIT 32 | Douglas County job listings | 229 |
| EXHIBIT 33 | Emails, Barbee/Christensen, 9/18/14 | 237 |
| EXHIBIT 34 | Emails, Schick/Young, 2/20/15 | 237 |
| EXHIBIT 35 | Email, Bates/Caviglia, 2/19/15 | 237 |
| EXHIBIT 36 | Email, Caviglia/Santoyo/Schick, 2/19/15 | 239 |
| EXHIBIT 37 | Email, Santoyo/Schick/Caviglia, 2/19/15 | 241 |





| | | |
|---|---|---|
| EXHIBIT 38 | Email, Caviglia/Santoyo/Schick, 2/17/18 | 242 |
| EXHIBIT 39 | Email, Caviglia/Santoyo, 2/17/15 | --- |
| EXHIBIT 40 | Documents, DC005508-DC005525 | 168 |
| EXHIBIT 41 | Email series, DC005531-DC005538 | 151 |
| EXHIBIT 42 | Email, Caviglia/Christensen, 11/12/14 | 243 |
| EXHIBIT 43 | Email, Caviglia/Christensen, 9/3/14, W/Facebook pictures | 243 |
| EXHIBIT 44 | Email, Caviglia/Christensen, 2/13/15 | 181 |
| EXHIBIT 45 | Leave of absence policy | 216 |
| EXHIBIT 46 | Douglas County employment application | 225 |
| EXHIBIT 47 | Email from McMurry | 226 |
| EXHIBIT 48 | Email to Moore | 244 |
| EXHIBIT 49 | Email from Santoyo | 245 |

BE IT REMEMBERED that on Wednesday, January 30, 2019, at the hour of 9:13 a.m. of said day, at the offices of Sunshine Litigation Services, 151 Country Estates Circle, Reno, Nevada, before me, CONSTANCE S. EISENBERG, a Nevada Certified Court Reporter, personally appeared JUSTINA CAVIGLIA, who was by me first duly sworn, and was examined as a witness in said cause.

-oOo-

(Exhibits 1 through 43 marked for identification.)

THE VIDEOGRAPHER: This is the beginning of Media Number 1 in the deposition of Justina Caviglia in the matter of Enos versus Douglas County, held at Sunshine Litigation Services on January 30th, 2019, at approximately 9:12 a.m.

The court reporter is Connie Eisenberg. I'm Kellan Adams, the videographer, an employee of Litigation Services.

This deposition is being videotaped at all times, unless specified to go off the record.

Would all present please identify themselves, beginning with the witness.

THE WITNESS: Justina Caviglia.

MS. PARKS: Katherine Parks on behalf of the defendants.

MS. PALMER: Raelene Palmer, cocounsel for plaintiff.

MR. ENOS: John Enos, plaintiff.



MR. GEDDES: Will Geddes, counsel for plaintiff.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

JUSTINA CAVIGLIA

called as a witness, having been duly sworn,

testified as follows:

EXAMINATION

BY MR. GEDDES:

Q Good morning, ma'am. Can you please identify yourself by first and last name and spell your name for the record.

A Justina Caviglia. The last name is Caviglia, C-a-v-i-g-l-i-a.

Q Good morning, Ms. Caviglia. I'm Will Geddes, and I'll be taking your deposition.

Now, I know that you are an attorney, and I apologize if you already know the ground rules of depositions. However, I have to make sure you understand how your deposition will proceed today and the obligations you are under when testifying today.

Even though you likely already know these ground rules, again, I still need to go over them with you for the record.

During this deposition, you'll be testifying under oath and under penalty of perjury of the laws of the United States. Therefore, you are required to testify truthfully, completely and



to the best of your knowledge just as if you were testifying in court at trial before a judge and jury.

Do you understand this?

A I do.

Q And the purpose of this deposition is to allow the parties here to become adequately informed of the facts and issues of the case and to enable us to prepare for trial.

Our purpose here today is to avoid surprise at trial and to elicit truth.

This deposition also provides you with an opportunity to explain any inconsistencies in your testimony today, because if, at the time of trial, your testimony is different than it is today in your deposition, then we will definitely draw attention to your inconsistent testimony to show the jury that you are not a credible witness.

Do you understand this?

A I do.

Q Therefore, it's very important to remember throughout your deposition today that if you wish to explain away or clarify on any issue, fact or matter regarding this case or your testimony, then the most opportune time to do so would be today, not at the day of your trial.

Do you understand this?

A I do.

Q Our purpose here today is not to trick you, it's not to



confuse you, but to allow you to take your time to understand the question so that you can provide truthful testimony.

So if you give an answer to a question, we can only assume that you understood the question.

However, sometimes questions may be confusing or unclear. Therefore, please, if you don't understand any question, it's incumbent on you to tell us so we can rephrase the question or break it into smaller pieces that make better sense.

Do you understand this?

A I do.

Q Today, we are entitled to receive your best testimony based on your best recollection of facts and events. In this vein, it's very important that your testimony be reliable and based upon facts that you are independently able to recall.

But if you don't know the answer to a question, you should simply state that you do not know the answer.

Do you understand this?

A I do.

Q And please keep in mind that where you are initially unable to recall facts or events, I may try to refresh your recollection either by asking you additional questions or by showing you documents. Alternatively, you may have brought documents here today that may help you refresh your recollection.

Either way, we are entitled to your best efforts at refreshing your recollection so that you can give truthful,

accurate and complete testimony today.
Do you understand this?
A I do.
Q Sometimes it's appropriate to give your best estimate, even though you are not completely certain, of matters capable of judgment by ordinary people concerning matters such as time, size and distance.
So when we ask you time questions, for example, you may not remember the exact date, but you may remember the day of the week or the month, or the time of the year or the holidays, or what you were doing, things like that.
And that's all very helpful at trying to refresh your recollection or at least give estimates as to when something occurred.
But you should never speculate on any matter whatsoever during your deposition.
And, you know, if I were to ask you the size of the conference room here, you could probably give your best estimate. If I were to ask you the size of the conference room at our office, assuming you haven't been there, you wouldn't be able to do so.
So that's the difference between estimating, which is reasonable, and speculating, which should be avoided.
You understand the distinction?
A I do.



Q Okay. Now, there is a court reporter here seated to your right who has a very difficult task of taking down every single word that's spoken today. So that the record is clear, it's important that we not speak over one another.
Please, if you can, wait until I finish a question before answering, wait until an objection is finished before answering, and we will wait until you finish your answer before we begin the next question.
Also, today, please remember you are testifying with words, not gestures, which are useless to the court reporter. So please verbalize your responses.
Rather than nod your head, please say "yes"; rather than shake your head, please say "no." As well, please remember that sounds like "uh-huh" and "huh-uh" are not clear, so please remember to use words.
Do you understand these things?
A I do.
Q Now, there are attorneys here who represent the parties. Ms. Palmer and I represent the plaintiff, John Enos. And Ms. Parks represents Douglas County and Victoria Sauer-Lamb and Mr. Scott Schick.
As well, Mr. Enos is here as a party. He's entitled to attend these proceedings.
So from time to time, you may hear one of the attorneys make an objection to one of the questions that is asked. If so,



you are still required to answer the question, unless the objection is based on a privilege or on a specific instruction or limiting order from the Court.
In such an instance, the instruction may be given to you not to answer a question, but otherwise, you must still answer all questions without regards to the objections made.
Now, you are an attorney?
A Yes.
Q And you've historically provided legal advice to Douglas County employees regarding John Enos?
A Yeah, I was -- I was assigned to Human Resources.
Q Okay. And so this may come up today, so we need to address it.
I will represent to you that Douglas County employees or former employees who have testified in this case have testified that they took the actions they took regarding John Enos on the advice or instructions of their legal counsel, specifically you or the Douglas County DA's Office.
In so doing, our position is they have waived their attorney-client privilege relating to those communications and on the subject matter of those communications because they cannot use the attorney-client as both a sword and a shield.
And I would cite the case of Aspex Eyewear, Inc., versus E'Lite Optik, 276 F. Supp. 2d 1084 at 1088. That's the District Court of Nevada, 2003 case. There are other citations.



So our position -- when I say "our," I'm saying plaintiff's counsel's position -- is that we do not believe your communications with Douglas County officials on matters concerning John Enos are privileged.
And we assert that you are required to testify about such matters today as Douglas County appears to be relying on the advice of counsel defense.
Now, I'll pause for a second and give Ms. Parks an opportunity to interject any objections or understanding that she has regarding this.
MS. PARKS: I'm going to reserve my objections on a question-by-question basis. I'm not going to agree that that applies across the board at this time.
MR. GEDDES: Okay.
BY MR. GEDDES:
Q So please know, however, that if you refuse to answer a question, including on grounds of confidentiality, then we would -- we will either ask the Court to compel your answers in a subsequent deposition or, alternatively, we may move the Court to preclude defendants and witnesses from asserting the legal defense of relying on advice of counsel at the time of trial.
Now, whether or not you agree with the things I've said, do you understand our position on these matters?
A I do.
Q Okay. Now, in order to ensure the reliability of your

testimony today, I have to ask you if you are currently under the influence of any medications, alcohol, substance or drug.
A Other than coffee, no.
Q Okay. Is there any reason that you will not be able to understand my questions today?
A No.
Q And is there any reason you will not be able to give your best testimony today?
A No.
Q Okay. Did you bring any documents with you today?
A No. I left everything at the County when I left the job.
Q Okay. Were you presented with any documents in preparation for your deposition?
A No, only the subpoena.
Q What did -- what did you do to prepare for your deposition today?
A I did speak with Ms. Parks last evening, or yesterday afternoon. I wanted to discuss the attorney-client confidentiality issue because it was -- I was concerned by that.
Q Okay. Now, is it your understanding that Ms. Parks is representing you today as a former employee of Douglas County?
A We didn't have that discussion, no.
Q Okay. Who did you speak with besides Ms. Parks in preparation for your deposition today?



A No one.
Q Okay. Where do you live?
A South Lake Tahoe, California.
Q And how long have you lived there?
A We moved there last January, so one year.
Q Do you plan on moving your residence in the next two years?
A As of right now, no.
Q Okay. Now, we have estimated -- based on the subpoena that we served you, we have estimated that the distance from your home at 830 Paloma Avenue in South Lake Tahoe, California, 96150, to the US District Court of Nevada at 400 South Virginia Street in Reno is 60 miles, according to MapQuest.com.
Therefore, for purposes of Rule 45(c)(1) governing trial subpoenas, you are within a hundred miles from the courthouse and could be served a trial subpoena in this case.
But I want to make sure, before making that assumption, do you dispute that you would be amenable to service of a trial subpoena based on the distance of the courthouse in the next two years for any reason?
A Unless I move, there shouldn't be a reason.
Q Okay. How old are you?
A I'm 38.
Q And are you married?
A I am.



Q Do you have any children?
A I have one.
Q Where did you go to high school?
A White Pine High School in Ely, Nevada.
Q Can you summarize your educational background, please.
A After high school, I went to the University of Nevada, Reno. I have a dual degree in environmental policy analysis and Spanish.
During that time, I spent a year in Bilbao, Spain. After that, I went straight to law school at the University of Nevada, Las Vegas, the Boyd School of Law, and graduated in 2006.
Q Okay. And what are your hobbies?
A Skiing. My son plays hockey, so I've become the crazy hockey mom. In the summer, we hike, hang out at the lake, go on -- you know, boating, all that kind of fun stuff.
Q Okay. Have you ever been convicted of a crime?
A No.
Q Have you ever been arrested?
A No.
Q Have you ever been a party to litigation?
A No.
Q Have you ever testified in a deposition before?
A Yes.
Q And where -- what type cases have you testified in a deposition for?



A I don't know the exact name of the case. It was a land use dispute in Douglas County when I was with the District Attorney's Office, involving two property owners at Lake Tahoe.
Q Is that the only time you testified in a deposition?
A In a deposition, yes.
Q Just give me a second here.
Have you ever testified at trial before?
A I did testify in front of a grand jury once, but other than that, no.
Q Okay. Have you ever received education or training in the subject of employment discrimination?
A Yes.
Q Okay. Can you tell us what education and training you've received.
A During law school, I did take an employment law class, as well as once I was assigned to Human Resources, Douglas County sent me to at least a CLE a year, if not more.
POOL/PACT, who was our insurance counsel -- or, insurance pool for the County, would send us to trainings. So we had trainings a couple times a year at least.
Q Okay. The employment law class, that class you took in law school, can you describe what that was.
A It was a general employment law. So we went over ADA, FMLA, FLSA. It got into a little bit about labor negotiations.

It wasn't really -- it was sort of an overview.

**Q And the -- I want to make sure I understand. You mentioned CLEs at least once a year. What -- what CLEs did you take, do you recall?**

A There were a number of them. I was handling collective bargaining, so I did take the collective bargaining classes in San Francisco and Las Vegas.

There were CLEs on, you know, all of the alphabet of employment law. So it -- there was a general -- I believe there was a general one that was a week long in Las Vegas every year that I would typically attend.

It was a national CLE, so it wasn't Nevada specific.

**Q Okay. So did you receive training on Title VII employment discrimination?**

A You know, I'm not sure. I'm assuming it was part of the classes, but it didn't really stand out.

**Q Well, do you have a general understanding, as you sit here now, what Title VII discrimination generally is?**

MS. PARKS: Objection, relevance.

THE WITNESS: I don't know Title VII.

BY MR. GEDDES:

**Q Okay. ADA, what -- when you took ADA training, did that include the ADA Amendment Act?**

A It did.

**Q Okay. And approximately how many hours of education and**



**training -- let me -- let me put this by a time period.**

**During the time period of -- by February 1st of 2015, approximately how many hours of ADA education and training do you think you had?**

A It would be hard to guess without looking at my sheet.

I went -- so my history in Douglas County, I spent a year with Judge Gamble, went to the District Attorney's Office. My first year and a half was in the criminal division. So about 2008, I was in the civil division.

And at that point until when I left in 2015 -- August 2015, I was handling HR. So throughout that time period, I would take whatever classes Mark would send me to, Mark Jackson, our DA.

**Q Do you -- do you think it would be at least 80 hours of training?**

A I'm not sure it would have been that much. Human Resources was only one client I had, so I also had training in other areas.

**Q Okay. So would it be fair to estimate it at between 40 and 80 hours?**

A I would -- that's probably closer.

**Q Okay. And you kind of got ahead of me, but that's fine. Let's talk about the places where you worked.**

**You worked -- currently, where do you work?**

A I work for a company called Corix, the United States --



or, the US subsidiary, AZ Utilities, Inc. The Nevada portion of that is Great Basin Water Company and Arizona is Bermuda Water Company.

I work as the vice-president of regulatory and government affairs on the west coast, so Arizona, Nevada, particularly.

California, we are also involved in military contracts, so it's more of a federal level there.

We are a water, wastewater private utility company.

**Q What do you do as the vice-president?**

A I do a majority of the public utilities filings with our outside counsel. I do lobbying in the two states. I oversee two employees in Nevada and four in Arizona.

We -- a little bit of everything, it seems like, these days.

**Q Do you do human resource work?**

A We have a human resource as our -- within the corporation. So other than hiring and addressing my direct staff, no.

**Q Okay. And when did you start working at Corix?**

A In May of 2018.

**Q Okay. And prior to working with Corix, where did you work?**

A I was with the Office of the Attorney General from August of 2015 until May of 2018.



**Q August of 2015?**

A Yes.

**Q To May of 2018?**

A 2018, uh-huh.

**Q Okay. And you were a deputy attorney general?**

A Deputy attorney general. Actually, I was a senior DAG, but --

**Q Okay.**

A -- I don't know if that really matters.

**Q Senior deputy attorney general?**

A And I represented only the division of water resources, as well as I was assigned to the open meeting law team. So I did open meeting law complaints as well.

**Q Okay. And when you worked at the Attorney General's Office, you didn't handle matters concerning HR matters; is that correct?**

A That is correct. They were handled by a different DAG.

**Q Okay. So is it fair to say, then, that the training that you received on the ADA, all of it was prior to August of 2015?**

A Yes.

**Q Okay. All right. And so prior to working at the Attorney General's Office, where did you work?**

A I was with Douglas County from March of 2007 until I left in August of 2015.

Q Okay. So you started to explain this, but I didn't catch it all. When you first worked at Douglas County, you were a law clerk for Judge Gamble; is that right?
A Yeah, that would have been in 2006 through --
Q Oh, okay.
A -- the District Attorney's Office.
Q Through 3 of 2007?
A Yes. I left my clerkship slightly early.
Q Okay. So during the period of 3/2007 to 8/2015, you started off at the DA's Office in the criminal division?
A Correct.
Q Okay. And what was the time period for that?
A Criminal was roughly -- I believe I started in civil around August, September of 2008. I didn't last long in criminal.
Q Okay. And then in civil, when did you start civil?
A It would have been August 2008.
Q I'm confused. Oh, I see. From 3/2007 --
A It was roughly a year and a half I was in criminal.
Q Okay. And then in 8/2008, you went to civil.
A Uh-huh.
Q Okay. And in the criminal division, what did you do in the criminal division?
A I handled mainly misdemeanor cases. However, I would fill in for the juvenile and felony cases when necessary. It was a smaller office.



Q When you say you handled them, you did the trials, right?
A I did the trials, everything from what -- the way Douglas County works was you would -- it was inception through trial. So we would have our -- everything from the original complaint all the way through the trial itself.
Q And you handled some felonies as well?
A A couple -- couple gross misdemeanors.
Q I'm sorry, not felonies, but gross misdemeanors?
A Yeah.
Q Okay.
A I did not -- I wasn't felony tracked at that point.
Q Okay. So if you can estimate, please, when you handled misdemeanors and gross misdemeanor criminal cases, how many cases did you handle? How many trials did you do?
A Counting or -- traffic -- I'm going to exclude the traffic trials because they were considered misdemeanors, but I would say probably around 40 to 50.
Q Okay.
A I was exclusively assigned to Lake Tahoe, so I had most of the cases up there.
Q Okay. In these criminal trials that you handled, did issues concerning ADA come up at all?
A No.
Q Okay. All right. And when you worked in the civil



division, can you describe what you did there.
A It varied by year. So when I initially started --
Q I'm sorry, you were a Deputy District Attorney?
A Deputy District Attorney.
Q Okay.
A There are four civil attorneys, and so we split up the entire county by division.
Because of my relationship with Judge Gamble, I had -- the entire time, I had the court clients, which would be JPO, China Springs Youth Camp, District Court Clerk's Office, Justice Court Clerk's Office, as well as the courts. I had human resources the entire time I was there.
I represented the airports. For a short time, I did land use and planning. And we would fill in if attorneys left or came on board.
Public works for a short time.
I did most of the collective bargaining for the first four years, and then that went to my later chief. Was sort of a jack of all trades.
Q Okay. So if I have this right, you -- you split up the division. You were saying that you handled court clients, HR as a client, airport, land use and planning, public works and collective bargaining?
A Uh-huh.
Q If you can estimate, please, about how much of your time



was spent with the HR client?
A The -- HR was my largest client, so I would say 60 to 70 percent of my time, depending -- and that would include the collective bargaining. We had five unions when I was there, as well as the Court. The Court had its own rules.
Q What about the court clients, how much time did you spend representing the court clients?
A Not much. We would do contracts. We would -- especially with China Springs Youth Camp, if there were issues that came up out there.
Q If you -- would you say 10 percent?
A Maybe 10 percent.
Q Okay. And airports?
A Probably about 10 percent.
Q And so that leaves about 10 percent for land use planning and public works?
A Yeah. And I would do other things as well.
Q Okay. Now, when you handled HR matters, did you also have some crossover with regard to HR matters involving court personnel?
A Yes.
Q Okay. And was there a distinction in how you handled personnel matters for non-court personnel as compared to court personnel?
A The only distinction -- and it would depend on where the

employee fell, under which bargaining unit, if they fell under a bargaining unit. The courts had their own -- I don't remember what they called it. They had their own rules, which was separate for their employees.

**Q Okay. Court personnel rules?**

A Uh-huh.

**Q Okay. And would that -- would those court personnel rules apply to juvenile probation officers?**

A Juvenile probation officers, China Springs Youth Camp, the -- initially, the court clerks were in the union. And then the case in Sparks happened and they were pulled out of the union and became court personnel.

And then the court -- the justice -- I'm trying to remember what they called them. The judge's assistants would fall under the courts as well.

**Q And you said "juvenile probation officers." That would be the same for senior juvenile probation officers?**

A Yes, it was all employees.

**Q Okay. All right. So was -- was there a set of rules that you went by for non-court personnel?**

A It just depended.

So if you were an employee that fell under, say, Douglas County Employee Association, their collective bargaining agreements would fall into place, or, for example, the Sheriff's Office had DCSO, which was the main line staff, and then



the sergeants had their own collective bargaining. So it would just depend on which -- how the employee fell.

And then if an employee, for example, a District Attorney, if their employees were not in the DCEA, it would be the county ordinances.

**Q Okay. You are starting to go in a direction that I had a question about.**

**So the county ordinances, are you referring to the Douglas County ordinances governing personnel rules?**

A Yes, I believe it's Chapter 3.

**Q Okay. And so for juvenile probation officers and senior juvenile probation officers, on matters regarding their employment, would you -- would you go by the county code personnel regulations or the court's personnel regulations, or both?**

A Typically both, unless the Court somehow usurped something in the county code. And that's how we treated all of the employees.

**Q Okay. All right. Who supervised you when you were at the DA's Office in your civil capacity?**

A Initially, it would have been Mike McCormick. And then it was -- what's Joe's last name? We had an attorney for a short time, Joe -- he used to be at the Attorney General's Office and I can see his face.

**Q Joe Reynolds?**

A No, it wasn't Joe Reynolds. He was a really nice guy.



And then it was -- I'm trying to think who was after him.

Doug Ritchie is the current one over there. So I think Joe was the last one, the one that -- I'm just trying to remember his last name.

**Q In the time frame of 2013 through 2017, who were -- well, let me take a step back because you weren't at the Douglas County DA's during that entire period.**

**In the year 2014, which supervisor did you have?**

A It was either Joe or Doug Ritchie. Mike had retired by that point.

**Q Okay. So from the time frame of 2014 through the time you left, it was either Joe or Doug Ritchie?**

A Yes.

**Q And as your supervisor, can you describe generally how they supervised you.**

A With matters of personnel -- well, they were very -- they were also working supervisors, and so I know they both handled county commission matters.

We would have weekly meetings, staff meetings, if there were issues that came up.

With personnel, because it was somewhat classified, we would always have separate meetings on issues. And depending on the issue, Mark Jackson, the DA, would actually get involved as well.



We tried to keep personnel issues separate from the rest of the group when we could.

**Q So I'm not asking you to be a mind reader, but was it your understanding, based on your interaction with Joe, that he had experience and knowledge and training and education on the ADA?**

A I don't remember if he even got involved in the HR issues. I wouldn't know.

I know he had come from the Attorney General's Office and he was a chief there. And I believe he was in the post conviction unit.

**Q Is his name Joe Ward?**

A Yes, it's Joe Ward.

**Q Okay.**

A I should have known that. I can -- I can see his face.

**Q All right. Yeah, everyone does say he's a really nice guy.**

**Okay. So you are not sure if Joe Ward was involved in HR matters in connection with work that you were doing; is that -- is that correct?**

A That is correct.

**Q Okay.**

MS. PARKS: Objection, asked and answered.

BY MR. GEDDES:

**Q Doug, Doug Ritchie, did he get involved in HR matters?**

A A little bit, but not quite as -- not a lot. Doug actually came from an employment law firm in Las Vegas, and so he did a lot of the collective bargaining. He took it over from me, which I was very grateful for towards the end.

**Q I'm sorry, what did he take over?**

A The collective bargaining --

**Q Okay.**

A -- with our unions. It was not my favorite part of my job.

**Q Now, Mark Jackson, to your recollection, did he get involved in personnel matters?**

A He would if we needed to raise it to him.

**Q Do you know -- from your perspective, was it your opinion that he had any education, training or experience in personnel issues?**

A He did come to some classes with me. Mark was usually involved if it was a higher level employee, such as a, you know, department head or director, or if there was massive issues that were going on.

**Q Okay. Now, as you sit here -- we'll be talking a lot about Mr. Enos in your deposition today. But as you sit here right now, do you have any specific recollection of either Joe, Doug or Mark Jackson being involved in any matters concerning Mr. Enos?**

A I -- I don't remember if they were --



**Q Okay.**

A -- brought in on any of them.

**Q All right.**

A They could have been.

**Q All right. Now, you mentioned that there were set -- there were weekly staff meetings. That was for the DDAs?**

A Yes, for civil division.

**Q Okay. And how frequently were those general meetings held?**

A We had one every week.

**Q But you wouldn't bring up personnel matters, that would be brought up in the separate meetings that you described?**

A That is correct.

**Q And how frequently would you have these separate personnel meetings?**

A It would only happen if we had an issue that was going on or if it needed to be raised.

**Q Okay. Do you recall ever having any personnel meetings with -- that you are describing here with the DA's Office regarding Mr. Enos?**

A I don't -- I can't recall if we did or not, if we talked about this issue.

**Q Would -- would those meetings be set up through email, appointment calendars, anything like that?**

A No, if -- because of Mark's or -- Doug was right across the hall from me, so I would just walk across the hall if I needed to ask questions or raise issues.



**Q So you don't believe there are any calendar appointments regarding any special meetings for Mr. Enos?**

A Probably not.

**Q Okay. Did you supervise anyone when you were at the DA's Office in the civil division?**

A No.

**Q When you worked for HR as a client, approximately how many personnel matters did you handle involving the ADA, to your recollection?**

A There were quite a few. So we had -- when I first started, we had roughly 700 employees. After layoffs, we had close to 500 employees. This was prior to the fire district splitting off.

So we would deal with ADA issues probably at least once a month.

**Q Can you describe the types of ADA issues you are describing here.**

A It depended on -- you know, reasonable accommodations, applicants asking for reasonable accommodations before they are hired, injuries on the job.

With the sheriff's department, you know, we do have -- and other employees getting injured on the job. So it was a wide range of issues that would go on.



**Q And to your recollection, did any of these matters separate and apart from Mr. Enos' matters, result in a complaint being filed with the EEOC or the Nevada Equal Rights Commission?**

A I'm trying to think if any of them -- we may have had one at China Springs Youth Camp that was raised to that level. It was.

**Q To your recollection, was that -- what general time frame was that?**

A Darcy Worms was still there. So it would have been prior to 2012.

Darcy Worms was the human resource manager when I first started.

**Q Did you have any particular involvement in the litigation aspect when it -- or the EEOC claim or NERC claim aspect for that China Springs case you are thinking of?**

A I would have put together the packet that would have gone to our outside counsel. And I was involved in the discussions with the employee and the supervisor at that time.

**Q So you -- by the time of February of 2015, you were aware of obligations under the ADA regarding reasonable accommodation to injured workers if they had a disability?**

A Yes.

**Q As you sit here now, do you recall having any conversations with anyone at either Douglas County or the 9th Judicial District Court concerning Mr. Enos and the ADA?**

A I do remember we offered him a position at the detention facility as part of a reasonable accommodation, but he declined to take it.

I was not involved in the discussions. I just know that that was offered to him.

I don't know -- I can't remember exactly when that was.

**Q Now, what do you base that on?**

A We -- just my recollection of having discussions about where we could place him, what we could do with his limitations.

One of the issues we come across -- we came across a lot in Douglas County is, we had a prior grievance with our employees association. So we could not place court employees in positions within the DCEA. We couldn't bump non-DCEA employees to put them in the DCEA.

So we had to look within the court/non-court positions, and there's not many of those at that level.

Similarly, we couldn't have placed him downstairs in the Sheriff's Office because they are a separate bargaining agreement as well.

**Q All right. So when you said that there were discussions regarding the position offered at the detention center, were you part of those discussions?**

A I was part of the initial discussions of offering it to him and whether or not he would be able to do that job based on the limitations at that time.



And I remember, there was some discussion -- and I don't know who it was with, it might have been Scott Schick -- about travel to and from Lake Tahoe, because that's where the detention facility is held.

**Q Now, you said that he declined it. How do you know that he declined it?**

A That's just my recollection, is that he declined.

**Q Did somebody tell you that, or were you a witness to him declining it?**

A I was not involved in the discussion, so I believe that somebody told me that.

**Q And is it -- is it your testimony that you are limited by a collective bargaining agreement as to where you can place him with regard to a reasonable accommodation under the ADA?**

A We were -- yes. So we had -- because of a grievance that had gone up to the Nevada Equal Rights Commission or Employment Rights -- I'm trying to remember the exact acronym.

There were issues with non -- nonemployees that are not part of the union bumping positions of employees within the union.

It rose mainly from, we had a time period where we were laying off quite a few employees.

**Q Well, let me ask it this way. I want to make sure I understand what you are saying.**

**Are you saying that when evaluating reasonable accommodations for Mr. Enos, he -- he was a union employee,**



**correct?**

A No.

**Q He was not a union employee?**

A No.

**Q Okay. And so the issue or concern was, you were limited in your ability to place him into positions that were union positions?**

A That is correct. So we couldn't have placed him, per se, out at the airports or in Public Works or in one of the other general employee categories.

**Q Now, you are citing issues that -- is this an issue that was raised by the Nevada Equal Rights Commission, NERC?**

A I don't know if it was NERC. It was the labor board. So Charlie Cockerill was involved in it, and it was part of the discussions we had when we were going through the layoff process.

**Q Did you do any particular research on the issue of the supremacy of the ADA over other rules and contracts with regard to this issue?**

MS. PARKS: Objection, lack of foundation.

THE WITNESS: I don't know if I did or not.

BY MR. GEDDES:

**Q Well, let's be very clear that we have the foundation here.**

**What we're talking about here is that you are stating that options to place Mr. Enos somewhere else within the County**



**were limited by an issue concerning bumping union employees, correct?**

A Correct.

**Q Okay. Did you do any specific research as to whether or not that was permissible under the ADA?**

A I do not recall if I did or not.

**Q Other than a discussion about placing Mr. Enos to a detention center, do you recall any other discussions or efforts at reasonably accommodating Mr. Enos' workplace injuries or disabilities?**

A We would have had those discussions, but I can't recall specifics.

**Q Do you recall the specifics of having other people within the department assist Mr. Enos in performing some of his job duties?**

A If we had those discussions, I don't recall them specifically.

**Q Now, with regard to the China -- I'm sorry, not the China Springs, the detention center in Lake Tahoe, did anyone ever tell you that Mr. Enos did not decline it?**

A Not to my knowledge.

**Q Did anyone ever tell you that Mr. Schick actually instructed Mr. Enos not to take that position or go there?**

MS. PARKS: Objection, lack of foundation.

THE WITNESS: I -- I wouldn't -- I don't know anything

about that.
BY MR. GEDDES:
**Q When you did this -- this work that you are describing here about the discussions and him being -- Mr. Enos being offered a position at the detention center, did you have any knowledge as to the needs of the detention center for staff?**
A We did discuss it. The staffing at all of our juvenile and other facilities requires certain amount of male and female detention workers. And so there was discussion about staffing. There was discussion about having the ability to place him there because of staffing needs and having room for him there.
**Q But isn't it true that the detention center often didn't have anyone there to be staffed for?**
A I hope that's not correct because I didn't know that.
**Q Well, I'll just represent to you that Mr. Enos maintains that he was told by Scott Schick not to go there because there were no kids there.**
MS. PARKS: Objection, lack of foundation.
BY MR. GEDDES:
**Q You never heard anything about that?**
MS. PARKS: Objection, lack of foundation.
THE WITNESS: No.
BY MR. GEDDES:
**Q And was information available regarding which kids were in detention at that facility in Lake Tahoe?**



A There would have been a list. We had contracts with outside agencies to place their kids in that facility.
We had to have -- like any jail, it has to be staffed and ready for a kid to be taken in custody at any time.
**Q But you didn't, yourself, actually look at those lists, you were relying on Scott Schick; is that correct?**
A It wasn't my -- within my duties.
**Q Okay. So if I'm understanding you then, it was your understanding that Scott Schick had offered this, but you didn't actually -- you weren't involved in making an offer to Mr. Enos?**
A That is correct.
**Q And as to issues of whether he declined it or was instructed not to go there, you didn't have any involvement directly with that?**
MS. PARKS: Objection, asked and answered.
THE WITNESS: I was not there.
BY MR. GEDDES:
**Q And as to whether there was a need at any particular time at that facility based on whether there were kids there or juveniles there, you don't have any direct knowledge and you didn't take any efforts to look for that information, correct?**
MS. PARKS: Objection, asked and answered.
THE WITNESS: Wouldn't have been part of my job duties.
BY MR. GEDDES:
**Q That's correct then, you didn't do that?**



MS. PARKS: Same objection.
THE WITNESS: No. I can tell you based on the contracts I was involved with, it would be a huge liability for the County not to have employees on that site at all times.
BY MR. GEDDES:
**Q I'm not talking about employees. I'm talking about juveniles.**
A Well --
**Q It wasn't part of your -- it wasn't part of your duties to look to see if there were juveniles at the facility, correct?**
A Correct.
**Q And you didn't -- you didn't look into that matter concerning the issue of a position offered to Mr. Enos at the detention center?**
MS. PARKS: Objection, asked and answered.
THE WITNESS: It wouldn't really be relevant, so --
BY MR. GEDDES:
**Q Well, I think your answer is no, and I know that counsel is saying asked and answered. And what I've heard a lot is it wasn't part of your job duties, and therefore, you didn't do it. That's what I'm trying to get at.**
A Well, to me, it didn't matter if a kid was there or not there, we had to staff the facility. So whether there's kids there or not, we still have to staff it.
And so, for me, whether or not a kid was there or not



there, if there's a position there that needs to be staffed, then it needs to be staffed.
**Q Was it your understanding, then, that the position that Mr. Enos was offered was a vacant position or was an extra position?**
A I do not remember.
**Q Would it make a difference --**
A No.
**Q -- as to whether it was necessary to staff Mr. Enos there?**
A To me, no.
**Q So if -- and I don't know what the number of staff is, but if there were three staff members there and that was a full roster, and this position that you are describing that was offered to Mr. Enos was a fourth position, would it make a difference whether or not he went there or not?**
**You talked about liability for the County. From that assessment, would it make a difference if it was fully staffed and Mr. Enos were an extra person? Would that, in your mind, create that liability issue that you described?**
A I -- I guess I'm confused by the question.
**Q Well, you testified that even if there aren't kids -- even if there aren't juveniles in the detention center, it needs to be staffed.**
A Correct.

Page 42

**Q And are you saying, then, when you say that, that it needs to be fully staffed?**

A It needs to have staffing to accommodate whatever child comes in. So fully staffing -- I know with China Springs Youth Camp, we had to ensure there were so many male to female staff members on staff at all times, regardless of whether every bed was full.

**Q Okay.**

A And so that's where -- and it's the same with the detention center or the jail. We had to have male to female staff members to make sure the male to female populations were handled appropriately.

**Q But if it was fully staffed and Mr. Enos was just extra, that was just make work for him beyond the staffing requirements, then that wouldn't be -- that wouldn't present the same issue that you were testifying about earlier; is that correct?**

A You know, I don't -- I don't know what the purpose was if that was not the case, so I would be speculating.

**Q Have you read any of the legal pleadings of the lawsuit?**

A No.

**Q Okay. What is your understanding of this lawsuit?**

A When I had left Douglas County, I know that there was a workers' compensation claim. I don't know if -- I didn't know this lawsuit existed until recently.

**Q My question is, do you have an understanding of what**

Page 43

**this lawsuit is about?**

A No.

**Q Okay. Now, do you know John Enos?**

A I've worked with him since I came to Douglas County.

**Q Okay. Can you describe your interactions with him.**

A I would fill in on the juvenile probation cases from time to time. Other attorneys were assigned to them.

I was assigned to a lot of the child abuse, neglect cases through NRS 432B. Most of those of cases do overlap with JPO, so we would have conversations sometimes on those.

He'd fall under the court. So any of the issues -- the day-to-day issues from JPO, if they had an issue with a kid, question on an order, anything like that, I was the attorney assigned. So -- and their office was next to mine.

**Q Now, I do want to go back to the issue of your understanding is that Mr. Enos declined the assignment at the Lake Tahoe detention center.**

**You understood how personnel matters generally worked, correct?**

A Correct.

**Q Wasn't it your understanding that if Mr. Enos declined an assignment, he could be terminated?**

A It depended on -- I don't think he could be terminated immediately because I believe we would always allow employees to complete any sick, vacation, FMLA leave before that.

Page 44

**Q Well, if Scott Schick ordered him there and he said no, wouldn't that be insubordination?**

A It could be.

**Q And did you ever hear of any issues regarding Mr. Enos being insubordinate on this -- on this assignment?**

A I don't recall.

**Q So when you worked with Mr. Enos, did you find him to be reliable?**

A He filed his court -- you know, from my perspective, he filed the court paperwork on time. He was prepared to go to court.

**Q And so I think you said you've worked with Mr. Enos as long as you've been in the civil division?**

A Correct. And I knew him prior to that when I was -- even when I was clerking with Judge Gamble. The juvenile cases were heard with our district court judges.

**Q Okay. How long have you known Mr. Enos?**

A Since 2006.

**Q Now, his employment with Douglas County was separated or terminated; is that correct?**

A I do believe -- yes.

**Q Okay. Why?**

A There was -- if I remember correctly, there were two incidences of injury. And the second incidence, we did not get a full release back to duty.

Page 45

And so his time had come to an end with vacation, sick, FMLA, and he wasn't able to return to duty with a full note or a note at that time, if I remember correctly.

**Q Is it your recollection that his employment ended in or about February of 2015?**

A Somewhere around there, yes.

**Q What was your involvement in connection with Mr. Enos's separation of employment from Douglas County?**

A I'm trying to think exactly how I was involved.

Before anyone is terminated, they have to go through the District Attorney's Office and HR. HR has written forms. The forms were created by myself and Darcy Worms prior to this.

And so they would have been filled out and presented to us. And if we approved, we would -- the supervisor would provide whatever termination, whether it was for cause, not for cause. It just depended on the situation.

**Q Are you referring to personnel action forms?**

A Not personnel action forms. They were actually form letters that were created that would describe, you know, return to work, dates that were -- you know, they were just fill-in-the-blank type forms.

The personnel action form would have been filled out by HR.

**Q Did you have any involvement with Mr. Enos's efforts to become reemployed with Douglas County after his employment was**

**terminated?**

A I do not believe so. I don't remember him -- or, being involved in any of that.

**Q Who was the DDA assigned to HR after you left?**

A I do not know. I know for a short time, it was Cynthia Gregory. They hired a replacement for me, but I don't know her name.

**Q And that's the daughter of Judge Gregory?**

A Wife.

**Q It's the wife of Judge Gregory. Okay. Thank you.**

**Do you know Scott Schick?**

A I do.

**Q Who is Scott Schick?**

A Scott Schick is the department -- he's the -- I don't know what his title is. He's in charge of JPO.

**Q Juvenile probation department?**

A Yes.

**Q You are calling it "JPO." What does that mean?**

A Juvenile -- we always called it JPO.

**Q The office -- Juvenile Probation Office?**

A Yeah. Yeah.

**Q How long have you known Scott Schick?**

A Since 2006.

**Q How would you characterize your relationship with him, personal, personal and professional, or strictly professional?**



A We really didn't have a personal relationship. I would -- you know, he was pretty easy to work with.

He did drive me nuts. He was always last minute in getting contracts to me. But compared to some of my other clients, he was easy to work with.

**Q And after you left your employment with Douglas County, did you have any communications with Scott Schick?**

A I have not seen him since I left.

**Q How frequently do you speak to him nowadays, not at all?**

A Not at all. I don't even know if he's still with the County.

**Q Have you had any conversations with him about this lawsuit?**

A No.

**Q And to your knowledge -- I'm not asking you to speculate about things you don't have information or knowledge about. But to your knowledge, what was Scott Schick's involvement in connection with Mr. Enos's separation of employment from Douglas County?**

A Scott would have worked with -- I believe it was Norma Santoyo was still there -- so, Norma and myself on the final decisions, the paperwork.

**Q Who had the final decision?**

A It would have been up to Scott. We would give him our recommendation based on county process and procedure, and he would



decide whether to go with it or not.

**Q When did he first determine that he wanted to begin separation of employment for Mr. Enos?**

A I wouldn't know.

**Q Do you recall it was a period of time prior to the separation? Was it a period of months, weeks, days?**

A I believe it was within the last week, if I remember correctly.

**Q To your knowledge, did Mr. Schick have any involvement in connection with any effort by Mr. Enos to become reemployed with Douglas County?**

A Not that I'm aware of.

**Q Do you know a person by the name of Vicky Sauer-Lamb?**

A I do.

**Q Who is she?**

A She worked under Scott Schick. She would have been the deputy director, whatever the title was.

**Q Okay. And how long have you known her?**

A 2006.

**Q And your relationship with her, same question, is it personal, personal and professional, or strictly professional?**

A Simply professional.

**Q And after -- you are aware that she left her employment at Douglas County?**

A She retired, yes.



**Q Okay. Since she retired, have you had any communications with her?**

A I've seen her a couple of times, but -- at public events, but other than that, no.

**Q How frequently do you speak with her nowadays?**

A Maybe once a year at Fortnightly.

**Q Have you had any conversations with Ms. Lamb at any time about this lawsuit?**

A Nope.

**Q To your knowledge, what was Vicky Sauer-Lamb's involvement in connection with Mr. Enos's separation of employment from Douglas County?**

A I'm not sure if she had much involvement. She might have been in a meeting or two.

**Q To your knowledge, did she have any involvement in connection with any effort by Mr. Enos to become reemployed by Douglas County?**

A Not that I'm aware of.

**Q Do you know Norma Santoyo?**

A I do.

**Q How do you know her?**

A She was the HR manager from 2013 until 2015.

**Q Who was she replaced by?**

A Wendy Lang is the current HR manager, if she is still there.

**Q How long have you known Norma Santoyo?**
A Since she came to work in 2013.
**Q And the same question about your relationship, personal, personal and professional, or strictly professional?**
A Strictly professional.
**Q Now, after -- now, she left, you said, in 2015?**
A Correct.
**Q After she left, did you have any communication with her?**
A No.
**Q And so you don't speak with her nowadays at all?**
A No.
**Q To your knowledge, what was Norma Santoyo's involvement in connection with Mr. Enos's separation of employment from Douglas County?**
A She was the human resource manager. So she would have been involved in the discussions, emails, making sure the paperwork was done correctly.
**Q To your knowledge, did she have any involvement in any effort by Mr. Enos to become reemployed with Douglas County?**
A No.
**Q Sarah Christensen, do you know her?**
A I do.
**Q Who is she?**
A She works in human resources -- or, worked in human resources before she retired.



**Q And what was she responsible for doing?**
A Her role morphed over the years. She did a lot of paperwork. For a brief time, she was doing hire, rehire, but I think that was prior to this.
She had been there since I started in 2006.
**Q And that's how long you have known her?**
A Yes.
**Q And how would you characterize your relationship with her, personal, personal and professional, strictly professional?**
A Personal and professional.
**Q Okay. The personal aspect, can you describe that.**
A We go to dinner a couple of times a year when the prior HR manager, Darcy Worms, is in town. She follows me on Facebook.
**Q Have you had any conversations -- we're talking about Ms. Christensen. Have you had any conversations with Ms. Christensen since she left her employment at Douglas County regarding Mr. Enos?**
A No.
**Q Have you had any conversations with Ms. Christensen about this lawsuit?**
A No.
**Q To your knowledge, what was Sarah Christensen's involvement in connection with Mr. Enos's separation of employment from Douglas County?**
A At that time, she probably would have been doing the



paperwork for any reasonable accommodation requests or ADA, doctor's notes that came in.
**Q Do you know -- to your knowledge, did she have any involvement in connection with any effort by Mr. Enos to become reemployed?**
A No. By that point -- what was her name? There was another employee that was handling recruitment.
**Q Someone else?**
A Uh-huh.
**Q You don't recall who that was?**
A I believe it was Cindy. I'm not remembering her last name, though.
**Q We may get to her.**
**Do you know Nathan Tod Young?**
A I do.
**Q Who is he?**
A He is the District -- current District Court judge.
**Q Okay. And how long have you known him?**
A Since 2006.
**Q How would you characterize your relationship with him, personal, personal and professional, or strictly professional?**
A Strictly professional.
**Q After leaving your employment with Douglas County, did you have any communications with him?**
A I've had a couple of cases in front of him, but other than that, no.



**Q How frequently do you -- you don't speak -- let me ask you this.**
**You don't speak with him nowadays outside of court; is that correct?**
A That is correct, or a CLE or another event.
**Q Okay. Have you had any conversations with Mr. Young about this lawsuit?**
A No.
**Q Have you had any conversations with Mr. Young about Mr. Enos's separation of employment?**
A No.
**Q To your knowledge, what was Judge Young's involvement in connection with Mr. Enos's separation of employment from Douglas County?**
A I'm trying to remember. We -- sometimes we would talk to the judges before a separation occurred with the judicial employee, but I can't remember if we talked to him or not.
Judge Young was assigned to oversee China Springs and JPO.
**Q Why would you sometimes talk to judges about separation of court personnel?**
A It was a practice with Judge Gamble. He wanted to be involved and to understand if anything was going on that he needed to know about.

Q So you are saying the same is true for Judge Young?
A That is correct.
Q But you don't have any specific recollection of speaking to Judge Young about separation of court personnel Mr. Enos?
A No.
Q To your knowledge, did Judge Young have any involvement in connection with any effort by Mr. Enos to become reemployed with the County?
A Not that I know of.
Q Do you know Michael Gibbons?
A I do.
Q Who is he?
A He is an appellate court judge, former District Court court judge.
Q And how long have you known him?
A 2006.
Q Would you characterize your relationship with him as personal, personal and professional, or strictly professional?
A Strictly professional.
Q After leaving your employment with Douglas County, did you have any communications with him outside court?
A Other than CLE and a couple events in Carson City, no.
Q And have you had any conversations with him about this lawsuit?
A No.



Q Have you had any conversations with him regarding Mr. Enos's separation of employment?
A No.
Q To your knowledge, what was Judge Gibbons' involvement in connection with Mr. Enos's separation of employment from Douglas County?
A I don't think he would have had any.
Q Okay. So as a -- as a judge, did he have any supervisory involvement in matters affecting court personnel, to your knowledge?
A Majority of it was handled by Department 1. If there were issues, he would raise it to Judge Gamble or Judge Young, or if there were issues with court reports and stuff, I do believe he did speak to Scott Schick.
Q Do you know somebody by the name of Kathy Jo Kidd?
A I do not.
Q Do you know -- you mentioned Wendy Lang. Who is she?
A She is -- well, she was the HR director after Norma Santoyo.
Q And how long have you known her?
A I believe we hired her in 2014 or 2015.
Q How would you characterize your relationship with her, personal, personal and professional, or strictly professional?
A Strictly professional.
Q And after you left your employment with Douglas County, did you have any communications with her?



A I've seen her once.
Q And have you had any conversations with her about this lawsuit?
A No.
Q Have you had any conversations with her regarding Mr. Enos's separation of employment after you left Douglas County?
A No.
Q To your knowledge, what was Wendy Lang's involvement in connection with Mr. Enos's separation of employment from Douglas County?
A I'm trying to remember what Wendy's -- I don't know if she was involved that much. She was the second in command in HR, so she would have had -- she might have been involved, she might not have. I can't remember exactly.
She was relatively new at that time.
Q To your knowledge, did she have any involvement in connection with any effort by Mr. Enos to become reemployed with Douglas County?
A I don't know.
Q This may be the person you are referring to. Do you know someone by the name of Cindy McMurry?
A Yes.
Q Okay. Who is she?
A She has worked at human resources since 2006, if she's



still there.
Q That's how long you have known her?
A Yes.
Q And what -- what does she do there?
A It has varied over the years. When I left, she was doing recruitment.
Q Okay. And your relationship with her, is it personal, personal and professional, or strictly professional?
A Strictly professional.
Q And after you left your employment at Douglas County, did you have any communications with her?
A I have not seen her.
Q Have you talked to her about this lawsuit?
A No.
Q Have you talked to her about Mr. Enos's separation of employment?
A No.
Q I'm sorry, somebody coughed.
A No.
Q Okay. Thank you.
To your knowledge, what was her involvement in connection with Mr. Enos's separation of employment from Douglas County?
A I don't remember her being involved, but she could have been.

Q To your knowledge, what, if any, involvement did she have in connection with any effort by Mr. Enos to become reemployed with Douglas County?
A I don't know of any involvement -- I wouldn't know.
Q Okay. Who is Darcy Worms? Do you know her?
A Yes. Darcy is the prior HR director.
Q Prior to whom?
A Norma Santoyo.
Q Okay. Did you work with her?
A I did.
Q During what period?
A 2006 to 2012 when she left.
Q So to your knowledge, she had no involvement with Mr. Enos's separation of employment?
A That is correct.
Q And she had no involvement in connection with any effort by Mr. Enos to become reemployed with the County?
A She would have been in Washington state by that point.
Q Okay. Do you know someone by the name of Sheila Dugan?
A Yes.
Q Who is she?
A Sheila was the human resource director prior to Darcy.
Q So prior to 2006?
A Yes, or around 2006.
Q So to your understanding, she would have had no



involvement in either Mr. Enos's separation of employment or any efforts by him to become reemployed?
A That's correct. She moved -- she moved to Las Vegas shortly after her time with Douglas County.
Q Do you know someone by the name of Kimmie Johnson?
A Kimmie Johnson -- oh, she was the attorney that replaced me in the District Attorney's Office.
Q How long have you known her?
A I really don't know her. I've met her in passing. I know her husband.
Q Okay. After -- well, have you had any communications with her regarding Mr. Enos?
A No.
Q Have you had any communications with her about this lawsuit?
A No.
Q To your knowledge, did she have any involvement in connection with Mr. Enos's separation of employment from Douglas County?
A I don't know.
Q And to your knowledge, did she have any involvement in connection with any effort by Mr. Enos to become reemployed with Douglas County?
A I don't know.
Q You mentioned Cynthia Gregory before, is the wife of



Judge Gregory?
A That is correct.
Q And how long have you known her?
A Since 2006.
Q And your relationship with her, has it been personal, personal and professional, or strictly professional?
A Personal and professional.
Q Okay. Can you describe the personal aspect.
A We see each other a couple of times a year. She's involved in a women's group in Minden that I sometimes go to their events.
Q Okay. Have you had any communications with her regarding John Enos?
A No.
Q Have you had any communications with her regarding this lawsuit?
A No.
Q To your knowledge, what involvement, if any, did Cynthia Gregory have in connection with Mr. Enos's separation of employment from Douglas County?
A She wouldn't have been involved at the time.
Q To your knowledge, what, if any, involvement did Cynthia Gregory have in connection with any effort of Mr. Enos to become reemployed with Douglas County?
A I don't know if she had any.



Q Do you know someone by the name of Karen Barbee?
A I know the name.
Q Okay. Was she part of the third-party administrator for workers' comp claims?
A Yes.
Q And did you have any communications with her, to your recollection, about Mr. Enos?
A I do not know. She might have been on an email or two, but I stayed out of the third-party administration. That was handled by HR.
Q Okay. Have you had any conversations with her about this lawsuit?
A No.
Q To your knowledge, what was her involvement, if any, in connection with Mr. Enos's separation of employment from Douglas County?
A I don't think she was involved.
Q And to your knowledge, did she have any involvement in connection with any effort by Mr. Enos to become reemployed with Douglas County?
A Not that I know of.
Q So as -- you were the day-to-day counsel for the HR department. Is that a fair --
A Yes.
Q -- thing to call you? Okay.

And you visited the HR department from time to time?
A Yes.
Q And where was that office that you visited?
A It was in the main county building in Minden.
Q Okay. Is that the old Minden Inn?
A It is.
Q Okay. So what I'm going to do is show you what has been marked as Exhibit 1 in this case, which we'll also have as an exhibit in this case, if you'll take a look at that document.
I'll represent to you that's a drawing created by Sarah Christensen --
A Uh-huh.
Q -- depicting the general layout of the offices and cubicles.
A Uh-huh.
Q Is that your recollection of the general layout of their office, on -- the 1 signifies where they first were, the 2 signifies where they moved to, and the 3 would be that -- beyond that as well.
Is that your general recollection of who worked where in what cubicles and offices?
A Yeah, except when I was there -- KJ wasn't there when I was there and Wendy Lang would have been sitting over here.
Q Okay. You are talking about on the far right where it says KJ 3 and Norma 2?



A Yeah, KJ came -- my understanding, she started working after I had left.
Q And Kathy Jo -- that's KJ is Kathy Jo Kidd?
A Yeah, and I don't know her.
Q Okay.
A And Norma had -- yeah, Norma was originally here. Yes, that's correct.
Q Okay. All right. Great. Thank you.
Now, can you describe the overlap in supervision that existed between the HR department and the judges or other personnel of the 9th Judicial District Court regarding court personnel?
A HR's role was to, basically, facilitate -- it was sort of a -- a separate. So all oversight should have came from the judges or their -- you know, either Wendy Garrison out at China Springs or Scott Schick within the JPO, or Bobby Williams who was over the court personnel -- or, the actual court clerk staff.
So overseeing day-to-day operation would have been the court personnel. And then any issues, you know, raises, failure to show up, disciplinary procedures, HR would step in and help them with that.
Q Now, you are considering Scott Schick a court personnel?
A Yes.
Q Okay. You've described -- I think you've described --



and if you haven't, please correct me. I think you've described oversight by Scott Schick?
A Yes, for the JPO.
Q And was there oversight -- who -- who was -- who was overseeing Scott Schick?
A It would have been the judges.
Q Which judge in particular?
A Tod Young.
Q Okay.
A I believe.
Q Now, on day-to-day matters, did Tod Young get involved, or did he defer to Scott Schick?
A The judges deferred to Scott Schick.
Q Okay. And to your recollection or knowledge, Scott Schick would report to the judges from time to time about matters?
A That is my understanding.
Q Okay. And you interacted with both the HR department, Scott Schick and the judges concerning court personnel; is that correct?
A That is correct.
Q So can you summarize how that interaction played out. Who would initiate requests for assistance or involvement by you, or was that something that was initiated by you? How did that typically work?



A It wouldn't have been initiated by me. We would have either gotten a phone call from HR or the department head themselves.
Some department heads would come, want to meet with me and Norma together. Others would go to Norma first, and then she'd bring me in. It just depended on the -- the situation.
Q Physically, where did you work, what building?
A I was in the -- the District Court's office. We were upstairs, second floor, across from the courts, courtrooms.
Q So you are in the -- you are in the building where the courts are?
A Yes. And JPO is also in that building.
Q Okay. Did you work in an office or a cubicle?
A Office.
Q Okay. And what was your typical workday like? What was your type of assignments that you would work on?
A Depended on the day. Towards the end, I was -- like I said, I was handling the 432bs. So I would be handling the child abuse, neglect cases Mondays and Tuesday mornings in court.
I had child support cases Monday and Tuesday afternoons in court. When I didn't have court, I would be working on contracts, ordinances, employee issues. It just -- it ran -- every day was different.
Q Did you ever have a 432B hearing or an issue come up where the ADA was implicated?

A Actually, we did have a 432B. It was a child abuse, neglect case involving a mother, and she tried to raise the ADA. That is correct.

**Q And so you had some experience with the fact that the ADA statutes might be implicated in the ordinary rules and procedures for 432B -- handling of 432B cases?**

A They were not. So she tried to use an ADA -- as a defense to her child abuse and neglect charges.

**Q Okay. So maybe we're thinking about different things.**

A I did -- we did address -- so because of my -- I think this is where you are going.

When I worked for the courts, we did have policies and procedures put into place for individuals that couldn't hear the judges correctly. We had worked through those issues for the public that were coming or the defendants in cases.

**Q So I think what you are describing is, sometimes the default rules would have to be changed in order to accommodate someone under the ADA. Is that what you are saying?**

A That is correct.

**Q Okay.**

A For example, we had a witness that was able to sit at the witness stand the entire trial so they could hear, or it was a defendant, I can't remember. It was somebody that needed to move.

**Q Did you consult anyone in the Douglas County DA's Office regarding your handling of matters involving Mr. Enos?**



A If I did, it would have been Doug Ritchie or Mark Jackson.

**Q Did anyone from the Ninth Judicial District Court, other than Mr. Schick, if you are considering him court personnel, authorize or instruct you to handle any matter involving Mr. Enos in the manner that you did?**

A It would have been Mr. Schick and/or -- I don't think the judges were involved, so it would have been Mr. Schick.

**Q And do you -- I'll get to particulars.**

**Now, the staff meetings that you described, the general staff meetings, were minutes kept?**

A No.

**Q And were they recorded?**

A No.

**Q The -- the private meetings regarding personnel matters, were minutes kept of that?**

A No.

**Q Did you take notes of those meetings?**

A If I did keep -- yes, there might have been notes.

**Q Where would those be?**

A If there were notes, they would be in the personnel files in the DA's Office.

**Q They would be -- they would be in your personnel file?**

A No. There were separate -- every time there was a personnel action in Douglas County, I -- my secretary would make a



file on the matter with that employee's name.

And so all of the documents that I was either cc'd on, emails, would go into those files. They were locked -- kept separate in my office and locked.

**Q That would be, for example, if there was a personnel action -- well, to your recollection, was a personnel action file created for Mr. Enos?**

A I believe so.

**Q And if you took notes, they would be in that file?**

A That's correct.

**Q And I apologize if I wasn't listening carefully enough.**

**Your understanding is that file -- would that be in the DA's Office, or would that be in the HR department's office or --**

A DA's Office.

**Q The DA's Office.**

**Okay. We have been going about an hour and about 15, 20 minutes. Would you like to take a break?**

A Sure.

**Q Okay.**

A I'll get some more coffee.

MR. GEDDES: Okay. We will take a break. Thank you.

THE VIDEOGRAPHER: We're going off the video record at approximately 10:31 a.m.

(A recess was taken.)

THE VIDEOGRAPHER: We are going back on the video record



at approximately 10:41 a.m.

BY MR. GEDDES:

**Q Okay. You understand you are still under oath?**

A Yes.

**Q Okay. Great.**

**During the -- the time frame that you worked -- we'll limit that time frame to the period of 2013 to 2016 -- how often did you typically communicate with Scott Schick regarding personnel matters?**

A Not very often.

**Q Once a week? Once a month?**

A Once a month maybe.

**Q And Vicky Sauer-Lamb, same question.**

A I would say rarely.

**Q Less than once a month?**

A Yeah.

**Q Norma Santoyo?**

A Daily.

**Q Okay. Several times a day?**

A Depending on the time of year and if we had issues going on.

**Q Okay. And Sarah Christensen?**

A Probably daily or close to daily.

**Q Were you -- were your communications with her mainly regarding workers' comp issues?**

A Workers' comp issues, setting up meetings, that kind of thing. It wasn't any -- it wasn't specific.

**Q Okay. What about Mr. Young regarding personnel matters, how frequently would you typically communicate with him?**

A Maybe once a month. We had more issues with China Springs Youth Camp due to the size of the facility and the number of employees, but probably once a month.

**Q What about Judge Gibbons?**

A Rarely.

**Q Okay. Less than once a month?**

A Yeah.

**Q Okay. So your understanding of the chain of command for the HR department was the director, then the assistants, and that was pretty much it?**

A That was it. And then I think there were four workers under that, three or four.

**Q Okay. Now, the HR department was involved in matters concerning hiring and firing of county workers, right?**

A Yes.

**Q And could you describe your typical involvement in hiring county workers.**

A So -- I'm trying to remember what year it was. We went to a centralized application process while I was there. It's the one they use today, and it's where you go fill in applications, post jobs.



So they would have collected all the resumes, applications that came through, put them in the system. And then depending on the positions, some positions, they were able to weed out, like, top candidates, lower candidates based on test scores and things like that and pass it on to department heads and directors for hiring, to go through the process.

They would always sit in on -- they would have at least one person sit in on interviews, make sure all the paperwork and process was done correctly.

**Q Okay. And that typical scenario that you described, that would be the same for hiring employees of the Douglas County juvenile probation department?**

A Yes.

**Q And what would the typical involvement of the HR be with a different aspect, specifically, disciplining county workers?**

A Everything would have gone through HR. So HR would have met with the supervisor. And at that point, I would have been involved.

We would discuss what was going on, what the discipline was, what the past discipline looked like, if we were going to do, say, instead of a discipline, an action plan.

They had different names for them in different departments, but it was, basically, a performance plan where we would try to get employees to actually do their job duties, if that was the issue.



But everything went through HR.

**Q So the departments wouldn't take action without HR?**

A Correct.

**Q Okay. And when HR would get involved, they would get you involved?**

A Correct.

**Q Okay. And that typical scenario that you described, that would be the same for disciplining employees in the Douglas County juvenile probation department?**

A Correct.

**Q Now, with regard to disciplining employees, court personnel, did you have to have special consideration of the court personnel regulations?**

A I do believe so. If I remember correctly -- and it has been years since I looked at these -- there was a different appeal process for court personnel that went through the judges.

I'm trying to think what else would have been different.

I just know for sure that the appeal went through the judges, if someone filed an appeal.

**Q To your recollection, had anyone ever done that?**

A While I was there, yes.

**Q How many people filed an appeal?**

A We had one at China Springs.

I'm trying to think. I think that was probably the only one that I can think of off the top of my head.



**Q To your recollection, this China Springs example, how did they notify of appeal? Is that part of what was written up in their disciplinary -- you have a right to appeal this?**

A Correct. We had -- the process for discipline was -- it depended on whether it was written or a termination. It would also -- the level of discipline would also affect their appeal rights.

But with -- they were -- like I said, we had forms that were, like, fill-in-the-blank forms for each of the different employee organizations, including the courts, so that the HR could grab the correct one and start filling that in with the department head.

**Q Okay. Now, this -- this typical description scenario that you described for the involvement of people in the firing of county workers -- I'm sorry, the disciplining of county workers, that was the same for the juvenile probation department?**

A Yes.

**Q And Douglas County HR department was involved in matters concerning -- when -- when you talk about disciplining, would that be the same procedure for firing, it's the same, it's just on the end of spectrum of discipline?**

A If it got to -- if it was a termination for cause, yes.

**Q Okay. All right. What was, to your recollection, Douglas County HR department's involvement in matters concerning workers' compensation and FMLA?**

Page 74

A The initial paperwork would be -- we would do trainings every year for the department heads and supervisors specifically on FMLA to make sure that the employees knew to fill out the paperwork.
HR would collect the paperwork, the doctor's notes, ensure that the personnel action form was filled out correctly with the dates the employee would be out.
They collected the doctor's notes to return. And they were, basically -- once an employee went on FMLA or had an issue, it was HR that would handle all the paperwork from that point forward and not the department head.
**Q So HR would track --**
A Everything, yes.
**Q Okay. And so to your recollection -- to your understanding, the third-party administrator received medical records in the handling of workers' compensation claims, correct?**
A That is correct.
**Q But the HR department received medical records inasmuch as doctor's notes are medical records?**
A The doctor's notes, yes.
**Q Okay. And so what are they tracking FMLA time for?**
A They would track the 12 weeks, the 12 consecutive weeks.
They would track if an employee -- to be able to be paid for Douglas County, you had to use your sick or vacation during that time period. So they would track your vacation, sick, to

Page 75

make sure the timecards were filled out correctly so an employee would be paid if they could.
They would track whatever dates were left.
They would provide notices when your 12 weeks were close to be up so that you could get a doctor's note to return to work.
**Q So the notices -- you say when it was close to 12 weeks being used -- weeks being used up, 12 weeks of FMLA?**
A Correct.
**Q And can you describe what those notices typically would say.**
A I wasn't really involved, but I know that it was just a generic -- I had one when I came back from having my son. It was a generic, we don't have a doctor's note on file, please provide one before you return to work on X date.
It wasn't very long.
**Q I'm confused. I would have thought that when you described notices would go out when it was close to 12 weeks being used up, the notices would say your FMLA is almost used up. But what you just said was we don't have a doctor's note on file. I'm confused.**
A Well, it would depend on the situation. So in my case, I didn't have the return-to-work doctor's note --
**Q Okay.**
A -- for the 12 weeks, because they knew I was coming back because I was still in contact with everyone.

Page 76

So they -- it was just, basically, giving you -- and it is, your 12 weeks are up, your return-to-work date.
**Q Okay.**
A If you had a doctor's note, they'd just put that in there. If you needed one, they would tell you what you needed to come back.
**Q Okay. Were you -- were you involved in sending out those notices that your 12 weeks of FMLA are coming close to an end, or was that something HR did that itself?**
A That's what -- it was part of HR's process.
**Q And it wasn't part of -- it wasn't the department that -- like, juvenile probation?**
A No. HR controlled all that.
**Q Okay. Now, when you were working there, were there ever situations where demands were made from employees who were out on workers' compensation leave, that hey, we know you are out on workers' comp leave, but your FMLA, you know, about to be used up, anything like that?**
A We had a couple of those.
**Q Okay. And advance notices were sent out for those as well?**
A When the FMLA leave was coming up, yes.
**Q Okay. And were -- were notices sent out to employees that their is FMLA coming close to an end, it's being used up, you have to return to work by this date, or you will be deemed away**

Page 77

**from work without authorization and it will be an automatic separation? Do you recall that?**
A I know that was the process. I don't know if the notice actually said that.
**Q Were there ever scenarios where that process that you are describing was initiated and the worker tried to come back to work so that he or she wouldn't get separated from employment?**
A For the most part, they either came back to work or they were completely unable to come back to work and so it was separated.
**Q When you say "completely unable," what does that mean?**
A They didn't have the paperwork -- they weren't released to full duty or weren't released to come back for their job, or they just abandoned it in one case.
**Q Okay. So release to full duty, what does that mean?**
A They would have to have a note to -- well, it just depends on the situation.
So they would have to be able to come back to their role outside of -- without talking about ADA, but come back into the position that they were out for.
**Q Well, that was a lot. I was trying to catch up with what you just said.**
A Yeah. And it's going to depend, situation by situation.
**Q I think you said outside of ADA. What does that mean?**
A So from the FMLA, just looking at FMLA in a vacuum, they

would have to return to work on that date. Whether or not there was reasonable accommodations or something given would have been separate than the 12-week timeline.

It's hard to describe because we had numerous employees out with different issues.

**Q Well, did you send out notice to anyone ever that said your FMLA is used -- words to the effect, your FMLA is used up, you need to come back to work, and if you are disabled, workplace injuries amount to a disability, you need to get in touch with us about pursuing ADA options?**

A Since I didn't send out those letters, I don't know what HR would have sent out.

**Q Well -- okay. But what do you base your discussion just now on outside of ADA? What do you base that on?**

A So, for example, with my personal experience when I went out for maternity leave, I had my 12 weeks. So at the end of my 12 weeks, I got the -- the letter from the FMLA perspective only, that your 12 weeks are up, you need to come back with a doctor's note saying you can go back to work on this date.

**Q Okay. But when you say outside of ADA, are you saying that if somebody wanted to come back to work who was given that notice, let's say it's a female court personnel and she can't get a full medical release, are you saying then that for FMLA purposes, she has to return, but for ADA purposes, there might be a further discussion?**



A That is correct.

**Q Okay. And --**

A We tried to keep them separate.

**Q Okay. Are you aware of any paperwork involving Mr. Enos that specifically, expressly references ADA?**

A I have no clue.

**Q Okay. In the -- in the time frame that you worked at the Douglas County DA's Office, what was the chain of command?**

A Mark Jackson, Doug Ritchie, and then it would have been me -- well, the three other DAGs would have fallen under Doug for the civil division.

Doug was the chief.

And a similar structure on the criminal side.

**Q Great. Okay. Now, I don't -- I want to try to avoid a lot of needless testimony, so I'm going to ask it this way.**

**Your discussion about how you got involved with whomever that you have testified to regarding the hiring and disciplining and firing of county workers, that would sum up the DA's Office's involvement, or is there more that you would need to add?**

A That would be it.

**Q Okay. Now, to your understanding -- and you may have answered this -- parts of this in separate questions, or answers to questions -- when you worked there, what was the chain of command for Ninth Judicial District Court personnel?**

A It would have been the two judges and then the different



divisions under them. So JPO --

**Q Scott Schick?**

A -- would have been Scott Schick. Wendy Garrison would have been China Springs Youth Camp, and then Bobby Williams would have been the court clerks under there.

**Q Okay.**

A And then there was also CASA, which sort of fell under the courts as well, which is Court Appointed Special Advocates.

**Q Okay.**

A And there was one other department, and it was like an elder abuse and I don't remember the exact name, with them.

**Q Were the -- were the judges ever involved in the hiring of court personnel, to your recollection?**

A They were involved with the court administrator when Bobby Williams took that position. They were also involved -- I do take back -- they had an IT personnel, and the judges were involved in that. So only the higher level employees were they involved in.

**Q And you are not including in that juvenile probation officers?**

A No, they wouldn't have been involved.

**Q Okay. What about Vicky Sauer-Lamb's job, which would be the chief deputy juvenile probation officer, would the judges have been involved in that?**

A They probably would have because she would have been



more of a supervisory role.

**Q I think you described somewhat, or you mentioned the judges hearing appeals --**

A Correct.

**Q -- of disciplined court employees. What is your recollection of how that would -- would occur?**

A The process is set forth in the court rules and regulations for court employees, so whatever that process is.

For a traditional employee, they would have been -- the appeal would have gone to the department head and then to an appeal panel. And I believe the judges were, basically, that appeal panel.

**Q When you worked there, was there ever an appeal involving juvenile probation officers?**

A No.

**Q Was the DA's Office ever involved in the hiring process for the departments?**

A Every once in a while, we would be asked to sit in on interviews. I sat in on interviews for the second in command at HR, so Wendy Lang's position.

I know Mark Jackson sat in when Norma was hired for HR director because I was out on maternity leave. I was supposed to do that.

I sat in on Court Appointed Special Advocates. Judge Young asked me to sit in on those because they do all the

child abuse and neglect cases.
Airport, when we hired the airport manager, I sat in on those. It would depend.
I know one of the attorneys -- I believe, when Vicky Sauer-Lamb left, one of the attorneys -- the attorney that was handling juvenile -- the juvenile cases sat in on the interviews.
**Q Do you know who replaced her?**
A I can see his face and I cannot remember his name. It was shortly before I left. He had been there for quite some time.
**Q To your recollection and knowledge, was Mr. Enos ever considered for that position?**
A I wasn't involved in that process, so I don't know.
**Q But to your knowledge, no?**
A I -- I don't -- I don't know.
MR. GEDDES: All right. Let's take a look at Exhibit 2, please.
I'm sorry, this isn't stapled, but we can put them together. Do we have a stapler out front?
MS. PARKS: Are these the exhibits from a different depo?
MR. GEDDES: They are the exhibits from the last depo and from Sarah Christensen's depo.
THE VIDEOGRAPHER: We are going off the video record at 11:01.



(A recess was taken.)
THE VIDEOGRAPHER: We're going back on the video record at approximately 11:03 a.m.
BY MR. GEDDES:
**Q Okay. Have you seen this before?**
A I have.
**Q What are they?**
A This is the original order, the court personnel regulations.
**Q Okay. Were those -- those are the Douglas County -- those are the court personnel regulations that you were referring to?**
A They are, but I believe that they were amended. It might have been after Mr. Enos had left --
**Q Okay.**
A -- but we had worked on amending these.
**Q Okay. So assuming that those were in effect prior to Mr. Enos's termination, to your understanding, the HR department would have followed those regulations when dealing with employees of the juvenile probation department?**
A Yes. And if it wasn't included in here, they would have gone with the county code.
**Q Okay. And that would include juvenile probation officers and senior juvenile probation officers?**
A Yes.



**Q Okay. What we want to do here is, if we can -- and I'll just borrow your stapler, if I can.**
A There are two of them.
And I'm attacking the microphone.
**Q Showing you what has been marked as Exhibit 3.**
**I'm sorry, is that 3 or 4? I might have stapled 3 and 4.**
A No, it looks like 3.
**Q Okay. Okay. And now, showing you what's been marked as Exhibit 4. That's the cover sheet to that.**
A There's 5's cover sheet.
**Q Okay. You've seen these before, haven't you?**
A Many times.
**Q Okay. So Exhibit 3 is the Douglas County personnel regulations?**
A Uh-huh.
**Q And Exhibit 4 is an ordinance amending those regulations?**
A Uh-huh.
**Q Okay. Now, I'll represent to you that Exhibit 2 was the Douglas County personnel regulations as revised in 1996 and Exhibit 3 was the ordinance that amended those in 2000.**
**So assuming that these regulations were in effect at the time of Mr. Enos's separation of employment from Douglas County, to your understanding, HR would have followed county personnel**



**regulations in limited circumstances?**
A So they would have gone off whatever the court rules provide. So these are the base rules and then whatever the court rules or bargaining unit supersede these.
**Q Okay. So when you say these are the base rules --**
A These are -- the county personnel regs --
**Q Okay.**
A -- are the base rules, so these apply to everyone. If an employee organization or, say, the courts change one of these rules, we go with the change.
**Q Okay. So where it's specifically referenced in the court personnel regulations, you go with those; where it's silent, you go with the default county rules?**
A That is correct.
**Q Okay.**
A And that was across the board with all of our different employee groups.
**Q Okay. Now, to your understanding, in 2014 and 2015, prior to Mr. Enos's separation of employment in February of 2015, the juvenile probation officers and senior juvenile probation officers were considered to have classified positions, as opposed to at-will positions, correct?**
A That is my understanding. When the court rules were amended -- and I believe it was after -- it was the case -- there was a case that came out of the Sparks Justice Court that changed

the rules for court employees. And at that point, the court personnel regs was changed.

**Q So does that relate to classified versus at-will positions?**

A Correct. All court personnel are now considered at-will based on that case.

**Q Okay. All right. But your understanding is that prior to the time Mr. Enos was separated from employment, he had a classified position?**

A Yeah, I'm not sure the exact timeline, but it would have been around -- probably around the same time because it was right before I left that it was switched.

**Q Okay. And a classified employee could only be fired for cause; is that correct?**

A For -- terminated, yes.

**Q Okay. And they could only be fired for cause after being given proper notice of proposed actions under the rules, correct?**

A That is correct.

**Q Okay. Let's focus for a moment on Vicky Sauer-Lamb. I think you testified that she retired, correct?**

A That is correct.

**Q Do you recall when that was?**

A I do not. I know it was prior to my departure.

**Q Okay. And I think you said that there was someone from**



**your office who sat in on the interviews for her replacement. But what was your involvement in finding and staffing her replacement?**

A I wasn't involved.

**Q Okay. To your understanding, what was Norma Santoyo's involvement in finding and staffing Ms. Sauer's replacement -- Sauer-Lamb's?**

A She probably -- I don't believe she would have been involved --

**Q Okay.**

A -- unless -- I don't know what happened internally in that department, so I don't know.

**Q Okay. What about Scott Schick?**

A Scott would have been involved in the process, reviewing applicants, interviewing. Ultimately, he would have -- as the hiring authority, he would have the ultimate decision.

**Q Not the judges?**

A He would probably -- so what happened with -- at least -- I can give you an example for Wendy Garrison. When she hired her second in command in China Springs, I actually sat in on those interviews. We made a recommendation. She met with the judges, and the judges agreed with us.

So I think the recommendation comes from -- it's up to -- ultimately up to Scott or the judges to pick.

**Q Okay.**

A I am not sure with Judge Young. I know with



Judge Gamble, he was pretty hands off and let the department heads pick their --

**Q Okay. Do you know if Vicky Sauer-Lamb herself was involved in staffing her replacement?**

A She might have. I'm not sure. She might have been.

**Q Okay. What about Sarah Christensen?**

A I don't think she was doing recruitments at that time.

**Q What about Wendy Lang?**

A If Wendy was there, I don't know if she would have been. I'm not sure.

**Q What about Cindy McMurry?**

A Cindy would have been.

**Q And what role would she have had?**

A She would have been the gatekeeper of the paperwork, basically. She probably would have -- when Cindy did recruitment, she would set up the interviews, contact, you know, candidates, that kind of thing.

**Q I think you described a process earlier where the HR -- there's a centralized job listing database --**

A Uh-huh.

**Q -- or what have you, and website, and people would apply to that. And then you described how the applications and packets or whatever for the candidates would, at some point, get forwarded to the various departments.**

**Do you recall that?**



A Uh-huh, yes.

**Q But you said something also along the lines of there might be high -- high scorers are screened out. Can you describe that?**

A So, for example, when we would hire a secretary, they would have to do a typing test. If you fail your typing test -- and a candidate that doesn't fail their typing test, the -- it would depend -- you know, that would go forward.

It just depends on the qualifications if you met the minimum qualifications for the job.

For a time, we were getting applicants that were simply not qualified for the positions they were hired -- applying for.

**Q Well, that would be a drop-out, people who don't --**

A Yeah.

**Q But I'm talking about people who excelled at scores. Would those people be recommended by HR to the departments?**

A No, they are never recommended. HR would, basically, pass along all of the applicants.

And it depended on the department and the position, but they would traditionally pass on either all of the applicants or all of the applications that met the minimum qualifications.

**Q Are you aware of a rule that if an employee was separated from employment under the -- considered as resigning rule for being away from work unauthorizedly for three days, that they were ineligible for rehiring within the County? Was there**

such a rule?
A I know we had eligibility for rehire, but I don't -- I don't know if that would have qualified or not. And I believe it was in the -- it was written out in one of the policies.
Q Do you know one way or another whether Mr. Enos was ever put on a list or a communication, do not rehire?
A Not to my knowledge.
Q So if I'm understanding your testimony, you are saying that the applications come in --
A Uh-huh.
Q -- and they are all forwarded to the various departments, except for the ones that fail and drop out based on failure to meet the minimum requirements?
A Correct.
Q Okay. Does the department ever track the ones that never made their way to them, the ones that failed?
A It depends on the department. I know with the District Attorney's Office, we had an agreement in place with HR that every applicant came to us.
Q Whether they met the minimum requirements?
A (Nodding head affirmatively.)
Q Do you know whether that was true for the juvenile probation department as well?
A I don't know. It would have been up to the judges and/or Scott Schick to request that.



And I know it -- it was -- when this program went into place, some departments wanted to see everyone still and others didn't, and it was a case-by-case basis.
Q So if -- I'll give you an example. If a job were advertised for a juvenile probation officer in 2017 and Mr. Enos applied for it and his application came to HR, that would have been forwarded to juvenile probation department, correct?
A I'm assuming it would.
Q I mean, you can't think of a reason --
A It's an assumption.
Q You wouldn't think of a reason or -- to your way of -- if they follow the ordinary rules, that would occur?
A Uh-huh, correct.
Q So to your understanding, how did -- you talked about Douglas County tracking workers' compensation claims.
Would Sarah Christensen be responsible for notifying either Norma or the employee, hey, your doctor's note says you should be returning next week, so we'll see you next week? I mean, who tracks that?
A It would have been HR. I don't know if it was Sarah or who in HR would have done that.
Q So they're tracking the work -- work excuse carefully enough to know in advance when an employee is expected to return?
A Yes.
Q Are there situations, to your recollection, where the



return date is uncertain?
A We did have a couple of those where we wouldn't have a return date or we would have to inform them. And that's when, traditionally, FMLA would come into play with their timeline of when they would have to return to work.
Q So if -- if a doctor's note comes in and describes, say, a court clerk is out on workers' compensation and she's expected to return on May 5th, that May 5th date would be tracked by HR and HR would expect her back?
A Correct.
Q And HR would communicate with the department, your employee is expected back on May 5th. That's the ordinary procedure?
A Yes.
Q And that was followed -- that applied with regard to the juvenile probation department?
A It should have been.
Q Okay. So at any given time, unless there's rare circumstances, I think, is what you are saying -- at any given time, the departments had an expectation of a return date.
Now, that -- I'm sorry. Is that "yes"?
A That is a "yes."
Q Okay. So you're nodding your head. Thank you.
And that -- that date may change, but they always had a picture of the return date, unless -- unless there was an unusual



circumstance?
A That's correct. Sarah was actually quite good at calling and letting at least the department heads know the idea of when they were coming back.
Q And to your way or to your recollection, was there ever an issue or problem with not knowing when Mr. Enos would return based on the work excuse return dates?
A I don't know. I was -- I don't know.
Q Okay.
A I didn't track those, so --
Q How was -- who was responsible -- or, let me ask it this way.
Who was involved in finding light duty for injured workers relating to workers' compensation claims?
A It would normally fall on HR. They would work with the department head.
In some situations, they would bring it to the DA's Office to help them brainstorm ideas, especially if, you know -- it was easier in an employee that fell within our general employees union because there's quite a few jobs in departments that they could go to.
Other places, it was more difficult.
Q As you sit here now, you -- do you recall any efforts to find light duty work for Mr. Enos in connection with his workers' compensation injuries or claims?

A Like I mentioned before, the only one I can remember is the detention facility. We did have discussions about what other options we had with the court department being so small.
China Springs was not an option. Clerk's office was completely fully staffed at that point, and there was no space for him there.
**Q You said "the clerk's office"?**
A Yeah, the court clerk. They fell under the courts.
And that would have been pretty much the only court employee section.
**Q Why couldn't he go work in, say, the library?**
A Library was a DCEA employee. So they fell under the bargaining unit with Douglas County Employees Association.
**Q Now, you gave some discussion earlier about how -- you gave this discussion about the detention center in response to a question about the ADA.**
**Is your recollection that the discussion concerning the detention center was based on an ADA inquiry or a workers' compensation inquiry?**
A It would have been based on his doctor's note for light duty. I -- I don't remember an ADA issue coming up with Mr. Enos while I was there.
**Q So the discussions would have centered around workers' compensation, not the ADA?**
A Correct. It was when he was injured.



**Q How would -- to your recollection, how would the HR department handle ADA matters typically?**
A Same process. It would -- you know, depending on what the ADA claim was, for example, we had an employee who had diabetes and he needed to have certain testing.
So we would meet with the department head. The employee, we met with her union rep because she fell under the union. And we would discuss what accommodation we could potentially provide based on her doctor's note.
And in that case, we were able to give the employee extra, you know, breaks. So it was -- it was case by case.
**Q Okay. Why wouldn't -- so a worker wouldn't be separated from employment as long as they had FMLA time and they were out on a workers' compensation medical leave?**
A As long as they had work -- whatever the leave was, whether it was sick, vacation, FMLA.
**Q And the way that --**
A Sick and vacation overlapped with FMLA because it was the only way an employee could get paid from the County.
**Q So if -- if a person had -- let's just say a person had 40 hours of sick time, 40 hours of vacation time and went out on an injury, a workers' compensation, had to be away from the office, then FMLA -- let's say -- keep things simple. They went out on January 1.**
A Uh-huh.



**Q FMLA would -- the 12 weeks would start being subtracted from January 1. And whether the employee got a paycheck would be based on, first, they would take it from sick or vacation. So 40 hours of pay there, 40 hours of pay under vacation.**
A Uh-huh.
**Q And then they would -- so that's one week under sick pay, one week under vacation pay, and then there would be, in this hypothetical, ten weeks -- ten weeks left. Ten weeks left on FMLA would be unpaid?**
A Correct.
**Q But if there was a workers' compensation claim, they might --**
A They would --
**Q -- be receiving workers' compensation benefits?**
A Correct.
**Q Okay.**
A And that would be outside the County. Our third-party administrator handled those.
**Q Now, when they were on light duty, how were they paid?**
A Light duty would have been paid the same as their position.
**Q Their regular job?**
A Correct.
**Q So to your understanding, HR is tracking all of that?**
A Correct.



**Q Okay. Did the DA's Office typically get involved with the third-party administrator on workers' comp claims?**
A Not on -- rarely.
**Q Okay. Are you aware of a worker named Anthony Field?**
A Yes.
**Q Isn't it true that in the same time frame that we're talking about here prior to the time of Mr. Enos being terminated in 2015, he exhausted his FMLA, but the sheriff allowed him to recover and return to his job without his being terminated?**
A One, I don't want to speak about it because it's a confidential HR matter with the sheriff's employee; and two, he would have fallen under a completely different category because he was under DCSO.
**Q That's -- that's that collective bargaining agreement?**
A Correct. And he would have fallen within the sheriff's department, so it was separate from the courts.
**Q And so in a scenario --**
A And I -- to be honest, I don't know if that's true or not. I don't know if what you are saying is true.
**Q Well, let me -- let me ask this question.**
**Scott Schick -- you were involved with Mr. Enos because somebody picked up the phone and called you, correct?**
A Correct.
**Q If nobody picked up the phone and called you, would you have been involved?**

A No.

**Q So to your understanding, Scott Schick had the authority to say words to the effect, hey, HR, thanks for tracking that. You know, Mr. Enos's FMLA may be used up and he -- but you know what, I don't want to terminate. I don't want to cause a separation of employment. I have the discretion to do that.**

**Did he have the discretion to do that?**

A I would say no, I don't believe so.

**Q Why?**

A One, he's not the elected official; two, the County had a general policy that once FMLA time was up, we -- most employees were not allowed to have extra time other than what was required.

MS. PARKS: Excuse me for a minute, please.

(Pause in proceedings.)

MS. PARKS: Thanks.

BY MR. GEDDES:

**Q What county policy was that?**

MS. PARKS: Wait a minute. Did you guys stay on the record?

MR. GEDDES: Yeah, we didn't say anything since you left. It was completely silent.

MS. PARKS: Okay. I mean, is that the first question?

MR. GEDDES: Yes, it's a follow-up to the -- she said it was county policy and we waited and you came back.

MS. PARKS: Okay. Just getting my bearings back where



we were. Thank you.

MR. GEDDES: Okay. All right.

THE WITNESS: I don't know if it was a written-down policy, but that's what had been put into place after all of the layoffs that we had incurred.

BY MR. GEDDES:

**Q What time frame was that?**

A Layoffs started 2009, 2010ish. We went from roughly 700 employees down to maybe 450.

**Q Now, when you said once FMLA was used up, they weren't allowed to go beyond that, what does that mean, "go beyond that"?**

A You know, there was always arguments that you guys can give us extra time, you can hold my position for so long.

Once we had layoffs and cut back, it was very difficult for any of our departments to hold positions open without having them be filled.

**Q Would that apply also to ADA issues?**

A ADA would have been separate in my head from these issues.

**Q So if ADA -- if a worker, as an accommodation, could be given more unpaid time off to accommodate their disability, what -- which would trump, the county policy or the ADA?**

A It would depend on the situation.

**Q Are there certain circumstances where the ADA would trump the policy?**



A I haven't looked at that in years, and I don't know if we ever -- my recollection is we've never had anyone ask for extra time off under the ADA.

**Q Well, is it your understanding that a person has to actually ask for time off on the ADA or that the interactive process, the duty is on the employer once it's aware that it's implicated?**

MS. PARKS: Objection, compound.

BY MR. GEDDES:

**Q Do you understand the question?**

A It is a compound question, and I do understand it. And it's a lot -- it's not that simple.

So, what -- you know, under the ADA, if an employer knows that you have a back condition, we have to try to help you get a chair.

If you are out on FMLA and there is no contact with us, at what point does the County know?

So I guess it would depend on the situation and what's going on.

**Q Okay. But you think there are circumstances where the County could know of a person's need for an accommodation based on tracking their workers' compensation claim?**

A I think that's a legal conclusion that I'm not willing to make.

**Q And not making that legal conclusion here, you never**



**made -- you didn't evaluate that at any time when you were working at the Douglas County DA's Office, correct?**

A I don't believe so.

**Q Okay. And you didn't do that for Mr. Enos, correct?**

A As far as my recollection, there was no ADA implicated by Mr. Enos at that time. It was all workers' compensation and/or, you know, FMLA.

**Q So I think -- I think your answer was this -- but if I'm wrong, please correct me -- that when it came to finding light duty, the HR would typically be involved, the department itself would be involved, and sometimes, they would get the DA's Office help for creative brainstorming on the issue as well?**

A Correct.

**Q Do you recall specific -- other than what you have testified to, do you recall other -- do you recall specific efforts -- well, let me say it this way.**

**Do you recall Scott Schick being personally involved in trying to find light duty for Mr. Enos, separate and apart from what you've talked about regarding the detention center?**

A Not that I was involved in.

**Q Okay. And then the same question for Norma Santoyo.**

A They could have, yeah. Not that I was involved in.

**Q Would anyone typically report to the judges of the status on court personnel, they're returning, here is an update, anything like that?**

A I know Wendy Garrison would report what -- about her employees. She had a standing meeting with her judge. I don't know if Scott Schick did the same. I'm assuming he did.

I wasn't involved in those.

**Q And I want to be clear here too. I know there was a discussion during the beginning of the deposition about attorney-client communications.**

**If, at any time, you think I'm asking a question that implicates an attorney-client communication with the judges, please let me know, because I have not yet asserted, although we reserve the right, that any communications you had with the judges are not -- have been waived, because although they were sued in this action, they were dismissed from this action, and they are not currently here to defend themselves.**

**So I -- do we understand each other?**

A Yes.

**Q Okay. Thank you.**

**Do you know if scorecards were used or some kind of a rating system was used by the juvenile probation department for interviewing its staff?**

A I don't know. I wasn't involved in their interviews directly.

**Q Okay. I don't know if you addressed this specifically, but you may -- you may have addressed this when you discussed paperwork.**



**Would -- who would be involved in notifying applicants that they weren't hired?**

A Human Resources normally.

**Q Okay. And the HR -- would the HR be involved in doing background checks on job applicants?**

A I'm trying to think. So they switched the process at some point, and I'm not sure when it was switched. It was before I left. They had a third-party administrator do background checks at the end.

Prior to that, HR and/or the Sheriff's Department, depending on the position, would do a background check.

**Q Were there investigations of employees who are out on workers' comp done for the legitimacy of their claims or injuries?**

A That would have been a third-party administrator.

**Q Okay. I think you started talking about your general recollection of Mr. Enos and some workplace injuries. Your recollection is that Mr. Enos was injured in workplace injuries?**

A I don't know what the first injury was. I know he was injured, came back. There was an incident that occurred with one of the larger juveniles, and I believe he was injured again.

And then that one would have -- I know the second one was actually within the office because it involved a kid that scared me personally.

**Q Okay. So you said -- I'm just describing this. You said first injury, but then you used the words "came back." What does "came back" mean?**



A I believe that was an injury -- he was injured, was working and then he got reinjured when there was an incident in the office.

**Q Okay. Do you know one way or another whether after his first injury, he went out on workers' compensation leave of any kind?**

A I don't recall. I don't know.

**Q Okay. Do you know if his first injury required that he be given light duty?**

A I don't remember. I know light duty was discussed, but I don't remember which -- timeline of events.

**Q Do you know if Mr. Enos pursued workers' compensation benefits for the first injury?**

A I do not know.

**Q And the second one?**

A I believe so.

**Q Okay. As you sit here now, though, you don't know when his FMLA kicked in or ran out; is that correct?**

A I would have assumed when he was terminated, if I remember correctly, but --

**Q Okay. In or around February of 2015?**

A Yeah.

**Q Okay. To your knowledge, when was the topic of Mr. Enos's possible separation of employment with Douglas County first considered by anyone at Douglas County?**



A That I'm aware of, it was probably right around the time he was terminated or -- well, he wasn't terminated, his employment was separated.

**Q And what prompted that?**

A There were issues with the doctor's note and his return to work. I don't remember the exact specifics.

**Q Didn't you advise Norma Santoyo that John Enos was too much of a liability to continue working at Douglas County?**

A I don't recall advising her of that. I know we had the discussion about the second injury and whether or not he could continue in the role of a peace officer, because that's what the juvenile probation officers are somewhat considered; whether he would be able to protect juveniles, other officers in the vicinity.

I do remember there was an issue with the amount of weight he could lift, and there were questions on whether or not he could comply with -- and I don't remember the acronym. There are juvenile -- basically, positions that they have to put these juveniles in.

For example, the kid that injured him was a very large kid who had mental health and other issues, and he scared everybody in the courtroom, including people with guns.

So it wasn't a light conversation that we were having.

**Q So you give this explanation in response to a question**

**about liability. What's the connection in your mind that you are giving this answer?**

A So I don't know if I would say "liability," but it's a concern of protecting our employees, protecting the public and protecting the juveniles, that once they come into juvenile detention, are basically our ward. So if anything happens to them too, we are responsible.

So liability would probably, if that was stated, is more the legal liability.

**Q Would you agree with Scott Schick's assessment of how -- how rare or how frequent the attacks -- the attack on Mr. Enos in the second workplace injury, how rare that occurrence is? Would you defer to his expertise on that?**

A I would. Well, I don't know what his expertise is --

MS. PARKS: Right. Objection, because there's lack of --

THE WITNESS: I don't know what he said. So, I'm sorry.

MS. PARKS: Because there's lack of foundation.

BY MR. GEDDES:

**Q Well, do -- to your way of thinking, would Mr. Schick be informed -- well informed on the issue?**

A He would.

**Q Okay. To your knowledge, what financial consideration or evaluation was made by anyone at Douglas County concerning the financial burden to Douglas County arising from Mr. Enos's**



**workplace injuries?**

A I don't know of any financial discussions.

**Q And that would be true with regard to his medical condition or physical limitations or workplace restrictions?**

A I don't remember -- there was nothing -- we never looked at the financials while I was there.

**Q So you were involved in communications regarding Mr. Enos, correct?**

MS. PARKS: Objection, asked and answered.

THE WITNESS: I believe so.

BY MR. GEDDES:

**Q You just don't recall specifically what those were?**

MS. PARKS: Same objection.

THE WITNESS: Correct.

BY MR. GEDDES:

**Q Okay. Are you able to recall who participants were in communications that you had regarding Mr. Enos?**

A It would have been Norma, Scott Schick and myself. I don't know who else would have been involved.

**Q So when you testified earlier that, to your recollection, the ADA wasn't implicated in Mr. Enos's case, is it fair to say, then, that you don't recall the topic of the ADA ever coming up with anyone regarding John Enos?**

A I don't recall that. We could have. I don't -- I don't recall.



**Q To your knowledge, was the topic of John Enos's rights under workers' compensation statutes ever discussed or considered by anyone?**

A I believe we did discuss those, or at least, were getting updates from our third-party administrator on those.

**Q And I think you testified to this, but I want to make sure. There was discussion about FMLA --**

A Yes.

**Q -- and Mr. Enos's rights under the FMLA, correct?**

A That's correct.

**Q Okay. Were there discussions about Mr. Enos's rights under the Douglas County code or the Douglas County personnel regulations?**

A I believe so, yes.

**Q And to your knowledge, was the topic of John Enos's rights under the Ninth Judicial District Court personnel regulations ever considered or discussed?**

A Yes.

**Q What do you recall about that?**

A We were discussing -- since this wasn't a disciplinary process, we were discussing whether or not the appeal process would apply because he was not being terminated in the traditional fashion.

There's a provision in there about absentee from work and how, after three days, you are deemed -- and this is in



both -- you are deemed to resign your position. We looked at the different provisions in both of them.

**Q Okay. And when you say it's not a disciplinary matter, what do you mean?**

A It wasn't a -- he wasn't being disciplined for, you know, insubordination or the list -- there's a list of horribles, as we always joked about, in the county code that applied to both -- to all employees about what would, you know, rise to discipline.

**Q So you are saying, then, that you looked at the court personnel rules and considered that he wouldn't be terminated if what?**

A If he returned to work.

**Q I'm sorry, if he what?**

A Returned to work.

Well, he was -- if I remember correctly, he wasn't terminated, he was separated because he failed to report to duty for three consecutive days.

**Q Okay.**

A I may be wrong, but that's my recollection of it.

**Q Does that mean that -- are you saying he failed to return to work for three days with full doctor's releases?**

A I don't know -- I don't remember the specifics, but I know that there's -- if I remember correctly, he did not return to work -- there was three days after his FMLA had expired that he

Page 110

wasn't there.
**Q But if he did return and he didn't have his full medical releases, would that have applied?**
A It depends on what the medical releases had stated and what was in the paperwork. I'm not quite sure. I don't remember.
**Q Okay. What I'm trying to get at is, is there a distinction between workers who don't return after they have been notified, hey, your FMLA is used up, you've got to return on date X -- so is there a distinction made between workers who don't show up on date X and workers who do show up on date X, but simply don't have full medical releases?**
A I don't think there's a distinction.
**Q And what's that rule based on?**
A I wouldn't -- I don't know at this point, but that's just my --
**Q And to your knowledge -- well, I'll ask that later.**
**And so the conclusion that you had was that the due process requirements of the Ninth Judicial District Court personnel regulations didn't apply to Mr. Enos?**
A The statute -- or, the rule that came into play was the failure to, you know, come to work for three consecutive days, it's deemed a resignation. And that's just how the -- both the code and the court rules provide.
**Q And so that, in your mind, obviates the due process requirements in those court personnel regulations?**

Page 111

A The court -- the due process requirements are for terminations and for disciplinary actions. It did not apply to separations, which is why -- you know, I know you talked about earlier about the do not -- the eligibility list.
That's why I don't believe that he would be deemed ineligible, because it's -- it's, basically, a resignation at that point under the county codes.
**Q Have you ever had a situation where, not just limited to the juvenile probation department, but in any department, where a worker came back, was not allowed to return to work because they didn't get full medical releases, and they were given their due process rights under -- under the department rules, the County rules, similar to the Ninth Judicial District Court personnel rules?**
A Not that I was involved in.
**Q And who was involved in that analysis that you've described when you say that you looked at the county code and the court personnel regulations? Who was involved in all of that?**
A If I spoke to anyone, it would have been Doug Ritchie.
**Q But what about on the employer -- what about the department, would you have spoken with --**
A I would have spoken to Scott Schick and Norma Santoyo.
**Q And do you recall anyone disagreeing with you?**
A No.
**Q Do you recall anyone having any concerns that you might**

Page 112

**be wrong about that?**
MS. PARKS: I'm just going to object, lacks foundation. She says she can't recall the discussions, specific discussions that she had.
THE WITNESS: I don't.
MR. GEDDES: Well, I'm entitled to ask her questions, so --
MS. PARKS: And I'll impose my objection and she can go ahead and answer.
MR. GEDDES: Yeah. So --
THE WITNESS: I don't remember those discussions.
BY MR. GEDDES:
**Q Let me take a step back.**
**You may say I don't remember the discussions. I'm entitled to try and refresh your recollection by asking a particular type of question that may jog your memory. So I just want you to know that I'm not trying to harass you or delay you in any way.**
**Okay. And when you did this research, in your mind, were you reasonably certain that you -- that this was a correct statement of the law, in your mind?**
A It was a correct statement based on the county codes and policies and procedures at the time.
**Q Okay. And let me take a step back here.**
**You're generally aware that attorneys tell clients the**

Page 113

**law is unclear, it's ambiguous, it seems like it's this, I'm not 100 percent sure.**
**In your mind, when you looked at this, were you -- were you reasonably sure about the conclusion that, for example, the due process didn't apply because he's separating and not being terminated? Were you comfortable with that, or did you have questions in your own mind about that?**
A To be perfectly honest, it was four years ago and I don't remember if I did or not.
**Q Typically -- and I'm not asking for specifics on any attorney-client communications because there may be other clients.**
**But typically, as an attorney, if you are not 100 percent certain about something or you are not -- or the law is not clear or there's ambiguity, that's something that you would commonly communicate to a client, correct?**
A Correct.
MR. GEDDES: Okay.
Can we go off the record, please.
THE VIDEOGRAPHER: We're going off the video record at approximately 11:49 a.m.
(A discussion was held off the record.)
THE VIDEOGRAPHER: We are going back on the video record at approximately 11:51 a.m.
BY MR. GEDDES:
**Q I'm going to show you what's been marked as Exhibit 5.**

**Okay. I'll represent to you that the documents that I'm showing you that have a DC in the Bates prefix, bottom right corner, are documents that were provided by Douglas County in this litigation.**

**Have you seen Exhibit 5 before?**

A I have.

**Q What is it?**

A It is the old job description for a juvenile probation officer senior.

**Q Okay. And as part of your job duties, would you ever look at these?**

A I did. We did a comp class study 2014-'15 time period and we revamped all of these.

**Q What did you -- why -- why did you revamp them, based on what?**

A We had an outside company that came and did a compensation classification study, and we looked at job descriptions to make sure they were up to date. We did it throughout the county.

**Q Okay. Do you recall whether this, the juvenile probation officer, had to be updated?**

A I believe they were.

**Q Okay. Do you recall generally what the differences were?**

A I do not remember what the differences were.



**Q Okay. Did you look at Exhibit 5 in connection with Mr. Enos regarding any matter of his employment?**

A I do not remember -- maybe. I'm not sure if I did or not.

I probably did look at it when we were discussing light duty and all of the issues that had occurred, but I don't have a an exact recollection of looking at it.

**Q Showing you what's been marked as Exhibit 6. I'll give that to you.**

**Okay. Have you seen any of those pages before?**

A Not that I can recall.

This would have gone to HR as part of a workers' compensation.

**Q Did you have any involvement with third-party administrator regarding accepting claims for workers injured on the job?**

A No.

**Q Show you what's been marked as Exhibit 7.**

**Okay. Have you seen any of the documents of Exhibit 7 before?**

A Not that I can recall.

**Q Okay. You gave some testimony earlier about a work excuse or being ordered off of work.**

**Is that the type of a document you are referring -- you've seen those types of documents before?**



A I have.

**Q And what is your understanding of what those documents do, those types of documents do?**

A These, basically, allow an employee to come back to work, or they give us direction as to whether or not they need light duty, what kind of light duty they need, that kind of thing.

**Q Okay. So if we look at Exhibit 7 and towards the middle of the first page, DC 1580, it reads "Off work until 3/10/14, may return to work as of above light duty."**

**That's the type of information that you testified earlier -- that's what HR would track when they are monitoring work excuses?**

A That is correct.

**Q Okay.**

A And they would -- so, typically, HR would get this and the department head wouldn't. So HR would, basically, sum up to the department head or director or supervisor what the employee would be coming back to and what would be required of him.

**Q Okay. Thank you.**

**Let's go to Exhibit 8.**

**Be a little careful, it's kind of a sharp, having a staple on the first page. That's marked as Exhibit 8.**

**Okay. Have you seen any of the pages of this exhibit before?**

A I have.



**Q Okay. What have you seen?**

A I have seen the police report and all of the witness statements. I don't know if I have seen the medical record that starts on page DC 005566 and goes through 5570.

And I've seen the supplement report with all the narratives.

**Q And why did -- why -- why did you see those?**

A This was the incident involving the juvenile that happened in the juvenile detention office. And since it involved employees, it was part of -- we were given this.

**Q Okay. Was it in connection with just the fact that something had happened, it was more of a security breach, or was it involving -- was it -- did it have to do with your evaluation of personnel matters concerning Mr. Enos?**

A It would have -- at the time I saw it, it was -- basically, the juvenile deputy was sitting -- was next to me in the office. And any time any of our employees were involved in -- whether it was a sheriff's department deputy getting involved with an injury with a -- subjects, I always looked at these.

And we keep a file, in case we needed them.

**Q Okay. So that was more of a security issue --**

A Correct.

**Q -- than it was dealing with a personnel issue?**

A Correct.

**Q Okay.**

A Yeah. And at the time, my wall was next to JPO, so I heard the whole thing through my wall, so -- it was also a curiosity.

**Q You heard -- you heard the attack on Mr. Enos?**

A Yes. We couldn't -- we couldn't hear words or anything, but we heard the scuffle and the --

**Q Okay.**

A -- what was going on. So it was sort of a -- everyone in the building wanted to know what was going on.

**Q Okay. Did you talk to Mr. Enos that day about the attack?**

A No. Not that I can recall.

**Q Showing you what's been marked as Exhibit 9, if you could look at this, please.**

**Okay. Have you seen any pages of those documents before?**

A No.

**Q Are you generally familiar with the types of documents?**

**For example, that first page on Exhibit 9, it reads "Notice of Injury Or Occupational Disease," and at the bottom, it says "Form C4." Are you generally aware what this form is?**

A Yes. We had this form on the county website for employees to fill out if there was a workers' comp incident.

**Q Okay. Do you know whether Mr. Enos was given light duty work in the county library as the result of either his first or**



**his second workplace injury?**

A I believe it was the first because it was prior to the grievance we received from DCSO, but I remember him working in the library.

Or, not DCSO, DCEA.

**Q Okay. All right. Can you explain that.**

A During the time of layoffs is when DCEA came to us and was objecting to light duty or any assignments that would have been taking away from, basically, a job duty from one of their employees.

**Q And that would include light duty?**

A It would include light duty.

They, basically, saw it as a competition for someone that should have been brought back to work, instead of having someone move from one department to the other.

The grievance came out of someone from the Sheriff's Office going into a DCEA position for a light duty assignment.

**Q I'm sorry. What does "DCEA" stand for?**

A DCEA is Douglas County Employees Association.

**Q And when was that grievance filed?**

A I'm trying to remember the exact time.

It was during some of our collective bargaining discussions, so probably 2014, '15.

**Q When was this -- this policy put into effect that didn't**



**allow non-DCEA members to get light duty in positions that might otherwise be held by DCEA members?**

A It would have been around the same time. And I don't know if it was necessarily a policy, it was an agreement between the County and DCEA that we would stop the practice.

**Q And so who was -- to your understanding, who was aware of this -- let me ask it more specifically.**

**Was Scott Schick aware of this agreement or policy?**

A He would have become aware when we were discussing placing Mr. Enos up at the detention center.

And I don't know if I would call it a policy. It was more of a gentlemen's agreement with the association.

**Q Okay. Were there exceptions, to your knowledge, to that agreement or policy?**

A No.

**Q So if Mr. Enos had, in fact, worked at the county library in light duty, you believe that would have occurred prior to this agreement?**

A Yes.

Prior to the complaints, we would put an employee wherever we could put them, basically.

**Q But you -- you believe that in or about February of 2015 when Mr. Enos's employment was separated, that agreement or policy was in place?**

A Yes.



**Q Okay. Now, you said Scott Schick would have been made aware. What about Norma Santoyo, would she have been made aware of this?**

A I believe she was involved in the discussion with DCEA.

**Q So is it your understanding that based on this agreement, that efforts would not have been made to look for light duty work for Mr. Enos in any position that would ordinarily be held by a DCEA employee?**

A Correct.

**Q Were you involved in the discussions that led to the agreement to stop that practice, the practice of placing workers in light duty in DCEA positions?**

A At that point, no, I was not doing the collective bargaining.

**Q Okay. So you don't know one way or another whether those discussions -- during those discussions, the issue of ADA compliance arose?**

A Correct, I wouldn't know.

This was around the same time -- traditionally, the court clerks and the Justice Court clerks were DCEA employees. Based on that case out of Sparks Justice Court, they were pulled out of DCEA and put under the court specifically.

And so there was lots of movement on who was in, who was out. The District Attorney's secretaries also were involved in that. So there was lots of maneuvering of what was going on.

Q Showing you what's been marked as Exhibit 10.
Have you seen that document before?
A I have not.
Q All right. Showing you what's been marked as Exhibit 11.
Have you seen that document before? Here's the second page of that. I apologize.
A No.
Q If an employee is on light duty, but then goes out on further workers' comp leave, maybe to get a surgery or what have you, to your understanding, do they return back to that light duty position when they return, or does a completely new process need to happen?
A New process needs to happen.
Q Is there a reason for that?
A We can't assume that they are coming back under the same conditions, so we would ask for a new doctor's note to update their -- whatever occurred.
Q And if someone is expected to undergo surgery, then from your perspective, you wouldn't presume that their current medical condition would be the same, correct?
A Correct.
Q Okay. Let's look at Exhibit -- hang on one second.
Take a look at what's been marked as Exhibit 12, please.
Have you seen that document before?



A I don't recall looking at this.
Q Okay. If we could go back to 11 for just a second, please.
Do you see here where, on this email -- it's an email between Karen Barbee and Sarah Christensen regarding John Enos's return from work comp leave.
A Uh-huh.
Q Do you see where Sarah Christensen writes "He'll be back to work light duty Monday"?
A Uh-huh.
Q And so I'm trying to reconcile that with what you said, and I might misunderstand what you said.
Would arrangements for him to be back on light duty have been made before he returned?
A I don't know.
Q Okay. But your understanding is it has to be renewed, or -- I forgot the word you used a second ago. I mean, it isn't a carryover from the prior light duty. Is that your understanding?
A That is my understanding.
Q So according to your understanding, then, Sarah Christensen would have initiated some sort of light duty inquiry and obtained it for him after he left?
A Right.
Q Okay. Now, when you would get involved in assisting HR or a department with respect to the issue you testified about,



about if your FMLA is used up and then you are given a return-to-work letter, would you, yourself, go and investigate the doctor's work excuse letters, or are you relying on the client here, the HR department or the juvenile probation department, to supply you with that information?
A They would have to supply it to me.
Q Okay. So you are assuming your information is accurate and then you work from that?
A Correct. And if it was any of the medical documentation, I would have to go over to HR to look at because this is only held in HR.
Q Okay.
A We didn't want that in our office.
Q And you -- I -- I think you said this, and -- and I just want to be clear. You don't have any specific recollection of looking at work excuse notes for Mr. Enos, correct?
A Not until the very end, no.
Q Okay. Okay. If you can please look at what's been marked as Exhibit 13.
Do you recognize any of the documents of Exhibit 13?
A Nope.
Q There's a reference in there where -- this is an email between Barbara -- between Karen Barbee and Sarah Christensen regarding Mr. Enos working while awaiting surgery.
And it states "I'm working on the D8 and he working



until the surgery."
Do you know what a D8 is?
A If I remember correctly, the D8 is the form that had the employee's salaries and the information so that the workers' compensation benefits could be calculated.
Q And do -- from your experience, was it uncommon for someone to be working, awaiting surgery?
A No. We've -- we've had that before.
Q Okay.
A Many of the employees would do that so they wouldn't have to use their leave time prior to their surgery.
Q Okay. Now, if Mr. Enos's FMLA time had expired sooner than it did, based on what you know about the meetings and what was discussed concerning him, would his employment have separated with the County sooner?
A I believe so.
Q Under the same circumstances?
A I believe so.
Q All right. After -- after the second workplace injury, people from the HR department and the juvenile probation department had a meeting about -- they had a meeting with John Enos about the issues of his workplace injury and light duty.
Is that your recollection?
A I believe so.
Q Okay. Let's look at Exhibit 14.

All right. If you could please look at Exhibit 14.
Okay. Have you seen any of the pages of Exhibit 14 before?
A I'm assuming I have, since I wrote the first email.
Q You wrote the what?
A The first email.
Q Okay. What are these pages?
A So it appears -- this is probably -- Scott would sometimes send me stuff to review and make sure the language is used correctly. So I don't know what the original statement is, but it looks like I made suggested changes to him to put in his memo to John.
Q Okay. If we look at Bates ending 96 -- I'm sorry, 97 to 00, this involves a meeting being set up to discuss John Enos's workers' compensation claim; is that -- is that correct?
A It appears so.
Q Were you involved in that meeting?
A It does not appear so.
Q And you don't have any recollection of it?
A No.
Q Okay. Then we look at 5593 to 5596.
A Uh-huh.
Q Are you able to tell what changes you made to what document after you reviewed it?
A I can't. I don't know what was attached to this.



Q Okay. If -- if we look at DC 5595 and DC 5596, 5595 says it's an email from Scott to you. And it says "For your review, Scott Schick."
And then 5596 is a three-paragraph document regarding John Enos's duty station assignment.
Does that appear to be what was attached to the email?
A It does. It looks like I made a couple of changes in the first paragraph.
Q Okay. Can you -- can you direct me to the changes you think you made?
A So instead of -- so the first sentence, "based on our conversation this morning and after evaluating our options," Scott initially had "I believe it is in your best interest to be assigned to the juvenile detention facility."
I changed that to "I'm assigning you to the juvenile detention facility."
Q Okay.
A I corrected a typo in the second sentence from "your" to "you."
And then all I did was -- and so the first paragraph, I changed that second sentence to more of a direct -- direction, but "you will be working in the correctional programming," instead of "you are encouraged to work in the correctional program."
And it looks like the rest is the exact same.
Q I'm sorry, where was the typo that you -- I didn't catch



that.
A So instead of "your," it should have been "you."
Q And where was it in the second paragraph?
A The second sentence in the first paragraph, Scott had "your are encouraged," instead of "you are encouraged," but I changed that sentence as well.
Q Oh, I see. I see.
A So that first paragraph is the only one I changed.
Q Okay. So the changes you made, if I'm understanding you, is this is more of a command than it is a suggestion?
A Correct.
Q Okay. And do you know what -- which version was ultimately sent out?
A I have no idea.
Q Okay. Did you -- do you recall having any follow-up with Scott on this?
A No.
Q Did you -- when you made your suggestions, did you have a conversation with him and try to find out where he was coming from to make these changes, or you just made them by yourself and emailed them back?
A I'm assuming -- if I didn't have access to WordPerfect, I was probably in the Tahoe office. So I'm assuming I just sent them by email and didn't have a conversation with him.
Q Okay.



A That I also was out of the office that day.
Q Okay.
A The County still used WordPerfect, and I used Word on my personal laptop. So --
Q I think, in time, you won out.
Okay. I'm showing you what has been marked as Exhibit 15.
Okay. Have you seen Exhibit 15 before?
A No.
Q Okay.
A Other than it's almost the same verbiage.
Q Okay. It appears that the recommended changes you made, paragraph 1, were not incorporated in what's been marked as Exhibit 15. Is that correct?
A Correct. It looks like Scott sent me the email for review and sent this one on July 17th, and I sent my corrected changes on July 18th, so after he had already sent it out.
MR. GEDDES: Okay.
Okay. We can go off the record, please.
THE VIDEOGRAPHER: We're going off the video record at 12:22 p.m.
(A recess was taken.)
THE VIDEOGRAPHER: We're going back on the video record, at 1:01 p.m.
///

BY MR. GEDDES:
Q Okay. We took a lunch break, but you understand you are still testifying under oath?
A I do.
Q Okay. So I'm going to show you what's been marked as Exhibit 16, if you can take a look at that, please.
Okay. Have you seen Exhibit 16 before?
A No.
Q Okay. Oh, I'm sorry. Thank you.
Showing you what's been marked as Exhibit 17. Here is the divider page.
Have you seen this document before?
A Not that I recall.
Q Okay. This is an email between Karen Barbee and Sarah Christensen, dated January 20th, 2018, regarding Mr. Enos, when he could be evaluated to perform his job duties.
And Sarah Christensen writes to Karen Barbee, "Hi Karen, John has exhausted his FMLA. We are looking for information on where he is in the workers' comp process, when he might be evaluated to see if he will be able to perform his job duties or not."
And Sarah writes back, later that day, "Hi Sarah, I would prefer to give you a better estimate after we receive Dr. Morales' report. If he has shoulder surgery, it will probably be six more months at the least, unless the County has light duty



for him. Right now, he is TTD for the wrist."
So it appears from the bottom of this page with Sarah Christensen's remarks that John Enos had exhausted his FMLA on or about January 20th.
Do you have any information about extending John's employment beyond January 20th, if his FMLA had exhausted at or about that time?
A I don't know exactly when it exhausted or -- I wasn't involved in any extension, so I -- it would be speculative on my part right now.
Q Okay. And I'm definitely not trying to put words in your mouth, but didn't you testify along the lines of, if a person went beyond their FMLA, that was it, they couldn't be carried further, according to policy?
I'm not sure exactly how you phrased it, but --
A That's how we typically treated it. My understanding was John's FMLA expired around the time of his termination in February --
Q Okay.
A -- so I don't know what this is.
Q But if it, in fact, expired on or about January 20th, 21st, doesn't it seem here that Sarah Christensen is looking to find out how much longer it will be before he can come back to work without medical restrictions?
A I can't guess as what she's looking for, but what's on



the paper, so I can't really give more to that.
Q Okay. And do you recall anyone by the name of Dr. Morales in connection with Mr. Enos?
A I know there were competing doctors' notes at the end. I don't know if Dr. Morales was one of them or not, so I don't recall that name.
Q Do you know what "TTD" means?
A It's part of the disability -- so it's part of the workers' comp language. I don't know the exact -- what it actually stands for, other than it's the payment for his wrist. So it appears that he was out for the wrist injury.
Q Okay. Did you direct Karen Barbee -- I'm sorry. Did you direct Sarah Christensen to make this inquiry of Karen Barbee?
A No.
Q Do you know who, if anyone, did?
A It would have been Norma or on Sarah's own behalf.
Q And that's based on just how things were typically handled?
A Yeah. I did not get involved in workers' comp at all.
Q Okay. Thank you.
To your knowledge, what is the longest you personally saw an example of while you worked there of a person being able to come back to work after their FMLA expired?
A I have only seen -- I don't know if anyone -- I can't think off the top of the head anyone that went past maybe a week



at most.
Q Okay.
A And there was always questions because the FMLA recounts every 12 months, so it was a lot of calculation. We would always err on the side of giving the employee more time.
Q Okay. So that was about a week?
A Possibly.
Q All right. Let's look at -- if we can, please, go back to Exhibit 5.
All right. Do you know if any evaluation was done of how frequently a juvenile probation officer or senior juvenile probation officer actually performed the duties listed in Exhibit 5?
A I do not, no.
Q Okay. When you said that the job descriptions were changed, what -- was it based on any form of information questionnaire that may have been filled out by the workers themselves?
A Yes. So in the comp class, when they did the third-party administrator, they came in and did -- I'm trying to remember how they did it. They just -- I know I had a questionnaire and filled out what our general -- just specific job duties were.
They looked at what the current job duties were, what the actual job duties were.

Part of it was also our compensation study. So they looked what other -- we talked about which county and cities to look at. So they looked at compensation elsewhere and what other JP officers were doing in the area.

And I believe every employee should have been given at least some sort of survey.

**Q Okay. And was the information that came back as to what the workers actually were doing, rather than what was described, was the job description typically amended to reflect that?**

A For the most part, yes. It just depended, because you can't -- one, for the example that -- civil DAs, you can't say, oh, you do HR and you do this. So it was more of a generic overview.

But yes, they were -- my understanding is most of them were amended.

**Q Okay. And when evaluating whether someone could perform their job duties, would it be important to take a look at what they're actually doing, rather than what's described on a piece of paper?**

A We always went off what was described on a piece of paper. Sometimes, what they were actually doing had changed over the years, and that's why we went through the comp class study to make sure it was consistent.

**Q All right. I'll show you what's been marked as Exhibit 18. Please look at that.**



**Okay. Have you seen this particular document before?**

A This one, no.

**Q Have you seen a position description questionnaire similar to this before?**

A This is part of the comp class study.

**Q Okay. And if I could direct your attention to Bates-stamped PLF 3214, do you see where it asks "How much weight are you required to manually lift at any one time?" and the answer given is 50 pounds?**

A Correct.

**Q And do you see where it asks "Is the lifting done regularly?" and the answer is given, "no"?**

A Correct.

**Q Do you see where it asks "How much weight are you required to manually carry at any one time?" and the answer given is 50 pounds?**

A Correct.

**Q And do you see where it asks "Is the carrying done regularly?" and the answer is given, "no"?**

A Yes.

**Q Do you know whether or not the job description was amended to reflect anything about the weight that was carried?**

A You would have to look at the new job description. I don't know.

**Q Okay. Are you familiar with the idea of core functions**



**and non-core functions in describing job duties?**

A Yes.

**Q What is your understanding of that?**

A Core functions are duties that are done on a routine basis. For example, a legal secretary, you are expected to type.

Non-core functions would be something that you would still be expected to do, but not as routinely, that may come up.

**Q I'm showing you what's been marked as Exhibit 19, if you could look at that, please. Oh, sorry, here's the divider page.**

**Okay. Have you seen this document before?**

A I may have.

**Q Okay.**

**All right. According to the standard procedure that you discussed already, this document would ordinarily be interpreted by HR to mean that as of January 28th, 2015, David Eisenhauer -- Dr. Eisenhauer was saying that Mr. Enos could return to work that day -- I'm sorry, could return to work on January 29th, 2015, to light duty for three weeks.**

**And it described what that light duty would be, lift less than 18 pounds with right upper extremity, and that below, where it reads "Other," Dr. Eisenhauer was saying he could return to full duty in approximately three weeks.**

**Is that a -- is that a fair statement?**

A That's what it says.

**Q Okay. And according to the practice, as you understood**



**it, that would be tracked by HR, correct?**

A Correct.

**Q Okay. Do you recall being involved in any discussions with anyone about the matters raised in this exhibit?**

A I do. I believe there were two competing doctors' notes that we received within a very short time frame of each other, if I remember correctly.

**Q Okay. Anything other than that?**

A No.

**Q Okay. So I'll represent to you that three weeks after January 29th, 2015, is February 18th, 2015.**

**Would -- to your understanding, would that calendar date be tracked by someone in HR as a return date?**

A You would have to ask HR exactly how they track those.

**Q Okay. What we've got here is, we've got two separate return-to-work dates, if you will.**

**The first return-to-work date has January 29th, 2015, under light duty and then full duty in approximately three weeks after that, which I'm representing to you is February 18th, 2015.**

**My question to you is, was it unusual for these sort of dual tracks to be listed in work excuses to your way of understanding? Did you deal with this before?**

A Not really. I only dealt with it when it was raised to me, so it would be something you would have to ask HR.

**Q Okay. But your understanding is they would have --**

they -- they would have tracked both?
A I believe so --
Q Okay.
A -- but you would have to ask Sarah or someone in HR.
And it's hard because it's approximate three weeks, it's not an actual date to come back.
Q But it's fair to say that the -- according to its standard practices, the HR department had -- would have had the expectation that he might have returned to full duty within three weeks?
MS. PARKS: Objection, calls for speculation.
THE WITNESS: That would be my guess. I would assume that they would actually require a note at that time as well.
BY MR. GEDDES:
Q Okay. Do you know whether Mr. Enos was invited to return to work on or about January 29th for three weeks under light -- light duty?
A I don't know. I don't remember.
Q Did you give any legal advice regarding that particular issue?
A I don't remember if I did or not.
Q Do you know whether Mr. Enos tried to return to work after this doctor's order was written on January 28 to return to light duty?
A I don't -- I don't know. I don't recall.



Q Do you recall a conversation with Ms. Sauer-Lamb that Mr. Enos contacted her on or about January 28th to -- to inform her of his doctor's release back to light duty?
A I don't recall that conversation.
Q Do you recall Mr. Enos requesting to return to light duty at the county library at or about that time?
A I know it came up. I don't know if it was that time or not, but yes, I do remember that being raised again.
Q What do you -- what specifically do you recall?
A I recall the request, I recall the discussion about the DCEA issues, and then I also -- because of the competing doctors' notes, one of the doctor's notes, I believe, didn't have him lifting -- it would have -- we didn't have a position for him and we weren't going to create a separate position, since it wasn't required under the law.
Q What was Scott Schick's involvement in that?
A I'm assuming he was there, I just don't know exactly what his involvement would have been.
Q What about Vicky Sauer-Lamb, do you recall any specific involvement by her?
A I don't.
Q Any involvement by Judge Young or Judge Gibbons on that issue?
A Not that I recall.
Q And Norma Santoyo, what about her?



A Her, I was probably talking to Norma.
Q Wendy Lang involved?
A I'm not sure. The doctor's notes would have gone through them, so --
Q Did someone order Mr. Enos's key card to the office building to be deactivated or discontinued prior to his separation of employment?
A I don't know.
Q To your knowledge, who was authorized to activate -- or, I'm sorry, deactivate or discontinue a senior juvenile probation officer's key card in or around that time frame of January and February of 2015?
A It would have had to have been one of the judges, Scott Schick, or Human Resources had -- Human Resources would control the key card. Essentially, they are the ones that would activate, deactivate and issue them.
Q But they wouldn't do that on their own, they would require some direction from the judges or Scott Schick?
A Correct.
Q I'll show you what's been marked as Exhibit 20, if you can please look at that.
Okay. Have you seen this document before?
A I have not.
Q Do you recognize the handwriting in this document?
A I do not.



Q Okay. I'll represent to you that Sarah Christensen testified that she wrote this. And she writes, on January 30th, 2015 -- one second -- "left message for John, 1/30/2015. Told him we had no work that could accommodate his doctor's notes."
Do you recall having any conversations with -- with Sarah Christensen about that matter?
A The doctor's notes?
Q About her leaving a message for John, 1/30/15, "told him we had no work that could accommodate his doctor's notes."
A Not that I recall.
Q Okay. Did you have a conversation with anyone about that particular sentence?
A We did have conversations about the competing doctors' notes. We did have conversations about not being able to accommodate because of the competing doctors' notes, but I'm not sure if Sarah was in those conversations or not. I know Norma was.
Q Now, is it your understanding, then, based on what you are saying, that telling him we had no work that could accommodate his doctor's notes is saying, hey, look, you've got competing doctors' notes, we're not even going to try to find you work, or we looked for work and couldn't find you -- find it?
Do you know one way or another what -- what you are referring to here?
A I do not, no.

**Q So it's possible that a search for light duty was not initiated because of competing doctors' notes?**
A I know we had discussion over the doctors' notes because one had a certain amount he could lift. The other one, I believe, said he couldn't lift anything.
We had discussion over which doctor's note trumps the other.
I know that they had -- we had discussed accommodating him, but I'm not sure -- that's about the extent of my involvement.
**Q Now, when you say we discussed accommodating him, you mean giving him light duty?**
A Yeah, trying to see if there was a place to put him for light duty.
**Q But you are not sure if that search was ever done; is that correct?**
A I know we had conversations about possibilities, but I don't know -- you know, it's -- there wasn't a lot of options at that point.
**Q Well, I guess my specific question is, you don't know one way or another whether a search for light duty was actually initiated in January of 2015?**
A I could assume by our conversations that they were going to, but I can't guarantee it was done.
**Q Okay. Was there, to your recollection, consideration as**



**to whether or not -- for the duties in his job description that he might not be able to do based on medical restrictions, that he might be able to have assistance, some kind of assistance from the employer, either by other workers or something, to allow him to -- to return to work?**
A I'm trying to remember. We did have discussions about the physical requirements under the job description, including the POST certification, because you have to be able to physically restrain these kids.
I'm trying to remember -- I don't know if they were required.
So there's a program called JIRA (phonetic spelling) that the China Springs Youth employees had to go through and were trained on every year. And it required taking kids down, holding them. It's just part of that physicality.
There were some discussion on whether or not, you know, that could be accommodated and -- or not, since it was such a core function of being a JPO officer.
**Q Who had that -- that -- when was that conversation?**
A It was during the course of this whole thing. I can't tell you exactly when, but it was part of the conversations we had towards the end about accommodating -- not accommodating -- whether or not we had a place for him, how long to keep the position open, that kind of thing.
**Q Do you know how long that conversation was?**



A I don't remember. It's probably the same time frame as that liability comment that -- from Norma that you mentioned earlier today.
**Q Well --**
A It would have been part of that conversation.
**Q Do you recall whether or not Scott Schick had a perspective on that?**
A I don't remember if he did or not.
**Q Are you aware of a conversation between Vicky Sauer-Lamb and Mr. Enos concerning calling for assistance if an altercation were to arise?**
A I don't know anything about that.
**Q And was the -- was a discussion had as to whether or not placement in the detention center, as you talked about earlier, presented a risk of altercation to Mr. Enos?**
A I know we had the discussion about the detention center and how it was staffed. It is next to the jail, but it would be -- it's a separate -- or, it would have less of a -- I don't know.
At the time, we were less concerned about altercations there than we were elsewhere.
**Q Are you saying the conversation was had that with respect to the detention center placement that you testified to earlier, the issue of whether or not an altercation risk was presented by John Enos being staffed there was discussed?**



A I believe so, but I'm not sure. I know it's in the email that you showed me from Scott Schick about altercation and making sure there was backup.
So it was at least part of that email chain.
**Q Do you know what duties Mr. Enos was expected to perform if placed into the detention center, as you referred to earlier?**
A I do not know what the exact duties were. It looked like it was going to be a programming type position.
**Q Was it discussed that Mr. Enos was put in a position of potential altercation after his first workplace injury with his limitations arising from that, which led to his second workplace injury involving the altercation?**
A Can you repeat that again.
MR. GEDDES: Probably not.
Could you please read that back.
(The question was read by the reporter.)
THE WITNESS: I don't know if we discussed that or not.
My understanding is, after his first workplace injury, he was released to full duty at some point or was on light duty.
I know there were discussions about the second altercation and whether or not Mr. Enos had stepped in appropriately in that altercation between the two juveniles.
I know there were some questions arising as to what caused it, whether or not he should have been involved in the middle of that as well. So there was all sorts of conversations

about that, but --
BY MR. GEDDES:
**Q Do you recall any conversation that stated that Mr. Enos had -- was expected to have surgery for -- a salvage surgery for a pin in his wrist, a problem with that?**
A I know he had a wrist injury. I just -- I don't know the full conversations or what surrounded that.
**Q Now, are the job -- are the job requirements for Vicky Sauer-Lamb's job different than the senior juvenile probation officer?**
A I would have to look at the job descriptions. I know she still had to be POST certified and have the physical -- there's portions of that in there.
But she was not really a day-to-day. She wasn't out in the field. She wasn't really writing the reports. She was reviewing the reports that went to court. So she was more of a manager, in-house manager instead of a working-in-the-field JPO officer.
**Q And her position presented less of a risk of an altercation than someone who is doing work out in the field; is that correct?**
A Yes.
MS. PARKS: Objection -- objection, calls for speculation.
MR. GEDDES: Did you get her answer?



THE REPORTER: Yes.
MR. GEDDES: Thank you.
BY MR. GEDDES:
**Q What do you base that on?**
A Her position was mainly in the office in the -- rarely was she left alone with juveniles in her office. They would have been supervised by one of the other employees or a secretary or Scott Schick.
Whereas, the other JPO officers are out in the field, meeting with kids, going to schools. They would have to drive them to and from court sometimes. So there was a different level of direct contact with the juveniles.
**Q And you base that on your personal observation?**
A Yes.
**Q Based on your experience working at Douglas County, were there circumstances that sometimes led to a key card of an employee being discontinued prior to the time when that employee was actually separated from employment?**
A There weren't a lot of -- so the only buildings that had key cards would have been the courthouse, and, I think, Minden Inn, you could get in with a key card.
Most of the other buildings did not have that. They would have a key that you can get in and out of.
It would be security issues whether they were coming in after hours when they weren't supposed to -- the key card would



log us in when we were coming in and out of the building -- if an employee was, you know, considered a security risk, basically.
**Q Otherwise, to your -- to your experience, their key card would be discontinued when they separated from employment?**
A Yes.
**Q Do you have any information one way or another whether -- well, let me rephrase that.**
**To your knowledge, did anyone -- did you or anyone consider Mr. Enos a security risk?**
A I don't think so.
**Q Did Mr. Enos contact someone at the HR department on January 29th, 2015, to try to return to work?**
A I don't know.
**Q You talked about competing doctors' notes. Did someone from HR tell Mr. Enos on or about January 29th, 2015, that although Dr. Eisenhauer had released Mr. Enos, a different doctor for Mr. Enos named Dr. Morales issued an order for light duty?**
A I don't know about the conversation.
**Q Do you have any information about these matters?**
A I just know that there were two doctors' notes, is all I remember.
**Q So to your recollection, who directed HR to tell Mr. Enos that he could not be accommodated or provided with light duty?**
A It would have been a final discussion between



Scott Schick, myself and HR, but no one would really direct them.
**Q Well, if he told you one thing and -- I'm sorry. If you told him your recommended course of action, he was free to agree or disagree with you, correct?**
A Correct.
**Q And so, ultimately, Scott Schick would be instructing the HR as to how to handle these matters with Mr. Enos. Is that your understanding?**
A That's how it traditionally is handled.
**Q But you don't have any specific information as to whether he actually did that?**
A I'm assuming he did. I'm not sure.
**Q Do you know whether Mr. Enos was instructed to return to work with a full medical release on February 17th, 2015, at 8:00 a.m.?**
A I don't recall the exact date, but I remember the discussion about that.
**Q And what prompted that discussion?**
A The end of his FMLA.
**Q And you advised Scott Schick and Norma Santoyo on these matters, correct?**
MS. PARKS: Objection, asked and answered.
THE WITNESS: We discussed them, yes.
BY MR. GEDDES:
**Q Well, the reason why I ask this is, you can discuss it**

on the one hand or you can recommend it as legal advice.
Do you recall one way or another whether you actually gave them the legal advice to require Mr. Enos to return to work with a full medical release or face separation of employment?
A I'm assuming it was legal advice, but it's been -- I can't tell you the exact conversation.
Q So if they testify, "they" being Scott Schick and Norma Santoyo or any of them, testify at trial that you gave them that legal advice and they relied on it, you are not in a position to disagree with that as you sit here now?
A Correct.
Q Isn't it true that on February 13th, 2015, Mr. Enos was expected to undergo surgery five days later on February 18th, 2015?
A I have no idea.
Q To your knowledge, did anyone at the DA's Office have that understanding or expectation?
A Unless it was documented to us, I can't tell you whether it was or not.
Q Okay. What about Scott Schick, same question.
A I have no idea what he would know.
Q And Vicky Sauer-Lamb?
A No clue.
Q Norma Santoyo?
A Unless it was documented, I don't know.



Q Okay. On February 5th, 2015, you attended a meeting with Norma Santoyo, Scott Schick and/or Sarah Christensen to discuss John Enos's employment status; is that correct?
A I don't know about the date. I probably met with them, yes.
Q And pursuant to that meeting, it was decided that John Enos would be ordered to return to work by a certain deadline with full medical releases or face separation of employment. Is that your recollection of that meeting?
A I'm not -- I'm assuming it was, but I'm not sure, for sure.
Q Do you recall when -- where that meeting was?
A My assumption would be HR or JPO, but I'm not sure.
MS. PARKS: And he's only entitled to what you recall.
THE WITNESS: I don't know.
BY MR. GEDDES:
Q I'm showing you what's been marked as Exhibit 41,if you could please look at this document. Thank you.
Okay. You've seen some or all of the emails in this email thread, correct?
A Yes.
Q Okay. What's this about?
A It appears Norma sent a -- set a meeting for February 5th at 3:30.
Q Well, the meeting was sent for February 10th, wasn't it?



A Oh, yes, February 10th.
Q Okay. And what we can do there is look at DCO 5536. And at the bottom of that is an original appointment from Norma Santoyo sent on February 5th, 2015.
The subject reads "John Enos next steps." And then the appointment was set for Tuesday, February 10th, 2015, from 3:30 to 4:30. Is that correct?
A Correct.
Q And "Where" is listed as Minden Inn, Room 104?
A Correct.
Q What is Room 104, do you know?
A HR. It's the room adjacent to -- it's a conference room, but it's adjacent to HR, so it's the room they typically use.
Q What's the significance of the words "sensitivity, private"?
A On our Outlook calendars, if we did not put "private," other people that had access to our calendars could see what the topic was.
Q Okay. So there -- why -- why is there an effort to make it private here?
A Because it's an HR matter. So if my secretary or one of the -- all of the attorneys had access to my calendar. They would just see that I had a meeting with Norma and not see what the subject was.



Q And the sentence that reads or the phrase that reads "meeting to discuss John's employment status," what does that mean?
A I don't know, probably the issue that was going on with the competing notes and FMLA.
Q But you are not sure?
A Not sure.
Q Now, the -- the words "and next steps," does that have any significance to you?
A No.
Q And so at the top of DCO 5536, you wrote back to the other parties of this email thread that same day, informing them that you had a hearing scheduled at 2 o'clock on February 10th, but expected the hearing to be done by the scheduled appointment time of 3:30.
Is that correct?
A That's correct.
Q And then if we turn to 5533, a couple of pages before that, there's an email exchange where Norma Santoyo wrote to you that same day, February 5th, 2015, asking if it's better to reschedule the meeting so that you can make sure to attend.
That's right?
A Correct.
Q And then you responded the following day, following morning, stating, "No, I should be done, but it's just going to

depend on if Judge Young has gotten through the other cases earlier in the day or not. He has a large calendar."
So do you recall -- does this refresh your recollection, is this the meeting that you were referring to when you -- you testified shortly ago that there was some discussion about this?
A I believe so.
Q Okay. Do you recall actually attending this meeting?
A I -- I know we had a meeting. I don't know if it was that day or if we had to reschedule.
Q The meeting that you recall, who attended that meeting?
A It would have been Norma and at least Scott Schick. I don't believe anyone else was there. They could have been, though.
Q Okay. Do you recall what, if any, legal advice you gave at that meeting?
A I know we discussed the competing notes. I know we discussed FMLA. We discussed the inability to have a position -- we didn't have position for him, so, basically, everything that led up to the final -- finality of what was going on.
Q And what informed your conclusion that there was no position available for him?
A Based on my recollection, there was no position available, but I'm not sure exactly what -- that would have came from HR.
Q Okay.



A That wasn't my role.
Q So you are not sure what job search was -- was done, you just recall generally that was the discussion?
A Yes, and I -- I think I testified to that. That's -- that wasn't my role.
Q Was there a discussion at that meeting that Mr. Enos might have due process rights if he wanted to return to work, but could not do so with full medical releases?
A I don't know.
Q Was there a discussion at that meeting that an improper separation of employment of Mr. Enos in this regard, that you were discussing, might subject the County or the NJDC -- I'm referring to the Ninth Judicial District Court -- to liability under 42 USC Section 1983 for due process violations?
A I don't know.
Q At the time, were you familiar with 42 USC Section 1983?
A Yes.
Q What was the basis of your knowledge of Section 1983?
MS. PARKS: Objection, relevance.
THE WITNESS: Numerous CLEs, we would discuss it in context. It wasn't my area of expertise, so one of the other attorneys or outside counsel would handle those cases.
BY MR. GEDDES:
Q Would you typically advise HR on matters of Section 1983 claims in your involvement dealing with HR matters?



MS. PARKS: Objection, relevance.
THE WITNESS: We would discuss due process, but it wasn't ever to the extent of 1983 claims, no.
BY MR. GEDDES:
Q Who first suggested the idea that if Mr. Enos could not return to work with a full medical release by a certain date, he could be deemed to have an unauthorized absence, subjecting him to separation of employment?
A I don't know.
Q Was the issue considered of what to do if Mr. Enos attempted to return to work by the deadline imposed, but without a full medical release?
A I don't know.
Q Do you know one way or another whether Mr. Enos communicated to anyone at HR that he wanted to keep his job?
A I don't know.
Q I'll show you what's been marked as Exhibit 21. Look at that, please.
Have you seen this document before?
A I remember it.
Q What do you recall?
A So this is one of the form documents that HR uses. And I remember getting this as part of the -- you know, the emails that would come to me -- or, the documents that would come to me in this case.



Q Now, Norma Santoyo wrote this document?
A She signed it. It's a form -- so this was one based off of a form document that they used for FMLA cases.
She probably filled in all the blanks and dates, is my assumption.
Q Do you know who directed her to write this letter?
A I'm assuming she did on her own because his FMLA was up.
Q Why is she CCing you, do you know?
A Because of, I'm assuming, the discussions we had. This would have been February 13th. She would CC Scott Schick.
Any time an employee was coming to a potential termination or separation, the DA's Office was always notified.
Q Was there the expectation by anyone, to your knowledge, that on this date, February 13th, 2015, anyone had an expectation that Mr. Enos could return to work with full medical releases by that deadline?
A I don't know.
Q Would you agree with me that if this letter, which expects him back on February 17th, 2015 -- if, at the time this was written, it was known by people that he had a scheduled surgery for February 18th, 2015, that it wasn't likely that he would be able to meet this deadline?
A I don't have the information to guess on that.
Q Well, let's stick with you then, rather than other people.

**If you knew that Mr. Enos had a scheduled surgery on February 18th, 2015, your opinion would be that it's not likely that he would be able to return to work a day before that surgery with full medical releases, correct?**
A Correct. I would assume that he wouldn't be able to. But I would also assume he would probably contact HR and discuss it with them.
**Q Now -- excuse me one second. I'll try to do something with my computer here.**
**Let's look at the third paragraph of this letter. It says "Please note that any absence beyond February 17th, 2015, will be deemed an unauthorized absence pursuant to Douglas County Code 2.02.080 and may subject you to automatic separation or disciplinary action up to and including termination."**
**What does that mean?**
A Under the Douglas County code, unauthorized absences is a -- a violation of the list of horribles. However, there's also provisions in Douglas County code and in the court rules that three days of unauthorized absence is deemed an automatic separation from the County.
**Q And what about the language that reads "and may subject you to disciplinary action up to and including termination," what does that language mean?**
A So if you missed one -- one day of unauthorized absence would traditionally lead to disciplinary action, one or two days.



Three days is the automatic separation.
**Q So how does one -- what type of disciplinary action does one or two days trigger?**
A Depends on the employee and their disciplinary history.
**Q Are you able to give me any example?**
A I can give an example of a secretary in our office who would repeatedly have unauthorized absences. The first few times would have been -- we would go verbal, written, suspension and then a termination.
**Q So if an employee has missed Day 1, no-call/no-show -- what does "no-call/no-show" mean?**
A I would have -- basically, you didn't show -- it's an unauthorized absence. You didn't come to work, you didn't let anyone know.
And it could be anywhere from a verbal warning -- normally, that would rise to a written or a suspension at that point.
**Q So --**
A It would -- it would actually depend on the employee. I know some department heads would want the unauthorized absence to be considered a, you know, unpaid day. Others would allow employees to fill in with vacation or sick. It just depended on the situation.
**Q So if Mr. Enos didn't return with full medical releases by February 17th, 2015, then February 17th, 2015, would be**



**considered Day 1 of unauthorized --**
A Yes.
**Q -- absence?**
**And that could have subjected him to disciplinary action up to -- including termination?**
A Potentially.
**Q I'll represent to you that February 13 is a Friday before a three-day weekend. February 16th, 2015, was President's Day.**
**That means this letter gave Mr. Enos an ultimatum on Friday, Friday afternoon, to return to work the next business day, which would be Tuesday, February 17th, 2015, at 8:00 a.m., with full medical releases in hand by 8:00 a.m., or he would be subjected to automatic separation or disciplinary action up to and including termination; is that correct?**
A I don't -- I think that would be a conclusion. I don't believe he would have been -- not automatic separation or discipline if he showed up at 8:00 a.m. I don't --
**Q Well, if he didn't have full medical releases?**
A I think you are trying -- I don't know. I just -- it would be a conclusion. It would depend on what happened that morning.
**Q Okay. But he would -- he would face the -- he would be subjected to it. Meaning, it could be disciplinary action or subjected to automatic separation. It doesn't mean it necessarily**



**would happen that day, but the letter says --**
A Well, the automatic separation wouldn't happen unless there were three unauthorized absences. So the way this is written is horrible.
But the way the county code is written, the automatic separation would only be after three unauthorized consecutive absences.
This sort of lumps it both together.
**Q Okay. So February 17th would be Day 1, unauthorized --**
A Correct.
**Q -- without a full medical release, correct?**
A Correct.
**Q February 18th would be Day 2 of an unauthorized -- let me use the exact words.**
**Well, unauthorized absence Day 2 would be February 19th. And then February -- I don't know if I said 18th or 19th, but I meant to say February 18th is Day 2.**
**And February 19th would be the third day of unauthorized absence without a medical release?**
A Correct.
**Q And would that be considered -- it could be either automatic separation or disciplinary action up to and including termination, correct?**
A So the way the county code -- and I would have to look at it again -- is written and the way the court rules are written

is, the third day is an automatic separation. So it's separate and aside from disciplinary action.

**Q And so if somebody called -- or, somebody showed up to work on the 17th, the 18th and the 19th and said I'm here, I'm ready, willing and able to work, I don't have my full medical releases, that person would -- according to your logic, would have no appeal rights; whereas, if someone who was a no-call/no show, they would be terminated, they might have appeal rights.**

**Is that -- is that the logic here?**

A It would be -- it's the way the county code is written.

**Q Well, I mean, your position is that if he shows up February 17th, 18th, and 19th, wants to work, doesn't have the full medical releases, he is no longer given a choice in the matter, he's automatically separated. Is that correct?**

A Whether or not the medical releases -- well, whether he shows up or not, three consecutive days is considered an automatic separation --

**Q Right.**

A -- under the county code.

**Q Even if he doesn't want to be separated?**

A Correct.

**Q And your understanding is that doesn't invoke appeal rights, due process rights, that someone who is no-call/no-show might have, correct?**

A If you are a no-call/no-show for one day, the likelihood



of being terminated is slim to none, but you would have appeal rights because it would be a disciplinary action.

The distinction is made and the county code has the three-day automatic separation language, and it's separate and aside from disciplinary action.

**Q So what disciplinary action would he face if he showed up on the 17th, 18th and 19th and said I'm ready, willing and able to work, I don't have my full medical releases?**

A He wasn't -- he wasn't -- my understanding is he actually wasn't given any disciplinary action for that.

**Q Well, what did he -- what disciplinary action did he face, was the potential for?**

A I don't believe -- I don't know. Other than unauthorized absences, I don't know if there was any disciplinary action. That's why I get so confused.

**Q I mean, why put it in the letter?**

A You would have to ask Norma because she's the one -- it's her letter.

**Q You didn't have any input in the writing of this letter?**

A No. Not that I recall.

**Q So --**

A This is traditional -- so this would be -- the automatic separation is different, but the "disciplinary action up to and including termination" is language we always use. So that was just traditional language we used.



**Q Douglas County code is cited here, but shouldn't the Ninth Judicial District Court regulations be cited?**

A It should be both because I believe it's the same.

**Q Now, if he provided a full medical release from one doctor on the 17th and a medical release from the other doctor on the 18th, would that subject him to unauthorized absence -- would he be deemed unauthorizedly absent for that first day, since he only put in one medical release, not both?**

A I don't know. It would be speculation, but I don't know.

**Q And the medical release -- what is meant by "full medical release"?**

A A full medical release, I'm assuming it would be a medical release that allows him to return to work.

**Q Well, if one medical release says, from one doctor, full medical release, and the other doctor says medical release with these restrictions, but the restrictions were lessened such that his lifting requirements complied with the job duty description, would that be considered an appropriate medical release to allow him to return to work?**

A I -- possibly. I'm not sure.

**Q Do you recall giving any legal advice on that one way or another?**

A I do not.

**Q And do you know why this notice on the 13th gave such**



**little notice to return on the 17th with medical releases, keeping in mind that Monday is a holiday, so it's not likely medical offices are going to be open in time for him to obtain that?**

MS. PARKS: Objection, lack of foundation, calls for speculation.

BY MR. GEDDES:

**Q Well, let's -- let's ask it in a way that is more sound.**

**February 13th was a Friday. I'll just represent to you that it was.**

A Okay.

**Q I'll also represent to you, as I already have, that the Monday was a holiday and that he was being ordered to come back that Tuesday.**

**Would you agree that this gave him short notice?**

A I'm assuming so. I don't know what time on February 13th he was given the notice. If it was in person or not, I don't -- I can't tell.

**Q If it was delivered to his home in the afternoon of the 13th, would that be, in your estimation, short notice?**

A Potentially.

**Q And if he did not receive any prior communication of that sort of lead-up warning that you talked about, hey, your FMLA is expiring, you know, got to work it out with us, and all he received was this, that would -- that would make it more problematic for him, wouldn't it?**

Page 166

A Potentially.
Q And --
A But my understanding is, when you get the FMLA paperwork, it actually has your -- our expiration date, or at least mine did, and so he would have had the notice of when his 12 weeks were up.
Q But wouldn't -- didn't you say that that was always -- the calculation was a moving target and it was changing over time?
A It depended on if -- what -- when -- so you have 12 weeks a year. And in this case, it appeared that it wouldn't have been a moving target because he went out on October 21st.
So it's not like he had six months, took two weeks and then came back six months later and took another ten weeks.
Q But -- but it's not clear, when he went out on October, how much time of his FMLA leave he had, because hadn't he already been out previous to that?
A He would have been out in 2013, if I remember correctly.
Q And so this letter written on February 13th stating that his FMLA leave had expired effective January 21st, if -- if a letter wasn't sent prior to the expiration, that would be something that wasn't ordinary and usual according to the standard practice, correct?
A Correct. Normally, they wouldn't get an extra month, which he was given.
Q And normally, notice would have gone out before the

Page 167

expiration, correct?
A Normally, yes.
Q Do you know why it wasn't?
A I'm assuming workers' comp, but I'm not sure.
Q What does that mean?
A He was out on a workers' comp claim, which, normally, our FMLA individuals were not. Most employees that are out on FMLA are not associated with workers' comp claims that I dealt with.
Q I'm sorry, are you saying that because it wasn't, for example, pregnancy related or caring for family related, but it was a workers' comp issue, somehow, that threw off the system?
A I'm assuming that's why it took longer than normal, but that would be my guess at this point.
Q Is that speculation, or do you have a basis for that opinion?
A Based on the emails I saw today, but that would be speculation.
Q Well, had you seen situations in the past where workers' comp workers hadn't received their notice that their FMLA would be expiring in the future?
A Not to my -- I don't recall any, but I might not be -- it's been a while.
Q Who is your client in this situation? Is it Douglas County or the employee?

Page 168

A Douglas County.
Q I would like to show you what's been marked as Exhibit 40, please. Please look at that.
Okay. Have you seen any of the emails or attachments of this exhibit before?
A I'm assuming I have. I don't remember them.
MS. PARKS: You are not required to assume, it's just what you recall.
THE WITNESS: I don't recall, but my name is on them, so --
BY MR. GEDDES:
Q Okay. To your understanding, what is this?
A It's an email communication between Norma, Scott Schick and myself about having someone serve him in person.
Q And what is -- what is this -- what is the document that is to be served on him?
A The February 13th letter.
Q And that's at DC 5510?
A Yes.
Q All right. Let's start with DC 5525, please. That's at the back of the document.
This is an email from Scott Schick to Norma and you -- I'm sorry. At the very bottom of DC 5525 is an email from Norma to you, copying Scott Schick. The subject is "Enos," and it's dated Thursday, February 12th, 2015. And it says "See attached

Page 169

letter. Let me know your thoughts."
And Scott writes back the same day, at 3:44 in the afternoon, "Okay, Scott Schick."
Did you understand this email to request you to review the attached letter, which subsequently became the return-to-work letter that we've talked about?
A I don't remember this, but I'm assuming, based on this, that that's what she's asking. But there was no response from me.
Q Okay. Let's move on to 5524. This is an email from Norma Santoyo to you and Scott Schick, dated the same day, Friday, February 13th, entitled "Serving Enos." And it was sent at 9:24 in the morning.
And Norma wrote "If I remember correctly, you guys were going to check about having someone from the Constable's Office or Steve Schultze serve the letter. Any information on this? Thanks, Norma."
Do you see that?
A I do.
Q What was that about?
A I can only speculate it was the service of the letter.
Q You don't recall communicating to Norma that you were going to check to see if someone from the Constable's Office or Steve Schultze could serve the letter?
A I remember talking about personally serving him. Steve Schultze is the internal -- or, well, at the time, was an

investigator within the District Attorney's Office who handled HR matters. He would serve things like this for me.

Q Is -- is there an importance behind personally serving something rather than mailing it here?

A I think we wanted to make sure that he had gotten it.

Q Does the -- does the rule require, to your knowledge, that he be personally served rather than mailed?

A I don't believe the rule requires either.

Q Do you have any understanding as to why it wasn't sent to him sooner by mail?

A I do not know.

Q Do you have any other information about this?

A I do not, no.

Q Well, let's move on to 5523.

Well, we'll move on to 5522. 5522 is an email from Norma Santoyo to you and Scott Schick, dated Friday, February 13th at 9:31, a little later in the morning from the prior email.

And the email has an subject line which reads "Enos FMLA exhausted letter 2-2015.doc." Is that correct?

A Correct.

Q And Norma wrote here "Since I didn't get a chance to finalize the notice and we haven't served it yet, do you mind if we move the return date to February 23rd. I've modified the letter. Please, let me know your thoughts. Thanks, Norma."

That's what it says, yes?



A Correct.

Q And what was your understanding of what Norma meant when she wrote "since I didn't get a chance to finalize the notice and we haven't served it yet, do you mind if we move the return date to February 23rd"?

A My guess is exactly what she wrote there, that she hadn't finalized it and it wasn't served.

Q Well, the return date is what I -- that's -- so, a letter would have gone out and required him to return to work by February 23rd, rather than the 17th?

A It appears so.

Q Why wasn't that done?

A I think we have to go through the next emails. I don't know.

Q Do you recall, looking at this form letter -- you have described a form letter that Norma has said -- that's at DC 5523 that Norma says she made changes to.

Do you recall whether you had any input on any of these -- language of this exhibit?

A I do not, no.

Q Do you know of any delay by Norma Santoyo to get this return-to-work letter out before the FMLA expired, Mr. Enos's FMLA expired?

A I do not, no.

Q Were you aware of any issue or problem with that



occurring with Norma Santoyo and anyone else?

A Not that I can recall.

Q Is there a rule that says that the County will send out these FMLA warning -- FMLA expiration warning letters before the FMLA expires?

A It was just practice. I don't think there was a rule.

Q All right. Let's move on to DC 5521 at the top of the page. There's an email from you to Norma Santoyo and Scott Schick, yes?

A Yes.

Q And that's 10:38 a.m. that day on February 13th, 2015. You wrote in response to the email from Norma Santoyo sent that day at 9:25, "Steve Schultze can do it after lunch if we get it to him soon."

Didn't you write that?

A I did.

Q And what did you mean here?

A That if we got the notice to him, he could serve it after lunch.

Q That day?

A That day.

Q And I apologize if you answered this. I know there was a discussion about certain people.

Who is Steve Schultze?

A Steve Schultze was -- at the time -- he's now an



investigator with the Sheriff's Office. But at the time, he was a DA investigator that would work with me on HR issues when I needed him to serve or do things like that.

Q And seeing this, does this actually refresh your recollection that you spoke to Steve Schultze about this?

A I'm -- I don't know if it refreshes -- I'm assuming I did. If I said that he could do it, he probably -- I went and asked him.

Q It says "if we can get it to him soon." Do you know what "soon" meant?

A I'm assuming before lunch. I can't tell you exactly what "soon" meant.

Q All right. Let's look at 5519. The bottom of the page has the email from Norma Santoyo sent at 9:31 that morning.

She was asking you in that email, "Do you mind if we move the return date to February 23rd. I've modified the letter. Please let me know your thoughts."

Wasn't Norma saying let's give this guy more time because he's not going to have a lot of reaction time here, or was she saying I'm still modifying it, because you seem to suggest in your testimony that she was still working on it.

Which was your understanding?

A I don't know if I know what my understanding was.

Q Okay. At the top of the page, you responded at -- she wanted -- she wanted to know -- she said "Please let me know your

thoughts." Do you see that?
A Yes.
Q And at the top of the page, you responded at 10:40 a.m. that same day, correct?
A Correct.
Q And you wrote "As long as he is served today or the 17th, prior to his surgery on the 18th, where he could claim he was on medication and didn't understand, etc. I don't mind pushing it back to the 23rd.
"However, since he can have him served today, why wait until the 23rd, instead of demanding he come back the next working date since he is out of time."
You wrote that, yes?
A I did.
Q What did you mean by these words?
A The first sentence, I did not want him to be served when he was under medication after his surgery. As I said, I didn't mind pushing it back to the 23rd.
I guess my question was, since we could have him served today, why wait? I was just wanting to get it done at that point. So if we could serve him that day, why not just serve him that day and give him the weekend.
Q But you agree there wasn't that much time if you served him that day and demand he return by the 17th, right?
A I don't think that's what it says, but --



Q But you would agree with me?
A But that's not what that said.
Q Okay. So let's -- let's build off what this says. This says you could demand he come back the next working date, which would be the 18th, correct? I'm sorry, that would be -- no, this was the 13th.
He -- he could be demanded to come back to work the next working date, which would be the 17th, correct?
A Correct.
Q And he would be served on the 13th. And assuming that's a three-day weekend, that gives him less time than demanding his return date on the 23rd, correct?
A Correct. I just don't know -- I actually don't know what I was meaning by this, other than I'm trying to figure out what day of the week the 23rd was.
It's been a while.
Q Okay. But doesn't this also confirm that you were aware that he was scheduled for surgery on the 18th?
A At that time, I guess I was.
Q And so you expected that if he was having surgery on the 18th, he couldn't realistically be expected to return to work a day early on the 17th with a full medical release, yes?
A I -- I -- that's putting words into my mouth. I don't know if I would say that.
Q Well, let me ask it this way. Could he realistically be



expected to return to work with a full medical release on the 17th if he was expected to have surgery on the 18th?
A Well, if he's out of FMLA time and he can't come to work on the 17th, you know, it wouldn't have made a difference at that point.
Q That's not my question.
My question is, you are saying to him --
A Well, I guess I don't know what the surgery on the 18th was. This doesn't say and I don't remember. I don't know if it was the same issue that he was out for leave on, I don't know if it was a separate issue. I -- I can't speculate at this point.
Q Okay. But you agree, at a minimum, if he's having surgery on the 18th, that complicates matters, correct?
A With service, yes.
Q Would you have known what that surgery is prior to writing that?
A I don't know if I did or not.
Q To your recollection, has this similar type of demand been made to other county workers?
A What -- what kind of demand? Can you explain or clarify?
Q Yeah, the demand that a day prior to surgery, the worker who is out of FMLA time be expected to return with the notice -- the span of notice that was provided here with a full medical release.



MS. PARKS: Objection, calls for speculation.
BY MR. GEDDES:
Q Let's be very clear.
To your knowledge, are you aware of any situation where this type of demand, a similar demand was made on any other county employee?
A Absent -- so without -- I'm not sure about the surgery. I know we made similar demands on employees who were out of FMLA time and their time was up.
Q Now, was this a suggestion, or was this your legal advice to the County? What -- what did this constitute?
A The first sentence is legal advice because I'm letting them know that I don't want him served when he's on medication, and it's not a good idea.
Second would be a suggestion, because I don't really -- it appears I didn't really care about pushing back to the 23rd.
And the third would have been a suggestion because it was suggesting, if we could serve him today, why not serve him today.
Q Okay. So your testimony is that if Scott Schick took your suggestions of sentence 2 and sentence 3 on the top of DCO 5519, that would not be relying on legal advice, that would just be performing an executive -- executive decision, correct?
A Correct.
Q Now, let's focus on -- let's turn to DCO 5517. At the

top of this email -- this is an email from you to Scott and Norma Santoyo, Scott Schick and Norma Santoyo, correct?
A Correct.
Q And you wrote at 10:42 on the morning of Friday, February 13, "I need caffeine so I can come over and pick it up in 15 to 20." Do you see that?
A I do.
Q And you wrote that?
A Yeah.
Q What did that mean?
A I was probably going to Starbuck's and could come drop by her office to pick it up.
Q That's what I'm asking. What -- what are you picking up?
A The notice.
Q Okay. The return-to-work letter that we've talked about?
A Correct --
Q Okay.
A -- because it's the same stream about having Steve Schultze deliver it.
Q Okay. Now, to your understanding, was it served that day?
A I'm assuming it was.
Q But you don't recall Steve Schultze confirming or anyone



confirming service of the letter?
A He probably did. I just don't remember.
Q Okay. Let's turn to 5515, the top of the page. This is an email from Scott Schick to you and Norma Santoyo, dated Friday, February 13th, 2015, at 10:43 in the morning.
Do you see that?
A I do.
Q And he's responding to the other emails on this page. At the bottom, for example, Norma Santoyo wants to know what the status is of checking on whether someone could serve the letter.
And in the middle of the page, you wrote "Steve Schultze can do it after lunch if we get it to him soon."
So Scott Schick, at the top of this, was writing "Let's get this done today, please"; is that correct?
A Correct.
Q What was Scott Schick's take on the list, do you recall?
A I do not recall. I'm assuming by this, that he wanted to get it done that day.
Q Well, what was the hurry? What was Scott Schick in such a hurry about?
A I don't know.
Q You didn't have any communications about that with him?
A No. It would have been his decision.
Q Let's turn to 5513.
A Uh-huh.



Q At the top of that is an email from Scott Schick to you and Norma Santoyo regarding serving Enos. It's the same stream of emails, Friday, February 13th at 10:44.
And he appears to respond to your email where you stated "As long as he's served today or the 17th, prior to surgery on the 18th where he could claim he was on medication and didn't understand.
"I don't mind pushing it back to the 23rd. However, since we could have him served today, why wait until the 23rd instead of demanding he come back the next working day, since he is out of time."
And Scott Schick wrote "I do not degree with pushing" -- it says "tis," t-i-s, but I think he meant "this" -- "back to the 23rd. Let's get this done, please."
Do you see that?
A Uh-huh.
Q Why did he not agree with pushing this back to the 23rd?
A I don't know.
Q You never had a conversation with him about that?
A No.
Q Isn't it true that Scott Schick -- as of this time, Friday, February 13th, 2015, at 10:44 a.m., he was looking to replace John Enos, wasn't he?
A I don't know. We -- in Douglas County, until an employee has been terminated or is separated from service, they do



not start reposting the position.
Q Well, that's not my question, though. I mean, he wanted -- he wanted to get the ball rolling on replacing John Enos, didn't he?
MS. PARKS: Objection, calls for speculation.
THE WITNESS: You would have to ask Scott. I don't know.
BY MR. GEDDES:
Q You didn't have any communications about that?
A No.
MS. PARKS: Same objection -- asked and answered.
Can we take a short break, Counsel? I need to use the ladies room.
MR. GEDDES: Sure.
THE VIDEOGRAPHER: We are going off the video record at approximately 2:33 p.m.
(A recess was taken.)
THE VIDEOGRAPHER: We are going back on the video record at 2:46.
MR. GEDDES: So I would like to mark the next exhibit 44.
(Exhibit 44 marked for identification.)
BY MR. GEDDES:
Q Okay. Have you seen the documents in Exhibit 44 before?
A I don't recall them, but my name is on them.

Page 182

Q Okay. Let's see. If we look at DC 5502, the bottom part is an email from Norma Santoyo to you, Scott Schick -- you and Scott Schick, stating "Here is a copy of the letter delivered to John's home today."
And you write back later that day, or less than a minute later, "Thank you."
So you received and acknowledged receiving this email, correct?
A Uh-huh.
Q And then the letter that was delivered to John's home today is that of Exhibit -- I'm sorry, same exhibit, DC 5504, correct?
A Uh-huh.
Q All right. Do you recall what you did, if anything, after receiving this email and responding?
A I don't recall what I did.
Q Okay. Do you know if you had any communications with anyone about the return-to-work letter or its delivery to John Enos?
A I do not recall having --
Q Okay. And this letter, 5504, refers to Douglas County Code 2.02.080. Did you ever advise them that they needed to include the Ninth Judicial District Court personnel regulation citation to that?
A I don't know if I did or not. I don't recall.

Page 183

Q All right. Let's return back, if we can, please, to Exhibit 40. Do you know -- did you ever know -- or, let me ask it this way.
Was Mr. Enos's expected surgery, scheduled for February 18th, 2015, cancelled or rescheduled?
A I don't know.
Q Isn't it true that on February 17th, 2015, Mr. Enos showed up to work -- that would be the Tuesday -- in response to this letter, advising the human resources department that he was reporting for duty?
A I don't recall. I don't know.
Q If he did, would that ordinarily be something that would be communicated to you?
A I would assume so, but I don't recall it.
Q Didn't Ms. Santoyo tell Mr. Enos on February 17th that Scott Schick was requesting to fill his position with another employee?
A I would have no idea. I don't know.
Q Did Norma Santoyo tell Mr. Enos -- I'm sorry.
Did Mr. Enos tell Ms. Santoyo on February 17th, 2015, when he showed up to the HR that he was stressed about losing his job?
A I wasn't part of that conversation, so I don't know.
Q Didn't he tell her he wants to do anything possible to retain his job?

Page 184

MS. PARKS: Objection, calls for speculation. She testified she was not part of that conversation.
BY MR. GEDDES:
Q Let me be clear what I'm asking you so that we're all clear.
I'm asking you whether you know, whether anyone told you that John Enos spoke to Norma Santoyo on February 17th, 2015, telling her that he wants to do anything possible to retain it, "it" being his job.
A I don't recall, but they could have. I just don't remember.
Q Did anyone inform you that Mr. Enos told Norma Santoyo on February 17th, 2015, that he would be requesting a leave extension as he had already been told by his doctors that he would be able to return to full capacity in the near future?
A I don't recall.
Q Did anyone inform you that Norma Santoyo told Mr. Enos on February 17th, 2015 -- told Mr. Enos about the medical retirement process and urged him to contact NV PERS?
A I don't know. I don't recall anything about that conversation. I wasn't there.
Q Did anyone inform you that Ms. Santoyo also advised Mr. Enos that day that if he could not get a full doctor's release within three days or by the end of Thursday, February 19th, 2015, the County would consider Mr. Enos to have abandoned his post for

Page 185

three days, which would constitute a voluntary resignation by Mr. Enos?
A I don't recall being told any -- I don't -- I might have been. I don't know. I don't recall that at all.
Q Did anyone inform you that Mr. Enos strenuously disagreed with the idea that he was voluntarily resigning from his job and that he was ready, able and willing to work his job?
A I don't recall a conversation.
Q To your knowledge or understanding, didn't Mr. Enos request an extension for a leave of absence to comply with the ultimatum to obtain a full medical release?
A I don't recall.
Q To your knowledge or understanding, didn't Mr. Enos also request for reassignment to any other position within Douglas County for which he was qualified to perform?
A Like I said, I wasn't part of that conversation, so I don't know.
Q Let's mark -- or, look at what's been marked as Exhibit 39. Will you please take a look at that.
Now, you received the email of Exhibit 39, correct?
A It appears so.
Q And this was an email from Norma Santoyo to you, sent on Tuesday, February 17th, 2015, at 9:45 a.m. It was sent to you and Scott Schick and CC'd to Sarah Christensen, correct?
A Correct.

Q And the subject was "Enos." And the text of it reads "John was here at 8:00 a.m. this morning and just left my office.

"I have to run to the SO for a meeting at 10:00. Are you available at 10:30 to meet and discuss? Essentially, he's stressed about losing his job and wants to do anything possible to retain it.

"I explained the process and gave him the leave of absence policy. He will be requesting a leave extension as he has been told by his doctors that he will be able to return to full capacity in the near future.

"I also discussed the medical retirement process and urged him to contact NV PERS. Norma."

And you wrote on the top in response, "Yes."

Is that correct?

A That is correct.

Q And so you had a meeting, right?

A I'm assuming so, but it looks like she wanted it with Scott too. So I don't know if we did -- I don't recall a meeting.

Q Okay. What, if anything, in your evaluation of this matter, changed when given the information Norma Santoyo gave to you in this email?

A I don't know if anything would have changed.

Q Well, you don't recall anything changing?

A I don't recall anything changing. I don't know if it would have or not.



Q And you don't remember meeting with Scott Schick about what Norma wrote here?

A I don't.

Q Did you inquire as to -- when he was told by his doctors that he would -- he will be able to return to full capacity in the near future, did you inquire as to when that might be?

A I don't -- I don't recall the meeting. I don't know if I did or not.

Q Well, I'm not asking about a meeting. I'm just saying, in response to what's written here, "he will be requesting a leave extension as he has been told by his doctors that he will be able to return to full capacity in the near future."

What I'm asking you specifically is, did you make any inquiry as to when that might occur in the near future?

A Based on this, all I said was yes, I was able to meet and discuss at 10:30. I don't know -- I don't remember anything further.

Q Okay. I think -- I think I understand your testimony, but I want to be clear. You don't recall making such inquiry, correct?

A Correct.

Q Okay.

A I could have, but I don't recall.

Q And do you recall Scott Schick or Norma Santoyo making such an inquiry?



A I don't recall.

Q Let me show you what's been marked as Exhibit 22, please, if you could look at that.

Have you seen this document before?

A Not that I can recall. I don't remember it.

Q Well, do you see, about midway down, he writes "I am requesting an extension of time -- in the first paragraph, "I am requesting an extension of time in order to get more information from my doctor regarding my ability to return to a full duty as a probation officer."

Do you see that?

A I do.

Q If you were shown this letter, what, if any, legal advice would you have given in response to that?

MS. PARKS: Objection, calls for an improper hypothetical on the part of this witness.

THE WITNESS: I mean, I don't know what -- if I would have given any advice, other than it would be up to -- I don't remember that policy. I believe it's up to the supervisor and their department head.

BY MR. GEDDES:

Q Well, when we talked earlier, we talked about how once FMLA is used up, that's it.

A Well, leave of absence is separate. So leave of absence isn't required to be FMLA or anything like that.



We had individuals seek leaves of absence for a number of reasons. And I believe it's also the policy that was used for individuals that left for, like, the Nevada National Guard, that kind of thing. So it's a separate policy on top of that.

Q Okay. What, if any, information do you have as to whether anyone from Douglas County or the Ninth Judicial District Court ever considered granting this type of leave of absence to Mr. Enos after he requested it?

A I don't have any recollection. It would have been up to Mr. Schick and the judges.

Q What is ordinarily done, to your knowledge, when considering a request for such a leave of absence?

A The only ones I can remember correctly are the -- we had a handful of police officers and fire personnel that were part of the Nevada National Guard. And so they would ask for leave of absences when they were placed on -- they had to go to duty.

I don't know of any leave of absence with respect to an illness or injury -- actually, I take that back.

We did have one individual who had cancer who asked for a leave of absence from their position for a short time.

Q Did they get that?

A I don't recall if they did or not.

Q You talked about National -- was it National Guard that you talked about?

A I believe so.

Q They are also protected under USERRA, are they not?
A They are. And so it was more of a formal process to ask to have their job kept open for them, because I believe under USERRA, we can put them in a different position when they came back.
Q The -- the sentence that reads "I am also requesting a leave of absence in order to receive necessary medical treatment for injuries I received while on the job and to recover from these injuries in order to return to my job as a probation officer at full capacity."
Do you see that?
A I do.
Q Did you consider this?
A Like I said, I was not involved in -- I don't remember being involved in a leave of absence discussion, and it wouldn't have been my decision to consider anything.
Q Would you agree with me that this request can be interpreted by an employer as a request for an accommodation under the ADA?
MS. PARKS: Objection, calls for a legal conclusion, improper hypothetical to this witness.
THE WITNESS: I don't know if I would jump to that conclusion, no.
BY MR. GEDDES:
Q Well, let me ask you this.



You said at the time -- at this time, you had received ADA training, correct?
MS. PARKS: Objection, asked and answered.
THE WITNESS: Yes, I had.
BY MR. GEDDES:
Q And was it your understanding at this time that one form of accommodation that an employer can provide is unpaid leave?
MS. PARKS: Objection, asked and answered.
THE WITNESS: I believe that is one.
But I don't know -- from this, reading this, medical treatment for injuries is different than medical treatment for a disability.
And I think that's where I don't necessarily agree that I would jump to the conclusion that this would be automatic under the ADA. An injury and a disability are two separate actions.
BY MR. GEDDES:
Q Mr. Enos was on disability leave?
A He was on -- I don't know if he was on disability leave. I'm not sure of that. I know he was on workers' compensation.
Q And was he not given temporary or -- or, was he not given some form of disability rating?
A That would have been part of the third-party administrator. I do not -- we didn't get involved in that.
Q As far as your understanding was, what would constitute a disability under the ADA?



MS. PARKS: Objection, improper hypothetical to this witness, calls for a legal conclusion.
THE WITNESS: That's a really compound question with lots of options.
BY MR. GEDDES:
Q Well, your testimony is, you said that you wouldn't necessarily conclude here, in response to the questions that I've asked, that his injuries constituted disabilities under the ADA. Is that a fair statement of your testimony?
A Based on this statement, I would say -- I wouldn't -- you wanted me to jump to the conclusion that this statement would put us on notice that he had a disability, and I would say no, this is saying he has an injury.
Q Well, actually, I didn't say anything about that.
A Okay.
Q I said, could this --
A And I don't agree. It's a legal conclusion that I would disagree with you on.
Q Okay.
A I don't believe so.
Q So let me -- let me ask you this.
Was it your understanding at the time that a disability under the ADA was a physical or mental impairment that substantially affected one or more of a person's daily life activities?



MS. PARKS: Objection, calls for a legal conclusion, improper hypothetical.
BY MR. GEDDES:
Q Let me be very clear here for the record.
I don't care if you are right or wrong. I'm not asking you for a legal conclusion. I'm asking for you, as an attorney, if you had an understanding of law. Whether it was right or wrong, I'm asking for a historical fact as to what your understanding was. So --
A My understanding is there's a difference between a disability and an injury. I don't know if he was disabled to the point that he would have fallen under the ADA.
Q Okay.
A We did not do that evaluation. I don't know. I know he had a wrist injury. I know he was -- later, had a shoulder injury. Whether that would be a disability, I don't know. I did not do that evaluation.
Q Let me ask it this way.
Did you have -- at the time of -- in the time of February of 2015, did you have a working definition in your mind as to what constitute -- the legal definition of a disability was?
A Correct.
Q Okay. And was your understanding the following: A disability under the ADA is a physical or mental impairment that substantially affects one or more of a person's daily life

activities?
MS. PARKS: Objection, calls for a legal conclusion.
BY MR. GEDDES:
Q Was that your understanding?
A That is the general overview, but it's much more specific than that.
Q Okay.
A It's not just -- that's the overview -- arching understanding. But, no, it doesn't come to, you know -- at the time we had this in front of us, there was no ADA claim, there was no ADA issues that I was aware of.
Q Well, I think you've answered my question, so I can move on.
Now, at the bottom with the asterisk, it reads "Also, if it is found that I will not be able to return to full duty as a probation officer, I will accept any other position with the County that I can perform."
Do you know whether a search was made -- after this request was made on February 17th, 2015, on or after, if a search was made for any other position within the County that he could perform?
A I don't know.
Q And to your historical understanding at this time, was it your understanding that reassignment to a vacant position for which an employee was qualified to work was another possible



reasonable accommodation that an employer could make?
MS. PARKS: Objection, calls for a legal conclusion, improper hypothetical.
THE WITNESS: I know that it is one of the reasonable accommodations you can make.
BY MR. GEDDES:
Q And you had no -- no conversations with anyone about the matter asterisked at the bottom; is that correct?
A I could have. I don't recall if I did or not.
Q And in that regard, you don't recall any conversations by Scott Schick or any communications by Scott Schick regarding the matter asterisked on this exhibit?
A Not that I can recall.
Q Didn't Mr. Enos get additional medical releases on February 17th and February 18th of 2015?
A I don't recall. He could have.
Q Well, let's mark, if we can, please, the next exhibit, 23.
Okay. Have you seen either page of Exhibit 23 before?
A I don't recall seeing them.
Q All right. The first page, Bates-stamped DC 1495, is a return-to-work record from Patricia Morales, Dr. Patricia Morales. And it lists work restrictions of he's able to lift up to 50 pounds, no pushing greater than 50 pounds, no pulling greater than 50 pounds.



Do you see that?
A I do.
Q Doesn't that comply with the physical requirements of his job description as a senior juvenile probation officer?
A Well, the next sentence says overhead shoulder lifting, not to increase 35 pounds, so I don't know if it would or not.
Q Okay. So let's go back to his job description. I'll find the exhibit number. It's Exhibit 5.
If we look at Exhibit 5, DC 333, do you see the section under "Physical Demands"?
A Yeah.
Q And do you see the second paragraph where it says "The employee is" -- "The employee occasionally is required to climb, balance and stoop, kneel, crouch or crawl, and must frequently lift and/or carry up to 50 pounds."
Do you see that?
A I do.
Q Is there any -- any reference in this particular job description that addresses overhead shoulder lifting and a weight?
A It -- it says "lifting." I don't know if it's that specific or not.
Q Okay. What was your understanding in February of 2015 as to what "frequently lift and/or carry up to 50 pounds" mean?
A I don't know if I have one.
Q Okay. But your recollection is, you don't -- you don't



recall actually seeing DC 1495, correct?
A I do not.
Q And you don't recall any communications by anyone alerting you to the information in this?
A No, I do recall -- I recall having a conversation about the conflicting doctors' notes and these are the two that were conflicting.
Q Okay.
A And it looks like Morales -- even though it looks like a full release, it still has current restrictions, light duty with the following restrictions.
And then Eisenhauer was the may return to work unrestricted as of today, on the 18th.
Q Okay.
A So these were the conflicting doctors' notes. I don't remember seeing them and I don't remember discussing them with Norma.
Q Now, you say they are conflicting. But you would agree that a reasonable interpretation of these documents is that he could perform the job duties listed in Exhibit 5, correct?
A I -- I don't know. I would want to talk to a -- I'm not a doctor, so I don't know if that would -- the lifting above the shoulders -- I -- I don't know.
Q Do you recall inquiring into that matter?
A I wouldn't have inquired. It would have been something

HR would have done.
Q Do you recall whether HR inquired into that matter?
A I do not, no.
Q Would it have been important to inquire into the matter?
MS. PARKS: Objection, vague and ambiguous, argumentative.
BY MR. GEDDES:
Q Do you understand the question? Is it vague or ambiguous to you?
A Would it have been important? I don't know. It was up to the employee to provide the release to work.
Q No. My question is, would it have been important in the evaluation of whether or not he obtained medical releases sufficient to allow him to return to work, that question of whether -- overhead shoulder lifting, not greater than 35 pounds, would it have been important to inquire into that particular issue regarding this matter?
A It would have been up to -- we would have had to look at what, you know, the requirements were under all of his job descriptions, including the POST certification and all the physical requirements. I don't know.
Q Do you have an opinion as to whether it would have been important?
A Based on -- I know that Scott Schick had said it was infrequent, but based on the physicality of some of the youth that



I saw, being able to defend yourself, it might be important because of the way that some of those kids would react.
Q Do you know if Douglas County ever took the position that these two documents enabled Mr. Enos to return to full duty?
A I don't know.
Q And do you know whether the third-party administrator took such a position?
A I don't know.
Q And do you know whether Mr. Enos's workers' compensation benefits were interrupted based on an interpretation of these documents?
A I do not, no.
Q Now, on the second day of the three-day period here, specifically, February 18th, 2015, isn't it true that Mr. Enos again showed up to work, reporting to the human resources department and stating he was reporting for duty?
A I don't know.
Q Did anyone ever tell you that he did that?
A They probably could have. I don't remember.
Q Did anyone tell you that Ms. Santoyo told Mr. Enos words to the effect that she confirmed that the HR department received the two medical releases and that they -- that those medical releases was good news -- those medical releases were good news?
MS. PARKS: Objection, lack of foundation.
THE WITNESS: I don't know.



BY MR. GEDDES:
Q Is it your belief that after you assisted in the emails that we showed you about getting the return-to-work letter sent to Mr. Enos, you were not involved in matters concerning whether he could return to work?
A I don't recall. I know once the letter went out, I wasn't involved again. You know, I don't recall. I had other clients and HR is the one who handles the day-to-day notes and everything.
Q So based on that testimony, is it possible that with regard to the consideration of these matters, "these matters" being the matters set forth in Exhibit 22 and the matters set forth in Exhibit 23, which matters occurred after the return-to-work letter was sent -- so based on your testimony, do you believe that the actions taken by Scott Schick regarding these matters, 22 and 23, were not based on any new advice from legal counsel?
A I can say I don't know. I don't remember, but they could have been.
Q Did you, yourself, ever form an opinion as to whether or not what you've described as the conflicting work releases and which you've identified as Exhibit 23 -- did you ever evaluate -- did you ever conclude that these did not constitute the necessary medical releases for Mr. Enos to return to work?
A I don't recall.



Q Do you recall having a conversation with Karen Barbee, the claims adjuster for Douglas County's workers' compensation third-party administrator, about the meaning of the medical releases of Exhibit 23?
A I do -- I think I do recall that because we were discussing these with the other release that was not -- the other one you showed me from -- in January, because they did -- they conflicted completely.
And so that one said he had to work light duty for so many times -- periods a week, he was going out on surgery. So it seemed like he went and got these notes just so he could come back to work, and they were not a true release.
So I do remember talking to Ms. Barbee about those and how they were going to handle this with respect to the workers' comp.
So I do remember talking to her, and I think Sarah Christensen was involved in that as well.
Q So I'm trying to understand what you are saying.
You're saying that --
A The -- the release we had prior to this and these would conflict datewise.
Q Let's find the release that you are referring to so we can --
A And I don't know if it's the one you showed me or not, but there was questions, because these came through -- if I

remember correctly, and from what it looks like, these came through workers' compensation and not directly to HR.

But I do remember talking to Karen briefly on this issue, because it was one minute, I have surgery, I can't come back to work, and the next, it's a full release to duty.

**Q You are referring to Exhibit 19?**

A Yes.

**Q Okay. Exhibit 19 says return to full duty in approximately three weeks. That is consistent with what Dr. Eisenhauer wrote, because three weeks after January 28th, 2015, is -- or is approximately February 17th, February 18th.**

MS. PARKS: Is there a question?

BY MR. GEDDES:

**Q Do you agree with that?**

A It would have been -- well, it would have been later that week, yes.

**Q Well, do you -- is it your testimony, then, that Exhibit 19 is the work release that you are thinking of here when you said it conflicted with Exhibit 23, page 1496?**

A Well, there's -- there's a conflict between -- so there's 21 days, and this one says in approximately three weeks. This was the wrist. He had the surgery on the 18th.

And I guess our -- our conflict was if, you know -- it just didn't -- we were trying to figure out exactly how it was going to add up.



**Q Well, wait a second. You're -- you're now testifying that he had surgery on the 18th?**

A I don't know if he had surgery on the 18th. The emails indicate that that's what he was supposed to be having.

**Q Okay.**

A There was a conflict that we spoke -- I don't know the exact conflict. There was a conflict that I spoke to ASC about.

I believe Sarah Christensen and probably Norma were involved with the work releases, with the other releases we had, because it -- this very conveniently shows up that, oh, he's back to full duty, when other information we had at the time did not.

**Q Okay. And so your testimony is, it -- it may have been Exhibit 19 that you are referring to?**

A It may have been, it may have been something else.

**Q Did anyone communicate to Mr. Enos, to your knowledge, hey, there's a -- there's a -- there's a fuzzy question here, we've got to -- we've got to -- we've got to work this out, anything like that?**

A That would have been on HR. I don't know.

**Q Okay. But you are not aware of any conversation --**

A I did not have any conversation with Mr. Enos.

**Q So is it your recollection, then, that in your communication with Karen Barbee, that it was her position that he shouldn't -- it was dubious that he could return to work, given the conflict in medical records that you are describing here?**



A That is what I -- I don't know if that's what I recollect. I remember we did speak to Karen Barbee because the second release came from ASC to the County and it wasn't provided -- as you can see on this, it was received by ASC and faxed to Norma.

**Q I'm sorry, I'm not understanding what you are saying.**

A ASC is our third-party administrator.

**Q Right.**

A And they are the one who received this. They faxed it to Norma.

**Q But why is that dubious?**

A No, that's why we spoke to Karen Barbee about these releases, because we were given one, they were given one. There was confusion as to the releases and whether or not --

**Q Well, is it your contention that she didn't receive 1495, DCO 1495 of Exhibit 23?**

A Who, Norma or --

**Q No --**

A -- Karen Barbee.

**Q -- the third-party administrator.**

A They received this and faxed it to Norma.

**Q Both? Both pages?**

A I don't know about this one. I know this one, I can tell that they did that.

**Q Okay. But is there -- I guess my question to you is, is**



**it your contention that DCO 1495 was sent to you directly, "you," Douglas County, from the provider and not through ASC, the third-party administrator -- let me finish my question.**

A Yeah.

**Q -- which would raise a cloud of doubt about it?**

**I'm trying to understand what you are saying.**

A No.

**Q Okay.**

A All I remember is that we ended up calling Karen Barbee because we had some confusion and concern about the different notes coming --

**Q Okay.**

A -- at that time.

**Q Do you see at the bottom of DC 1495, it says -- the bottom half, you can make out "Karen Barbee"?**

A Yes.

**Q Scanned 2/18?**

A Yes. And this could have been sent to her. I can't tell.

**Q Okay.**

A This one, I can tell was sent to her directly.

**Q So --**

A And I remember we did have a phone call with her, but I don't remember the specifics, other than we were trying to figure out what was going on.

Q Okay. Now, I ask this not because it has been asked and answered, but I'm confused by -- by your answers. So please bear with me.
A You have to bear with me. It's been four and a half years --
Q That's fine.
A -- since I've dealt with any of this crap.
Q That's fine.
Did -- when you spoke with Karen Barbee in this call that you are describing, was that call -- what day did that call happen?
A I don't know. I know it was during this time frame because Norma wanted to talk to her, since they were coming through her.
Q Was it, to your recollection, before or after Mr. Enos's employment had separated?
A I don't know.
Q Okay. And when you had this phone call, to your recollection, which, if any, position did Karen Barbee take? Did she take the position that these do not constitute proper release to go back to work, or did she take the opposite view, hey, this is sufficient for him to return to work, do you recall?
A I don't recall, and I don't know if she would have given us that.
Q I'm sorry, say that again.



A I don't know if she would have told us that or not.
Q Okay. All right. Did you ask her?
A I don't recall.
Q Do you recall if anyone on the phone call asked her?
A I do not recall.
Q Let's, if we can, please, look at Exhibit 24. I'm sorry, here is the divider page for that.
Okay. Have you seen this document before?
A I have not.
Q Okay. This is the letter from Karen Barbee to Mr. Enos.
A Uh-huh.
Q And she writes "A review of your claims referenced above indicates that you have been given a full duty release from Dr. Eisenhauer effective 2/18/15, and Dr. Morales has decreased your restrictions to no lifting greater than 50 pounds, no pushing greater than 50 pounds, no pulling greater 50 pounds, no overhead shoulder lifting greater than 35 pounds, effective 2/17/15.
"We have been advised that the restrictions given by Dr. Morales are compatible with your regular job duties. As such, you are no longer eligible for temporary total disability benefits. No further TTD payments will be made."
And then she goes on to write about appeal rights.
A Uh-huh.
Q Do you recall having any communications with anyone about the matters set forth in those two paragraphs?



A Nope.
Q Now, based on your understanding of how things typically worked at the DA -- at the HR department, Douglas County, who would be the person referenced here, "we have been advised that the restrictions," and it goes on. Who would be the "we"?
Who -- advised by whom? I'm sorry. Would that be HR?
A I'm assuming HR. I -- it could be the attorneys that handle our workers' compensation, which would be Mr. Balkenbush and Mr. McCarty. I don't know who "we" is. You would have to ask Karen.
Q Okay. Now, when Karen Barbee takes this position and states that she has been advised regarding the no lifting greater than 50 pounds, no pushing greater than 50 pounds, no pulling greater than 50 pounds, no overhead shoulder lifting greater than 35 pounds effective 2/17/15, is that something that you would defer to?
A No.
Q Why not?
A Third-party administrator, they are not part of the County. They were handled separately -- workers' compensation was handled outside of Douglas County.
Q Do you know if Douglas County ever disputed this?
A I do not know.
Q Now, you see at the bottom here, it says CC Douglas County.



A Correct.
Q So based on your understanding of how things work, Douglas County received this document.
A It would have gone to HR as part of his workers' compensation file.
Q And you were still working, representing HR on February 24th, 2015, correct?
A That is correct. But as I have stated previously, workers' compensation cases, I was never involved with.
Q And you have no knowledge one way or another whether the County agreed with that or disagreed with it?
A That is correct.
Q Do you have -- do you have a basis to know from practice, having worked there, whether it's common for Douglas County to disagree with the third-party administrator on -- on its determinations, or does it usually agree with them, based on -- on your experience? Do you have a reason to know one way or another?
A I wouldn't -- I did not handle the workers' compensation cases.
Q So you don't feel you have a basis to make an answer?
A No.
Q And you don't know if Scott Schick was involved in this at all, do you?
A I do not know. I would assume he has no clue about this

letter.
**Q What do you base that on?**
A Workers' compensation files were kept confidential and separate in HR, and the department heads and supervisors did not have access to them. They were separate from an employee's personnel file.
**Q You may have answered this and I apologize. Did -- would HR have had access to this information?**
A Yes, it would have gone to the HR. HR handled the workers' compensation and sent them out to third-party administrators.
**Q And so in this regard, it would have been Norma Santoyo, or if she had left, it would have been her replacement?**
A Or one of the employees that was handling the paperwork.
**Q And -- and wouldn't the HR have advised the departments about such matters?**
A No.
**Q Why not?**
A Confidentiality. The most they would advise us would be light duty, return to work dates, those kind of situations.
They would not advise us to determinations, when it started, stopped. It was completely separate from the departments.
**Q Well, if a determination was made by a third-party administrator that Mr. Enos could return to work and he**



**subsequently would apply for work to the department, wouldn't that be important information for the department to know?**
A If he was eligible for the position, I don't know -- they would need to know that he was -- I don't know. I guess it would depend on the situation.
**Q Well, if I represent to you that Mr. Enos did, in fact, apply for a juvenile probation vacancy, wouldn't you agree that the information as to whether or not the third-party administrator made a conclusion that he could return to full duty -- wouldn't that be important to know -- wouldn't that be important for the department to know?**
A I guess it would depend. I would be concerned about confidentiality.
HR could let them know that he's eligible for rehire, he's eligible for the position.
Whether or not -- what the third-party administrator determined, I think, would be that gray fuzzy area where HR tends to be more conservative about what they provide to department heads and directors.
**Q Okay. But you think, though, that it would be important to know that he was eligible for rehire based on physical demands?**
A Correct.
MS. PARKS: Objection, asked and answered.
MR. GEDDES: Well, she didn't specify physical demands and I wanted to get clarification.



BY MR. GEDDES:
**Q So let's look at what's been marked as Exhibit 25. Will you take a look at that, please. I'm sorry, here is the divider page.**
**Have you seen this document before?**
A I have not.
**Q Have you spoken -- have you had any communications with anyone regarding the matters set forth in this email?**
A No. But this does clarify my confusion, because this 2/10/15 doctor's note is the one I had mixed in my head with Morales and the restrictions conflicting.
But, no, I haven't had any discussion on this email.
**Q Okay.**
A That just clarifies why I was confused as the two doctor's notes conflicted.
**Q Just give me a second here. I'm trying to tie in the exhibit numbers. If you know what exhibit numbers you are referring to, that would be helpful.**
A We thought it was Exhibit 19, that job description -- or, that release to duty, but it appears the one I had in my head was this 2/10/15 release to duty that restricted of less than 10 pounds.
**Q Okay. One second here.**
A That was my confusion as to -- between the releases on the 17th and 18th, compared to the release on 2/10.



So those were the conflicting doctor notes that I had in my head when we were discussing that, and not Exhibit 19.
**Q This email is dated -- you talk about the -- we were talking about Exhibit 25.**
A Uh-huh.
**Q Talking about the conflicting emails.**
**Here, this is dated February 24th.**
A Uh-huh.
**Q And the response is given February 23rd.**
**Do you know whether this issue regarding the confusion was addressed in response to Karen Barbee's inquiry after Mr. Enos was terminated or his employment was separated?**
A I don't know. And it's hard to tell because it appears -- Norma would typically do this. She would respond to you in an email in a different color or in a different font.
I can't tell you which is her language, which is Karen's language in this bottom, because it says "Hi Karen, please see below response."
But if you go down to the paragraph that say "Do these restrictions fit with the usual and customary job duties?" that's what I'm talking about. That was the discussions I had with Norma and with Karen, were the Dr. Morales note said he could do it, the note from Eisenhauer from 2/10/15 had a weight restriction of 10 pounds.
**Q I guess my question is more general than that.**

A Yeah.
Q Is it possible that your discussion with Norma -- with Karen Barbee, occurred after Mr. Enos was fired, in connection with the inquiry of Exhibit 25?
A Like I said before, I don't know when my discussion with Karen happened. I know we discussed the conflicting job duties, which is what is in here.
Q Okay.
A And whether or not -- you know, I can't tell who did what writing in here, but I can tell you that was one of our discussions.
Q I guess what I'm getting at is, you don't know whether that analysis that you are describing here, the questions you had between the conflicting medical -- you don't know whether that was actually --
A With Karen, it happened -- whenever it happened with Karen, it was part of our discussion when these notes came in.
So -- however, you know, we had two different notes. We had discussions with Norma, Scott, Karen, all throughout that time period, which would have been the two weeks.
Q Did anyone ever reach out to Dr. Eisenhauer and ask for a clarification?
A I don't know. I don't recall if they did or not.
Q And no one gave you any communications about that? You didn't receive any communications about whether somebody did,



correct?
A Not that I can recall. I don't know.
And I don't remember which doctor was his general practitioner. There were different doctors involved. I know Dr. Eisenhauer was the one that did the surgery, I believe.
I just wanted to clarify where my confusion came from at the time.
Q Let's take a look, if we can, please, at Exhibit 26.
Okay. This is a letter from Scott Schick to John Enos, and you are CC'd on it.
A Uh-huh.
Q Did you receive this document?
A I'm assuming I did.
Q Do you recall having any involvement in the matter that's stated in this exhibit?
A I do not.
Q The letter reads "Dear Mr. Enos, I have received and seriously considered your request for a leave of absence dated February 17th, 2015, pursuant to Douglas County Policy 200.40. However, after considerable deliberation, your request is being denied."
Did Scott Schick ever tell you that he considered that request or denied it?
A I don't recall.
Q I mean, other than being CC'd on the letter.



A Yeah. I can't remember if he did or not.
Q Did you ever provide any legal advice to him regarding this matter?
A I believe it would have been in his discretion, so I don't recall if I did or not.
Q But the decision was ultimately his and not yours?
A I would never -- I don't have the authority to make these decisions. It would have been the department head.
As much as I would have liked to tell department heads what to do with employees, they didn't give me that leeway.
Q Did you hear that -- this letter is dated February 19th, but did anyone inform you in any communication that Mr. Schick actually made his decision on this, the prior date, February 18th?
MS. PARKS: Objection, lack of foundation, calls for speculation.
THE WITNESS: I have no idea.
MR. GEDDES: All right. Let's look at -- let's mark as next exhibit this document, please.
(Exhibit 45 marked for identification.)
BY MR. GEDDES:
Q Okay. Have you seen this document before?
A I have.
Q What is this?
A It is the leave of absence policy.
Q Okay. I think you gave some testimony earlier about the



different types of leave that can be provided.
How many -- under this policy, how many different types of leave of absences are permitted?
A It appears that there are five.
Q And that's disability leave; family and/or personal medical leave; work-related accident, injury; personal leave and military leave?
A Correct.
Q Okay. Based on your understanding of these procedures, what leave of absences would be appropriate to consider in response to the request by Mr. Enos that we've talked about?
A Probably either disability, work or personnel -- personal leave. He had already exhausted his family medical leave.
Q I'm sorry, did you say disability, work or personal?
A Yeah, so 1, 3 and 4 on Section 2C, potentially. I haven't read -- that's without reading this.
Q Well, under DC 36, it says "Disability leave. A disability leave of absence may be provided only for an employee who does not" --
A Yeah, it wouldn't apply to that.
Q I'm sorry?
A I don't believe it would apply to that because he was eligible for FMLA, because if you go to B, it has got to be less than 12 months of service.

Page 218

Q I'm sorry, "Disability Leave" says "A disability leave of absence may be provided only for an employee who does not meet the eligibility requirements of FMLA leave."
Did he meet the eligibility requirements? You are saying he did --
A He did.
Q -- he just used it up?
A He used it up, because if you go on to the second one --
Q Okay.
A I don't think that would have applied.
Q All right. What about Subsection 2, FMLA, would that --
A He had already had that, so this would -- this doesn't provide for anything more than the 12 weeks.
Q Okay. And what about Subsection 3, "Work-Related Accident, Injury"?
A He potentially could have. I haven't read it.
Q Okay. If we look at DC 42, it says "Work-Related Accident, Injury Leave," Subsection A.
A Uh-huh.
Q Definition of "Work-related accident or injury, leave of absence may be provided for an employee who has experienced an accident or injury while working and must be absent from work as well.
"Such leaves will be considered FMLA leave if the employee qualifies under the above-mentioned eligibility

Page 219

requirements," and it goes on to talk about eligibility, sick leave.
A Uh-huh.
Q So based on your reading of this, would he -- would it have been appropriate to consider a leave under this section?
A I believe so.
MR. GEDDES: I would like to mark Exhibit -- I think we may have done this. Yes, we just did that. That was Exhibit 45?
THE REPORTER: Yes.
BY MR. GEDDES:
Q Okay. Let's go to Exhibit 3, if we could, please.
This is the county personnel regulations, Chapter 2.02. And I don't want to misspeak here, but I think you said you are familiar with this document, correct?
A I am, but I think they've been revised since '98.
Q Okay. And that was through Douglas County Administrative -- that was through Exhibit -- Exhibit --
A 4.
Q -- 4, the county ordinance?
A Yeah --
Q Okay.
A -- because, like, these ones look old.
Q Okay. All right.
A They didn't look right to me.
Q Okay. So -- one second here.

Page 220

All right. Let's move on to Exhibit 28.
Well, let's move to 27, if we can. Mark this 27. Sorry, here is the divider page.
Have you seen Exhibit 27 before?
A I have not.
Q Have you seen this type of document before?
A Yes.
Q Can you tell us what this type of document is.
A This is a personnel action form. They were normally done in, like, triplicate. Part would go to Finance, part would go to the department head, and part would stay with HR.
And it was used any time someone was hired, their jobs changed, they became seasonal, if they got a salary increase.
It was just the general form that would let everyone know what the changes were to that person's position.
Q Okay.
A Or employment status.
Q And this document cites county code 2.02.082, correct?
A I don't know if we have a 082, but it would be 080, most likely. I can't tell if that's a 2 or an 0.
Q Okay. But it doesn't reference the judicial personnel regulations, correct, the court personnel regulations?
A Correct.
Q And do you recognize Scott Schick's signature?
A Yes.

Page 221

Q And do you see the human resources manager, that's Wendy Lang's signature?
A Yes.
Q There's a section at the bottom where it says "I've been notified of the above personnel action. Employee," and it says "refused to sign." Do you see that?
A I do.
Q Did anyone communicate to you that an effort was made to get John Enos to sign this and he refused to sign?
A I have no idea.
Q Have you seen a situation where the -- the separation of employment occurring by this procedure where the employee is deemed to automatically resign, is it customary for the employee to actually sign this?
A Normally, it's notified, either it's refused to sign or some other notification. But in the other situations, when an employee had abandoned their job, they were -- they weren't there to sign it.
Q And in the medical situation -- I say "situation" because I'm not sure if you testified as to more than one -- do you recall whether that employee signed this document?
A I can't -- I don't recall.
Q Let's take a look at Exhibit 28.
Okay. You've seen this document before, correct?
A I believe so.

Q And this was the letter which formalized the separation of employment between -- or, of Mr. Enos's employment at Douglas County?
A Correct.
Q And this was written by Scott Schick -- well, it's signed by Scott Schick, correct?
A Correct.
Q And what, if -- if any, involvement did you have in -- in preparing this document?
A I believe I gave them the two -- well, it's the exact -- the language is the exact same between the county code and the court order, other than instead of termination from county, I believe the court order says termination from court judicial service.
So I would have given them the citations to put in there and the language.
Q Other than that, any other involvement?
A Probably not. I may have helped have it hand-delivered, because it appears it was hand-delivered as well. I would have had Steve Schultze do it again, most likely, but that's just a guess on my part.
Q Yeah, we don't want you to guess because the notation at the top of this document suggests that it was received by mail.
A Uh-huh.
Q Okay. Is this required to be hand-delivered?



A It does not.
Q It can be mailed?
A It can be mailed.
I don't think there's any actual requirement.
Q Now, to your knowledge, was -- was Judge Young notified of this separation of employment?
A I believe so, but I'm not -- I'm assume -- I don't know for sure. Most likely, he probably was.
Q What do you say -- what do you base that on?
A Typically, when an employee was terminated from -- I know with China Springs, he was always informed.
Q Was he informed before or after the separation?
A Depended on the situation.
Q So in this instance, what do you -- what is your -- what is your belief as to when he was informed?
A I don't know.
It could have been either.
Q What do you base that on?
A With Scott Schick, I didn't have as many separations or employee issues as I did with the other department heads that fell under the courts.
Q Let's take a look, if we can, at Exhibit 29.
I'm sorry, the divider page.
Okay. Have you seen Exhibit 29 before?
A I was already -- I had left the County before they even



received this, so no.
Q Okay. And -- okay.
I think your answer is no, you haven't seen this?
A No.
Q Okay. Thank you.
A I was at the State at that point.
Q Okay. And you have no information about that exhibit; is that correct?
A That is correct. I made a -- I made it very clear when I left the County that I was leaving the County and they needed to leave me alone.
Q I apologize for not asking this earlier in a more relevant section of your deposition. Why did you leave your employment with Douglas County?
A Susan Joseph Taylor asked me to apply, and she knew I wanted to practice water law. And so it was to do what I wanted to do.
Q And when you told them that -- I apologize if I'm misquoting you -- words to the effect that you were leaving and you wanted to be left alone -- what was it?
A The first two months of my departure, I would get phone calls on a routine basis from county staff and other attorneys, asking me questions. And it was affecting my job at the AG's Office.
Q But you don't recall being contacted in any of those



calls about Mr. Enos?
A Nope. It would have been after I had asked them not to contact me.
Q Okay. I'm sorry, when did you ask them that?
A Probably September, October of 2015.
MR. GEDDES: Okay. I want to mark as the next exhibit, Exhibit -- I believe we're at 46.
(Exhibit 46 marked for identification.)
BY MR. GEDDES:
Q Okay. This document states that it's an employment application to Douglas County. The date listed is October 25th, 2017. And it's an application by John Enos for juvenile probation officer, a rehire.
Have you seen this document before?
A I have not seen this document, no. I've seen a similar application.
Q "Similar application," what do you mean?
A The application for employment looks like what comes out of the system.
Q Okay. So this -- you've seen this type of document before?
A Yes, just not this one.
Q Okay. And was this -- is this the type of document you are describing -- you described earlier when you said there was -- you went to a centralized system?

A Yes.
Q Okay. And did you have -- did anyone communicate to you, other than what we may have said in this deposition, that Mr. Enos applied for the position of a juvenile probation officer with Douglas County on or about October 25th, 2017?
A No. I was gone at that point.
MR. GEDDES: All right. I would like to, if we could, please, mark this as 47.
(Exhibit 47 marked for identification.)
BY MR. GEDDES:
Q Okay. This is an email from CMMcmurry@douglasnv.us.
A Uh-huh.
Q Do you recognize that to be --
A Cindy's.
Q -- Cindy McMurry's email address?
A Yes.
Q And this is dated Friday, February 24th, 2017. The subject is "Juvenile probation officer." And it's addressed to John Enos.
And this is, essentially, a rejection letter after he had applied for the position of juvenile probation officer at Douglas County juvenile probation department.
Have you seen this document before?
A No.
Q And do you have any information as to what vacancy



occurred that caused this job opening?
MS. PARKS: Objection, calls for speculation.
THE WITNESS: When Vicky retired and Mike, I believe, became the -- her position, there would have been a vacancy. I don't know if this was this or not. I was long gone before this point.
BY MR. GEDDES:
Q All right. And you are aware of no communications regarding this matter --
MS. PARKS: Objection --
BY MR. GEDDES:
Q -- other than -- other than this exhibit?
MS. PARKS: Objection, calls for speculation on the part of this witness, who was not working for the County at the time this email was sent.
BY MR. GEDDES:
Q Do you understand my question? I'm asking --
A I do.
Q -- if you are aware of communications --
A No.
Q Okay.
A Other than the handful of people I continued to speak to, I was no longer with Douglas County.
Q Okay. All right. Show you what's been marked -- all right. I'm going to show you what's been marked as Exhibit 30, if



you could please take a look at that.
Okay. This document is dated January 6th, 2017. And it has a -- it has a read-out that says "juvenile probation officer." Above that, it says "www.governmentjobs.com, Jobs," and it has a longer listing including the word "juvenile probation officer."
Have you actually seen what a confirmation sheet looks like when someone submits an application online to Douglas County?
A No.
Q Okay. So you wouldn't know if this form represents what was generated in response to Mr. Enos applying for the position of juvenile probation officer?
A Yeah, I don't know if this is it. I know the governmentjobs.com is the site that everyone applies through, but --
Q Okay.
A -- whether this is it or not, I don't know.
Q All right. And then -- did I give you Exhibit 31?
A No.
Q Just a second here.
Exhibit 31 is sort of a different format of what we already showed you. I just want to confirm that you haven't seen that document before.
A I think it's the same email from Cindy McMurry.
Q Okay. So you haven't seen that. Okay.
A Before today, no.



Q Let's take a look, if we can, please, at Exhibit 32.
Okay. Have you seen this particular document before?
A No.
Q Have you seen the -- this type of document before?
A No.
Q Does the information in this document lead you to believe it was taken from a certain database?
A I would assume this is from the database for applying for positions and when they were advertised to and from.
Q Okay. Now, in your prior testimony about efforts to -- or, evaluating or considering light duty work or some other type of work for Mr. Enos within the County, what, if any, positions listed in this document do you recall specifically evaluating?
A I think I previously -- I didn't evaluate it, and I think I stated that. It would have been HR that would have looked at positions.
Q Well, you did say, though, that sometimes they would come to you and you -- you, you guys at the DA's Office, would brainstorm.
A Correct.
Q Did any such brainstorming involve considering placements in the types of jobs listed here?
MS. PARKS: Objection, vague and ambiguous with respect to use of the term "types of jobs listed here" and to what conversation she may have had about Mr. Enos and light duty.

BY MR. GEDDES:
**Q So -- I can rephrase my question if you don't understand it.**
A No, I understand it.
These were -- you know, we didn't look at -- I -- I wasn't involved in looking at a list like this.
We would have a general discussion on, you know, where we could put someone, where we couldn't put someone, were there positions within that office that were more of a desk job, whether it would be temporary or permanent.
But this kind of list, this appears just to be a, you know -- this is just when positions came open at the County. So I --
**Q When you say -- I'm sorry. Are you finished? I don't want to interrupt you.**
A Yeah. No, go ahead.
**Q If you look at the columns on the far right, you say when positions became available. Help me understand. What do those two right columns mean?**
A This is just my guess, is that they started -- so, for example, the first one, Douglas County clerk/treasurer, they started advertising on August 30th -- '13, 2014, and they advertise that position being open until August 29th, 2014.
So applicants would have to be -- you know, apply for that position by that last date.



**Q That doesn't necessarily mean, for example, based on your experience working with this, that -- it says advertised from 8/13/2014, advertised to 8/29/2014.**
**That doesn't mean the position was filled by 8/29/2014?**
A No, that would be the date that the posting on the website would be closed for additional applications to come in.
**Q Okay.**
A And depending on the position, it could be a very quick process. Other positions, it would take a month or two before it was filled.
**Q Okay.**
A For example, the library director, if you look, the posting was from April of 2014 till July of 2014 because of the level of that position. So each posting would be different.
**Q Okay. So if we look, for example, on DC 5287, there is a position for a youth detention counselor trainee --**
A Uh-huh.
**Q -- advertised from 8/24/15 to 9/11/15. Do you know whether -- what that position is, youth detention counselor trainee?**
A The youth detention counselor would be similar to the youth services counselor. It would be the detention worker at the juvenile detention facility.
The youth services counselor is a similar position, and that would have been out at China Springs Youth Camp. So I'm



familiar with those positions.
**Q Okay. There is -- on the DC 5291, there's a listing for a juvenile probation officer, advertised from March 19th, 2015, to April 17th, 2015, and it says "Juvenile Probation Officer, Outdoor Wilderness Program."**
**Do you know what that is?**
A That would have been Dominic's position when he went -- he stopped doing the outdoor program and came in-house -- or, came into the JPO.
**Q Okay. And then, if we can direct --**
A I believe --
**Q I'm sorry. Go ahead.**
A Well, Dominic -- that was Dominic's position originally. I don't know if he had moved over or not.
**Q Okay. And if we could direct your attention to the same page, 5291, you gave some testimony earlier about the library positions being union positions.**
A Uh-huh.
**Q Do you know -- what's listed at 2490, "Librarian," do you know -- it says "Librarian, Youth Services." Is that a union position?**
**When I say "union," you gave an acronym for that, that was --**
A DCEA.
**Q DCEA, thank you.**



**Do you know if that position was DCEA?**
A I'm trying to think if it was. There was -- the library director was not. The librarians, I believe, are not, because they were exempt employees from FLSA.
And so they were -- I don't believe they were because that would have been a librarian for youth services. It was a higher level position.
**Q Okay. So that position -- it says 2490, "Librarian." That was not a union position, correct?**
A Correct. That would have been a -- you would have had to have an MLIS or MLS, whatever that library degree is, master's in library sciences.
**Q And what about 2530, "Library Page"?**
A That would have been a union position. I believe the pages are the lower level positions, if I remember correctly.
**Q And the library technician, same?**
A Same. They would be union positions.
**Q Okay. Now, if we look at DC 5293 and 5292, there are positions listed there, "Maintenance Assistants." Do you see that?**
A Uh-huh.
**Q Are those positions union positions?**
A Yes.
**Q Now, before, you talked about not giving light duty to a worker that was a union position.**

**Is there a distinction between giving someone light duty as a stopgap measure and transferring someone to a position on a permanent basis?**

A I think that would have been prohibited -- we would have had a grievance by the union if we had done that, depending on if the position was open or not.

And it also depended on the time of the opening. When we had our layoff list and we had the layoffs going on, we would have had a massive issue with that.

**Q Well, I guess my question is this. If these positions are advertised, come one, come all, apply --**

A Uh-huh.

**Q -- the people who are applying aren't necessarily currently union workers.**

A Correct. And they -- or they could be people on wait lists.

And some of these positions, I do need to clarify. Anything that says "town," although they are on our list, we had no control -- we handled HR for the town of Minden, Gardnerville, but they were not employees that we had any control over. They fell under the town government.

**Q Okay.**

A And some of the others -- because we also handled HR for some of the other general improvement districts as well under contracts that were not -- they are on this list, but they are not



positions we could have placed someone in.

**Q Well, I want to get an example so I understand what you are saying here.**

**If Mr. Enos were to be transferred to a maintenance assistant position, and even if it were union, but it weren't a stopgap measure of light duty, that this is meet John Enos, he's going to be the new maintenance guy, and he really loves this job and he wants to work here, and he's going to join the union and be like the rest of you guys, why -- why does that run afoul of that agreement that you described about bumping people for temporary assignments on light duty?**

MS. PARKS: Objection, compound, improper hypothetical to this witness.

THE WITNESS: Well, one, the court personnel regs, there are different supervisors -- it's very difficult for me to say, John, you are going to go work for Bob; Bob, here is your new employee. That would not have flown in the County, especially with the way the departments were set up.

Elected officials were very cognizant of who fell under them. County manager, department heads were very cognizant of who fell under them. We didn't willy-nilly move this employee from this position to that. It wasn't something that we were comfortable with and we weren't going to force anyone to do that.

So, for, you know -- and the other thing, too, is, I think maintenance would be a horrible example because they do



have, you know, the same -- some physical limitations as well. That would have been looked at, whether or not he could comply with those.

And these positions are much less -- the pay would have been a lot less than what he was making at JPO, which would also be a consideration.

BY MR. GEDDES:

**Q Well, let's talk about that.**

**The asterisk on that letter that Mr. Enos wrote -- we can get the exhibit if you want to look at it.**

**Are you finding what exhibit number that is? You might find it faster than I can.**

**Okay. It's Exhibit 22.**

**Okay. There's nothing on Exhibit 22 that demands a pay level, correct?**

A Correct.

**Q And you are not aware of any discussions with anyone that John Enos would require a certain pay level if he were transferred to another position, are you?**

A I'm not aware of any. I don't know.

MR. GEDDES: Let's move to Exhibit 33, but before we do, Ms. Court Reporter, would you like a break?

THE VIDEOGRAPHER: We are going off the video record at approximately 4:25 p.m.

(A recess was taken.)



THE VIDEOGRAPHER: We're going back on the video record at approximately 4:31 p.m.

BY MR. GEDDES:

**Q Okay. I would like to show you what's been marked as Exhibit 33 and ask if you've ever seen this document or whether you have had any communications with anyone regarding that matter.**

A I don't know what this matter is.

**Q Okay. I would like to show you what's been marked as Exhibit 34.**

**That's an email from Scott Schick to Judge Young. And in that email string, on February 20th, Scott Schick wrote "Good morning. John Enos has been separated from employment with Douglas County as of 8:00 a.m. this morning, February 20th, 2015.**

**"I will find some time with you today."**

**And in response from Judge Young, "I understand, I'm back on Monday," and then from Scott Schick, "See you then."**

**Have you seen these -- these emails before?**

A I have not.

**Q Do you have any information regarding these communications?**

A Nope. No.

**Q Okay. I'll show you what's been marked as Exhibit 35.**

**Okay. This is an email -- it's a two-part email. The lower part is from you on February 19th --**

A Uh-huh.

Q -- sent to Allan Bates.
You wrote this email and sent it to him, correct?
A I did.
Q And who is Allan Bates?
A Allan Bates is the IT guru for the court building.
Q Okay. You wrote, "Allan, can you pull the video from the south parking lot from last night around 5:35 to 6:30. John Enos was reported to be going through the JPO vehicle parked in the first spot across from the judges' reserved spots.
"Also, we need to either get a copy of or have you pull the hard drive off his assigned computer so we" -- "it, in case we need to send it out to have the encrypted password-protected files reviewed. Thank you."
And Allan Bates writes back, "There was nothing on the recordings that showed someone accessed the vehicle. I have disabled John's account and John's email.
"Any files that need to be retrieved from the file server on the PC on John's desk can be gotten at any time that an investigator needs them."
Do you recall this matter?
A I do recall. I don't remember who made a comment that he had been going through the parking lot the night before.
Q And if this -- if this was sent on the same day that was his last day, what was -- was the purpose to be used as a basis to separate his employment?



A No. Our video camera system had a very limited recording, so we would have had to grab it as soon as we found out about it.
Q And what was the purpose of -- of following up on this? Was it a criminal investigation?
A No. There was no investigation. It was to see -- one, it was to see what -- if the -- I can't remember which employee or who told us this. We wanted to see if it was true or not, and then if it was, to have it documented.
And then the other portion of it was to make sure that we had everything on the computer saved.
Q And do you know what happened to the contents of Mr. Enos's hard drive, his assigned computer?
A I'm assuming -- I don't know what Allan -- normally, Allan would download them, but I don't know what he did.
There were backup servers that the State -- or, the County used.
Q All right. Let's look at what's been marked Exhibit 36.
Have you seen this document before?
A I believe so.
Q This is an email sent from Norma Santoyo to Scott and you on February 19th, the day that was Mr. Enos's last day of employment.
And Norma wrote "John will get the letter from ASC tomorrow denying his request to include his left" -- "left should



into the claim and that no further treatment will be authorized pending further investigation.
"I wanted to give you a head's-up because of the sensitivity of the situation. Note, I highly recommend we take care of his personal items today before he receives additional negative news."
So you wrote in response, "I agree. Scott, you should try to schedule this ASAP when you get back from your meetings."
What was this about?
A I was agreeing that we needed to get his personal items back to him.
Q What was the matters that Norma was writing you about regarding ASC denying his request and a head's-up and the sensitivity of the situation?
A I don't -- I'm assuming that -- ASC is our third-party administrator, so it appears that -- I'm assuming that's "left shoulder," into the claim. So she probably heard that one of his claims was going to be denied.
Q And so they were telling you about this, right?
A At this point, yes.
Q And they were telling Scott Schick about this?
A Correct.
Q And this is a matter involving workers' compensation that you testified earlier is not ordinarily shared with departments; is that correct?



A It is not.
Q It is not -- it is not normally --
A It is not normally shared, no.
Q And do you have any understanding as to what she meant by "the sensitivity of the situation"?
A I believe this would have been his last day of employment on the 19th.
Q Were people afraid of violence from Mr. Enos?
A I don't know.
Q Do you have any other information about this matter?
A I do not.
Q All right. Let's take a look at what's been marked as Exhibit 37.
Okay. Have you seen this document before?
A It appears it was emailed to me.
Q And this is an email memorializing what Norma Santoyo told John and the matters listed therein, correct?
A Uh-huh.
Q And did you -- did you recommend or suggest that Norma call him and talk to him about these matters?
A Not that I recall.
Q And what other information do you have about the matters discussed in Exhibit 37?
A It appears Norma was talking about the FMLA running out and it's -- yeah. I don't remember seeing this, but it appears

that I got it.
Q So you don't recall taking any action regarding this?
A No.
Q Let's take a look at what's been marked as 38.
This is a letter -- this is an email from you to Norma and Scott Schick. And you are submitting a draft of a letter that was sent out to the last employee who exhausted their FMLA; is that correct?
A Correct.
Q And so the letter -- the draft was 5497?
A Correct.
Q And so you -- this -- the letter -- the termination letter that Mr. Enos received was actually -- a draft was proposed by you; isn't that correct?
A Correct.
Q And the draft is on 5497 to 54- -- or, 5497?
A Correct.
Q And if we look at 5498, this is an email from Norma Santoyo to Scott Schick and you. And it says "Please see attached." And that's the handwritten note by John Enos, dated 2/17, requesting the matters that we talked about.
Is that correct?
A Correct.
Q So you would have received 54 -- DCO 5499?
A I believe so.



Q Do you recall now, having looked at this, what, if any, action you took in response to that -- receiving that document?
A Nope. I still don't recall.
Q Let's look at the next exhibit, 42.
Okay. This -- this matter involved Mr. Enos and Facebook. And 5556 is an email from you to Sarah Christensen.
A Yes.
Q And it says "I'll try to find him on my own to get better dates posted on the first page where Quinton Madsen mentions him on November 8th."
What was this matter about?
A One of the other employees at juvenile probation came in with these photos of John hunting or shooting or doing something while he was out on light duty or not supposed to be doing work, physical work.
And so I forwarded them to Sarah who was handling the workers' compensation claim.
Q And what -- I'm going to show you what's been marked as Exhibit 43 as well.
Does this also pertain to that matter?
Sorry, here is the divider page.
A It does.
Q And what was the result of that?
A I have no idea. I provided it to Sarah, who provided it to ASC, and they did whatever they did.



Q Who was the employee that referred those matters to you?
A I'm trying to remember which one it was. It was one of his coworkers. It was -- I believe it was Bruce.
Q Bruce who?
A I'm trying to remember his last name.
Q Beauchamp?
A Yes.
MR. GEDDES: All right. I'm going to mark as our next exhibit -- what's our next exhibit? -- 48.
(Exhibit 48 marked for identification.)
BY MR. GEDDES:
Q Please look at Exhibit 48 and tell me what it is.
A Vicky Moore was one of the employees in HR, and I was sending her an email.
Or, no, she was in -- in Finance.
Q What was the purpose of sending this email?
A As a new employee, there was something wrong with his paycheck and I don't remember exactly what it was.
I also represented Finance for a short time, and so we were trying to let her know what applied to court employees versus other employees.
MR. GEDDES: Okay. I'm going to mark as the next exhibit --
THE WITNESS: I don't remember exactly what it was, though.



MR. GEDDES: This is -- 49. Thank you.
(Exhibit 49 marked for identification.)
BY MR. GEDDES:
Q Okay. Exhibit 49 is an email from Norma Santoyo to you and Scott Schick and to Vicky Lamb regarding John Enos. And she wrote on Monday, February 23rd -- this is 2015. That's after his separation.
A Uh-huh.
Q "FYI, he stopped by the office to sign the PERS form and dropped off a car key -- I think he said it was for a Jeep -- and the gas card. He was very calm and didn't say much."
And you wrote -- I'm sorry, Vicky Sauer-Lamb wrote "Thank you, Norma. Can you send over the car key and gas card."
Do you recall receiving this?
A I do not.
Q Do you have any information concerning the matters set forth in this document?
A Nope.
Q And was there a concern that Mr. Enos would not be calm and would be -- act inappropriately or -- or violently with regard to his separation of employment?
A Not that I was expecting, but --
MR. GEDDES: Okay. Take a break. Go off the record. We have about two and a half minutes.
THE VIDEOGRAPHER: We are going off the video record at

4:45 p.m.

(A discussion was held off the record.)

THE VIDEOGRAPHER: We are going back on the video record at approximately 4:47 p.m.

MR. GEDDES: Okay, Ms. Caviglia.

I'll go ahead and pass the witness at this time.

MS. PARKS: I have no questions.

MR. GEDDES: Okay. Ms. Caviglia, I'm done with my examination.

What I want to do is just go over what happens here with regard to review of the transcript and give Ms. Parks an opportunity to correct any mistakes I make in this regard or give you her perspective on it.

My understanding is, under the rules, you have 30 days from the time that you are notified that your transcript is available for review, to actually review it. And you can make corrections to mistakes in the record.

You don't have to, but you can. It's your right.

And what I want to caution you about is that the changes that are made, an errata sheet, to the transcript of your deposition, my position is that those changes should not be substantive changes. That is to say, oh, I should have said that or I wish I said that or this is what I -- I want to say.

Instead, what it is, is it's, hey, there's an error in the record and it needs to be corrected. It could be a spelling



error, it could be a name error. It could be some kind of error in what is written down that was not what you said.

And the caution that I give to all witnesses, is that if our perspective, upon reviewing any changes that you make, is that you are trying to change your testimony, we will try to argue that you are shifting in your position or that you are not credible.

And I don't know what's more convenient for you. I'm very flexible. If, for example, Ms. Parks wants to send you a copy, I don't know if the court reporter will be okay with this, but she's okay with it and you get a copy through the email, you wont have to drive all the way down.

Whatever works for you guys. I -- I will work with you on that. But you have 30 days from the day that you receive that.

Do you understand that?

THE WITNESS: I do.

MR. GEDDES: Okay. And Ms. Parks, did you want to comment on that?

MS. PARKS: No, I'll send the witness a copy of her deposition for review.

MR. GEDDES: Okay. All right. Well, I want to thank you very much for your attendance today, and that will conclude the deposition.

THE VIDEOGRAPHER: This concludes the deposition of Justina Caviglia --

THE WITNESS: "Caviglia."



THE VIDEOGRAPHER: -- "Caviglia," on January 30th, 2019. We're going off the video record at approximately 4:50 p.m.

(The proceedings concluded at 4:51 p.m.)

-oOo-



REPORTER'S CERTIFICATION

I, CONSTANCE S. EISENBERG, a Certified Court Reporter in and for the State of Nevada, do hereby certify;

That on Wednesday, January 30, 2019, at the hour of 9:13 a.m. of said day, at 151 Country Estates Circle, Reno, Nevada, personally appeared JUSTINA CAVIGLIA, who was duly sworn by me to testify in the within-entitled proceedings;

That said deposition was taken in verbatim stenotype notes by me and thereafter transcribed into typewriting as herein appears;

That I am not a relative nor an employee of any of the parties, nor am I financially or otherwise interested in this action;

That the foregoing transcript, consisting of pages 1 through 249, is a full, true and correct transcription of my stenotype notes of said deposition.

DATED: At Reno, Nevada, this 19th day of February, 2019.

Constance S. Eisenberg

CONSTANCE S. EISENBERG, CCR #142, RMR, CRR

ERRATA SHEET

I declare under penalty of perjury that I have read the foregoing _______ pages of my testimony, taken on _________________________ (date) at ___________________(city), __________________(state),

and that the same is a true record of the testimony given by me at the time and place herein above set forth, with the following exceptions:

| Page | Line | Should read: | Reason for Change: |
|---|---|---|---|
| ___ | ___ | _________________________ | ___________________ |
| | | _________________________ | ___________________ |
| ___ | ___ | _________________________ | ___________________ |
| | | _________________________ | ___________________ |
| ___ | ___ | _________________________ | ___________________ |
| | | _________________________ | ___________________ |
| ___ | ___ | _________________________ | ___________________ |
| | | _________________________ | ___________________ |
| ___ | ___ | _________________________ | ___________________ |
| | | _________________________ | ___________________ |
| ___ | ___ | _________________________ | ___________________ |
| | | _________________________ | ___________________ |



ERRATA SHEET

| Page | Line | Should read: | Reason for Change: |
|---|---|---|---|
| ___ | ___ | _________________________ | ___________________ |
| | | _________________________ | ___________________ |
| ___ | ___ | _________________________ | ___________________ |
| | | _________________________ | ___________________ |
| ___ | ___ | _________________________ | ___________________ |
| | | _________________________ | ___________________ |
| ___ | ___ | _________________________ | ___________________ |
| | | _________________________ | ___________________ |
| ___ | ___ | _________________________ | ___________________ |
| | | _________________________ | ___________________ |
| ___ | ___ | _________________________ | ___________________ |
| | | _________________________ | ___________________ |
| ___ | ___ | _________________________ | ___________________ |
| | | _________________________ | ___________________ |

Date: ___________ _______________________________

Signature of Witness

_______________________________

Name Typed or Printed

**From:** Santoyo, Norma
**To:** Shick, Scott; Caviglia, Justina
**Subject:** Enos phone call notes -
**Date:** Thursday, February 19, 2015 9:27:36 AM

**For your information, notes from phone call to John Enos:**

February 18, 2015 – Call to John from Norma at 4:45pm to 781-3104

Hi John,

I am calling you as promised with an update.

FMLA – I have reviewed your FMLA usage by pulling the timesheets for the time you referenced earlier. You were on FMLA starting February 18, 2014 through March 14, 2014 for a total of approximately 4 weeks. You were then on FMLA starting October 21, 2014 to January 21, 2015 for a total of 12 weeks. You were then on leave after that from January 21, 2015 to present, that is an additional 4 weeks. You have received more than the 12 weeks you are entitled to under the law as you have received approximately 20 weeks of job protected leave in the last 12 months.

Under the law, you are entitled to 12 weeks of job protected leave in a rolling 12 month period measured backward. Under the rolling 12-month period, each time you take FMLA leave the remaining leave entitlement is the balance of the 12 weeks which has not been used during the immediately preceding 12 months. Based on this, you have exhausted the FMLA protections.

Do you have any questions or is there anything else I can provide you on the FMLA? (John: *"This is over my head."*) I explained FMLA process again and included discussion on how Workers' Compensation runs with FMLA.

Okay, I also want to tell you that I spoke to Chief Shick about your request for an extension and your request for a leave of absence per policy 200.40. Scott did share that he has carefully considered your request, but is denying your request. He will be sending you a written response.

Also, in response to the doctor's note from Dr. Morales and Dr. Eisenhauser. At this point we do not have valid and concrete information that you are able to return to full capacity. The County does not have any light duty positions available for you. *(John questioned why the County could not provide him a light duty assignment when the doctor has changed his restrictions. He asked why you can't return to the library. I explained the County does not have a position available for him. He stated "wow.")*

John, based on the information I've shared –your leave is classified as unapproved leave and is governed under the County Code Article 2 which was referenced in the letter you received Friday and is covered in the copies of the Code I provided you yesterday where after 3 days it will be considered an automatic resignation. Based on this, the 3rd day will be Thursday and you will be considered a voluntary separation after that and the County will send you a letter stating that. (John: "Wow! Okay! The attorney I just met with, Norma, said if they are hell bent on getting rid of you they're going to do it and there is no way you can get out of it. It's really unfortunate situation for me.")

Norma Santoyo
Human Resources Manager
Douglas County Human Resources

Δ π EXHIBIT 37
Deponent
Date Rptr.
WWW.DEPOBOOK.COM

DC005487

Office: 775-782-9866
Fax: 775-782-9083

**From:** Caviglia, Justina
**To:** Santoyo, Norma
**Subject:** RE: Enos
**Date:** Tuesday, February 17, 2015 9:58:55 AM

---

Yes

**Justina Alyce Caviglia**
Deputy District Attorney
Douglas County District Attorney's Office
P.O. Box 218
Minden, Nevada 89423
(775) 782-9803
(775) 783-6490 (fax)
jcaviglia@douglas.nv.gov
www.dcnvda.org

CONFIDENTIAL AND PRIVILEGED ATTORNEY/CLIENT COMMUNICATION AND WORK PRODUCT: This communication, including attachments, is for the exclusive use of addressee and may contain proprietary, confidential and/or privileged information. If you are not the intended recipient, any use, copying, disclosure, dissemination or distribution is strictly prohibited. If you are not the intended recipient, please notify the sender immediately by return e-mail, delete this communication and destroy all copies.

PUBLIC RECORD: Any communication within this email may be subject to monitoring and disclosure to third parties.

**From:** Santoyo, Norma [mailto:nsantoyo@douglasnv.us]
**Sent:** Tuesday, February 17, 2015 9:45 AM
**To:** Shick, Scott; Caviglia, Justina
**Cc:** Christensen, Sarah
**Subject:** Enos

John was here at 8am this morning and just left my office. I have to run to the SO for a meeting at 10. Are you available at 10:30 to meet and discuss?

Essentially he's stressed about losing his job and wants to do anything possible to retain it. I explained the process and gave him the leave of absence policy. He will be requesting a leave extension as he has been told by his doctors that he will be able to return to full capacity in the near future. I also discussed the medical retirement process and urged him to contact NVPERS.

Norma

Δ π EXHIBIT 39
Deponent________
Date______ Rptr.______
WWW.DEPOBOOK.COM