# EXHIBIT 11

## DEPOSITION TRANSCRIPT OF SCOTT SHICK
**(Including Exhibits 18, 23 and 24)**

EXHIBIT 11

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

-o0o-

JOHN ENOS, an individual, Case No. 3:17-cv-00095-MMD-CBC

Plaintiff,

vs.

DOUGLAS COUNTY, a political subdivision of the State of Nevada; et al.,

Defendants.

______________________________/

VIDEOTAPED DEPOSITION OF

SCOTT JAMES SHICK

December 18, 2018

Reno, Nevada

REPORTED BY: CONSTANCE S. EISENBERG, CCR #142, RMR, CRR

Job No. 514344

APPEARANCES

For the Plaintiff:

THE GEDDES LAW FIRM, P.C.
BY: WILLLIAM J. GEDDES, ESQ.
8600 Technology Way, Suite 115
Reno, Nevada 89521
775-853-9455
Fax 775-853-6899
will@TheGeddesLawFirm.com

And:

GALLIAN WEKER & BECKSTROM, L.C.
BY: RAELENE K. PALER, ESQ.
540 E. St. Louis
Las Vegas, Nevada 89104
702-892-3500
Fax 702-386-1946
Rpalmer@vegascase.com

For the Defendant:

THORNDAL, ARMSTRONG, DELK, BALKENBUSH & EISINGER
BY: KATHERINE F. PARKS, ESQ.
6590 S. McCarran Blvd., Ste. B
Reno, Nevada 89509
775-786-2882
Fax 775-786-8004
Kparks@thorndal.com

The Videographer:

DENISE MATT
Sunshine Litigation Services

Also present:

John Enos



INDEX


| EXAMINATION | PAGE |
|---|---|
| SCOTT JAMES SHICK | 6 |
| EXAMINATION BY MR. GEDDES | 6 |


EXHIBITS


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT 1 | Juvenile probation officer job description | 70 |
| EXHIBIT 2 | Job description, chief deputy juvenile probation officer | 70 |
| EXHIBIT 3 | Notice of injury | 96 |
| EXHIBIT 4 | Excuse from work | 104 |
| EXHIBIT 5 | Information re: Workplace injury | 113 |
| EXHIBIT 6 | Notice of injury, June 17, 2014 | 117 |
| EXHIBIT 7 | Work restriction report and excuse from work | 124 |
| EXHIBIT 8 | Memo to John Enos re: Duty station assignment | 130 |
| EXHIBIT 9 | Emails, Barbee/Christensen | 170 |
| EXHIBIT 10 | Work/School Excuse, Tahoe Fracture Orthopedic Medical Clinic | 181 |
| EXHIBIT 11 | Handwritten note | 188 |
| EXHIBIT 12 | Letter from Santoyo | 195 |
| EXHIBIT 13 | Request for additional time | 208 |
| EXHIBIT 14 | Documents from Dr. Morales/Specialty Health and Tahoe Fracture | 216 |





| | | |
|---|---|---|
| EXHIBIT 15 | Letter from Alternative Service Concepts | 222 |
| EXHIBIT 16 | Email stream | 224 |
| EXHIBIT 17 | List of jobs available | 231 |
| EXHIBIT 18 | Letter signed by Shick | 234 |
| EXHIBIT 19 | Douglas County administrative policies and procedures, 200.40, leave of absence | 240 |
| EXHIBIT 20 | Title II, Administration and Personnel | 242 |
| EXHIBIT 21 | Douglas County Ordinance 2000-907 | 242 |
| EXHIBIT 22 | Ninth Judicial District Court personnel regulations | 246 |
| EXHIBIT 23 | Personnel action form | 255 |
| EXHIBIT 24 | Termination letter, February 20th, 2015 | 263 |
| EXHIBIT 25 | Document from Ed Howden & Associates | 266 |
| EXHIBIT 26 | Job application confirmation | 272 |




BE IT REMEMBERED that on Tuesday, December 18, 2018, at the hour of 8:59 a.m. of said day, at the offices of Sunshine Litigation Services, 151 Country Estates Circle, Reno, Nevada, before me, CONSTANCE S. EISENBERG, a Nevada Certified Court Reporter, personally appeared SCOTT JAMES SHICK, who was by me first duly sworn, and was examined as a witness in said cause.

-oOo-

THE VIDEOGRAPHER: This is the beginning of Media Number 1 in the deposition of Scott Shick in the matter of Enos versus Douglas County, held at Sunshine Litigation Services in Reno, Nevada. The date is December 18th, 2018. The time is 8:59.

The court reporter is Connie Eisenberg. I am Denise Matt, the videographer, an employee of Litigation Services.

This deposition is being videotaped at all times, unless specified to go off the video record.

Would all present please identify themselves, beginning with the witness.

THE WITNESS: Scott Shick.

MS. PARKS: Catherine Parks on behalf of defendants.

MR. GEDDES: Will -- I'm sorry. Will Geddes on behalf of plaintiff John Enos.

MR. ENOS: John Enos, plaintiff.

MS. PALMER: Raelene Palmer on behalf of John Enos.

THE VIDEOGRAPHER: Would the court reporter please swear

in the witness.

MS. PARKS: We need to stop for a second.

THE VIDEOGRAPHER: Going off the video record, the time is 9 o'clock.

(A recess was taken.)

THE VIDEOGRAPHER: We're back on the video record at 9:03.

Would the court reporter please swear in the witness.

SCOTT JAMES SHICK

called as a witness, having been duly sworn,

testified as follows:

EXAMINATION

BY MR. GEDDES:

Q Good morning, sir. Could you please identify yourself by first and last name and spell your last name for the record.

A Scott Shick, S-h-i-c-k.

Q Good morning, Mr. Shick. My name is Will Geddes, and I'll be taking your deposition today.

And before I start -- before we start asking questions, I have to go over the ground rules of a deposition to make sure you understand how this deposition will proceed and the obligations you are under when testifying today.

Even if you already know these ground rules, I'll still



need to go over with -- go over them with you for the record.

Do you understand this?

A I do.

Q During this deposition, you'll be testifying under oath and under penalty of perjury in the United States, under the laws of the United States.

Therefore, you are required to testify truthfully, completely and to the best of your knowledge, just as if you were testifying in court at trial before a judge and jury.

Do you understand this?

A I do.

Q The purpose of this deposition is to allow the parties to become adequately informed of the facts and issues of the case and to enable us to prepare for trial.

My purpose here today is to avoid surprise at trial and to elicit truth.

This deposition also provides you with an opportunity to explain away any inconsistencies in your testimony today here, because if, at the time of trial, your testimony is different than it is here today at your deposition, we will definitely draw attention to that to a jury, pointing out inconsistent testimony to show the jury that you are not a credible witness.

Do you understand this?

A I do.

Q Therefore, it's very important to remember throughout



your deposition today that if you wish to explain away or clarify any issue, facts or matter regarding your case or your testimony, then today is the most opportune time to do so, not at the day of your trial.

Do you understand this?

A I do.

Q My purpose here today is not to trick you, it's not to confuse you, but to allow you to take your time and to understand the question so that you can provide truthful testimony.

If you give an answer to a question, we will assume that you understood the question.

However, attorneys are famous for asking bad questions and asking questions that are confusing or unclear.

Therefore, if you don't understand any question, it's incumbent on you to tell me so that I can rephrase the question or break it into smaller pieces that make better sense.

Do you understand this?

A I do.

Q Today, we are entitled to receive your best testimony based on your best recollection of the facts and events. In this vein, it's very important that your testimony be reliable and based upon facts that you are independently able to recall.

If you don't know the answer to a question, you should simply state that you don't know the answer.

Do you understand this?



A I do.

Q Now, however, please keep in mind that where you are initially unable to independently recall facts or events, I may try to refresh your recollection either by asking additional questions or by showing you documents.

Alternatively, you may have brought documents here today yourself which might help you recall facts or events.

Either way, we are entitled to your best efforts at refreshing your recollection so that you can give truthful, accurate and complete testimony today.

Do you understand this?

A I do.

Q Sometimes, it's appropriate to give your best estimate, even though you are not completely certain, of matters capable of judgment by ordinary people concerning matters such as time, size and distance.

Do you understand this?

A I do.

Q However, you should never speculate on any matter whatsoever during your deposition. Again, you can give reasonable estimates if you have a basis for doing so, but please don't speculate or guess at answers.

Do you understand this?

A I do.

Q An example of the difference between reasonably

estimating a matter of size, which is permissible, versus speculating, which is not permissible, which should be avoided at all times is the following:

If I ask you to estimate the size of this conference room table here at your deposition, based on your powers of observation and size estimating, you may be able to provide an estimate.

However, if I ask you to estimate the size of the table in the conference room of my office, given that you've never been there, you could not give an answer without speculating, which you should not do.

Do you understand the difference here?

A I do.

Q Now, there's a court reporter here seated to your right, who has a very difficult task of taking down every single word that's spoken today.

So that the record is clear, it's very important that we not speak over one another. Please wait until I finish a question before answering, and I will wait until you finish your answer before I ask the next question.

Also, today, you are testifying with words, not gestures, which are useless to the court reporter.

So please verbalize your responses. Rather than nod your head, please say "yes"; rather than shake your head, please say "no." As well, sounds like "uh-huh" and "huh-uh" are not



clear. So please remember to use words.

Do you understand this?

A I do.

Q Now, there are lawyers here who represent the parties. Ms. Palmer, who is seated two persons to my right, and I both represent John Enos, plaintiff, who is seated to my right.

And as you know, Ms. Parks represents you, Douglas County, and Ms. Victoria Sauer-Lamb.

Now, from time to time -- time to time, you may hear either Ms. Parks or I make an objection to a question, depending on who's asking it.

If an objection is made, it's very important to remember you are still obligated and required to answer the question truthfully, unless the objection is based on a privilege or a specific instruction limiting testimony or an order like that from the Court.

In such an instance, for example, Ms. Parks will specifically instruct you not to answer a question. But otherwise, you must still answer all questions without regard to the objections made.

Do you understand this?

A I do.

Q And please know, however, that if you refuse to answer a question, we will be forced to either ask the Court to compel your answer or, alternatively, we would move the Court to preclude you



from providing that withheld testimony at the time of trial.

Do you understand this?

MS. PARKS: Scott, you are going to need to speak up just a smidge.

THE WITNESS: Yes.

BY MR. GEDDES:

Q In order to ensure the reliability of your testimony today, I have to ask you if you are currently under the influence of any medications, alcohol, substance or drug.

A No, sir.

Q Okay. Is there any reason that you will not be able to understand my questions today?

A No, sir.

Q Is there any reason you will not be able to give your best testimony today?

A No, sir.

Q Did you bring any documents with you today?

A No documents.

Q Okay. What did you do to prepare for your deposition today?

A I've met with my counsel at a couple of different times, and I've read the -- the testimony of Victoria Sauer-Lamb. That's how I prepared.

Q Okay. Did you review any of the pleadings of the case, for example, the -- I think it's the third amended complaint?



A Those things, I -- I don't understand them to their totality, so I -- I briefed through them. I couldn't serve them, but I -- I have not read through them.

Q Okay. Where do you currently live?

A I live in Minden, Nevada.

Q Where?

A You need a specific --

Q Yes.

A 1668 Mackland Avenue in Minden, Nevada.

Q How long have you lived there?

A Seventeen years.

Q Do you plan on moving your residence in the next two years?

A No, sir.

Q All right. How old are you?

A Sixty-four.

Q And are you married or have you ever been married?

A I'm married.

Q Okay. And do you have any children?

A I have three children.

Q Okay. How old are they?

A Thirty, twenty-eight and seventeen.

Q And where did you go to high school?

A Santa Rosa, California.

Q All right. And can you summarize your educational

**background, please.**
A High school graduate, A.A. degree in -- from community college; B.A. degree from State College, Chico; master's degree from the University of San Francisco.
**Q And what was your degree in?**
A Administration of justice, social welfare and corrections, and counseling -- master's in counseling.
**Q Okay. And what are your hobbies?**
A I have outdoors hobbies, from cycling to hiking, fishing. I'm an outdoors person.
**Q Have you ever been convicted of a crime?**
A No, sir.
**Q Have you ever been a party to a litigation other than this case?**
A No, sir.
**Q Have you ever testified in a deposition before other than in this case?**
A No.
**Q Have you ever testified at a trial before?**
A Yes.
**Q How many trials?**
A One.
**Q And what type of case was that?**
A It was a juvenile delinquency trial -- delinquent trial in San Bernardino County many years ago.



**Q What was your function in testifying?**
A To testify as to the progress and demeanor of a young man that was in treatment in a -- in a place that I worked.
**Q Have you ever received education or training in the subject of employment discrimination?**
A No, sir.
**Q Let's talk about the places where you've worked. Can you list them in reverse order. You are currently employed at Douglas County in the juvenile probation department?**
A Yes.
**Q And you are the chief of the department?**
A I am.
**Q And what -- what's the time period for that?**
A January 4th, 2002.
**Q And that's when you became the chief?**
A Yes, sir.
**Q And you have been the chief since then?**
A I have.
**Q Okay. And then prior to that, where did you work?**
A I worked with Rite of Passage.
**Q Okay. What is Rite of Passage?**
A That's a residential treatment program for boys and girls, private.
**Q What did you do there?**
A My last position there was facility director.



**Q And when did you -- what period of time did you work there?**
A I've worked with Rite of Passage schools from 1983 till 2002.
**Q Go back before Rite of Passage, where did you work?**
A I just did internships at Fouts Springs boys ranch in Colusa County and at school before that.
**Q Okay. So if we focus on the Douglas County Juvenile Probation Department, can you please tell me again what your title is.**
A I'm the chief juvenile probation officer.
**Q And what are your job duties?**
A Administrative responsibilities, budget, oversight, interface with legislative requirements and just oversee the department in general, ensuring that, you know, policy, procedures; at an arm's reach with respect to staff and personnel, yeah.
**Q Okay. With respect to policies and procedures, are you required to have a general working knowledge of what those policies and procedures are?**
A Sure.
**Q And what -- can you identify what policies and procedures you are referring to? Do they have a title, or are they called something?**
A Well, there's the policies and procedures for the



juvenile probation department, and then there's -- and those are the ones that I'm responsible for.
And then there's the court ordered, which is the personnel.
**Q And you are responsible for that too?**
A I am not.
**Q You are not?**
A I am responsible for knowing it and enforcing it, but I'm not responsible for -- I don't write it or --
**Q Okay.**
A Yeah.
**Q Now, when you talk about the juvenile probation policies and procedures, are you referring to -- are you referring to Douglas County policies and procedures?**
A It would be Douglas County juvenile probation department policies and procedures.
**Q What about Douglas County personnel rules and procedures and regulations, is that something that you would also, as part of your job, have general familiarity with?**
A I have -- yes, I have general familiarity with the Douglas County personnel policies and procedures and also the court order --
**Q Okay.**
A -- for personnel procedures for the Ninth Judicial District Court.

Q All right. And what's -- can you describe your supervisory role, what -- what activities you are responsible for as a supervisor of the probation -- juvenile probation department.
A Well, the administrative responsibilities, budget, policy, personnel. And I also am a juvenile probation officer, so I have transportation, I can transport, arrest, you know, drug test.
I also work with the juvenile detention facility and just oversee their meetings. I sit in on meetings, offer feedback, meet with the supervisor of detention, meet with the chief deputy to discuss matters, policy, direction.
Q How is juvenile detention different than -- as a department or entity than juvenile probation?
A Well, juvenile -- it's secure juvenile detention, which is -- staff are not juvenile probation officers that work in juvenile detention, but they are certified in many ways. It's state required, meet state requirements for operating secure juvenile detention facilities.
Q But if we were to do an organization chart --
A Yeah.
Q -- would the juvenile detention center be under your --
A Oh, yes.
Q -- supervision?
A Yes, sir.
Q So it would be juvenile probation and juvenile detention



as a subsidiary or entity under that control of -- of you?
A Yes, sir.
Q Okay. Can you identify the -- basically, you supervise everyone? I mean, you supervise the juvenile probation officers?
A You mean, directly on a day-to-day basis? Evaluations or --
Q However you would describe that.
A I oversee the juvenile probation officers and the juvenile detention personnel.
Q So who -- who is responsible for hiring juvenile probation officers?
A I would be.
Q Okay. And who is responsible for disciplining them?
A The chief deputy would be.
Q Okay. And if the chief deputy -- that's the position underneath yours directly?
A Yes, sir.
Q And if the chief deputy disagreed with -- or, you disagreed with something that the chief deputy wanted to do in regard to discipline, is that something that you could override him or her over?
A Yes, I could.
Q Okay. And what about the function, the relationship between Douglas County probation department and any of the personnel of the Ninth Judicial District Court, what type of



interaction or joint responsibility does the Court have?
A I'm not clear on what you are asking.
Q You -- you mentioned that you are responsible for carrying out the court-ordered personnel procedures and regulations, correct?
A Right.
Q So for purposes of this deposition, I'll just call those the Ninth Judicial District Court regulations, personnel regulations.
A Okay.
Q Isn't it true that the judges serving in an administrative capacity have some function, input or role here?
A In?
Q In hiring, firing, supervising or disciplining probation officers.
A They do not.
Q And who is your boss?
A I report directly to the Ninth Judicial District Court Judge Thomas Gregory.
Q Okay. So the judge is your boss?
A Yes.
Q Okay. And the judge is responsible for hiring and firing you; is that correct?
A Yes.
Q The person in your position.



A Yes, I'm an at-will employee --
Q Okay.
A -- and could be asked to leave today.
Q Okay. And the chief deputy is the same; is that correct?
A Yes, sir.
Q And if the judges want to hire someone as a juvenile probation officer, are they able to do that?
A No -- yes, they would be able, but they do not exercise that authority. They rely upon myself as the chief juvenile probation officer and the chief deputy to do the hiring.
Q Have they -- have they ever recommended anyone to be hired to you as a juvenile probation officer?
A No, sir.
Q And what is your understanding of this lawsuit?
A A wrongful termination. That's as much as I can understand of it.
Q And who is alleging wrongful termination?
A John is alleging wrongful termination on the part of Douglas County Juvenile Probation.
Q Okay. How do you know John Enos?
A I've worked with John, known John for 17 years.
Q And you understand he is the plaintiff in this lawsuit?
A I do.
Q And how would you characterize your relationship with

Mr. Enos? There's personal, personal and professional, or strictly professional.
A Strictly professional.
Q And after Mr. Enos -- Mr. Enos is no longer employed at Douglas County; is that correct?
A That's correct.
Q And do you know when -- when his separation of employment occurred?
A I don't know the exact date, no.
Q A month or a year, approximately?
A I don't. I don't. I don't want to guess.
Q After Mr. Enos left his employment with Douglas County, did you have any communications with him?
A No. No.
Q Did you instruct, encourage or request after -- at any time, did you encourage, instruct or request that any other Douglas County employees not speak to Mr. Enos after he left his employment with Douglas County?
A I do not recall saying that.
Q Do you recall giving the instruction to anyone that it would be better if they did not speak with him?
A I do not recall that instruction.
Q If Mr. Enos testifies at trial that -- or, we have other witnesses testify at trial that you did make such statements, would you have any reason to disagree with that?



A I don't recall having made those statements.
Q Well, my question is a little different. As you are sitting here now, would you have any reason to disagree with testimony if that testimony is offered?
A I would not disagree.
Q And who is Vicki Sauer-Lamb?
A Sauer-Lamb is the -- was the chief juvenile -- chief deputy juvenile probation officer for Douglas County.
Q How do you know her?
A I met Vicki Lamb in 2002 when I came aboard as the chief juvenile probation officer.
Q You understand that Ms. Sauer-Lamb is a defendant in this case?
A I do.
Q How long have you known her, did you say?
A Seven -- seventeen, approximately seventeen years.
Q And how would you characterize your relationship with her, personal, personal and professional, or strictly professional?
A Professional.
Q After Ms. Sauer-Lamb left her employment at Douglas County, did you have any communications with her?
A Occasionally.
Q And what did you guys speak about?
A Children, events, Christmas parties, yeah.



Q Isn't it true you spoke with her about this case?
A I spoke with her about the case just in -- recently, yeah.
Q When was that?
A Well, within the last two months.
Q That was after her deposition, correct?
A I did speak to her after her deposition.
Q And what did you guys talk about after her deposition?
A I asked her what kind of person you were, you know, just to see where -- how she felt about you and the questions, and just about the questions in general. And she elaborated a little bit, but wasn't willing to -- to go much further.
Q But you had an opportunity to read her transcript, right?
A I -- I did.
Q So you know the questions that were asked of her?
A I do.
Q And you know her answers?
A I do because I read the transcript.
Q Okay. And do you know someone by the name of Nathan Tod Young?
A That would be in a judicial -- judge, yeah, Judge Young from the Ninth Judicial District Court.
Q And how do you know him?
A He is -- works for -- he has been a public defender in



the courthouse since I've been there in 2002. And he became the district court judge in the last -- I forget how long he has been sitting.
Q You understand that he was a defendant in this case?
A I do not.
Q How long have you known him?
A Since 2002.
Q How would you characterize your relationship with him, personal, personal and professional, or strictly professional?
A Strictly professional.
Q After leaving your employment at Douglas County, did you have any communication -- I'm sorry. After Mr. Enos left his employment at Douglas County, did you have any communications with him about Mr. Enos?
A Would you repeat the question, please.
MR. GEDDES: Could you please read back the question.
(The question was read by the reporter.)
BY MR. GEDDES:
Q And when I say "him," I'm referring to Judge Young.
A Not that I recall.
Q How frequently do you speak with Judge Young nowadays?
A Occasionally.
Q A couple times a month?
A If that.
Q Is it in a professional capacity?

Page 26

A Absolutely, professional capacity.
Q Do you have -- you don't have a private friendship with him?
A I do not.
Q And you don't recall whether -- have you had any conversations with him about this lawsuit?
A Briefly.
Q Can you elaborate on that.
A Just that there was a deposition and that I had to move forward with responding to -- to the deposition, and that was the nature of the conversation.
Q Did he express his opinion about this lawsuit?
A He did not.
Q Do you know someone by the name of Michael Gibbons?
A I do, Judge Michael Gibbons.
Q And you understand that he was a defendant in this lawsuit?
A I do not.
Q How long have you known Judge Gibbons?
A I've known Judge Gibbons since 2002.
Q Did Judge Gibbons originally hire you in 2002 when you were hired as the chief?
A He made the phone call that -- and -- and hired me.
Q Okay. And how long did you interview for the position?
A Maybe a half hour.

Page 27

Q And did you know Judge Gibbons prior to you being appointed in 2002 as the -- as the chief of the department?
A I knew he was the judge of the Ninth Judicial District Court in Minden, Nevada.
Q Did you -- did you have any prior relationship with him prior to your being hired?
A I met him at a -- maybe a function or two in years past.
Q You had no personal friendship with him --
A No, sir.
Q -- at any time?
So how would you characterize your relationship with him, personal, personal and professional, or strictly professional?
A Professional.
Q After leaving your employment -- after Mr. Enos left his employment at Douglas County, have you had any communications with him regarding Mr. Enos?
A No, sir.
Q How frequently do you speak to him nowadays?
A I haven't spoke to him in a long time.
Q Have you had any conversations with him about this lawsuit?
A No, sir.
Q Do you know someone by the name of Norma Santoyo?
A Yes.

Page 28

Q Who is she?
A Norma was, I believe, the director -- if that's the title, director of Human Resources.
Q Have you had an opportunity to read the transcript of her deposition in this case?
A I have not.
Q How long have you known her?
A Since she came aboard, whenever she was hired at Douglas County. I have a working relationship with the director of Human Resources. We are required to.
I don't know when she came aboard, and till she left.
Q You say that you have a working relationship with the director of Human Resources and you have to. Can you explain that.
A Well, I am not -- that's not my scope of -- you know, Human Resources and -- scope of practice and area of knowledge. So I work diligently with Human Resources on personnel matters and classification matters and pay matters and all those things attributed to --
Q What about discipline and termination matters, do you interact with her as well in that?
A We would -- yes, I would interact with the human resources director and respond to disciplinary matters and things like that.
Q Is it -- is it Human Resources' function to carry out

Page 29

your wishes, or are you carrying out what they tell you to do, with respect to hiring, firing and discipline?
A I follow the advice of Human Resources. And if the District Attorney, Deputy District Attorney is involved, I would follow their advice as well.
Q But ultimately, the buck stops with you, you have the ultimate responsibility of making the decision, correct?
A I have the ultimate responsibility of making the decision.
Q And so how frequently do you speak with -- now, Norma Santoyo no longer works at the human resources department; is that correct?
A She does not work there anymore.
Q How frequently do you speak to her nowadays?
A I haven't spoke to her since she left.
Q Have you had any conversations with her before she left about this lawsuit?
A I've had conversations -- no, not about the lawsuit. Sorry.
Q Do you know someone by the name of Karen Barbee?
A The name sounds familiar, but I don't recall.
Q Does it refresh your recollection if I explain that she works with the workers' comp insurer, dealing with workers' compensation claims for employees under your -- under your command?

A I did not work with Karen Barbee. The name sounds familiar.
**Q Have you ever heard of ASC?**
A I -- no, sir.
**Q So you haven't -- you don't speak with her -- you haven't spoken with her, to your recollection?**
A Spoken with who?
**Q Karen Barbee.**
A I have not. To my recollection.
**Q Do you know someone by the name of Sarah Christensen?**
A Yeah, Sarah worked for Human Resources.
**Q And does she work in that department, or does she work under you?**
A She worked in Human Resources.
**Q Does she no longer work there?**
A I don't believe so.
**Q Do you know when she left that employment?**
A I don't -- I don't recall.
**Q How would you characterize your relationship with -- if we went back to Norma Santoyo, personal, personal and professional, or strictly professional?**
A Strictly professional.
**Q And the same is true with Sarah Christensen?**
A Strictly professional.
**Q Have you had any communications with Sarah Christensen**



**about John Enos?**
A Yeah, during the course of -- yeah, over time, yes, I had conversations -- I don't recall when or how or what they were about, but I did have conversations with Sarah Christensen.
**Q Concerning Mr. Enos?**
A Yes, sir.
**Q How frequently do you speak to her nowadays?**
A Not at all.
**Q Have you had any conversations with Sarah Christensen about this lawsuit?**
A No, sir.
**Q Do you know anyone by the name of Kathy Jo Kidd?**
A Yes.
**Q Who is Kathy Jo Kidd?**
A She works for Human Resources.
**Q And does she currently work there?**
A I believe so.
**Q And how long have you known her?**
A Since she began working there.
**Q How would you characterize your relationship with her, personal, professional and personal, or strictly professional?**
A Professional.
**Q Have you had any communications with her about John Enos?**
A I don't recall.



**Q How frequently do you speak to her nowadays?**
A Not -- not much at all.
**Q Do you speak to her when personnel matters come up on HR regarding your employees?**
A No, I don't -- I have -- I don't have pretty personal -- I don't know who -- personnel -- HR has changed a bit, so I'm not quite sure who would be my primary contact.
Typically, I would go to the director, and then she would give me direction.
**Q In the period of 2014 through 2016, what was the chain of command for the supervision of juvenile probation officers and senior juvenile probation officers?**
A The chain of command in the department?
**Q Yes.**
A It would be -- the primary supervisor over the juvenile probation officers and the senior juvenile probation officers was Victoria Sauer-Lamb, the chief deputy. And then I have over -- Vicki Lamb reports to me.
**Q And then over you are the judges?**
A The judges -- I report to the judges, but not on personnel matters, not on routine matters pertaining to the department or the administration of the department or Human Resources. I do not report to the judges on those matters.
**Q So from your perspective, then, what is the function of the judges of the Ninth Judicial District Court and how they**



**factor into the chain of command for supervision of the juvenile probation officers?**
A They don't have any responsibilities or choose to have any responsibilities over supervising the juvenile probation officers, the senior juvenile probation officers or the chief deputy.
**Q Are you aware of a Nevada Revised Statute that requires these judges to actually oversee the juvenile probation department?**
A I do -- I am aware that they oversee the juvenile probation department. It's state statute.
**Q How do they accomplish that?**
A They do that through the court order with respect to personnel regulations, and they do that in respect to, you know, me reporting up to them in respect to policies and procedures.
**Q So they defer to you?**
A Yes, sir.
**Q So to your understanding, the judges don't have an active role in hiring, disciplining or firing juvenile probation officers?**
A No, sir, the judges do not have an active role in hiring, firing or disciplining juvenile probation officers.
**Q What about the judges' role in hearing administrative appeals of juvenile probation officers and senior juvenile probation officers who are disciplined or fired?**

A The court order is written as such that in the case that an employee wants to contest a termination, disciplinary termination action, that they can request a hearing, and it is spelled out in the court personnel regulations.
**Q Has that ever happened before?**
A No, sir.
**Q Not in any -- not since -- since you became the chief in 2002?**
A I've had no turnover other than retirement since I've been chief, since 2002.
**Q So in the period of 2014 to 2016, what personnel rules governed discipline and firing of juvenile probation officers and senior juvenile probation officers? Would those be the Ninth Judicial District Court rules?**
A Yes, sir, and Human Resources' administrative policy as well.
**Q And is that policy codified anywhere?**
A It is. There's county code and then there's Douglas County policy and procedure. I'm not quite -- much -- quite sure where it's located. It's in either county code or the policies and procedures.
**Q Okay. So the Ninth Judicial District Court personnel regulations, sometimes referred to as the order establishing court personnel regulations, those govern the discipline and firing of juvenile probation officers and senior juvenile probation**



**officers, correct?**
A I don't understand your question.
**Q The -- what we talked about earlier, the Ninth Judicial District Court regulations, those -- I think you just answered that that governs and controls how a person is disciplined or fired and -- with respect to probation officers and senior juvenile probation officers.**
A Actually, the specifics on progressive discipline and training reminders and letters of -- are spelled out in the county codes. And that's what --
**Q Okay.**
A Yeah. Yeah.
**Q I guess what I'm asking you is, you testified earlier that the Ninth Judicial District Court rules and the HR administrative policy are -- those govern the discipline and firing of juvenile probation officers and senior juvenile probation officers.**
**Are you now saying that's not correct, and that instead, only the county code governs, or they all govern?**
A They -- yeah, together, but the specifics for progressive discipline are located in the county code.
**Q Are you referring to Douglas County personnel regulations? Is that what you are referring to when you say the code?**
A The county code, Douglas County code --



**Q Under --**
A -- or Douglas County, you know, administrative policy.
**Q Okay. That would include the personnel regulations?**
A No, sir.
**Q Okay. What's the difference between the -- the Douglas County personnel regulations and what you have just described as the county code?**
A You know, I don't -- I would have to walk through both of those documents to talk about the differences. There's quite a bit of information in both -- in -- in both sets of policies.
**Q Okay. So to your knowledge or understanding, in 2014 and 2015, the juvenile probation officers and senior juvenile probation officers who survived their probationary period, they were classified positions, as opposed to at-will positions, correct?**
A Yes, sir.
**Q And during that time frame, the juvenile probation officers and senior juvenile probation officers who survived their probationary period could only be fired for cause; isn't that right?**
A I believe so.
**Q And during that time frame, the juvenile probation officers and senior juvenile probation officers who survived their probationary period could only be fired after giving proper notice and an opportunity to be heard, correct?**



A Would you repeat the question, please.
MR. GEDDES: Could you please read that back.
(The question was read by the reporter.)
THE WITNESS: I don't understand the question.
BY MR. GEDDES:
**Q Due process, they had to be given due process before they could be fired; isn't that correct?**
MS. PARKS: Objection, calls for a legal conclusion.
BY MR. GEDDES:
**Q You can answer the question.**
A Would you repeat your last -- the last question.
**Q Well, I was characterizing the longer question as due process, notice and an opportunity to be heard.**
**So before someone is fired, they have an opportunity -- or given notice of potential firing and an opportunity, if they want, to be heard and defend.**
A In a disciplinary employment matter, if -- that would be the case, if this was a disciplinary matter with progressive discipline and potentially training reminders and discussions and letters of reprimand and maybe even -- that would be the case, yes, sir.
**Q Would you -- is it fair to say, then, that a person who is fired against his or her will who wants to work there, but is being fired, that that is a disciplinary matter?**
A No, I would not agree with that.

**Q Okay. Can you tell me the difference between disciplinary matters by which a juvenile probation officer is fired and nondisciplinary -- disciplinary matters by which a juvenile probation officer is terminated from employment against that officer's wish.**
A I wouldn't know of any such circumstances.
**Q Who supervised Vicki Lamb, you?**
A Yes, sir.
**Q Did the judges also supervise her?**
A No.
**Q Who had the power to discipline Vicki Sauer-Lamb?**
A I did.
**Q Anyone else?**
A No, sir.
**Q Who had the power to fire her?**
A I did.
**Q Anyone else?**
A The -- I guess a judge could fire her if they felt, you know -- she's at will. They could fire her if they felt compelled to do so.
**Q Okay. And so you're -- you're considered to be the department head; is that correct?**
A Yes, sir. Yeah.
**Q But if the judges -- if the judges came to you and said we want Vicki Lamb fired, she's fired, you are going to fire her, is that right, or a person in that position?**



A An at-will position can be let go at any time.
**Q But what I'm saying is, in addition to the idea coming from you, the idea could come from the judges to terminate that position and that person would be terminated, whether you wanted it or not.**
A If the judges chose to ask an at-will person to leave their position, they are entitled to do so.
**Q And what about the idea of hiring someone? If the judge wanted to hire someone in an at-will position that Vicki Sauer-Lamb had and you didn't want that person hired, but the judges did, that person would be hired, correct?**
THE WITNESS: Would you repeat that question, please.
(The question was read by the reporter.)
THE WITNESS: No.
BY MR. GEDDES:
**Q Okay. So just to be clear then, one of the administrative judges, who is responsible for hiring and firing you, comes to you and says Jane Doe, who is in the deputy chief position, we want her fired, and you said I don't want her fired, are you saying, then, that she would not be fired?**
THE WITNESS: Repeat the question, please.
(The question was read by the reporter.)
THE WITNESS: She could be fired based on the authority of the judge. However, I find that very unlikely that either one of the judges would exercise that kind of authority.



They would yield to human resource policy and procedure, they would yield to the court order, and that's -- that's how that --
BY MR. GEDDES:
**Q And they would yield to you?**
A They would not yield to me. They would want process to take its course.
**Q And how was Douglas County's HR department -- we talked about this earlier, but I want to get more specific.**
**How was the HR department involved in the disciplining, termination or hiring for the deputy chief's position?**
THE WITNESS: The discipline -- one more time, please.
(The question was read by the reporter.)
THE WITNESS: Human Resources -- I'd notify Human Resources of an open position. We compile that application. They activate it and collect names of all the applicants and their qualifications to find out who meets the qualifications.
And they hand that over to the juvenile probation department, along with questions and whatnot. That's how -- that's how they work with us.
BY MR. GEDDES:
**Q When you say they hand it over to the juvenile probation department --**
A They hand over the hiring list.



**Q Who do they hand that over to?**
A They would hand that over to me. And it's also on their record.
**Q And that would -- that would be true not just for the chief deputy position, but for any open juvenile probation officer, senior juvenile probation officers' positions, correct?**
A Yeah, we have a process -- I think it might have been active -- called NEOGOV. It's a computerized system where you get online, you put a requisition in. It gets approved by, I believe, the HR director, the county manager. There's a couple of, oh, budget folks make sure the position is open.
At that point, it opened -- the qualifications are there. Applications are accepted for the designated period of time, and then the list of qualified individuals is established.
And back -- yeah, and then I work with HR on that list in respect to notification for interviews and whatnot.
**Q Is that process followed for -- is the same process followed for internal promotions?**
**So, for example, if you had an open position for senior juvenile probation officer, and one of the juvenile probation officers wanted to apply for that job, they would go through the same procedure of submitting their materials directly to HR?**
A Yeah, if there was a -- the only -- yeah, if, like, a detention worker wanted to -- we kept it internal within the framework of the county.

We would post -- required to post it intercounty. And then that juvenile probation officer or another county employee could actually put their application in for that position, with the understanding that they would have to meet the qualifications for entry level -- or, not entry level, but a senior juvenile probation officer.

**Q They would submit that paperwork to the HR just as an outside person would, or they would submit --**

A They would submit that paperwork to HR via computer -- via the NEOGOV computer system.

**Q And that's the same thing that outside people are doing to apply for jobs?**

A If there is -- if it's open to the public, then they would apply through the NEOGOV process.

**Q How many -- during the 2014, 2000 time frame, period, how many juvenile probation officers, including senior, did -- were -- were employed?**

A Six.

**Q Was the number six ever greater or lower during the period of time that you've been the chief?**

A We kept a position open for a period of time based on budgetary concerns, but I don't recall when or how.

**Q Was the budgetary -- what -- what do you mean by that?**

A Just taking a look at the budget, taking a look at the caseload and just evaluating the juvenile probation department on



the whole.

**Q What I mean by that is, what does it mean that you kept it open on budgetary concerns? What does that mean? You didn't put someone in that position --**

A I believe there was a -- somebody retired, and I forget. I guess it might have been Bruce. We kept it open for a short period of time.

**Q Oh, but -- but do you know what period of time that was?**

A I do not. I don't recall.

**Q So -- but other than that, your recollection is, since -- since 2002, when you became the chief of the department, there have always been six positions, none more and none less?**

A Yes. Yes, to the best of my recollection.

**Q And how many cases were typically assigned -- well, let me do it this way. Approximately how many cases would the department average per year?**

A In the beginning, it was higher, 20, 22. And you are talking diversion caseloads, informal case -- informal cases and formal probation.

And I think it tapered down to 12 to 10. It varied based on probation officer and child, individual case basis. Cases sometimes stay with us longer just based on the particular individualized needs of the client and the family.

**Q Okay. So at -- at the height of the higher caseloads -- you said they were higher in the beginning. You said -- I believe**



**your testimony is 20 to 22.**

A That's my estimate.

**Q Right. I understand.**

**Approximately what time period was that?**

A I can't recall. In the beginning.

**Q 2002?**

A 2002 on, for a while.

**Q Okay. And then when -- when did they start to go to 12 to 10?**

A I don't recall.

**Q Okay. Where would that information be?**

A It might -- well, our old database is gone. It crashed. We are in a new database, so I'm not quite sure where it would be.

**Q Well, wouldn't you have to --**

A Files are deleted because they are juvenile files. So there's not a working record of that. And I don't have a working record of caseloads, you know, that far back.

**Q But previously, you testified that you would often -- and I'm maybe not saying it exactly accurately. But generally speaking, you interacted with the legislature, you made reports to the legislature. Is that right?**

A Yeah, mostly on detention numbers and status offenses and detention protocol and mental health issues.

**Q You don't recall reporting as part of annual reporting or --**



A The annual reporting would be done through our database to the State.

**Q But do you recall -- I mean, it seems quite logical that the number of cases that the department would handle would be a statistic that would be published on a -- on a basis to the legislature for budgeting purposes and things like that.**

A I'm not confident that it would be published at a state level. I'm not sure.

**Q On a county level?**

A At -- in arm's reach, within a three-, four-year period, yes, I would report on caseload to the judges, to the county commissioners, who always had concern about budget and operations and necessity of, you know, cases and necessity of officers and positions.

You are constantly using those numbers to share with the county commissioners in the budget cycle.

**Q Okay. So you think that it probably was published to the County at some point?**

A I'm -- I'm not sure.

**Q Now, when you say, for example, 20 to 22, or 12, 12 to 10, that's departmentwide and that would be split up among the six probation officers, juvenile probation officers; is that correct?**

A Yeah. One -- one of our juvenile probation officers does not have as large a caseload as others.

**Q Who is that?**

A It would be Dominic Hastings Molyneux.
Q Why not?
A He's an outdoor intervention probation officer, basically, in charge of programming and outdoor and sober leisure activities on behalf of the kids and their probation caseload.
Q Okay. So most of the cases, then, would be divided up among the five others, but he would get -- he would get some?
A He would get a handful from up in the Lake Tahoe region.
Q Okay. And was the caseload distributed evenly, more or less, among the other five?
A I believe so.
Q Okay. Do you know who supervised Norma Santoyo?
A I do not.
Q Do you know who supervised Sarah Christensen? Would that be the director of HR?
A I'm not sure who would be her immediate supervisor.
Q But the director would have --
A I would think she would have oversight.
Q Well, based on your interactions with HR department, is your understanding that the director of the HR department has -- has supervisory authority over the subordinates?
A Supervisory and management authority over her department.
Q Okay. Do you know --
A Administrative.



Q All right. So from what I gather, is it truthful and complete, then, that the persons who supervised or oversaw Mr. Enos' job was both the deputy chief and the chief of the juvenile probation offices?
A Vicki Lamb was the primary supervisor over Mr. Enos' position as juvenile probation --
Q But if you wanted to step in and supervise a matter, you had the authority to do so, correct?
A I would have the authority to do so.
Q And as far as -- so that -- you both had authority to discipline him and fire him; is that correct?
A I have the authority to discipline and fire any employee under my supervision in respect to the detention facility or the juvenile probation department based on -- it would have to be based on progressive -- you know, accurate progressive discipline.
Q But deputy chief did not have the power to fire Mr. Enos?
A Deputy chief has the power to -- to make that decision based on, you know, progressive discipline.
Q Okay. So either you or she, in this case, Victoria Lamb, had the authority to fire Mr. Enos in the 2014, 2015 time period?
A We have the authority to fire based on, you know, accurate progressive discipline in conjunction -- and we would use the Human Resources in order to ensure that decision.



Q Okay. So that we're clear here, with regard to Mr. Enos, and to your knowledge or understanding, the Ninth Judicial District Court judges, either Judge Gibbons or Judge Young, were in no way involved in the disciplining, termination or hiring of Mr. Enos; is that correct?
A That's correct.
Q How many times --
A Excuse me. Yeah, I did not hire John Enos on as a -- I received him.
Q Okay.
A Yeah. So before that, I'm not quite sure.
Q But as far as disciplining and terminating Mr. Enos, the same question, Judge Gibbons and Judge Young had no involvement whatsoever?
A No involvement whatsoever.
Q How many times did you meet, confer or communicate with the Ninth Judicial District Court judges in 2014 to 2015 regarding administration and personnel matters of the probation department and its employees?
A I don't recall.
Q Did you have quarterly meeting, weekly meetings, monthly meetings? Was anything routinely scheduled?
A I have no routinely scheduled meetings with the Ninth Judicial District Court judge -- it would be Judge Gibbons at that time.



Q Okay. And did Judge Gibbons -- did you have to report to Mr. Gibbons in writing regarding the status of the department?
A I would report to him on -- not routinely, but periodically around budget time, around caseloads and things like that, very briefly.
Q And so --
A Yeah.
Q -- other than that, they were not kept in the loop as to what's going on in the department as far as employees and administrative matters?
A Yeah, they were -- they preferred to be distanced from any of those matters based on the personnel regulations and the fact that if there is a disciplinary action, disciplinary termination, if they are going to be conducting a hearing or a due process, as you call it, that they -- their objectivity is essential to a fair hearing.
Q How many times, to your recollection, did you meet with any of the Ninth Judicial District Court judges regarding Mr. Enos?
A I don't recall.
Q More than 10 times?
A I don't recall.
Q Less than 10 times?
A I don't recall.
Q Do you recall meeting at least once?

A Maybe once.
Q And when was that meeting?
A I don't know.
Q What was discussed?
A I don't recall.
Q Was that before or after he was -- his employment was terminated?
A I don't recall that either.
Q So apart from communicating with the Ninth Judicial District Court judges regarding administration and personnel matters and the way that you have testified already regarding budgetary matters, would you communicate with them regarding any other issue?
THE WITNESS: Could you repeat that question, please.
(The question was read by the reporter.)
THE WITNESS: Typically, it was budgetary matters or detention facility, you know, administrative matters pertaining to the juvenile probation department.
BY MR. GEDDES:
Q But you have no recollection of actually speaking with any of the judges prior to Mr. Enos' termination about Mr. Enos?
A I have no recollection.
Q Now, during the 2014, 2015 time frame, did your office hold office meetings?
A There -- yeah, we have monthly -- or weekly office



meeting, typically on Mondays in the morning.
Q And who -- who attended those meetings?
A Juvenile probation officers, chief deputy and myself occasionally.
Q Okay. And what was the purpose of those meetings?
A To review the week's activity as far as the on-call juvenile probation officer is concerned, to review the numbers of juveniles in detention, to review court, court coming up for the week, and any other matters, events, outdoor intervention trips.
And sometimes we would just train, a policy or procedure, take 10 minutes to review those things, keep people abreast of what was going on in the department.
Q Typically, how long would those meetings last?
A Anywhere from a half hour to an hour.
Q And attendance was mandatory?
A It was mandatory if a person was on duty or did not have other responsibilities, like a transport from juvenile detention.
Q The judges attended those meeting from time to time, correct?
A Not very often.
Q But you do recall they did attend on occasion?
A I don't recall, quite frankly.
Q So if Ms. Sauer-Lamb testified that they did occasionally attend, would you have any reason to disagree with her?



A I would yield to Ms. Sauer-Lamb's comment.
Q Okay. And so it sounds like, from these meetings, the chief and the deputy chief had a pretty good handle on what was coming up and what was going on in the department. Is that a fair characterization?
A Yes. We would review the past week's activities and upcoming trainings and/or particular events, yes, so we would have an update for the staff on whatever the week brought to us.
Q Now, were minutes kept of those meetings?
A No, sir.
Q No one took notes or it was not -- it wasn't recorded, video or audio?
A No, sir.
Q All right. If we focus on the 2013 to 2015 time frame, was Mr. Enos injured in any workplace injuries?
A I can't recall the time frames.
Q But your recollection is that he did suffer workplace injuries?
A I believe he suffered a workplace injury on a wilderness trip. I do know -- I know he did.
Q Okay. And what do you recall about that?
A That he was injured on an outdoor intervention trip, and I'm not quite sure of the -- of the specifics around it.
Q Do you recall whether he had a workers' compensation claim filed as a result of -- of that injury?



A I don't recall.
Q And do you recall whether or not he was subsequently injured on the duty?
THE WITNESS: Could you repeat that question, please.
(The question was read by the reporter.)
THE WITNESS: I don't understand that question.
BY MR. GEDDES:
Q He was injured while on duty. You don't recall a subsequent injury while on duty?
A I was confused by the word "subsequent."
Q Okay.
A Yeah, he was injured on duty on an outdoor intervention trip.
Q But subsequent to that, was there another incident about a year later where he was also injured?
A I don't recall that.
Q Do you recall whether Mr. Enos ever took time off from work in connection with an injury that occurred on the job?
A He may have taken time off work due to injury. I don't specifically recall that he took time off for that or when it was or the time frames.
Q What is your level of involvement in monitoring your subordinates if they have a workplace injury?
When I say "monitoring," I'm talking specifically about how long they are going to be out, when they come back, things

**like that.**

A I rely on the report of the chief deputy juvenile probation officer who networks with Human Resources.

That's not our scope of practice, nor our expertise, and we rely on Human Resources and our Deputy District Attorney, the advice of them to walk us through those complicated processes.

**Q But you have a general awareness as far as manpower. If you are out an employee, would you generally know about that?**

A Yeah, sure.

**Q And so if Mr. Enos took time off for medical reasons in connection with a workplace injury, that's something that generally you would be aware of?**

A I would be aware of that.

**Q So during the 2014 to 2016 time frame, do you recall attending any meetings with anyone regarding John Enos?**

A I don't recall the meeting specifically. I know there -- I've met with HR and our District Attorney, but I couldn't recall when, I couldn't recall the content of those meetings, nor the place.

**Q Okay. Who in HR are you referring to here?**

A Norma Santoyo.

**Q How many times do you think you met with her?**

A I don't recall.

**Q More than once?**

A I don't recall.



**Q You met her at least once?**

A At one time. Let's just say one time.

**Q So who is the Deputy District Attorney that you are referring to?**

A Justina Caviglia.

**Q How many times did you meet with her regarding Mr. Enos?**

A More than once. I can't recall specifically how many times.

I was relying on them to -- and their expertise in this area to advise me.

**Q Advise you as to what?**

A As to, again, what to do and how to do it.

**Q And what exactly are you referring to when you say "what to do"? How to do what?**

A Just the -- in response to the workman's compensation protocol.

**Q So your recollection, then, would be that you met with them regarding Mr. Enos' workers' compensation matters?**

A That would be my recollection.

**Q Do you recall whether Judge Young or Judge Gibbons attended any of those meetings?**

A I don't recall that they did. I don't believe they did.

**Q Do you recall whether Sarah Christensen attended any of those meetings?**

A I don't recall.



**Q Do you recall whether Kathy Jo Kidd attended any of those meetings?**

A I don't recall.

**Q Do you recall whether Karen Barbee attended any of those meetings?**

A I don't recall.

**Q Was the topic of the Americans with Disabilities Act, which I'll call "ADA," or John Enos' rights or potential rights under the ADA ever discussed at any of those meetings?**

A I don't recall.

**Q Was the topic of Mr. Enos' FMLA leave ever discussed at those meetings?**

A I remember talking about FMLA -- I don't understand it, I still don't understand it -- in one of those meetings with somebody, I couldn't tell you which meeting it was or who it was with, regarding the use of FMLA and when it applies and how it applies and in the time frames.

But I couldn't tell you who that was with and what the outcome of that meeting was.

**Q So just to be clear, that meeting that you are referring to was a meeting about the FMLA concerning Mr. Enos?**

A It would be in respect to FMLA in general, just the -- more the, you know, FMLA and how it applies. It didn't really get into, I don't believe, in respect to John's case.

**Q So the meeting at which the FMLA was discussed in**



**general was not a meeting at which you discussed John Enos; is that correct?**

A I don't believe so.

**Q And was that meeting before or after Mr. Enos' employment was terminated?**

A I don't recall.

**Q Was the topic of Mr. Enos' termination ever discussed at those meetings?**

MS. PARKS: Objection, lack of foundation with respect to use of the term "termination of Mr. Enos."

BY MR. GEDDES:

**Q Let me be more specific. The termination of Mr. Enos' employment, was that ever discussed at any -- any meeting that you recall?**

A I recall one meeting with Norma Santoyo regarding his inability to report to work with full clearance, and that according to our court personnel regulations, it would have been considered a resignation, slash, termination from employment with the Douglas County Juvenile Probation Department.

**Q Now, when was that meeting?**

A I don't recall, sir.

**Q Well, that was before his employment was terminated, correct?**

A I don't recall.

**Q Was the topic of Mr. Enos applying for rehire after his**

employment was terminated ever discussed at a meeting that you recall?
A I don't recall.
Q Were you aware one way or another whether Mr. Enos ever attempted to be rehired at the juvenile probation department after his -- after his employment was terminated?
A I was not aware.
Q And was the discussion of Mr. Enos being hired anywhere within Douglas County, not necessarily just the juvenile probation department, ever discussed after he -- after his employment was terminated?
THE WITNESS: Could you repeat the question, please.
(The question was read by the reporter.)
THE WITNESS: I had no such discussion.
BY MR. GEDDES:
Q Are you aware of a discussion by anyone?
A I'm not aware.
Q So to your knowledge or understanding, was the topic of the Americans with Disabilities Act, the ADA, or Mr. Enos' rights under the ADA ever discussed by anyone, whether through email, at a meeting, voicemail, phone, any -- any type of communication?
MS. PARKS: With this witness? Because if not, it calls for speculation.
BY MR. GEDDES:
Q Well, no, I'm asking to your -- to your awareness or



understanding, which if it's not your awareness, it may be your understanding, and your understanding could be incorrect, but I'm interested in what you are aware of or understand.
Does that make sense?
Do you understand the question?
A No, I don't.
Q Okay. To your awareness or understanding, was the topic of the ADA or John Enos' rights under the ADA ever discussed by anyone?
And when I say "discussed," I'm referring to orally or in writing.
A It was not -- I never discussed those, what you said, with anybody.
Q Okay. That's helpful to know that you never discussed it, but you could be in a meeting or you could be watching emails go back and forth. So I'm asking about whether you are aware of --
A I don't --
Q -- anyone discussing this.
A I don't recall.
Q So a conversation may have occurred that you -- that you observed, but you are saying you don't recall whether that occurred?
A I don't -- don't recall.
Q And the same question with regard to FMLA leave, his



FMLA leave. To your awareness or understanding, was the -- was the topic of John Enos' FMLA leave ever discussed by anyone, other than what you have already testified to?
A I don't recall.
Q And the same question as to the termination of his employment.
A Could you -- I'm not sure what you -- I'm not sure what you are asking, yeah.
Q To your aware -- to your knowledge or understanding, was the topic of Mr. Enos' termination ever discussed by anyone?
A I would understand that it might -- it had to be discussed by somebody, but who, I don't know.
Q It wasn't you? You didn't have any discussions about that subject?
A Not termination.
Q What about his separation of employment, how ever you want to characterize it.
A I would characterize it as a resignation and a termination from employment, slash -- based on the -- based on the language in the court order.
Q So the question stands then. Did you have any conversations with anyone about that matter?
A Norma Santoyo.
Q And when did you have that conversation?
A I don't recall.



Q Was it the conversation you already testified to?
A I'm not sure.
Q What was spoken -- what was discussed at that -- in that conversation?
A That if he could not report to duty with full medical clearance within three-day period, that it would be considered a resignation and then termination from employment based on the court order.
Q Wouldn't that conversation logically have occurred before his separation of employment?
A I would think so.
Q But you don't have a specific recollection of when that was?
MS. PARKS: Objection, asked and answered.
BY MR. GEDDES:
Q You can answer the question.
A I don't recall.
Q To your knowledge or understanding, was the topic of John Enos being rehired after his employment with Douglas County ended ever discussed by anyone?
And when I say "rehired," rehired anywhere in Douglas County.
A I don't know.
MS. PARKS: Counsel, could we take a short break? I need to use the ladies room.

MR. GEDDES: Okay. Sure.
THE VIDEOGRAPHER: Going off the video record. The time is 10:14.
(A recess was taken.)
MR. GEDDES: Okay. Go back on the record.
THE VIDEOGRAPHER: This is the beginning of Media Number 2 in the deposition of Scott Shick. We're back on the video record at 10:22.
BY MR. GEDDES:
**Q Mr. Shick, we just went on break and came back. You understand that you are still testifying under oath and under penalty of perjury?**
A I do.
**Q Now, before his separation of employment, Mr. Enos was a senior juvenile probation officer at the Douglas County Juvenile Probation Department, correct?**
A Yes, sir.
**Q And at that time, wasn't the position of senior juvenile probation officer the highest level juvenile probation officer position beneath the position of chief deputy probation officer?**
A Yes, sir.
**Q At that time, who held the position of chief deputy probation officer?**
A Victoria Sauer-Lamb.
**Q And you were familiar with the job duties of the senior**



**juvenile probation officer because you supervised that position, correct?**
A The chief deputy juvenile probation officer is the immediate supervisor of the senior juvenile probation officer position.
**Q But you are familiar with the job duties of the senior juvenile probation officer at that time, correct?**
A I am familiar with the job duties of the senior juvenile probation officer.
**Q And you were at the time prior to Mr. Enos' employment being separated, correct?**
A I don't understand your question.
**Q Well, you say that you are aware, but I'm trying to make certain that you were aware at the time.**
A I was aware of the responsibilities of the senior juvenile probation officer.
**Q Okay. Now, can you summarize the basic differences between the job duties of the chief deputy probation officer, on the one hand, and the senior juvenile probation officer, on the other.**
A The senior juvenile probation officer position is solely a juvenile probation officer with all the routine functions and essential functions of a juvenile probation officer.
The chief deputy juvenile probation officer position has supervisorial and management responsibilities, management over the



programming and department, and supervisorial responsibilities over the senior juvenile probation officers and juvenile probation officers and the administrative assistant.
**Q So that a chief deputy probation officer position is less physically dangerous and less physically demanding than the senior juvenile probation officer, correct?**
A I disagree.
**Q It's not -- a chief deputy probation officer is not subduing juveniles or facing potentially combative situations; isn't that right?**
A They potentially -- in a -- as far as their job -- they are POST certified juvenile probation officers and they are required to subdue juveniles and arrest juveniles if the situation calls for it.
**Q But on a day-to-day basis, that would be less frequent than a senior deputy probation officer, correct?**
A Their exposure to the risk factors directly related to being a -- solely a juvenile probation officer is somewhat less.
**Q Would you say that the chief deputy probation officer has more desk time than does the typical juvenile probation officer?**
A The chief deputy juvenile probation officer has more administrative, supervisorial -- actually, supervisorial and management responsibilities than a senior juvenile probation officer.



**Q Okay. Let's focus on the juvenile probation officer from your experience, which I think you are saying, the senior has the same job functions. That's right?**
A I don't understand your question.
**Q Well, you previously testified that the senior juvenile probation officer is, essentially, a juvenile probation officer with higher rank.**
A Right, they have -- yes.
**Q Okay. So if we compare the duties of a juvenile probation officer, we're essentially capturing the duties of a senior juvenile probation officer?**
A That's -- that is correct, sir.
**Q Okay. So if we focus on the juvenile probation officer's job duties --**
A Yes, sir.
**Q -- can you -- based on your position and your observation of how the office runs, can you describe a typical -- a typical workweek as far as percentagewise, you know, between this amount of time they're at the office, and this amount of time they are typically out in the field. How did that work?**
A Juvenile probation officers have report writing. I'm not quite sure what percentage of their time is spent on that.
They have supervision responsibilities, which puts them in the field, in schools and homes, at workplaces, other -- other community -- places in the community, some supervision

Page 66

responsibilities.

They meet with -- transportation responsibilities. They visit children in our treatment settings, based on wherever they are placed.

I'm not sure I covered everything.

And they arrest children, if necessary, based on violations of probation.

They have on-call juvenile probation officers assigned an on-call, scheduled -- it's a cycle. It's scheduled, and they are available 24/7 to work with the sheriff's department to respond to after-hours calls regarding juveniles, make decisions regarding the detention or the release of juveniles after referral.

**Q So you -- you've described, generally, report writing, on the one hand, and work in the field.**

**And you gave quite a description there about the work in the field, at the settings such as schools, homes, workplaces, transport duties, visiting treatment facilities, and arresting children, parole violation, and being available or on call 24/7.**

**So as between the field work and the report writing work, was there generally another category of work that they did?**

A Go to court hearings.

**Q Okay. Can you break that down? What do they do at court hearings?**

A They bring in petitions.

Page 67

**Q I'm sorry, did you say "petitions"?**

A Yes. They bring in petitions and recommendations, petitions for delinquency.

And they also handle -- go in for dispositions. And they go in for court reviews as well and/or detention hearings to make determination of longevity of detention on behalf of the kid.

**Q So when you say they bring in petitions, are they just, basically, carrying paper to court? Is that what you are describing?**

A No, sir.

**Q Okay. What does that mean, "bring in petitions"?**

A You have to, you know, receive the paperwork on the complaint. The petition is filed with the District Attorney's Office. The report is written. A comprehensive report is written regarding the nature of the offenses.

And that's presented to the Court, in conjunction with the District Attorney at the time of the disposition -- excuse me, at the time of the -- the petition hearing.

**Q Do they -- do they testify?**

A They do.

**Q And what do they testify about?**

A If asked, they will testify whatever the judge -- in response to whatever the judge asks of them.

**Q Okay. So is it -- is it fair to generally characterize their work as two basic fields, one, field work, and the other,**

Page 68

**court work, because you -- you called report writing one of their functions, but it sounds like the function of report writing is really part of the court procedure.**

**So are those, basically, the two worlds that the juvenile probation officers work in, areas?**

A Supervision, you know, court reporting, case management in respect to working with clients and finding out what their particular needs are, school, family systems, mental health, all those pieces are taken into consideration at the time of disposition, and that directly relates to how a child is supervised in respect to their probation.

**Q So the chief deputy -- does the chief deputy probation officer perform the same field work?**

A They are not assigned a specific caseload, but a minimal caseload, at times.

Sometimes the chief deputy works -- you know, works with -- in conjunction with the juvenile probation officers with families and/or does programming.

But they are not -- their sole responsibility is not to handle a caseload.

**Q And the same question about the chief deputy as far as the court work. They don't do the -- they don't do the same court work --**

A The chief deputy can step up and do a court report on behalf of a juvenile probation officer. They can do a petition.

Page 69

They can do a disposition. They can do a detention hearing. And that has happened and continues to happen.

**Q But as between the actual juvenile probation officers and the chief deputy, the juvenile probation officers perform that function much more; isn't that right?**

A I would -- yes. That would be a part of their routine functions.

**Q And the same -- the same would be true for the field work that you've described, isn't that correct, that the juvenile probation officers are doing much more of that work than the chief deputy probation officer?**

A That is part of their essential functions of the juvenile probation officers.

**Q So that would be yes?**

A I don't understand your question.

**Q My question is, the juvenile probation officers perform field work, the field work that you've described, much more frequently than does the chief deputy probation officer.**

A Yes, that's accurate.

**Q Okay. Now, are the lifting requirements less for a chief deputy probation officer than for a juvenile probation officer?**

A I don't know.

MR. GEDDES: Okay. What I would like to do is mark as Exhibit 1, a document, please.

(Exhibit 1 marked for identification.)
MR. GEDDES: And I would also like to mark as Exhibit 2, this document.
I think there might be an issue with a page number. One second.
I think -- oh, okay. So people I handed pages, apparently, I'm not giving you the whole document. Here is the whole document.
I don't know if you are able to put a sticker on this document. This is a three-page document, and what you put the sticker on was a one-page document. That's my mistake. I apologize.
(Exhibit 2 marked for identification.)
MR. GEDDES: There you go. Thank you.
BY MR. GEDDES:
**Q All right. I'll represent to you that the documents presented to you in your deposition today bearing the Bates stamp prefix of DC at the bottom lower right-hand corner --**
A These right here?
**Q Absolutely.**
**-- at the bottom lower corner of the page are documents --**
A Let me get my glasses.
**Q Okay.**
A Excuse me.



**Q Okay. The documents that have on the bottom right -- bottom right corner, you'll see a stamp. Here, for example, it says, on Exhibit 1, DC 332.**
A Yes, sir.
**Q And then I'll represent to you that any document that I show you today that has DC at the bottom lower corner, those are documents that were produced by Douglas County in this litigation.**
A Okay.
**Q "DC" standing for "Douglas County."**
A Yes, sir.
**Q So Exhibit 2 doesn't have that Bates stamp on it. Do you see that?**
A I do see that.
**Q But I'll represent to you that I obtained this from Douglas County's official website.**
A Okay.
**Q Now, as to the documents of Exhibit 1 and 2, take your time and look at them.**
**Have you seen these documents before?**
A I may have seen them. If they are an accurate representation of the job descriptions, I would have seen them, yes.
**Q Okay.**
A As I recall, I -- I may have seen them.
**Q Okay. So let's focus first on Exhibit 1.**



A Okay.
**Q It says "Juvenile probation officer job description, Douglas County." The "Department" reads, "District Courts," slash, "juvenile probation."**
**Do you see that?**
A I do.
**Q What is that department? What does that mean that it has both "district courts" and then a slash, "juvenile probation"?**
A It simply means that the juvenile probation department is under the district court.
**Q Okay. Are you familiar with how the district court is funded, where it gets its operating funds?**
A I believe the courts get their funding from the administrative office of the -- state administrative office of the court, that the judicial -- the judges are paid by the State from -- that's just my general understanding.
**Q And the county, the juvenile probation, that comes from county budgeting?**
A Yes, it does.
**Q And so here, it says that -- it describes the summary of the job purpose, and it lists the essential functions of the job. On the second page, it lists certificates, licenses and registrations. It lists physical demands, and it lists the working environment.**
**Now, if you need time to look at this, that's fine, but**



**my question is, does this describe with reasonable accuracy the senior juvenile probation officer's position and job functions and demands and working environment?**
THE WITNESS: Could you please repeat that question so I can respond to him.
MR. GEDDES: Can you read that back, please.
(The question was read by the reporter.)
THE WITNESS: Yeah, it's a reasonable description of the juvenile probation officer's essential functions and working demands.
This document is dated 2008, I would add.
BY MR. GEDDES:
**Q I'll represent to you that this was still in effect, and we see Mr. Enos' signature on the -- on the last page, 3 -- 333.**
MS. PARKS: Still in effect when, Counselor?
MR. GEDDES: This was in effect -- this was in effect during the period of 2013 and '15.
MS. PARKS: I'm going to object, lack of foundation.
MR. GEDDES: Well --
MS. PARKS: Go ahead.
MR. GEDDES: Whether or not --
MS. PARKS: You are testifying about when the document was in effect.
MR. GEDDES: Well, that was part of my -- my question.
///

BY MR. GEDDES:
Q Okay. So to your recollection -- then we'll do it this way.
To your recollection, this accurately -- with reasonable accuracy described the juvenile probation officer's position during the time period of 2013 through 2015, Exhibit 1?
A It's a reasonable -- yeah. I would agree with you.
Q Okay. Let's go to Exhibit Number 2. Now, this Exhibit Number 2 is a job description of the chief deputy juvenile probation officer.
And this is -- to your prior testimony, this is an at-will position, is that correct, the chief deputy?
A Yes, sir, it's at-will position.
Q And the juvenile probation officer of Exhibit 1, that was a classified position?
A Yes, sir. That's a classified position, the juvenile probation officer.
Q So I'm going to ask you the same question I asked about Exhibit 1. I'm going to ask it about Exhibit 2.
If you could take your time and review the summary of job purpose, the essential functions, the qualifications, the certificates, licenses, registrations, the physical demands, basically, the -- this entire three-page document.
And my question is going to be the same. My question is going to be, does this describe with reasonable accuracy the



deputy chief juvenile probation officer's job purpose, functions, qualifications, certificates, licenses, registrations, physical demands and working environment and for the time period of 2013 through 2015.
A It's a reasonable explanation of the responsibilities of the chief deputy juvenile probation officer. However, I don't know if it was applicable during that time frame.
Q Okay.
A The 2013, '15, whatever you mentioned.
Q Okay. Is there anything in Exhibit 2 that describes the function or duty of arresting and detaining a juvenile?
A Number 6, Number 7, Number 8.
Q One second.
A Number 9.
Q Okay. Let's go through that briefly.
Number 6 reads "Makes investigations of alleged probation violations, arrests or cause of arrest of violators, and impounds evidence, including confiscation of weapons and contraband."
Does that mean that this position actually makes the arrests or makes investigations of arrests?
A It makes arrests. It can make arrests, and it can make investigations of arrests.
Q Okay. During the 2013 to 2015 time period, how frequently would a chief deputy juvenile probation officer make



arrests?
A I don't know.
Q Is it your understanding that the juvenile probation officers make more arrests typically than -- in that time frame, typically than did the chief deputy juvenile probation officer?
A It's a reasonable conclusion to say that a juvenile probation officer would make more arrests in the field than a chief deputy juvenile probation officer.
Q You cited Number 7 as well. Where exactly in 7 are you getting the reference to arrests?
A "Supervising a caseload of juvenile criminal offenders, assessing the client, develop treatment plans designed to achieve rehabilitation" -- that's supervision.
"Contact with a juvenile" -- "with a juvenile client and working with parents, and working with the courts in respect to needs."
It's, basically, managing the case, and those are the responsibilities and the things that you would complete if you did manage a case.
Q So are you saying 7 implies arresting someone?
A 7 does not imply -- 7 refers to the functions of a juvenile probation officer.
Q Okay. Does 8 imply arresting someone?
A Yes, it does.
Q Okay. How does it do that?



A If you visit a juvenile probation officer's home and you -- they test positive for drugs, you have the option and the decision to make to where you can arrest them. It's discretionary.
You could arrest them at a place of employment based on particular circumstances, if you are working a case that definitely would -- could evolve into an arrest.
Q And Number 9, same question, does that implicate arrest and how so?
A That's the reporting functions of a juvenile probation officer, Number 9.
Q So that doesn't really implicate arresting someone?
A Again, that's the reporting functions of a juvenile probation officer, Number 9.
MR. GEDDES: Could you read back the question, please.
(The question was read by the reporter.)
THE WITNESS: The language in Number 9 does not implicate arresting somebody.
BY MR. GEDDES:
Q Okay. I'm sorry, the reason why I brought up Number 9 is you mentioned Number 9, and so --
A And it does reflect the responsibilities of a juvenile probation officer.
Q Okay. So can you tell, between Exhibit 1 and Exhibit 2, whether there is a lower weight limitation requirement of physical

demands as between the two jobs?
A One says 50 pounds, one says 25.
Q Okay. And so from this document, then, the physical demands stated in the job description are lower -- up to 25 pounds for a chief juvenile probation officer -- than the stated weight for the physical demands of the juvenile probation officer, which requires up to 50 pounds; is that correct?
A That is accurate.
Q When did Ms. Sauer-Lamb retire?
A I know it was in July, but I don't remember the year.
Q Do you know approximately how many years she's been gone?
A Potentially, three.
Q So your best recollection is she retired in or about July of 2015?
A You know, I don't recall.
Q To your knowledge, when did she first disclose to anyone at Douglas County Juvenile Probation Department that she was going to retire?
A She got quite ahead of that. It was -- I think she was anxiously looking for retirement probably a year before, was kind of candid about it.
Q Okay. So to your knowledge, who at the County knew of Ms. Sauer-Lamb's retirement plans before her retirement? You did?
A I would have known about that, yeah.



Q Okay. What about Judge Gibbons or Judge Young, do you know one way or another?
A Potentially, they would know about that.
Q Did you ever consider promoting Mr. Enos to the position of chief deputy probation officer?
A Mr. Enos would be eligible to apply for the -- based on his credentials, his experience, who he is as an employee, would be eligible to apply for the position of chief deputy juvenile probation officer if it was posted either internally or externally.
Q Did you ever consider promoting Mr. Enos to the position of chief deputy probation officer?
A Once again, my answer to your question is, Mr. Enos is eligible -- would have been eligible to apply for the position of chief deputy juvenile probation officer.
Q Okay. That's not my question. My question is, did you ever consider promoting him to that position?
MS. PARKS: Objection, asked and answered.
MR. GEDDES: Absolutely not answered.
THE WITNESS: My answer is --
MR. GEDDES: Could you read back the question and the answer, the twice that it was asked, please, Ms. Court Reporter.
(The record was read by the reporter.)
THE WITNESS: My answer is, Mr. Enos is eligible -- would have been eligible to apply for the position of chief deputy



juvenile probation officer --
BY MR. GEDDES:
Q Okay.
A -- based on his credentials, his experience and the kind of person that he is.
Q All right. So here is my objection, is that you are not answering the question that I asked. And so we can do it a couple of ways.
We can move on, but, Ms. Court Reporter, if we are forced to do that, I would ask that you mark this part of the transcript and we will move the Court to compel that answer.
MS. PARKS: That's not necessary, Counsel. Ask your question and answer the question.
BY MR. GEDDES:
Q Did you ever consider promoting Mr. Enos to the position of chief deputy probation officer?
A No.
Q To your knowledge or understanding, did Ms. Sauer-Lamb ever consider promoting Mr. Enos to the position of chief deputy probation officer?
A No.
Q To your knowledge, did Judge Gibbons ever consider promoting Mr. Enos to the position of chief deputy probation officer?
A No.



Q To your knowledge, did Judge Young ever consider promoting Mr. Enos to the position of chief deputy probation officer?
A No.
Q To your knowledge, did anyone at Douglas County or the Ninth Judicial District Court ever consider promoting Mr. Enos to the position of chief deputy probation officer?
A No.
Q Who filled Ms. Sauer-Lamb's position as the chief deputy probation officer after she retired?
A Michael Torres applied and was awarded the position of chief deputy probation officer for the probation department.
Q And is he currently the chief deputy probation officer?
A Michael Torres is currently the chief deputy juvenile probation officer for the Douglas County Juvenile Probation Department.
Q Did you have any involvement in the recruiting, interviewing or selection process for Mike Torres in this position?
A It was an internal application, and I triggered the NEOGOV website in order to announce the open position.
Q Did you interview, yourself -- were you part of an interview panel for Mr. Torres?
A I was part of an interview panel, yes.
Q And to your recollection, how many times was Mr. Torres

interviewed?
A Once that I recall.
Q Separate and apart from triggering the NEOGOV website, separate and apart from interviewing him or serving on an interviewing panel, did you perform any other actions in connection with Mr. Torres filling the position?
A No. No, sir.
Q To your knowledge, did Judge Gibbons have any involvement in the recruiting, interviewing or selection process for Mike Torres filling the position of chief deputy probation officer?
A He did not.
Q Same question for Judge Young.
A He did not.
Q To your knowledge, was anyone else involved in the selection process or the recruiting, interviewing -- or interviewing for Mr. Michael Torres for the position of chief deputy probation officer?
A The interview panel consisted of District Attorney Zach Wadle; Vicky Barrett was a court secretary to the judge, past; and Victoria Sauer -- no, not Victoria, myself. There was one more person.
I don't -- I believe it might have been a staff person.
Q Was -- was Vicki -- I'm sorry. Was Ms. Sauer-Lamb on the panel as well?



A She might have been, I don't recall.
Q What about Norma Santoyo, did she have any involvement in the selection process for Mr. Torres?
A She was not involved in the selection process other than administratively and, you know, NEOGOV and her staff processing backgrounds and things.
Q What about Sarah Christensen?
A She was not involved in that.
Q What about Kathy Jo Kidd?
A No, sir.
Q When did the interviews take place for filling Ms. Sauer-Lamb's job replacement's position?
A I don't recall the time or dates of those interviews.
Q Do you know how long, generally, that period was, how long it took?
A Potentially, a month. I don't recall specifically.
Q Did you, yourself, make particular recommendation for any one of the candidates to be selected for the chief deputy probation officer?
A It was a team effort. I'm sure I had some recommendations. I don't recall.
Q Do you recall recommending one or more people?
A I don't recall.
Q Do you recall whether Ms. Sauer-Lamb made any recommendations?



A I don't recall.
Q What about DA Zach Wadle?
A I don't recall the recommendations.
Q Do you recall recommendations from Vicki Barrett?
A I don't recall.
Q Did Norma Santoyo make any recommendations?
A She was not in the interview panel.
Q Well, separate and apart from that, did she --
A No, she --
Q -- try to put in a good word for anyone, though?
A No, she did not.
Q With regard to qualifications, years of experience working in the field -- well, let me be more specific.
With regard to the years of experience working in the field, how did Michael Torres compare with Mr. Enos?
A I don't -- I don't know their exact background. Mike has got an extensive background in juvenile justice, and Mr. Enos has a background in juvenile justice as well.
Q To your recollection, why was Michael Torres selected?
A Please elaborate on my question. I'm not quite sure --
Q Well, your recollection of why he was picked.
A For?
Q To succeed Ms. Sauer-Lamb as the chief deputy probation officer.
A The best of my recollection, it was the decision of the



panel after discussion regarding the candidates.
Q Do you recall specific -- anything stand out as to why?
A Absolutely not. I don't recall any of that.
Q What about as -- comparing Mr. Torres with Mr. Enos with regard to years of experience, what about educational background, how did Michael Torres compare with Mr. Enos in this regard?
A Mike does not have a formal degree. Mr. Enos has a master's degree in public administration. I believe he has maybe a journalism B.A. I'm not quite sure what else he has underneath his belt.
Q What about comparing Mike Torres with Mr. Enos with regard to the number of years they had been working for Douglas County?
A I don't -- I don't know the comparison there. I wouldn't know.
Q Did Mike Torres have a case he was handling involving one of the relatives of the judges?
A I don't recall a case.
Q Does it refresh your recollection that Mike Torres had a case involving Judge Young's son who was on probation?
A Yes. I do recall Judge Young's son being on juvenile probation.
Q Did that factor in, in any way, his selection as the chief -- the chief deputy juvenile probation officer?
A That did not factor in, in any way, as to the decision

to make Mike Torres the chief deputy juvenile probation officer.
Q Was that case reassigned to someone else after Mike Torres became the chief deputy?
A I don't recall.
Q And your recollection and understanding is, this did not influence the selection of Michael Torres in any way?
MS. PARKS: Objection, asked and answered.
THE WITNESS: Please explain your question.
BY MR. GEDDES:
Q To your understanding, did this influence the selection of Michael Torres in any way?
A When you say "this," please.
Q The fact of that case assignment, that he had Judge Young's case.
A Did not affect my decision or anybody's decision one way or the other.
Q Now, in your opinion, was Mr. Enos -- I think you said this, but I'm not sure the level of your prior testimony, so it's going to sound like a repetitive question. I'm not trying to repeat the question, I just want clarification.
A Okay. I'm with you.
Q In your opinion, was Mr. Enos qualified by education, training and experience to be a chief juvenile probation officer at Douglas County to fill Ms. Sauer-Lamb's position?
A Mr. Enos' experience, his education, would make him



eligible as a chief deputy juvenile probation officer for the department.
Q Okay. So I think you are saying that -- I can't testify for you, but I think you are saying he was qualified by education, training and experience to be Ms. Sauer-Lamb's replacement.
I'm not trying to fight with you on this, I just want to know what your answer is to that question.
A Mr. Enos is qualified to -- if he were to submit his application, he would definitely be qualified to interview for the position of chief deputy juvenile probation officer --
Q Okay.
A -- and take the place of Ms. Sauer-Lamb if so selected.
Q Okay. Now, do you value Ms. Sauer-Lamb's appraisal of whether persons are qualified to serve in the position of chief deputy probation officer?
A I would be -- have an open ear to her evaluation, her appraisal of a particular person, but I would not let that influence the final decision.
I would take that into consideration, along with the feedback and objectivity of the other persons involved in the interview team.
Q Okay. So it sounds like you had more influence on who was picked than the other panel members.
A That's --
Q Well, my question is, did you all have equal vote? How



did that work?
A We use a point system and then we have a discussion.
Q And then does the person with the most points get selected? How did that work?
A Not necessarily.
Q Okay. So was it a consensus reached by all the panel members that Michael Torres was to be selected?
A Amongst the candidates that had interviewed, it was a consensus that Michael Torres had met the qualifications to become the new chief deputy juvenile probation officer.
Q Well, if there were more than -- if the consensus was that there was more than one candidate who had the qualifications, how was it resolved who was actually picked?
A With the discussion that takes place after the points and back-and-forth discussion and objective evaluation.
Q But didn't Ms. Sauer-Lamb want someone else to be the chief deputy probation officer, to your recollection?
A Not to my knowledge.
Q Did you ask for Ms. Sauer-Lamb's opinion as to whether certain persons were qualified to serve in the position of chief deputy probation officer?
A Not to my recollection.
Q And you testified earlier that you read Ms. Sauer-Lamb's deposition transcript, correct?
A I have read pages, not the whole thing.



Q You didn't read the entirety?
A No, sir.
Q How did you select which pages to read?
A Oh, just more curiosity than anything and just kind of -- the kind of questions that you would be asking, what you would be talking about, that's kind of what I looked at.
Q Did you know that Ms. Sauer-Lamb testified in her deposition that Mr. Enos was qualified to serve in the position of chief deputy probation officer?
A I did not know that she testified to that fact. I did not read that.
Q How would you characterize your relationship with Michael Torres, personal, personal and professional, or strictly professional?
A Strictly professional.
Q Did you know Mike Torres before he applied for the position?
A I've known Mike Torres for many years.
Q And have you ever -- have you ever interacted with him in a nonprofessional setting?
A Not that I recall.
Q Have you ever had any conversations with Mike Torres about Mr. Enos?
A Not that I recall.
Q Have you ever had any conversations with Mike Torres

about this lawsuit?
A That I was -- I did have a conversation with Mike Torres that I'm in deposition and -- so he understands where I'm at and what I'm doing.
Q So I think you -- your prior testimony was you generally recollected, recalled that Mr. Enos was injured or might have been injured about a wilderness trip. Do you recall --
A I remember that John Enos was injured on a wilderness trip.
Q Okay. Do you -- do you recall that he was injured when he was helping a juvenile get down from a tree and the juvenile fell on him?
A That sounds familiar.
Q And did you also have a general understanding that in that incident, he suffered neck and back injuries?
A I don't know the extent of his injuries. I knew that a person, a boy fell on a -- out of a tree on him and that he was injured.
Q Do you recall whether he had medical screws or pins surgically implanted in his wrist?
A I do recall him having medical screws or pins installed in his wrist -- wrist. Yes, I do recall that.
Q And do you recall also that the medical screws or pins had to be removed because they came apart in -- in about May of the following year?



A I do recall such difficulty.
Q Now, typically, how frequently would you interact with Mr. Enos? Let me -- let me -- let me give you an example.
And I have no idea how your office works, but if I'm the chief of the department, I might be in meetings all day. I might never see my officers except at those weekly meetings, or I might -- in walking through the office in a typical day, I might, you know, interact with the juvenile probation officers when they were doing their desk work or report writing, or I might see them in court.
So can you generally describe the frequency that you interacted with Mr. Enos in the two to three years before his employment was separated.
A I would not say frequently.
Q Okay. Can you just sort of narrate what -- typically how your day went and how you would -- how often you would interact with him.
A I would say good morning, good night. If there was something to talk to about a case or something, I would check in on it. I don't recall specifically.
Q Okay. How -- where -- at the time of 2013 to 2015, where physically was your office?
A I don't know if I had moved my office yet or not. I reduced -- my office was a larger office, and we put two -- so I don't -- I think it was down the hallway --



Q Okay.
A -- way on the other side.
Q Did Mr. Enos have an office or cubicle?
A Mr. Enos had his own office.
Q And do you think -- about how many doors away was it from your own office?
A Quite a few doors, if that is where I still was.
Q Okay. And so in the morning, would you typically stop by and talk with the juvenile probation officers that were in their offices?
A I would. I would stop by, say good morning.
Q Did they have -- typically have their doors open, or were they closed, when you would do that?
A Typically, open. Yeah.
Q So as you are walking down the hall, you would just generally say hello to them?
A Generally say hello to them.
Q Okay. And did you ever -- did you typically observe Mr. Enos after that wilderness trip accident, the workplace injury, observe how he was walking or how he -- how he was physically moving? Do you recall that?
A I don't recall specifically his movement, but I knew he had discomfort.
Q Okay. And you testified earlier that you had some interaction with the HR folks. The HR folks would handle the



workers' compensation matters. Is that a --
A Absolutely.
Q -- fair statement?
A I refer all those type of matters to their expertise.
Q Okay. And did you learn in your interactions with HR after the wilderness trip incident that Mr. Enos had filed a workers' compensation claim?
A I was aware of the workers' compensation claim.
Q Okay. And were you generally aware that the workers' compensation claim had asserted -- that Mr. Enos had asserted in his workers' compensation claim that he was injured on the job from that wilderness trip injury?
A I didn't read the claim specifically, but understood that he was injured on the job and that was what the nature of the claim was about.
Q Now, I know that you testified that HR handled it, but did you ever, yourself, inquire as to the extent and nature -- nature and extent of his injuries?
A I don't recall.
Q Do you know one way or another whether his injuries affected his ability to grasp objects?
A I don't -- I don't know.
Q Do you recall one way or another whether his injuries in the wilderness incident affected his ability to bend or lift or perform his ordinary work at the juvenile probation department?

A I would assume that they would.
Q And why would you say that? What do you base that on?
A Because he was injured on -- in his neck and wrist was bothering him, but I don't know specifically.
Q Do you recall whether he had medical restrictions from his doctor in connection with the injuries he sustained in the wilderness trip injury?
A I believe he had medical restrictions. I don't know what those were specifically.
Q And your understanding was that those restrictions were in effect after the injury and for some time after that?
A I know they were after the injury.
Q Do you recall whether Mr. Enos was injured a second time when he was attacked by a juvenile about a year later?
A I was aware of -- of him being injured again after being attacked by a juvenile in our offices.
Q Okay. Can you just summarize your understanding of what happened.
A I wasn't there. My understanding is a young man came out of our holding cell and, basically, assaulted him after -- I think he approached him to ask him to calm down, and the boy assaulted him.
Q Now, you said you weren't there. How did you learn this?
A That was reported from the chief deputy juvenile



probation officer, Victoria Sauer-Lamb.
Q And you received a written report? Was it an oral report?
A I received an oral report as to the nature of the event, the incident, and written reports were forthcoming.
Q Did -- do you recall what effect being attacked by this juvenile had on Mr. Enos' prior injuries? Do you know if they made them worse?
A I don't know specifically if they made his -- I assume that based on the -- the volatility that was explained to me in the attack, that could have had a significant impact on his injuries.
Q Do you recall whether he received medical treatment for that attack?
A I believe he received medical treatment for that attack. He was taken to urgent care, emergency eventually.
Q And how did you learn that?
A I was told that.
Q By Ms. Sauer-Lamb?
A Most likely.
Q And did you have an understanding one way or the other that he had medical restrictions from his doctor for that second workplace injury, the attack injury?
A I -- I don't know for sure. I mean, I -- yeah, I don't know.



Q Did you -- do you recall ever making a specific inquiry as to what his medical restrictions were, if any, from the second workplace injury?
A I don't recall making that inquiry.
MR. GEDDES: All right. I would like to mark as Exhibit 3, the following documents.
(Exhibit 3 marked for identification.)
BY MR. GEDDES:
Q All right. These are actually different documents, but I've assembled them as one exhibit.
If you could take a moment and just generally look at these.
A Yes, sir.
Q Okay. And the first document -- the first page marked DC 1482 states that -- in the body of its document, states that it's a notice of injury or occupational disease. It's an incident report for the Douglas County Juvenile Probation Department for John Enos for a date of accident of 6/21/13.
And it -- have you seen this document before?
A I don't recall, but obviously I have because my signature is on it.
Q Okay. So that signature is dated 6/25/13.
Do you recall how it would be that you would actually sign this document? I mean, is there a routine or procedure followed?



A It's the supervisor's signature.
Q Okay.
A It's required --
Q Go ahead.
A -- when somebody is injured on the job.
Q All right. Now, before you signed this document, would you have reviewed the information contained in it?
A Briefly.
Q Okay. If you had any questions or doubts or -- or concerns or problems with the information put on this document, would you have ordinarily raised it before you signed it?
A Yes.
Q Okay. Now, the third row, left column asks the question -- this is a form and the field says "What is the nature or injury or occupational disease?"
Are you able to read -- I'm not asking you to read it, but are you able to read and understand what those words are? Is that printed neatly enough for you?
A Certainly.
Q Okay. And that says neck and back pain; right wrist pain; abrasions on arms, back and legs.
A Yes, it does.
Q Okay. And then says -- it gives a description in the box below that. And you -- you are able to read that handwriting as well?

A Yes, sir.
Q Okay. To your recollection, you didn't have any cause, concern or doubt about that particular document or what was being claimed as injuries?
A No, sir.
Q Okay. The second page is DC 1524 to 25.
A Uh-huh.
Q Have you seen these pages before?
A I don't recall, sir.
Q Okay. This document is described as a -- as a Form C-4, "Employee's Claim For Compensation, Report of Initial Treatment."
Do you know what those documents are, what they -- what their function is?
A I don't.
Q And during your ordinary duty, would you have been presented with this type of a document to review or take any action on?
THE WITNESS: Could you repeat that question, please.
(The question was read by the reporter.)
THE WITNESS: I don't recall whether I reviewed this document.
Actually, I believe I might have filled it out because I believe this is my handwriting in the middle box, begins with "Juvenile was climbing a tree."
So obviously, I have seen that. Yeah, this certainly is



my printing in the middle as to the nature of the injury.
BY MR. GEDDES:
Q Okay. So did you have an understanding that this document is part of the process of a workers' compensation claim being filed?
A Yeah, I do remember that.
Q Okay.
A Yes, sir.
Q And then if we can go to the last page there, DC 1537.
A Okay.
Q Have you seen this document before?
A I have not, sir.
Q Okay. Now, this document has a letterhead that says "Alternative Service Concepts, Flexibility, Expertise, Integrity." And it talks about, on the right side, a claim number, an employer, an insurer and TPA, Alternative Service Concepts.
Did you have an understanding that "TPA, Alternative Service Concepts" meant third-party administrator for workers' compensation claims?
A I have no knowledge of that, sir.
Q Okay. Now, there is a -- the letter reads -- it's a notice of claim acceptance.
And did you have an understanding one way or another as to whether or not Mr. Enos' workers' compensation claim was accepted?



THE WITNESS: Could you repeat that, please.
(The question was read by the reporter.)
THE WITNESS: I don't recall that I knew that Mr. Enos' claim was accepted.
BY MR. GEDDES:
Q Then underneath the line, "Karen Barbee, Senior Claims Adjuster," there's a CC. And second line of that is "Employer, Douglas County."
Do you see that?
A Yes, sir.
Q Would you typically be in the loop -- when I say "in the loop," would you typically receive documents from Douglas County's insurance -- third-party administrator regarding workers' compensation claims?
A No, sir.
Q Okay. Those would go -- to your understanding and knowledge, those would go to HR?
A Human Resources.
Q And if HR had issues or questions about documents, they might send the information to you with a question?
A That was not the practice.
Q Okay. Did that ever occur?
A Not that I recall.
Q Okay.
A Are we done?



Q I think we are done with those. Let me just double-check.
Did you ever ask HR what the status was of Mr. Enos' workers' compensation -- any workers' compensation claim filed by Mr. Enos?
A I don't recall, sir.
Q Would it have been ordinary for you to -- if an employee were under your supervision, were out on a workers' compensation claim for an extended period of time, would that have caused you typically to wonder when they are coming back to work?
A That would be a possibility.
Q And you don't recall whether you wondered that about Mr. Enos?
A I don't recall that.
Q Recall whether Ms. Sauer-Lamb ever monitored the status of Mr. Enos' workers' compensation claim?
MS. PARKS: Excuse me just a minute, Counsel.
(Pause in the proceedings.)
BY MR. GEDDES:
Q Do you need the question read back to you?
A Yes, please.
(The question was read by the reporter.)
THE WITNESS: I do not recall that she specifically did that.
///

BY MR. GEDDES:
Q Would it have been her -- her duties to report to you what the status of a person's workers' compensation claim was?
A It would be her duties to -- to inquire and to keep abreast of the status of the claim, but not necessarily report to me.
Q But if you were scratching your head after a while and thought, you know, Jane Doe isn't here, what's going on, you might go to Ms. Sauer-Lamb and ask that question?
A I would go to Ms. Sauer-Lamb to ask that question.
Q And do you recall ever speaking with her about the status of Mr. Enos' workers' compensation claim?
A I don't recall specific conversation.
Q Do you recall a general conversation?
A I don't recall --
Q Okay.
A -- the specific conversation or a general conversation.
Q So you don't know, as you sit here, one way or another what Norma Santoyo's involvement was in monitoring the status of any workers' compensation claim by Mr. Enos?
A I would not know what her status was as far as monitoring workman's compensation claims.
Q And it's your understanding that Judge Young and Judge Gibbons had no involvement in monitoring the status of a workers' compensation claim filed by Mr. Enos?



A They have no involvement in monitoring the status of a workers' compensation claim.
Q Was Mr. Enos given light duty for his workplace injury where -- we're talking about the 2013 injury where he was on a wilderness trip and a juvenile fell on him.
Do you know whether he was given light duty for that?
A I know Mr. Enos was given light duty. Specifically for what injury, I could not tie that in.
Q Okay. And generally, what -- well, not "generally." What do you recall about the light duty that was given to Mr. Enos?
A The light duty that Mr. Enos was given was at the Douglas County library.
Q And what was -- what was he supposed to be doing at the library?
A I don't -- I don't know, light work in the library, not to be -- in compliance with his workman's compensation claim, that's all I knew.
Q Okay. So I think what you are saying is, is that you are not sure what injury that light duty applied to. It might have applied to the first injury in 2013, or it might have applied to the second injury when he was attacked. You are just not sure?
A That was a -- that was a part of your two-part question. So, yeah, I wasn't sure.
Q Okay.



A Yeah.
MR. GEDDES: All right. If we could -- all right. Let's go ahead, if you could, please mark this as Exhibit 4.
(Exhibit 4 marked for identification.)
THE WITNESS: Thank you.
BY MR. GEDDES:
Q Okay. If you could take a moment, please, and look at Exhibit 4.
A Yes, sir.
Q Okay. Let's look at the first document. It has a Bates stamp of DC 1580. Top page.
A Yes, sir.
Q This -- have you seen this document before?
A I don't recall.
Q Okay. Have you seen this type of a document before?
This document, for example, at the top says "Excuse from work or school." It has the name of an employee. And it's a letter, or literature, talking about, you know, a clinic and work restrictions.
Have you -- have you seen this type of a document?
A I have not.
Q Okay. Well, the first page states that it's an excuse from work or school for Mr. Enos, and it's dated February 28th, 2014.
And it states that -- at some point, has a check mark



through the words "attended clinic today, and it says "Please excuse from work." And it reads "must observe work restrictions as follows: Off work until March 10, 2014. May return to work as of above light duty."
And then below that, it says "no use of right hand or wrist."
Now, as I -- and it's signed by someone -- Dr. Eisenhower or the name Dr. Eisenhower is listed there.
In saying these things and describing the words on this document, does this refresh your recollection as to whether or not Mr. Enos was given light duty in 2014, in about February of 2014? Do you know one way or the other? Do you recall?
A It doesn't help me recollect a specific time and date. I just know that Mr. Enos was given light duty in the library.
Q Okay. And then the second page, DC 1585, it talks about him returning to work as of March 17th, 2014, light duty. Does this refresh your recollection as to when Mr. Enos was on light duty for any injuries in March of 2014?
A It does not, sir.
Q And do you recall whether or not Mr. Enos -- because this occurs in March of 2014. And the documents we looked at regarding the wilderness incident occurred in June of 2013, so this is some eight or nine months later.
Do you recall that after Mr. Enos was injured in the workplace injury of the wilderness incident, about eight or nine

months later, he had to -- he had to get surgery for the pins in his wrist? Does that ring a bell?
A I recall a surgery of his wrist. Specifically what it was for and when it was, I don't recall.
Q If Mr. Enos were on a workplace restriction where he was not supposed to use his wrist, was that -- would that be something that you would know, or would HR know that?
A HR would know that.
Q Okay. And if it had to do with making sure that your employees are working in compliance with their work restrictions, wouldn't that be information that you would need to know?
A That would be information that Victoria Sauer-Lamb, the chief deputy juvenile probation officer, would need to know.
Q And if you had a question about it, you would ask her?
A If I had a question about it, I would ask her.
Q Okay. So you know the job duties of the juvenile probation officers, so the question I ask is this.
If Mr. Enos was not supposed to use his wrist, would -- would that mean that he should not have been escorting inmates to the juvenile probation department or to court alone or without backup?
THE WITNESS: Could you repeat that question, please.
(The question was read by the reporter.)
MS. PARKS: Objection, assumes facts not in evidence, lack of foundation.



BY MR. GEDDES:
Q Do you understand the question?
A I do.
Q Okay.
A Do you want me to answer?
Q Sure.
A Okay.
Based on the circumstances of the juvenile, John has got a very good rapport with his clients. And he would know better than any of us who he could escort over to the juvenile court in respect to -- you know, it's probably not the -- with some support would probably be the best decision, have -- have another officer or a bailiff assist him in supporting his client over to the courtroom.
Q Okay. And when you read back the question, I want to make sure that I asked it correctly. The question that you just answered, when I said if he wasn't supposed to be using his wrist, what I want to specify in that question -- and I think you understood it to mean that, but I want to be clear -- that he's not supposed to use his wrist as far as a work restriction goes.
Did you understand that to be my question, a medical work restriction?
A Is that a statement or a question?
Q Well, I am trying to confirm or deny that you understood that my question was, when I asked if he is not supposed to use



his wrist, you understood that question to mean because of a work -- medical work restriction, because I asked that question in the context of the medical work restrictions of this exhibit. We're talking about the same thing here?
A Yes, sir.
Q Okay. Thank you.
All right. So do you recall whether his second workplace injury happened in June of 2014?
A I do not recall that.
Q Do you know whether Mr. Enos was working alone when he was attacked by a juvenile in that second incident?
A I do not. I was not there in the building at the time.
Q Okay. So in the second workplace injury, which -- and we'll show you documents in a minute, but I'll represent to you that occurred in June of 2014.
Do you know one way or another whether the person who attacked him was his probationer or whether it was someone else's probationer?
A I don't know if it was specifically his case or not.
Q Okay. And when I use the word "probationer," what does that mean?
A That means, that would be a juvenile on formal or informal probation on a caseload with the juvenile probation department.
Q Do you recollect that Mr. Enos was, in fact, required by



Ms. Sauer-Lamb to transport another parole -- juvenile -- juvenile correction officer's, another PO's probationer, and that's the person who attacked him, since that other probation officer was at a training? Do you recall that?
A I do not -- I was not there in the building at the time of the incident.
Q Do you recall whether he suffered injuries to his shoulders, his wrist and his head and his -- his right ear and his left side? Do you recall what the nature of his injuries were in that attack?
A I don't recall the specific nature of his injuries. I knew Mr. Enos was injured during the course of the attack.
Q Did you ever observe that his ability to grasp, bend, lift or perform his ordinary work duties at the juvenile probation officer -- I'm sorry, juvenile probation department were affected adversely by that second workplace injury?
A I observed his wrist. He had shared that with me at one time. But I did not observe his inability to do particular things because he was abstaining from doing particular things that would have injured further his injuries. So I didn't observe that.
Q And when was that?
A When was what?
Q You are describing him showing you --
A I don't recall.
Q Was that -- you don't know if that was before or after

the second injury?
A I do not, sir.
**Q And what types of things was he abstaining from doing?**
A Whatever is -- his workman's compensation claim required him to abstain from.
**Q But you don't recall the particulars?**
A I do not.
**Q But your understanding is he did receive medical care for the injuries he sustained in that second workplace injury? You described going for urgent care.**
A Yeah, I believe he received medical attention for the injuries described in the second injury.
**Q Isn't it true that Mr. Enos had blood on his clothing from the physical attack by the juvenile?**
A I don't know. I do not know that.
**Q Is it true that Mr. Enos -- after that attack occurred, the second workplace injury, the attack, that Mr. Enos was required to continue his duties that day before he went to a medical facility to get treatment?**
THE WITNESS: I don't -- would you repeat the question, please.
(The question was read by the reporter.)
THE WITNESS: I did hear that he was required to do that.
///



BY MR. GEDDES:
**Q And do you have an opinion about that?**
A I probably would have gotten him to urgent care quicker than that, or emergency, whatever, whatever the case.
**Q Now, you never actually observed Mr. Enos prior to him receiving medical treatment that day, after the attack occurred, correct?**
A I did not observe Mr. Enos.
**Q Where were you when that attack occurred?**
A I don't recall.
**Q So you didn't instruct or order Mr. Enos to continue with his court duties that day either directly or through someone else?**
A I did not instruct him to continue with his court duties that day.
**Q Did you -- you spoke with Ms. Sauer-Lamb about this. Do you recall when that was?**
A Probably the day of the event, the incident.
**Q Do you recall that Mr. Enos questioned the appropriateness of -- the appropriateness of the request that he continue his duties before getting medical treatment?**
A I don't recall that he -- I read that somewhere, but I don't -- I didn't get that firsthand.
**Q You didn't hear from Ms. Sauer-Lamb that Mr. Enos explained that under the circumstances, he believed he should be**



**heading to the hospital emergency room, instead of escorting juveniles to court?**
A I did not hear that from Ms. Sauer-Lamb. I don't recall -- I do not recall hearing that from Ms. Sauer-Lamb.
**Q Or anyone else?**
A No, sir.
**Q After -- after receiving medical care for that second -- well, actually, prior to receiving medical care for that workplace injury -- well, let me ask it this way.**
**Did you -- was it reported to you or did you otherwise learn that Mr. Enos told the judge what happened and the judge made a comment? Do you recall anything about that?**
A I recall hearing about that.
**Q What do you recall?**
A That Mr. Enos -- and the judge made a comment, exactly what you just said. That's as much as I recall.
**Q Do you recall that Mr. Enos explained that somebody had punched him?**
A I do not recall that.
**Q And that the judge says -- Mr. Enos said words to the effect that "I haven't been punched since the sixth grade like that," and the judge said something like, "Well, it's about time it happened"?**
A I do not recall that, sir.
**Q If that occurred, would you agree with that, or do you**



**think that would be an inappropriate statement?**
MS. PARKS: Objection, calls for speculation.
BY MR. GEDDES:
**Q You can answer.**
THE WITNESS: Could you repeat that back, please.
(The question was read by the reporter.)
THE WITNESS: I would just have to ask you to describe "that." Go back.
BY MR. GEDDES:
**Q The statement -- if Mr. Enos described to the judge words to the effect that somebody punched him and he hadn't been punched like that since the sixth grade, and the judge responded words to the effect, "Well, it's about time," would you think that would be appropriate or inappropriate?**
A I'm not going to question a judge's statements, so I just --
**Q You have no opinion?**
A I have no opinion, sir.
MR. GEDDES: Let's mark as the next exhibit, Exhibit 5.
(Exhibit 5 marked for identification.)
BY MR. GEDDES:
**Q All right. If you could take that moment, please, and look at this.**
A Yes, sir.
**Q Have you seen this document before?**

A I don't recall seeing it, but I'm sure I reviewed it.
**Q Do you recognize the handwriting on this document?**
A I believe it's the handwriting of Chief Deputy Sauer-Lamb.
**Q As you read this, does this document refresh your recollection of the events of the second workplace injury?**
A It refreshes my secondhand knowledge of the event, since I was not in the building at the time.
**Q Okay. And do you -- does this give you any further information as to whether or not Mr. Enos -- this was actually a probationer who attacked him, Mr. Enos' probationer who attacked him?**
A It does not give me any more information that is on -- hold that answer. Let me look -- let me read through it one more time.
Could you repeat his question, please. I'm sorry.
(The question was read by the reporter.)
THE WITNESS: It doesn't give me any information that it would be John's probationer.
BY MR. GEDDES:
**Q What instructions or assistance did you provide regarding the events of this day relating to the second workplace injury?**
A I don't recall, sir.
**Q Is it uncommon for -- in your experience, uncommon for**



**probation -- juvenile probation officers to be attacked?**
A Very uncommon.
**Q Did you speak to or console Mr. Enos that day regarding his physical attack?**
A I don't recall whether I saw John or not.
**Q Do you recall when you first communicated with Mr. Enos about this physical attack?**
A I do not.
**Q Other than Ms. Sauer-Lamb, do you recall having conversations with anyone that day about this -- this second workplace injury?**
A I don't recall my -- any conversations.
**Q To your recollection or knowledge, what was Ms. Sauer-Lamb's reaction or response to this?**
A She was upset, obviously upset, and also being professional and trying to resolve the reporting requirements and manage the -- the boy, and to collect the necessary information to complete the report.
**Q To your understanding or knowledge, what was Norma Santoyo's reaction to this incident?**
A I have no understanding or knowledge of her reaction to this incident.
**Q Did you subsequently inform Judge Gibbons about this incident?**
A I don't recall informing Judge Gibbons about this



incident.
**Q So you don't know one way or another what his reaction or response was?**
A I did -- I did not recall informing Judge Gibbons regarding this incident.
**Q Well, you may not have informed him, but do you have any knowledge as to whether he had a reaction or response to this?**
A I have no knowledge of that.
**Q And do you know one way or another whether Mr. -- Judge Young was informed of this?**
A I have no knowledge of that.
**Q And you have no knowledge of his reaction or response to this?**
A Other than what you shared with me.
**Q After Mr. Enos received medical care for the second workplace injury, he was given work restrictions from his doctor; isn't that correct?**
A I don't -- I don't know, sir. I would assume he might have been given work restrictions from his doctor.
MR. GEDDES: All right. Let's pause for a moment.
THE VIDEOGRAPHER: Going off the video record. The time is 11:50.
(A discussion was held off the record.)
THE VIDEOGRAPHER: We're back on the video record. The time is 11:50.



MR. GEDDES: Mark as Exhibit 6.
(Exhibit 6 marked for identification.)
BY MR. GEDDES:
**Q Before we go to Exhibit 6, I want to ask you, do you recall that after the incident, you specifically came in to transport the juvenile to detention after the incident?**
A I don't recall that, Mr. --
**Q You don't recall buying the juvenile a submarine sandwich at Subway?**
A I don't recall that.
**Q If there's testimony given that that occurred, would you have any reason to disagree with that?**
A Since I don't recall, somebody else testifies to it under oath, I would probably not disagree with that, sir.
**Q All right. This exhibit, Exhibit 6, if you could take a moment and look through them and I'll go ahead and ask you questions about them individually.**
A Yes, sir.
**Q Okay. Have you seen these documents before?**
A I don't recall seeing these documents.
**Q All right. DC 1526 to 1530 --**
A Okay.
**Q -- is a document, which -- on the first page, it reads "Notice of Injury Or Occupational Disease." It's an incident report. It's for Mr. Enos. It's dated June 17th, 2014.**

And it describes an accident or injury occurring at 11:15. And the nature of it was "battered by a juvenile in custody." All right. And it lists injuries.

Do you recognize any signatures on this page?

A I recognize Vicki Sauer-Lamb's signature and I recognize Mr. Enos' signature.

Q Okay. On the second page, this document is -- purports to be a report of industrial injury or occupational disease. And this has handwriting and signatures on it.

Do you recognize any signatures on this?

A I do not.

Q Okay. There -- middle of the -- middle of the page under the grouping of "Injury OR Disease," there is -- it says witness, Vicki Lamb. Do you see that?

A I see that.

Q Is that her handwriting?

A I don't -- I don't know. I don't know, sir.

That's not her signature as you would compare it to the first page, so I'm not quite sure if that's her printing or not.

Q Okay. Below that, down below, on the bottom, it reads "Employer," "Employer Signature," and "Title," it says Sarah Christensen. Do you see that?

A Yes, sir.

Q All right. Do you know Sarah Christensen's handwriting?

A I do not.



Q Okay. If we go back to that first page --

A Yes, sir.

Q -- it says "Describe the accident."

There's handwriting. It says "Juvenile became combative." Do you see that?

A I do.

Q Now, that's not Mr. Enos' handwriting, is it?

A I don't know, sir.

Q Would you recognize Mr. Enos' handwriting if you saw it?

A Potentially.

Q But you don't know one way or another whether he wrote that?

A I do not know one way or the other whether he wrote that.

Q Okay. On the third page, DC 1528, do you recognize any signatures on this page?

A I do recognize Mr. Enos' very clear signature there under -- next to "Employee's Signature." I don't recognize anything else.

Q All right. If we go to 1196 at the back of this document, this is another document from Alternative Service Concepts. It's -- it purports to be dated -- date of notice is 7/18/2014.

And it discusses body parts, cervical sprain, left wrist sprain, right wrist sprain, left chest wall contusion, right



shoulder strain, acute stress reaction.

Have you seen this particular page before?

A I have not, sir.

Q Do you know whether or not Mr. Enos had a workers' compensation claim as a result of the second injury?

A I do not know that specifically.

Q Do you know whether he suffered injuries that affected one or more of his -- his daily life activities as a result of that second injury?

A I knew Mr. Enos was assaulted that day, rather -- very physically assaulted. It was severe.

Q And you don't know one way or another, though -- well, let me say it this way.

Do you know if he had to take time off from work as a result of injuries from that -- that assault?

A I believe that might have happened.

Q But you are not sure?

A I'm not sure.

Q So if he -- if he did pursue a workers' compensation claim as a result of the second workplace injury, would your testimony describing how that would have been handled before in connection with the first workplace injury -- would that be the same such that that would be handled by HR, and if people were monitoring it, that would be the chief deputy?

Is it generally the same?



I mean, I don't want to have to go through another 50 questions to get to that.

A Yes. Those -- the expertise and scope of HR would be called upon to respond to that workman's compensation claim, and any communication with the department would be with Victoria Sauer-Lamb.

Q And she, to your understanding, would monitor that to determine when Mr. Enos would be coming back to work?

A She would monitor that circumstance, yes, sir.

Q And if you had questions about it, you would ask her; is that correct?

A If I had questions about it, I would ask the chief deputy.

Q And you are not aware one way or another whether Judge Young or Judge Gibbons monitored the status of Mr. Enos' workers' compensation claim for that second injury?

A I'm not aware one way or the other that they monitored anybody's workman's compensation claim.

Q Now, you testified earlier about light duty work in the county library.

Do you know how that light-duty position was obtained for Mr. Enos?

A I believe through the human resources department.

Q So is it your understanding, then, that when someone is given light duty in the juvenile probation department, the

Page 122

**arrangements for where they go work and what the light duty is, that's handled by HR?**

A It would be monitored by HR, the -- the situation of light duty, to make sure -- ensure compliance with the workman's compensation requirements.

**Q I guess my question is a little different.**

**If light duty is being obtained, someone has got to track down a job, know where this person is going. Is that something that you handled?**

A I did have an opportunity for Mr. Enos to participate in what I felt was light duty at the time in our juvenile detention facility.

**Q Okay. So how did that come up?**

A It came up by understanding that he needed to be in a least risk environment, and not being -- supervising a caseload of juveniles and potentially exposing himself to further injury on the job.

**Q Did you pick up the phone, did someone say, "Hey, you know, Scott, we have got an opening over here"? How did you learn --**

A I don't know how I came to the conclusion about him working in the juvenile detention facility, other than his skill set, his master's degree, his rapport with kids and groups, his knowledge.

He could -- you know, the whole thing would be, go up

Page 123

there, take a back seat to the primary person on staff to support kids throughout the day with their education or career development or life skills, whatever that might be.

If there was a perceived risk situation in the building, that he would be asked to -- or, he would, himself, take himself into the control room and let that be resolved between the on-duty staff person and the sheriff's officer.

It's a co-located facility. So the sheriff's officers in their control room on the other side of the building, the adult side, have cameras on us.

So any -- and our incident rate up in juvenile detention is minimal. We don't have serious -- we haven't had serious violent incidents or -- more opposition and temperament than physical violence situation.

That -- that -- so that position was offered to Mr. Enos in respect to having a car to go up there, coming into the office at 8 o'clock, driving up to juvenile detention, working with the juveniles in the facility, returning to the office at 5:00, and being paid for the driving time as well and to, you know, head on home after that.

**Q So procedurally, though, was -- was light duty something handled by both HR and you or Ms. Sauer-Lamb, or was it handled only by HR?**

A When we recommended the light duty option for Mr. Enos, HR was in support of that.

Page 124

**Q But how is it typically handled? That's my question.**

A That was my first situation in ever looking for light duty within the framework of the department, so that's how we handled it on that particular circumstance.

**Q Okay. So --**

A In that particular circumstance.

**Q So the position -- you found the position, recommended it to HR, and they supported it?**

A I didn't find the position. We just put our heads together and found out what's the safest place to keep John Enos out of harm's way so he could heal and get back to the work of juvenile probation.

**Q Okay. You said "the safest place." But isn't it true that a staff member was attacked in the detention center and he never returned?**

A I don't recall that.

MR. GEDDES: Okay. So why don't we break for lunch.

THE VIDEOGRAPHER: Okay. We're going off the video record. The time is 12:02.

(A recess was taken.)

(Exhibit 7 marked for identification.)

THE VIDEOGRAPHER: This is the beginning of Media Number 3 in the deposition of Scott Shick. We're back on the video record at 1:26.

///

Page 125

BY MR. GEDDES:

**Q Okay. I've handed you what's been marked as Exhibit 7, if you could take a look at this and --**

A Yes, sir.

**Q Have you seen these documents before, either DC 1626 or the second page, DC 1667?**

A I have not seen these.

**Q Okay. The first page, DC 1626, is dated 7/22/14. And it's a physical limitations work restrictions report from Sierra Neurosurgery Group for John Enos.**

**And the body part injured is listed as neck and back. And the treatment plan states "Patient status stable and rateable. Work status, release to full duty as of August 18, 2014.**

**"Physical restrictions, restrict limit, 25 pounds."**

**So this is dated July 22nd, 2014, with the expectation that Mr. Enos would have a physical restriction of 25 pounds until August 18, at which point, he would be returned to full duty.**

**Having stated -- stated what's on this document, does that refresh your recollection as to whether or not, after the June 2014 injury, the second workplace injury that Mr. Enos had, that he was -- he had workplace restrictions for a while after that injury?**

A It doesn't. I'm -- I'm not aware of this document. It doesn't refresh my recollection.

**Q Okay. Then on the next page, DC 1667, it's dated**

October 31st. It's an excuse from work or school.
You haven't seen this document before, but it states that he attended the clinic that day and he must observe the following work restrictions. He had to be off of work until further notice. It's signed by Dr. Eisenhower.
Now, do you recall that in late October or early November, John Enos was off work for an extended period of time?
A I don't recall the exact dates or times.
Q Do you recall generally whether he was present at work, working in his -- his ordinary capacity, at or about the time his employment separated?
A I do not remember that.
Q All right. Is that something that -- that Ms. Sauer-Lamb would have -- would have known?
A I'm not sure what you are referring to.
Q Well, as to whether or not Mr. Enos was present at work in his full capacity prior to his separation of employment.
A She may have knowledge of that, may have had knowledge of that.
Q Would that be something that you would ordinarily concern yourself with?
A No, not -- not really.
Q Well, let me ask it this way.
You are the chief of the department. Is it a matter that you would be concerned about as to whether or not an employee



has returned to work full duty or is off duty on a medical leave?
A It would be more of a matter to me that the person -- yeah, the person was back on duty, working in full capacity.
Q So you may not know what the answer is now, but did you at one time know whether Mr. Enos was away from work for a period of time?
A There were periods of time when Mr. Enos was away from work. I don't recall the exact times and dates, but there were times when Mr. Enos was away from work.
Q Do you know one way or another whether Mr. Enos had -- do you know what FMLA leave is?
A I know -- yeah, I know the name. I recognize it. I couldn't tell you all the aspects of FMLA. It's some type of privilege or honor -- I'm not quite sure, something that we're entitled to based -- based on particular circumstances.
Q So you wouldn't know -- you are saying you don't know whether -- if an employee has FMLA leave, whether that person can be terminated or whether that job has to be kept open? You don't know anything about that?
A I don't know anything about those laws. It's the expertise of the human resource department.
Q Now, isn't it true that after the second workplace injury, which occurred in June of 2014, that you and Ms. Sauer-Lamb had a meeting with him about the issue of his workplace injuries and light duty?



A I don't recall the meeting specifically.
Q You don't recall being angry, hostile or resistant to the idea of Mr. Enos going on light duty?
A I was not angry, hostile or resistant to the aspect of Mr. Enos going on light duty.
Q You don't recall having a meeting where you tried to get Mr. Enos to resign or separate his employment with the County?
A I don't recall that meeting.
Q If Mr. Enos recalls it and testifies that you attempted to get him into quitting his job, would you have any reason to disagree with him?
A I would.
Q And what would that reason be?
A I disagree.
Q Well, you don't recall the conversation.
A I don't, but I would disagree.
Q And I'm asking you why you would disagree.
A Because I would disagree with that. I wouldn't do that.
Q So didn't you have a meeting with Mr. Enos where you guys decided you were going to transfer his cases away to other juvenile probation department workers?
A I don't recall a specific time and day. I recall having a meeting with Mr. Enos regarding -- and also a letter -- for light duty up at the detention facility, and that his cases would be transferred to other juvenile probation officers in the



department.
Q How long does the average caseload last?
A Case or caseload?
Q I'm sorry, case, yeah.
A It can vary based on the response of the individual juvenile and their family.
Q Do you have a range in mind?
A Say, a year, a year to 15 months on formal probation.
Q Now, why -- why was it decided to transfer Mr. Enos' cases away to other juvenile probation department workers at that time?
A So the juvenile probation cases could be continued to be supervised in their homes and at their schools and wherever else it was deemed necessary to supervise them, to visit with them, to make sure they are in compliance with the court order.
Q Well, why couldn't Mr. Enos do that?
A Because he was -- he was on workman's compensation claim. He might have to arrest somebody. He might get assaulted by somebody. He would be in a home, potentially subject to the dangers of entering somebody's home.
Q Well, why couldn't he just have an assistant go with him to help him in that regard?
A He could have had an assistant. We encourage probation officers to go in tandem frequently in order to assure demeanor and rapport in the house and to avoid situations.

He could very well have had somebody, a partner team up with him.
Q Now, did you have an expectation of when Mr. Enos' work restrictions would be over at the time when -- before you transferred his cases away?
A I had no expectation.
Q Did you make any inquiry into it?
A I don't recall.
Q Did you consult with HR about it?
A I don't remember.
MR. GEDDES: All right. Let's take a look at the next exhibit.
(Exhibit 8 marked for identification.)
THE WITNESS: Thank you.
BY MR. GEDDES:
Q Okay. You are looking at Exhibit 8. You -- you've seen this document before, haven't you?
A Yes, sir.
Q And what is this document?
A It's a memo to John Enos regarding duty station assignment.
Q And this was your memo, correct?
A Yes, sir.
Q You wrote it?
A I did.



Q And that's your signature?
A It sure is.
Q And you wrote this on July 17th, 2014?
A That's what it's dated.
Q Do you ordinarily write your memos on the same day that they are typed, as the day of the memo?
A I have no -- I have no system for that.
Q But it's safe to conclude that you wrote this on or about July 17th, 2014?
A I would conclude that.
Q So if you could just take a moment and read this to yourself.
A Yes, sir.
Q You read it?
A Uh-huh.
Q Okay. I'm sorry, did you say you already read it?
A Yes.
Q Okay.
A I'm sorry.
Q Does this refresh your recollection regarding a meeting with Mr. Enos and -- and/or Ms. Sauer-Lamb regarding transferring cases away to other workers?
A I recall the meeting. I don't recall the time or date or the specifics of the meeting.
Q And who was at that meeting?



A I don't recall. Potentially, Mr. Enos, myself and Ms. Sauer-Lamb.
Q So the subject matter says "Duty station assignment." And do you recall whether you discussed the matters of this memo with anyone other than Mr. Enos and possibly Ms. Sauer-Lamb?
A I believe I talked with this duty station -- about this duty station assignment to our District Attorney, Deputy District Attorney.
Q That's -- and who would that be?
A Justina Caviglia. I don't know the correct pronunciation of her last name.
Q Anyone else?
A I don't recall.
Q Now, we looked at documents that showed Mr. Enos was involved in that altercation that was the second workplace injury that occurred on June 18th.
And so this meeting on July 17th was written less than a month after he was involved in that workplace injury. Is that fair to say?
A It appears that way.
Q So to clean up the time frame of Mr. Enos' work performance after his second workplace injury, leading up to the time of this memo that you wrote about a month later, Mr. Enos was injured on June 18th, 2014, and he received medical treatment.
I believe your testimony was you did not inquire about



the severity of his injuries, or do you recall actually --
A I don't -- I don't recall what I testified to you.
Q Okay. Do you -- did you inquire about the severity of his injuries?
A I believe I was informed as to the severity of his injuries, when I talked to Victoria Lamb, as the result of the incident.
Q Was that -- that conversation the same day it happened, or was that communication from her based on her review of medical records after he received treatment?
A I don't recall.
Q So when you wrote this memo on July 17th, 2014, what was your understanding of the state of his physical abilities or injuries when you wrote this memo?
A I understood that he needed to be on light duty.
Q Did you know the particulars about light duty, about his weight restrictions, what body parts?
A Not the specifics, other than he shouldn't be arresting kids and being out in the field, subjecting himself to potential harm.
Q So when you wrote this memo, did you have any opinion about whether he could perform the essential functions of his job with or without a reasonable accommodation?
THE WITNESS: Would you please repeat that question back.

(The question was read by the reporter.)
MS. PARKS: Objection, calls for legal conclusion.
THE WITNESS: I was following the advice of counsel, the Deputy District Attorney and Human Resources.
BY MR. GEDDES:
**Q And what advice was that?**
A That's to -- that Mr. Enos should not be operating in the capacity of juvenile probation officer.
**Q Any more specifics than that?**
A No, sir.
**Q So you, yourself, didn't actually perform an assessment of whether he could perform the essential functions of his job, you were -- you were acting on someone else's advice about that matter?**
A I was acting on the advice of our attorney, Deputy District Attorney, and our human resources director.
**Q Do you know one way or the other whether the human resources director -- and who was the human resources director, Norma Santoyo?**
A That was Norma Santoyo.
**Q And so she said the same thing?**
**You mentioned you were acting on instructions. What were her instructions?**
A I don't know what her -- under the advisement of the human resources director and the district attorney -- deputy district attorney.
**Q And do you know whether they performed an analysis of whether he could perform the essential functions of his job?**
A I do not.
**Q Now, prior to writing this memo, do you recall one way or another whether Mr. Enos took time off work from the date of the second injury in June of 2014 to the day of this memo?**
A I don't recall, sir.
**Q And you had no expectation one way or another whether he would return to his ordinary full-duty capacity, is that correct, as of the time of writing this memo?**
A I had no time frame expectation as to when he would return to full duty.
**Q So let's turn to Exhibit 8. The first paragraph, it reads "Based on our conversation this morning."**
**So if the date of that document is correct, you would have had that meeting with Mr. Enos on July 17th, 2014, correct?**
A Yes, sir.
**Q And what prompted that conversation?**
A The assignment of light duty.
**Q But did someone call you, email, say, "Hey, you've got to have a meeting with Mr. Enos"? I mean, what -- what physically prompted that meeting?**
A The fact that we were going to inform Mr. Enos about his new duty station, which would honor the light duty request.





**Q Okay. Do you recall where that meeting was held?**
A I do not.
**Q Do you know how long the meeting was?**
A I don't.
**Q Did you take notes at that meeting?**
A I did not.
**Q Did anyone, to your knowledge?**
A Not to my knowledge.
**Q And was it recorded, audio or visually?**
A I did not record it audio or visually.
**Q And you're not aware if anyone did?**
A I'm not aware of anybody that did.
**Q So the first sentence reads "Based on our conversation this morning and after evaluating our options, I believe it is in your best interest to be assigned to a juvenile detention center" -- "detention facility in a strictly support role as you work through your medical circumstances."**
**So what does that mean?**
A Which part?
**Q The whole sentence. If you need to break it in parts, that's fine.**
A I believe that that's the best place for Mr. Enos in respect to the requirements of being on light duty. It keeps him out of harm's way and also tapped into his skill set as, works well with kids and, you know, could be one-on-one with kids, those types of things that could be very beneficial to kids in our juvenile detention facility.
**Q Did you investigate whether or not there was the need for additional help in the -- in the juvenile detention facility at that time?**
A There definitely was -- wasn't a need for additional help in the juvenile detention facility. Our population was really minimal at those times, average population of two children per day.
As this evolved, you know, John could have been working on curriculum or other things.
But also, we also have PREA requirements, which is the Prison Rape Elimination Act, which required two staff to be on duty at all times.
And it just seemed like a good way to meet those upcoming requirements of state regulation, have another able body up there, but also -- and be a safe, out of kind of harm's way, light-duty position for Mr. Enos.
**Q So at that time, didn't the detention center have two staff members?**
A There's a supervisor and a line staff person that's assigned to every shift back -- I don't recall what the shift structure was back then, but we were keeping it pretty lean.
**Q But -- so they -- they satisfied PREA with or without him; isn't that correct?**

A That's not correct.
**Q Okay. So when were they not complying with PREA?**
A It was -- PREA was not enacted yet, but we were instructed to be reaching for PREA compliance with respect to having two staff on during waking hours.
**Q So prior to Mr. Enos' assignment on July 17th, 2014, to that position, did they have two staff members on duty in the detention center?**
A I don't -- I don't recall, sir. I don't recall that schedule.
**Q Was it makeshift work? Was it -- I mean, was there a position that was open, or were they just adding him to --**
A There was no open position. It would just be adding John's experience and his capacity to work with kids to the detention facility, which I think that kind of one-on-one contact would have been very beneficial.
**Q Now, you didn't need to get approval for that because you were in charge of the detention center, correct?**
A I worked in conjunction with the District Attorney and Human Resources, and they gave me the thumb's-up that that would be an okay thing to do.
**Q Now, you write "after evaluating our options." What options did you consider? What options are you referring to?**
A I don't really recall. There weren't any other positions. There weren't any other options within the framework



of the office or the framework of -- this seemed like the best place as far as light duty was concerned in respect to the risk factors and also in respect to Mr. Enos' skill set.
**Q You said that there weren't any other options, there weren't any other positions. Are you saying countywide or just in juvenile probation?**
A Just in juvenile probation. I don't know what was available countywide as far as other positions are concerned in respect to light-duty requirements.
**Q You write "You are encouraged to work in a correctional programming or educational capacity with juveniles in the facility."**
**What does -- what does that mean?**
A Well, we have life skills programs and pamphlets up there. We have that type of correctional -- just counseling in respect to looking at, you know, working -- tutoring, looking at grades, working with kids, just interacting with them, being a positive role model, being a positive mentor.
**Q So is he physically having to go into -- are they in cells, these juveniles?**
A Yeah, they are.
**Q Does he -- does he open the door and does he go into the cells? Is he walk -- is he talking to them behind the door? I mean, how does what work?**
A We would not expect Mr. Enos to go into the pods where



the cells are and open the doors, bring the kids out. That would be the staff person on duty.
He would be there to receive the kids during -- you know, out in the rec area, rec and dining area and school area. It's kind of a multipurpose room.
**Q Now, the -- when the juveniles are brought out to interact, say, with Mr. Enos as was intended here, were they restrained, or were they -- did they have their hands restrained or feet restrained, or were they --**
A Not whatsoever, not restrained. They just normally would come out of their rooms. They would be in a line movement, follow the instruction, come sit down, maybe get a drink of water, get their school work, whatever the activity was, and go on about that next -- next block of time, yeah.
**Q And some of these juveniles are violent?**
A We don't have a real violent population up in our juvenile -- or, Douglas County kids on juvenile probation, there's a handful that always break that threshold as far as volatility and violence and oppositional defiance, but those cases are rare.
So the majority of our kids are -- have a lot of mental anguish, mental health system, frustration, potentially drug and alcohol use, they are coming down, they are anxiety based. And they calm down rather quickly when they are in good care and they are around good people.
**Q You write that "your caseload will be assigned to the**



**other officers in the department."**
**Now, that's -- these cases are going to these officers and that's it. I mean, it's not like we're going to give them back to you in two weeks. They are being reassigned on a permanent basis.**
A The cases are being assigned to the officers in order for them to continue on with the court-ordered terms of probation assigned to each case.
**Q But the assignment of the cases to the other officers was considered a permanent assignment. It wasn't you are going to have these for two weeks and we'll give them back to you.**
A I did not consider that a permanent assignment.
**Q So what was your expectation when you assigned the cases, that Mr. Enos would get them back at some point?**
A My expectation would be that if a case was reassigned to a probation officer, that they would take it up with their skills, their knowledge of what's expected and continue on with that case, getting to know the family and the child, that that would be something that they would probably have to catch up on.
But the expertise in the office and the staff that we have are very capable of doing that. They are very good at it.
**Q But that's not my question. My question is -- if I could give you an analogy, if someone worked in an attorney's office and they said, Jane Doe, while you are on light duty, we are going to have so-and-so work on your case, and when you are**

off light duty, you can have your case back. That's Scenario A.
Scenario B, Jane Doe, you are on light duty. We're going to just transfer your cases to these other people. That's my question.
Was your expectation that these cases would stay with these other detention officers or that they -- they would come back to Mr. Enos?
A No, I had no expectations of -- for that far out at the time. I hadn't thought about it.
Q Have you actually assigned caseloads away from officers to other officers before?
A That doesn't happen frequently. I believe there's been a case or two over the years based on particular circumstances that we've assigned to other officers.
But typically, we encourage the kids to deal with the probation officer.
A lot of times, it's just because they are holding them accountable and they are good at what they are do, and they are frustrating the child. But it's what's in the best interest of the child when the day is done.
Q So if Mr. Enos had come off duty a month later, would he have gotten these cases back?
A Potentially.
Q And did he ever get these cases back?
A No, sir.



Q You write "If you could staff each case with a newly assigned officer, it would be appreciated."
What does that mean?
A If he could review the case and the specifics of the case with the new officer to catch them up on anything that would be current or any particular aspects of the family or the child or whatever that might be, just a professional exchange of information.
Q You wrote that he would be -- he would be assigned to the facility in a strictly support role.
What does that mean, with a support role?
A Just tutoring, mentoring, career development, counseling.
Q Well, don't the other workers in the detention center do that?
A They do -- they may do some of that, yes.
Q Now, regarding this assignment, do you know one way or another whether Mr. Enos wanted this assignment?
A I don't believe he wanted it. He turned it down.
Q And how do you know that?
A Because he told me.
Q What did he say to you?
A I don't recall.
Q Well, does he have the freedom to turn down assignments that you give him?



A He certainly does.
Q And so if you said to him, "Mr. Enos, this is your assignment," and he said, "I don't want it," that wouldn't be insubordination?
A The circumstances at the time, I -- John is a sensitive individual. He's a very intelligent individual.
And the circumstances at the time, I didn't feel pushing it -- pushing him into that would be in anybody's interest. So therefore, his denial -- I just thought, you know, let -- just -- the refusal was a refusal.
He felt that he would be in harm's way up there. I do remember just that small part of the conversation, and I -- which I disagreed with.
But I'm not going to force somebody into specifically -- considering his current physical and emotional status as an employee, I didn't think that was wise to push him into that and -- you know, in a negative manner.
Q You stated that he objected for medical reasons?
A I don't recall why he -- I -- just the risk factors of the detention facility.
Q Risk factors to his physical health?
A Potential risk factors from assaultive behaviors or things that could take place in the juvenile detention facility.
Q And that was based on what he had experienced in the second workplace injury and his physical condition?



MS. PARKS: Objection, calls for speculation.
THE WITNESS: Could you repeat that question for me, please.
(The question was read by the reporter.)
THE WITNESS: That he based what on?
BY MR. GEDDES:
Q You said that he told you he didn't want the job because of the risk factors.
A Oh, I -- oh, I -- I think, John -- I mean, John has a working knowledge of what goes on in our juvenile detention facilities.
Again, he's very well versed in juvenile justice and our system, and that he made an educated opinion regarding our juvenile detention facility. I don't think that had any impact with a standalone assaultive situation that took place in our office.
Q But when he -- you are saying that he told you that he didn't want to do it based on the risks. Those were risks to his health and safety?
A I assume so, that he would be in harm's way as a result of being on light duty in the Douglas County juvenile detention facility.
Q Would you have a difference of opinion with Mr. Enos as to what his medical circumstances required?
A I have no opinion about Mr. Enos' medical circumstances.

It's none of my business.
Q So when you write "I believe it is in your best interest to be assigned to a juvenile detention facility in a strictly support role as you work through your medical circumstances" --
A Yes, sir.
Q -- that wasn't based on any opinion you had, that was based on the instruction given you by HR and the attorney?
A Yeah, that was based on the advice given by my attorney and human resources director.
Q Do you know whether or not the HR director or the attorney about whom you refer here, considered the other option of letting Mr. Enos keep his caseload and have others assist him?
A I was not aware that was an option.
Q So you don't know one way or another whether they considered it?
A I was not aware that that was an option, sir.
Q No, not whether it was an option, whether they considered it. They didn't tell you one way or another that they considered it?
A That they considered that an option?
Q Yes.
A I don't know one way or another whether they considered that being an option.
Q Is there a reason why Mr. Enos wasn't just fired?
A There's no disciplinary circumstance that would warrant



Mr. Enos' termination from employment. There is no progressive discipline. He had a couple of riffs over the years, but Mr. Enos' evaluations and his productivity was successful and exceptional at times.
Q But if he couldn't do the work, why not just consider him to be away from work for three days or more and call it an automatic resignation?
A I'm not sure what your question is.
Q My question is very clear. If Mr. -- the assessment was made that Mr. Enos needed to be on light duty because he couldn't perform his job; is that correct?
A That's what I was -- the information I was given from Human Resources and our District Attorney.
Q So if he couldn't do his job for three days, why not just fire him?
MS. PARKS: Objection, calls for speculation on the part of this witness with respect to HR issues.
THE WITNESS: You'll have to repeat that again.
(The question was read by the reporter.)
THE WITNESS: There was no grounds for firing Mr. Enos. He had no disciplinary -- course of disciplinary action, progressive discipline.
BY MR. GEDDES:
Q And so his -- his inability to perform his work for three days in full capacity wasn't grounds to --



A That's not a disciplinary action.
Q What kind of action is that?
A I don't know.
Q Well, would it have been justified to fire him at that point?
A It would not have been justified to fire Mr. Enos at that point. I had no -- for disciplinary circumstance.
Q Well, but for an inability to be away -- for his inability to perform his full duties, get full medical clearances at the time, why wasn't he just considered away from work for three consecutive days, subject to which he would be deemed to automatically resign?
MS. PARKS: Objection, calls for speculation, asked and answered.
THE WITNESS: You'll have to repeat that back, please. Thank you.
(The question was read by the reporter.)
THE WITNESS: I don't know. I wasn't making those decisions.
BY MR. GEDDES:
Q I think you testified earlier there were a total of six juvenile probation officers, is that correct, at the time?
A Yes, sir.
Q And at the time that you transferred Mr. Enos' cases away to these other officers, was anyone brought on to -- to fill



that role to make the sixth, if you are considering Mr. Enos working in detention?
A No, there was nobody brought on to fulfill that role.
Mr. Enos' salary and benefits would have moved with him to the light-duty juvenile probation -- juvenile detention position, and he would have been paid as a senior juvenile probation officer, performing those light duties in the juvenile detention facility.
Q So then he wouldn't have been paid out of the budget for the detention center, he would have been paid out of the same budget he was paid from when he worked as a juvenile probation officer?
A Yes, sir.
Q And what was that like as far as other officers picking up the slack? Was that -- was that an issue or a problem?
A I have dedicated, loyal officers. They picked up the slack like professional -- that you would expect from a professional juvenile probation officer.
Q So you are not recalling there being a problem then?
A I don't recall there being a problem.
Q Now, why was Mr. Enos' -- why were Mr. Enos' cases transferred away from him after his second workplace injury when that wasn't done after the first workplace injury about a year earlier?
A I don't know. I don't know the answer to that question.

Q Is it true that at the time of writing this memo on July 17th, 2014, you didn't like Mr. Enos?
A I have a lot of respect for Mr. Enos as a person and as a juvenile probation officer. And there's no reason to dislike Mr. Enos whatsoever.
Q So you didn't dislike him when you wrote this memo?
A I do not dislike Mr. Enos. I did not at the time of that memo as well.
Q And so you wrote "I'm asking you to report to duty at juvenile detention on 7/21/14." That was the date he was supposed to start?
A Potentially. If that's what was documented, I probably --
Q Did you ever --
MS. PARKS: Let him --
MR. GEDDES: I'm sorry.
MS. PARKS: -- finish his answer, please.
BY MR. GEDDES:
Q Yeah, go ahead. Are you through with --
A That would have potentially been the date that he would have started. I don't know if it's exact -- the exact date or not.
Q Did you document your conversation with Mr. Enos that you say occurred where he said he didn't want the job?
A No. I wish I would have, but I did not. That's it --



that's the nature of the -- that's the only document that I had.
Q Is it your testimony, then, that during that conversation, before the writing of the memo, he expressed to you he did not want that position, but you still wrote the memo afterwards?
A That's not true.
Q Okay. What was the order?
A The memo was given to him at the time of the meeting, I believe, to the best of my recollection. I would assume I would have given him the memo at the time of the meeting. I don't recall specifically.
Q Now, you referred to a shift change meeting. What was that?
A I'm not -- in the document?
Q Yes.
A That's our shift change meeting that takes place -- sounds like we had a shift change meeting on that day and that the juvenile probation officers would be there. I was asking him to staff his cases with the persons receiving his caseload.
Q What is a shift change meeting?
A Oh, that's -- that's a typo. That should have been "staff meeting," yeah. I'm sorry, yeah, that -- shift change is something that happens up at detention. That was a typo. It would be a staff meeting.
Q Okay. So you are asking him to attend the Monday staff



meeting?
A I don't know if that was a Monday or not. It might have been the next -- a staff meeting or could have been Monday.
Q You write "Typically you may leave the valley station at 8:00 a.m. and take the Crown Victoria vehicle as your transportation."
What was the purpose of that? What does that mean?
A So John would not be spending -- driving his personal vehicle the -- I forget how far it is up -- about 14 miles one way -- that he would be in a county vehicle and not have to be financially burdened with using his personal vehicle to go up to juvenile detention, and to report back and not have to drive on his own time; that would be incorporated within the framework of his eight-hour workday, nine-hour workday, including lunch.
Q You write "Take your breaks and lunch at the appropriate times of your shift and give your best effort to be another set of eyes and ears and general support for the civility" -- "for the facility."
What in particular does that mean?
A Take your breaks at lunchtime, appropriate times of your shift. You are entitled to an hour lunch and a break, 15-minute breaks, if you so deem necessary or choose to do so, and your best effort, you know, to be another set of eyes and ears.
John is very good at that, very good at supervision, very good at reading kids.



Q Were you concerned that Mr. Enos would not give his best efforts and that's why you put that in there?
A No, it was supposed to be encouraging.
Q And to your recollection, his duties were to assist the kids in education and what else?
A Mentoring, tutoring, counseling, maybe -- activities, anything that he'd do that the kids can benefit from in a juvenile detention facility, alternative programming.
Q What were the -- I think you -- you alluded to this earlier, but what were the -- the actual needs at the juvenile detention center at the time of this reassignment? Were they busy? Were they not? Did they have a lot of kids? Did they not?
A We talked about an average population of two kids. There could have been nobody in the juvenile detention at the time we assigned Mr. Enos up to the building.
That was something I was willing to stand up for in order to give him a positive light-duty assignment and also to rely on his skill set.
Q So you had a staff meeting on July 21st, 2014. Is that your recollection?
A I don't recall specifically.
Q Don't you recall specifically telling Mr. Enos at a staff meeting not to report to the detention center facility since there were no kids there?
A I don't recall that.

Page 154

Q Mr. Enos -- if Mr. Enos testifies that that's absolutely what you told him to do, would you have reason to disagree with him on that?
A I wouldn't disagree.
Q And if Mr. Enos testifies at trial that he absolutely did not refuse this assignment, would you have any reason to disagree with him on that?
A I would absolutely disagree with him.
Q And why would you disagree with him on that?
A Because he refused the assignment.
Q And you are saying he had the discretion to do that?
A He refused the assignment.
Q Did Mr. Enos have the discretion as a subordinate to you to refuse assignments given by you?
MS. PARKS: Objection, asked and answered.
BY MR. GEDDES:
Q Go ahead.
THE WITNESS: He did -- ask the question again, please.
MR. GEDDES: Could you read it back, please.
(The question was read by the reporter.)
THE WITNESS: I respected Mr. Enos' decision and his discretion at the time.
BY MR. GEDDES:
Q Mr. Enos had discretion to turn down assignments?
A I respected Mr. Enos' decision and discretion at the

Page 155

time of denial of the assignment.
Q So your statement there is saying that you respected his discretion?
A Uh-huh.
Q Are you saying, then, that he had discretion to turn down assignments?
A I respected his decision, his discretion to make that decision at the time to turn down the assignment.
Q Does Mr. Enos have -- as a subordinate, did Mr. Enos have the freedom to turn down assignments?
MS. PARKS: Same objection, asked and answered.
THE WITNESS: He turned -- he turned down the assignment and he used his discretion. Therefore --
BY MR. GEDDES:
Q Could you have written him up for turning that down?
A I would not have written him up for turning it --
Q Would you have written --
A I would not have turned --
Q Not whether you would have, did you have authority --
A I don't -- I don't believe I -- I could have written him up for something -- something like that.
Q Why?
A I just don't think -- it would not be -- it would not be something that I would do.
Q But you had the authority to, if you wanted to?

Page 156

A Potentially, I might have had the authority to do so.
Q Do you know who the detention staff persons were at the time?
A I do not.
Q Did you speak with any of them about this matter?
A I spoke with the supervisor of juvenile detention at the time about Mr. Enos coming up to the facility for light-duty assignment.
Q And who was that? Do you know who that was?
A Kris Zehren.
Q Kris who?
A Zehren.
Q Is that a man or woman?
A That's a woman. K-r-i-s, Z-e-h-r-e-n.
Q What did you talk about with her?
A I don't recall the conversation specifically.
Q Do you know when you talked with her?
A I don't recall.
Q It was before writing this memo?
A I don't recall.
Q Do you recall contacting her and telling her, never mind, he's not coming up?
A I don't recall that either.
Q You write "Please follow all doctor guidelines for your medical limitations while on duty in the detention center."

Page 157

What does that mean? Why did you write that?
A It was a -- yeah, nobody knows his medical limitations better than Mr. Enos. And I just asked him to please follow those guidelines while he was on duty in the juvenile detention facility.
Q But you didn't know --
A Just a polite request.
Q You didn't know what his medical limitations were; isn't that correct?
A Not specifically.
Q Isn't it true that HR or the attorney that you are referring to gave you -- gave you language to include in this memo?
A I don't recall that.
Q This memo -- was this memo written completely from scratch from what you wrote and not from what anyone else asked you to write or include?
A To the best of my recollection, I wrote this memo.
Q You write "Avoid any potentially volatile juveniles that may enter the facility."
A Yes, sir.
Q Why did you write that?
A Because they would pose a potential threat to Mr. Enos, based on the -- their volatility. I didn't want him to get hurt.
Q Last sentence of the memo reads "A staff person will

always be on duty with you."

What did -- why did you write that?

A To assure him that a primary staff person would always be on duty with him, that he would never be left with the full responsibility to manage the juvenile detention facility. He was a support role.

Q Did that also mean that if he ran into any problems with volatile juveniles, since it's the next sentence, that someone would be there to help you?

A I'm not understanding your question, sir.

Q The -- the sentence reads "Avoid any potentially volatile juveniles that may enter the facility." The following sentence reads "A staff person will always be on duty with you."

Does that "A staff person will always be on duty with you" sentence also refer to stating that there will be someone there to help you for safety reasons if you encounter a volatile juvenile?

A No, it meant there would be always a primary staff person, you know, the person scheduled in the juvenile detention, on duty with John; John would be in a support role with that person.

Q So that sentence has no -- no -- you never intended that sentence to have any meaning regarding safety or protection of Mr. Enos in the event that he encountered a volatile juvenile?

A Oh, most -- if -- if, by nature of a particular



incident, that a juvenile was becoming volatile, that person would be the primary person to intervene with that, and Mr. Enos would be -- distance himself in the control room.

Q Did you or anyone, to your knowledge, at Douglas County or the Ninth Judicial District Court perform any evaluation of the cost or the burden to Douglas County to have others assist -- or Mr. Enos -- for Mr. Enos to work in this position or to have others assist him?

A Oh, it definitely is a cost that I believe, in order to keep him whole, I was responsible for.

So therefore, I felt that this was the best light-duty assignment to keep him whole as an employee with Douglas County, based on the advice I was given by my attorney and the human resources director.

Q But do you know whether when an actual evaluation was performed, dollarwise, costwise, on what -- what the burden or cost would be to have Mr. Enos work in the juvenile detention center?

A I took responsibility for the budget and the cost, and I did not -- it did not significantly impact me or my relationship with Finance or the county commissioners.

Q Now, what happened to Mr. Enos? He didn't work in the detention center, so where did he go?

A I don't know what happened to him other -- well, the library, I believe, eventually light duty in the Douglas County



library was a job that was -- he was assigned to, he accepted.

Q So what was the process that occurred to get Mr. Enos light-duty work in the library?

A I don't -- I wasn't involved in that process.

Q Do you know who was?

A I do not.

Q You were simply informed Mr. Enos is working in the library?

A I was informed that Mr. Enos was going to be doing light-duty assignment in the Douglas County library.

Q Do you know what -- what those duties were?

A I do not.

Q Was he helping out as an extra worker, or was there an open position there?

A I don't know what the capacity that Mr. Enos was in.

Q And you didn't investigate it?

A I did not.

Q So who paid for his work while he was there, what budget? Was it still the juvenile probation department's budget, or was it the library's budget?

A He was still under the juvenile probation department's salary and benefits.

Q Now, when he's being paid, he's not paid his full regular wages, he's being paid a workers' compensation rate; is that correct?



A I don't know.

Q You didn't inquire into that?

A I did not.

Q To your knowledge, what evaluation or consideration did anyone perform to determine whether the placement in the library accommodated his medical work restrictions?

A I don't know.

Q Was it your understanding that when he worked light duty in the library, he would be required to grab and lift books and perhaps boxes of books?

MS. PARKS: Objection, calls for speculation.

THE WITNESS: I don't know.

BY MR. GEDDES:

Q You didn't have an opinion one way or another?

A I didn't know that -- I don't know.

Q Well, my question is, you didn't form an opinion one way or another; is that correct?

A Regarding?

Q Regarding whether he would be required to grab and lift books and perhaps boxes of books.

A I didn't know that he had to grab and lift books or boxes of books.

Q And do you know how long Mr. Enos was scheduled to work in light duty at the library?

A I do not.

**Q Was it -- do you know if it was open and indefinite?**
A I do not.
**Q Did you have an expectation that if -- if his work ended there, they would call you? I mean, what was your -- your end vision of when that would end?**
A I really didn't have an opinion at that time.
**Q Do you know how long it took to get that placement at the library?**
A I do not.
**Q Do you know when he started work there at --**
A I do not.
**Q Were there other positions that Mr. Enos was considered for to be transferred with regards to light -- light duty?**
A I don't know.
**Q But to your knowledge, there were none?**
A I don't know that there were any positions where Mr. Enos would have been transferred within the framework of Douglas County.
**Q You are not aware of a consideration for other positions; is that correct?**
A I'm not aware of any positions that were under consideration.
**Q And you are not aware of any documents or anything that would memorialize the communication regarding transferring Mr. Enos to the library?**



A I'm not aware.
**Q Did you ever consider whether Mr. Enos' workplace injury, either one of them, constituted a disability under the ADA?**
A I have -- I have -- I'm not an expert in that area. It's not my scope, practice. I relied on Human Resources to -- and the District Attorney to make those decisions.
**Q Is this -- is that a way of saying you personally didn't consider the matter?**
A No, that's not a way of saying I did not personally consider the matter.
**Q Did you personally consider the matter? That's my question.**
A Consider what matter?
**Q Did you ever consider whether either workplace injury from either the tree incident in the wilderness or the attack by the juvenile -- did you ever consider whether his injuries arising from that constituted a disability under the ADA?**
MS. PARKS: Objection, calls for a legal conclusion.
THE WITNESS: I'm -- I'm not an expert in that area, sir. I can't answer the question.
BY MR. GEDDES:
**Q So if, at the time of trial, I tell a jury that you never considered it, would that be inaccurate?**
THE WITNESS: Could you please repeat, go back a ways,



please.
(The question was read by the reporter as follows:
"Did you ever consider whether either workplace injury from either the tree incident in the wilderness or the attack by the juvenile -- did you ever consider whether his injuries arising from that constituted a disability under the ADA?")
THE WITNESS: I'm not qualified to consider that.
THE REPORTER: That was the prior question.
MR. GEDDES: And then the follow-up question was -- that's what I think he was asking for a readback on.
(The question was read by the reporter as follows:
"So if, at the time of trial, I tell a jury that you never considered it, would that be inaccurate?")
THE WITNESS: Yes.
BY MR. GEDDES:
**Q So you did consider it?**
A No, I'm not qualified to consider it.
**Q I'm not asking you whether you are right or wrong in your considerations. I'm not asking you whether you are qualified to make considerations. My question is, did you ever consider it, whether you were right or wrong?**
A I have to -- I have to go back to what I might be considering.
**Q I can just read it back to you.**
A Yeah, go ahead.



**Q Did you ever consider whether either workplace injury constituted a disability under the ADA?**
MS. PARKS: Objection, calls for legal conclusion.
THE WITNESS: I would consider that John was harmed as a result of both of those incidents and it was a legitimate claim. I would consider that.
BY MR. GEDDES:
**Q But as to whether it constituted a disability under the ADA, that's not something that you considered?**
A Again, I would consider that Mr. Enos had been harmed as the result of those incidents, and I'm not qualified to make an opinion about ADA. That's not my area --
**Q Okay. So --**
A -- area -- scope of practice or expertise, sir.
**Q That's fine. Just so that I'm clear factually --**
A Yeah.
**Q -- I can -- I can consider whether, you know, a trademark infringement occurs or not. I have no basis for making that opinion because I'm not educated in it, but I can tell you that I never considered it.**
**That's my question. Factually, did you ever consider, the thoughts in your head, this workplace injury might constitute a disability under the ADA. I think your answer is no because you are not qualified to make it, but I'm not testifying for you. You are.**

MS. PARKS: Objection, calls for a legal conclusion.
THE WITNESS: Yeah, I'm not qualified to make it. I wouldn't know what -- what parts of the claim or, you know, any -- I don't know what -- when ADA would kick in, when workman's compensation -- I would have no working knowledge of it.
So, therefore, I wouldn't consider it on -- on those terms as far as this would apply to this or that, ADA.
What I would consider is that Mr. -- Mr. Enos was legitimately hurt and was able to file claims, appropriate claims through our human resource department.
BY MR. GEDDES:
**Q Now, to your knowledge, were there ever communications or documents made by anyone, to your knowledge, as to whether or not Mr. Enos' workplace injuries constituted a disability under the ADA?**
A Not to my knowledge.
MR. GEDDES: Let's take a couple-minute break. I want to grab some water.
THE VIDEOGRAPHER: We are going off the video record. The time is 2:28.
(A recess was taken.)
THE VIDEOGRAPHER: Okay. We're back on the record.
Okay. Just a moment.
This is the beginning of Media Number 4 in the deposition of Scott Shick. We're back on the video record at



2:37.
BY MR. GEDDES:
**Q Mr. Shick, we took a brief break, but you understand you are still testifying under oath?**
A Yes, sir.
**Q Okay. Did anyone ever say words to the effect that Mr. Enos was too much of a liability for his employment at Douglas County Juvenile Probation Department to -- to continue?**
A Nobody said that to me.
**Q Are you aware that Mr. Enos had a conversation with Ms. Santoyo where Ms. Santoyo told him that?**
A I was not aware of that conversation.
**Q When did you first consider separating Mr. Employment -- Mr. Enos' employment from Douglas County?**
A I don't recall.
**Q Well, you recall -- you recall when he was separated from employment, correct?**
MS. PARKS: And, Counsel, I object to the previous question. It misstates his testimony as to who made the decision to separate him from his employment.
BY MR. GEDDES:
**Q Who -- who determined that John Enos' employment would be separated from the County?**
A I don't know specifically who determined that. I was following the advice of the District Attorney and the human



resources director.
**Q How did that -- how did that come up?**
A I don't recall.
**Q You don't recall --**
A I don't --
**Q -- when it arose?**
A I don't recall when it arose.
**Q Was it shortly before his separation occurred or long before?**
A I don't recall.
**Q Well, often in depositions, people don't recall an exact date, and then follow-up questions are asked to bookend it, and that helps refresh someone's recollection.**
**Do you recall what time of the year it was?**
A I don't.
**Q You don't recall the season?**
A I don't, sir.
**Q Do you recall whether Mr. Enos was back at work or not at work when the decision was made?**
A I don't recall that either.
**Q And what advice were you given in this regard?**
A I don't recall the specific conversation or the advice.
**Q Well, what was the general contour?**
A "Contour" meaning?
**Q The shape of it. What was the general drift of the**



**advice that you followed?**
A In respect to what?
**Q Mr. Enos' separation of employment from Douglas County.**
A That he was unable to return to work with full medical clearance.
**Q And do you know what facts that was based on?**
A I don't.
**Q Do you know what the -- the phrase you are using here, "full medical clearance," what does that mean?**
A To perform the functions of a senior juvenile probation officer.
**Q Well, when you say "full medical clearance," as opposed to what, partial medical clearance?**
A That's just my terminology, that he would be cleared to perform the functions of a senior juvenile probation officer.
**Q As listed where?**
A What would be listed where?
**Q In the job description?**
A Yeah, would be able to perform full functions of his juvenile probation officer.
**Q Okay. And in what way was he not able to do that?**
A I don't know.
**Q So somebody else did that analysis --**
A Yes, sir.
**Q -- made their recommendations, and then that's what you**

followed?
A Yes, sir.
Q You didn't perform any independent analysis?
A No, sir.
Q And no independent investigation?
A No, sir.
Q And you don't know what analysis or investigation they performed; is that correct?
A I do not.
Q Now, did you receive this in a memo? Where did you get this instruction? Was it oral or written?
A I don't recall.
Q Well, do you recall having any meetings where this was discussed?
A I do not.
Q And that would come from specifically which people?
A Human resources director.
Q Norma Santoyo?
A And the District -- Deputy District Attorney, Justina Cavla.
MR. GEDDES: Let's look at Exhibit 9, please.
(Exhibit 9 marked for identification.)
BY MR. GEDDES:
Q Okay. Have you seen this document before?
A No, sir.



Q This is an email from Karen Barbee at the top to Sarah Christensen. And below that, there's an email below that from Sarah Christensen to Karen Barbee.
And the first email is dated January 20th at 4:06 p.m., and the second email came the same day at 4:14. So in the first email, Sarah Christensen writes "Hi, Karen. John Enos has exhausted his FMLA."
Do you recall discussions with anyone about Mr. Enos' FMLA leave being exhausted at any time?
A I do not recall any conversations regarding Mr. Enos' exhausted FMLA.
Q And you didn't have any conversations with anyone about that too; is that correct?
A I don't recall any conversations.
Q She writes "We are looking for information on where he is in the workers' comp process, when he might be evaluated to see if he will be able to perform his job duties or not."
Do you have any information about that?
A No, sir.
Q You don't recall any conversations with anyone about that?
A No, sir.
Q Is this a matter that was left entirely to Human Resources to work through, or did you have any involvement in matters concerning his FMLA leave?



A I had no involvement in matters concerning his FMLA leave.
Q Do you recall a conversation with anyone where the idea was expressed that John Enos couldn't be fired as long as he had FMLA leave?
A I do not recall that conversation.
Q Does this refresh your recollection, that at about the time this email was written in January, that consideration was -- was being given to separating employment with Mr. Enos, the County separating employment with Mr. Enos?
THE WITNESS: You'll have to repeat that question back, please.
(The question was read by the reporter.)
THE WITNESS: I'm not sure what you are asking. Refresh my recollection.
BY MR. GEDDES:
Q I asked you before when consideration was first given to the separation -- Mr. Enos' separation of employment from the County, and I believe your testimony was that you did not know.
My question is, does this document refresh your recollection as to the timing --
A No, it does not.
Q Weren't you interested in having Mr. Enos separate his employment at that time?
A I was not interested in having Mr. Enos separate his



employment.
Q You had no desire to fill his position?
A I was not interested in Mr. Enos separating his employment.
Q Did you have a desire to full his position at that time?
A I had no desire to fill Mr. Enos' position.
Q So if somebody said in February of 2015 that you were looking to fill that position, that person would not be telling the truth?
A I don't know the dates and times.
Q All right. At any time, did you wish to have Mr. Enos' position filled with someone else?
A No, sir.
Q So if Norma Santoyo advised Mr. Enos that you were looking to fill his position with someone else in February of 2014, that would not be an honest statement; is that correct?
THE WITNESS: Would you repeat that question, please.
(The question was read by the reporter.)
BY MR. GEDDES:
Q And let me --
A I was not looking to --
Q I'm sorry, make that "2015." I apologize.
A I was not looking to fill Mr. Enos' position.
Q Without regard to what someone else said? If someone said you were, that's not true?

A I was not looking to fill Mr. Enos' position.
Q Now, this exhibit, written in January of 2015, at the bottom, states "We are looking for information on where he is in the workers' comp process, when he might be evaluated to see if he will be able to perform his job duties or not."
Doesn't that imply that on that date, the County had not done an evaluation to determine whether he could perform his job duties or not?
MS. PARKS: Objection, calls for speculation.
THE WITNESS: It sounds like he had an evaluation to see if he was able to perform his job duties. That's what this tells me. It was forthcoming.
BY MR. GEDDES:
Q Well, the sentence actually reads "when he might be evaluated to see if he will be able to perform his job duties."
A Yeah, sounds like that was forthcoming to me, that potentially, there was an --
Q But --
A -- evaluation waiting to happen to see if he could perform his job duties or not.
Q Right. And so my question to you is, not only does it sound like that, but does it sound like at that time, the County didn't know one way or another because it hadn't performed an evaluation?
MS. PARKS: Objection, calls for speculation.



THE WITNESS: That is -- I can't -- I don't know what would generate the County's or Sarah's statement. I'm not sure what the foundation for that would be or what she would base that on.
BY MR. GEDDES:
Q But in any event, they never told you -- you didn't have communications with anyone about that, correct?
A No, sir.
Q And at the top of this exhibit, it says "Hi Sarah, I will prefer to give you a better estimate after we receive Dr. Morales' report."
Do you remember a discussion about Dr. Morales?
A I do not.
Q Did you have any concern that in January of 2015, Mr. Enos was not at work?
A I don't recall that concern.
Q And did you have any concern in January of 2015 that the work of the probation department was not getting done because Mr. Enos wasn't at work?
A I don't recall that.
Q Is it fair to say, then, that the work was getting done?
A Yes.
Q Do you have any information about an anticipated shoulder surgery for Mr. Enos that's referenced in the -- in the top email by Karen?



A I have no information. I had no information.
Q Ms. Barbee goes on to write in this email "unless the County has light duty for him."
Do you recall whether or not consideration was given as to whether there was light duty for Mr. Enos after his light-duty post at the library?
A I don't know whether there was any consideration for Mr. -- Mr. Enos to have light duty after that date.
Q So the timeline that we're talking about here, is Mr. Enos, from the documents that we've discussed and your testimony, had light duty at the library, and then the doctor's note at the end of October had him off of work until further notice.
And so is that your understanding, that Mr. Enos worked at the library, doing light duty, and then he went off of work for medical reasons after that? Did you have -- do you have a recollection of that?
A I'm not sure why he went off of work from -- what reasons he went off specifically.
Q Okay. But you are aware that after he did light duty at the library for a time, he did leave work; is that correct?
A I -- that could be true.
Q But you don't know one way or another?
A I don't. I can't recall.
Q She writes "Right now, he's TTD for the risk."



Do you know what that means?
A I do not.
Q Were you aware that Mr. Enos was evaluated to be in total temporary disability status in his workers' compensation claim for his wrist?
A I was not aware of that.
I was aware he was being evaluated for workmen's compensation. To what degree and those laws and how that works, I had -- I had no working knowledge of that.
Q So from your perspective, on the date this is written, January 20th, 2015, you don't know one way or another what the status of Mr. Enos' job with the County was, specifically, whether he was at work, working, or whether he was off work at that time?
A Yeah, I don't recall.
Q When Mr. Enos left his light-duty work at the library, did someone else fill in for that position he left?
A I don't know, sir.
Q Do you know if the position he had was make work or whether he was filling a position that was open?
A I'm not sure.
Q Was he welcome to work light duty at the library after he initially worked there?
A I'm not sure.
Q Are you aware that Ms. Santoyo sent a letter to Mr. Enos February of 2015 ordering him back to work?

Page 178

A I recall such a letter.
Q So wouldn't that imply that prior to February of 2015, Mr. Enos was not at work?
A I'm not sure.
Q Well, the idea of returning to work, doesn't that imply someone is not at work and needs to return?
A I'm not sure the language in the letter.
Q But you said that you are aware that Ms. Santoyo had sent a letter to Mr. Enos in February of 2015 ordering him back to work.
A I'm not sure what the content of that letter was.
Q Well, how are you aware of that? What -- what do you recall?
A That she wrote a letter to Mr. Enos to ask him to come back to work.
Q And what was your involvement in that?
A I don't recall.
Q Did you have any?
A I don't recall.
Q So to be clear, you are not sure what prompted the instruction from Ms. Santoyo to Mr. Enos to return to work?
A I'm not clear what prompted the instruction for Mr. Enos to return back to work from Ms. Santoyo.
Q What would -- what was Ms. Sauer-Lamb's involvement in that matter?

Page 179

A I don't know.
Q And what about Judge Gibbons or Judge Young, what was their involvement in that matter?
A I don't know. I don't believe they would have been involved.
Q Now, is it part of your job duties as the chief of the Department of Probation to know about matters concerning the staffing demands and workload of juvenile probation officers at your department?
THE WITNESS: Could you repeat that question, please.
(The question was read by the reporter.)
THE WITNESS: Yes, it is.
BY MR. GEDDES:
Q I think you testified initially that the caseload in the department was higher in the beginning when you first became the chief in or about January of 2002, and that it tapered down to 12 to 10 cases. So --
A Formal cases.
Q Okay. So is it fair to say, then, that in January or February of 2015, each of the probation officers had about two or three cases, formal cases?
A That would not be accurate.
Q Okay. What was -- what was the distribution in workload at that time?
A I'm not sure.

Page 180

Q But you know that it's not accurate, but you're not sure -- you don't know what -- what the number --
A I do not.
Q Isn't it true that you had a conversation with the juvenile probation officers that when people came into the work area, to look busy, and the reason why you said that was because you weren't very busy at the time?
A I don't recall that conversation.
Q But if -- if officers testify at trial that you made those statements, would you have any reason to disagree with that?
A I wouldn't disagree with my officers.
Q Now, you have to authorize overtime work; isn't that correct?
A Chief deputy position authorizes overtime work.
Q Okay. Was there overtime work for the juvenile probation officers in the period of January and February of 2015?
A I don't recall.
Q Do you recall generally whether overtime was something that was issued or whether that would be unusual?
A Overtime was -- was unusual, unless it was -- the on-call juvenile probation officer was called out on their shift to go to work. It would be -- that would be overtime.
Q Were -- were any officers laid off or did they retire during the period of January or February of 2015?
A I can't recall specifically.

Page 181

Q But in January or February of 2015, you had six juvenile probation officers, to your recollection?
A To my recollection.
MR. GEDDES: Let's take a look at Exhibit 10, please.
(Exhibit 10 marked for identification.)
THE WITNESS: Thank you.
BY MR. GEDDES:
Q Okay. Have you seen this document before?
A I don't recall.
Q Okay. This is a work/school excuse from Tahoe Fracture Orthopedic Medical Clinic, dated January 28th, 2015.
And the middle of it reads "John" -- because it's about John Enos -- "may return to work with the following restrictions; light duty, 1/29/2015, times three weeks, lift up to 18 pounds with right upper extremity."
Below that, it reads "Return to full duty in approximately three weeks." And it's signed by Dr. David Eisenhower.
Were you, in January or February, involved in any conversations about John Enos' return to work at the end of January to be put on light duty for three weeks, after which he would return to full duty?
A I don't recall such a conversation.
Q But this would be of interest to you, would it not, because you have a department to run, and if Mr. Enos can return

to duty -- full duty in approximately three weeks, that would be important, correct?
THE WITNESS: Could you please repeat that back.
(The question was read by the reporter.)
THE WITNESS: It would be important.
BY MR. GEDDES:
Q And so you don't recall whether anybody gave you this information?
A I don't recall.
Q If somebody testifies at trial from HR that they did give you this information, would you have any reason to disagree with that?
A I would not.
Q So to be clear, at the end of January, on or about January 28th, 2015, you had no expectation one way or the other as to whether Mr. Enos would return to full duty at the juvenile probation department or when; is that correct?
A I have no -- I had no expectation regarding Mr. Enos returning back to full duty at the juvenile probation department.
Q And did you make any inquiry about the matter at that time, at the end of January, on or about January 28th, 2015?
A I don't recall.
Q To your knowledge, did -- did anyone at Douglas County expect that Mr. Enos might return to work in full duty in three weeks from January 28th, 2015?



MS. PARKS: Objection, calls for speculation.
THE WITNESS: Yeah, I don't know that anyone had expectation of Mr. Enos returning back to full duty.
BY MR. GEDDES:
Q Now, this exhibit says that Mr. Enos could actually return to work right away, because it's dated January 28th, and it's saying he can return to light duty the following day, January 29th, 2015.
And so did anyone inform you that at the end of January, on or about January 28th or 29th, 2015, Mr. Enos could return to full -- could return to light duty, according to Dr. Eisenhower?
THE WITNESS: Could you run back through that, please.
(The question was read by the reporter.)
THE WITNESS: I don't recall that anybody informed me of that.
BY MR. GEDDES:
Q And to be clear, then, on or about January 28th, 2015, you did not want to get rid of John Enos?
MS. PARKS: Objection, asked and answered.
THE WITNESS: I had no desire to get rid of John Enos.
BY MR. GEDDES:
Q Do you know why Mr. Enos was not invited to return back to work on light duty on January 29th, as the doctor's note indicates he could do?
A I don't know why.



Q Do you know whether Mr. Enos tried to return to work after his doctor's order was written on January 28th, 2015, to return on light duty?
A I'm not aware that he tried to return to work.
Q You don't recall having conversations with Norma Santoyo, saying that she met with Mr. Enos, he returned to work, tried to keep coming back to work, and she told him he could not return to work? You don't recall that?
A I recall her saying that she had been meeting with John Enos regarding coming back to work. The specifics around those conversations, I don't recall.
Q And what was your response to her when she advised you of that?
A I don't recall.
Q Did you ever say to her, when she told you that, "Oh, sure, have him come on back"? Did you ever -- did you ever do anything like that?
A I don't recall.
Q Do you think if you did something like that, he would have come back?
MS. PARKS: Objection, calls for speculation.
THE WITNESS: Potentially, he may have come back.
BY MR. GEDDES:
Q Did you have a conversation with Ms. Sauer-Lamb that Mr. Enos contacted her on or about January 28th, 2015, to inform



her of his doctor's release of him back to light duty?
A I don't recall.
Q So if she reports -- if she testifies that she did tell you this, would you have any reason to disagree with her?
A I would not disagree with Vicki Sauer-Lamb.
Q Do you recall anyone telling you or did anybody tell you that Mr. Enos spoke with Ms. Sauer-Lamb in a phone call and asked if he could report to the county library again for light duty?
A I don't recall that conversation.
Q Do you recall whether anybody looked for light duty for Mr. Enos on or about January 28th, 2015, or after that?
A I'm not aware of anybody looking for light duty around those dates.
Q If you were shown this exhibit, Exhibit 10, and you were shown that on January 28th, 2015, where it says that John Enos may return to work as of tomorrow, January 29th, 2015, for light duty, what would you have done?
A I would have asked Human Resources and the District Attorney to advise me as to what light duty availability there was within the framework of the County.
Q And if there were light duty available anywhere in the County, you would have -- you would have said bring him back for light duty?
A I wouldn't have had a choice.
Q And then the section that says -- if they said -- if you

**got this information and it said return to full duty in approximately three weeks, what would you have done in response to getting that information on or about January 28th, 2015?**

A If I was told from the District Attorney and the human resources director that Mr. Enos was cleared -- likely cleared to full capacity to return to work at those times, I would have responded accordingly.

**Q And when you say "full capacity," what do you mean?**

A Ability to perform the essential functions of a senior juvenile probation officer position.

**Q Okay. And -- but if they had shown you this record, what would you have done?**

A If they would show me that record?

**Q Yeah, Exhibit 10 where it says he can return to full duty in approximately three weeks.**

A I would have asked them if we had light duty available for Mr. Enos.

**Q But I'm talking about the bottom part where it says return to full duty in approximately three weeks.**

A Approximately three -- I would just say it sounds like he's returning to duty in approximately three weeks.

**Q And you would have made preparations for him to return?**

A I would have had to.

**Q And what -- what preparations would you have made?**

A I wouldn't have to make many. John is a very capable individual. If he was to come back to work, he would be meshed back into the office, assigned a caseload and asked to go back to work.



**Q But your testimony is that you were not given this information or you don't recall being given this --**

A I don't recall being given that information.

**Q And you don't recall making plans for him to come back to work; is that correct?**

A I did not make plans for Mr. Enos to come back to work.

**Q Didn't you order Mr. Enos' key card to the office building to be deactivated or discontinued?**

A I requested Mr. Enos' key card to be returned.

**Q When was that?**

A I don't recall.

**Q Was that before or after his separation of employment?**

A I don't recall.

Most likely, after.

**Q If there is a note or a document that shows it was done before his separation of employment, would you have any reason to disagree with that?**

A Depends on who the note came from.

**Q It came from Sarah Christensen.**

A I would have to see the note.

**Q Who was authorized to deactivate or discontinue a key card in January and February of 2015?**



A I'm not sure.

**Q But you were?**

A I'm not sure what your question is.

**Q Who had the authority to --**

A I had the authority to ask for a key card to be cancelled.

**Q What were the circumstances under which you would typically do that?**

A If somebody was no longer working.

**Q Would you do that for someone who was on leave and had not come back to work?**

A I don't believe so.

**Q Why not? Why wouldn't you do that?**

A Because I would -- they would still have the trust of the department -- and the clearance necessary to enter the buildings.

**Q So if it turns out that Mr. Enos' key card was deactivated or discontinued prior to his separation of employment, did that mean he did not have the trust of the department?**

A I'm not sure. I'm not sure when his key card was cancelled. I'm not sure of the dates and the configuration. Again, I just don't recall, sir.

MR. GEDDES: Let's take a look at the next exhibit, please, Exhibit 11.

(Exhibit 11 marked for identification.)



BY MR. GEDDES:

**Q Do you recognize the handwriting of that person?**

A I do not.

**Q Okay. This is a handwritten note that says "left message for John, January 30th, 2015.**

**"Told him we had no work that would accommodate his doctor's notes."**

**Do you know what that means?**

A I don't.

**Q Well, this is written January 30th of 2018, according to what its date is. And we talked about Exhibit 10 being dated January 28th, 2015, and that says that he can return to light duty as of the 29th.**

**Does that refresh your recollection that there was --**

A This document says he can return to light duty on the 29th. It's written by Tahoe Fracture and Orthopedic. It's a work/school excuse that's written from the doctor.

**Q Right. And so my question is, the connection here being, on the -- on the 30th, they said we don't have -- "we had no work that could accommodate his doctor's notes."**

**Do you have any information as to whether this relates to this particular doctor's note of Exhibit 10?**

A I have no information that that would be related to that.

**Q You didn't have any conversations with anyone in HR**

**about it?**
A I don't recall any conversations.
**Q And does this refresh your recollection as to whether or not, on or about January 30th, 2015, any efforts were made to evaluate whether or not there was light duty available to Mr. Enos, if he needed it?**
MS. PARKS: His question was, does that refresh your recollection of the light duty discussions.
THE WITNESS: That does not refresh my recollection.
BY MR. GEDDES:
**Q Then it reads also "1/30/15, discontinued key card."**
**If Mr. Enos' key card were discontinued on January 30th, that would be before he -- his employment was separated, correct?**
A I'm not sure the dates, sir.
**Q Well, I'll represent to you that his separation of employment occurred in February.**
A Okay.
**Q That being the case, why would his key card be discontinued on January 30th, 2015?**
A You would have to discuss that with Human Resources and the District Attorney.
**Q But you stated that you requested his key card be discontinued.**
A I may have stated that. I don't recall specifically.
**Q Are you saying that you may have testified to that or**



**that you may have -- your testimony is that you may have instructed them?**
A I don't recall specifically whether I was the one that initiated the key card to be discontinued.
**Q Well, what is your knowledge or recollection about the key card issue?**
A That it was discontinued.
**Q Nothing else?**
A No, sir.
**Q That means his access to the office building at work was discontinued on January 30th, 2015; isn't that correct?**
A His access to the courthouse building would have been discontinued.
**Q And he worked at the courthouse building; isn't that right? That's where the juvenile probation office is.**
A Yes, sir.
**Q And do you know when the decision was made to discontinue his key card?**
A I do not.
**Q Do you know who was involved in the decision-making process other than you?**
A I do not.
**Q So Mr. Enos was, essentially, fired on January 30th, 2015, because his key card access was discontinued; isn't that correct?**



A No, sir.
**Q Well, how could he come to work if he didn't have access to the building?**
A He was not approved for work.
**Q By whom?**
A By Human Resources and the District Attorney, based on their knowledge and working knowledge of the claim.
**Q How do you know that?**
A Because that's who was advising me in these matters.
**Q And they -- they specifically told you he was not authorized to return to work?**
A I was told that he was not authorized to return by work -- to work by somebody in the human resources department or the District Attorney. One of those folks informed me of that.
**Q And did they tell you why?**
A They did not.
**Q Well, before, you said that he needed full medical releases. Is that the reason why?**
A There you go. That would be it.
**Q And to your knowledge, you don't know one way or another whether Judge Gibbons or Judge Young had any involvement in the deactivization -- deactiv- -- deactivating his key card?**
A I do not know one way or the other whether Judge Gibbons or Judge Young had any knowledge of the deactivation of Mr. Enos' key card.



**Q Well, I was asking whether they had any involvement.**
A I don't know that they have had any involvement. I have no knowledge of their involvement.
**Q Do you have any information that -- about a phone call by Mr. Enos to Ms. Christensen on or about January 29th, 2015, at or about 8 o'clock to discuss the matter?**
A I do not.
**Q Do you have any information about Ms. Christensen or anyone in the HR having the -- taking the position that although Dr. Eisenhower had released Mr. Enos, Dr. Morales issued an order for light duty with no pulling, pushing or lifting?**
THE WITNESS: Please.
(The question was read by the reporter.)
THE WITNESS: I have no knowledge.
BY MR. GEDDES:
**Q But you subsequently instructed Ms. Santoyo to communicate to Mr. Enos that he was expected to return to work with a full medical release on February 17th, 2015, at 8 o'clock; isn't that right?**
A I don't recall that conversation.
**Q Well, would -- would Ms. Santoyo do that on her own without consulting you?**
A I don't know.
**Q Would it be -- would it seem to be something that would ordinarily occur?**

A That this -- this is not an ordinary circumstance, so I'm not sure.
**Q In what way is this not ordinary?**
A What part?
**Q Well, it's your statement.**
A What part -- what part would you like -- what's not ordinary -- ordinary circumstance?
**Q What do you mean when you say "this is not an ordinary circumstance"?**
THE WITNESS: Could you read back what I said before that, please.
(The last answer was read by the reporter.)
MR. GEDDES: Before that.
(The answer was read by the reporter as follows:
"This is not an ordinary circumstance, so I'm not sure.")
THE WITNESS: Yeah, I don't know what I meant by that. I'm retracting that statement, if that's possible.
BY MR. GEDDES:
**Q Well, I don't -- I don't know that you can retract a statement. It is what it is.**
A It is what it is. You are absolutely right.
**Q I was asking you to explain what you said. I think you are saying you can't explain it.**
A There you go.



MR. GEDDES: All right. Let's mark this next exhibit, Exhibit 12.
(Exhibit 12 marked for identification.)
BY MR. GEDDES:
**Q Okay. You've seen this document before, haven't you?**
A Yes, sir.
**Q And Norma Santoyo wrote that; isn't that right?**
A Her signature is on the document.
**Q And her name, "Norma Santoyo, human resources manager"?**
A Yes, sir.
**Q And she CC'd you and Justina Caviglia, Deputy District Attorney; is that right?**
A Yes, sir.
**Q Do you know why she CC'd you on this?**
A Because I'm the department head.
**Q And this affects Mr. Enos and he's one of your employees?**
A That would be true.
**Q Isn't it true that you directed her to write this letter?**
A That's not true. I don't recall directing her to write this letter.
MS. PARKS: Make sure you speak up enough for the court reporter.
THE WITNESS: I don't recall directing her to write this



letter.
BY MR. GEDDES:
**Q To your knowledge, would she have written this on her own?**
A To my knowledge, I don't know if she would have written this on her own or not written this.
**Q Well, what did you do after you received a copy of this?**
A I don't recall.
**Q Did you agree with this letter?**
A I was going on the advice of the District Attorney and the human resource director. I had no reason not to agree with the content of the letter.
**Q Do you know who Ms. Santoyo consulted when she wrote this letter?**
A I do not.
**Q Do you know who took part in the decision-making process that resulted in this letter being sent?**
A I do not.
**Q What information do you have about this matter?**
A I have no other information about this matter.
**Q What was your involvement in the matter?**
A I had no -- to my recollection, I had no involvement in this matter, as far as this letter is concerned.
**Q What was Ms. Sauer-Lamb's involvement in the matter of this letter?**



A I don't know.
**Q Do you know if Judge Gibbons or Judge Young had any involvement?**
A I don't know.
**Q Let's look at the first paragraph. It reads "Our records indicate that you have been on family medical leave, FMLA, since October 21, 2014. As you know, the FMLA provides employees up to 12 work weeks of job-protected leave for absences caused by serious health conditions.**
**"Since your serious health condition is under a workers' compensation claim, your FMLA has run concurrently to that claim. This notice does not impact your workers' compensation claim."**
**Did you have any discussions with anyone about that -- the matters of that paragraph?**
A I remember casually -- I mean, I don't -- having conversations with somebody about John's workmen's compensation claim. I don't know the specific times or dates, and I don't remember who that was with.
**Q What about the FMLA leave?**
A There were conversations throughout this time frame about FMLA. Specifically, I don't recall.
**Q Let's look at the second paragraph. "Our records indicate your leave entitlement under FMLA has expired effective January 21, 2015. Accordingly, you are expected back at work and must return on February 17, 2015, at 8:00 a.m.**

"You are expected to provide a full medical release prior to returning to work. Please deliver the release to Human Resource office no later than February 17th, 2015, at 8:00 a.m."
What information do you have about that?
A I do remember a conversation with maybe Norma or Justina regarding John needed to report back to work with a full medical clearance within three days. I don't know when that was, I don't remember who it was with, but I do remember that conversation.
Q And do you recall telling them that he needs more time or we should give him more time?
A I don't recall that.
Q Do you recall the question of his expired FMLA coming up, ever?
A I recall discussions regarding expired FMLA, but I don't recall who it was with or when it was.
Q Well, we're looking at the letter here, and it's saying that his FMLA expired on January 21st. And yet, this letter is written February 13th.
So if allowing Mr. Enos to be away from work on leave without coverage by his FMLA were of any significant concern here, why wasn't this notice sent to Mr. Enos before his FMLA expired on January 21, 2015, at 8:00 a.m.? It wasn't sent until 23 days later on February 13th, 2015.
A I don't -- I don't know, sir.



Q Did you ask anyone about that?
A I did not.
I don't remember if I did.
Q Now, it was your understanding at the time of this letter that Mr. Enos could be fired if he didn't have a full medical release prior to returning to work?
A My understanding was, based on county code and the court order, that if he couldn't report for duty within three working days, considered a resignation, slash, termination --
Q But you see --
A -- of employment.
Q I'm sorry.
But you see in this exhibit, there's no reference to the judicial, it's just the county code, 2.02.0 --
A But it's also -- it's also in the court order.
Q It may be. But my point is that, that court order language, "Ninth Judicial District Court regulation," is not listed in this letter; is that correct?
A It is not listed in this letter, that's correct.
Q Why was Mr. Enos required to obtain a full medical release prior to returning to work?
A You would have to talk to Human Resources and their attorney, Justina. I would be under -- operating under their advisement.
Q And they never explained to you why he needed a full



medical release?
A In order for him to be safe on duty, I would assume. That would be my assumption.
Q Well, a full medical release, as opposed to a mostly full medical release, I mean, what's the distinction?
A I don't know what the distinction would be, sir.
Q And they never shared it with you, why he needed a full medical release?
A I don't -- no, I don't recall that.
Q But you don't know one way or another based on your prior testimony whether a requirement for a full medical release before returning to work in this particular situation -- you don't know whether that complied with the ADA or not; is that correct?
MS. PARKS: Objection, calls for a legal conclusion.
THE WITNESS: Yeah, I'm not aware of the ADA regulations. I refer to the Human Resources and our District Attorney to make those decisions within that framework of that expertise.
BY MR. GEDDES:
Q Let's look at the third and fourth paragraph.
"Please note that any absence beyond February 17th, 2015, will be deemed an unauthorized absence pursuant to Douglas County Code 2.02.080 and may subject you to automatic separation or disciplinary action, up to and including termination.



"Please contact me in advance of your scheduled date of return if there are additional circumstances that may be relevant or that you may wish to bring to our attention regarding your absence."
Do you have any information as to what -- why this was sent, this particular paragraph, why it was written?
A I did not write -- I have no information as to why it would have been written that way.
Q But according to Exhibit 10, Mr. Enos wasn't expected back to work until after the deadline that's given in the letter.
The letter says you got to return by February 17th, 2015, at 8:00 a.m. And yet, the doctor's note says return to work full duty in approximately three weeks.
So he wasn't expected to return -- three weeks is February 18th. So he's expected to return a day after the deadline that's given in the human resources letter.
Do you know why that was?
A I do not.
Q Now, this letter being dated on February 13th, 2015, I'll represent to you that's a Friday --
A Okay.
Q -- before a three-day weekend, because February 16th, 2015, was the President's Day.
That means this letter gave Mr. Enos an ultimatum to return to work on the Tuesday after President's Day with full

medical releases by 8:00 a.m., or he would be fired or subjected to automatic separation or disciplinary action, up to and including termination.
Now, you would admit that if you sent the letter on Friday, February 13th, or Norma did, he didn't have much time to receive the letter and obtain medical releases before the next workday on that Tuesday; isn't that correct?
A I would agree with you.
Q And so why did this letter give such little notice?
A I don't know.
Q What was the hurry?
A I don't know.
MS. PARKS: Objection, asked and answered, argumentative.
BY MR. GEDDES:
Q So if -- as to the timing of this letter and its ultimatum, that was something that was -- was established by someone in HR or the DA's Office; is that correct?
A That would be correct.
Q You didn't have this information sooner and hold on to this letter? I mean, this information went out according to its ordinary timing?
A I'm not sure what your question is.
Q Do you know whether or not the plan to send this communication to Mr. Enos was -- was established before


February 13th, 2015?
A I do not know that.
Q Did you consider or do you believe that on February 13th, 2015, the Ninth Judicial Court regulations required that Mr. Enos receive proper notice and a specification of charges before his termination?
MS. PARKS: Objection, asked and answered.
THE WITNESS: This was not a disciplinary matter.
BY MR. GEDDES:
Q Why?
A It was a workman's compensation matter and injury matter. It's not -- it wasn't a course of disciplinary action pertaining to John Enos' performance as a senior juvenile probation officer.
Q Well, how do you know that?
A Because I had no course -- progressive disciplinary action against Mr. Enos in his capacity as a juvenile probation officer.
Q But --
A He's good at what he did.
MS. PARKS: Counsel --
THE WITNESS: He did successful deportment --
MS. PARKS: Counsel, please --
THE WITNESS: -- absolutely.
MR. PARKS: Please allow my client to finish his answer.


BY MR. GEDDES:
Q Are you through with your answer?
A Maybe not.
Q Okay. I'll wait.
A Thank you.
So there was no course of progressive discipline in respect to John Enos' performance as a senior juvenile probation officer.
Q But this letter actually says "may subject to you automatic separation or disciplinary action, up to and including termination." So this letter contemplated that his failure to return was something that implied a disciplinary action; isn't that right?
A I would not agree with that, that this was a disciplinary -- that this letter would infer that. It says "or."
So it could have been automatic separation, it could have been a disciplinary action, or it could have been a termination. It could have been either one, any one of those, would be my interpretation of it.
Q But Mr. Enos showed up on February 17th in response to this letter, advising the human resources department that he was reporting to duty, didn't he?
A I don't know.
Q If you did know that he did that at the time, what would you have done?


MS. PARKS: Objection, improper hypothetical to this witness, calls for speculation, argumentative.
BY MR. GEDDES:
Q Go ahead.
A That was a lot.
Would you repeat that, please.
MR. GEDDES: Can you read that back, please.
(The question was read by the reporter.)
THE WITNESS: Yeah, I'm trying to remember what "that" is, did "that."
BY MR. GEDDES:
Q I can just ask it.
If you had known that Mr. Enos showed up for work on February 17th, 2015, in response to this letter, advising the human resources department that he was reporting for duty, what would you have done?
MS. PARKS: Same objections.
THE WITNESS: I would have just referred -- I would have referred to Human Resources and the District Attorney whether John was eligible to return back to work based on the fact that he took the time to show up.
BY MR. GEDDES:
Q And do you recall ever doing that?
A I do not.
Q So you don't know if he met with Norma Santoyo on

February 17th, 2015?
A I do not know. I don't recall that, sir.
Q Do you recall or know about Ms. Santoyo telling Mr. Enos on February 17th, 2015, that if he could not get a full doctor's release within three days or by the end of Thursday, February 19th, 2015, the County would consider Mr. Enos to have abandoned his post for three days, which would constitute a voluntary resignation by Mr. Enos?
THE WITNESS: I have -- go back to the first part of that question, I'm sorry.
(The question was read by the reporter.)
THE WITNESS: Thank you.
I recall a meeting. I was not involved in that meeting. I recall a meeting to that effect.
BY MR. GEDDES:
Q And who was at that meeting?
A I don't know. I just recall that meeting.
Q Well, did you attend the meeting?
A I did not attend that meeting.
Q How did you learn that there was a meeting?
A Either through the District Attorney or through Human Resources.
Q And so you learned that there was a meeting that concluded what -- what we -- what we just talked about here?
A I learned that there was a meeting with John Enos



regarding this matter, this -- in this letter.
Q Oh, I'm sorry, you said there was a meeting and John Enos was at the meeting.
A I don't know.
Q I didn't understand what you --
A I wasn't at the meeting. I just recall that there was a meeting sharing this information -- somebody told me of a meeting sharing this information with Mr. Enos.
Q And did you also learn or come to have an understanding that Mr. Enos strenuously disagreed with that notion, stating that he was not abandoning his job, not resigning from his job, and that he was ready, able and willing to work?
A I did not know of John -- or, the content of John Enos' response to this meeting.
Q Did you inquire about it?
A I did not.
Q Did you know or hear that Ms. Santoyo told Mr. Enos at that time that he could request an extension of time for the deadlines imposed in the letter?
A I don't know that she told him that at that time.
Q Did you ever hear it reported that she did?
A She did contact me regarding -- I'm not -- I'm thinking it's -- she contacted me regarding something in respect to that meeting. I'm kind of vague as to what that would be.
Q Did you write it down, take notes?



A I did not.
Q Do you normally write down notes about matters such as these?
A I don't.
Q Do you recall or understand that Mr. Enos requested an extension for a leave of absence to comply with the ultimatum to obtain full medical releases?
A I believe I received a letter and I -- yeah, and I do remember that.
Q Other than that, what other information do you have about this?
A None.
Q Do you also know that Mr. Enos -- Mr. Enos also requested a reassignment to any other position in Douglas County for which he was qualified to perform?
A I don't know that he requested the other assignments at the time of that meeting. I wasn't at the meeting.
Q Was that in the letter that you are talking about?
A I don't recall.
MR. GEDDES: Let's mark as the next exhibit, Exhibit 13.
(Exhibit 13 marked for identification.)
THE WITNESS: Thank you.
Yes, sir.
BY MR. GEDDES:
Q Have you seen this document before?



A I have.
Q Who else has seen this document, to your knowledge?
A I don't know.
Q Do you know if this was shared with the DA's Office?
A I don't know.
Q Isn't this the document that Mr. Enos gave to Ms. Santoyo on the morning of February 17th, 2015?
A I don't -- I don't have knowledge of that.
Q How did you get this document?
A I've seen it. I didn't -- I don't have possession of this document.
Q I mean, how was it -- how was this -- a copy of this or the information of this conveyed to you?
A I believe I saw it at the time when complaints were beginning to be filed regarding Mrs. -- Mr. Enos' -- decision around Mr. Enos' employment.
Q Okay. So --
A Came forth as -- in human resource documents.
Q All right. So are you saying that the first time that you laid eyes on this was when the lawsuit was filed?
A Yeah, to my recollection, yes.
Q So the information that's put in this request --
A Yes.
Q -- did it make its way to you to make a decision on this, any part of this?

A I would -- I did not make a decision in this area, as far as the -- oh, yes, I did make a decision regarding leave of absence. I denied the leave of absence.
**Q And so how were you made aware of his request for leave of absence in or about February of 2015 if you hadn't actually seen this document until months later?**
A You know, I could have very well have seen this document, but I don't recall.
**Q So this document requests additional time to the three-day deadline for him to get full medical releases, correct?**
A Yes, sir.
**Q And it also states, at the asterisked section below, "Also, if it is found that I will not be able to return to full duty as a probation officer, I will accept any other position with the County that I can perform."**
**Do you see that?**
A I certainly do.
**Q Now, do you recall when you received this document or information in this document?**
A I do not. I said before, I very well could have seen it sooner than the time of the complaints, but I don't recall specifically time or dates I received this document.
**Q What did you do when you received this document or information?**
A I sought the advice of Human Resources and the



District Attorney as to how to respond.
**Q What was the advice given to you about how to respond?**
A Not to approve a leave of absence.
**Q Why?**
A I don't know.
**Q Did you question why?**
A I did not.
**Q And so that's the basis of you not granting the leave of absence, was because you were advised not to?**
A Yes. In these matters, I used the advice of my attorney, the District Attorney, and also Human Resources' expertise to guide me through the decision-making process.
**Q Okay. So this wasn't something that you, on your own, evaluated, it was something that the District Attorney's Office evaluated, they gave you their recommendation and you went with it. Is that a fair statement?**
A They gave me my recommendation and I -- I responded accordingly, yes.
**Q Okay. But you didn't perform an independent evaluation, you went with what their evaluation --**
A I did not perform an independent -- well, I would have --
**Q "Independent."**
A Yeah, I would have to clarify. Independent evaluation regarding what?



**Q You didn't evaluate, on your own, the request for a leave of absence, you deferred to the evaluation of the District Attorney's Office; is that correct?**
A I referred to their advice.
**Q I'm sorry, "referred" or "deferred"?**
A Sorry, referred to their advice.
**Q Well, I'm asking if you deferred to them. They said here is our advice, and you said I'll do what you tell me to do. Is that what you are saying?**
A Is that -- is that what "deferred" means?
**Q Yes.**
A Thank you.
Yes, I deferred to their advice and expertise.
**Q All right. Now, the matters at the top here, on Friday, February 13th, the whole three-day weekend thing, doctor's clearances that he couldn't get, he received this letter at 4:45 p.m., before a three-day weekend.**
**Did you consider that matter in response to receiving the information of this letter?**
A I don't understand your question.
**Q Did you, for example, say, "Hey, guys, that's not right. Who is the knucklehead who did this?" anything like that? Do you recall having a response to this portion of Mr. Enos' letter?**
A I was following the advice of the District Attorney's Office and the Human Resources that a letter needed to be



delivered, and I didn't really think any more of it.
**Q Well --**
A I had been following their advice all along.
**Q So you are saying that you followed their advice that a letter needed to be delivered, so you asked that the letter was delivered?**
A No, sir.
**Q What did you mean when you just said that?**
A I'm not sure.
Would you repeat back what I just said. Sorry.
(The answer was read by the reporter as follows:
"I was following the advice of the District Attorney's Office and the Human Resources that a letter needed to be delivered, and I didn't really think any more of it.
"I had been following their advice all along.")
THE WITNESS: What was your question?
BY MR. GEDDES:
**Q My question is, does that mean that you had an involvement in sending the letter, and when you did that, you were just following their advice?**
A I did send a letter of denial, so I signed it. It was drafted by District Attorney, and it was -- so I had a working knowledge of the letter being sent. Yes, I did.
**Q You are talking about two different letters, right? When you denied it -- I'm talking about him sending you his**

request for an extension.
The letter he got back was report back to work by Tuesday. That's the letter he's complaining about in this first paragraph.
A Okay.
Q So did you -- did you have any response at all to his complaint about the timing of his getting his return-to-work letter?
A I didn't know that there was a complaint about the timing of his getting-to-work letter.
Q But it's in this letter here.
A Yeah, that's -- I don't recall that there was an issue regarding the timing of the letter.
Q What about, what, if anything, did you do in response to his request that the asterisk for a job reassignment to any other position with the County that he could perform?
A That request was not made to me.
Q Well, it's in this letter, would you agree?
A It's in the letter.
Q So who was the letter -- who was the request made to?
A Looks -- says "Human Resources" at the top of the letter.
Q Okay. Were you given the information that if it was found that Mr. Enos would not be able to return to full duty as a probation officer, he would accept any other position with the



County that he could perform?
A I was not given that information.
Q Do you recall having any conversations with Ms. Sauer-Lamb about the contents of this letter?
A I don't recall any conversations.
Q And you don't know one way or another whether Judge Gibbons or Judge Young was involved?
A I don't know that they were involved one way or another.
Q To your knowledge or understanding, did Ms. Norma Santoyo communicate to Mr. Enos that it would help if Mr. Enos could get updated work reports from his doctors?
A I don't know of any conversation.
Q To your knowledge or understanding, didn't Mr. Enos actually get his doctors to send additional medical releases to Douglas County on February 17th or 18th?
A I have no --
MS. PARKS: Objection, calls for speculation.
THE WITNESS: I have no knowledge of that.
BY MR. GEDDES:
Q Well, let's -- let's be clear here.
I'm talking about what you specifically know. You didn't -- you didn't have any knowledge or understanding that -- whether his doctors faxed additional medical releases to Douglas County on February 17th and 18th, 2015?
A I have no knowledge or understanding that documents were



faxed on behalf of his doctors on those dates.
Q And you don't know who his doctors were; is that correct?
A I had heard the name Eisenhower. That's -- just stands out in my mind.
MR. GEDDES: Let's mark the next exhibit, Exhibit 14.
(Exhibit 14 marked for identification.)
THE WITNESS: Thank you.
BY MR. GEDDES:
Q All right. Please take a look at -- these are two separate documents as Exhibit 14, if you could look at both pages, please.
A Oh, this is duplicate.
Q I'll take that.
A Thanks.
Okay.
Q All right. Have you seen either of these documents?
A I don't recall seeing these documents.
Q All right. The first document is from Specialty Health, signed by Dr. Patricia Morales, and it's -- it's dated February 17th, 2015.
And it reads "Return to work for John Enos, date of appointment, 2/17/15; employer, Douglas County; date of injury, 6/17/2014.
"It is the injured worker's responsibility to inform the



employer of current status.
"Current restrictions. Light duty with the following restrictions: Employee is unable to lift greater than 50 pounds, no pushing greater than 50 pounds, no pulling greater than 50 pounds, overhead shoulder lifting not greater than 35; above the shoulder lifting, yes; condition stable, no; rateable, no; return visit two weeks."
Look at the second page.
A Uh-huh.
Q The second page is from Tahoe Fracture Orthopedic Medical Clinic --
A Uh-huh.
Q -- for John Enos, dated February 18, 2015.
It says "John Enos may return to work unrestricted as of today."
My question to you is, did you know, prior to Mr. Enos' separation of employment in February of 2015, that Mr. Enos was cleared by Dr. Morales as indicated in Exhibit 14 at page DC 1495?
A I had no knowledge of that.
Q Same question with respect to the next page. Did you know that Mr. -- know or learn -- was it reported to you that Mr. Enos was cleared to return to work unrestricted as of February 18, 2015?
A I had no knowledge of that.
Q What, if anything, would you have done differently if

you were made aware of that?
A I would have followed --
MS. PARKS: Objection, assumes -- assumes facts not in evidence with respect to what he did or didn't do, to have done differently.
BY MR. GEDDES:
Q Go ahead.
A I would have just responded to the direction of the human resources director and the District Attorney.
Q Okay. If we go back to the job description for the juvenile probation officer as Exhibit 1 -- do you have Exhibit 1 handy?
A Sure. This is for the juvenile --
Q Probably at the bottom of your stack, Exhibit 1. Oh, you got it. Okay.
A Number 1.
Q All right. If we look at the job description for senior juvenile probation officer, at the section on physical demands with the Bates stamp DC 333, paragraph 2, doesn't it list the requirement for senior juvenile probation officer to lift up to 50 pounds?
A It says 50 pounds, yeah, carrying, lift and/or carry up to 50 pounds.
Q So Patricia Morales' release on Exhibit 14 would comply with that requirement, correct?



A Is unable to lift greater than 50 pounds, that would appear to be -- comply with that.
Q And the second document is Dr. Eisenhower's release, and he has a full release. So that would also comply with the physical demands stated in Exhibit 1; isn't that correct?
A As far as 50 pounds is concerned, yes.
Q To your knowledge, did any -- who at Douglas County for the Ninth Judicial District Court received the information in this exhibit? I'm referring to Exhibit 14.
A I don't know who received that information.
Q And you are not aware of any communications about the information contained in Exhibit 14?
A I don't recall any communications as a result -- as a result of Exhibit 14.
Q Or contained in Exhibit --
A Contained in Exhibit 14.
Q Do you know what, if any, involvement Ms. Sauer-Lamb had in these matters of Exhibit 14?
A I do not.
Q Now, do you have -- to your knowledge or understanding, didn't Mr. Enos report again back to work at the human resources department on February 18th, 2015, at 8 o'clock, at or about 8 o'clock, and stated that he was reporting for duty?
A I have no knowledge of that.
Q Do you have any -- to your knowledge or understanding,



isn't it true that Ms. Santoyo told Mr. Enos on February 18th, 2015, that she had sent her -- that she had sent Mr. Enos' request of -- excuse me -- Exhibit -- the exhibit with DCO 435, what exhibit number was that?
A 13.
Q So let me start over again.
To your knowledge or understanding, didn't Ms. Santoyo tell Mr. Enos that she had sent his request of Exhibit 13 to you and she was awaiting your response?
MS. PARKS: Objection, calls for speculation.
THE WITNESS: Could you repeat the question, please.
(The question was read by the reporter.)
THE WITNESS: I don't know what Ms. Santoyo's conversation -- I have no knowledge of that conversation with Mr. Enos.
BY MR. GEDDES:
Q If Mr. Enos testifies that Ms. Santoyo told him on February 18th, 2015, that she had sent to you the day before, on February 17th, Exhibit 13, would you have any reason to disagree with it?
A I would not disagree with Mr. Enos.
Q To your knowledge or understanding, didn't Mr. Enos ask Ms. Santoyo on February 18th, 2015, if there was anything else that he needed to do that day and she said there was not?
MS. PARKS: Objection, calls for speculation.



THE WITNESS: I have no knowledge of that conversation.
BY MR. GEDDES:
Q Isn't it also true, to your knowledge or understanding, that later that day on February 18th, 2015, Ms. Santoyo called Mr. Enos and told him words to the effect that his FMLA had expired and that you denied Mr. Enos' request for an extension of time and for a leave of absence?
MS. PARKS: Objection, calls for speculation.
THE WITNESS: I have no idea to the nature of that conversation.
BY MR. GEDDES:
Q So if Mr. Enos testifies that Ms. Santoyo called him later in the day of February 18th, 2015, and told him words to the effect that his FMLA had expired and that you denied Mr. Enos' request for an extension of time and for a leave of absence, would you have any reason to disagree with him?
A No, I would believe him.
Q Do you know why the HR folks and the DA folks -- when I say "folks," I'm referring to the people that you have been saying you followed the advice of.
Do you know why they didn't consider the releases of Exhibit 14 to be full releases?
MS. PARKS: Objection, calls for speculation.
THE WITNESS: I do not know why.
///

BY MR. GEDDES:
Q Now, to your knowledge or understanding, didn't the senior claims adjuster for Douglas County's workers' compensation insurance company believe or state that the releases given in Exhibit 14 are compatible with Mr. Enos' regular job description?
MS. PARKS: Objection, calls for speculation.
THE WITNESS: I have no knowledge of that conversation.
BY MR. GEDDES:
Q And you didn't hear any communications about that or know of any communications discussing that?
A I heard of no communications discussing that.
MR. GEDDES: Let's mark as Exhibit 15, please, the next document.
THE WITNESS: May I use the bathroom?
MR. GEDDES: Yeah. Do you want to take a --
THE VIDEOGRAPHER: Going off the video record, the time is 4:04.
(A recess was taken.)
THE VIDEOGRAPHER: This is the beginning of Media Number 5 in the deposition of Scott Shick. We're back on the video record at 4:11.
(Exhibit 15 marked for identification.)
BY MR. GEDDES:
Q You understand you are still testifying under oath?
A I do.



Q Okay. We have marked Exhibit 15. Have you seen this letter before?
A I have not.
Q This is a letter from Douglas County's insurer, ASC, Alternative Service Concepts, to Mr. Enos, acknowledging that his full-duty release from Dr. Eisenhower and the limited release from Dr. Morales of up to 50 pounds are compatible with his regular job duties.
And she goes on to say "This disables Mr. Enos from receiving temporary total disability benefits."
Do you see that?
A I do see it.
Q Would you agree or disagree with Ms. Barbee here, that the full-duty release from Dr. Eisenhower and the limited release from Dr. Morales of up to 50 pounds were compatible with his regular job duties?
A I believe, yeah, in the job description, it does -- I'm not sure --
MS. PARKS: If you know, Scott.
THE WITNESS: You know, I don't know.
BY MR. GEDDES:
Q Okay.
A Yeah. I'm sorry.
Q But you never heard or learned of the information contained in this letter; is that correct?



A That's correct.
Q And Douglas County is listed as a CC, but that -- that didn't forward -- it wasn't forwarded to you?
A No, sir.
Q And you don't know one way or another who at Douglas County received this document?
A I do not.
Q And so you had no involvement or input in any response or action taken in regard to this letter; is that correct?
A No, sir, no involvement.
MR. GEDDES: Let's mark as Exhibit 16.
(Exhibit 16 marked for identification.)
THE WITNESS: Thank you.
BY MR. GEDDES:
Q Okay. This is -- if you can take a moment and look at this.
A Okay.
Q Have you seen any of the emails in this -- in this document?
A I have not, sir.
Q Okay. This is -- this is -- appears to be, on its face, a two-part document. The lower part is -- or, portions of it is an email from Karen Barbee to Sarah Christensen. The top part is from Norma Santoyo --
A Uh-huh.



Q -- cc'ing Karen -- I'm sorry, to Karen Barbee, cc'ing Sarah Christensen.
And at the top of this document, Norma Santoyo says "Hi Karen. Please see the below response."
A I see that.
Q And the part that's a little confusing about it is that the lower part contains an original -- appears to contain original email, and there appears to be interlineation or responses that were typed in. So it's a bit confusing.
A Yeah. Yes.
Q I believe based on -- on prior deposition testimony that that's the explanation for, actually, a response being interlineated in the lower portion of this document.
Now, I say all that because it's a bit confusing.
All right. So Ms. Bisbee wrote in the first paragraph, "Hi Sarah" --
A Barbee.
Q I'm sorry? Thank you. You are right, I'm wrong. It's Ms. Barbee.
"Hi Sarah. As you know, the last return-to-work note from Dr. Morales dated 2/17/15 indicated that John's restrictions were no lifting greater than 50 pounds, no pushing greater than 50 pounds, no pulling greater than 50 pounds, no overhead shoulder lifting greater than 35 pounds.
"I realize he was terminated last week, but I need to

determine if we will need to continue his TTD and to document whether or not he would be able to return to return to work with these restrictions.
"Do these restrictions fit within his usual and customary job duties?"
Do you recall a discussion about this matter, by anyone?
A I do not.
Q And in response, either Ms. Christensen or Ms. Santoyo, whoever is interlineating the response, writes "Based on Dr. Morales' note, the restrictions fit within his usual and customary job duties."
Do you have any reason to disagree with that statement?
MS. PARKS: Objection, calls for speculation.
THE WITNESS: The lifting and pushing --
MS. PARKS: Listen to his question.
THE WITNESS: Okay.
MS. PARKS: I'm sorry, Ms. Court Reporter, can you please read the question back.
(The question was read by the reporter.)
THE WITNESS: I'm not sure what restrictions you're -- you're asking about.
BY MR. GEDDES:
Q The call of the question above was -- it says "Hi, Sarah," and there's a first paragraph --
A Uh-huh, I see that.



Q -- indicating the restrictions.
And then there's a follow-up that says "I realize he was terminated last week, but I need to determine if we will need to continue his TTD and to document whether or not he would be able to return to work with these restrictions."
A Okay.
Q "Do these restrictions fit within his usual and customary job duties?"
And the response was "Based on Dr. Morales' note, the restrictions fit within his usual and customary job duties."
So my question to you is, do you have any reason to disagree with the statement that says "based on Dr. Morales' note, the restrictions fit within his usual and customary job duties"?
A Yeah, the restrictions listed in that paragraph fit.
Q Okay. Now, this response goes on to say "However, the note from Dr. Eisenhower dated 2/10/15 indicate a weight restriction of less than 10 pounds."
Do you have any understanding as to what that sentence means?
A Weight restrictions regarding less than 10 pounds, it's not -- it's not definitive.
Q Does -- do you -- are you aware of any communications with anyone debating the issue as to Dr. Morales' note and restrictions fit within the usual and customary job duties, but Dr. Eisenhower's 2/10/15 note indicate weight restrictions of less



than 10 pounds?
Do you have any information about anyone having communications about that?
A I do not have any information regarding communications about those two areas.
Q Now, we just talked about the most recent -- or, I should say, the more recent medical release from Dr. Eisenhower. That was, I believe -- is that Exhibit -- Exhibit 10?
BY MR. GEDDES:
Q 14, Exhibit 14.
A Yes, sir, I see it.
Q So Exhibit 14 is dated later, more recent than the 2/10/15 restriction. And so they are citing an old Dr. Eisenhower note of February 10th when, in fact, there was a restriction on February 18th that returned him unrestricted.
Do you have any information or knowledge as to why in this email an outdated doctor's note from Dr. Eisenhower of 2/10/15 is cited and not the more recent note of Dr. Eisenhower dated February 15th -- February 18th?
MS. PARKS: Objection, calls for speculation, lack of foundation.
THE WITNESS: I have no knowledge --
BY MR. GEDDES:
Q Okay.
///



A -- as to what that --
Q And you didn't have any communications about that matter; is that correct?
A I had no communications about that matter.
Q Now, further in this exhibit, Exhibit 16, Ms. Barbee asks if Mr. Enos was not eligible return -- to return to work with his medical restrictions, then did the County have light duty available for him if he had not been terminated.
Do you recall anything about that?
A I do not.
Q And you don't know of any communications by anyone about that?
A I do not.
Q Do you know whether or not an evaluation was performed by anyone at the County in connection with this exhibit as to whether light duty was available for Mr. Enos?
MS. PARKS: Objection, calls for speculation.
THE WITNESS: I'm not aware of any conversation or evaluation.
BY MR. GEDDES:
Q Now, down below, the response given in the interlineation reads "If not," the question was, "will the County have light duty available for him if he had not been terminated?"
And the response was "The County does not have light duty available."

Do you know one way or another whether the County had light duty available for Mr. Enos on or about February 23rd, 2015?
A I do not know.
Q Did Ms. Sauer-Lamb, to your knowledge, have any input in or involvement in the review, handling or decision-making of the matters set forth in Exhibit 16?
A I have no knowledge of that.
Q Do you know what -- you mentioned a database before. Do you know what process is -- is used to evaluate open positions or light-duty positions? Is there a computer program? What was that computer program you were talking about earlier?
A That's our juvenile probation case database.
Q Okay. Is there a county database or portal or -- or website that you could access to determine what positions are open, countywide?
A Yes, anybody -- there's a public access to the Douglas County website, which does -- I don't know if you have to go through NEOGOV or -- but that lists open -- excuse me -- job positions within the framework of the County.
Q And you don't know whether anyone consulted that database to determine whether there was a job that Mr. Enos could have performed; is that correct?
A I don't know whether anybody consulted that database.
Q Now, in or about February 24th of 2015 -- this was after Mr. Enos' -- well, let me -- let me make it different.



After Mr. Enos was terminated or his employment terminated, you, yourself, never performed any evaluation to determine whether there were positions available, whether light duty or otherwise, that Mr. Enos could -- would qualify and could apply for; is that correct?
MS. PARKS: Objection, asked and answered.
THE WITNESS: I'm sorry, I'm going to have to hear that back. Thank you.
(The question was read by the reporter.)
THE WITNESS: I performed no such evaluation.
BY MR. GEDDES:
Q Now, before Mr. Enos was -- his employment had terminated with Douglas County, you did not consider transferring Mr. Enos to another job countywide for which he might have been qualified; is that correct?
MS. PARKS: Objection, asked and answered.
THE WITNESS: I did not consider that.
MR. GEDDES: All right. Let's look at the next document. This is going to be Exhibit 17.
(Exhibit 17 marked for identification.)
THE WITNESS: Thank you.
BY MR. GEDDES:
Q All right. If you could just -- you don't need to read every line, but if you could generally glance through this document.



A Okay.
Q All right. Have you seen this document or a document similar to this before?
A I think this is just the -- I forget what it would be called, the list of jobs available within the framework of the Douglas County.
Q Okay.
A Yeah.
Q Now -- I know I just asked you a question about your considering transferring Mr. Enos, or whatever I asked, but that -- the time frame for that question was after he was -- his employment terminated.
My question here is, did you consider transferring Mr. Enos to any of the actual positions or any of the types of positions listed on this exhibit prior to his employment being terminated with the County?
MS. PARKS: Objection, asked and answered.
THE WITNESS: I did not.
BY MR. GEDDES:
Q Why not?
A Why not what?
Q Why didn't you consider that?
A I wasn't directed to do so.
Q To your knowledge or understanding, did anyone at Douglas County or the Ninth Judicial District Court consider



transferring Mr. Enos to any of the actual positions or any of the types of positions listed in this exhibit --
MS. PARKS: Objection, asked --
BY MR. GEDDES:
Q I'm sorry, prior to his employment being terminated with the County.
MS. PARKS: Objection, asked and answered, calls for speculation.
THE WITNESS: I have no knowledge of that.
BY MR. GEDDES:
Q Now, to your knowledge or understanding, isn't it true that Mr. Enos showed up again at Douglas County human resources department on Friday, February 19th, at around 8 o'clock and told Ms. Santoyo that he was showing up to work?
A I have no knowledge of that.
Q Did -- are you aware of any communications by anyone about that matter?
A I've not communicated with anybody regarding that matter.
Q But are you aware of any communications by anyone about that matter?
A I'm not aware of any communications regarding that matter, nor do I recall them if they took place.
Q To your knowledge or understanding, didn't Ms. Santoyo tell Mr. Enos on February 19th, 2015, in the morning, that as of

5 o'clock that day, Mr. Enos would no longer be an employee at the juvenile probation department?
MS. PARKS: Objection, calls for speculation.
THE WITNESS: I don't recall that conversation.
BY MR. GEDDES:
Q Well, do you have any knowledge or understanding that Ms. Santoyo told him that?
MS. PARKS: Same objection.
THE WITNESS: I don't have any -- I don't remember that.
BY MR. GEDDES:
Q But Mr. Enos' employment was terminated on February 19th, 2015; is that correct?
A I'm not sure what the final date was.
Q But to your recollection, the reason given was that he was away from work for three days and deemed to have voluntarily resigned?
A That sounds close.
MR. GEDDES: Let's mark as the next exhibit, Exhibit 18.
(Exhibit 18 marked for identification.)
THE WITNESS: Thank you.
BY MR. GEDDES:
Q Okay. You wrote this letter, correct?
A I sure did.
Q And you wrote that on February 19th, 2015?
A Actually, it was drafted by Justina Cavla, and I signed



it.
Q Okay. So she drafted this and you signed it?
A The language, yeah, was --
Q Okay. And you -- you signed this on February 19th, 2015; is that correct?
A I'm not sure when I signed it.
Q But it's dated February 19th, 2015, and it says via hand delivery.
A That would be a good assumption, that it was signed on February 19th.
Q Would you have any reason to disagree with testimony or evidence establishing that this was drafted on February 19th, 2015, or signed by you on February 19th, 2015?
A If somebody testified that I signed this on the 19th, I wouldn't question that.
Q Now, this reads at the top, "via hand delivery." Do you see that?
A I do.
Q Do you know one way or another whether this was actually hand-delivered to Mr. Enos?
A To my knowledge, the best of my knowledge -- recollection, it was hand-delivered by a bailiff.
Q And who was that bailiff?
A I don't recall.
Q And do you know if it was delivered to Mr. Enos? When



you say it was hand-delivered, you are saying it was hand-delivered to Mr. Enos?
A I don't know one way or the other. It was -- yeah.
Q Okay. If Mr. Enos testified that he did not receive this via hand delivery, but he received it on February 23rd --
A Uh-huh.
Q -- 2015, via mail, you wouldn't have any reason to disagree with him, would you?
A I would be -- I would be hesitant to agree with that based on the fact that it was mandated to be hand-delivered.
Q By whom?
A I think, the bailiff.
Q Now, by the time of this letter, February 19th, 2015, what was the state of communicating that you had with either Judge Young or Judge Gibbons on these matters?
A I don't recall.
Q So it's possible that you didn't consult them at all; is that correct?
A It's very possible.
Q The paragraph reads "I have received and seriously considered your request for a leave of absence, dated February 17, 2015, pursuant to Douglas County policy 200.40.
"However, after considerable deliberation, your request is being denied. Sincerely, Scott Shick, Chief Juvenile Probation."



Now, it's your testimony that you actually did write those words, those words were prepared for you, correct?
A Actually -- that sounds like my -- my -- I'm not quite sure. I -- I know it was reviewed by the District Attorney prior to its distribution.
Q Okay.
A So I may have certainly wrote those. As I'm looking at it, it sounds like -- it looks like I could have written it.
Q Okay.
A It's a possibility.
Q Well, the statement, then, "I have received and seriously considered your request for a leave of absence" --
A Yes.
Q -- "dated February 17, 2015, pursuant to Douglas County policy 200.40," is that a true and accurate statement?
A I did seriously consider his request for leave of absence. That's true.
Q And the next sentence reads "However, after considerable deliberation, your request is being denied." That was a true and accurate statement?
A I did deliberate on that, yes.
Q Well, the sentence reads "However, after considerable deliberation, your request is being denied." Is that a true and accurate statement?
A Yes, yes, sir, it is.

Q Do you know why evaluation -- excuse me.
Do you know why serious consideration and considerable deliberation is reported in this letter of February 19th, 2015, concerning a request for a leave of absence when, by the time of February 19th, 2015, Dr. Morales and Dr. Eisenhower already cleared him to return to work? Do you know why this was still being considered?
A I do not.
Q This letter references Douglas County Policy 200.40, correct?
A It does.
Q And you are familiar with Douglas County policies?
A I am familiar. I know where to find them, but I couldn't recite 200.40 off of my memory.
Q And do you have a general working knowledge of what Douglas County Policy 200.40 says?
A I don't.
Q Did you have a general working knowledge of Douglas County Policy 200.40 at the time of -- of February 19th, 2015?
A I can't recall.
Q So right now, if I asked you what the policy generally says, 200.40, you wouldn't be able to -- to say?
A Not unless I looked it up.
Q Do you know how many different types of leave of



absences are permitted under Douglas County Policy 200.40?
A I do not.
Q Do you know what types of leave of absence were considered for Mr. Enos under Douglas County Policy 200.40?
A I do not.
Q Did you consider any -- well, let me say it this way.
Were any other laws or statutes considered when denying Mr. Enos' request for leave here, whether a municipal code, department regulation, state law or federal law?
A It would be our court order.
Q And you are referring to the Ninth Judicial District Court regulations?
A Yes, sir.
Q But you testified earlier that you deferred to the District Attorney's Office. Are you aware of what law or statute they evaluated?
A I'm not aware of what law or statute that they used to come to this conclusion.
Q And you didn't actually draft this. This was something presented to you by their office. So you didn't research Douglas County Policy 200.40 when this letter was written; is that correct?
A Right. I incorporated that -- like I said, it appears to be -- you know, I received and seriously considered and considerable -- but I may not have written it. I'm just only --



kind of guessing, yeah.
Q But my question --
A Yeah.
Q My question is this. Did you consult Douglas County Policy 200.40 any time in February of 2015 as it pertained to Mr. Enos?
A I did not. I don't recall.
Q And you are not aware of consulting any other municipal code, department regulation, state or federal law; is that correct?
A No, sir.
MR. GEDDES: All right. Let's mark the next exhibit, please, 19.
(Exhibit 19 marked for identification.)
THE WITNESS: Thank you.
BY MR. GEDDES:
Q Okay. If you can just generally glance at this. You don't need to pore over it.
A Okay.
Q Okay. This is a document that on its face, states that it's Douglas County administrative policies and procedures. It states that it's Number 200.40, and the subject is "Leave of Absence."
If I could direct your attention, please, to the first page, DC 36, that's Section 2, Subsection C, 1 through 5.



A I see it.
Q Okay. So you don't know one way or another whether the leave of absence that was considered as referenced in Exhibit 18 was disability leave?
A I have no way, one way or the -- I have no knowledge of that.
Q Okay. And you don't -- the same question, you don't know one way or another whether it was considered under the family and/or personal medical leave of Subsection C(2); is that correct?
A That's correct.
Q And you don't know whether the leave request was considered under Subsection C(3) for work-related accident or injury; is that correct?
A That's correct.
Q The same --
MS. PARKS: Make sure you speak up, Scott.
THE WITNESS: That's correct.
BY MR. GEDDES:
Q And the same is true for Subsection C(4) for personal leave, correct?
A That's correct.
Q And C(5) for military leave; is that correct?
A That's correct.
MR. GEDDES: All right. Let's mark as the next exhibit, Exhibit 20.

(Exhibit 20 marked for identification.)
THE WITNESS: Thank you.
BY MR. GEDDES:
Q All right. This document is "Title II, Administration and Personnel." It's -- of the Douglas County personnel regulations.
Have you ever reviewed or consulted Chapter 2 -- or, I should say, Title II, it's Chapter 2.02, county --
A I -- I have been -- I have been into this document, yes.
Q Okay. So from time to time, you have looked through this?
A From time to time.
MR. GEDDES: Okay. Let's mark as the next exhibit, Exhibit 21.
(Exhibit 21 marked for identification.)
THE WITNESS: Thank you.
BY MR. GEDDES:
Q Okay. Exhibit 21 is County Ordinance 2000-907, which, on the face of the document, purports to amend Chapter 2.02 of the Douglas County Code.
A Okay.
Q Now, let's take a look at this county ordinance, 2.02.010(C) on PLF 57.
And it states -- well, yeah. It states "The intent of this chapter is to provide equal employment opportunities to all



applicants and employees without discrimination due to race, color, religion age, sex, disability or national origin, marital status, sexual orientation or the presence of any sensory, mental or physical disability, unless the disability prevents the performance of the essential duties required of the position and cannot be accomplished without undue hardship."
Now, I'll just represent to you that the italicized, emboldened portion is newly added language to Chapter 2.02 of the regulations.
Did you evaluate Mr. Enos' request for additional time or, to your knowledge, did anybody evaluate Mr. Enos' request for additional time in Exhibit 13 with Section 2.02 of the Douglas County code, subsection C in mind?
MS. PARKS: Objection, calls for speculation.
THE WITNESS: I did not evaluate, nor do I know of anyone who evaluated that.
BY MR. GEDDES:
Q And did you ever evaluate whether Mr. Enos' physical condition in connection -- his injuries in connection with his workplace injuries constituted a disability under this personnel regulation?
A I did not.
Q Exhibit 21 uses the phrase "undue hardship." Do you see that? It's Section 2.02.010, Subsection C. It's at the very end of the italicized portion.



A Yes, I see "undue hardship."
Q Did you or, to your knowledge, did anyone else perform an evaluation as to whether or not Mr. Enos' disabilities arising from his workplace injuries presented an undue hardship to Douglas County?
A I don't know.
Q But you did not?
A I did not.
Q Okay. Mark as -- if we look at Exhibit 21, at Subsection C.
A Uh-huh.
Q Just a second, I've got to find it.
It's 2.02.020, Administration, Subsection C.
A Yes.
Q And it reads "The provisions of this chapter establish policies, procedures and standards to achieve the stated purpose and to apply all" -- "and to apply to all employees of the county under the direct and indirect jurisdiction of the Board of County Commissioners except as otherwise provided in Chapter 2.03."
And then it reads, in italicized, emboldened language, "Employees of the District Court, juvenile probation, juvenile detention and China Springs Youth Camp are employees of the judicial branch and are subject to the personnel regulations and policies established by the District Court."
A Yes, sir.



Q And so wouldn't you agree that this policy of saying employees of the District Court are subject to the personnel regulations established by the District Court -- wouldn't you agree that that policy applied to Mr. Enos in January and February of 2015?
A I -- the policy -- the personnel -- court personnel regulation policy?
Q Yes. Yes.
A I would leave that -- I don't -- I don't know one way or the other. I would have left that up to the decision of the District Attorney to define that. That's how it's deferred.
The District Attorney and the Human Resources makes those decisions --
Q Okay.
A -- as to which policies and which procedures -- with respect to that.
Q Previously, you gave testimony as to the Ninth Judicial District Court regulations --
A I had.
Q -- applying to Mr. Enos.
Is that something that you confirmed and evaluated on your own, or is that something that you are stating as reported or advised to you by DA counsel?
A Yeah, under the -- yeah, advised to by the DA counsel.
MR. GEDDES: Okay. All right. Let's mark as

Exhibit 22, please.
(Exhibit 22 marked for identification.)
THE WITNESS: Thank you.
BY MR. GEDDES:
Q All right. Exhibit 22 is a document on the pleading paper, caption of "In the Ninth Judicial District Court of the State of Nevada in and for the County of Douglas, Order Establishing Court Personnel Regulations." And then it has court personnel regulations.
Have you seen this document before?
A I've seen -- I'm not sure what the date is on this document.
Q Well, it says it's file-stamped September 25th, it looks like 2006.
A I have seen this document sometime in the past, I don't recall exactly when.
Q Okay. So as you sit here today, you don't have any knowledge or understanding as to whether these court regulations applied to Mr. Enos in 2015 and 2014, that's something that you would defer to the District Attorney's Office?
A The District Attorney's Office, yes, specifically because of the date, because I know the court personnel regulations have been revised since 2006.
Q All right. If we look at PLF 146 at Section 1.03. It's that first page there.



A Okay.
Q This document states "The intent of this order is as follows," and by the time you get 1.03, it reads "To provide equal employment opportunities to all applications and employees without discrimination due to race, color, religion, age, sex, physical handicap or national origin."
You didn't evaluate Mr. Enos' request for additional time based on this subsection in February or January of 2015; isn't that correct?
A I did not evaluate -- yes, that is -- that's correct.
Q And you don't know one way or another whether anyone else did as well; is that correct?
A I don't know one way or the other whether anybody else did.
Q If we look at PLF 147, Section 2.04 --
A Yes.
Q -- this regulation -- this portion states "These rules supersede policies, procedures and standards of all county agencies and departments with respect to classified personnel of the Ninth Judicial District Court."
So your understanding was that Mr. Enos was classified personnel of the Ninth Judicial District Court in or about 2015 and 2014, correct?
A That is my understanding.
Q And if we look at Section 3.09 on PLF 148, it defines



"classified position." It means "All positions regulated by Ninth Judicial Court personnel regulations. Each will be assigned a class in the classification plan and will be defined by a class specification."
And then if we look at Section 3.41, defining "unclassified positions," that lists the positions that are not classified.
And chief juvenile probation officer and chief deputy juvenile probation officers are specifically listed here as not classified. That would have been your job and Ms. Sauer-Lamb's job, correct?
A Correct.
Q We look at PLF 150 to 151 at Section 3.12, this rule says "Any individual appointed to an unclassified position serves at the will of the appointed authority and may be removed at will by the appointing authority without notice, cause or hearing."
So to your knowledge and understanding, this rule would mean that you and Ms. Sauer-Lamb in 2015 could have been removed by the appointing authority without notice, cause or hearing, correct?
MS. PARKS: Object -- objection, relevance.
BY MR. GEDDES:
Q Go ahead and answer.
THE WITNESS: You'll have to repeat that question, please.



(The question was read by the reporter.)
THE WITNESS: We could have been, yes, that is correct.
BY MR. GEDDES:
Q Okay.
A Yeah.
Q But to your knowledge or understanding, this language did not apply to Mr. Enos before his employment was terminated because he served in a classified position as a senior juvenile probation officer; is that correct?
A Yes. Yes, to my knowledge.
Q So if we turn to PLF 161, at Section 7.0, this section says "Appeals and Hearings."
And if we turn to 7.0.1, the language reads "In the event the department head desires to institute any disciplinary or correctional action to a nonprobationary employee wherein a suspension of five days or more, demotion, termination, is contemplated, the following procedures will apply."
Now, to your understanding, in 2015, prior to the time when Mr. Enos' position was terminated with the County or he was -- his employment was terminated with the County, you were the department head over the juvenile probation officers, including Mr. Enos, which is referenced here; is that correct?
A That is true.
Q And if we look at PLF 148 at Subsection 315, which defines the department head, it states that that means "the

Page 250

individual serving as the head of a county department or district reporting directly to the District Court judges."
Q And that's you, correct?
A That's me, correct.
Q Now, if we look at Subsection 7.0, which includes 7.01 to 7.06, you didn't follow the rules outlined in these sections with regard to Mr. Enos' termination of employment with Douglas County; isn't that correct?
MS. PARKS: Objection, argumentative, lack of foundation that Mr. Enos requested any of the procedures set forth in the document being described.
BY MR. GEDDES:
Q You can answer the question.
THE WITNESS: I hate to do this to you again, but I get a little distracted when that happens. Thank you. Could you repeat it.
(The question was read by the reporter.)
MS. PARKS: Same objections.
THE WITNESS: And these rules -- I was -- did not apply because they're for disciplinary or correctional action. John -- that was not -- had no course of discipline or progressive discipline or correctional action towards Mr. Enos for his performance.
BY MR. GEDDES:
Q My question is, did -- you didn't follow these rules;

Page 251

isn't that correct?
MS. PARKS: Same objections. And he's answered the question. It has been asked and answered.
THE WITNESS: These -- yeah, these rules did not apply.
BY MR. GEDDES:
Q Okay. So I'm going to do this very slowly so that there's no misunderstanding of what my question is, because I'm getting objections, and that's not my question.
My question is not whether the rules applied. I'm not asking that.
I'm asking you whether you followed the rules in Section 7.0. For whatever reason, whether they didn't apply or because they didn't exist, I'm asking you whether you followed the rules outlined in Section 7.0, which includes 7.01 through 7.06, with regard to Mr. Enos' termination of employment with Douglas County.
MS. PARKS: And objection, argumentative, asked and answered.
THE WITNESS: I did not follow those rules.
BY MR. GEDDES:
Q Thank you.
Now, I think to your other answer, you did not, why not. And your testimony is, your understanding is they did not apply to Mr. Enos?
A If I was making the decision, which I didn't, I was

Page 252

relying on the advice of my District Attorney and the human resources director.
If I was making -- I would say that this disciplinary, correctional action did not apply to Mr. Enos' case. He was not written up for anything. There was no progressive discipline on his performance and/or correctional action.
Therefore, it would be very inappropriate to use this in -- based on another matter which I don't have a working knowledge of the case.
Q Okay. So if we look at 7.0 --
A Yes, sir.
Q -- according to what you just said, 7.0 applies to people who have disciplinary issues; is that correct?
A It seemed -- that would be what it appears to say to me, yeah, disciplinary, correctional action.
Q And so you are saying that those rules do not apply to Mr. Enos if he wants to return to work and he's being told you cannot return to work unless you have full medical releases?
A I can't come to --
MS. PARKS: Objection, misstates his testimony.
MR. GEDDES: I'm asking a question.
MS. PARKS: That's not what he testified to, Counsel.
MR. GEDDES: Can you read back the question, please.
(The question was read by the reporter.)
THE WITNESS: My assumption is, is that those rules

Page 253

would not apply to Mr. Enos' case based on the fact they are for disciplinary and correctional purposes.
BY MR. GEDDES:
Q So he doesn't get, then -- according to that, he doesn't get the protections when he's not doing anything of a disciplinary nature; is that correct?
A I'm not sure what your question is.
Q You are saying that 7.0 is reserved for disciplinary matters.
A It appears to be, in my opinion.
Q Have you ever had a hearing or a case where this -- this issue has been decided?
A I'm not sure what your question is.
Q Have -- have you ever had a hearing or a case, are you aware of a hearing or a case where that has been decided as that's what the rule means?
A No. No. No, sir.
Q I asked this before, but do you see in Section -- we're going to talk about 6.06 in a minute, but we can jump to it ahead for a second here.
Do you see 6.061 says "An unauthorized absence from work shall be treated as leave without pay and may be cause for disciplinary action, up to and including termination"?
A I do see that.
Q So isn't it true that Mr. Enos' issue concerning work

releases and his being construed to be gone for three days as an unauthorized absence could be construed as a disciplinary matter?
A It could be, based on that -- that line. "Could be" is key word, two words.
Q Now, you didn't actually consider whether you were required to follow, at the time, the rules outlined in Section 7.0, which include 7.01 to 7.06, because you, again, were relying on the advice of counsel; is that correct?
A Yes, sir.
Q Did anyone explain the logic or their interpretation of this matter, or was it simply, they gave you the conclusion and you went with it?
A I do not question the District Attorney. I'm not a lawyer, nor do I question a --
Q Well --
A Excuse me. Let me finish.
Q Go ahead.
A Nor do I question the human resources directors. They are the experts in those areas. I trust them and I worked with them.
Q Okay. Here -- here is my question.
I understand that you deferred to them. And I understand that you are stating that you do not feel like you are in a position to question their authority on legal and HR matters. I get that.



A Expertise.
Q Yeah, I get that. That's not what I'm asking you. What I'm asking you is slightly different. I'll give you an example.
Sometimes, I might say to a client X, Y and Z, and it's my advice about the law. And I give no explanation as to why the law is that way and break it down for them.
My question is that, when they -- when they gave you their advice concerning the matters you've already testified to, did they explain to you their rationale as to whether or why Section 7.0, which includes 7.01 to 7.06, applied to Mr. Enos?
A I did not feel that I needed their rationale on that matter.
Q Did they volunteer it to you?
A I don't recall.
MR. GEDDES: All right. Let's look at Exhibit 23.
(Exhibit 23 marked for identification.)
THE WITNESS: Thank you.
BY MR. GEDDES:
Q Okay. Have you seen this document before?
A I signed this document. I don't recall it specifically, but I have signed it.
Q Okay. And so that's your signature at Section 3, signature as department head, dated 2/19/15. And you signed this on 2/19/15, correct?
A Yes, sir.



Q All right. Now, are there any other signatures that you recognize on this document?
A Oh, that's Wendy, yeah, the director of Human Resources, Wendy Lang.
Q And you recognize that as her signature?
A I have not seen her signature before. I assume that it would be valid signature.
Q At the bottom under "Employee," it reads "refused to sign." Do you recall anything about that matter?
A I do not.
Q Do you know who prepared this document?
A I don't, sir.
Q Have you seen this document apart from the matter concerning Mr. Enos?
A I'm not sure of your question.
Q I mean, in your governance in the -- in the years that you have been there, have you, time to time --
A Yeah, I've used personnel action forms before, yes.
Q Okay. So you are familiar generally with this form?
A With the personnel action form --
Q Okay.
A -- absolutely.
Q Do you know who instructed the document preparer, whoever prepared this -- do you know who instructed that person to prepare it?



A I do not.
Q Now, Wendy Lang signed this on 2/26/15.
A Uh-huh.
Q That would have been after Mr. Enos' employment was terminated, correct?
A Yes, I believe so, yeah.
Q And what role or involvement did you have in connection with this document?
A I signed the document on 2/19.
Q Did you attend any meetings with HR or with the DA's Office with regard to the matters set forth in this document, apart from what you already -- apart from what you already testified?
A I don't recall attending any meetings regarding this document.
Q Did Ms. Santoyo have any involvement or role in this document?
A I don't know. I don't believe so.
Q Now, if we look at the middle or the top middle, it says "The employee listed above is recommended for the following personnel action." And it has a check box of "separation."
Do you see that?
A I do.
Q And it states that he was paid from Fund 101 in Department 361. Do you know what that is?

Page 258

A That is our budget line item for the juvenile probation department. 361 is our call-out.
**Q Then in the middle there, it says "Change of status or explanation. All actions with asterisk must be explained below. See reverse for details.**
**"The human resource division and District Attorney's Office must review disciplinary actions."**
**Now, on this document, is there anyone from the human resources division other than Wendy Lang -- well, Wendy Lang signed it.**
**Is there anyone from the District Attorney's Office who reviewed this, to your knowledge?**
A Not to my knowledge.
**Q And is there -- it reads, "Input by." And do you see that, "Input, A" -- I don't know, looks like it says A-M-C?**
A Could you point to it?
**Q Yeah, right here.**
A Okay. Thank you.
**Q Because it's a human resources' input, do you see that?**
A I do.
**Q Who is that?**
A I don't know whose initials that is.
Oh, that could be Anita McGillivray, a human resource administrative assistant who records these documents. So she input it into the system. That -- that would -- that would be my

Page 259

assumption.
**Q Now, this document states the reason or change of status or explanation was three days absence without approval per County Code 2.02.082; is that correct?**
A That's what it says.
**Q And it says "employee automatically resigned." Is that correct?**
A That's what it says.
**Q And nowhere on this document is the Ninth Judicial District Court regulation cited; isn't that correct?**
A It doesn't -- it doesn't say that.
**Q Doesn't say --**
A It does not say that, yeah.
**Q So that's correct, it's not contained on this document?**
A Yeah, the court --
**Q Okay.**
A That code for the court personnel regulations is not contained on this document.
**Q Now, you testified that you don't know about the matters of Mr. Enos' refusing to sign this. Is that your recollection?**
MS. PARKS: Objection, asked and answered.
BY MR. GEDDES:
**Q Okay. So --**
A That's my recollection.
**Q -- if Mr. -- if Mr. Enos testifies that you gave this**

Page 260

**document to Ms. Sauer-Lamb to have Mr. Enos sign this document, you wouldn't have any reason to disagree with that?**
A I wouldn't -- I wouldn't question Mr. Enos.
**Q And having said that, does that refresh your recollection as to how this might have been -- how this was distributed for attempted signature by Mr. Enos?**
A It does not refresh my recollection.
**Q Did you ever make any inquiry as to why Mr. Enos would not sign this?**
A Not to my recollection.
**Q Had the situation involving an employee in the juvenile probation department having a change of status, three days absent without approval per county code, employee automatically resigned -- has that occurred for other juvenile probation officers, to your recollection?**
A That has not -- on my tenure as chief juvenile, has not occurred.
**Q So this was the first instance where that occurred --**
A Yeah.
**Q -- to your knowledge?**
A I would have to understand what "that" means.
**Q Well, what you just testified to.**
THE WITNESS: I'm going to have to hear that back, please.
(The answer was read by the reporter as follows:

Page 261

"That has not -- on my tenure as chief juvenile, has not occurred.")
THE WITNESS: And I have to go back even a step back.
BY MR. GEDDES:
**Q Okay. Well, I can ask it again.**
A Okay. Please. Sorry.
**Q You stated that in your tenure, the change of status of a juvenile probation officer having had a three days' absence without approval per County Code 2.02.082, employee automatically resigned -- that is what I am referring to.**
A Yes.
**Q You stated that never occurred in your tenure prior to Mr. Enos, correct?**
A That's correct, sir.
**Q And since Mr. Enos -- since his employment has been terminated with the County, that has not happened since then; is that correct?**
A That's correct.
**Q To your knowledge or understanding, when did Judge Gibbons first learn that Mr. Enos' employment with the County was terminated?**
A I don't recall.
**Q And to your knowledge or understanding, when did Judge Young first learn that Mr. Enos' employment with the County was terminated?**

A I don't recall.
**Q Do you ever recall discussing the matter of his termination of employment with either Judge Young or Judge Gibbons?**
A I do not remember such a conversation.
**Q Let's look back on Exhibit 22, if we can, please.**
A Yes, sir.
**Q Exhibit 22, Section 6.062.**
A Yes, sir. I'm there.
**Q It says "An unauthorized absence for three consecutive days shall be regarded as automatic resignation and termination from court service."**
**Do you see that?**
A I do.
**Q Did you ever inquire of either -- well, did you ever inquire of any of the judges in Douglas County, Ninth Judicial District Court, including Judge Gibbons and Judge Young, if this rule applied to an employee who had a medical condition and whether that employee had an ability to provide medical clearance as requested?**
A I did not.
**Q Did you ask that question of anyone at any time?**
A I did not. Not to my recollection.
**Q Did you ever make an inquiry on anyone as to whether Mr. Enos wanted to keep his job and did not want to have his**



**employment terminated with the County in February of 2015?**
THE WITNESS: Could you please go back to the first part of that question.
(The question was read by the reporter.)
THE WITNESS: I'm not sure what "on anyone" means.
BY MR. GEDDES:
**Q Did you ever ask anyone.**
A Thank you. Okay.
I -- no.
**Q So on the date of Mr. Enos' termination, is it your testimony you had no idea whether he wanted to keep his job or not?**
A I'm pretty sure he wanted to keep his job.
MR. GEDDES: Let's mark the next exhibit, please, 24.
(Exhibit 24 marked for identification.)
THE WITNESS: Thanks very much.
BY MR. GEDDES:
**Q Okay. Exhibit 24, this is a termination letter that you prepared on February 20th, 2015, correct?**
A It has my signature on it, yes.
**Q Who wrote this?**
A I don't believe I wrote this.
**Q Who wrote it?**
A I believe it would have been our District Attorney.
Yeah, I'm pretty confident it would have been our



District Attorney that drafted this letter.
**Q And this states that it was via hand delivery.**
A Yes, it does.
**Q What, if anything, did you do to confirm whether Mr. Enos received this by hand delivery?**
A I did nothing to confirm that personally.
**Q So if he contends that he did not receive this by hand delivery on February 20th, but he received it through the mail on February 23rd, you wouldn't have any reason to disagree with him?**
THE WITNESS: I have to go back again. Sorry. Please.
(The question was read by the reporter.)
THE WITNESS: I wouldn't disagree with Mr. Enos if he said he didn't get it in his hand. But to my knowledge, he did receive it before that date that you are talking about, or somebody received it, I'm not sure who.
That's kind of --
BY MR. GEDDES:
**Q But this letter --**
A -- vague knowledge of that, sir.
**Q This letter is dated February 20, '15. Isn't that the day after Mr. Enos' -- was actually separated from employment, on February 19th?**
THE REPORTER: Would you say the date again. I'm sorry.
BY MR. GEDDES:
**Q This date is February 20th, but wasn't Mr. Enos actually**



**separated from employment on February 19th?**
A I -- I -- I'm not sure.
**Q Didn't you -- didn't you tell Ms. Sauer-Lamb that you wanted Mr. Enos to clear his desk out by 5 o'clock, before 5 o'clock on February 19th, 2015?**
A I don't recall that conversation.
**Q If Mr. Enos states that you did -- that he was informed of that matter, would you have any reason to disagree with that?**
A I would believe him.
**Q Do you regret that Mr. Enos' employment was terminated?**
A I do.
**Q Why?**
A Because he's a good man.
**Q Did you ever apologize to Mr. Enos for his termination of employment?**
A I haven't spoken to Mr. Enos.
**Q Were you aware that Mr. Enos made efforts to get rehired by the County?**
A I'm not aware of that.
**Q So you were never made aware one way or another as to whether Mr. Enos tried to obtain his reemployment with Douglas County in any available position for which he was qualified through his vocational rehabilitation counselor in or about April of 2016?**
MS. PARKS: Objection, asked and answered.

THE WITNESS: I don't recall, sir.
MR. GEDDES: Let's take a look at Exhibit 25.
(Exhibit 25 marked for identification.)
THE WITNESS: Thank you.
BY MR. GEDDES:
Q Okay. Now, I know that you've already given your testimony on this. This may draw an objection, but I'm entitled to try and refresh your recollection. So I'm showing you a document that has been marked as Exhibit 25. And --
A So you are saying I testified on this --
MS. PARKS: No, that's not what he's saying.
THE WITNESS: Thank you.
BY MR. GEDDES:
Q All right. I'm -- this is a document, which, on the face of it, is from someone named Ed Howden & Associates. Does that name ring a bell to you?
A I -- I'm not familiar with that name, sir.
Q And you haven't actually seen this document before; is that correct?
A I have not seen this document.
Q Okay. And have you ever -- well, if you can glance through this generally, my question is, have you -- you may need to do more than generally -- but my question is, did you learn of information contained in this document?
MS. PARKS: Yeah, you are going to have to read the entire document if the question is did you obtain information about what's in this document. So -- I mean, we can go off the record --



MR. GEDDES: Well, we're -- we're almost -- we're almost done. We're -- we're good with time.
THE WITNESS: It seems like some type of request to -- written to Douglas County regarding employment.
BY MR. GEDDES:
Q So your general recollection is that you don't recall this document?
A I have never seen this document.
Q All right. So to -- to sort of short-circuit things here, I'll represent that Ed Howden was retained by Alternative Service Concepts as the vocational rehabilitation counselor for assisting Douglas County and Mr. Enos in his workers' compensation claim to get a return to work.
And that's all referenced in the first paragraph. If we look at the first paragraph, it says, basically, that.
A Okay.
Q It states that he has recently completed his medical treatment and with -- and Dr. Morales has released him with permanent restrictions.
"Ms. Enos" -- it says "Ms.," but it states Mr. Enos' "limitations are no lifting above shoulder with right extremity and no lifting greater than 50 pounds."



And it states "It appears that Mr. Enos will not be able to return to the preinjury job. I encourage you to consider him for a permanent modified job.
"Attached is the intent to offer employment form, and I urge you to check yes and return this form to me as soon as possible. You are encouraged to consider these limitations and make an offer of employment.
"Returning your employee to work is good for both the injured employee and employer."
And it states other things.
A Uh-huh.
Q On the second page --
A Yes.
Q -- it states "Within the following" -- "please take the following steps."
Subsection 1 states "Within 30 days of the date of this letter, return the completed intent to offer employment form. If it is not received within 30 days, the injured employee will be under no obligation to accept the offer.
"Within 10 days of sending the intent to offer employment form, if you will be offering a job, please call me for assistance in creating a form" -- "a formal written job offer."
And it has other procedures.
And then it states about other rights. But in Subsection 4, it talks about "employment must meet the following guidelines," and it goes through that.



And if we look at the very last page, where it says "Intent to Offer Employment," a check box could either say yes or no. And this says "No, I do not have an appropriate job to offer within the stated limitations." And it has been marked that and signed by Kathy Jo Kidd, dated --
A Oh, there's --
Q -- May 2nd, 2016.
So my question is, having just discussed these things, do you have any knowledge about these matters?
A I do not.
Q And did you have any communications with anyone as to whether or not Mr. Enos -- whether or not there was an appropriate job to offer within the stated limitations of this letter?
A I don't recall any communications of that nature.
Q But to your knowledge, no one contacted your department to find out if there were any jobs within your department --
A To my knowledge, nobody contacted my department.
Q -- regarding Mr. Enos obtaining work with -- within the limitations stated in this letter; is that correct?
A To my knowledge.
Q And do you know one way or another whether Douglas County, whether it's human resources department or anyone else, performed a search to determine whether it had a job that Mr. Enos could perform with the stated restrictions of Exhibit 25?

Page 270

A Not --

MS. PARKS: Objection -- objection, calls for speculation.

THE WITNESS: Not to my knowledge.

BY MR. GEDDES:

**Q Now, if we move forward in time, in or about January of 2017, didn't Douglas County have an open position in the juvenile probation department?**

A Sounds close.

**Q And whose position was that, that came open?**

A Bruce Beacham, I believe, yeah.

**Q And you described at the very beginning of your deposition, the process that is started to get HR involved, to receive applications and then to, you know -- an evaluation of the applications, et cetera, et cetera.**

**Do you recall that for the position that became advertised or open in January of 2017, that one of the applicants for that position of a juvenile probation officer was actually John Enos?**

A I do not recall.

**Q And you have no information concerning that?**

A I do have -- I have no information.

**Q And you are not aware of any communications by anyone concerning that matter; is that correct?**

A I don't -- I don't recall any communications.

Page 271

**Q Why did that position become available?**

A A senior juvenile probation officer resigned -- excuse me, retired.

**Q Okay. And so is it your testimony, then, that Human Resources never forwarded to you for consideration Mr. Enos' application?**

A Not to my recollection.

**Q Well, if they did, isn't that something that you would remember?**

A Not to my recollection, is my answer.

**Q Well, Mr. Enos' application was rejected. Do you know who made the decision to reject that application?**

A I do not.

**Q You had no involvement in the rejection of that application?**

A I have no knowledge of that rejection.

**Q Not my -- did you have any involvement in that rejection?**

A I had no involvement of a rejection -- in a rejection.

**Q Do you know who was selected for that position?**

A We hired a female juvenile probation officer.

**Q And who was that?**

A Kelly McGee.

**Q And how did Kelly McGee's qualifications compare with Mr. Enos' qualifications for that position?**

Page 272

A Kelly McGee was qualified to apply for the position of juvenile probation officer.

**Q But by education, training and experience, how did they stack up?**

A John Enos had more education, experience and training.

MR. GEDDES: Did -- let's mark as Exhibit 26.

(Exhibit 26 marked for identification.)

THE WITNESS: Thank you.

BY MR. GEDDES:

**Q Okay. I'll represent to you that you wouldn't have seen the top part that says "redacted," but have you seen any other portion of the pages of Exhibit 26 before?**

A No, sir.

**Q Okay. Have you learned of any information contained in these documents?**

A Once again, please.

**Q Have you learned of any information contained in these documents?**

A No, sir.

**Q I'll represent to you that the first page is a document confirming that Mr. Enos applied for the job of juvenile probation officer on or about January 6th of 2017.**

A Okay.

**Q And the -- the record of his application would still be on file with Douglas County, correct?**

Page 273

A I'm not sure. You would have to talk to the human resources department who manages the NEOGOV website with respect to Douglas County.

**Q Okay. The -- the web banner on the first page says governmentjobs.com, jobs, 1605, 962, juvenile probation officer; agency, Douglas Co; apply; submit.**

**Do you know -- well, I'm talking about the blue. I was reading the blue.**

A Yeah, yeah. Okay.

**Q Do you know where the -- where that email address is? Is that basically to the probation department -- to the HR department?**

A Yeah, that government jobs is another website. So maybe that's where they advertise for it. That's -- that's all I know about that.

**Q But your understanding is that the applications get funneled and sent to HR; is that correct?**

A Absolutely, all -- all initial applications.

**Q All right. Let's look at the second page here.**

A Uh-huh.

**Q There is a message from C. McMurray --**

A Uh-huh.

**Q -- on Friday, February 24th, 2017, 2:56 p.m.; subject, "Juvenile probation officer," to the address of huntbucks22@gmail. And it states that it's addressed in the body to John Enos.**

A Yes, it is.
**Q Now, who is Cindy McMurray? Do you know her?**
A She is the human resource person -- I'm not sure of her exact title. She manages -- probably administrative assistant would be accurate or --
**Q Is she still employed?**
A Yes, she is.
**Q Okay. So Ms. McMurray writes "Dear John, thank you for the time you took" -- "thank you for the time you took to complete the application for juvenile probation officer with Douglas County Juvenile Probation Department.**
**"We were fortunate to have several qualified candidates for this position, making the decision very difficult. However, after careful consideration, the department has selected another applicant."**
**Does this refresh your recollection as to whether Mr. Enos applied for this position?**
A It does not.
**Q How many people actually applied for this position?**
A I do not know.
**Q Were you part of the hiring process for that position?**
A I was part of the hiring process for that position.
**Q Who else was involved in the hiring process?**
A Human Resources would have been revolved -- involved. I'm not quite -- I don't remember specifically which person.



**Q Anyone else from juvenile probation?**
A This is -- so Mike Torres would be involved in the hiring process as far as interviews would be concerned.
**Q What was the selection criteria for the person who ultimately was chosen? How did you guys decide that? You talked about a point system. What was being evaluated?**
A Well, it's in the -- they meet the qualifications, the court qualifications to receive an interview. And then we have a point system of questions regarding juvenile probation, juvenile justice, teamwork.
I don't recall the questions specifically on the question sheet.
**Q Well, in January of 2017, was Mr. Enos qualified for this position?**
A Mr. Enos holds the qualifications to be eligible for a position of senior juvenile probation officer based on his education and experience.
**Q And so this was, in a sense, a lesser position because this is not a senior position, this is a junior -- this is a regular juvenile probation officer, correct?**
A It was a juvenile -- juvenile probation officer position that we -- I believe, we posted it that way.
**Q And --**
A Entry level.
**Q I'm sorry.**



A I'm sorry too. Yeah.
**Q That used to be his job before he was a senior, correct?**
A Yes, I believe so. I wasn't here when he was hired as a juvenile -- or, entry-level juvenile probation officer, I assume it was.
**Q So when she writes in this letter "However, after careful consideration, the department has selected another applicant," she's not stating, to your knowledge, that you selected another applicant; is that correct?**
A That would be the department, my department, I would believe.
This is kind of a -- sounds like an after-the-fact letter, communiqué.
**Q Did you ever have a conversation with -- with Mr. Torres about Mr. Enos' application?**
A I do not recall such a conversation. I didn't know Mr. Enos had put an application in.
**Q And no one ever told you that?**
MS. PARKS: Objection, asked and answered.
BY MR. GEDDES:
**Q You didn't have a conversation --**
A I didn't know anybody -- Mr. Enos had put an application in.
**Q And Mike Torres never talked to you about that?**
A Not to my recollection.



**Q Do you have any opinion as to why Mr. Enos' application was not forwarded to you?**
A I do not.
**Q Do you think it should have been?**
A He certainly meets the qualifications and has the experience to be eligible for the position of senior -- or, juvenile probation officer in this case.
**Q Well, my question is, do you think that his application should have been forwarded to you by HR?**
A I -- yeah, it should have been, based on his qualifications and his experience.
**Q Now, if we go way back to June of 2014, isn't it true that you refused to allow Mr. Enos to take POST training for an advanced supervisory certificate while on the job?**
A He was approved for POST management training. A whole week of time off was awarded.
And according to tuition reimbursement policy of the County, we would have reimbursed him if there was any cost associated with the class. I don't believe there was.
And he was graciously given the time off to complete that class and -- as far as furthering his education and his capacity as a juvenile probation officer.
**Q Do you specifically recall that?**
A Certainly.
**Q And isn't it true, though, that Mr. Enos took the**

**training, but had to use his vacation time to do it?**
A That's what the policy says in respect to the -- if you pull the Douglas County tuition reimbursement policy, it will say that it cannot be done on -- I forget the actual language, but he was approved for his time off to pursue that training.
**Q But wasn't it customary for juvenile probation officers -- or, the juvenile probation office to allow its juvenile probation officers to take the training on -- while on the job and not using vacation or personal time?**
A Only on a required POST -- POST-required training, which is directly related to being recertified each year as a peace officer Category 2.
Those requirements are particular requirements in respect to use of force, in respect to CPR, first aid, defensive tactics.
Those hours are all done on the job and respect -- and there's another 12 hours on top of that. And juvenile probation officers can take that 12 hours, and defines a training that they would like to go to, juvenile justice specific, and beyond department time in order to complete those 12 additional hours.
MR. GEDDES: Okay. Give me one minute. I know it's -- we'll go off the record, please.
THE VIDEOGRAPHER: Going off the video record. The time is 5:38.
(A recess was taken.)



THE VIDEOGRAPHER: We're back on the video record. The time is 5:42.
BY MR. GEDDES:
**Q Okay. Mr. Shick, you understand you are still testifying under oath after this break?**
A Yes, sir, I do.
**Q Okay. Now, isn't it true that Eric Anderson was a juvenile probation officer who attended Leadership 2014 training, attending eight hours per month through the year, paid for by the juvenile probation office, and he had a total of 96 hours?**
A I don't recall that.
**Q If there's testimony at trial concerning that, would you have any reason to disagree with that?**
THE WITNESS: I would have to know what I was disagreeing or -- could you repeat that back, please, what he said about Mr. Anderson's training.
(The question was read by the reporter as follows:
"Now, isn't it true that Eric Anderson was a juvenile probation officer who attended Leadership 2014 training, attending eight hours per month through the year, paid for by the juvenile probation office, and he had a total of 96 hours?")
THE WITNESS: I wouldn't argue with that if it's on the record.
MR. GEDDES: Okay. I go ahead and pass --
THE WITNESS: It's documented.



MR. GEDDES: I go ahead and pass the witness.
If you don't have anything, I can give the instructions about the transcript and go over --
MS. PARKS: I don't have any questions.
MR. GEDDES: Okay. So, Mr. Shick, thank you for coming today and testifying.
I want to go over what typically happens after a deposition is given, and that's going to apply here.
You'll have a transcript of your testimony, and you are usually going to get that pretty quickly. You'll have a time limit of when you have to return it to the court reporter, and that will be given in instructions to you. Normally, it's 30 days.
You can review and make corrections to errors in the transcript. This means correcting mistakes where the court reporter wrote down the wrong word or misspelled someone's name, as an example.
You will get instructions from the court reporter again. Typically, you'll get an errata page, which is a page with lines, and you note by page and line numbers where corrections need to go.
Now, I have to remind you -- or, state that if you change the substance of your answer beyond a mere typographical error, we will certainly comment on that to a jury for all substantive changes you attempt to make in an effort to show that



you are trying to change your testimony and that you are not credible.
Do you understand these things?
THE WITNESS: Yes.
MR. GEDDES: Okay. So I want to, again, thank you for your time today, and we're done. Thank you.
THE VIDEOGRAPHER: This concludes the deposition of Scott Shick on December 18th, 2018. We're off the video record at 5:45.
(The proceedings concluded at 5:45 p.m.)
-oOo-

REPORTER'S CERTIFICATION

I, CONSTANCE S. EISENBERG, a Certified Court Reporter in and for the State of Nevada, do hereby certify;

That on Tuesday, December 18, 2018, at the hour of 8:59 a.m. of said day, at 151 Country Estates Circle, Reno, Nevada, personally appeared SCOTT JAMES SHICK, who was duly sworn by me to testify in the within-entitled proceedings;

That said deposition was taken in verbatim stenotype notes by me and thereafter transcribed into typewriting as herein appears;

That I am not a relative nor an employee of any of the parties, nor am I financially or otherwise interested in this action;

That the foregoing transcript, consisting of pages 1 through 282, is a full, true and correct transcription of my stenotype notes of said deposition.

DATED: At Reno, Nevada, this 3rd day of January, 2019.



CONSTANCE S. EISENBERG, CCR #142, RMR, CRR



ERRATA SHEET

I declare under penalty of perjury that I have read the foregoing _______ pages of my testimony, taken on ________________________ (date) at __________________(city), _________________(state),

and that the same is a true record of the testimony given by me at the time and place herein above set forth, with the following exceptions:

| Page | Line | Should read: | Reason for Change: |
|---|---|---|---|
| ___ | ___ | ________________________ | __________________ |
| | | ________________________ | __________________ |
| ___ | ___ | ________________________ | __________________ |
| | | ________________________ | __________________ |
| ___ | ___ | ________________________ | __________________ |
| | | ________________________ | __________________ |
| ___ | ___ | ________________________ | __________________ |
| | | ________________________ | __________________ |
| ___ | ___ | ________________________ | __________________ |
| | | ________________________ | __________________ |
| ___ | ___ | ________________________ | __________________ |
| | | ________________________ | __________________ |



ERRATA SHEET

| Page | Line | Should read: | Reason for Change: |
|---|---|---|---|
| ___ | ___ | ________________________ | __________________ |
| | | ________________________ | __________________ |
| ___ | ___ | ________________________ | __________________ |
| | | ________________________ | __________________ |
| ___ | ___ | ________________________ | __________________ |
| | | ________________________ | __________________ |
| ___ | ___ | ________________________ | __________________ |
| | | ________________________ | __________________ |
| ___ | ___ | ________________________ | __________________ |
| | | ________________________ | __________________ |
| ___ | ___ | ________________________ | __________________ |
| | | ________________________ | __________________ |
| ___ | ___ | ________________________ | __________________ |
| | | ________________________ | __________________ |

Date: ___________ ________________________________

Signature of Witness

________________________________

Name Typed or Printed

RECEIVED 2/23/15 (VIA mail)

Juvenile Division

**Ninth Judicial District Court**

Douglas County
State of Nevada

Nathan Tod Young
District Judge
Department One

Michael P. Gibbons
District Judge
Department Two

Scott Shick
Chief Juvenile
Probation Officer

VIA Hand-Delivery

February 19, 2015

John Enos
1184 Sierra Vista Dr.
Gardnerville, NV 89460

RE: Leave of Absence

Dear Mr. Enos:

I have received and seriously considered your request for a leave of absence dated February 17, 2015 pursuant to Douglas County Policy 200.40. However after considerable deliberation, your request is being denied.

Sincerely,

Scott Shick
Chief Juvenile Probation

cc: Norma Santoyo, Human Resources Manager
Justina Caviglia, Deputy District Attorney

EXHIBIT 18
Witness:
C. EISENBERG, NV CCR 142

# Douglas County
# Personnel Action Form

Complete Section I

Received:

## SECTION I - REQUESTING DEPARTMENT

Effective Date: 02 / 17 / 15 Employee Name: John M. Enns

Employee Number # 3185 Department: Juvenile Probation

The employee listed above is recommended for the following personnel action:

- ☐ New Hire ☐ Temporary Appointment ☐ Reemployment
- ☐ Full-time ☐ Part Time ____ hours per p/p ☐ Probation ☐ Seasonal ☐ On Call
- ☐ Merit Increase (Must be accompanied by a performance evaluation)
- Holiday Pay 3.4: ☐ Yes ☐ No ☐ * Change of Status: explain below
- ☒ * Separation (see reverse for details)

(Please complete all applicable areas listed in this table)

| | |
|---|---|
| Current Title: (required) Sr. Juvenile Probation Officer | Current Hourly Salary: $ |
| Proposed Title. | Proposed Hourly Salary: $ |
| Supervisor's Name: (required) Victoria Sauer-Lamb | Proposed Increase %: |
| Proposed Fund: (required) 101 Proposed Dept: 361 | Evaluation Score: |
| Eligible for Rehire: (required) ☐ Yes ☐ No | Employee's Work Extension: (required) |

CHANGE OF STATUS OR EXPLANATION: (All actions with (*) MUST be explained below (see reverse for details).
The Human Resources Division and District Attorney's Office MUST review disciplinary actions).

3 days Absence without approval Per County Code 2.02.082 employee automatically Resign

## SECTION II - HUMAN RESOURCES ONLY

(circle the codes that best apply)

Safety Sensitive Position: Yes No PERS ELIGIBLE YES NO RETRO PAY - LUMP SUM

Drug/Alcohol Testing: Pre-Employment Only Random DOT/CDL

Physical Required: Yes No Type: ____ Hep-B Required TB Required

Proposed Information: Position Code: JPOSR Pay Grade: 47BRS Job Code: 2410

Benefits Group: DCEA DCSPA EFFPEA Non-Contracted

Underfill: Yes No Admn Leave: Yes No

Human Resources: Input Date: 2/25/15 Input By. [signature] (Initials)

## SECTION III - SIGNATURES

Department Head: [signature] Date: 2-19-15

Fiscal Authorization: ____ Date: ____

Human Resources Manager: Wendy Lang for HRM Date: 2/26/15

Other. ____ Date: ____

I have been notified of the above personnel action:

Employee: refused to sign Date: 2-19-15

Distribution White-Human Resources Yellow-Payroll Pink-Department

EXHIBIT 23
Witness: ____
C. EISENBERG, NV CCR 142

Revised May 12, 2011

DC000086

(24)

RECEIVED 2/23/15
(VIA MAIL)

Juvenile Division

# Ninth Judicial District Court

Douglas County
State of Nevada

**Nathan Tod Young**
District Judge
Department One

**Michael P. Gibbons**
District Judge
Department Two

**Scott Shick**
Chief Juvenile
Probation Officer

VIA Hand-Delivery

February 20, 2015

John Enos
1184 Sierra Vista Dr.
Gardnerville, NV 89460

RE: Resignation

Dear Mr. Enos:

Due to your absence from work for three consecutive days, Douglas County Juvenile Probation accepts your resignation pursuant to Title 2, Chapter 2.02 of the County Personnel Regulations 2.02.080(J) and Section 6.062 of the Order Establishing Court Personnel Regulations, which provide:

Unauthorized absence.

> 2. An unauthorized absence for three consecutive days shall be **regarded as an automatic resignation** and termination from county [court/judicial] service.

Please contact me as soon as possible to arrange the removal of your personal items from the Juvenile Probation and the return of any County property currently in your possession.

Sincerely,

Scott J. Shick

Scott Shick
Chief Juvenile Probation

cc: Norma Santoyo, Human Resources Manager
Justina Caviglia, Deputy District Attorney

EXHIBIT 24
Witness: ____
C. EISENBERG, NV CCR 142