# EXHIBIT 12

## DEPOSITION TRANSCRIPT OF KAREN BARBEE

(Including Exhibit 10)

EXHIBIT 12

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

-o0o-

JOHN ENOS, an individual, Case No. 3:17-cv-00095-MMD-VPC

Plaintiff,

vs.

DOUGLAS COUNTY, a political subdivision of the State of Nevada, et al.,

Defendants.

______________________________/

VIDEOTAPED DEPOSITION OF

KAREN BARBEE

OCTOBER 3, 2018

RENO, NEVADA

REPORTED BY: CORRIE L. WOLDEN, NV CSR #194, RPR, CP

JOB NO. 498783

A P P E A R A N C E S

FOR THE PLAINTIFF: THE GEDDES LAW FIRM, P.C.
BY: WILLIAM J. GEDDES, ESQ.
8600 Technology Way, #115
Reno, Nevada 89521
775-853-9455
will@thegeddeslawfirm.com

FOR ALTERNATIVE SERVICE CONCEPTS AND KAREN BARBEE: THORNDAL, ARMSTRONG, DELK, BALKENBUSH & EISINGER
BY: ROBERT F. BALKENBUSH, ESQ.
6590 S. McCarran Blvd. Ste. B
Reno, Nevada 89509
775-786-2882
rbalkenbush@thorndal.com

FOR DOUGLAS COUNTY, SCOTT SHICK AND VICTORIA SAUER-LAMB: THORNDAL, ARMSTRONG, DELK, BALKENBUSH & EISINGER
BY: KATHERINE F. PARKS, ESQ.
6590 S. McCarran Blvd. Ste. B
Reno, Nevada 89509
775-786-2882
kfp@thorndal.com

ALSO PRESENT: JOHN ENOS



I N D E X


| EXAMINATION: | PAGE |
|---|---|
| BY MR. GEDDES | 5 |


E X H I B I T S


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Notice of Claim Acceptance from Alternative Service Concepts to Mr. Enos from Karen Barbee, 7/10/13 | 28 |
| Exhibit 2 | Notice of Claim Acceptance from Alternative Service Concepts to John Enos from Karen Barbee, 7/18/14 | 32 |
| Exhibit 3 | E-mails Between Karen Barbee and Sarah Christensen, 1/20/15 | 33 |
| Exhibit 4 | Work/School Excuse from Tahoe Fracture Clinic for John Enos, 1/28/15 | 39 |
| Exhibit 5 | Handwritten Note | 42 |
| Exhibit 6 | Open Positions at Douglas County | 45 |
| Exhibit 7 | Letter Dated 2/13/15 from Human Resources to John Enos | 47 |
| Exhibit 8 | Job Description for Juvenile Probation Officer - Senior | 48 |
| Exhibit 9 | Handwritten Letter Dated 2/17/15 to Human Resources from John Enos | 49 |
| Exhibit 10 | Return to Work Record from Dr. Morales, 2/17/15, and Work/School Excuse, 2/18/15 | 50 |
| Exhibit 11 | Letter from Scott Shick, Chief Juvenile Probation Officer, to Mr. Enos dated February 19, 2015 and Letter from Scott Shick, Chief Juvenile Probation Officer, to Mr. Enos dated February 20th | 56 |
| Exhibit 12 | Letters Dated 2/24/15 to Mr. Enos from Karen Barbee | 57 |
| Exhibit 13 | Miscellaneous E-mails | 61 |
| Exhibit 14 | Decision and Order from the Hearing Officer | 72 |




BE IT REMEMBERED that on WEDNESDAY, OCTOBER 3, 2018, at the hour of 1:02 P.M. of said day, at the offices of SUNSHINE LITIGATION SERVICES, 151 Country Estates Circle, Reno, Nevada, before me, CORRIE L. WOLDEN, personally appeared KAREN BARBEE, who was by me first duly sworn, and was examined as a witness in said cause.

-oOo-

THE VIDEOGRAPHER: All right. This is the beginning of media number one in the deposition of Karen Barbee in the matter of Enos versus Douglas County, et al, held at Sunshine Litigation on October 3rd, 2018, at 1:02 p.m.

The court reporter is Corrie Wolden. I am Denise Matt, the videographer and employee of Litigation Services. This deposition is being videotaped at all times unless specified to go off the video record.

Would all present please identify themselves beginning with the witness.

THE WITNESS: Karen Barbee.

MR. BALKENBUSH: Robert Balkenbush on behalf of Alternative Service Concepts and Karen Barbee.

MS. PARKS: Katherine Parks on behalf of Douglas County, et al.

JOHN ENOS: John Enos.

MR. GEDDES: The Plaintiff.



JOHN ENOS: Plaintiff.

MR. GEDDES: Will Geddes, Counsel for Plaintiff.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

KAREN BARBEE,

called as a witness, having been duly sworn, testified as follows:

EXAMINATION

BY MR. GEDDES:

**Q This is the date and time set for the deposition of Karen Barbee, a nonparty witness in the matter of Enos versus Douglas County, Case 3-17-cv-95 now pending in the U.S. District Court for the District of Nevada.**

**Good afternoon, ma'am. Could you please identify yourself by first and last name and spell your last name for the record.**

A Karen Barbee, B-A-R-B-E-E.

**Q Good afternoon, Ms. Barbee. I'm Will Geddes. I'm an attorney for the Plaintiff and I will be taking your deposition today.**

**Ms. Barbee, have you had your deposition taken before?**

A Yes, I have.

Q Are you familiar with the ground rules for a deposition?
A Yes, I am.
Q Would you be comfortable if we didn't go over them at this time and that you understand that you are testifying under oath and under penalty of perjury?
A Yes.
Q Okay. All right. In order to ensure the reliability of your testimony today, I have to ask if you are currently under the influence of any medications, alcohol, substance or drug?
A No.
Q Okay. And is there any reason that you will not be able to understand my questions today?
A No.
Q Is there any reason that you will not be able to give your best testimony today?
A No.
Q Okay. Did you bring any documents with you today?
A Just a copy of the subpoena --
Q Okay.
A -- or whatever this is.
Q Okay. That's the Second Amended Notice of the deposition. Okay. What is your current address?
A 6, my business address is 639 Isbell Road, Reno,



Number 390.
Q And how old are you?
A I'm 66.
Q Okay. And can you please summarize your educational background.
A I graduated high school. I took some, I mean, that was a long time ago, I took some advanced courses in stenography and insurance courses, and attained my AIC, Associate in Claims, through the Insurance Institute of America.
I attained my self insurance certificate in California, that was for worker's compensation, and I have a worker's compensation license in Nevada.
Q Okay. Have you ever received any formal training in matters of employment discrimination?
A No.
Q Now, what is your marital status?
A Married.
Q Do you have any children?
A No.
Q And you, I guess you are on the verge of retiring, is that correct, or changing jobs?
A No.
Q Okay. Are you going to be moving out of state?
A Yes.



Q Okay. When do you intend to move out of state?
A Next week.
Q And where will you be moving?
A Out of state.
Q Is it more than 100 miles from Reno?
A Yes.
Q Okay. Can you tell me what state that is?
A Oregon.
Q Okay. Can you tell us where do you currently work --
A I work --
Q -- as of today?
A -- for Alternative Service Concepts.
Q Okay. And if I refer to ASC in the deposition --
A Same thing.
Q Okay. And what is your job at ASC?
A I'm a senior claims adjuster.
Q Okay. Can you summarize what your duties are as a senior claims adjuster at ASC?
A I administer worker's compensation benefits for public entities in Nevada.
Q And how long have you been doing that?
A For ASC I have been doing that for a little over 10 years.
Q Okay. And how long have you worked at ASC?



A A little over 10 years.
Q Okay. And then prior to ASC did you work somewhere else handling insurance claims?
A Yes, I did.
Q Okay. Can you tell us where that was?
A How far do you want me to go back?
Q Go back five or ten years from that, if you can.
A All right. I worked for a company called Gregory B. Bragg & Associates. They all bought each other out, so it's kind of, I think I have -- let me see how it goes.
MR. BALKENBUSH: Counsel, is it -- if she has been an adjuster on work comp claims and you are going to be asking her questions about Mr. Enos' claim, why do you need to go back prior to 10 years?
MR. GEDDES: I'm not. I'm trying, this is most likely going to be her trial testimony and so there is an opportunity to evaluate her and get a general understanding of her background. That's why I'm asking these questions.
THE WITNESS: All right. I have --
BY MR. GEDDES:
Q Okay.
A -- my employment history right in front of me.
Q All right.
A Prior to ASC I worked for a year for Insurance Overload Staffing in Oregon. Prior to that I worked three

years for Gregory Bragg & Associates in California. Prior to that I worked for 12 years for Claims Management, Inc. in California, and prior to that, I mean, that's going back to --
Q Okay.
A -- 1989. Do you need anything --
Q That's sufficient.
Do you have, have you ever been convicted of a crime?
A No.
Q Okay. Have you ever been a party to a lawsuit other than this one? Well, you are not a party, but have you ever been a party to a lawsuit?
A Yes.
Q What cases -- were those involving work?
A No.
Q Were they, they were private matters regarding family matters?
A No.
Q Okay. Can you just summarize what those were?
A Yes. A construction defect --
Q Okay.
A -- lawsuit.
Q All right. Were you a plaintiff --
A Yes.



Q -- in that action?
Okay. Any other civil litigation background?
A No.
Q Okay. Now, you testified that you had your deposition taken before. Was that in your capacity as a senior claims adjuster?
A No.
Q Okay. What was, where were you deposed before?
A Regarding the construction defect claim.
Q Okay.
A May I add something?
Q Sure.
A I think, to the best of my recollection, that perhaps 30 years ago I was deposed in the capacity of a claims adjuster on a property claim, but more than that --
Q Okay.
A -- I don't know.
Q All right. Ms. Barbee, have you read any legal pleadings of the lawsuit in the case that we are having your deposition in?
A No.
Q Okay. Do you have an understanding of what this lawsuit is about?
A An understanding?
Q Yes. I mean, do you have a, so you might have no



understanding at all or you might have an understanding of what this case is about. Do you have an understanding of what this case is about?
A No.
Q Okay. Do you know John Enos?
A Personally?
Q Yes.
A No.
Q You are familiar with him in the course of your work?
A Yes.
Q Okay. And how do you know him?
A He is a claimant on a couple work comp claims that I administer.
Q Okay. And you understand that Mr. Enos is a Plaintiff in this lawsuit?
A Yes.
Q Okay. Do you know someone by the name of Scott Shick?
A No.
Q Do you know someone by the name of Vicki Sauer -- Victoria Sauer-Lamb?
A No.
Q Do you know -- go ahead. Were you going to say something? I don't want to interrupt you.



A I don't know about Vicki Sauer-Lamb. Did she go by another name?
Q I'm not sure. I know the name that we have is Victoria Sauer-Lamb.
A I don't know that name.
Q Okay. Do you know a person named Norma Santoyo?
A I know of that person.
Q Okay. How do you know of that person?
A Through work.
Q Okay. Was she involved in working with you on a claim involving John Enos?
A I don't recall.
Q Okay. Do you know a person named Sarah Christensen?
A Yes.
Q Okay. Can you tell us who she is?
A She was a contact person that I dealt with at Douglas County regarding worker's compensation claims.
Q Okay. And did you deal with Sarah Christensen regarding a claim by John Enos?
A I can't recall specifically.
Q Okay. How many claims have you worked approximately with Sarah Christensen?
A I couldn't guess.
Q More than 20?

A I'm sure.
**Q Okay. More than 50?**
A Perhaps.
**Q Okay. Do you know what basic time frame you worked with Sarah Christensen on cases?**
A God.
MR. BALKENBUSH: Don't guess. If you, if you don't know just tell him --
THE WITNESS: I don't know.
MR. BALKENBUSH: -- you don't know.
BY MR. GEDDES:
**Q Okay. Do you know a person by the name of Kathy Jo Kidd?**
A I know the name, yes.
**Q And who is that person?**
A She works for Douglas County, I believe.
**Q Have you worked with Kathy Jo Kidd on any claims involving worker's compensation claims for employees at Douglas County?**
A What do you mean by worked with?
**Q Well, have you had any professional relationship with her in the course of performing your job?**
A Perhaps.
**Q Okay. But you don't have any specific recollection?**



A No.
**Q Okay. Do you know a person by the name of Ed Howden?**
A Yes.
**Q Who is that?**
A Ed is a vocational rehabilitation counselor.
**Q And you have retained Ed Howden, your -- ASC has retained Ed Howden in worker's compensation cases before?**
A We have hired him, correct.
**Q And can you just summarize what you hire him to do, typically?**
A We hire him to explain and administer vocational rehabilitation rules and regulations, devise plans, examine the rehabilitation laws as it applies to the injured worker and come up with a plan.
**Q Approximately how many times have you guys, ASC, retained or hired Ed Howden?**
A I cannot speak on behalf of ASC.
**Q How many times do you have personal knowledge of you working with Ed Howden on cases?**
A Five.
**Q Okay. Did Ed Howden --**
A That's a guess.
**Q Okay. Well, I don't want, let's --**
MR. BALKENBUSH: Don't guess.



THE WITNESS: Okay.
MR. BALKENBUSH: If you don't know, just say you don't know.
THE WITNESS: I don't know.
BY MR. GEDDES:
**Q Let's go over one of the admonitions regarding guessing in the ground rules of a deposition. So we're, we're asking for your best recollection --**
A Okay.
**Q -- and any recollection that might be refreshed by looking at documents. What we are not asking you to do is speculate, but where you have an informed basis to offer an estimate, that's perfectly fine.**
**An example that's often given in depositions is if I ask you to look at this conference room table and estimate its length, based on your powers of observation you may be able to do that. If I asked you what the length of the conference room table is at my office, assuming you have never been there, you wouldn't be able to do that without speculating, and you understand the difference?**
A Uh-huh.
**Q Okay.**
A Yes.
**Q All right. And, I'm sorry, I apologize, I don't know if I asked this or not, did Ed Howden work on a case**



**with John Enos that you worked on?**
A Yes.
**Q Okay. Do you know someone by the name of Nathan Tod Young?**
A No.
**Q Do you know someone by the name of Michael Gibbons?**
A No.
**Q Okay. So now in this deposition I will be talking about Mr. Enos' separation of employment from Douglas County. I may refer to it as a separation of employment. I may refer to it as a termination. I may refer to it as him being fired. Even though counsel present may object to that characterization, I'm referring to the same thing when I use those phrases. Can we agree on that?**
A Yes.
**Q Do you understand?**
**Okay. Do you know whether Mr. Enos was fired from his employment at Douglas County?**
A No.
**Q Okay. So you don't have knowledge one way or another as to whether Mr. Enos is currently employed with Douglas County or is separated from employment at Douglas County?**
A Mr. Enos, to my knowledge, is not employed with

Douglas County.
Q Okay. What is your understanding, if you have one, as to why his employment was separated or terminated from the County?
A I have no idea.
Q Okay. Do you believe at one time you had an idea?
A No.
Q All right. Can you describe how you typically interacted with Douglas County? I'm not asking you specifically how you interacted with Douglas County in connection with Mr. Enos, but just in your day-to-day handling claims how as senior claims analyst you interacted with Douglas County regarding worker's compensation matters?
A Correction. I am not a senior claims analyst. I am a senior claims adjuster.
Q Thank you. Okay. Same question, then.
A Could you repeat it, please?
MR. GEDDES: Yes. Can we get a read back, please?

(The question was read by the Reporter.)

THE WITNESS: Do you have a specific question or --
BY MR. GEDDES:
Q Well, that was my specific question.



A Well, there are many aspects of worker's compensation, so.
Q Right. But what I'm interested in is how you interacted with the County, how you communicated with them, how they typically communicated with you, how you advanced your claim. That is what I'm asking you.
A From the beginning of a claim?
Q Generally, yes. I'm not --
A All right.
Q -- asking for minutia, you know, that will take us five hours, but generally speaking.
A Well, generally we request the forms from the County that are required. We request anything that is required by statute from the employer. If they have questions concerning work status, we will provide that to them. We will ask them regarding work status.
Q Does the employer have any input on issues of coverage or is that something determined by ASC?
MR. BALKENBUSH: Object; I'm just going to object to the question as being vague as to coverage.
BY MR. GEDDES:
Q Coverage of a worker's compensation claim. Do you understand what the phrase means?
MR. BALKENBUSH: Objection; the question is overbroad.



BY MR. GEDDES:
Q Do you understand? Let me also give another admonition. I apologize, I didn't know that you only had one or two cases that you testified at.
During this deposition, you are going to hear attorneys make objections, and unless you are instructed not to answer the question, for example, on claims of privilege or, you know, scope of testimony from a Court order, you are still required to answer the question.
Attorneys make objections in depositions to preserve them. So, please, if you are not instructed not to answer and if you understand the question, then please answer it.
MR. BALKENBUSH: That was simply him just --
THE WITNESS: Is that correct?
MR. BALKENBUSH: -- providing you information, sort of an admonition about depositions. So if you have a question, Counsel, and you want to repeat it --
MR. GEDDES: Yeah.
MR. BALKENBUSH: -- my objection will still be the same.
MR. GEDDES: Okay.

(The question was read by the Reporter.)



MR. BALKENBUSH: The objection was overbroad.
BY MR. GEDDES:
Q Do you understand the question? I can ask other questions leading up to it if you don't understand it.
A Coverage regarding what?
Q Okay. So in your job, what you do is claims for potential worker's compensation coverage are presented to ASC, correct?
A Correct.
Q And ASC at some point makes a determination as to whether or not it is a covered claim for worker's compensation, correct?
A Correct. We use the word compensable or compensability --
Q Okay.
A -- rather than coverage.
Q Okay. And so my question is does the employer have any input into any analysis as to whether compensability or compensation is provided?
MR. BALKENBUSH: Again, the question is overbroad. Counsel, there is various aspects of a comp claim where the issue of compensability comes up and so your question is just far too broad.
BY MR. GEDDES:
Q Okay. Do you understand the question?

A Wait, do I answer the question?
MR. GEDDES: If you understand.
MR. BALKENBUSH: If you understand the question.
THE WITNESS: Could you read it again, please?

(The question was read by the Reporter.)

THE WITNESS: That's not really specific. They have input, but the decision comes from me.
BY MR. GEDDES:
**Q Okay.**
A Is that what you are --
**Q Yeah.**
A Is that --
**Q And can you just summarize what the input is. For example, the input may be them giving you documents and then you figuring it out, but I'm not testifying here, so I'm not going to be providing that testimony.**
**So my question would be can you summarize what input the employer has that facilitates the analysis that you provide?**
A Okay. That's better. Thank you.
MR. BALKENBUSH: That was a better, yeah, much better question.
THE WITNESS: Yes. They provide us with forms,



one that they have the employee complete, which is called the C1 form. That's a report, an incident report.
Then they fill out a report called a C3 form, which gives us all of the data on the employer, or not all of the data on the employee with regard to name, address, date of birth, occupation, how long they worked there, their wages, full-time, part-time, that kind of information that we need in order to administer the benefits.
If there is an additional incident report that was completed by the employer, they may provide that information. They provide the wage history. If there is lost time on the claim, they will give us a 12 week summary of the wages listing how much he has earned. That's if there is a lost time claim, that kind of thing.
BY MR. GEDDES:
**Q Okay.**
A Is that what you are looking for?
**Q Yeah. And so the input that the employer provides how is that provided, by e-mail, by mail, by phone call, by all of them?**
A All of them.
**Q Okay. Including faxes?**
A Yes.
**Q Now, how do you receive medical records that are relevant to your analysis? Is that something that the**



**employee provides you or do you get that directly from the medical provider or both?**
A The medical provider.
**Q Okay. And do you share records back to the employer that you receive from medical providers?**
A Some.
**Q Okay. So your involvement in this case with Mr. Enos, your involvement in Mr. Enos' claims was limited to worker's compensation; is that correct?**
A Correct.
**Q And so you didn't proceed on any matter with Mr. Enos with any consideration of the Americans with Disabilities Act; is that correct?**
A Correct.
**Q To your knowledge, did anyone at Douglas County or the State of Nevada, and when I refer to the State of Nevada I'm referring to the entity, the government, who might be considered a co-employer in this case, and I can give you more background on that, if you want me to.**
MR. BALKENBUSH: I'm, I'm going to object to State of Nevada being vague and ambiguous, if you want to be more specific.
MR. GEDDES: Sure. I will be happy to.
BY MR. GEDDES:
**Q In this case, I will just represent to you Douglas**



**County is a Defendant, and separate and apart from Douglas County being a Defendant state actors such as judges or in their administrative capacity are also named as parties, and I will just represent to you as well that the theory of that was that the position that Mr. Enos had as a juvenile probation officer from our perspective, our perspective being the Plaintiffs, implicated two co-employers, the judges who supervised their work in an administrative capacity and Douglas County.**
**So I could ask questions two times or I could just simply say did anyone from the county or the state, and when I ask you a question about the state, I'm just referring to anyone in the judicial courts that may have had supervision over Mr. Enos, and your answer may be I had no involvement or knowledge of the state and that will make things pretty quick.**
**But so I guess what I will do is I will just ask you this, did you have any communications with a Nevada administrator, state administrator in the courts, whether it's the judges or their staff, to your knowledge?**
MR. BALKENBUSH: And, Counsel, just, I just want to make this clear. It may expedite it. You had just previously talked about District Court Judges in Douglas County.
MR. GEDDES: Right.

MR. BALKENBUSH: That's what you were referencing.
MR. GEDDES: Right.
MR. BALKENBUSH: There is also quasi judicial officers that oversee administrative proceedings related to worker's compensation.
MR. GEDDES: Right. I'm not talking about them.
MR. BALKENBUSH: Okay. It was unclear.
BY MR. GEDDES:
**Q Okay. I'm just referring to the Ninth Judicial District Court Judges and their staff to the degree that they had an administrative role over juvenile probation officers, so maybe the best way to do it is this. Did you have any, to your knowledge, did you have any communications with those government, state government officials regarding any matter concerning John Enos?**
A Not to my recollection.
**Q Okay. So then I, I'm not going to phrase my question asking about the county and the state. I'm just going to stick with the county since we have got that.**
**So, to your knowledge, did anyone at Douglas County ever address the question of whether Mr. Enos had a disability under the ADA?**
MS. PARKS: Objection; calls for speculation.
MR. BALKENBUSH: Yeah. Just it's outside of her expertise. You already asked her whether she made any



determinations related to the Americans with Disabilities Act and she said no.
BY MR. GEDDES:
**Q Okay. So just so that we are clear, I'm not asking you to talk about expertise. I'm asking you a simple fact question. To your knowledge, did you communicate -- I'm sorry, to your knowledge did Douglas County communicate to you issues concerning ADA and Mr. Enos?**
A I don't recall.
**Q All right. Do you have any recollection of Mr. Enos' workplace injuries for which you would have worked on claims or did work on claims?**
A It's been quite awhile. I do, I remember that he had something with an upper extremity, but the details I don't remember.
**Q Okay.**
A He had multiple body parts is my recollection that were an issue on his claim.
**Q Okay. Did you have an understanding of what job Mr. Enos had at the time of his injuries?**
A At the time that I administered his claim, yes, I did.
**Q And what was his job, to your knowledge or recollection?**
A He had something to do with the juvenile -- I



couldn't tell you, to be honest.
**Q Okay. Did you at any time ever look up what his job duties were when you were handling his claim?**
A I don't remember.
**Q Is that something that you would typically do when processing a worker's compensation claim?**
A Yes. I might get a job description in order to provide it to the doctor.
**Q And would you get that typically from your, the employer?**
A Yes.
**Q But you don't have any specific recollection regarding Mr. Enos?**
A No.
MR. GEDDES: Okay. So let's look at some documents. Let's go ahead and mark this as Exhibit 1, please.
(Exhibit Number 1 was marked for identification.)
BY MR. GEDDES:
**Q Have you seen this --**
MS. PARKS: Did they make another copy of that?
MR. GEDDES: Have you, have you seen --
MR. BALKENBUSH: That's the exhibit.
MS. PARKS: Oh, okay.
MR. BALKENBUSH: So You can take a quick look at



it.
MS. PARKS: All right. I thought they made an extra copy.
MR. BALKENBUSH: Okay.
MR. GEDDES: They made one extra copy of one last exhibit because it hadn't been copied before.
MS. PARKS: All right.
BY MR. GEDDES:
**Q Have you seen this document before?**
A Yes.
**Q What is it?**
A It's a Notice of Claim Acceptance.
**Q Okay. And it has your name on the bottom, so you wrote this document?**
A Yes.
**Q Okay.**
A I --
**Q Go ahead.**
A It's a form letter.
**Q Okay.**
A I fill in the appropriate identifying information regarding the claim.
**Q Okay.**
A The body of the letter is a form.
**Q Okay. And how is this, how is this produced? Do**

you produce it, drop it in the mail or do you have an assistant who does that?
A I produce the letter, put it in an envelope and put it in the outgoing mail for an assistant to --
Q Okay.
A -- mail it.
Q And so it's not a problem that this isn't signed. Sometimes you wouldn't sign documents; is that correct?
A I don't sign my copies in my file.
Q Okay. So the document that's sent out, is that something that's signed?
A Yes.
Q So the recipient receives it as signed?
A Yes.
Q Okay. Now, does this document confirm that Mr. Enos suffered a workplace injury on or about June 21, 2013?
A This is a Notice of Claim Acceptance for date of injury June 21st, 2013.
Q And this document confirms that Mr. Enos filed a worker's compensation claim for this injury and that claim was accepted; is that correct?
A This is a Notice of Claim Acceptance. We are accepting his claim for date of injury June 21st, 2013, for the body parts that are specified in the upper right-hand



corner.
Q Okay. And so when you say accepting, that's in comparison to rejecting?
A Or denying, correct.
Q Okay. Now, on the bottom of this document there is a list of cc and it says File. Employer: Douglas County. Treating physician: SHC MCO. What, what does that signify?
MR. BALKENBUSH: Which of those are you referring to, Counsel?
BY MR. GEDDES:
Q We can go through each line. File, we can do one-by-one.
A File is my file copy.
Q Okay.
A Employer is Douglas County.
Q Okay.
A Goes to Douglas County. Treating physician CVMC is Carson Valley Medical Center Occupational Med and SHC MCO is Specialty Health Clinic, Manage Care Organization.
Q Okay. Now, you made this document in the course, regular course of your business activities at ASC, correct?
A Correct.
Q And it was a regular practice of yours to make these types of documents at ASC, correct?



A Correct.
Q And this document was made at or near the time or the date of the document July 10th, 2013; is that correct?
A Correct.
MR. GEDDES: Okay. I would like to look at the next exhibit.
(Exhibit Number 2 was marked for identification.)
BY MR. GEDDES:
Q Okay. I'm, basically, going to ask the same types of questions before so, as before. You have seen this document before?
A Yes.
Q And you wrote this document?
A Yes.
Q And this is -- well, maybe you could just summarize what this is. It would be faster.
A It's the same as, it's, the subject matter is a Notice of Claim Acceptance; however, this one is for a different date of injury. This one is for date of injury June 17th, 2014, and it is for other body parts than the one from the injury in 2013. Same thing.
Q Okay.
A It's a Notice of Claim Acceptance.
Q And so the cc at the bottom, your answer would be the same as it was for the last one?



A Yeah. It doesn't show who the treating physician was that I cc'd it to and SHC is Specialty Health Clinic, so.
Q Okay. So this document confirms that Mr. Enos pursued a worker's compensation claim for an injury occurring on June 17, 2014, correct?
A Correct.
Q And that this claim was accepted?
A Correct.
Q Okay. Now, the same questions I had before, this document -- one second here.
This document was made in the course of ASC's regularly conducted business activity?
A Yes.
Q And it was the regular practice of ASC to make these claim acceptance notices?
A If we accept the claim, yes.
Q Right. And this notice was made at or near the date of the document, July 18, 2014?
A Yes.
MR. GEDDES: Okay. Next document, Exhibit 3.

(Exhibit Number 3 was marked for identification.)
BY MR. GEDDES:
Q All right. Have you seen this document before or

the electronic versions of it?
MR. BALKENBUSH: Give her a second to --
MR. GEDDES: Okay.
MR. BALKENBUSH: -- review it. This has a top half and a bottom half.
THE WITNESS: It looks like a copy of an e-mail, yes.
BY MR. GEDDES:
Q So the bottom part reads that it's from Sarah Christensen --
A Uh-huh.
Q -- to Karen Barbee. Do you recall receiving this e-mail?
A No.
Q Do you have any reason to doubt its authenticity?
A No.
Q Okay. And your e-mail at ASC is listed correctly at the top of Exhibit 3, Karen.Barbee@asrisk.com?
A Yes.
Q Okay.
A It's, wait, ASCrisk.
Q ASCrisk.com?
A Uh-huh.
Q Okay. Sarah Christensen writes in this e-mail, "Hi, Karen. John Enos has exhausted his FMLA. We are



looking for information on where he is in the worker's comp process, when he might be evaluated to see if he will be able to perform his job duties or not."
Do you have an understanding as to what that means?
A Well --
MS. PARKS: I'm going to object; calls for speculation.
MR. BALKENBUSH: Maybe you might want to lay a foundation if she knows what the acronym is and --
BY MR. GEDDES:
Q Well, do you know what FMLA is?
A I have a general understanding of it only.
Q Okay.
A Not specifically.
Q What is your general understanding of it?
A I believe it stands for Family Medical Leave Act.
Q Okay. And was it uncommon for Sarah Christensen to ask you for a status update on the work you were doing on a claim for a given employee at Douglas County?
A Was it --
Q Uncommon?
A No.
Q Okay. So do you have an understanding as to what it means to have John Enos evaluated in connection with



what's written here?
MS. PARKS: Objection; calls for speculation.
MR. BALKENBUSH: Yeah. It calls for state of mind of Sarah Christensen.
BY MR. GEDDES:
Q So I'm not asking you as to whether you are right or wrong. I'm asking you whether you had an understanding and that would come from your mind. Does that make sense?
A I'm sorry, can you say that again, please?
Q Yeah. Do you have an understanding of what it means when an employer asks you when a claimant might be evaluated, does that mean anything to you?
A I can tell you what I believed that Sarah was asking --
Q Okay.
A -- in this. She was asking when a doctor would evaluate him.
Q Okay. And at the very top there is a response from you, correct?
A Correct.
Q And it says, "Hi, Sarah. I would prefer to give you a better estimate after we received, after we receive Dr. Morales' report. If he has shoulder surgery, it will probably be 6 more months at the least, unless the County has light duty for him. Right now he is TTD for the wrist."



So let me take the first sentence, "I would prefer to give you a better estimate after we receive Dr. Morales' report." What does that mean?
A It means I'm relying on the doctor's information to pass onto the employer, so I believe that Mr., by me saying this I believe that Mr. Enos treated with a doctor by the name of Dr. Morales and I had not yet received an updated report, so I wanted to have Dr. Morales' report to determine the nature and extent of his disability.
Q Okay. And then the next sentence reads, "If he has shoulder surgery, it will probably be 6 more months at the least." Is that saying that if he has shoulder surgery you would not be able to have a better estimate for 6 more months?
A I don't recall what I meant by that, honestly.
Q Okay. And then you write, "Unless the County has light duty for him." What did that mean?
A Well, sometimes employees may have surgery. That doesn't mean that they can't return to a light duty position. So I was not able to tell her what his actual work status was at the time that this e-mail went forward. I needed to have more information from Dr. Morales.
So all I could say was he was temporarily totally disabled for a different body part than what he was seeing Dr. Morales for and it looks like he may have shoulder

surgery, so we are talking about two different things here.
And I can't, I cannot go back three and a half years and remember all of the specifics that were intended by short little e-mails.
**Q Can you tell me a little bit more about what, what the significance of light duty is? You obviously are working the worker's compensation claims and you gave your testimony earlier about light duty, but do you have communications with your, with the employers about light duty?**
A Sure.
**Q Can you summarize that? And this is typically. I'm not asking you specifically about Mr. Enos.**
A Sure. Every employer deals with light duty differently. It's been my experience that some employers have, are able to temporarily accommodate a light duty position with anticipation that the employee would be able to return to work unrestricted.
Some employers do not have any temporary positions to accommodate the temporary restrictions, so every employer is different, and I can't tell you what was going on here. I don't remember.
**Q Did you have any, do you typically have any input as to light duty or is that something the employer deals with?**



A The employer, that's, that's a personnel issue that the employer has to deal with. We give them the restrictions and ask them whether or not there will be an accommodatable position for him and temporarily sometimes, permanently sometimes.
**Q And then the employer typically contacts you and gives you a follow-up on that?**
A Yes, typically.
**Q So this is Exhibit 3.**
**Do you recall having any communications with Douglas County, anyone at Douglas County about light duty for Mr. Enos?**
A No.
MR. BALKENBUSH: Objection; the question is vague as to time.
BY MR. GEDDES:
**Q At any time?**
A I don't remember.
MR. GEDDES: Okay. So I would like to mark the next exhibit. Is that going to be 4?
(Exhibit Number 4 was marked for identification.)
BY MR. GEDDES:
**Q Okay. Have you seen this document before?**
A I don't know.
**Q Okay.**



A It has my date stamp on it, so --
**Q Okay.**
A -- I'm assuming I did.
**Q Your date stamp is at the bottom that says received by --**
A Yeah.
**Q -- Karen Barbee?**
**Okay. How does that date stamp get on the document, do you know?**
A Electronically.
**Q Is that something that you do or once it's in your e-mail system the system does that?**
A Something I do when I receive it by some electronic means.
**Q Okay. And what purpose would there be in you receiving this document? What, what does it help you do on your claim receiving this document?**
A It helps me determine whether or not I should pay him temporary disability benefits.
**Q Okay. And this document is dated, it's dated January 28, 2015, correct?**
A Correct.
**Q And it says that -- and this involved Mr. Enos, correct?**
A It's identified as such, yes.



**Q And this document states that he may return to work with certain restrictions; is that correct?**
A Yes.
**Q And those restrictions are light duty January 29, 2015, for three weeks; is that correct?**
A Correct.
**Q And when he is on light duty, he is to lift less than 18 pounds with his right upper extremity; is that correct?**
A Correct.
**Q And that's what you would have interpreted this document to read?**
A Yes.
**Q Okay. And then below that it reads, "Return to full duty in approximately 3 weeks," is that correct?**
A Yes.
**Q And that's what you would have interpreted this document to mean?**
A Yes.
**Q Do you recall having any communications -- This is from Dr. Eisenhauer, correct?**
A Yes.
**Q Do you recall having any communications with anyone at Douglas County regarding this document?**
A I don't recall.

Q And do you recall having any communications with anyone at Douglas County regarding the information contained in this document?
A I don't recall.
MR. GEDDES: Okay. Mark the next exhibit, please.

(Exhibit Number 5 was marked for identification.)
BY MR. GEDDES:
Q Have you seen this document before?
A No.
Q Do you recognize the handwriting of this document?
A No.
Q Do you have any knowledge about Mr. Enos being on leave? You talked about the leave in the last exhibit, him returning. Do you have any recollection of him being on leave?
A No.
Q Do you have any recollection of whether -- go ahead.
A When you say leave, what do you mean?
Q Well --
A He was on temporary total disability.
Q Okay.
A That's what I --
Q Let's go back to Exhibit 4, if we can. This talks



about him returning to work, so I'm, I'm referring to the phrase leave as he is not at work. He is away from work on some leave. I'm not characterizing it as FMLA or otherwise. I'm just saying he is not at work. He is on leave.
And so my question to you is do you have any recollection of Mr. Enos attempting to return from leave back to work?
MS. PARKS: Objection; calls for speculation.
BY MR. GEDDES:
Q At this time frame in or about January and February -- December, January, and February of 2015?
MS. PARKS: Same objection.
THE WITNESS: Oh, am I still required to answer?
BY MR. GEDDES:
Q Yeah. They are preserving objections for their own reasons.
A You know, it's so long ago, I don't remember. I see this document, yeah, I obviously saw this document three and a half years ago. Anything else surrounding that --
Q Well, I'm asking a question as far as anything surrounding it. Part of what I'm doing here is asking you specific questions --
A Okay.
Q -- to see if you recall.
A Say it again, please.



Q Yeah. To your knowledge, did Mr. Enos attempt to return to work in or about December, January or February -- December or, December of 2014 or January to February of 2015?
A I don't --
MS. PARKS: Objection.
THE WITNESS: -- recall.
MS. PARKS: Objection; calls for speculation.
BY MR. GEDDES:
Q Okay. Do you have any information, do you recall any information about Mr. Enos attempting to return to work in that time frame?
MS. PARKS: Objection.
THE WITNESS: I don't recall.
MS. PARKS: Objection; calls for speculation.
BY MR. GEDDES:
Q Do you recall whether Mr. Enos at any time did light duty in the County Library relating to any of the claims that you worked on?
A I don't recall.
MR. BALKENBUSH: Are you done with Exhibit 5, Counsel?
MR. GEDDES: Yeah, I'm done with Exhibit 5. Oh, here you go, Kathy.
///



BY MR. GEDDES:
Q Do you recall having communications with anyone at the County regarding whether Mr. Enos could return to work in that time frame?
MR. BALKENBUSH: She doesn't have anything in front of her. What time frame again?
MR. GEDDES: It's December --
MR. BALKENBUSH: December 2014, January, February, 2015?
MR. GEDDES: Yes.
MR. BALKENBUSH: Okay.
THE WITNESS: Do I recall?
BY MR. GEDDES:
Q Yes.
A No.
MR. GEDDES: Okay. So let's look at the next exhibit, Exhibit 6, I believe.

(Exhibit Number 6 was marked for identification.)
BY MR. GEDDES:
Q Okay. I will represent to you that this document was produced by Douglas County in the course of discovery of this case and it represents positions that Douglas County had open or were interviewing for during various date ranges.

**To your knowledge, did you or anyone at Douglas County evaluate whether Mr. Enos was qualified to be transferred to other jobs?**
MS. PARKS: Objection; calls for speculation.
MR. BALKENBUSH: Counsel, she doesn't work for Douglas County. She works for ASC. You can ask her --
MR. GEDDES: I'm aware of that. I'm asking for her knowledge.
BY MR. GEDDES:
**Q You can answer the question.**
MR. BALKENBUSH: Repeat the question.

(The question was read by the Reporter.)

THE WITNESS: I can only speak for myself.
BY MR. GEDDES:
**Q Okay.**
A I did not see this. I have no knowledge of this.
**Q Okay. Did, but did you --**
A And at what point in time are you speaking?
**Q I'm, I'm saying at any time --**
A At any time.
**Q -- did you evaluate whether Mr. Enos was qualified to work at another job at Douglas County?**
A No. That's not part of my responsibilities.



**Q That's fine. I'm just asking for your testimony. Now, does this document -- I'm almost done with 5 -- does this document seem familiar? Have you, have you looked at Douglas County listings of job positions opening, job openings?**
A No.
**Q Okay. And then my last question is did, did anyone at Douglas County communicate with you regarding trying to find other jobs for Mr. Enos at Douglas County?**
A I don't recall.
MR. GEDDES: Okay. So this is 6. Here you go, Kathy. All right. Mark this as 7, please.
(Exhibit Number 7 was marked for identification.)
BY MR. GEDDES:
**Q Have you seen this document before?**
A I don't remember ever seeing it.
**Q Okay. Did you have any communications with anyone at Douglas County regarding Mr. Enos being on family medical leave?**
A I don't recall.
**Q Do you have any recollection of having any communications with anyone at Douglas County regarding the expiration of Mr. Enos' FMLA?**
A I don't recall.
**Q Well, we looked at an exhibit earlier.**



A Right.
**Q Do you, you don't have any, doesn't refresh your recollection?**
A No.
**Q Do you have any -- Did Douglas County communicate with you regarding terminating Mr. Enos for an unauthorized absence pursuant to any of the Douglas County codes?**
A I don't recall.
MR. GEDDES: Okay. This is 8.

(Exhibit Number 8 was marked for identification.)
BY MR. GEDDES:
**Q Now, I will just say that there are two separate pages for this exhibit. Have you ever seen this document before?**
A I'm not certain. I will elaborate a little on that answer, if I may.
**Q All right.**
A This might be something that I would have requested to provide the vocational rehabilitation counselor, but I'm not certain.
**Q You don't recall --**
A Or, or not to the vocational rehabilitation counselor, to the doctor. I, I don't really know.
**Q Okay.**



A But it's not unusual for me to have a job description.
**Q But you don't have any particular recollection of --**
A Correct.
**Q -- looking at this document?**
A Correct.
**Q And stated differently, you don't have a particular recollection of looking at Douglas County's job description for a Senior Juvenile Probation Officer?**
A Correct.
MR. GEDDES: Okay. Let's take a look at the next exhibit. Is that Number 9?
(Exhibit Number 9 was marked for identification.)
BY MR. GEDDES:
**Q All right. Have you seen this document before?**
A I don't, it does not look familiar to me.
**Q Okay. This document addresses Mr. Enos' return, attempt to return to work, but unable to get a full release from his doctor over the President's Day weekend. Does that subject matter ring a bell as to anything you had a communication with --**
MS. PARKS: Objection.
MR. GEDDES: -- at Douglas County?
MS. PARKS: Objection; lack of foundation.

BY MR. GEDDES:
Q Did you have any communications with Douglas County regarding an ultimatum given by the County that he had to have full releases to return to work?
MS. PARKS: Objection; lack of foundation.
THE WITNESS: I don't remember.
BY MR. GEDDES:
Q And do you have any recollection of Mr. Enos requesting an extension of time in order to get information from his doctors regarding an ability to return to work full duty as a probation officer?
A I don't recall.
Q So let me say it this way. You have no recollection about any of the matters that are listed on this document; is that correct?
A Three and a half years ago, no, I do not.
Q And you are not recalling any communications by the County regarding these matters; is that correct?
A Correct.
MR. GEDDES: Okay. Let's take a look -- Oh, Kathy, there you go. Let's take a look at Number 10.

(Exhibit Number 10 was marked for identification.)
BY MR. GEDDES:
Q I will just let you know these are two separate



documents. Okay. Let's take a look at the first page. Well, I will just save time. Have you seen these documents before, the first page or the second page?
A Yes.
Q Okay.
A Uh --
Q Go ahead. All right. Can you tell us what these separate pages are?
A These are work status reports.
Q Okay. And the first one is provided by Dr. Morales, correct?
A Correct.
Q Concerning Mr. Enos?
A Yes.
Q Now, at the very bottom of this document there appears to be I can read as the bottom half of your name Karen Barbee next to the word scanned 2/18/2015; is that correct?
A Correct.
Q Okay. So you, you received this document?
A Correct.
Q Okay. And what, how would this document have informed your processing of Mr. Enos' claim?
A It would depend on what his work status or what his disability status was as far as receiving temporary



total disability benefits or temporary partial disability benefits, or whatever form of disability benefit he might have been receiving through worker's compensation, this may have had an effect.
Q So the top of this document reads Return to Work.
A Uh-huh.
Q Does this document indicate when he is able to return to work?
MR. BALKENBUSH: Doesn't the document speak for itself, Counsel?
MR. GEDDES: Well, I'm asking, I'm asking the witness whether she can ascertain from this document when there is a return to work.
THE WITNESS: The date of the appointment is the only thing I can tell you --
BY MR. GEDDES:
Q Okay.
A -- on this, which is 2/17/15 at 6:00 PM is when this issued.
Q And so this is a return to work as of the date it was written with the light duty restrictions of lifting up to 50 pounds; is that correct?
A I --
Q Where it says employee?
A -- can only tell you what it says.



Q Well, I'm interested in what it meant to you.
A What it meant to me?
Q Yeah. "Employee is unable to," and then it has, "Lift greater than 50 pounds."
A Oh, that?
Q Yeah.
A Yes, what it says.
Q Okay.
A Uh-huh.
Q And that no pushing and the 50 pound sign, that to you meant no pushing over 50 pounds?
A Correct.
Q And no pulling over 50 pounds?
A Correct.
Q And no overhead shoulder lifting not greater than 35 pounds?
A Correct.
Q And he was able to do above the shoulder lifting?
A Yes.
Q And his condition was not stable and not ratable?
A Correct.
Q Okay. And did you evaluate whether this release was compatible with his job duties such that he could return to work with this release?
A I don't do that evaluation.

Q Okay. Let's go to the next page. You received this document on February 18th as indicated by the ASC stamp on the --
A Correct.
Q -- bottom right?
Okay. And this was from Dr. Eisenhauer?
A That's what it says.
Q Okay. And this document indicates that he may return to work unrestricted as of the date today, the date being 2/18/15. That would have been your understanding, correct?
A Correct.
Q Now, there is a handwriting at the top that says, "Fax to Norma Santoyo." Do you know whether this document was faxed to Norma Santoyo?
A No, I do not know.
Q Okay. You testified earlier that when you receive documents from doctors you would forward them onto the client. Do you have any reason to suspect you did not forward these onto the client? The client being the employer.
MS. PARKS: I'm just going to object that it misstates her testimony to the extent that it implies she indicated all documents of any kind.
///



BY MR. GEDDES:
Q So do you understand my question? My question is your prior testimony stated that typically you would forward medical records to the employer. My question to you is do you have any specific recollection of faxing or sending these to the employer?
A No. That's not my writing.
Q No, I'm not saying that's your writing.
A Yeah.
Q Do you have any reason to believe that the practice that you ordinarily followed whereby you sent documents to the employer was not followed here?
A No, I have no reason, no reason not to believe, how does that -- Could you read the question again?

(The question was read by the Reporter.)

THE WITNESS: No.
BY MR. GEDDES:
Q Okay. Do you recall having any conversations with anyone at Douglas County regarding these documents?
A No.
Q Do you recall receiving any e-mails from anyone at Douglas County regarding these documents?
A The ones you are holding in your hand?



Q Yes. I'm referring to Exhibit 10.
A No.
Q Okay. Do you know whether Mr. Enos returned to work pursuant to the medical releases of Exhibit 10?
A I don't recall.
Q And you don't recall any communications with Douglas County, anyone from Douglas County about Mr. Enos' return to work based on the information contained in Exhibit 10?
A That is correct.
MR. GEDDES: Okay. All right. Let's go ahead and mark as the next document Exhibit 11.
(Exhibit Number 11 was marked for identification.)
BY MR. GEDDES:
Q These are two separate letters.
Okay. Have you seen either letter of Exhibit 11?
A Not to my recollection.
Q Okay. The first letter is a letter from Scott Shick, Chief Juvenile Probation Officer, to Mr. Enos dated February 19, 2015, where he writes he has received and seriously considered Mr. Enos' request for a leave of absence dated February 17, 2015, and after considerable deliberation that request was denied.
Do you recall having any communications with anyone at Douglas County regarding this matter?



A No.
Q The next page, please, you testified you have not seen this document either; is that correct?
A Correct.
Q Okay. This document is from Scott Shick, Chief Juvenile Probation Officer, to Mr. Enos dated February 20th, and the letter states in part that due to his absence from work for three consecutive days the Douglas County Juvenile Probation Office accepted his resignation pursuant to certain regulations, and it requests that Mr. Enos contact him to remove, to arrange the removal of his personal items from Juvenile Probation and the return of County property.
Do you recall having any communications with anyone about these matters?
A No.
Q Do you have any knowledge about these matters?
A No.
Q Isn't it true that you held the opinion in or about February of 2015 that Mr. Enos was qualified to return to his job at Douglas County?
A I can't recall something that long ago.
MR. GEDDES: Okay. Let's go ahead and mark the next exhibit, Exhibit 12.
(Exhibit Number 12 was marked for identification.)
///

BY MR. GEDDES:
Q The second page is the same as the first.
A It looks like it.
Q Just different Bate stamp.
A Yeah.
Q All right. You wrote this document, correct?
A Correct.
Q And this document was made in the course of ASC's regularly conducted business activity?
A Yes.
Q And it was the regular practice of ASC to write letters concerning these matters?
A Yes.
Q And it was made at or near the time of the date of this document, February 24, 2015?
A Yes.
Q And Douglas County is cc'd on this document, correct?
A Correct.
Q Now, the -- do you know who at Douglas County received this?
A No.
Q So the letter states in paragraphs 1 and 2, "A review of your claims referenced above indicates that you have been given a full duty release from Dr. Eisenhauer



effective 2/18/15, and Dr. Morales has decreased your restrictions to no lifting greater than 50 pounds, no pushing greater than 50 pounds, no pulling greater than 50 pounds, no overhead lifting greater than 35 pounds effective 2/17/15." Did I read that accurately?
A I believe so.
Q Okay. The second paragraph reads, "We have been advised that the restrictions given by Dr. Morales are compatible with your regular job duties. As such, you are no longer eligible for temporary total disability benefits. No further TTD payments will be made."
So are you saying in this paragraph that Mr. Enos as of February 17th, 2015 was -- his restrictions had been modified sufficiently to allow him to return to his job at Douglas County?
A As of 2/17 on one body part or another, because it wasn't until 2/18 -- he had two, he had different doctors. He was treating for one body part with Dr. Morales and he was treating with Dr. Eisenhauer for a different body part, so Dr. Eisenhauer released him on 2/18, and by this letter it says that Dr. Morales released him with restrictions effective 2/17.
Q So your testimony, then, is that he was medically cleared to return to work by February 18th, 2015?
A With restrictions that were -- yes. Well, would



you ask me a question?
Q I thought I did. So by February 18th his medical restrictions were sufficient to allow him to return to his job as a Senior Juvenile Probation Officer in Douglas County, correct?
A Correct, based on the information I had.
Q Okay. Now, where did you get that information?
A From the work statuses that were provided.
Q You are referring to Exhibit 10? And I will let you look at Exhibit 10 to make sure.
A Most likely.
Q Okay. Did you have any communications with Douglas County regarding that?
A I don't recall.
Q All right. And at the time of this letter, February 24th, did you know that Mr. Enos had been separated from his employment at Douglas County?
A No, I don't know.
Q Well, no or you don't know?
A I don't recall.
Q So the purpose of this letter was to notify Mr. Enos that no further TTD payments would be made to him based on the fact, based on the other language in this letter; is that correct?
A That's correct.



Q Did anyone at Douglas County respond to you after receiving this letter with respect to offering any disagreements about anything in your letter?
MS. PARKS: Objection; lack of foundation.
THE WITNESS: I don't recall.
MR. GEDDES: All right. Let's mark this as Exhibit 13, please.

(Exhibit Number 13 was marked for identification.)
BY MR. GEDDES:
Q Okay. Have you seen this document before or in any electronic form?
A Well, I assume when I wrote it.
Q Well, parts of this appear to be written by you.
A Correct.
Q That would be the part that says, it's about the middle of the page downward, Karen J. Barbee?
A Right.
Q Sent Monday, February 23rd at 8:20 a.m. to Sarah Christensen regarding John Enos. Now, do you recall, having read this does this refresh your recollection about any of the matters contained in this e-mail?
A It refreshes my memory only with regard to what this says.
Q Okay. And so can you tell me what your refreshed

**recollection is about what this says?**
A You want me to read it to you?
MR. BALKENBUSH: I think what she said, Counsel, is that --
BY MR. GEDDES:
**Q No, I don't want you to read it. What is your, okay --**
A My recollection is limited to what this says.
MR. GEDDES: Okay.
MR. BALKENBUSH: Right.
MR. GEDDES: So --
MR. BALKENBUSH: It's limited to the document, in other words.
MR. GEDDES: So --
THE WITNESS: Yes.
BY MR. GEDDES:
**Q All right. So let's do it this way, then. The part that you wrote to Sarah, why did you write that?**
A Because I had documents from the doctors that we previously referenced in this deposition.
**Q Okay. And so it says, "I realize he was terminated last week."**
A Okay.
**Q So as of February 24th you were aware that he was already terminated?**



MS. PARKS: Objection; lack of foundation.
BY MR. GEDDES:
**Q The foundation being DC001497, paragraph 2, quote, "I realize he was terminated last week, but I need to determine if we will continue his TTD and to document whether or not he would be able to return to work with these restrictions," unquote.**
MS. PARKS: Lacks foundation, and I'm going to object. It calls, calls for speculation on the part of this witness as to the manner of the separation of employment of John Enos from Douglas County.
BY MR. GEDDES:
**Q You wrote the words, "I realize he was terminated last week," correct?**
A Correct.
**Q Okay. Now, do you recall how you, how you learned he was terminated?**
A No.
MS. PARKS: Same objection.
BY MR. GEDDES:
**Q And when you wrote, "I need to determine if we will need to continue his TTD and to document whether or not he would be able to return to work with these restrictions," what did you mean?**
A Well, I don't know how to explain this. Personnel



issues, work comp issues, separate. In order to provide Mr. Enos with temporary total disability benefits, he would not have been able to return to work.
I was merely trying to find out, I'm basing my statement here on this document, whether or not the restrictions that were set forth by Dr. Morales, if I recall correctly on that document, were accommodatable regardless of whatever else was going on, because it's a separate issue.
**Q Are you asking in part in this paragraph that says I realize and it ends with the words these restrictions, are you asking in part I know he was terminated, but can he return to work? Aren't you asking that question?**
A I'm asking if these restrictions fit in with his job duties, if he could have worked with these restrictions.
**Q Well, when you write, "And to document whether or not he would be able to return to work with these restrictions --"**
A Correct, document my file.
**Q Are you asking them, he has been terminated, but can he return or are you presuming he can't return and you just want to document your file? I'm not understanding --**
A No, I'm --
**Q -- what your testimony is.**
A Okay. I'm not explaining this correctly, then.



An injured worker is entitled to receive temporary total disability benefits if he is temporarily totally disabled. His right to those benefits terminate if he is released to return to work, and even if he is released to return to work with restrictions, if those restrictions are compatible with his job duties, so that's all I was asking.
**Q So you are asking if the work restrictions enable him to return to work and do his duties as a Senior Juvenile Probation Officer?**
A Yes.
**Q And then it reads, "Do these restrictions fit in with his usual and customary job duties? Based on Dr. Morales' note the restrictions fit within his usual and customary job duties."**
**Now, when you wrote that --**
A I didn't write that.
**Q You didn't write that?**
A That's a response from the employer.
**Q Well, how do we, how do, how do you know that? I'm confused. I don't see a break in the e-mail.**
A Well, in Norma Santoyo's response, she says, "Please see below response," so I, I asked the question and they were responses from her.
**Q Okay.**
A So her response. I wrote, "Do these restrictions

fit within his usual and customary job duties?"
**Q Okay.**
A Then I'm assuming that it was Norma who composed this e-mail wrote, "Based on Dr. Morales' note, the restrictions fit within his usual and customary job duties. However, the note from Dr. Eisenhauer dated 2/10/15 indicate weight restrictions of less than 10 pounds."
**Q Okay. So let's pause for a second here. Your question related to Dr. Eisenhauer's --**
A No. I'm sorry, I didn't let you finish your question.
**Q Okay. All right. You previously testified that Dr. Eisenhauer with regard to Exhibit 10 gave Mr. Enos an unrestricted release. That's on Exhibit 10.**
MR. BALKENBUSH: That's Dr. David Eisenhauer, yeah, not Dr. Morales.
MR. GEDDES: No, I know. I think I said Dr. Eisenhauer.
BY MR. GEDDES:
**Q Right? Correct?**
A What was your question?
**Q My question is, is when you sent this e-mail you are specifically referring to Dr. Morales, but you had already received Dr. Eisenhauer's release that's part of Exhibit 10 at DC1496, correct?**



A I had already received that when?
**Q This is dated 2/18.**
A Correct.
**Q Your e-mail is about a week later.**
A Right.
**Q 2/24. What I'm saying is by the time of this e-mail in Exhibit 13 you had already received Dr. Eisenhauer's release on the second page of Exhibit 10?**
A The date stamp from ASC is this date, correct.
**Q Okay. So what's being quoted back to you presumably by Norma Santoyo is Dr. Morales' note restrictions, I'm sorry, Dr. Eisenhauer's weight restrictions have a different date, February 10th, which was about a week earlier than the release given in Exhibit 10. Are you following what I'm saying?**
A I'm following what you are saying, yes.
**Q Okay. So does it appear to you, then, that the person who wrote this is citing the incorrect release from Dr. Eisenhauer?**
A I would not know.
**Q Did you follow up with in a follow-up response to correct that saying, no, wait a minute, Dr. Eisenhauer actually had a later one where he gave a release with no restrictions. Did you do that?**
A I don't recall.



MR. BALKENBUSH: Are you done with 13, Counsel?
MR. GEDDES: Oh, I don't know yet.
MR. BALKENBUSH: Okay.
MR. GEDDES: Still looking.
MR. BALKENBUSH: All right.
BY MR. GEDDES:
**Q Now, you based your letter to Mr. Enos, Exhibit 12, on the information you received in Exhibit 13; is that correct?**
A Would you ask the question again, please?
MR. GEDDES: Sure. Can you please read that back?

(The question was read by the Reporter.)

THE WITNESS: I, I based my letter of -- I'm looking at two different documents here, so could you read it again, please?
(The question was read by the Reporter.)

THE WITNESS: I can't answer that. I don't know.
BY MR. GEDDES:
**Q Did you --**
A I'm, I'm stating, I'm stating what I'm stating in this letter. I don't know.
**Q What informed you, did Exhibit 13 inform you to**



**write Exhibit 12?**
A Say that again, please.

(The question was read by the Reporter.)

THE WITNESS: I don't know.
BY MR. GEDDES:
**Q Did you retract your -- go ahead.**
A I can only, you don't want me to assume. You want, you want me to recall things that are a very long, that occurred a very long time ago. I'm not trying to be argumentative, but I'm, I'm saying we have been advised the restrictions given by the doctor are compatible with your regular job duties.
This says based, an answer from Norma Santoyo, based on Dr. Morales' note the restrictions fit within his usual and customary job duties, okay, and I'm saying that in this letter that doctor, so I just don't --
**Q Okay. So --**
A -- understand where you, what your question is.
**Q Well, you in Exhibit 12, you are quoting Dr. Eisenhauer's release of up to 50 pounds and Dr. Morales', one second here, I'm sorry, you in your letter of Exhibit 12 you are quoting both Dr. Eisenhauer's February 18th release, which was a full duty release**

according to what you wrote, and you are also citing Dr. Morales' February 17th release which gives lifting restrictions up to 50 pounds. You are doing that in Exhibit 12, would you agree?
A Correct.
Q Okay. And yet Exhibit 13 indicates that Dr. Eisenhauer had a weight restriction of less than 10 pounds. Do you see that in Exhibit 13?
A I see that that is what Norma Santoyo wrote.
Q That's correct.
A Yes, I see that.
Q Do you believe that what she is writing is incompatible? When she is citing Eisenhauer's February 10th restriction with the restriction you cited in your letter is there a conflict in your mind? Did you pick up a conflict between what you are writing in Exhibit 12 and what was written in Exhibit 13?
MR. BALKENBUSH: As to what, Counsel?
BY MR. GEDDES:
Q As to the specific matter of Dr. Eisenhauer's release, weight restrictions release?
A Well, I didn't ask Sarah, who I sent the e-mail to, Norma responded, but I sent the e-mail to Sarah, I didn't ask anything about Dr. Eisenhauer's full release, so I'm basing my letter on the releases that I have and the



fact that I was told that the restrictions that Dr. Morales provided were compatible.
Q And you don't recall ever communicating back to anyone at Douglas County words to the effect, hey, you guys are citing Dr. Eisenhauer's --
A No.
Q -- 2/10 release with the weight restriction of less than 10 pounds, but what about Dr. Eisenhauer's 2/17 release which allows him to lift up to, or 2/18 release which allows him to lift up to 50 pounds?
A I don't recall.
Q And so knowing that the County had written this, you went ahead and wrote this letter denying TTD benefits; is that correct?
A Correct.
Q Did you ever attempt to evaluate whether or not the position you took on TTD was incorrect and should be pulled back?
A I don't understand your question.
Q When, when you make a determination that your TT benefits, I will use the language of your letter, no further TTD benefits will be made. There, there is an appeal process to that, correct?
A Correct.
Q Okay. And through that appeal process the matter



might get overruled; is that correct?
A It could.
Q Do you recall whether that happened here?
A No.
MR. GEDDES: Okay. Let's mark as the next exhibit, is it 14?
(Exhibit Number 14 was marked for identification.)

MR. BALKENBUSH: Give her an opportunity to look at it.
MR. GEDDES: Sure.
THE WITNESS: Okay.
BY MR. GEDDES:
Q All right. Do you recognize this document?
A Oh, sort of. I mean, I'm sure I got it.
Q This document is a court administrative hearing officer's order that reversed your --
A Right.
Q -- decision to terminate Mr. Enos' TTD benefits.
A Right.
Q Is that correct?
A Correct.
Q And how are you able to maintain this position that you did in the letter of Exhibit 12 -- never mind on that question.



After you received this order, after this order was handed down in early April, April 1, 2015, did you have a communication with Douglas County about rehiring Mr. Enos?
A Oh, I don't recall.
MR. BALKENBUSH: Would this be a good place for a break?
MR. GEDDES: We are almost done.
MR. BALKENBUSH: Okay. Good.
MR. GEDDES: Rather than do that.
MR. BALKENBUSH: Good. Are you all right, Ms. Court Reporter?
THE COURT REPORTER: (Nods head).
BY MR. GEDDES:
Q Did you, do you have any information concerning Mr. Enos' attempts to be rehired by the County in any capacity after he was terminated?
A Do I remember?
Q Do you have any information about that?
A I don't know. I don't recall anything.
MR. BALKENBUSH: And the question, Counsel, is in her capacity as the adjuster of Mr. Enos' claims?
BY MR. GEDDES:
Q I'm just asking if you have any knowledge, any information?
A (Shakes head).

**Q So your answer is no --**
A My answer --
**Q -- or you don't recall?**
A -- would be, no, I don't recall.
MR. GEDDES: Okay. Let's just pause for one second.
THE VIDEOGRAPHER: Do you want to go off the video record?
MR. BALKENBUSH: Yes.
MR. GEDDES: That's fine.
THE VIDEOGRAPHER: The time is 2:38.

(Whereupon a break was taken from 2:38 p.m. to 2:43 p.m.)

THE VIDEOGRAPHER: This is the beginning of media number two in the continuing deposition of Karen Barbee. Back on the video record at 2:43.
BY MR. GEDDES:
**Q Okay. Ms. Barbee, I'm holding Exhibit 12 again and I will show it to you in just a second. That's the letter that you had sent to Mr. Enos stating that no further TTT -- TTD payments would be made.**
**This document shows that Douglas County got a copy of this document, and so my question is did Douglas County ever communicate to you that you had it wrong that he could not return to work within the weight restrictions?**



A I don't remember.
**Q And did Douglas County ever tell you withdraw, or rather stated more accurately reinstate his TTD benefits because he cannot return to work as a juvenile probation officer with his restrictions?**
A I don't remember.
MR. GEDDES: Okay. I have nothing further. Do you want to give an explanation as to an opportunity to review? Well, before we, before we go completely off the record, oh, I'm sorry, Counsel, did you have --
MS. PARKS: I have no questions.
THE VIDEOGRAPHER: Do you want me to go off the video?
MR. GEDDES: Not yet. So there is no other examination. Okay. So then the, given that you, I know that you have, you are going to be leaving at some point, do you guys want to go over the time frame for her review of her transcript and what she should, what she has an opportunity to do?
THE COURT REPORTER: Well, if it is okay, I would just send it to her counsel and he would take care of the signing and she would have 30 days.
MR. GEDDES: Okay.
THE WITNESS: That would be fine with me.



MR. GEDDES: Okay. Great. Thank you very much.
MR. BALKENBUSH: Thank you.
THE VIDEOGRAPHER: This concludes the deposition of Karen Barbee on October 3rd, 2018. Off the video record at 2:44.
(Whereupon the proceedings concluded at 2:44 p.m.)
-o0o-



STATE OF NEVADA )
) Ss.
WASHOE COUNTY )

I, CORRIE L. WOLDEN, a Certified Shorthand Reporter in and for the County of Washoe, State of Nevada, do hereby certify; That on WEDNESDAY, OCTOBER 3, 2018, at the hour of 1:02 P.M. of said day, at 151 Country Estates Circle, Reno, Nevada, personally appeared KAREN BARBEE, who was duly sworn by me to testify the truth, the whole truth and nothing but the truth, and thereupon was deposed in the matter entitled herein;

That I am not a relative, employee or independent contractor of counsel to any of the parties; or a relative, employee or independent contractor of the parties involved in the proceeding, or a person financially interested in the proceeding;

That said deposition was taken in verbatim stenotype notes by me, and thereafter transcribed into typewriting as herein appears; That the foregoing transcript, consisting of pages 1 through 77, is a full, true and correct transcription of my stenotype notes of said deposition.

DATED: At Reno, Nevada, this 15th day of October, 2018.

Corrie L. Wolden

CORRIE L. WOLDEN, CSR #194, RPR, CP

ERRATA SHEET

I declare under penalty of perjury that I have read the foregoing _______ pages of my testimony, taken on ________________________ (date) at __________________(city), _________________(state),

and that the same is a true record of the testimony given by me at the time and place herein above set forth, with the following exceptions:

| Page | Line | Should read: | Reason for Change: |
|---|---|---|---|
| ___ | ___ | ________________________ | __________________ |
| | | ________________________ | __________________ |
| ___ | ___ | ________________________ | __________________ |
| | | ________________________ | __________________ |
| ___ | ___ | ________________________ | __________________ |
| | | ________________________ | __________________ |
| ___ | ___ | ________________________ | __________________ |
| | | ________________________ | __________________ |
| ___ | ___ | ________________________ | __________________ |
| | | ________________________ | __________________ |



ERRATA SHEET

| Page | Line | Should read: | Reason for Change: |
|---|---|---|---|
| ___ | ___ | ________________________ | __________________ |
| | | ________________________ | __________________ |
| ___ | ___ | ________________________ | __________________ |
| | | ________________________ | __________________ |
| ___ | ___ | ________________________ | __________________ |
| | | ________________________ | __________________ |
| ___ | ___ | ________________________ | __________________ |
| | | ________________________ | __________________ |
| ___ | ___ | ________________________ | __________________ |
| | | ________________________ | __________________ |
| ___ | ___ | ________________________ | __________________ |
| | | ________________________ | __________________ |
| ___ | ___ | ________________________ | __________________ |
| | | ________________________ | __________________ |
| ___ | ___ | ________________________ | __________________ |
| | | ________________________ | __________________ |
| ___ | ___ | ________________________ | __________________ |
| | | ________________________ | __________________ |

Date: __________ ______________________________

Signature of Witness

______________________________

Name Typed or Printed

SpecialtyHealth

**SPECIALTY HEALTH CLINIC**

| | | |
|---|---|---|
| **Patient:** JOHN M. ENOS | **DoB:** | **Sex:** M |
| **Provider:** Patricia Morales, MD | **Visit:** 02/17/2015 6:00PM | **Chart:** ENJO000001 |

## ***RETURN TO WORK:

RETURN TO WORK FOR: JOHN M. ENOS
DATE OF APPOINTMENT: 02/17/2015 06:00PM
BODY PART:
EMPLOYER: Douglas County

Date of Injury:06/17/2014

It is the injured worker's responsibility to inform the employer of current work status.
CURRENT RESTRICTIONS: Light duty with the following restrictions
EMPLOYEE IS UNABLE TO: Lift,, > 50 lbs
No Pushing > 50#, No pulling > #50
Over head shoulder lifting not > 35#
ABOVE SHOULDER LIFTING? YES
CONDITION STABLE? NO
CONDITION RATABLE: NO

RETURN VISIT: 2 weeks
SIGNED: Patricia Morales, MD

EXHIBIT
10
Barbee 10/3/18
PENGAD 800-631-6989



Scanned: 02/18/2015

**Tahoe Fracture & Orthopedic Medical Clinic, Inc.**

Fax to Norma Santoyo
# 775 782 9083

COMPREHENSIVE ORTHOPEDIC CARE

- Arthroscopic ankle, knee, shoulder, elbow & wrist repair
- Shoulder & elbow replacement
- Hip & knee replacement
- Sports injury treatment
- Treatment for work-related injuries
- Surgical & complex nonsurgical treatment of spine injuries & disorders, including herniated disc, lumbar instability & spinal stenosis
- Scoliosis evaluation
- Artificial disc replacement
- Basic & complex fracture repair
- Diagnostic digital X-rays
- Outpatient surgery center available

Work/School Excuse

Name: Enos, John Date: 2/18/15

To Whom It May Concern:

The above patient attended clinic today please excuse from ___ Work ___ School

Accompanied a patient to clinic today please excuse from ___ Work ___ School

Must observe P.E. Restrictions as follows:
__ May not participate until ________
__ May participate without restrictions as of ________
__ May participate with the following restrictions as of

______________________________

______________________________

Must observe work restriction as follows:
__ Off work until ________
✓ May return to work unrestricted as of today
__ May return to work with the following restrictions

______________________________

______________________________

Lifting Maximum (lbs): 0 10 20 50 100
__ Squatting __ Stooping __ Climbing __ Crawling __ Driving
__ Standing __ Walking __ Overhead Reaching __ Bending/Twisting
__ Repetitive Use ( Upper Extremity / Lower Extremity ) __ As Tolerated
Part Time (hours) 2 4 6 Other ________

Other:

______________________________

______________________________

______________________________

David E. Eisenhauer, D.O.

RECEIVED
FEB 18 2015
asc

973 MICA DRIVE, SUITE 201
CARSON CITY, NV 89705

CENTRAL SCHEDULING: 775.783.6190, PRESS OPTION #2
CENTRAL SCHEDULING FAX: 775.783.6191
WWW.TAHOEFRACTURE.COM

Feb-18-2015 08 21 AM tahoe fracture 7757836190 1/1