# EXHIBIT 13

## DEPOSITION TRANSCRIPT OF WENDY McMURRY

EXHIBIT 13

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

-oOo-

JOHN ENOS, an individual,

Plaintiff,

Case No. 3:17-cv-00095-MMD-CBC

vs.

DOUGLAS COUNTY, a political subdivision of the State of Nevada; et al.,

Defendants.

---

VIDEOTAPED DEPOSITION OF

CINDY McMURRY

March 4, 2019

Reno, Nevada

REPORTED BY: DEBORA L. CECERE, NV CCR #324, RPR

JOB NO.: 529617

A P P E A R A N C E S

FOR THE PLAINTIFF
THE GEDDES LAW FIRM, P.C.
BY: WILLIAM J. GEDDES, ESQ.
8600 Technology Way, Suite 107
Reno, Nevada 89521
(775) 853-9455
will@thegeddeslawfirm.com

- and -

GALLIAN WELKER & BECKSTROM, L.C.
BY: RAELENE K. PALMER, ESQ.
540 E. St. Louis Avenue
Las Vegas, NV 89104
(702) 595-4695
(702) 892-3500
rpalmer@vegascase.com

FOR THE DEFENDANTS
THORNDAL, ARMSTRONG, DELK,
BALKENBUSH & EISINGER
BY: KATHERINE F. PARKS, ESQ.
6590 South McCarran Boulevard, Suite B
Reno, NV 89509
(775) 786-2882
kfp@thorndal.com

THE VIDEOGRAPHER

LITIGATION SERVICES
KELLAN ADAMS

ALSO PRESENT
JOHN ENOS



I N D E X


| EXAMINATION | PAGE |
|---|---|
| BY MR. GEDDES | 6 |




E X H I B I T S

NUMBER DESCRIPTION PAGE

(NONE MARKED DURING THIS PROCEEDING.)

(Exhibits from previous depositions were referenced.)



BE IT REMEMBERED that on Monday, the 4th day of March, 2019, at the hour of 8:59 a.m. of said day at the offices of Sunshine Litigation Services, 151 Country Estates Circle, Reno, Nevada, before me, DEBORA L. CECERE, a certified court reporter, personally appeared CINDY McMURRY, who was by me first duly sworn, and was examined as a witness in said cause.

-oOo-

CINDY McMURRY,
called as a witness in said case,
having been first duly sworn, was
examined and testified as
follows:

-oOo-

THE VIDEOGRAPHER: This is the beginning of media number 1 in the deposition of Cindy McMurry in the matter of Enos versus Douglas County, held at Sunshine Litigation Services on March 4th, 2019, at approximately 8:59 a.m.

The court reporter is Debbie Cecere.

I'm Kellan Adams, the videographer, an employee of Litigation Services.

This deposition is being videotaped at all times unless specified to go off the record.

Would all present please identify themselves, beginning with the witness.

THE WITNESS: Cindy McMurry.

MS. PARKS: Katherine Parks on behalf of the defendants.

MS. PALMER: Raelene Palmer on behalf of plaintiff.

MR. ENOS: John Enos, plaintiff.

MR. GEDDES: Will Geddes on behalf of plaintiff.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

(Whereupon the witness was sworn.)

EXAMINATION

BY MR. GEDDES:

Q Could you please identify yourself by first and last name, and spell your last name for the record?

A Cindy McMurry. Last name, M-C-M-U-R-R-Y.

Q Good morning, Ms. McMurry. I'm Will Geddes, and I'll be taking your deposition today.

I want to take a few minutes and go over the



rules of your deposition so we can all make sure you understand how your deposition will proceed today and the obligations you're under when testifying today.

During this deposition you'll be testifying under oath and under penalty of perjury of the laws of the United States. Therefore you're required to testify truthfully, completely, and to the best of your recollection, as if you were testifying in court in front of a judge or jury.

Do you understand this?

A Yes.

Q The purpose of this deposition is to allow the parties to become adequately informed of the facts and issues of the case and to enable us to prepare for trial.

The deposition also provides you with an opportunity to explain away any inconsistencies or opportunity to clarify your testimony. Because if at the time of trial your testimony is different than it is now, we will draw upon the inconsistency to a jury to try to demonstrate that you are not a credible witness.

So it's very important that if you need to clarify or explain an issue or a question or an answer, your more opportune time to do so is today rather than



at trial.

Do you understand these things?

A Yes.

Q Okay. Now, our purpose here is to allow you to take your time and understand the question so that you can provide truthful testimony.

If you give an answer, however, we will assume you understood the question. So it's incumbent on you to make sure that you understand a question. And if you don't you can ask us to clarify or rephrase it or repeat it.

Do you understand these things?

A Yes.

Q Okay. Now, today we're entitled to receive your best testimony based on your best recollection of facts and events. It's important that your testimony be reliable and based upon what you can recall. If you don't know the answer to a question, you should simply say you don't know.

Do you understand these things?

A Yes.

Q However, please keep in mind when you're initially unable to recall, we may try to refresh your recollection by asking follow-up questions or showing documents to you. And our, our goal is to help refresh



your recollection so that you can give truthful testimony.

And some of the areas where this happens a little bit is matters concerning time. You may not recall a specific date, but you may recall it was a season, or if there were a construction project in front of a building you may remember that. So we may ask follow-up questions on that. And also size and distance, you can give your opinions.

But it's important not to speculate on your answers -- or to answer a question. You can give estimates, but, but we'd ask that you not speculate in your deposition.

So we give a common example. If we asked you the size of this conference room table, you could probably give your best estimate. If we asked you the size of the conference room table at my office, assuming you've never been there, that would be pure speculation, which is to be avoided.

Do you understand the distinction?

A Yes.

Q Okay. There is a court reporter seated to your right. She has the difficult job of taking down every word that is spoken today. So we can all help by making sure that we don't talk at the same time. I'll

try to make sure that you're finished your answer before I begin a question, and if you can wait for me to finish my question before you begin your answer, that will be very helpful.

And also we're testifying with words today. It's natural to use gestures, but the court reporter needs words. So if you could please verbalize your response rather than shake your head. If you could say no rather than nod your head. If you could say yes rather than shrug your shoulders. If you could use words to spell out what that means.

Now, there are, there are other attorneys present here. Ms. Palmer and I represent John Enos. John Enos is the plaintiff. He's here.

Ms. Parks represents the defendants.

And throughout the deposition you may hear an attorney make an objection to a question that's asked. But notwithstanding the objection, you still have to answer the question. Often attorneys are making objections to preserve the issue for trial or to preserve a question or an objection later for trial.

But the objections aren't meant to coach you. The objections aren't meant to get you to freeze up and then not want to answer questions. The purpose of the objection, again, is procedural for trial.



Now, if, if there's an objection made and an attorney specifically instructs you not to answer a question, that might be something that happens based on a privilege or a limiting court order. But other than that, you will still need to answer, answer questions.

And so I ask if you understand these things.

A Yes.

Q Okay. Now, in order to make sure that you're able to go forward today in your deposition and that your testimony is reliable, I have to ask, are you currently under the influence of any medications, alcohol, substance, or drug?

A No, I am not.

Q Okay. And is there any reason you won't be able to understand my questions today?

A No.

Q And is there any reason that you're aware of that you won't be able to give your best testimony today?

A No.

Q Okay. You didn't bring any documents today, did you?

A No, I did not.

Q Okay. What did you do to prepare for your deposition today?



A Kathy and I met about a week ago to go over the recruitment process. And then she gave me Kathy Kidd's deposition just to get familiar with questions.

Q Anything else?

A No.

Q Did you read Kathy Kidd's deposition?

A I, I did not have time. I read a few pages of it. Seeing how long it was, I could not.

Q Do you recall what you read, what pages you read?

A I think all up to asking what hobbies she has.

Q Okay. So you read just the beginning admonitions and up to what are your hobbies, and then you didn't read any more?

A Yes.

Q Did you review any other documents in preparation for your deposition today?

A No, I did not, other than what Kathy and I looked at.

Q Okay. And the recruitment process, what did you go over with Kathy about the recruitment process?

A Steps as applications come in and how they go through the steps.

Q Anything else that you recall?



A No.

Q Where do you live?

A Gardnerville, Nevada.

Q How long have you lived there?

A Forty-plus years.

Q Do you plan on moving your residence in the next two years?

A No, I do not.

Q Okay. Are you married?

A No.

Q Do you have any children?

A Yes.

Q How many children do you have?

A One.

Q Okay. How old is your child?

A Twenty-two.

Q Okay. Where did you go to high school?

A Douglas County.

Q Okay. And can you summarize, please, your educational background?

A I have a AA degree from Western Nevada Community College.

Q Okay. Did you have a concentration or an area that you specialized in?

A AA in psychology, industrial psychology.

Q Okay. What are your hobbies?
A Outdoor activities.
Q Have you ever been arrested?
A No.
Q Have you ever been convicted of a crime? No?
A No.
Q Okay. Have you been part of a lawsuit before, either party in a litigation of any kind?
A No.
Q Have you ever testified in a deposition before?
A No.
Q Have you ever testified at trial or a hearing before?
A No.
Q Have you received education in the subject of employment discrimination?
A Training, yes.
Q Okay. Can you summarize what training you've received?
A I did a training with POOL/PACT about ten years ago with HR issues.
Q What kind of issues did you get trained in?
A FMLA, EOC.



Q I'm sorry. FMLA and what was the other one?
A EEOC.
Q Okay.
A Job descriptions. Several HR-type functions.
Q Now, when you say you took it ten years ago, approximately how many hours was that training that you took?
A I think it was either a day once a month for maybe six months.
Q So a total of about six days training?
A I'd say, yeah.
Q Okay. Did you receive any specific training in Title VII discrimination?
Do you know what Title VII discrimination means?
A Yeah. Age discrimination, religion, just, you know.
Q You recall taking training on age and religion discrimination?
A Well, including all those.
Q Okay. So race, national origin --
A Yes.
Q -- religion? You took training on that? That was included in that POOL/PACT training?



A Yeah.
Q What about the Americans With Disabilities Act? Did you take any training --
A Yes.
Q -- on that? Okay.
And when you, when you had your six days training over a six-month period, would you say that the subjects of ADA and Title VII discrimination and age discrimination were split evenly, or did you focus on one more than the other?
A I can't remember.
Q Let's talk about the places where you've worked.
You're currently working at Douglas County, correct?
A Correct.
Q In their HR department?
A Yes.
Q Okay. And when did you start that job?
A 2007.
Q Okay. And then prior to Douglas County, where did you work?
A Previous to that, the Douglas County School District, in human resources.
Q And when did you work there?



A 2003 to 2007.
Q And then prior to that?
A Bently Nevada Corporation, for 23 years.
Q What did you do there?
A Human resources.
Q Okay. And why did you leave Bently?
A GE came in and reorganized. And I had an opportunity to go to the school district.
Q And why did you leave the school district?
A For a better opportunity with the county.
Q When you were at Bently Nevada for 23 years in HR, did you ever have to handle any matters regarding ADA discrimination?
A No, I did not.
Q No claims of ADA discrimination?
A No, I did not.
Q And when you were at the Douglas County School District in the HR, did you have to handle any ADA claims there?
A No.
Q And at Douglas County in the HR, separate and apart from any consideration of Mr. Enos's case, had you -- did you have to handle any ADA claims?
A No, I did not.
Q So at the Douglas County Human Resources

Department, what exactly is your title?
A Human resources analyst.
Q And can you please tell us what you do for your job?
A I am a recruiter.
Q Do you have any other duties other than recruiting?
A No.
Q Do you have a supervisory role?
A No.
Q Who is your supervisor?
A Wendy Lang.
Q And before her?
A Norma Santoyo.
Q So when you, when you do recruiting work, is that what you've done from the beginning? Or has your job changed over the years?
A No. That is what I've done.
Q Okay. Did you assist the HR department in matters other than recruiting? For example, matters involving Worker's Comp claims?
A No, I do not.
Q And matters regarding disciplining employees?
A No, I do not.



Q And matters -- this may sound like disciplining -- but matters involving terminating employees?
A No, I do not.
Q Have you read any legal pleadings of this lawsuit, the complaint, the answer, anything other than what you've testified to as far as a transcript?
A No, I have not.
Q To the degree that you have an understanding, what is your understanding of this lawsuit?
A I have no clue other than it may relate back to a Worker's Comp issue.
Q Do you know who John Enos is?
A Yes, I do.
Q How do you know John Enos?
A From being an employee with the county.
Q Okay. Did you interact with John Enos when he was working in the county?
A No, other than maybe taking something from him at our door or -- yeah, that would be it.
Q I'm sorry. I don't understand when you say taking something at your door. Can you help me out?
What does that mean?
A Helping employees at our door.



Q Oh, if they have questions?
A Right.
Q Oh, I see. Okay.
But -- obviously you're seeing him now in this deposition. But prior to this morning when you walked in here to this deposition, do you -- could you recall who he was or what he looked like or anything about him?
A No.
Q Okay.
A No. As a matter of fact, I have no idea.
Q Okay. You understand he's the plaintiff in this lawsuit?
A Yes, I do.
Q Okay. Now, is it your understanding that Mr. Enos's employment with the county was separated or terminated?
A I -- yes.
Q Okay. And what do you -- what is the basis of your understanding?
A I, I do not know.
Q Well, you say you know his employment separated.
How do you know that?
A Because we get, we get forms showing



separation.
Q Do you recall specifically seeing a separation form for Mr. Enos?
A No, I do not.
Q Do you, do you just know that he's not working at the county based on your preparation for this deposition? Or -- I mean, because I asked you how you know that he doesn't work at the county anymore, and you said that you get forms.
A Going back to the time of his separation, I knew that he was separated. We don't have closed doors in our office.
Q So what does that mean?
A I have heard that he was separating his employment with Douglas County.
Q Okay. And who did you hear that from?
A I don't remember.
Q Would it have been someone who worked inside the HR office?
A Yes.
Q Do you recall why Mr. Enos's employment ended?
A No, I do not.
Q And you don't recall hearing why?
A Excuse me?

Q When you said that you heard his employment had, had separated, do you recall hearing why?
A No, I do not.
Q Do you know when his employment ended?
A No, I do not.
Q Did you have any involvement in connection with Mr. Enos's separation of employment from Douglas County?
A No, I did not.
Q Did you have any involvement in connection with any effort by Mr. Enos to become re-employed with Douglas County?
A I received an application in from him and processed it.
Q When did you receive the application?
A In 2017, I believe.
Q And how did you receive that application?
A We had an opening for a juvenile detention officer in December of '16, and we received in all the applications for that recruitment, including Mr. Enos.
Q Did you receive that online or was it paper? How did you receive those?
A It is online with our recruitment system, program.
Q What's the name of that program?



A NEOGOV.
Q Do you recall specifically receiving his application? I mean, as you're sitting here, do you have a recollection of it?
A The date, the time, the -- no.
Q But it's just generally you have a recollection?
A Yes.
Q You said that you processed it. What does that mean?
A When I receive in the applications, I move them to the second step, which is the minimum qualification step. And then I send those applications over to the hiring manager.
Q And your recollection is you did those things for Mr. Enos's application?
A Along with everybody else that applied.
Q And the hiring manager, who would that be for the Juvenile Probation Department?
A Scott Shick.
Q Do you recall any conversations with Scott Shick about any of the applications?
A I do not.
Q So as part of their -- and we'll get into the process a little bit more. But as far as you



recall, you sent the paperwork over and that's, that's the last that you recall about Mr. Enos's application?
A Electronically, yes.
Q Okay. Did you say that -- I think you said there was an opening in juvenile detention in December of 2016.
Did you mean juvenile probation?
A Yes.
Q Okay.
A Sorry.
Q Is there anything else you recall about Mr. Enos's application?
A No, I do not.
Q Did you have any -- do you recall any communications with anyone about Mr. Enos's application?
A I notified my manager.
Q Who at the time was?
A Wendy Lang.
Q Why did you do that?
A Because he separated, and now he's wanting to be re-employed. And I felt she should know.
Q And when did you do that? Immediately after you got it or -- you don't recall when?
A I don't recall.



Q And did you communicate with anyone else other than Wendy Lang about that?
A Not that I can remember.
Q And how did you communicate to Wendy Lang? Is that through --
A Verbally.
Q In person?
A Verbally.
Q Okay. You went to her office and talked to her about it?
A Yes.
Q And what did -- what was Wendy Lang's communications regarding that?
A Just knowledge.
Q Did she say anything to you about it?
A Just thank you. She acknowledged.
Q And she acknowledged your -- you had communicated to her that this application came from someone who used to work there and you wanted to bring it to her attention and she acknowledged -- she acknowledged it.
Is there anything else other than that?
A Not that I can remember.
Q Did Wendy Lang have any follow-up conversation with you about that?

A No. Not that I can remember.
Q Now, you said that you forwarded the -- I believe you said that you, you moved it to the second step, minimized qualifications, and then that you forwarded, forwarded the applications electronically to Scott Shick?
A I forwarded all the applications to Scott Shick.
Q So what's -- so when you went and spoke with Wendy Lang, you weren't holding an application in your hand, you were just telling her verbally?
A Correct.
Q How many applications did you receive? Do you recall?
A No, I do not.
Q More than 10?
A More than 10.
Q More than 20?
A I don't know.
Q Now, did you -- when you received -- well, I'll ask that question in a little bit.
And what other involvement did you have in communicating with Mr. Enos regarding -- or did you communicate with Mr. Enos regarding his application?
A I send out notifications that the



application has been received and it is under review.
Q And you sent one to Mr. Enos saying, Your application has been received and it's under review?
A Hopefully so.
Q Okay. How do you do that?
A Electronically, via email through the system.
Q Any other communication with Mr. Enos regarding his application?
A Not that I know of.
Q Anything refresh your recollection?
A No. I do not remember.
Q You're not aware of a document that might refresh your recollection if you had any more communications with Mr. Enos?
A I do not remember.
Q No; my question is, knowing your job and knowing the documents that are created in your job, do you believe there's a document that might exist that could help you recall whether you had other communications with Mr. Enos?
A No. At this time, I don't know.
Q So we talked a little bit about Scott Shick.
How do you know Scott Shick?
A Through work.



Q And how long have you known Scott Shick?
A Ever since I've been there.
Q Okay.
A Ten years.
Q Have you ever socialized with Scott Shick outside of the office?
A No, only professionally.
Q Have you had any communications with Mr. Shick about Mr. Enos?
A No.
Q Have you had any communications with Mr. Shick about this lawsuit?
A No, I have not.
Q Do you have any knowledge as to what Mr. Shick's involvement was in connection with Mr. Enos's separation of employment?
A No, I do not.
Q You haven't reviewed any documents that would, would address that matter?
A No, I have not.
Q Do you know someone by the name of Vicky Sauer-Lamb?
A Yes. She was an employee that retired.
Q She was the chief deputy of the juvenile probation --



A I believe so.
Q -- is that correct?
Okay. Have you ever socialized with Ms. Sauer-Lamb outside of the office?
A No, I have not.
Q Have you spoken with Ms. Vicky Sauer-Lamb regarding Mr. Enos?
A No, I have not.
Q Or this lawsuit?
A No, I have not.
Q And we mentioned Norma Santoyo. She's the -- who is Norma Santoyo?
A She was the human resources manager, director.
Q Okay. How long have you known her?
A Since we hired her, which I believe it was 2013.
Q She no longer works there.
Have you had any communications with her after she left the --
A No, I have not.
Q -- Douglas County? Okay.
Have you had communications with her about Mr. Enos or this lawsuit?
A No, I have not.

Q Do you know Sarah Christensen?
A Yes, I do.
Q Who is Sarah Christensen?
A She was a co-worker.
Q She worked in the HR department?
A Yes.
Q Have you ever socialized with Sarah Christensen outside the office?
A Since her separation?
Q Just at any time.
A I have visited her at her home.
Q Do you characterize your relationship with her as professional and personal?
A Yes, I would.
Q Have you had any communications with Sarah Christensen about Mr. Enos or this lawsuit?
A No, I have not.
Q Do you know Judge Young?
A Yes, I do.
Q How do you know Judge Young?
A Through Douglas County.
Q Have you socialized with Nathan Todd Young, Judge, outside of the office?
A No, I have not.
Q Have you had any communications with Mr. --



Judge Young regarding Mr. Enos or this lawsuit?
A No, I have not.
Q Do you know Judge Gibbons?
A Through Douglas County.
Q And have you socialized with Mr. Gibbons outside of the office?
A No, I have not.
Q Have you had any communications with Judge Gibbons, Michael Gibbons, about Mr. Enos or this lawsuit?
A No, I have not.
Q Do you know Kathy Jo Kidd?
A Yes.
Q Who is she?
A She used to work at Douglas County.
Q And what did she do at Douglas County?
A She was the HR analyst senior.
Q Was she your supervisor at one time?
A For a brief time, while Wendy Lang went on maternity leave.
Q Have you had any communications with Kathy Jo Kidd regarding Mr. Enos or this lawsuit?
A No, I have not.
Q You mentioned Wendy Lang earlier, and you mentioned communications you had with Wendy Lang



regarding Mr. Enos.
Did you have any other communications with Wendy Lang regarding Mr. Enos?
MS. PARKS: Objection, asked and answered.
Go ahead.
THE WITNESS: No.
BY MR. GEDDES:
Q Have you had any communications with Wendy Lang about this lawsuit?
A No.
Q Do you know someone by the name of Kimmy Johnson?
A Yes. She was in the District Attorney's Office.
Q Are you -- have you socialized with Wendy Lang outside of the office?
A Lunch.
Q Would you characterize your relationship as personal and professional?
A Yes.
Q And Kimmy Johnson, have you socialized with her outside the office?
A No.
Q Have you had any communications with Kimmy Johnson about Mr. Enos or this lawsuit?



A No.
Q Do you know Justina Caviglia or Cavilia (phonetic)?
A Yes. Through Douglas County.
Q Who is she?
A She used to work for the District Attorney's Office.
Q And have you had any communications with her about Mr. Enos or this lawsuit?
A No.
Q Do you know someone by the name of Cynthia Gregory?
A Yes. She is at the District Attorney's Office.
Q Have you socialized with her outside of the office setting?
A No, I have not.
Q Have you had any communications with Cynthia Gregory about Mr. Enos or this lawsuit?
A No, I have not.
Q Do you know someone by the name of Karen Barbee?
A The name is familiar, but I -- no.
Q She -- does she work with the third-party administrator handling Worker's Compensation claims for

Douglas County?
Does that refresh your recollection?
A I don't -- I do not know.
Q In handling HR matters for Douglas County, does your job require that you meet with the judges of the Ninth Judicial District Court?
A Only if they have an opening.
Q And when you say "if they have an opening," are you talking about court personnel?
A No, recruitment. But I have not recruited for them, I think maybe -- I can't -- I cannot remember recruiting for them.
Q Well, you've recruited for the Juvenile Probation Department, correct?
A Yes, I have.
Q Do you consider juvenile probation officers to be court personnel?
A Yes.
Q So in connection with that type of recruitment, have you had to interact with the judges at all?
A Not -- very rarely.
Q Can you think of an instance when you did interact with the judge regarding court personnel?
A No.



Q To your knowledge, are the judges involved in the recruitment process for juvenile probation officers?
A I, I do not know.
Q When you send -- when you send applications to the department, and you described Scott Shick for the juvenile probation officer, did you send any information to the judges for that position?
A I don't, I don't remember.
Q Now, physically where did you work? What building?
A The Minden Inn.
Q Did you work in an office or a cubicle? Or do you work in an office or a cubicle?
A Cubicle.
Q Let me show you what's been marked as Exhibit 1 to the deposition of Sarah Christensen. And take a look at that, please.
Does that layout of cubicles or offices look familiar to you?
A Yes.
Q Can you walk me through that?
A So we had Norma as the manager in one office.
We have Sarah, Anita, and myself in another



office.
Q In cubicles, you mean?
A Cubicles.
Q Okay.
A Yeah.
And at one time Norma moved. Well -- and Sarah used to be -- yeah. Sarah was -- okay.
Then Norma moved over into another office, and I moved over where Sarah used to sit in the cubicle. Sarah then moved into another cubicle, where I used to sit. Then after Norma left, Wendy -- Wendy came into all this. I have no -- I can't remember. And then KJ came into another office.
Q KJ is Kathy Jo Kidd?
A Yes.
Q And then Wendy Lang took Norma's office?
A Yes.
Q And you -- when you said earlier that you -- you can hear things in the office, is it, is it because if people are talking at cubicles that sound travels to you?
A Yes.
Q And is it also because if someone is speaking in what's been marked as Norma's office on this diagram, you can also hear that?



A On occasion.
Q Okay. Does the door have to be open for you to be able to hear what's going or, or can you hear it even if the door is closed?
A No, when the door is open.
Q When the door is open, that's when you hear it?
A Yes.
Q And then that would be true for the other office, to the right, right of your cubicle? Same?
A Yes.
Q Okay. And from time to time workers, employees, from the county come into the HR department, and there's a counter near the cubicle --
A Yes.
Q -- where they can come and talk to you?
A Yes.
Q Okay. So if someone is talking, let's say, to Sarah Christensen, and you're two cubicles down, you can hear that?
A I, I could.
Q Okay. What's your typical workday like? What kinds of assignments do you work on? I know you said you do recruitment, but what does all that break down to on a day-to-day basis?

A Well, opening up the program, I take a look at who has applied. I take a look at my openings, the requisitions that have come in. Process postings. When jobs close, process those applications. Send out emails, applications received. Forward them to the hiring manager. Schedule interviews. Occasionally I sit on interview panels. Develop questions.
**Q Anything else come to mind?**
A That's all I can think of.
**Q What program do you open?**
A NEOGOV recruitment program.
**Q And that program has a listing of all openings countywide; is that correct?**
A Correct.
**Q So on a -- on a day-to-day basis, there are always openings within the counties, and when you say you open the program to see who's applied, that's true because it's an ongoing process, correct?**
A Correct.
**Q And you mentioned requisitions. You say you look at -- I think you said you look at requisitions.**
**What are requisitions?**
A Requisitions are submitted by hiring managers to replace or recruit for openings.
**Q And so that -- do, do you actually post the**



**openings for the departments, or do they post them but give you requisitions?**
**How does that work?**
A No, I post them. I send them a draft of the job posting. They approve that, and I post with a closing date.
**Q Okay. And is your -- is the process started by the requisition that's submitted to you, and then you build a profile from that, send it back to the department, they approve it, and then you post it?**
A Correct.
**Q Okay. And do you specifically recall that process for the Juvenile Probation Department opening? I think you testified it became open in December of '16.**
**Do you specifically recall that process?**
A I do not remember.
**Q How many of these do you process a year?**
A 200.
**Q So you don't have any specific recollection of the requisition that was sent over from the Juvenile Probation Department for that opening in December of 2016?**
A No. Other than looking back at what we looked at a week ago.



**Q And what was that?**
A The recruitment.
**Q What specifically did you look at a week ago?**
A We looked at the exam plan of the applications. We looked at the requisition.
**Q Who is "we"?**
A Kathy, Kathy and I.
**Q What's an exam plan?**
A That is a folder of the recruitment where the applications are housed, the posting, the requisition.
**Q And so when you looked in, into this exam plan of applications, did you find the folder of recruitment for Mr. Enos?**
A Yes.
**Q How many pages is it?**
A It's, it's not pages. It's based on steps.
**Q Maybe you could spell that, but I'm not following what you're saying.**
MS. PARKS: Maybe, maybe this would help, that what we were looking at is NEOGOV. We were looking online. It wasn't -- if that helps any, Counsel.
THE WITNESS: Electronically.



BY MR. GEDDES:
**Q Okay. So you were looking at his steps.**
**What were you looking at his steps for?**
A The steps. The steps -- step 1 is where applications are received. Step 2 is where the applications are moved to, and then submitted to the hiring manager.
**Q Is there a step 3?**
A Step 3 on this was physicals. And that's all I can remember.
**Q Okay. So when you looked at the app received, you're looking on a computer screen?**
A Correct.
**Q And it confirmed that his application was received?**
A Yes.
**Q Does the application received screen or step 1 screen that you're looking at address qualifications for the job?**
A The step 1 is applications received. Once, once they pass that, then they go into the minimum qualifications, which is the second step.
**Q And so what I wrote down from what you said before was you associate step 2 with the applications moved to submitted to the hiring manager.**

Is that the same thing --
A Correct.
Q -- or is that different?
A Yes.
Q And it's in that step that the qualifications are evaluated?
A Yes.
Q Who evaluated those qualifications for Mr. Enos?
A I send them to the hiring manager.
Q So to your understanding then Scott Shick would have looked at, or someone appointed by Mr. Shick would have looked at qualifications?
A Correct.
Q Who typically looks at those qualifications? The hiring manager?
A Yes.
Q There was some testimony by other witnesses, I'll represent to you, that there's some feature or aspect of the job qualification program that if a person's not -- doesn't meet the minimum qualifications -- and if I'm wrong -- and it's not to your understanding, let me know -- but it sort of falls away from the application pool.
Is that an incorrect statement? Or are you



able to clarify that process?
A The second step, the minimum qualifications are linked to the job description, of the minimum qualifications of the job description.
Q Does the computer figure things out and reject it, or is that a human person that does that?
A No, that is done by the computer. But it is also verified by the hiring manager.
Q So if a person was evaluated by the computer by not having a fundamental requirement or a number of years, then the computer would recommend kicking it out, but then the hiring manager would double check that?
A Yes, sir.
Q So to your understanding then, they're all sent to the hiring manager. You're not involved -- HR is not involved in removing any before they go to the HR hiring -- I'm sorry -- the hiring manager of the department. Is that correct?
A No. All applications are moved or sent to the hiring manager, whether they pass or they fail.
Q Okay.
A All applications.
Q And so you said that you were looking at step 2 about a week ago.



Did you confirm, in looking at it a week ago, that this paperwork, Mr. Enos's application, was indeed sent to the hiring manager?
A Yes.
Q And specifically what, what did you -- what did you learn in looking at it last week?
What were the specifics? Who did it go to?
A I just verified that the application was there.
Q Did you verify that it was submitted to the hiring manager of the department?
A I didn't -- I did not look at that.
Q But does step 2 imply that that's what happens?
A Yes.
Q Okay. And you have no reason to doubt that Mr. Enos's application was sent over to Scott Shick; is that correct?
A Correct.
Q Then there's step 3. I think you described it as physicals. Can you walk us through that?
What is that?
A I -- it's, it's just moving the applications into that next step, where they are invited to the physical --



Q Okay.
A -- portion of the recruitment.
Q Now, is that only for people who are selected to interview, or is that for all applicants?
A The applications of the hiring -- the hiring manager directs me to move those to the physical and send letters to invite them to the physical.
Q I apologize if you answered this question from a different perspective.
In working at Douglas County, have you ever dealt with an issue where an applicant has a disability for which under the ADA you take a certain step?
Do you understand my question?
A Yes.
Q Can you, can you tell us about that?
A No, I have not.
Q Okay. So there's no feature or process of the application process where you take any action in, in regard to a person's disabilities under the ADA?
A I have not.
Q Okay. Do you know if anyone does?
A No, I do not.
Q What I'm getting at is you're not aware of any ADA screening that goes on?
A Other than -- in the supplemental questions,

it does ask -- on the job description, it has physical requirements, and on the supplemental questions that the applicant has to fill out, it, it either says can, can you, will you be able to -- I don't know exactly what the words are -- will you be able to perform duties with or without accommodations? And there is a yes or a no from the job description.

**Q And if, if someone -- well, the way you phrased it just now, will you be able to perform with or without an accommodation, if a person could perform the duties with an accommodation, is there a part of the application process that distinguishes one from the other?**

A No.

**Q Do you recall when Mr. Enos applied whether or not he had any injuries or disabilities or any physical limitations that were stated in his application?**

A No, I do not.

**Q Do you leave it to the hiring manager of the department to figure that out, I mean, or do you involve yourself with ADA issues in the recruitment process?**

A I have not.

**Q Do you recall a department handling that**



**type of matter in all the time that you've worked at Douglas County?**

A No, I do not.

**Q Do you know what the Douglas County per- -- Douglas County personnel regulations are?**

A In regards to?

**Q Any aspect of your job. I mean, do you have to deal with the Douglas County personnel regulations in connection with your job?**

A I would defer to my manager.

**Q So if I showed you county personnel regulations, would you recognize them? I mean, do you deal with them frequently enough that you --**

A I do not.

**Q Okay. In the time that you worked at Douglas County, from 2007 to now, have you ever -- have you ever seen a situation where a former employee has reapplied for work and been rehired?**

A Yes.

**Q Is it common or uncommon that, for those who reapply, they get rehired?**

**Do they --**

A I don't understand.

**Q So for former employees who apply for rehire, is it more common for them to be rehired, or is**



**it more common for them not to be rehired, based on your experience?**

A Gosh, I -- I'm not sure how to answer that. It all depends on the circumstances. It depends on the job. It depends on if they're qualified. It --

**Q Is it unusual for a former employee to apply for rehire with the county?**

A Is it unusual, no.

**Q Is it your usual practice to call out to a supervisor in the HR department that someone who used to work is reapplying for work?**

A Yes.

**Q So you do that in all instances when they reapply? You call that out?**

A Yes.

**Q Now, when you first were hired in 2007, you were trained for your position, correct?**

A What do you mean, trained?

**Q Well, did they give you any employee training at all, orientation or anything like that?**

A New hire orientation.

**Q Okay. Did, did they say to you, Hey, when you get people who worked in the county before and they reapply, will you go ahead and let us go? Did someone instruct you to do that --**



A No.

**Q -- or was that just you on your own?**

A No. No one instructed me.

**Q You came up with that idea?**

A I would alert my manager to any rehires.

**Q And doesn't the application point that out as well, that this person used to work at the county?**

A Yes, it does.

**Q Is there any particular reason why you give extra alert when the application states that?**

A Just knowledge to my manager.

**Q Now, you said earlier as well that you schedule interviews and sometimes you sit in on interviews.**

**What determines whether you sit in on interviews?**

A If -- we have a new system actually right now in regards to interview questions, so if they're not familiar with that process I will sit on the interviews.

**Q I'm sorry. When you say "they're not familiar," you mean the department?**

A Right.

**Q Okay.**

A Right.

Q Did you -- you said that you developed questions.
Did you develop any questions -- have you ever developed any questions for the Juvenile Probation Department?
A I can't remember.
Q Have you -- did you sit on any interviews for the Juvenile Probation Department, at any of their interviews before?
A I can't remember.
Q Are you familiar with a rule -- let me ask it this way.
Are you familiar with -- some people would call it a three-day no-show, where the employees are considered to have abandoned their position.
Have you ever heard of anything like that in Douglas County, that type of separation of employment?
A I've heard of that.
Q What is your understanding of that, that rule or that process?
A If the employee does not call in within a specific amount of time, we deem it as a no-call no-show.
Q Have you ever seen that rule applied to a situation where the employee calls in and tries to come



back to work, but the employee can't receive full medical releases, so the county then considers that to be three days' absence, unauthorized, deemed to be a voluntary resignation?
Have you ever heard of that before?
A I don't -- I don't deal with that.
Q Right.
A I don't work with that.
Q You're in recruitment. I get that. But have you ever heard of that?
A I --
Q Let's take a step back.
A No, I can't answer that.
Q Okay.
A I don't know.
Q Let's take a step back.
You just testified that you understood what the no-call rule was.
A Right.
Q Okay. Even though you don't work in that area, you're familiar with it?
A Right.
Q Okay. So what I'm asking you, along those same lines, have you ever heard of that rule applied in the manner that I just asked in my last question?



A I have not heard of it being applied to a specific person, no.
Q No; I'm saying have you heard it applied to a situation involving someone who tries to come back to work but can't get full medical releases.
Have you heard that?
A I don't know. I, I am not aware. I don't work in that.
Q So, I mean, your best recollection is that you haven't heard of that?
A Um-um.
Q Okay.
MS. PARKS: I need to take a break, Counsel.
MR. GEDDES: Okay.
THE VIDEOGRAPHER: We are going off the video record at approximately 10 o'clock a.m.
(Whereupon a recess was taken.)
THE VIDEOGRAPHER: This is the beginning of media number 2 in the continuing deposition of Cindy McMurry.
We are going back on the video record at approximately 10:08 a.m.
BY MR. GEDDES:
Q Ms. McMurry, we just took a break now.
You understand, though, that you are still



under oath?
A Yes.
Q Okay. The job that came open in December of 2016 in the Juvenile Probation Department, do you know whose -- who vacated the position that was filled?
A I don't remember.
Q Now, I know that you don't get involved, based on your testimony, in terminating employees. But is there a rule in the recruitment or application process that certain persons are disqualified from reapplying to the county?
A No. Anybody can apply.
Q So if that three-day no-call no-show situation, someone is separated from employment based on that, are they blocked?
Is there a policy that blocks them from being rehired?
A No.
Q Okay. And do you know if, if Mr. Enos was invited for a physical?
A He was not.
Q Okay. How do you know that?
A Reviewing the exam plan showed that he stayed back at step 2.
Q And what would the exam plan look like if he

Page 54

advanced beyond step 2?
A He'd go to the physical.
Q And so what does that look like? It just looks like a form? The screen, would it be more populated with information?
Is that what -- how you would know?
A It would be the third step in the exam plan, where the applications get moved.
Q Okay. And so -- because I'm not -- I don't have the advantage of looking at what you were looking at.
Is it -- does step 3 have some fields that become populated with information that tell you that someone moved onto that step?
A No.
Q What, what is it that you looked at that signified to you that Mr. Enos stayed back at step 2?
A Just that the application sat in step 2 and did not progress to the physical.
Q Okay. So I think -- I think I understand your testimony, but I'll just double check to ask this way.
You said that you're not aware of a rule that prevents an applicant from being rehired.
So to your understanding, then, if Mr. Enos

Page 55

applied for an open job today with the county for which he qualified, he could potentially be rehired?
Is that correct, based on your understanding?
A He can apply.
Q He can apply. Well, my five-year-old son could apply. It doesn't mean he's going to -- well, I don't have a five-year-old son.
But you know what I'm saying? Someone, someone can apply, doesn't mean that they'll necessarily be hired.
What I'm interested in knowing is whether they are -- whether they are -- they would be prevented from being rehired.
Does that make sense?
A How would they be prevented?
Q Well, I asked you if, if John Enos qualified for a position that was open and he applied, he, he might get that job; is that correct?
A I'm, I'm not understanding.
Q Well, I asked that general question, and then you fell back in your answer to "he could apply."
A All, all people can apply for our positions, whether they're qualified or not.
Q Okay. But my, my question is, if he's

Page 56

qualified for an open position with Douglas County, is it possible he could be rehired?
A Yes.
Q What is the, to your knowledge, the score -- what scoring is done in these interviews for the Juvenile Probation Department?
MS. PARKS: Objection, calls for speculation.
BY MR. GEDDES:
Q Do you have any, any knowledge about a scoring aspect of the application process?
A You mean for this position? No, I do not.
Q For the department, for the juvenile probation.
A No, I do not.
Q Are, are scoring evaluations done for departments in Douglas County?
A During, during interview?
Q Right.
A Yes.
Q Can you describe generally your understanding of that process.
A Questions are asked based on a 1 to tail -- 1 to 10 score. Some departments use that and some don't.

Page 57

Q And are you aware of whether scores were taken for the applicants for the position in Juvenile Probation Department that you described as becoming open in December of 2016?
A I do not remember.
Q Do they submit that? Typically do the departments submit those to the HR department?
A Yes. It goes with the recruitment.
Q And when you looked at the folder that you described, the folder of recruitment for Mr. Enos, what was contained in that folder other than the, the online step, step information that you described?
A Only the online step information I gave you.
Q The application was also there; is that right?
A Correct. Electronically.
Q So you didn't have any -- there was no paper component of any, any folder recruitment for Mr. Enos?
A I -- no, that is not what's in there.
Q Would the D.A.'s Office get involved in any aspect of recruitment, to your knowledge?
A This specifically?
Q Just does the D.A. have a function or a role?
Does it ever interact with the HR department

in the recruitment process?
A I don't know.
Q So you haven't worked with the District Attorney's -- the Douglas County District Attorney's Office in your job?
A No, I have not.
Q Okay. Are you aware of whether anyone in HR -- who else in HR besides you handles recruitment?
A Currently now just me.
Q In the 2017 time frame?
A I don't remember.
Q Did Kathy Jo Kidd have a function or a role in recruitment?
A I can't remember.
Q Does she -- wasn't she temporarily the HR manager or director?
A Correct.
Q And, and when was that?
A I -- when Wendy went on maternity leave.
Q Do you know for how long?
A Six weeks.
Q But your recollection is that when you took -- when you spoke about Mr. Enos's application, you spoke with Wendy Lang, not Kathy Jo Kidd, correct?
A I, I, I deferred to my manager at the time.



Q So you're not just -- you don't know if that was Wendy Lang or Kathy Jo Kidd?
A I -- no, I don't remember.
Q Did you have any involvement in any aspect of finding light duty for workers?
A No, I do not.
Q And the sole purpose of you going through the NEOGOV website is for recruitment?
It doesn't serve any other purpose; is that right?
A Say that again.
Q Yeah. You're accessing NEOGOV, the website that you described that has job postings -- you're looking at that for the sole purpose of your recruitment duties; is that right?
A Correct.
Q Were you involved in recruiting the replacement for Vicky Sauer-Lamb when she retired?
A I don't remember.
Q You get involved in recruitment whether it's an internal posting or it's open to the public; is that right?
A Correct.
Q And so you typically would be involved in the recruitment for all departments?



Or is there a time or a situation where you don't get involved in the recruitment for a department?
A What do you mean by involved?
Q Your job. For example, do they say, Cindy, We've got this. No, no, we're hiring for Dave Smith, and we don't want you involved. We're going to handle this on our own.
Has that ever happened?
A Yes.
Q Okay. Can you describe that situation and what that's about?
A On the requisition it does ask whether they need HR assistance, or sometimes they'll tell me that they need packets made up, or that they would like a Human Resources representative on the panel --
Q So --
A -- or help with questions, developing questions.
Q And you looked at the requisition for this particular position that came open in the Juvenile Probation Department in December of '16; is that correct?
A Yes.
Q And you looked at that, you say -- was that a week ago, last week?



A Yes.
Q And what do you recall about the requisition?
A I don't remember what was on it.
Q Does the requisition have the history of the application process for that position?
A It will have a replacement on it, or if it's a new position.
Q Does it have -- does it have information concerning how many applicants came, who the applicants were, who was hired, things like that?
A On the requisition, no.
Q Okay. Where would that information be?
A In the exam plan.
Q So if we wanted to find out who applied for that position and we obtained the exam plan, that would tell us?
A Yes.
Q Does, does the HR director or manager, person in Wendy Lang's position, did they have involvement on -- in the recruitment, or is it just you, to your knowledge?
A They can. They have access to it.
Q And in this particular case, given that you reviewed the exam plan a week ago, did Wendy Lang have

involvement in this, in the recruitment for this position?
A I do not know.
Q If she were involved, would that be in -- would that be recorded or listed anywhere in the exam plan typically?
A I -- if she moved applications, yes, it is. It's an audit trail.
Q So if we went to the exam plan and looked at it, and there were an audit trail of who was involved, and Wendy Lang were involved and not Kathy Jo Kidd, then that would have been the person that you spoke to when you said you spoke to your supervisor?
A I don't remember.
Q Well, I think you testified that Wendy Lang was out on maternity leave for about six weeks; is that right?
A Um-hum.
Q The -- does the HR -- do the HR department hold meetings, staff meetings?
A Yes, they do.
Q When do they hold staff meetings?
A Just depends on the timeline, what we're all doing, what we have.
Q There's not a fixed time?



A Currently my manager tries to meet once a week.
Q And how long are those meetings typically?
A An hour.
Q And what, what, what happens at those meetings?
A We, we go over issues, workload.
Q Do you recall Mr. Enos being discussed at any of those meetings?
A I do not remember.
Q Are minutes kept of those meetings?
A I, I don't know.
Q Do you have any knowledge one way or another whether Mr. Enos was involved in a workplace injury when he worked at Douglas County?
A Just overhearing.
Q Did you actually -- do you actually review the applications as they come in, or do you just compile them and send them to the division?
A Occasionally I will check them for making sure that the, the plan, the score plan is working correctly. But other than that, I, I forward all applications to the hiring manager.
Q But you reviewed Mr. Enos's application, correct?



A Did I look at it?
Q Yes.
A I don't -- I don't remember.
Q Well, you would have had to look at it to know he was a prior employee, correct?
A I saw his name there.
Q Did you see in his application that he was -- he once worked at the county?
A Did I open it up at the time? I don't remember.
Q So you would have remembered him historically from when he worked there before?
A As an employee.
Q And seeing his name, recognizing the name, and then that would have been enough for you to know that he was a prior employee?
A Correct.
Q Other than generally hearing that he was injured in a workplace injury, do you have -- do you recall any of the specifics about his injuries?
A No, I do not.
Q Do you know how many times he got injured in a workplace injury at work?
A No, I do not.
Q Do you know whether he was ever -- ever went on a medical leave?



A No. No, I do not.
Q So other than what you've testified to, do you recall witnessing anyone having any communications about Mr. Enos?
A Like who, what? I'm not sure.
Q Well, you might see a document, you might see an email. You might not be involved in the communication, but you've seen communications by people --
A No.
Q -- regarding Mr. Enos.
A No.
Q And --
A Not that I remember.
Q Did you ever overhear any communications between Norma Santoyo and Mr. Enos in the HR department?
A I do not remember.
Q To your knowledge, was the topic of the ADA or Mr. Enos's rights under the ADA ever discussed by anyone?
MS. PARKS: Objection, calls for speculation.
///

BY MR. GEDDES:
Q Do you understand my question? I'm asking for your actual knowledge, anything that you would have heard or seen. I'm not asking you to guess.
A I do not.
Q You have no such knowledge?
A I, I do not remember.
Q Well, is there anything that would refresh your recollection?
A I don't know. I have no idea.
Q Other types of documents that you might be able to review that would let you know whether or not you ever heard the topic of the ADA in connection with Mr. Enos ever discussed or communicated about?
A I don't know.
Q Do you have any involvement in reviewing -- as part of your job do you have any need or reason to look at job descriptions of positions?
A Yes.
Q What is that?
A To make sure that it's accurate information for my job postings.
Q Do you recall ever reviewing the Douglas County job description for a senior juvenile probation officer?



A I don't remember.
Q I'll show you what's been marked as Exhibit 16 to Sarah Christensen's deposition. Please take a look at this document.
Have you ever seen that document before?
A No, I have not.
Q Okay. This is an email from Sarah Christensen to Norma Santoyo dated February 24th, 2015.
Sarah Christensen writes:
John Enos was terminated from Douglas County on February 19th, 2015. John's FMLA time was exhausted, and he was unable to return to work with no restrictions as stipulated.
Having looked at this document and seeing what's written here, does this refresh your recollection as to any communications that anyone had that you witnessed regarding the matter of this email?
A No, I don't remember.
Q Okay. And so you have no information about that exhibit?
MS. PARKS: Objection, asked and answered.
MR. GEDDES: No, I didn't ask that question.
///



BY MR. GEDDES:
Q Is your answer "no"?
MS. PARKS: Go ahead.
THE WITNESS: I do not remember.
BY MR. GEDDES:
Q You don't remember if you have any information about this or you don't have any information about this?
A I don't, no. I have no involvement with that.
Q No. My question is whether or not you have any information about the matter of this exhibit.
A No, I do not.
Q I'll show you what's been marked as Exhibit 18 to Sarah Christensen's deposition. You don't have to pour over every word. If you could just basically glance at that.
Have you seen this document before?
A No, I have not.
Q Have you seen that type of document before?
A No, I have not.
Q This is a, a Douglas County Position Description Questionnaire.
You haven't worked with those before?
A I have not.



Q I'll show you what's been marked as Exhibit 21 to Sarah Christensen's deposition. If you could take a moment and look at that.
Have you seen that document before?
A No, I have not.
Q That document is a document essentially ordering Mr. Enos back to work, and it requests that he return with full medical releases. And any absence beyond February 17th would be deemed unauthorized absence pursuant to Douglas County Code 2.0, 2.080 --
COURT REPORTER: Could you repeat the code, please?
MR. GEDDES: Yes. 2.02.080.
BY MR. GEDDES:
Q -- and may subject him to automatic separation or disciplinary action up to and including termination.
You said you haven't seen that document before. But do you have any information about the matters contained in that document?
A No, I do not.
Q And you haven't had any communications with anyone or overheard anyone's communications regarding those matters?
A No, I have not.

Page 70

Q Okay. I'll show you what's been marked as Exhibit 22 to Sarah Christensen's deposition.
Have you seen that document before?
A No, I have not.
Q All right. You were in charge of recruitment on February 17th, 2015, correct?
A Yes.
Q Okay. Do you recall -- do you have any information about the matters set forth in that exhibit?
A No, I do not.
Q And do you know of any communications by anyone other than that, those contained in that exhibit about those matters?
A No, I do not.
Q Did anyone ever contact you to try and find any job anywhere countywide for which Mr. Enos may have qualified at any time ever?
A I do not remember.
Q Is that something that you would ordinarily remember?
A It's been so long, I don't remember.
Q Well, do you help departments try and find other jobs for their employees?
A I have run reports as to what is current,

Page 71

currently available, but that has been the extent.
Q And you have no recollection of doing that for Mr. Enos; is that correct?
A I do not remember.
Q Okay. Now, you say you run reports.
What kind of reports would you run in a situation if that arose?
A Current open position list.
Q And you just hand them the list, or do you assist them to try and figure out if the employee qualified?
A I would just hand the list over.
Q Do you know how, how it's determined whether a match from the employee and an opening on that list is determined?
A I hand the list over. I do not.
Q Do you know if anyone else in HR does that?
A They have access to NEOGOV. They can run the reports also.
Q I'm sorry. My question is, you don't -- you're describing the process as handing over a list.
Do you know if anyone in HR helps out departments figure if there's a match?
A I do not know.
Q I'll show you what's been marked as

Page 72

Exhibit 24 to Sarah Christensen's deposition. Could you take a look at that, please.
Okay. Have you seen that document before?
A No, I have not.
Q There's a paragraph in there that says:

A review of your claims referenced above indicates that you have been given a full-duty release from Dr. Eisenhauer effective 2/18/15. And Dr. Morales has decreased your restrictions to no lifting greater than 50 pounds, no pushing greater than 50 pounds, no pulling greater than 50 pounds, no overhead shoulder-lifting greater than 35 pounds, effective 2/17/15. We have been advised that the restrictions given by Dr. Morales are compatible with your regular job duties. As such, you are no longer eligible for temporary total disability, TTD, benefits. No further TTD payments will be

Page 73

made.

Do you have any information about those matters?
A No, I do not.
Q And you didn't overhear communications regarding those matters?
A I do not remember.
Q I'll show you what's been marked as Exhibit 32 to Sarah Christensen's deposition. If you could please just generally look at that.
Have you seen that type of a document before?
A Yes. They're reports that are run in NEOGOV.
Q You said that you helped assist in closing positions or taking note of when positions close?
A I put a closing date on a job.
Q Is the work that you do in inputting job openings after you get a requisition form, is this exhibit the product of your work?
A Part of it.
Q What parts do you contribute?
A The advertisement from the Advertisement To. This is a part of the job posting. I input titles. I input job numbers.

Page 74

Q And does -- is the information -- if I may look at the front page, please.
One of the columns is Advertise From, Advertise To. Is that, as a rule, accurate? Or do some positions linger after the Advertise To date has expired?
A No. No, the program would close the position on the Advertise To date.
Q Okay. But the Advertise To date doesn't necessarily mean when the position is filled; is that correct?
A That's right. It's when the posting has closed to the public.
Q And if a position closed by a certain date and not enough applications were received, or, for example, a department said, You know, we want better applicants, can you reopen it?
Would that be reflected in there as just simply a different date on the Advertise To?
A No. It would be your Advertise To date.
Q So that would be -- so, for example, if you closed -- if it said close on January 1, and then on January 15th you got a, you know, notice from the department saying, Hey, we got to -- we got to open it back up to get more people, would that type of document

Page 75

reflect it closed on the 1st and it was reopened on the 15th, or would the closing date on the 1st just simply be stretched out?
A So if I understand that right, a position can reopen and readvertise again to this date. I think this would be the original date of that job posting closing --
Q Okay.
A -- whether it's been opened three, four times --
Q So --
A -- in the last two weeks.
Q Okay. So this, this would create a record of how many times the position reopened to fill it if it didn't get filled in the first advertising; is that correct?
A I am not sure.
Q Okay. Did you ever get involved in a situation where there was a layoff of county workers, and subsequent to their layoff -- they're not working, and subsequent to their layoff a person from a different department who has light duty is, is being placed in the department where the workers have been laid off, and the workers who are laid off are pretty upset about that, and so it resulted in a policy or an

Page 76

agreement where positions would not be placed in other departments.
Have you ever heard of such a thing?
A I do not remember that.
Q Do you deal with -- in your recruitment duties have you dealt with -- was there a period of time when workers were laid off in the department because of budgets?
A Yes.
Q What period was that?
A I can't remember. Any specific job?
Q Department, a period. You don't recall?
A Most recently we had a department under the D.A.'s Office that was reorganized and two employees were laid off.
Q When you recruit people, is there a consideration that you're asked to give to workers who have been laid off, or are you free to recruit whomever?
A I try and let a hiring manager know if any of the layoff applicants are in, in their applications that I have sent to them.
Q Have you hired positions for the library, or recruited for positions for the library?
A Yes, we do.

Page 77

Q And when you're recruiting for a department, do you, do you have to consider whether or not the department has extra workers temporarily on light duty?
Is that ever a factor in what you do?
A No, it is not.
Q I'd like to show you what's been marked as Exhibit 26 to Sarah Christensen's deposition. If you could take a look at that, please.
Have you seen this document before?
A No, I have not.
Q This is a document from Scott Shick. It's a letter from Scott Shick to John Enos, and he writes:

> I have received and seriously considered your request for leave of absence dated February 17, 2015, pursuant to Douglas County Policy 200.40. However, after considerable deliberation, your request is being denied.

Do you have any information about that matter?
A No, I do not.
Q And you've seen or overheard no communications regarding that matter?
A I have not.

Q I'll show you what has been marked as Exhibit 28, Sarah Christensen's deposition. If you could please look at this document.
Okay. Have you seen this document before?
A No, I have not.
Q In this letter, Scott Shick writes to Mr. Enos:

> Due to his absence for work for three consecutive days, the Juvenile Probation Department accepts his resignation with respect to a provision that says an unauthorized absence for three consecutive days shall be regarded as an automatic resignation and termination from county court judicial service.

Do you have any information about these matters?
A No, I do not.
Q And have you -- have you witnessed any communications by anyone regarding these matters?
A Not that I remember.
Q Do you get involved, or is there an overlap of your involvement with anyone else with regard to



vocational rehabilitation counselors requesting placement of a former employee?
Do you understand my question?
A Yes. And no, I do not.
Q Okay. Do you -- are you aware that from time to time a vocational rehabilitation counselor may contact Douglas County and request that the county offer or rehire an employee who was on Worker's Comp?
You're familiar with that concept?
A I -- no, I'm not.
Q Okay. Let me show you what's been marked as Exhibit 29 to Sarah Christensen's deposition. Please look at that.
Okay. Have you seen that document before?
A No, I have not.
Q And do you have any information about the matters set forth in that document?
A No, I do not.
Q Okay. This document is a, is a letter from Ed Howden, who writes to Sarah Christensen explaining that he's working with John Enos. And this letter requests -- it states:

> Return to work within your company is the best option if at all possible. I am always



> available to discuss with you various options for returning Mr. Enos back to work. However, if you are unable to provide physically appropriate work, vocational rehabilitation services may be provided for the injured employee.

And then it goes through steps. And he asks the county to fill out whether it will offer a job or not offer a job under the Intent to Offer Employment Form.
So my question to you is, given that your turf, if you will, is recruitment, you don't have any overlap with anyone else in HR regarding matters where vocational rehabilitation counselors requesting that the county evaluate whether an injured worker can be rehired, you don't deal with that?
A I do not. It would be deferred to my manager.
Q Okay. And your manager, you're referring to either Wendy Lang or Norma Santoyo?
A Correct.
Q Do you work with Kathy Jo Kidd -- or did you work with Kathy Jo Kidd on certain types of matters, or



did you work by yourself without her?
A She was my co-worker.
Q What types of things would you work with her on, if you worked with her on anything?
A Revisions to job descriptions. Very little. Very little.
Q Okay. And you mentioned revisions to job descriptions. I showed you that job questionnaire before.
Is that -- did that have any factor in revising job descriptions?
A No. I -- no, I do not know.
Q What -- when you talk about revisions to job descriptions, what do you mean?
A Certificates being held. Being -- certificates required within six months of employment, such as a CDL certificate. Things like that.
Q How does that factor in to revising a job description? I'm sorry. I'm not following the connection.
A You add verbiage to a job description that will revise the job description from the original.
Q Okay. I want to show you what's been marked as Exhibit 47 -- 46, excuse me -- to Justina Caviglia's deposition. If you'd take a look at that, please.

A Okay.
Q Have you seen this document before?
A Parts of it.
Q What parts have you seen before?
A The supplemental questions. It looks like an application, maybe. Yes, yes.
Q So this is John Enos's application for that position that came open in December of '16; is that correct?
A Yes.
Q And how are you able to tell?
A The job number is 161700062.
Q And that corresponds to a juvenile probation officer?
A To this particular exam plan, yes.
Q Okay. And does this refresh your recollection as to whether you looked at John Enos's application or whether you just simply pulled it off and forwarded it?
A No, I don't remember.
Q Well, you said that you looked at the supplemental -- is it supplemental questions, you said?
A I look at -- yeah, I could see that they were supplemental questions from the application, yes.
Q And that starts at what page? What page



number does it start with?
PLF 2882, at the bottom?
A 2883.
Q Well, it starts -- do the supplemental questions start at the very bottom of 2882?
A I guess so.
Q Agency-wide --
A The agency-wide questions.
Q Okay. And you said you looked at those.
How do you know that you looked at these?
A In what respect?
Q Well, I may have --
A I just saw them right here.
Q I may have misunderstood your testimony. I thought when I asked you have you seen this document before and you said portions, and I asked you to list what portions, and you -- I believe you testified that you looked at the supplemental questions.
A The supplemental questions are, are familiar only because this is how our applications come out.
Did I read each one? No, I did not.
Q I might be misunderstanding you.
Are you saying that you recognize them as types of questions, that you've seen them before, or are you saying that you actually have -- you've seen



these particular questions and answers in this document?
A Types of questions that we ask --
Q Okay.
A -- for our applicants.
Q All right. So you don't have any particular recollection of seeing this actual application?
A No, I do not.
Q Do you have any information about, other than what you testified, any discussions about this application by anyone?
A Kathy and I looked at it about a week ago. I, I did not dissect it. I did not really review it.
Q But this doesn't refresh your recollection as to anything -- I mean, you've testified as you have. I'm not even going to characterize it. What you said is what you said.
But my question is, in looking at this, does it change anything that you said?
Do you, do you -- are you aware of communications by anyone in the department or Scott Shick or anyone about Enos, or is -- are your answers still the same after looking at this document?
A It's still the same.
Q Okay. Is there anything in this document



that would indicate someone has received this from the department?
A Say again? I'm not sure I understand.
Q Is there any, any line item in here of confirmation that it was sent or received by someone in juvenile probation?
Does that form have a field that would designate that?
A No.
Q Is there any other way you might be able to tell?
A Through my software program.
Q All right. Let me show you what's been marked as Exhibit 47 to the Justina Caviglia deposition.
If you could please look at this document.
A Okay.
Q All right. You wrote this, correct?
A Yes.
Q And you wrote this at or about the date and time that's listed here?
A Yes.
Q And you wrote, in the first paragraph:
Dear John, Thank you for the time you took to complete the

application for juvenile
probation with Douglas County
Juvenile Probation Department.
We were fortunate to have several
qualified candidates apply for
this position, making this --
making the decision very
difficult. However, after
careful consideration, the
department has selected another
applicant.

Do you recall writing this?

A It is a form letter that I send out once the position has closed.

Q My question is, do you recall writing that?

A It is a form letter that I have originally written in the system that I use when a position closes.

Q So this isn't a unique email sent to John. This is the same email that you would send to all the other applicants, correct?

A Yes.

Q And you don't have any specific recollection of sending this to John?

A I sent it to all the applicants that, that



were not selected.

Q But you have a lot of applicants. You don't -- there's nothing about this that you particularly remember that -- you're relying on the fact that this is coming from your email. You don't have any specific memory of sending this; is that correct?

A Correct.

Q Okay. When you wrote, "We were fortunate to have several qualified candidates apply for this position, making the decision very difficult," that was just a form letter prewritten, correct?

A It is a form letter.

Q So you don't know one way or another whether there were several qualified candidates that applied for that position; is that correct?

A That is correct.

Q And you also don't know whether the decision was difficult to make in not hiring Mr. Enos; is that correct?

A Correct.

Q You write, in the next paragraph:

We encourage you to apply for any
future openings with Douglas
County for which you have an



interest. All available
positions are posted at our
website.

And you list the website.

You may also sign up for future
vacancies that you would be
interested in with the job
interest card. When a job
announcement is posted, you will
receive an email notice.
Please accept our best wishes,
and thank you for your interest
in employment opportunities with
Douglas County.

That also is part of the form letter, correct?

A Correct.

Q And as you've looked at all these documents, you recall no other conversations, anything from Scott Shick or anyone in the Juvenile Probation Department, about this application from John Enos or whether to hire him?

A No, I do not recall that.

MR. GEDDES: All right. Let's go off the record for five minutes if we can, please.



THE VIDEOGRAPHER: We are going off the video record at approximately 11:07 a.m.

(Whereupon a recess was taken.)

THE VIDEOGRAPHER: This is the beginning of media number 3 in the continuing deposition of Cindy McMurry.

We are going back on the video record at approximately 11:20 a.m.

MR. GEDDES: Okay. I'll go ahead and pass the witness.

MS. PARKS: I have no questions.

MR. GEDDES: Okay.

BY MR. GEDDES:

Q Ms. McMurry, I'll tell you the rules that -- I'm done with my deposition, so thank you.

And what we want to do is go over the rules for what will happen now.

You will receive a copy of your transcript. And you will have 30 days to make any changes to errors that are contained in the record.

Now, my understanding of the rule is that it allows you to fix errors that are errors in transcription. If you make substantive changes beyond errors in the record, be forewarned that we will comment upon that to a jury to argue that you're

**shifting in your position, you're trying to change your testimony, and that you're not a credible witness. So the reason why I say this is to have you take great care if you make changes to the record as to these matters.**

**Do you understand that?**

A Yes, I do.

**Q Okay. And I believe Ms. Parks can assist you with getting a copy of the transcript so that you can review it. They have a, an errata sheet or an index sheet where you will write the line -- the page and the line numbers where there is an error and what the correction should be, and then you would sign and date that.**

**Other than that, thank you very much for coming down today. We appreciate it.**

THE VIDEOGRAPHER: This concludes the deposition of Cindy McMurry on March 4th, 2019.

We are going off the video record at approximately 11:22 a.m.

(Whereupon the deposition was concluded at 11:23 a.m.)

-oOo-



STATE OF NEVADA )
) ss.
WASHOE COUNTY )

I, DEBORA L. CECERE, a Certified Court Reporter, State of Nevada, do hereby certify:

That on Monday, the 4th day of March, 2019, at the hour of 8:59 a.m. of said day, at 151 Country Estates Circle, Reno, Nevada, personally appeared CINDY McMURRY, who was duly sworn by me to testify the truth, the whole truth, and nothing but the truth, and thereupon was deposed in the matter entitled herein;

That I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter;

That said deposition was taken in verbatim stenotype notes by me, a Certified Court Reporter, and thereafter transcribed into typewriting as herein appears;

That the foregoing transcript, consisting of pages 1 through 91 is a full, true and correct transcription of my stenotype notes of said deposition.

DATED: At Reno, Nevada this 14th day of March, 2019.

[signature]

DEBORA L. CECERE, NV CCR #324, CA CSR #8821



ERRATA SHEET

I declare under penalty of perjury that I have read the foregoing _______ pages of my testimony, taken on _______________________ (date) at _________________(city), ________________(state),

and that the same is a true record of the testimony given by me at the time and place herein above set forth, with the following exceptions:

| Page | Line | Should read: | Reason for Change: |
|---|---|---|---|
| ___ | ___ | _______________ | _______________ |
| | | _______________ | _______________ |
| ___ | ___ | _______________ | _______________ |
| | | _______________ | _______________ |
| ___ | ___ | _______________ | _______________ |
| | | _______________ | _______________ |
| ___ | ___ | _______________ | _______________ |
| | | _______________ | _______________ |
| ___ | ___ | _______________ | _______________ |
| | | _______________ | _______________ |
| ___ | ___ | _______________ | _______________ |
| | | _______________ | _______________ |



ERRATA SHEET

| Page | Line | Should read: | Reason for Change: |
|---|---|---|---|
| ___ | ___ | _______________ | _______________ |
| | | _______________ | _______________ |
| ___ | ___ | _______________ | _______________ |
| | | _______________ | _______________ |
| ___ | ___ | _______________ | _______________ |
| | | _______________ | _______________ |
| ___ | ___ | _______________ | _______________ |
| | | _______________ | _______________ |
| ___ | ___ | _______________ | _______________ |
| | | _______________ | _______________ |
| ___ | ___ | _______________ | _______________ |
| | | _______________ | _______________ |
| ___ | ___ | _______________ | _______________ |
| | | _______________ | _______________ |

Date: __________ ____________________________
Signature of Witness

____________________________
Name Typed or Printed