# EXHIBIT 14

## DEPOSITION TRANSCRIPT OF VICTORIA (VICKY) SAUER-LAMB

EXHIBIT 14

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

---oOo---

JOHN ENOS, an individual,

Plaintiff, 3:17-cv-00095-MMD-VPC

-vs-

DOUGLAS COUNTY, a political subdivision of the State of Nevada, ET AL.,

Defendants.

---

DEPOSITION OF VICTORIA SAUER-LAMB

Wednesday, October 10th, 2018

Reno, Nevada

Job No. 502641

Reported by: KATE MURRAY, CCR #599

APPEARANCES:

FOR THE PLAINTIFF:

THE GEDDES LAW FIRM, PC
Attorneys at Law
WILLIAM J. GEDDES, ESQ.
8600 Technology Way, Suite 107
Reno, Nevada 89521

GALLIAN, WELKER & BECKSTROM, LC
Attorneys at Law
RAELENE PALMER, ESQ.
540 East St. Louis Avenue
Las Vegas, Nevada 89104

FOR DOUGLAS COUNTY:

THORNDAL, ARMSTRONG, DELK, BALKENBUSH & EISENGER
Attorneys at Law
KATHERINE PARKS, ESQ.
WADE CARNER, ESQ.
6590 South McCarran Boulevard, Suite B
Reno, Nevada 89509

ALSO PRESENT:
JOHN ENOS



INDEX


| EXAMINATION: | | PAGE: |
|---|---|---|
| By Mr. Geddes | | 5 |

| EXHIBITS: | | PAGE: |
|---|---|---|
| Exhibit 1 | Job Description, Juvenile Probation Officer - Senior | 59 |
| Exhibit 2 | Job Description, Chief Deputy Juvenile Probation Officer | 60 |
| Exhibit 3 | Notice of Injury or Occupational Disease, Incident Report | 76 |
| Exhibit 4 | Tahoe Fracture Clinic, Excuse from Work or School, 2/28/2014 | 80 |
| Exhibit 5 | Douglas County Statement | 96 |
| Exhibit 6 | Notice of Injury or Occupational Disease, Incident Report | 99 |
| Exhibit 7 | Sierra Neurosurgery Group Physical Limitations/Work Restrictions Report, 7/22/2014 | 111 |
| Exhibit 8 | Letter from Scott Shick to John Enos, 7/17/2014 | 122 |
| Exhibit 9 | E-mail string, 1/20/2015 | 133 |
| Exhibit 10 | Tahoe Fracture & Orthopedic Work/School Excuse, 1/28/2015 | 136 |
| Exhibit 11 | Handwritten note | 142 |
| Exhibit 12 | Letter from Norma Santoyo to John Enos, 2/13/2015 | 146 |
| Exhibit 13 | Handwritten letter from John Enos to Human Resources, 2/17/2015 | 153 |





| EXHIBITS: | | PAGE: |
|---|---|---|
| Exhibit 14 | Various medical records | 157 |
| Exhibit 15 | Letters from Scott Shick to John Enos, February 2015 | 160 |
| Exhibit 16 | Letter from Edward Howden to Sarah Christensen, 4/5/2016 | 165 |




BE IT REMEMBERED that on Wednesday, October 10th, 2018, at the hour of 8:54 a.m., of said day at the offices of SUNSHINE LITIGATION SERVICES, 151 Country Estates Circle, Reno, Nevada, before me, KATE MURRAY, a certified court reporter, personally appeared VICTORIA SAUER-LAMB, who was by me first duly sworn, and was examined as a witness in said cause.

---oOo---

VICTORIA SAUER-LAMB,
after having been duly sworn, testified as follows:

EXAMINATION

BY MR. GEDDES:

**Q. This is the date and time set for the deposition of Vicky Sauer-Lamb in the matter of Enos versus Douglas County, et al., Case No. 3:17-CV-95 now pending in the US District Court for the District of Nevada.**

**Good morning, ma'am.**

A. Good morning.

**Q. Could you please identify yourself by first and last name and spell your last name for the record, please?**

A. It's Victoria Sauer-Lamb, S, as in Sam, A-u-e-r, dash, Lamb, L-a-m-b.
Q. Good morning, Ms. Lamb. My name is Will Geddes. I'm an attorney representing the plaintiff, John Enos, who is also seated here, and seated to his left is co-counsel, Raelene Palmer.
I will be taking your deposition today and what I have to do -- I apologize if you have had your deposition taken before. I have to go over the ground rules of a deposition.
A. I have never had.
Q. Okay. I have to make sure you understand how this deposition is going to proceed today and the obligations you're under when testifying today.
The following explanations aren't given in any underestimation of your intelligence. I just have to go over them to make sure that the deposition is conducted properly.
So during this deposition, you're testifying under oath and under penalty of perjury under the laws of the United States. Therefore, you're required to testify truthfully, completely, and to the best of your knowledge, just as if you were testifying in court in front of a judge and jury.



Do you understand this?
A. Yes.
Q. Now, the purpose of this deposition is to allow the parties to become adequately informed of the facts and issues of the case and to enable us to prepare for trial.
Our purpose here today is to avoid surprise at trial and to elicit truth. This deposition also provides you with an opportunity to explain away any inconsistencies in the testimony you give here because if at the time of trial your testimony is different than it is today in your deposition, we will definitely draw attention to the inconsistent testimony to a jury to show the jury that you're not a credible witness. Do you understand this?
A. Yes.
Q. Therefore, it's very important to remember throughout your deposition today that if you wish to explain away or clarify any issue or fact or any part of your testimony, then today is the best day to do it, not at the time of trial. Do you understand this?
A. Yes.
Q. Now, my purpose here today is not to



trick you. I'm not here to confuse you, but to allow you to take your time and to understand the question and to provide truthful testimony.
If you give an answer to a question, we can only assume that you understood the question. However, especially with attorneys, sometimes questions can be very bad, very badly phrased, very confusing and very unclear. So it's really important if you don't understand a question, the burden is on you to tell us or tell me or whoever is asking you a question, so we can rephrase the question and break it into smaller pieces or somehow ask it in a way that makes better sense. Do you understand this?
A. Yes.
Q. Today, we are actually entitled to receive your best testimony based on your best recollection of the facts and events, and in this regard, it's very important for your testimony to be reliable.
We would like to determine whether your recollection is -- those are things that you independently recall, but if you don't know the answer to a question, you should simply state that you don't know the answer. Do you understand this?



A. Yes.
Q. Keep in mind, where you are initially unable to independently recall facts or events, I may try to refresh your recollection either by asking additional questions, so it's not to bully you, it's just to jog your memory, or by showing you documents.
Alternatively, you may have brought documents yourself, which might help you recall facts and events, but either way, we're are entitled to your best efforts at refreshing your recollection, so you can give truthful, accurate, and complete testimony today. Do you understand these things?
A. Yes.
Q. Sometimes, it is appropriate for you to give your best estimate, even though you're not completely certain of matters capable of judgment by ordinary people concerning time, size, distance, but it's really important that you not speculate on matters during your deposition.
You can give reasonable estimates, but you just can't speculate.
An example that is often given, the one that relates to size, for example, we may say,

Ms. Sauer-Lamb, what length is your estimate of this table, and based on your ability to look and estimate, you might be able to offer an informed opinion, and that would be okay.

But if I asked you how big the table is in the conference room at my office, assuming you have never been there, that would be inappropriate for you to offer an opinion on because that is complete speculation.

Do you understand the difference then?

A. Yes.

Q. There is a court reporter here who is seated to your left, and she has a very difficult task. She has to take down every single word that is spoken today, and so that the record is clear, it's important that we try very hard not to speak over one another.

Sometimes, I might accidentally interrupt you, and sometimes, you might accidentally interrupt me, and so sometimes the court reporter will yell at us to try and not speak over one another, and so that is what we should try to do.

It's also important to remember that you're testifying today with words, not gestures. Gestures are useless to the court reporter. It's



not going to be reflected in the record.

It's important to verbalize your responses, just like now, for example, you're nodding your head, which is human nature, and I haven't asked you question. It's very natural.

Rather than nod your head, you would say yes, and rather than shake your head, you would say no, and also, sounds like, "uh-huh," and, "huh-uh," are mostly unclear, so please, if you can, remember to use words. Do you understand these things?

A. Yes.

Q. Now, you have your attorney here, who is seated to your right, and as I said earlier, Ms. Palmer and I represent the plaintiff, Mr. Enos.

From time to time, you will hear Ms. Parks -- most likely, you'll hear her make objections to questions I ask.

You are still required to answer the question unless she specifically instructs you not to answer a question. There is a difference. Basically, what happens in depositions is attorneys make objections to the form of the question, and that has to do with lawyerly objections and issues of preserving matters and objections for trial.

It doesn't relieve your obligation to



testify, but if she turns to you and says, I'm instructing you not to answer the question, and that would be, for example, based on a privilege or the scope of a restriction by a court order, then you could either take her advice or disregard her advice, but that would be an instance where you could evaluate not answering the question.

So do you understand these things?

A. Yes.

Q. Okay. In order to ensure the reliability of your testimony today, I have to ask if you're currently under the influence of any medication, drug, or alcohol?

A. No.

Q. Is there any reason you won't be able to understand my questions today?

A. No.

Q. Is there any reason you won't be able to give your best testimony today?

A. No.

Q. Did you bring any documents with you to your deposition today?

A. I did not.

Q. What did you do to prepare for your deposition?



A. I met with Ms. Parks.

Q. I'm not interested in any communications you would have had with her.

A. Yeah. I met with Ms. Parks a couple of days ago, and last year, when I was named in the complaint, I guess is what it's called, I reviewed it.

Q. Okay. Now, in addition to Mrs. Parks, in preparation for your deposition today, did you speak with anyone else?

A. No.

Q. Where do you live?

A. In Reno.

Q. What is your address?

A. 9510 Comanche Moon Drive, Reno, Nevada 89521.

Q. How long have you lived there?

A. Twenty-six months, a little over two years.

Q. Do you plan on moving your residence in the next two years?

A. Not from the Reno area, no. I'm renting right now, so it just depends on if they want to put the house up for sale, then I might have to.

Q. Do you believe where you move in the Reno

**area will be 100 miles from the courthouse?**
A. Oh, yes, yes.
**Q. How old are you?**
A. I'm 58 years old.
**Q. Are you married or have you ever been married?**
A. I am currently married but separated.
**Q. Do you have any children?**
A. I do.
**Q. Where did you go to high school?**
A. George Whittell High School in Zephyr Cove, Nevada.
**Q. Can you summarize your educational background, please?**
A. I have a bachelor's degree in criminal justice from the University of Nevada, Reno. I have a master's degree in justice management with a specialty in juvenile justice from the University of Nevada, Reno.
I was a licensed alcohol and drug abuse counselor for the State of Nevada for 25 years. I also was a certified juvenile justice administrator through the State of Nevada, and I possessed basic, intermediate and advanced management certificates from the Peace Officers Standards and Training.



**Q. What are your hobbies?**
A. What are my hobbies? Shopping, watching sports, I am big 49er fan. John knows that. I love spending time with my family and traveling, and I work part-time at my favorite clothing store.
**Q. Where is that?**
A. Talbot's here in Reno.
**Q. Have you ever been convicted of a crime?**
A. No.
**Q. Have you ever been a party to a litigation other than this case?**
A. No.
**Q. I think you said you have never testified in a deposition before; is that right?**
A. Yes.
**Q. Have you ever testified at trial before?**
A. As a juvenile probation officer, sometimes we would be called to testify in what was called a fact finding hearing regarding a juvenile, so I did that maybe a handful of times in my career, not very often.
**Q. Have you ever received education or training on the subject of employment discrimination?**
A. No.



**Q. Let's talk about the places you have worked. We can work in reverse order.**
**I understand you say you work at Talbot's, but prior to that, you worked at the Douglas County Juvenile Probation Department?**
A. Yes.
**Q. We're going to focus on that. What was the time period for that?**
A. From January 11th, 1983 to July 3rd, 2015.
**Q. Okay. What was your job prior to that?**
A. Prior to juvenile probation?
**Q. Yes.**
A. Oh, gosh. I was in college.
**Q. Okay. So you didn't have prior --**
A. No.
**Q. Your first job -- when did you -- your first job was 1983, basically out of college?**
A. It was actually my last semester of college when I got hired.
**Q. Okay. Now, when you started work in 1983, can you tell us what you first started out as?**
A. I was a child abuse and neglect investigator for Douglas County.
**Q. Okay. Can you summarize what you did?**



A. At the time, the counties were given contract money through the State of Nevada to provide child abuse and neglect services, and so I was the investigator basically who investigated child abuse and neglect cases as they were reported in Douglas County.
**Q. What was the timeframe of that?**
A. That was -- well, in 1983, that is what I was hired for, and then I graduated in May of 1983 from college and I was sworn in as a juvenile probation officer as well, so I only did the child abuse and neglect solely for six months.
I think it was 1988 when the state took back all their contracts from the rural counties, so I was doing both jobs for approximately five years.
**Q. So you were a juvenile probation officer under a contract?**
A. Well, it's kind of complicated. Do you want me to explain how that worked?
**Q. Sure.**
A. Back in the early 80s, there were only two or three actual county employees paid by the county in juvenile probation. That was the chief and at the time it was called the senior deputy, and maybe one other position.

All the other positions were grant funded, so mine was through a contract through the state, and then July 1st, 1985, I became an actual county employee, so no longer were contracts and grants paying for our positions.

Everybody became county employees with the benefits of retirement and all of that, so yes, the first two and a half years, I was considered a contract employee. I didn't earn retirement benefits until starting July 1st, 1985.

**Q. Okay. How long were you a juvenile probation officer?**

A. Well, basically from May 1983 until I retired in July of 2015. I was promoted to chief deputy in January of 2003.

**Q. Okay. What supervisory role did you have as a chief deputy juvenile probation officer?**

A. Well, my role was basically to supervise the juvenile probation officers, assign the cases. I also supervised the administrative assistant and our wilderness director, he later became a probation officer, but he was our wilderness director.

I would, like I said, assign cases and manage the office to make sure it ran effectively and efficiently.



**Q. When you were the chief deputy juvenile probation officer, was it part of your job duties or description to assist with processing workers' compensation claims?**

A. No.

**Q. Was it part of your job duties or description to assist with any discrimination claims that might have been made?**

A. No.

**Q. Have you read any of the legal pleadings in this lawsuit?**

A. Is that the complaint?

**Q. Yes.**

A. I read it about a year ago.

**Q. Have you read any other documents in the case, any motions or any orders?**

A. No.

**Q. What is your understanding of the lawsuit? I want to take a step back. When I ask you questions about your understanding of things, attorneys may think that is not a correct understanding or that's a legal matter.**

**I'm not interested in whether you're right or wrong. I'm just interested in what your understanding is.**



**What is your understanding of the lawsuit?**

A. That John is suing Douglas County.

**Q. Why?**

A. I'm a little confused about that. I am not quite sure. I think -- well, I don't know. Can I say, "I think"?

**Q. If you don't know, you don't know.**

A. He is suing Douglas County.

MS. PARKS: You're not required to guess. If you don't know, you don't know.

BY MR. GEDDES:

**Q. Do you know John Enos?**

A. Oh, yes.

**Q. How do you know him?**

A. Well, I worked with him.

**Q. For how long?**

A. I don't know when he started, but until February of 2015. I also knew him prior to coming to work at juvenile probation.

**Q. How did you know him prior to that?**

A. He worked at China Spring Youth Camp and at Family Support Council.

**Q. If you had to estimate, how long would you say you have known Mr. Enos?**



A. Up to this day?

**Q. Yeah.**

A. Twenty-three years, maybe.

**Q. How would you characterize your relationship with Mr. Enos? Personal, personal and professional, or strictly professional?**

A. Personal and professional.

**Q. After leaving your employment with Douglas County, did you have any communications with Mr. Enos?**

A. I saw John one time at a local copy place making -- office supply place, and I'm thinking that was a few months after I retired.

I don't remember the exact date, and he was getting something copied. I was getting something copied. We visited for probably 10, 15 minutes and --

**Q. Can you summarize what the conversation was?**

A. Well, we talked a little bit about his stepdaughter and how she was doing, and how John was doing physically. He told me, I believe it was his back or shoulder was still injured, and he had still some medical stuff going on.

I expressed my sadness or my condolences

for that, and I don't think we really talked about anything else.
**Q. In that conversation with him, did you tell him words to the effect that you were glad you didn't work at the county anymore?**
A. I don't know if I used those words. I think I probably said I was happy to be retired and I love retirement, but I don't recall using those words.
**Q. Do you know Scott Shick?**
A. I do.
**Q. How do you know him?**
A. He was my supervisor at juvenile probation.
**Q. When you were a deputy chief?**
A. No. Actually, he started in January 2002, and I was still -- we call them senior probation officers, and he was my boss, and then I got promoted a year later.
**Q. And he was still your boss?**
A. Yes.
**Q. You understand that Mr. Shick is a defendant in this lawsuit?**
A. Yes.
**Q. How long have you known Mr. Shick?**



A. Since January 2002.
**Q. How would you characterize your relationship with Mr. Shick? Personal, personal and professional, or strictly professional?**
A. Personal and professional.
**Q. After leaving your employment at Douglas County, did you have any communications with Mr. Shick?**
A. Maybe a couple of phone calls and then I was invited to the Christmas luncheon that December 2015, so I saw him and the rest of the office there, and I saw him at a Christmas party for Rite of Passage, I think it was last year or the year before.
We haven't socialized other than I have seen him at places, but we haven't socialized.
**Q. Have you discussed with him in any of those communications, and we're talking about the timeframe after you left employment at Douglas County, in any of those communications with Mr. Shick, did you all talk about Mr. Enos?**
A. In relation to this, or just in general?
**Q. About anything?**
A. Not that I'm aware of, in general. It was more specifically to the lawsuit.



**Q. What did you guys talk about?**
A. Well, Scott called me and said that I was named and I said I knew that. I had spoken with Mrs. Parks, and then he -- what did he say to me?
I talked to him twice. Once was in November of last year, and then in January of last year after I found out it had been -- I think my deposition was supposed to be in January, so when I found out it was stayed, and he just told me he had spoken with Mark Jackson --
**Q. One second. Is that an attorney?**
A. I was going to tell you who he is.
**Q. Okay.**
A. Mark Jackson, who is the district attorney in Douglas County.
**Q. Okay.**
A. Scott was talking to him about a deposition, and Mark just said to tell the truth and answer your questions as you know it, so that was all we talked about. We didn't talk about specifics with John.
**Q. How frequently do you speak with Mr. Shick nowadays?**
A. I haven't spoken to him since last January.



**Q. Do you know someone by the name of Nathan Tod Young?**
A. I have known him since he was a public defender, and now, he is the judge in Department 1 in Douglas County.
**Q. Do you understand he's a defendant in the lawsuit?**
A. Oh, no, I did not.
**Q. How long have you known him?**
A. Oh, my goodness. Well, since he was an attorney -- approximately 30 years.
**Q. How would you characterize your relationship with him? Personal, personal and professional, or strictly professional?**
A. Strictly professional.
**Q. After leaving your employment with Douglas County, did you have any communications with him?**
A. No.
**Q. Do you know someone by the name of Michael Gibbons?**
A. I do.
**Q. Who is that?**
A. He worked at the District Attorney's Office and was judge in Department 2 of Douglas

County.
**Q. You understand he's a defendant in this lawsuit?**
A. No, I did not know that.
**Q. How long have you known him?**
A. Well, I have known him since my first day of juvenile probation, since January 11th, 1983.
**Q. How would you characterize your relationship with him? Personal, personal and professional, or strictly professional?**
A. It used to be personal and professional.
**Q. After leaving your employment with Douglas County, did you have any communications with him?**
A. I have not.
**Q. Do you know someone by the name of Norma Santoyo?**
A. I do.
**Q. Who is she?**
A. She was the director of human resources for Douglas County.
**Q. How long have you known her?**
A. I have no idea. Five years maybe. I don't really even know her, so I think five years.
**Q. How would you characterize your**



**relationship with her? Personal, personal and professional, or strictly professional?**
A. Strictly professional.
**Q. Now, you understand that -- when you were working at Douglas County, you left, and when you left, was Norma Santoyo still working there?**
A. I don't think so. I think she had left prior to me leaving, and there was an interim human resources director, and I don't remember who it was, and then I believe Wendy, and I don't know her last name. I think she came on right around the time I retired.
**Q. So after Norma Santoyo left her employment with Douglas County, slightly before when you left yours, did you have any communications with her?**
A. No.
**Q. Do you know someone by the name of Karen Barbee?**
A. No. I don't believe so.
**Q. Do you know someone by the name of Sarah Christensen?**
A. Yes.
**Q. How do you know her?**
A. She worked for human resources.



**Q. Doing what?**
A. I don't know what her job title was. She was at the front desk, and she would be the one when I had questions, I would ask the questions to.
**Q. About?**
A. Workmen's comp.
**Q. How long have you known Sarah?**
A. Fifteen years.
**Q. How would you characterize your relationship with her, personal, personal and professional, or strictly professional?**
A. Mainly professional. She actually lived down the street from me for a period of time before we moved. I knew her as a neighbor. I didn't socialize with her, but I knew her as my neighbor, but mainly it was professional through human resources.
**Q. After you left your employment with Douglas County, did you have any communications with her?**
A. I don't think so, with her. No, there was some insurance questions I had, but it wasn't with her. It was with our insurance person, so no, she maybe answered the phone when I called human resources.



**Q. Do you know someone by the name of Kathy Jo Kidd?**
A. Kathy Jo Kidd? I believe I do. I think she may -- if this is the one I am thinking of, she was the mother of a juvenile we had on probation at one point.
The name sounds familiar, but I'm not sure if that is who I'm thinking of.
**Q. Did you have any communications with Kathy Jo Kidd regarding Mr. Enos?**
A. No. I don't believe so.
**Q. So I would like to switch gears here if we can and talk a little bit about the office administration structure and supervision, how the juvenile probation department worked.**
**In 2014 through 2016, what was the chain of command for the supervision of juvenile probation officers and senior juvenile probation officers.**
A. Okay. Well, I can't speak to anything after July 3rd, 2015, so all I can speak of is to the day I retired.
The chain of command, you want me to go from bottom to top or top to bottom?
**Q. Top to bottom would be helpful.**
A. Okay. The judges, basically it was

Department 2 who was in charge of juvenile probation and juvenile detention, so our two judges, Department 1 and Department 2 had their own departments that they oversaw, even though both judges could make decisions.

Department 1 was China Spring and Aurora Pines, and Department 2, which was Judge Gibbons and then Judge Gregory, was supervision for juvenile probation and juvenile detention.

So then below them was Scott. Below Scott was myself, and then it was the juvenile probation officers and administrative assistant.

**Q. So you talked a little about the judges. You're talking about the judges of the Ninth Judicial District Court?**

A. Yes.

**Q. They factored in the chain of command in an administrative capacity?**

A. Yes. I would say so.

**Q. What was the judges' role in the hiring of juvenile probation officers and senior juvenile probation officers?**

A. I don't know.

**Q. What about the judges' role in the disciplining of juvenile probation officers and senior juvenile probation officers?**



A. I don't know.

**Q. What about the judges' role in the firing of juvenile probation officers and senior juvenile probation officers?**

A. I don't know.

**Q. What about the judges' role in hearing the administrative appeals of juvenile probation officers and senior juvenile probation officers who were disciplined or fired?**

A. I don't know.

**Q. What about the judges' role in reversing the discipline imposed and the termination of juvenile probation officers and senior juvenile probation officers who were disciplined or fired?**

A. I don't know.

**Q. Did you ever attend meetings with the judges in connection with the administration of the juvenile probation office?**

A. No, not that I can recall.

**Q. This is one of those questions that I'm not asking you to be necessarily correct because it may require a legal opinion, but I'm interested in your personal understanding or your professional understanding when you were at work.**



**In 2014 through the time that you left in 2015, what was your understanding as to what personnel rules governed the discipline and firing of juvenile probation officers and senior juvenile probation officers?**

A. Well, we had what we called court regs. I guess their formal name was court regulations, but in my tenure, I don't believe we ever fired a juvenile probation officer, so I don't know what the role was.

**Q. That was how many years, you said, in your tenure?**

A. Thirty-two and a half years.

**Q. So in 32 and a half years, you don't recall a juvenile probation officer ever being fired?**

A. No, I don't.

**Q. Now, when you say you don't recall them being fired, do you recall a termination of a juvenile probation officer against that juvenile probation officer's desire?**

A. No, I don't.

**Q. Now, are the court rules that you're talking about here, are those the Ninth Judicial District Court personnel regulations, sometimes referred to as the order establishing court personnel regulations?**



A. Like I said, we called them court regs, so I don't know if that was the formal name. I don't have them in front of me, but it would be something that the judges wrote and signed.

**Q. So it was your understanding that those regulations applied to the juvenile probation officers?**

A. Yes.

**Q. Did you have an understanding one way or another as to whether the Douglas County personnel regulations applied or applied in part to the juvenile probation officers?**

A. Yes. It was my understanding that anything that was not specifically written in the court regs, we would defer to the county's policies and procedures.

**Q. So now in 2014, and 2015, the juvenile probation officers and senior juvenile probation officers who survived their probationary period were classified positions as opposed to at-will positions; is that right?**

A. Yes.

**Q. So your understanding was during that**

timeframe, the juvenile probation officers and senior juvenile probation officers who survived their probationary period could only be fired for cause; is that correct?
A. I was not -- I don't know that.
Q. You didn't have an opinion?
A. No. Yeah, that was not part of my duties.
MS. PARKS: Her testimony was she didn't know.
MS. SAUER-LAMB: Yeah. I don't know.
BY MR. GEDDES:
Q. So did you have an understanding one way or another during that timeframe whether or not notice, proper notice was required to these juvenile probation officers before they were fired?
MS. PARKS: Objection. Calls for a legal conclusion.
BY MR. GEDDES:
Q. Did you have an understanding one way or another?
A. No.
Q. Now, I think your testimony is during the 2014 to 2015 timeframe that judges were the ones on top as far as the chain of command?



A. Yes.
Q. In that timeframe, who supervised Scott Shick?
A. I believe it was -- I don't know when Judge Gibbons left, when he became on the appellate court. I don't know if that was 2014 or not, but it would be Department 2, which was Judge Gregory at some point, whenever he became the judge.
Q. But Judge Gibbons and Young would have also shared?
A. Well, Judge Gibbons mainly, and like I said earlier, both judges had say over all four of the departments, but mainly, it was Department 2 who supervised juvenile probation.
Q. Okay. So these judges had the power to discipline Scott Shick; is that correct?
A. I would believe so.
Q. Do they have the power to fire Scott Shick?
A. Yes.
Q. Did they have the power to hire someone new for the position that Scott Shick had?
A. They would, yes.
Q. And he was the chief of the juvenile probation department, correct?



A. Yes.
Q. Now, how is Douglas County's Human Resource Department involved in the disciplining, termination or hiring for Scott Shick's job?
MS. PARKS: Objection. Calls for speculation.
MS. SAUER-LAMB: I don't know.
BY MR. GEDDES:
Q. Okay. Did you work with the Douglas County Human Resources Department?
A. I don't -- I mean --
Q. Did you communicate with them? Did you interact with them in your daily --
A. Yes. Not in my daily work, no, no, not at all.
Q. From time to time, you would?
A. From time to time.
Q. So if I call it HR, you understand I'm saying human resources?
A. Yes.
Q. Did you have an understanding, whether correct or incorrect, as to how the HR department would be involved in disciplining, terminating, or hiring people who filled Scott Shick's job?
A. No.



Q. During the 2014 timeframe, I think your testimony is that both Scott Shick and the judges supervised you; is that correct?
A. Scott was my immediate supervisor. The judge was over the department, so yes.
Q. Okay. Both Scott Shick and the judges had the power to discipline you; is that correct?
A. Yes.
Q. And they had the power to fire you?
A. Yes. I was at-will.
Q. They had the power to hire someone new for the position you had?
A. Yes, I guess.
MS. PARKS: If you know. If you don't know, don't guess.
MS. SAUER-LAMB: Okay, yes.
BY MR. GEDDES:
Q. Did you have an understanding one way or another as to how Douglas County's Human Resources Department was involved in disciplining, terminating, or hiring for your job, the deputy chief juvenile probation officer?
A. Can I give a little -- I don't understand.
MS. PARKS: If you don't understand, you

can tell him that, Vicky, if you don't understand the question Mr. Geddes asked you.

MS. SAUER-LAMB: Yeah.

BY MR. GEDDES:

**Q. Did you have an understanding as to how your job was monitored for your compliance with the rules, your employment rules by HR, if they did at all?**

A. No.

**Q. Who supervised Norma Santoyo?**

MS. PARKS: Objection. Calls for speculation.

MS. SAUER-LAMB: I don't know.

BY MR. GEDDES:

**Q. Do you have any knowledge one way or another or opinion or thoughts as to who was responsible for supervising and disciplining her?**

MS. PARKS: Objection. Calls for speculation.

MS. SAUER-LAMB: No.

BY MR. GEDDES:

**Q. Do you have any knowledge regarding who supervised Sarah Christensen?**

MS. PARKS: Objection. Calls for speculation.



MS. SAUER-LAMB: Do I have any idea who supervised her? Yes.

BY MR. GEDDES:

**Q. What is --**

A. The director of human resources.

**Q. What do you base that on? Did you ever speak with the director of human resources?**

A. Regarding Sarah Christensen?

**Q. Just in general?**

A. Yes, yes.

**Q. So your understanding was from what you observed?**

A. Yes, yes.

**Q. Would your answer be the same for Kathy Jo Kidd? You think Kathy Jo Kidd was -- well, we'll get back to her.**

A. Okay.

**Q. Who supervised John Enos?**

A. I was his immediate supervisor when I became chief deputy.

**Q. But Scott Shick also had the authority to supervise him?**

A. Oh, yes.

**Q. And the judges as well?**

A. Yes.



**Q. All of you had the power to discipline him?**

A. I don't think I really had the power to discipline him.

**Q. Okay. Who had the power to discipline him?**

A. Scott Shick and the judges.

**Q. Who had the power to fire him?**

A. Scott Shick and the judges.

**Q. Who had the power to hire someone new for the position that he had?**

A. Scott Shick and the judges.

**Q. To your understanding, did Douglas County's HR Department have any role or function in the disciplining, termination, or hiring of juvenile probation officers or senior juvenile probation officers?**

A. I know at our interviews, we would have a representative from human resources there. I don't believe that they had any power of picking. They were just there representing the human resources department.

**Q. Okay. Now, did your -- in the juvenile probation department, did your office hold office meetings?**



A. Yes.

**Q. How frequently?**

A. Every Monday morning, or just about every Monday morning.

**Q. Who attended them?**

A. All the probation officers, myself, and Scott Shick.

**Q. Were the judges ever present at any of those meetings?**

A. They came, occasionally.

**Q. What types of meetings were they?**

A. Oh, my. Just going over the -- we would have a probation officer on call from Monday at 5:00 o'clock -- no, I guess it would be Monday morning, to the following Monday morning, so we would go over the weekend activities, if kids were in detention or what had happened, so we would go over that, go over -- oh, my.

We would go over things for the week. They were just general meetings, so it was whatever the flavor, or whatever we had to discuss, and also, if we had a birthday celebration that week, we would usually do it on Mondays because that was really the time during the week where we were all together.

**Q. Were minutes kept of such meetings?**

A. No.
**Q. Were such meetings video recorded or audio recorded?**
A. No.
**Q. During the 2013 to 2015 timeframe, to your knowledge, was John Enos ever injured in any workplace injuries?**
A. Yes.
**Q. Can you summarize your understanding of that?**
A. Well, there were two times that I know of. You want me to talk about both?
**Q. Sure.**
A. I believe it was -- the first one was summer of 2013, John was on a wilderness trip, and as I believe, a kid climbed a tree or climbed up something and fell, and fell onto John, and I believe that is when John hurt his wrist.
Then there was a second one in June of 2014 where John was assaulted, physically assaulted by a juvenile in custody.
**Q. Okay. So to your recollection, he suffered two workplace injuries?**
A. Yes.
**Q. I think you testified one was in the summer of 2013, and the other one was in June of 2014?**



A. Yes.
**Q. Do you know whether Mr. Enos pursued workers' compensation benefits for any of those workplace injuries?**
A. I know for sure the second one, and I think yes, on the first one.
**Q. Now, do you know whether Mr. Enos took time off in connection with those workplace injuries?**
A. Yes.
**Q. Can you summarize your understanding?**
A. I don't remember from the first one if he took time off immediately after it happened. I know he had surgery. He had physical therapy first and then surgery on his wrist, so he had medical time off recovering from the surgery from the first one.
Then the second one, I know he had time off, I believe, shortly after the injury because he was hurt, and then again, he had surgery on his wrist a second time because the screw had broken or come out as a result of the second injury.
**Q. Do you know what FMLA is?**
A. I'm familiar with it.



**Q. So do you know whether Mr. Enos took time off, FMLA time off in connection with his workplace injuries?**
A. I believe so.
**Q. Do you know for that second workplace injury, how long Mr. Enos took off from work?**
A. I believe his surgery was in November or end of October of 2014, and I don't know how long he was off after that.
**Q. Do you know whether his FMLA leave had run out at any time in 2014 or 2015?**
A. Yes.
**Q. What is your understanding?**
A. Justina -- I can't remember her last name, who was the civil attorney for Douglas County, had made mention that John's FMLA had run out or he had used all 12 weeks, so.
**Q. How do you remember that?**
A. She was asking for copies of his time card, and we kept copies of everybody's time card in the department, so I made the copies for her.
**Q. Do you know why she was asking for copies of his time cards?**
A. At the time, no.
**Q. Do you understand now why she was asking for copies?**



A. No.
**Q. Do you know whether or not Mr. Enos ever tried to return to work at Douglas County from FMLA leave?**
A. What do you mean, "Tried to return to work"?
**Q. Well, shows up, I'm ready to go. Did he ever try and get back to work physically, but was not allowed to return back to work? Do you recall that?**
MS. PARKS: Objection. Lack of foundation.
MS. SAUER-LAMB: I don't know about him not being allowed to come back to work, and like I said, I don't remember the dates.
He came back to work after his first injury, and so the second injury, I --
MS. PARKS: If you don't know the answer --
MS. SAUER-LAMB: I don't know. I don't know.
BY MR. GEDDES:
**Q. So do you know when Mr. Enos' employment with Douglas County ended?**

A. I don't know the exact date.
**Q. Do you have an approximate?**
A. I believe it was February 2015.
**Q. Okay. Do you know why Mr. Enos' employment with Douglas County ended?**
A. I believe it -- well, I believe it was because his FMLA had run out, and he had not been medically -- not approved, that's not the right word -- medically cleared to come back to work as a juvenile probation officer.
**Q. What do you base that understanding or opinion on?**
A. I was told by Scott Shick.
**Q. When were you told that?**
A. I don't remember the day, but it was the day that I had to call John and ask him to come to the office to get his stuff. I don't remember what day that was.
**Q. Now, during the 2014 to 2015 timeframe, do you recall attending any in-person meetings with anyone regarding John Enos?**
A. With anyone regarding John Enos? Yes, but I don't know -- yes, I do.
**Q. Approximately, how many?**
A. Two.



**Q. Who attended those meetings?**
A. The first one, and I'm not sure if it's in that timeframe you're talking about, was Norma Santoyo, Scott Shick, Sarah Christensen, myself, and then somebody was on the phone from workmen's comp.
**Q. When did that meeting occur?**
A. I don't know.
**Q. Approximately? Was it after his first workplace injury?**
A. No. I believe it was after his second.
**Q. Okay. What was the purpose of the meeting?**
A. I don't remember. It was someone from workmen's comp.
**Q. Do you know if Judge Young or Judge Gibbons attended that?**
A. No. I don't believe they were there.
**Q. But your testimony is it was Scott Shick, Norma Santoyo, you, and someone from workmen's comp?**
A. And Sarah Christensen.
**Q. What was Sarah Christensen's role in that meeting?**
A. As I understand it, she was the workmen's comp person for human resources.
**Q. Do you know if Karen Barbee was the person on the other end of the phone?**



A. I don't know.
**Q. Was John Enos at that meeting?**
A. No, he was not.
**Q. How long did that meeting last?**
A. Ten, 15 minutes, perhaps.
**Q. What happened in the meeting? Can you summarize it, describe it?**
A. Whoever was on the phone from workmen's comp talked about John's workmen's comp, and that is all I remember.
**Q. You said a second meeting. What was the second meeting?**
A. The second meeting was in the conference room next to human resources, and I believe it was Norma, Sarah Christensen, Scott, myself and John.
**Q. When did that meeting occur?**
A. I know it was after the workmen's comp meeting, but I don't know the date or the month.
**Q. What was the purpose of that meeting?**
A. I believe it was to talk about light duty options for John.
**Q. Who attended those meetings; did you say?**
A. Norma, Sarah Christensen, Scott Shick, myself, and John were there.



**Q. Were the judges there?**
A. No.
**Q. Can you summarize the discussions you had at that meeting?**
A. I just remember it was about light duty for John, or light duty options for John.
**Q. When you say, "Options," what do you mean?**
A. Well, the county -- Norma had represented that the county always tries to find light duty options for workers who are receiving workmen's comp. They don't want them sitting at home, so we were talking about light duty options for John.
**Q. Do you recall what those light duty options were?**
A. I don't know if it was at this conversation or a subsequent one, working at the library, Douglas County library.
**Q. Was the topic of the ADA or John Enos' rights under the ADA ever discussed at any of those meetings?**
A. No.
**Q. Was the topic of John Enos' termination ever discussed at any meeting that you attended?**
A. No.

**Q. Was the topic of John Enos applying for rehire after his employment with Douglas County terminated ever discussed at a meeting you attended?**

A. No.

**Q. Do you recall, aside from the meeting that had a phone call component to it that you testified, and the testimony you gave about the lawsuit that you had with Scott Shick, do you recall having any phone calls with anyone regarding John Enos?**

A. Ever?

**Q. In the 2014 to 2015 timeframe?**

A. Well, I would call Sarah Christensen if I had a workmen's comp question. If John would ask me a question or if I didn't understand how I was supposed to do something, I would call her and ask her because she was our workmen's comp person, so I'm sure I had conversations with her about John and time cards.

MS. PARKS: It's just what you recall. Don't guess.

MS. SAUER-LAMB: Yeah, so no.

BY MR. GEDDES:

**Q. Anyone else?**

A. I can't think of anybody else, no.



**Q. Did you ever have a conversation with anyone at any time regarding the topic of the Americans with Disabilities Act relating to John Enos or his rights under the -- I say ADA. It's the same thing, the Americans with Disabilities Act?**

A. No.

**Q. Did you ever have a conversation with anyone on the phone regarding John Enos' termination?**

MS. PARKS: Objection. Lack of foundation.

BY MR. GEDDES:

**Q. Let me say it this way. When I say the phrase, "Termination," I'm referring specifically to his separation of employment.**

**Did you ever have a conversation with anyone regarding John Enos' separation of employment, whether it was on the phone or in person?**

A. Yes.

**Q. Can you summarize those -- who did you have those conversations with?**

A. Scott Shick.

**Q. Can you summarize them?**

A. I don't remember the details of them.



**Q. How many conversations did you have with Scott Shick?**

A. Regarding this with John?

**Q. The separation of employment.**

A. Yeah. I know of one. That was whatever day it was I called John, so I can only really for sure say one.

**Q. Do you know if anyone else was present during that conversation with Scott Shick?**

A. No. It was on the phone.

**Q. How long did that call last?**

A. I don't know.

**Q. He instructed you to do what?**

A. To call John and ask him to come in and pack up his office.

**Q. Didn't he also request that you have him sign a form, the effect of which would suggest that he was resigning?**

A. I don't recall that.

**Q. You never asked John to sign a form?**

A. I don't recall.

MS. PARKS: He asked you if you ever asked John to sign such a form.

MS. SAUER-LAMB: I don't recall.



BY MR. GEDDES:

**Q. Did you ever have a conversation with anyone, whether it's in person or on the phone, regarding Mr. Enos applying for rehire after his employment with Douglas County ended?**

A. No, no.

**Q. Was the topic of John Enos' termination or separation of employment ever discussed in a meeting at the office, in those weekly meetings that you described?**

A. Yes.

**Q. Can you summarize what discussions were had at those meetings about that?**

A. I believe it was the meeting after John left when we had our office meeting the following Monday or whenever it was that Scott made the announcement that John was no longer --

**Q. Isn't it true that Scott Shick requested or instructed or ordered people not to contact John Enos?**

MS. PARKS: Objection. Lack of foundation.

MS. SAUER-LAMB: I don't remember.

BY MR. GEDDES:

**Q. Do you recall any statements by anyone**

regarding the matter of contacting John Enos, having discussions with him, having communications with him, after his employment separated from Douglas County?
A. I remember something being said, but I don't remember the details of it.
Q. What is your general recollection?
A. I just remember -- I just remember it being talked about, but I don't -- it was three and a half years ago. I don't remember.
Q. What was being talked about?
MS. PARKS: Objection. Asked and answered.
BY MR. GEDDES:
Q. What I'm trying to understand is, are you saying that the issue of not communicating with John Enos after his separation of employment was talked about, but you don't remember the details?
MS. PARKS: Objection. Lack of foundation, misstates her testimony.
BY MR. GEDDES:
Q. So it's important that you understand my question. I'm happy to have the court reporter read that back, please.
(Question read back)



MS. SAUER-LAMB: Yes.
BY MR. GEDDES:
Q. Okay. Do you recall during the 2014 to 2015 timeframe, do you recall receiving or sending any e-mails or letters or memos regarding John Enos?
A. I don't remember.
Q. Before his separation of employment -- I want to switch gears here real fast. I want to talk about your replacement.
When I say, "Replacement," I'm saying the person who took your job after you left.
A. Okay.
Q. Now, before his separation of employment, Mr. Enos was a senior juvenile probation officer at the Douglas County Juvenile Probation Department, correct?
A. Yes.
Q. At that time, wasn't the position of senior juvenile probation officer the highest level juvenile probation officer position beneath the position of your position, chief deputy probation officer?
A. Yes.
Q. That chief deputy probation officer position was your position that you were going to be



leaving; is that correct?
A. Correct.
Q. Why did you leave that position?
A. I retired.
Q. Okay. You're familiar then as the supervisor of the senior juvenile probation officer, you're familiar with the job duties of the senior juvenile probation officer because you supervised that position, correct?
A. Yes.
Q. You were Mr. Enos' supervisor, as you testified?
A. Yes.
Q. Can you summarize the basic differences in job duties between the position of chief deputy probation officer, yours, and the senior juvenile probation officer, Mr. Enos?
A. Well, as chief deputy juvenile probation officer, I had to be able to perform all the duties of a juvenile probation officer, in addition to supervision of the juvenile probation officers.
Q. Now, the chief deputy probation officer, your position, was less physically dangerous and less physically demanding than the senior juvenile probation officer position; isn't that correct?



A. No.
Q. So in your position, when you were the chief deputy probation officer, you weren't responsible for subduing juveniles or facing potentially combative situations, were you?
MS. PARKS: Objection. Lack of foundation. Go ahead.
MS. SAUER-LAMB: Yes.
BY MR. GEDDES:
Q. Your position as the chief deputy probation officer was more of a desk job than the senior juvenile probation officer; is that correct?
A. No.
Q. Were the lifting requirements less between the two positions?
A. No.
Q. Okay. So what I would like to do --
MS. PARKS: I need to take a quick break, Counsel.
MR. GEDDES: Okay.
(Break taken at 9:53 a.m.)
BY MR. GEDDES:
Q. We're back on the record.
Ms. Sauer-Lamb, you understand you're still under oath, correct?

A. Yes.

**Q. Okay. I want to touch back on one issue we talked about earlier. It was the meetings.**

**In addition to the meetings that the judges would sometimes attend, weren't there also staff retreats at several locations where the judges would attend?**

A. Yes.

**Q. Can you summarize your recollection of that?**

A. Well, I don't know if we did it on a yearly basis, but every couple of years, we would meet off site, so away from our office, and we would meet for half a day, sometimes all day, and we would just strategically plan and use it as a bonding session as well to just come together as a team.

We would do activities. We would have lunch. The judges would come and give us motivational speeches, whatever.

Like I said, we would kind of plan for the future, programming, things like that.

**Q. Okay. Your recollection is that Judge Gibbons attended some of those?**

A. Yes.

**Q. And Judge Young did as well?**



A. I don't know if Judge Young did. I don't know.

**Q. Do you recall one of those staff retreats occurring at Walley's Hot Springs?**

A. Yes.

**Q. Is it your recollection that Judge Gibbons was at that one?**

A. Yes. I believe so.

**Q. There was another one at Edgewood Golf Course, and Judge Gibbons attended that as well?**

A. I don't remember the one at Edgewood.

**Q. What about the Christmas lunches with the judges; do you recall that?**

A. Yes.

**Q. Judge Gibbons attended those?**

A. Occasionally, yes.

**Q. And Judge Young?**

A. Occasionally.

MR. GEDDES: What I would like to do is I would like to mark Exhibit 1 to your deposition.

(Exhibit 1 marked for identification)

BY MR. GEDDES:

**Q. If you could take your time and look at that and let me know when you're finished reviewing**



**that?**

A. This second page says, "Senior" and it's attached to the chief deputy so it doesn't make any sense.

**Q. Okay. I can fix that, probably. Let me look here. So it looks like --**

A. Page 2 is senior juvenile probation officer. Page 1 is chief deputy juvenile probation officer.

**Q. You might have a different document than I have. Just a second here.**

A. I'm sorry. I'm sorry. It's correct. I was looking at, "Reports to." I was looking at that. I thought that was my job description here.

**Q. Okay.**

A. But it doesn't --

MS. PARKS: Just review the document.

MS. SAUER-LAMB: Okay, yeah.

MR. GEDDES: All right. What I would like to also mark now is Exhibit 2, please.

(Exhibit 2 marked for identification)

BY MR. GEDDES:

**Q. If you could take a moment and review that document?**



A. Yes, okay.

**Q. Okay. Have you seen these documents before?**

A. Yes.

**Q. What are they?**

A. They appear to be the job descriptions for chief deputy juvenile probation officer and juvenile probation officer senior from Douglas County.

**Q. Exhibit 1 is for the senior juvenile probation officer, and Exhibit 2 is for the deputy chief juvenile probation officer, your position, correct?**

A. Yes.

**Q. Do you believe these documents describe with reasonable accuracy your respective jobs, that is to say, the senior juvenile probation officer and the deputy chief juvenile probation officer?**

A. It's chief deputy, but yes, I do.

**Q. Thank you. Chief deputy. Just so we're clear, when I made the mistake of saying, "Deputy chief," throughout your deposition, you understand it's chief deputy?**

A. Yes.

**Q. Okay, thank you. So when you reviewed**

those documents just now, did that refresh your recollection as to the basic differences between the jobs?
A. Yes.
Q. Can you summarize how your recollection is refreshed?
A. By reading the job descriptions.
Q. But what the basic differences are, is it different than the testimony you have already given, or is your testimony the same?
MS. PARKS: Objection. Vague and ambiguous.
MS. SAUER-LAMB: I don't understand the question.
BY MR. GEDDES:
Q. Okay. Let's look at -- let's compare them if we can. If we look at Exhibit 1, that is the position of juvenile probation officer, the senior, and if you look at item 4 under essential functions that reads, "Arrests, detains, and transports probationers who have violated court orders, performs a variety of booking and intake duties, and makes determinations about formally processing cases through the court system and about requiring secured detention prior to a court



hearing." Do you see that?
A. Yes.
Q. Do you see anywhere in the description of Exhibit 2 that that same essential function is listed?
A. No.
Q. If you take a look at the second pages of each of these exhibits, Exhibit 1 and Exhibit 2, the juvenile probation officer description of the job on Exhibit 1 under physical demands; do you see that?
A. Yes.
Q. The second paragraph -- just a second here. Let me find it. The second paragraph has the following physical demands listed.
"The employee occasionally is required to climb, balance and stoop, kneel, crouch, or crawl, and must frequently lift and/or carry up to 50 pounds." Do you see that?
A. Yes.
Q. If you look at page 3 of Exhibit 2 under the physical demands description, it has a lower weight. Do you see that?
It reads in part, "Frequently lift and carry up to 25 pounds." Do you see that?
A. I do.



Q. Okay. So you would agree as between the two jobs, the senior juvenile probation officer, which is required to lift up to 50 pounds, but your position required up to 25 pounds?
MS. PARKS: Objection. Lack of foundation as to when this particular job description was in effect.
BY MR. GEDDES:
Q. Okay. Let's lay a foundation here.
Do you see the document on both Exhibits 1 and 2, it lists at the bottom, "Last updated November 2008." Do you see that?
A. I do.
Q. Now, do you recall whether these job descriptions changed between the years 2008 and 2015?
A. I don't know.
Q. So I'll go ahead and represent to you that Exhibit 2 was printed and obtained last night from the county website. I did that myself.
My question still stands, subject to the objection that has been made, would you agree that when these documents were in effect, whenever they were, that there is a lower weight limitation for your position than there was for Mr. Enos' position?



A. According to the job description, yes.
Q. Now, I'm sorry. I know you testified. It was a while back. When did you retire?
A. July 3rd, 2015.
Q. When did you first disclose to anyone at Douglas County Juvenile Probation Department that you were going to retire?
A. Actually, it was no secret. I had a 1,000-day party. I called it Cinco de Octubre, and I believe it was in 2013, and then I did my official letter of retirement, I believe it was January of 2015. I gave six months' notice.
Q. Who at the county -- when I say, "The county," I'm referring to Douglas County Juvenile Probation Department -- who knew of your retirement plans? Did Scott Shick?
A. Yes. Everybody in the department knew.
Q. And your 1,000-day party that was held in October 2013, did Scott Shick attend that?
A. I believe he was there.
Q. Were the judges there?
A. No.
Q. When I say, "The judges," this is an example of me being vague and ambiguous. I'm referring to Judge Gibbons and Judge Young?

A. I don't believe any judges were there.
**Q. Did you ever personally consider promoting John Enos to the position of chief deputy probation officer?**
A. No.
**Q. To your knowledge, did Scott Shick ever consider promoting Mr. Enos to the position of chief deputy probation officer?**
A. I don't know.
**Q. To your knowledge, did Judge Gibbons ever consider promoting Mr. Enos to the position of chief deputy probation officer?**
A. I don't know.
**Q. And to your knowledge, the same question for Judge Young?**
A. I don't know.
**Q. To your knowledge, did anyone ever consider promoting Mr. Enos to the position of chief deputy probation officer?**
MS. PARKS: Objection. Calls for speculation, vague and ambiguous with respect to the use, "Anyone."
BY MR. GEDDES:
**Q. To your knowledge, did any person, any human being?**



A. I don't know.
**Q. Okay. Who filled your position when you retired?**
A. Mike Torres.
**Q. How do you spell his name, please?**
A. Mike, Michael, and T-o-r-r-e-s.
**Q. Did you have any involvement in recruiting, interviewing or -- in the recruiting, interviewing, or selection process for Mr. Torres?**
A. Yes.
**Q. Can you summarize that?**
A. I was part of the interview panel for the chief deputy position.
**Q. Who else was on that panel?**
A. Scott Shick, Zack Wadley, who was our juvenile deputy DA, and Vicky Barrett, who was our previous administrative assistant.
**Q. Judge Gibbons or Judge Young, were they involved in that recruiting, interviewing or selection process?**
A. Not that I'm aware of, no.
**Q. Can you describe what criteria was used to select Mr. Torres for your position as your replacement?**
A. It was based on his interview as well as



his previous supervisor position at China Spring.
**Q. Was there a subjective and objective component in the interviewing process, or how would you describe that?**
A. We had a list of questions that we asked each candidate and then we had discussion afterwards.
**Q. Was there scoring done?**
A. I believe so. I don't remember, though.
**Q. Do you remember where those records were kept?**
A. I don't.
**Q. But records were kept, to your understanding?**
A. I don't know.
**Q. Well, did you fill-out a score sheet?**
A. I don't remember.
**Q. Do you know if anyone filled them out?**
A. I don't remember.
**Q. Do you know if Norma Santoyo had any involvement in the process whatsoever, any involvement in --**
A. I don't know.
**Q. I'm sorry. In your replacement?**
A. I don't know.



**Q. Do you know if Sarah Christensen had any involvement?**
A. I don't know.
**Q. Did you make any recommendations for the selection of the person to be your replacement?**
A. Yes.
**Q. Who did you interview? Who were the candidates; do you recall?**
A. All of the juvenile probation officers applied for the position.
**Q. Okay. Anyone else?**
A. No.
**Q. Who did you recommend to get the position?**
A. I thought Tammy Morris did a wonderful job in her interview, and I think she would have been good.
**Q. You recommended Tammy Morris?**
A. Yes.
**Q. Who did Scott Shick recommend?**
A. I don't know.
**Q. Do you remember when the interviews took place?**
A. I believe it was mid-May 2015.
**Q. Do you know when the selection was made?**

A. I believe it was that day or the day after, within close proximity of the interview.
**Q. Who ultimately made the decision to hire your replacement?**
A. I don't know if it was Scott and the judges, so I would have to say I don't know.
**Q. Do you know of the process, when you all were involved, did you all have an equal say? Was it a vote, or one person makes the decision or certain people make the decision?**
A. We all had equal say.
**Q. Now, were you familiar with the credentials and background of Mike Torres, who got your position, and I'm talking about the timeframe when he was a candidate or applied for the position?**
A. His credentials?
**Q. Were you familiar with his background?**
A. Yes.
**Q. And his resume?**
A. Well, I wouldn't say his resume. I'm familiar with his background. He also worked in the department for several years.
**Q. You understood Mr. Enos' background because you supervised him?**
A. Yes.



**Q. How did -- in your estimation, how did Mr. Torres compare with Mr. Enos with regard to years of experience working in the field of juvenile probation?**
A. John had more years in juvenile probation.
**Q. How did Mr. Torres compare with Mr. Enos with regard to educational background?**
A. John has more education.
**Q. How did Mr. Torres compare with Mr. Enos with regard to the number of years he had been working for Douglas County?**
A. I don't know how many years Mike worked for Douglas County outside of juvenile probation.
**Q. In your opinion, was Mr. Enos qualified by education, training and experience to be the replacement, your replacement?**
A. Yes.
**Q. Is the reason why he was not -- why was he not selected as your replacement?**
A. He didn't interview.
**Q. Now, the record will reflect that you have a pretty good memory with respect to his injuries, and I say that because I have questions about that and I don't want you to feel like I'm**



**boring you to tears by going over the injuries, but this is the part of my questioning that I go over the injuries, so I'm not trying to harass you.**
**I'm not testifying. I'm just letting you know that to the degree --**
MS. PARKS: Well, I'm just going to object to the extent that you're going to make a comment about her memory.
BY MR. GEDDES:
**Q. I thought it was good. I don't want her -- she is going to object, asked and answered, all she wants.**
**I am just letting you know that I think this may be somewhat rehashing what you said, and I'll try to avoid that. That is the purpose of what I'm saying.**
A. Okay.
**Q. All right. Mr. Enos was injured in 2013 in June during a wilderness trip he supervised for juveniles, correct?**
MS. PARKS: Objection. Asked and answered.
MS. SAUER-LAMB: Well, he didn't supervise it. We had a wilderness director, I believe, who was with him. John accompanied him.



He supervised the kids on the wilderness trip, yeah.
BY MR. GEDDES:
**Q. Okay. You described some of his injuries, but I'm not sure you described all of them, so I want to go over that.**
**Was it your understanding that Mr. Enos suffered neck and back injuries in the incident?**
A. In the first one?
**Q. Yes.**
A. I don't remember that.
**Q. But your recollection is that he suffered an injury to his wrist?**
A. Yes.
**Q. Now, I noticed when you were testifying earlier, you actually held your right wrist. Is that your understanding it was his right wrist?**
A. I don't know. I'm just right-handed, so I grabbed my right wrist.
**Q. Okay. Do you recall whether he had medical screws or pins surgically implanted in his wrist?**
A. Yes.
**Q. When you say yes, he did; that is your understanding?**
A. He did.

**Q. It's your understanding then that the medical screws or pins had to be removed because they came apart in May of the following year; do you recall that?**
A. I don't recall that.
**Q. Okay. Do you recall whether he had complications of his wrist surgery arising from that first workplace injury?**
A. Prior to the second incident?
**Q. Yes.**
A. I guess I would ask you to clarify what complications you're talking about.
**Q. Medical complications. I think your testimony was he had surgery. Do you recall him having surgery?**
A. Yes. He had surgery. I believe it was in February 2014.
**Q. Part of your job was to observe Mr. Enos at work, correct?**
A. Yes.
**Q. In your observations at work during the period of June 2013 and June -- during the period of June 2013 to June 2014, before the second workplace injury occurred, did the injuries that Mr. Enos sustained, did they substantially limit his activities of grasping, bending, lifting or performing his ordinary work at the juvenile probation department?**



A. Did you say, "Substantially"?
**Q. Yes, substantially?**
A. I can't say substantially.
**Q. Describe what you observed?**
A. Well, I know he had a cast or brace on his wrist, which would prevent him from lifting heavy objects, and I believe it was his right wrist too because I think he is right-handed and had to -- anyway.
Yeah, so it limited, I wouldn't say substantially, but it certainly limited his ability, yes.
**Q. He had medical restrictions from his doctor regarding that workplace injury?**
MS. PARKS: Objection. Lack of foundation. Calls for speculation.
BY MR. GEDDES:
**Q. Do you recall one way or another?**
A. I don't recall, no.
**Q. Do you know -- let's go to another exhibit here? We'll mark this as Exhibit 3, please.**



(Exhibit 3 marked for identification)
BY MR. GEDDES:
**Q. I'll let you know, this is not one continuous document. They jump around in Bates stamps, so if you can take a moment and review the documents in Exhibit 3, please?**
A. Okay.
**Q. Have you seen any of these documents before?**
A. They don't look familiar.
**Q. Okay. When a workers' compensation claim is filed or one was typically filed at your office, would you ever see documents regarding that matter, workers' compensation type documents?**
A. I know there was a packet that we were supposed to fill-out, but I had never dealt with a workmen's comp issue.
**Q. Let's look at the first page of Exhibit 3. It ends in 1482 at the bottom.**
**That is Scott Shick's signature at the bottom left, correct?**
A. It appears to be, yes.
**Q. You have seen his signature before and you recognize it?**



A. Yes.
**Q. Okay. Now, if we look at the second page ending in 1524, do you recognize any handwriting or signatures on this document?**
A. Handwriting, I recognize John's handwriting where it's, "Employee" and, "Accident or disease."
**Q. Okay.**
A. I don't know whose signature that is at the bottom.
**Q. Okay. If I could direct your attention, please, to the middle of the document on the left tab vertically, it reads, "Injury or disease," and then there's a series of rows to the right of that?**
A. Yes.
**Q. There is a signature that says, "Treating physician, chiropractor name," and I believe it reads, "Kara Cole." Do you see that?**
A. Yes.
**Q. Do you recall anyone by the name of Kara Cole?**
A. I don't.
**Q. Do you ever review these types of documents in your official duties?**
MS. PARKS: Objection. Asked and

answered.
BY MR. GEDDES:
**Q. This particular page?**
A. I had never had a workmen's comp prior, so I never reviewed them prior.
**Q. Do you see to the right, in the right most column, in the injury or disease series of rows, there's a box. It has a check mark.**
**It says, "Will you have light duty work available, if necessary?" Do you see that?**
A. Yes.
**Q. And it is checked, "Yes"?**
A. Yes.
**Q. The box to the left of that reads, "Did employee return to next scheduled shift after accident," and it's checked, "Yes"?**
A. Yes.
**Q. Does this refresh your recollection as to whether and when Mr. Enos returned to work after his first workplace injury?**
A. No.
**Q. Does this refresh your recollection as to whether or not light duty was provided to Mr. Enos after his first workplace injury?**
A. No.



**Q. If you can turn to the last page, please, which ends in 1537? It's all the way at the very back. Do you know what Alternative Service Concepts is?**
A. No.
**Q. Do you know whether or not Douglas County had a workers' compensation administrator, a company that handled workers' compensation claims?**
A. I don't.
**Q. Your recollection is that the human resources department at Douglas County handled those matters?**
A. Yes.
**Q. Okay, thank you. Just to be clear, you didn't have any specific function or role as Mr. Enos' supervisor to monitor or supervise matters concerning workers' compensation?**
MS. PARKS: Objection. Asked and answered.
MS. SAUER-LAMB: No.
BY MR. GEDDES:
**Q. But your testimony also is that you would fill-out paperwork?**
MS. PARKS: Objection. Asked and answered.



MS. SAUER-LAMB: No. I said we had a packet in the file for workmen's comp.
BY MR. GEDDES:
**Q. And you had no responsibilities or duties with that?**
A. I don't believe so, no. That is when I would refer to Sarah Christensen, and I believe Scott is the one that filled it out.
**Q. Just to be clear then, you don't have any particular knowledge as to how HR handled or monitored Mr. Enos' workers' compensation claims, correct?**
A. Correct.
(Exhibit 4 marked for identification)
BY MR. GEDDES:
**Q. I believe these are separate documents as well, so if you could take your time and look at them?**
A. All right.
**Q. Have you seen either of these pages before?**
A. They don't look familiar -- let me clarify that.
**Q. Okay.**



A. I don't know if I have seen these before, but John would give me some sort of report. It's, I believe, something similar to this when he came back from doctor's appointments.
I would give it to Scott, or if Scott wasn't available, I would interoffice mail them to human resources.
MS. PARKS: His question was specific to that particular document.
MS. SAUER-LAMB: I don't know.
BY MR. GEDDES:
**Q. My next question is, these types of documents, this first page is called an excuse from work or school, and the second page is an excuse from work or school.**
**Is it your testimony that from time to time, you would get these types of documents from employees?**
A. Not from employees. No one else ever gave me one of these.
**Q. Just from John?**
A. Yes.
**Q. When he gave these types of documents to you, you're not certain whether he gave these documents to you, but that he gave these types of**

documents to you; is that your testimony?
A. Yes.
Q. Okay. When he gave these types of documents to you, specifically documents that said excuse from work or school, did you ever read them?
A. I may have looked at them.
Q. Okay. Was he required to provide medical excuses, documentation, for example, if he took off work to go to the doctor? Was that required?
A. I don't know. I don't know.
Q. There is -- you gave testimony earlier about surgery, and you believe that occurred with respect to the first workplace injury, you believe that occurred when?
A. February of 2014.
Q. Okay. Is it your recollection that he took time off to get that surgery?
A. Yeah. I believe it was four weeks.
Q. This document right here has -- it says excuse from work or school, name, Enos, John, and the date is February 28th, 2014, to whom it may concern.
It checks off an item that says, "Attended clinic today." Below that it says, "Please excuse from work." Below that, it reads,



"Must observe work restrictions as follows: Off work until May 10th, 2014. May return to work as of above, light duty."
Below that, it reads, "No use of," and my interpretation of that says right hand wrist, and it's signed by, or it's on the signature line of somebody by the name of Dr. Eisenhower.
After looking at this document, does it refresh your recollection as to whether or not John had work restrictions that he wasn't supposed to use his right hand or wrist?
A. Well, yes. It's right there, yeah.
MS. PARKS: I would just object. The document speaks for itself, Counsel.
BY MR. GEDDES:
Q. Well, I'm asking about, does it refresh your recollection. Go ahead.
A. This document does not refresh my recollection. I know from experience with John and his hands, so.
Q. The second document is that -- it reads in the middle of the document, it reads, "May return to work as of 3/17/14, light duty," and then it says, "No use of," and then there is something and a circle and it says, "wrist."



Do you know, does this refresh your recollection as to whether Mr. Enos received light duty when he returned from work after his first workplace injury?
A. It does not.
Q. Okay.
A. I just want to clarify too. You said May 10th. It's March 10th.
Q. Thank you. March 10th.
A. Yes.
Q. Now, if John were on light duty, that is something that you would know about, correct?
A. Yes.
Q. Would you agree that based on your knowledge of his job duties that if he is on light duty, he should not have his full duties? He should not be working his full duties?
A. Yes.
Q. Would that also include him not escorting inmates to court alone or without backup assistance?
A. He never escorted inmates to court.
Q. I'm sorry. I'm calling them inmates, but you're correct, juveniles?
A. Juveniles.
Q. I will ask the question again.



A. Okay.
Q. Would that mean that he should not have been escorting juveniles, when I say "that," I'm referring to light duty.
As part of light duty, he should not have been escorting juveniles to court alone or without backup assistance; is that correct?
A. When you define light duty, I can't say -- I have to say no, that doesn't -- I don't know what his light duties were at that point.
Q. You don't recall; is that right?
A. I don't recall, no.
Q. But it would have been your business to know at the time?
A. Yes.
Q. Okay. Do you know one way or another whether Mr. Enos was performing his regular duties after the date of March 7th, 2014?
A. If he was resuming his regular duties?
Q. Yes.
A. I don't recall.
Q. Do you know whether Mr. Enos suffered a second workplace injury? I think you have described it as an attack or altercation.
Do you know if that occurred because he

**was performing his regular duties?**
MS. PARKS: Objection. Calls for speculation.
MS. SAUER-LAMB: I wouldn't -- no. I don't believe it was the result of him performing his regular duties, so.
BY MR. GEDDES:
**Q. So let's talk about this. In June of 2014, Mr. Enos suffered a second workplace injury?**
A. Yes.
**Q. He was injured on the job when he was transporting a juvenile to court, and during that, the juvenile attacked and assaulted Mr. Enos; is that correct?**
A. That is not correct. He was not transporting a juvenile to court.
**Q. I appreciate that. I'm not using the correct words. Escorting; is that the right word? What word would you use?**
A. No. The juvenile was in the holding cell, and John was in his office. Do you want me to tell you what happened?
**Q. Sure. Tell me what happened.**
A. It was a very traumatic event. Let me just put it that way.



John, his juvenile Jordan, I'll only use his first name, was in our holding cell, which is right outside John's office. A little holding cell, maybe five by five, six by six, and that is where juveniles were held when they were in custody prior to going to court or going back up to detention.
I was in my office, which was two offices away from John. I heard Jordan yelling, and I believe John was in his office at the time, and John came out of his office about the same time I came out to see what Jordan was yelling about.
John went into the holding cell and told him to knock it off, calm down, which we often do, and with that, Jordan struck John, hit him very, very hard. John flew back against the cinder block wall, his head, neck, and shoulders.
Then Jordan began hitting John, and two of our other probation officers went into the holding cell to try to subdue Jordan. I went into the holding cell, trying to get him to stop kicking Bruce Beauchamp in the head. Jordan was kicking Bruce in the head.
I yelled for our secretary to call 911 and she did, and deputies came up, and yeah, and then they took custody of Jordan.



**Q. So it's your understanding then that in the second workplace injury, he had injuries to his neck and back?**
A. John.
**Q. Yes, and his right wrist?**
A. Yes. Well, I found that out afterwards when I took him to the urgent care.
**Q. Okay. When you observed John at work after the second workplace injury, did you observe that that injury substantially limited any of his activities of grasping, bending, lifting, or performing his ordinary work at the juvenile probation department?**
A. Immediately after or --
**Q. At any time after?**
A. Well, he reinjured his wrist, so he had to have surgery again.
**Q. But my question is -- can you read back the question, please?**
(Question read back)
MS. SAUER-LAMB: Yes.
BY MR. GEDDES:
**Q. Now, your understanding -- I think you started to testify as to it. He received medical care for his injury?**



A. Yes.
**Q. Isn't it true that Mr. Enos had blood on his uniform from the physical attack by the juvenile?**
A. He did have blood on his shirt. It wasn't a uniform. It's a dress shirt similar to what he's wearing, because we would get dressed up for court.
**Q. What happened immediately after the attack? Was Mr. Enos required to continue his duties that day before he went to a medical facility to get treatment?**
A. Well, what happened right afterwards, after the deputies came up and they were dealing with Jordan, I went over to Judge Young's office because we were supposed to be getting ready for juvenile court, and I told him what happened. I was very upset, very shaken.
Anyway, I asked Judge -- I'm sorry.
**Q. That's all right.**
A. It was very traumatic to watch. I told Judge Young what happened to John, and I asked him what he wanted me to do, and he said he wanted to see everybody in court right away, so I went back over to the office, and I told everybody, John, the

deputies, Scott, whoever was there, I don't recall exactly, that Judge Young wanted to see them in court, see us in court, so we went into court.

The deputies escorted Jordan over to the courtroom. I believe he was shackled at that point, and his shirt was off. He had ripped his shirt off.

We appeared in front of Judge Young or John appeared in front of Judge Young. He went up to the table, and I don't remember the exact verbiage of what happened, but I felt it was very inappropriate how John was treated.

**Q. Go ahead.**

A. So after that court hearing, I believe Jordan went down to jail, and that is where they housed him because he was too dangerous to be up in our detention center. We were on single coverage at that point.

It was then that I took John, Bruce and Dominic, the other two probation officers involved in the incident, to the urgent care.

Bruce and Dominic were cleared medically. John, they told me to take him to the emergency room, so I drove him to the emergency room and stayed with him until his wife came.

MR. GEDDES: Just one second.



(Break taken at 10:45 a.m.)

BY MR. GEDDES:

**Q. Back on the record. You understand you're still testifying under oath?**

A. Yes.

**Q. Right after the incident occurred, you observed that Mr. Enos was in a state of shock and confusion from the physical attack?**

A. Yes.

**Q. You had mentioned something inappropriate was said in the court. Isn't it true that during the court when Mr. Enos was in the courtroom, Judge Young was on the bench, correct?**

A. Yes.

**Q. And there were other people; it was a public court. The public was there?**

A. Yes.

**Q. Your recollection, do you recall that Judge Young said words to the effect, I may not have it exactly right, but words to the effect that he asked Mr. Enos how he was and Mr. Enos said words to the effect, Your Honor, I haven't been punched since I was in sixth grade, and Judge Young said words to the effect, Well, it's about time someone did.**

**Do you recall that?**



A. I don't recall those words, but I do recall whatever he said was very inappropriate.

**Q. I appreciate your testimony, and I appreciate that it may be painful to recall this, but we need to get your testimony about this, so take your time with this, and if you need water, we can get you some more water. Let me get you some more water.**

A. I'm good right now.

**Q. You sure?**

A. Yeah, I'm good.

**Q. You actually did instruct or order Mr. Enos to transport the juvenile from detention and to take him to court for Eric Anderson, who was at a training; isn't that right?**

A. I don't recall. Are you talking about that day?

**Q. Uh-huh, yes.**

A. I don't recall.

**Q. Isn't it true that Mr. Enos brought him down from detention at Tahoe?**

A. I believe Mr. Enos and Bruce Beauchamp transported Jordan.

**Q. Isn't it true that actually Mr. Enos was in the process of transporting him to court when the**



**attack occurred?**

MS. PARKS: Objection. Misstates her testimony.

MS. SAUER-LAMB: No.

BY MR. GEDDES:

**Q. Isn't it true that Mr. Enos had a conversation with you right after the attack, words to the effect that he questioned the appropriateness of him going to court, and instead -- given his condition, and instead, under the circumstances, words to the effect that he should be heading to the hospital emergency room instead of going to court?**

A. I don't recall that conversation. I just remember telling everybody Judge Young wanted to see everybody in court.

**Q. Do you recall telling him in response, words to the effect that he would go to the hospital emergency room but after the court hearing?**

MS. PARKS: Objection. Lack of foundation.

MS. SAUER-LAMB: I don't remember saying that to him because we didn't go to the emergency room anyways. We went to urgent care first.

BY MR. GEDDES:

**Q. You testified that you took him there,**

**correct?**
A. I drove him, yes.
**Q. Did you tell him that he could go to wherever he was getting treated, urgent care, what-have-you, receive medical care after court? Did you tell him that?**
A. I don't recall.
**Q. Did Mr. Enos appear to be in pain at the time?**
A. He was in shock. It was horrible. I don't know if he was in pain at that time.
**Q. Right. I'm just asking you if he appeared to be?**
A. He appeared to be in shock, yeah.
**Q. Do you believe, as you sit here now, that it was appropriate to have him continue his court duties that day when he was in the physical and mental condition that he was in just after the physical attack that day?**
MS. PARKS: Objection. Lack of foundation.
MS. SAUER-LAMB: It wasn't my decision to make.
BY MR. GEDDES:
**Q. Whose decision was it?**



A. I was following the Court's orders.
**Q. But my question is in hindsight, do you believe that was inappropriate?**
MS. PARKS: Same objection. Lack of foundation.
MS. SAUER-LAMB: I really don't think I can make that determination. I was following the Judge's orders.
BY MR. GEDDES:
**Q. Do you personally think it was wrong to make him wait to get medical care?**
MS. PARKS: Objection. Lack of foundation.
MS. SAUER-LAMB: I would have preferred to have taken him to the urgent care.
BY MR. GEDDES:
**Q. Did you ever apologize to Mr. Enos for the delay in his getting medical care?**
A. I don't think so, no.
**Q. Now, after receiving medical care for that second workplace injury, Mr. Enos had medical restrictions from his doctor; isn't that correct?**
A. I believe so, yes.
MR. GEDDES: If we can mark this, please, as Exhibit 5?



(Exhibit 5 marked for identification)
BY MR. GEDDES:
**Q. Have you seen this document before?**
A. Yeah. I wrote it.
**Q. Okay. I am fine with an objection that the document speaks for itself, but this is your handwriting, and I want to make sure that there is no dispute as to what actually is written here.**
**To avoid any questions at trial concerning what the words are, and it's your handwriting, could you please read all your handwriting that is on this document? It's only one page.**
A. Do you want me to read it out loud?
**Q. Yes.**
A. Just the body of it?
**Q. You can read all the sections where there are different fields.**
A. "Case No. 14-SO," and I didn't have the rest of the case number.
"Sauer-Lamb, Victoria, Elizabeth, date of birth 12/29/59, race and sex, white, female, age 54." Under, "Physical address," I wrote, "confidential," and under employment location,



"DCJPO."
Then the body of the report, it says, "My observation or involvement in this matter was as follows:" This is in my handwriting. "On Tuesday June 17th, 2014, at approximately 11:10 a.m., I was sitting in my office at the Douglas County Juvenile Probation Department when I began hearing yelling coming from our holding cell.
"I exited my office and observed Jordan W. standing in the holding cell yelling very loudly and hitting the window and wall.
"JPO Hastings-Molyneux and JPO Beauchamp were standing near the holding cell. JPO Enos came out of his office and opened the holding cell door, asking Jordan to sit down and calm down.
"Jordan continued to yell at JPO Enos, and again, JPO Enos told him to stop. Jordan then punched JPO Enos in the face and he fell against the wall. JPO Hastings-Molyneux and JPO Beauchamp immediately went into the holding cell to aid JPO Enos.
"JPO Hastings-Molyneux was able to get behind Jordan in order to handcuff him. JPO Beauchamp attempted to grab Jordan by the legs as he was kicking JPO Enos," meaning Jordan.

"Jordan began kicking and kneeing JPO Beauchamp in the head, and punching him with his left hand in the head.

"I went into the holding cell in an attempt to stop Jordan from continually kicking and hitting JPO Beauchamp. At one point, Jordan grabbed my sweater on my right arm with his mouth attempting to bite me. I told him to stop and he let go of my sweater.

"JPO Morris then reached over the top of us with another," and that is all I have.

**Q. Okay. That is your signature?**

A. Yes.

**Q. It was dated 6/18/14 at 9:15 a.m.?**

A. Yes.

**Q. So this was the following day that you made that statement?**

A. Yes.

**Q. Did you have any conversation -- separate and apart from this statement form, did you have any conversations with anyone else that day about Mr. Enos' second workplace injury separate and apart from anything you have already testified to?**

A. I mean the whole office was talking about it. I don't recall any, other than in the office.



**Q. To your knowledge, what was Mr. Shick's reaction or response to Mr. Enos' second workplace injury on the day of the second workplace injury?**

A. I don't even know if Scott was there in the office when it happened. He directed me to take John and Bruce and Dominic to urgent care.

**Q. Well, did you do that by phone? Are you saying he wasn't there that day?**

A. No. I don't know if he was there, but he must have been there because I believe he was who directed me to take him to -- I think an ambulance came. I believe an ambulance came, and I was directed to take them.

**Q. Okay.**

A. I believe. I don't -- yeah.

**Q. To your knowledge, do you know if Judge Gibbons had a reaction or response to that?**

A. I don't.

MR. GEDDES: Let's mark this as Exhibit 6, please.

(Exhibit 6 marked for identification)

BY MR. GEDDES:

**Q. If you can look at these documents, please?**



A. Uh-huh. Yes. I recognize these.

**Q. Okay. The first document reads, "Notice of injury or occupational disease." It's an incident report that is Bates stamped ending in 1526.**

**1527 and 8 are employer's report of industrial injury or occupational disease. Bates stamp 1528 is an employee's C4. It's a claim for compensation report of initial treatment, and 1529 is a continuation of that, as is 1530, and 1196 is a different document altogether.**

**These are different documents, but have you seen these documents before?**

A. Yes. I filled these out.

**Q. So the first page, 1526, that is your handwriting?**

A. Yes.

**Q. That your signature on the bottom left?**

A. Yes.

**Q. The third row, right column reads, "List any body parts involved." Can you read that into the record since it's your handwriting?**

A. I know it's hard to read my writing. "Face, ribs, shoulder, wrists, neck and back."

**Q. So what did you mean when you wrote that?**



**What does that mean?**

A. Those were the injuries that John told me that he -- where he was hurt.

**Q. Okay. On the next page, did you fill-out any part of this?**

A. Yes. I filled out all of this, or up until where it says under injury and disease, "NA, CVMC ER, Lance Orr." That is not my writing.

**Q. Okay.**

A. This was filled out at the urgent care.

**Q. Okay.**

A. They had me fill this out.

**Q. All right. What is the significance, if you know, at the very bottom, it says Sarah Christensen 6/8/14. There's a signature there. Do you see that?**

A. Uh-huh.

**Q. Do you know what that means?**

A. I don't know. No, I don't.

**Q. If we go back to the middle of the page on the row group that reads, "Injury or disease," it reads in a box, "Did employee return to next scheduled shift after accident, if applicable?"**

**Did you write that question mark and an X? Do you see that?**

A. I don't do X's. I do check marks, so I did not do that, and I don't know if I wrote that question mark. Maybe because we were at urgent care, I probably wrote that question mark like I don't know if he is returning to work. I don't know, so.

**Q. The column to the right of that in the row, it says, "Will you have light duty work available, if necessary?" What does that say?**

A. I think it says, "Not sure."

**Q. Okay. The next page, 1528, is that your handwriting?**

A. Yes.

**Q. Then in the middle, I think it says, CVMC urgent care. Is that where you went?**

A. That is the first place we went, yes. Carson Valley Medical Center Urgent Care.

**Q. Okay. You say the first place. Was there a second place?**

A. Yes. I took him to the emergency room.

**Q. Afterwards?**

A. Yes, yes.

**Q. Can you describe that? You went to urgent care, and then what happened?**

A. I had Bruce and Dominic and John. I



transported all three of them, and we went to the urgent care. I don't know if you're familiar with Minden, but there are two urgent cares.

One is Minden Medical Center and then right next to it is Carson Valley Medical Center's urgent care. We have a hospital in Douglas County, but this is a separate urgent care, and it was close to our office, so I went there.

They needed this paperwork, and John, as you can imagine, was injured and stuff, so I filled it all out, and they checked out Bruce and Dominic and John, but they said that Bruce and Dominic were cleared, but that John should go to the emergency room, so I dropped Bruce and Dominic --

**Q. Did they say why?**

A. I believe it was because he hit his head.

**Q. Okay.**

A. I'm thinking that that is why. So I dropped Bruce and Dominic off at the office, and continued on to the emergency room with John, and I called his wife or the office called his wife, and I stayed with him until she came down.

**Q. Okay. All right. Then the last page ends in 1196. I know that your testimony -- my impression of your testimony is that you ordinarily**



**didn't get involved in workers' compensation matters, but do you know one way or another, in looking at 1196, whether there was a workers' compensation claim accepted for this injury?**

A. I would say yes, I believe it was.

**Q. Okay. What were Mr. Enos' work medical restrictions as a result of the second workplace injury, if you know?**

A. Well, he had reinjured his wrist, and I believe he was going to need surgery again.

Neck and back injuries, like I said, he had hit his head. I don't even remember how long he was off. I don't remember when he came back to work.

**Q. Is it your recollection he didn't come back to work right away?**

A. Yeah. I believe he had a couple of days off after that.

**Q. Now, was he given light duty in the county library as a result of that second workplace injury?**

A. Yes. There had been, I believe it was two other light duty options prior to the library.

**Q. What does that mean?**

A. That means the first light duty, and I



believe it was after this incident, not the first incident, we had him -- his doctor said he couldn't come in contact, obviously, with combative juveniles or kids that might become physically aggressive because he could reinjure himself, so I believe it was then that we set up that he would have his caseload to come to him at the office.

**Q. Have his what?**

A. Caseload come to him rather than him going out to do home visits at the school where it could put him in possible physical jeopardy, so we had him based out of the office more. His kids would come see him. His families would come see him.

He would also handle what we call misdemeanors, minor consuming alcohol citations, curfew citations, et cetera, so he wouldn't be out in the field.

**Q. How long did that assignment last?**

A. Oh, I don't remember. I'm going to anticipate a few weeks to maybe a month.

**Q. That is your best estimate?**

A. Yes.

**Q. There were other posts after that?**

A. Yeah. Then I believe we got a doctor's

note or somebody said that he really shouldn't even be doing that, and then in -- because we had had kids get aggressive in the office either with their parents or with us.

I believe it was at that time Scott Shick offered him to work up at detention and kind of be a second body up there, but be more in the control center, which had a locked door.

I believe he was instructed if any of the kids acted out or became aggressive, he was to shut the door and call 911. We were attached to the sheriff's department in the jail up at the lake, so they would have somebody available, and I believe John turned that down.

So then it was at that time, I was instructed to find another location where he could work but not be subject to possible kids being hurt because like I said, the county didn't want somebody sitting at home getting workmen's comp. They wanted to see if we could find another place.

**Q. What was involved -- it sounds like you were involved in trying to find those positions for John. What was involved?**

A. No, I wasn't.

**Q. You weren't?**



A. I wasn't involved in the detention one. That was Scott.

**Q. Scott found that one?**

A. Yeah, yeah. Scott supervised the detention facility, and then I don't know if I was told to find one or someone told me to call the library. I don't remember.

I believe I called over to the library and asked if they had anything available.

**Q. So the first position, what are you calling that, where he is assisting, the work is coming to him?**

A. Basically, it was rather than him going out in the field, whether it be at the school to see his kids or home visits, we had him in the office, so there would be other probation officers available as well and myself. I was mainly based out of the office.

He would have his kids, his probationers and their families come to the office to see him, and also, we had him handling the misdemeanor citations.

**Q. Was there a problem with him doing that?**

A. I don't think so. I think his doctor wrote a note saying that he didn't want him even



doing that because we do sometimes have kids who get out of control in the office.

**Q. Did he do okay when he did that?**

A. Yeah, yeah.

**Q. The second matter regarding the control room, you say that Mr. Enos didn't want to do that. How do you know that?**

A. Because he turned it down.

**Q. But how do you know that that happened? Did somebody tell you that?**

A. Or I was there when he turned it town. I don't remember if it was Scott and I or just with Scott, but I do know he turned it down, yeah, or he didn't go to work there.

**Q. Let's be careful because you're testifying under oath and under penalty of perjury. If you don't know that he turned it down, are you staying with your understanding that he did turn it down?**

A. That is what I was told.

**Q. Who told you that?**

A. I believe it was Mr. Shick.

**Q. Would it surprise you if evidence is offered at the time of trial that he never turned that position down at the detention, but instead,**



**there were no kids in the detention for two weeks, and that is why he was placed at the library?**

A. That is a possibility.

**Q. But you don't recall ever learning or hearing that?**

A. No.

MR. GEDDES: Just a second, please?

BY MR. GEDDES:

**Q. You gave some testimony earlier about a person named Tammy Morris; isn't that correct?**

A. Yes.

**Q. If I follow your testimony, you had a high opinion of Tammy Morris, correct?**

A. Yes.

**Q. In fact, she was the one that you had recommended take your job when you retired; isn't that correct?**

A. She was the one I felt did very well in the interview, and I think she would have been a good chief deputy juvenile probation officer. Ultimately, it wasn't solely my decision.

**Q. But your vote went to her?**

A. Actually, I liked both Mike and Tammy. I thought Tammy did very well, but I also supported Mike.

Q. Tammy was a good worker?
A. Yes.
Q. Generally -- I'm not asking for all this private information about Tammy Morris, but generally speaking, she was a good employee?
A. Yes.
Q. Is she still working there?
A. Yes.
Q. What is her current position?
A. I don't know.
Q. Isn't it true that Tammy Morris had an arrangement where she wasn't required to go out in the field alone when she had to do visits with male juveniles, but it was okay and allowed that other assistant, other officers would go with her and provide assistance? Do you recall that?
A. No.
Q. You don't recall that?
A. No, no. She had her own caseload and she did night visits. She did all that stuff. Yeah, she didn't have a partner, no.
Q. So she wasn't assisted in the field when having to detain or arrest or bring male juveniles in? She didn't have assistance?
A. Not on a regular basis, no.



Q. If she did, you would have known about it?
A. Oh, yes.
(Exhibit 7 marked for identification)
BY MR. GEDDES:
Q. Getting back to Tammy Morris for just a second. She wasn't allowed to have other officers assist her when obtaining drug tests from males at home?
A. Oh, yes. Absolutely, she was allowed.
Q. Can you explain that?
A. Yeah. Because Tammy and myself are the only female probation officers, when the males needed to have their female probationers drug tested, either myself or Tammy would do it, either at our office or a home visit.
We did not encourage drug testing at the schools, but anyway, and same thing, when Tammy had a male probationer who needed to be drug tested, one of the male probation officers would do it.
Q. Why?
A. Because females were not allowed to drug test males, and males were not allowed to drug test females because you had to be with them while they



went to the bathroom.
Q. Are you talking about a urine test?
A. Yes.
Q. All right. So if you could please look at Exhibit 7. They're separate documents, so take your time with them.
A. Okay.
Q. Have you seen these documents before?
A. The first one does not look familiar. The second one may have been, like I said, one of those reports.
Q. Let's focus on the first page of Exhibit 7. This is a document from Sierra Neurosurgery Group.
It says at some point above the signature line, "Date of evaluation, July 22nd, 2014. Release to full duty on August 18, 2014."
Does that refresh your recollection as to when Mr. Enos returned after his second workplace injury?
A. No. The date is there, but I don't recall it.
Q. If you turn the page, at the bottom, it's 1667. It's the second page on Exhibit 7. You say that you may have seen this document before?



There is a -- this document is dated October 31st, 2014. It reads, "To whom it may concern, the above named person/patient attended clinic today. Please excuse from work."
Below that, it reads, "Must observe work restrictions as follows: Off work until further notice," and the name that is typed at the bottom is Dr. Eisenhower.
Does this refresh your recollection as to whether Mr. Enos had any kind of leave related to medical treatment of his second workplace injury?
A. Yes.
Q. What do you recall?
A. I just remember that he was seeing doctors and physical therapists, and he was given these notices. I don't know how often, and he would give them to me, and I would give them to Scott or send them on to HR.
I believe this is part of the workmen's comp requirement.
Q. If we look at the first page on Exhibit 7 when it says, "Released to full duty on August 18, 2014," that would imply he had medical restrictions at least until August 18, 2014; isn't that right?
MR. CARNER: Objection. Lacks

foundation.
MS. SAUER-LAMB: I don't know.
BY MR. GEDDES:
**Q. In October, Mr. Enos took FMLA leave from work for medical reasons regarding his workplace injuries. Do you recall that?**
A. I believe that is when he had surgery, right about that time.
**Q. October of 2014?**
A. Yes.
**Q. That is -- your recollection is that is what the second page of Exhibit 7 relates to, that he is off work until further notice after he took medical leave?**
A. I just remember his surgery was right about the end of October, beginning of November, so I don't know if that is why, because he was having surgery. I don't know.
**Q. Okay. But you have already testified, and you do recall that he did actually have light duty for a time after his second workplace injury?**
A. Yes.
**Q. Is it your recollection that at some point, he was working in the county library?**
A. Yes.



**Q. And then after that, is it your recollection that he went on some form of leave, FMLA leave, relating to his injuries?**
A. I believe he worked at the library up until when he was going to have surgery.
**Q. That was in October?**
A. Yes. I just remember his birthday is in November, and I had his birthday that year, and I went and saw him after he had surgery, so.
**Q. Let's go back to the second attack. When the second attack occurred, let's say the minute before the second attack occurred, he was already on light duty from the first workplace injury; isn't that right?**
A. I don't remember if he was still on light duty at that time. I just know his surgery was in February and he came back in March, and I don't remember if he was still on light duty after that. I don't remember.
**Q. Didn't he question the wisdom of having him transport another juvenile while on light duty, and the result of him doing that was that you guys had a meeting with HR after that? Do you recall that?**
A. I don't specifically recall that, no.



**Q. Okay. So think back to October of 2014. Do you recall that he was able to take time off to go do his surgery? Was that because it was workers' comp gave him that leave, or was it FMLA gave him that leave; do you know?**
A. I don't know because I wasn't part of that FMLA determination or anything. I remember there was paperwork that needed to be filled out, and that was the only thing I know. I wasn't part of that decision.
**Q. Do you recall after the second workplace injury that you and Mr. Shick and Mr. Enos had a meeting?**
A. After the second one?
**Q. Yes, to discuss his workplace injuries and light duty. Do you recall that?**
A. I don't recall that.
**Q. Do you recall a meeting where Mr. Shick was hostile or angry or resistant to the idea of putting Mr. Enos on light duty?**
A. I don't recall that.
**Q. Do you ever recall yourself being resistant or hostile to the idea of putting Mr. Enos on light duty?**
A. No. I would not have reacted that way.



**Q. Do you recall a meeting where Mr. Shick discussed Mr. Enos resigning or otherwise separating from his employment with the county after his second workplace injury?**
A. I don't recall that.
**Q. Do you recall any meetings where Mr. Shick appeared to bully Mr. Enos?**
A. I wouldn't use the word "bully."
**Q. How would you describe it?**
A. John and Scott sometimes butted heads, so it was strong personalities discussing issues.
**Q. Were there any strong personalities involved in any discussions concerning his workplace injuries?**
A. Not that I recall, no.
**Q. As a result of that meeting, did either you or -- well, as a result of a meeting with Mr. Enos, did either you or Mr. Shick decide to transfer John's cases away to the other officers?**
A. At some point, we did, and I don't remember -- well, I shouldn't say I don't remember.
I believe it was when he was going to be working at the library. He had some cases that needed to have continued supervision, so they were reassigned to the other probation officers to

supervise.

**Q. Is it your recollection they were some cases or all of his cases?**

A. No. They were all of his cases, but he didn't have a large caseload. None of --

**Q. What was his caseload?**

A. Maybe 10 to 12 kids.

**Q. What was the average caseload at the time?**

A. Ten to 12 kids.

**Q. For how many officers?**

A. I believe Dominic was a probation officer at that time, a new one, so he would have some cases. I have to count. I'm sorry. Five probation officers.

**Q. On average, each of the five probation officers had 10 cases?**

A. Ten to 12, yeah. Sometimes, they have a little bit more, sometimes a little bit less, yeah.

**Q. What is the most -- if push came to shove and you had heavy activity in any given period, what was the most number of cases that the probation officers would carry?**

A. Oh, wow. Twenty to 25 perhaps, but those -- yeah.



**Q. The transfer of cases that occurred prior -- I think I might be misstating your testimony, so correct me if I'm wrong.**

**You are saying that that transfer occurred when he was going to work in the library?**

A. I believe so, yes.

**Q. That transfer was a permanent transfer of cases, wasn't it?**

A. Not at that time, no.

**Q. What is the lifespan of a case? How long does an officer typically have a case on average?**

A. Well, we're talking about different types of cases. Diversion, which would be -- we usually did for first-time marijuana charges and/or arson, that ran about, like I said, I have to try and remember. I believe that was a 90-day type of informal probation.

We had informal probation cases which ran a maximum of six months per statute, and formal probations averaged about a year. Some could obviously be longer, some shorter.

**Q. So it was expected at the time that his cases were transferred that he wouldn't be coming back to normal duties for a period of six months to a year; is that fair?**



A. No. I can't determine that at that time. No. It was just he was not going to be available to supervise his caseload, so I disseminated them to the other probation officers.

**Q. Do you ever temporarily reassign cases?**

A. Absolutely.

**Q. Can you describe the circumstances where you do that?**

A. When we have, for example, when Tammy Morris was on maternity leave, I temporarily assigned her cases to other probation officers.

**Q. How long was that?**

A. She was off three months, I believe.

When probation officers -- I cover oftentimes their supervision if they're on vacation or a wilderness trip or going to be out of the office for extended periods of time, but the actual more formal part of doing that would be for longer periods of time.

**Q. What is the longest period of time that you temporarily transferred cases away?**

**What I mean by that is, Hey, this case is going to go to someone else, but not permanently. It will come back to you.**

**What is the longest temporary transfer of cases you have seen?**



A. I would probably say Tammy Morris' maternity leave of three months.

**Q. So at the time of transferring cases away, it's true you didn't have an understanding of when Mr. Enos was coming back to full duty, correct?**

A. No, I did not.

**Q. So it might have been less than three months; is that right?**

A. It could have been, possibly, yes.

**Q. What, if any, role did Mr. Shick have in the decision to transfer Mr. Enos' cases away?**

A. Well, I would imagine that that was his recommendation or we discussed it. I really didn't do anything without discussing with him.

**Q. Do you recall any e-mails or letters or memos or other written documents that went out concerning the matter, either created or received?**

A. Went out to who?

**Q. Were created to memorialize or to communicate the issue to someone?**

A. I don't know if there were any e-mails or correspondence. It may have been done verbally at a staff meeting that I was going to be reassigning the cases, but I don't know if there was anything

written down about it.
Q. Just to be clear, you don't actually remember sitting in a meeting with Scott Shick and Mr. Enos discussing this matter?
A. I don't because it was part of many, many meetings, and I don't remember that one specifically.
(Exhibit 8 marked for identification)
BY MR. GEDDES:
Q. All right. Have you seen this document before?
A. It looks familiar, but I don't know when I would have saw it.
Q. Well, this document, you recognize Scott Shick's signature there, correct?
A. Yes.
Q. This is dated July 17, 2014, so about a month after the second workplace injury, and the title reads, "Re: Duty station assignment," and the first sentence reads, "Based on our conversation this morning and after evaluating our options, I believe it is in your best interest to be assigned to the juvenile detention facility in strictly a support role as you work through your medical



circumstances.
"You are encouraged to work in a correctional programming or educational capacity with juveniles in the facility."
Does that first paragraph describe that first light duty assignment that you testified to earlier?
A. As I recall, this was not the first one. The first one was in his office, but I --
Q. No, no, no. I'm sorry. You said he was given three light duty options. One was the cases came to him?
A. Right.
Q. That is not this, right?
A. No. This was the second one, and they weren't all given to him at the same time, like you have your choice.
We tried this one first and then detention and then the library, so this would have been the one I was referring to about him going up and working in detention in a support role.
Q. Your testimony is that he refused this, correct?
A. That's my understanding, yes.
Q. Isn't it true, though, based on your



knowledge as a supervisor, if he refused that, he could have been fired?
A. I don't know. I mean, I don't know.
Q. The second paragraph reads, "Your caseload will be assigned to other officers in the department. If you could staff each case with the newly assigned officer, it would be appreciated."
What does that mean, if you know? What does "staff" --
A. That means go over the details of the case, the family, not necessarily information that is contained in court documents or police reports, but John's working knowledge of the family, their strengths, weaknesses, so that the transition from one probation officer to another would be seamless for the family.
Q. The next paragraph reads, "I'm asking you to report for duty at juvenile detention on 7/21/2014. Please attend shift change meeting and work on transferring your cases to the assigned officers prior to leaving for the detention center."
When Scott Shick is referring to the juvenile detention and for Mr. Enos to be there on 7/21, that describes that second description of light duty that you gave testimony to, correct?



A. What do you mean?
Q. Where he is working in juvenile detention, and he can close the door if there is a problem. That is what is being referring to here?
A. Yes.
Q. Is there anything in that paragraph that suggests it was a choice given to Mr. Enos?
A. No.
Q. It seems like it's a command, yes? I mean, you know Scott Shick and how he phrases things, correct?
A. Yes.
Q. So this paragraph demonstrates that Scott Shick was ordering Mr. Enos to go to juvenile detention on 7/21/14, correct?
A. I cannot state that Scott was ordering him. Scott was telling him.
Q. Okay. The last sentence reads, "A staff person will always be on duty with you."
Can you describe, is that describing the door shutting, that he can shut the door of the facility? What would that mean?
A. There would be a juvenile detention staff there at all times. That is where they work.
Q. Juvenile detention is basically the jail?

A. It's a wing of the jail converted to a juvenile detention facility, yes.
**Q. The juveniles are detained in the cells?**
A. Yes.
**Q. They don't have the freedom to leave?**
A. Well, no. They're not detained in the cells. We have a common area, or day room, I guess is what you would describe it as. They were in there most of the time.
**Q. How many typically would be there?**
A. At this time, we were -- we didn't have contracts with other counties, so our numbers were very low.
When we used to detain kids from other counties, our numbers were higher, but at this time, it was just Douglas County kids.
**Q. Do you know whether there was actually sufficient -- were there any juveniles detained in July of 2014?**
A. I have no idea.
**Q. How much lead time or advance does your office know whether there will be detainees there in the juvenile detention center?**
**Do you get lead time? We're processing these cases; we have five juveniles coming next**



**Tuesday, that kind of lead time?**
A. Oh, no, no. They were usually decisions that were made, or courts detaining kids.
**Q. Was there ever a time when there was no one?**
A. Oh, yes, yes.
**Q. Was that common?**
A. I wouldn't say common, but it did happen, absolutely.
**Q. Now, the first sentence reads, "Based on our conversation this morning, and after evaluating our options," isn't that referring to the meeting that you described at the beginning of your testimony today where you said there was a meeting with HR?**
**Wasn't this a meeting that was Mr. Enos, Scott Shick, you, and someone from HR?**
A. No. I don't believe -- I believe that meeting I referred to was when we found the light duty for him at the library. I don't know what meeting he is referring to here.
**Q. Would you agree that at this time, you were Scott's supervisor, and you had a need to know basis for this information?**
A. I was not Scott's supervisor. Scott was



my supervisor.
**Q. I apologize. I misspoke. Mr. Enos. You were his supervisor and you had a need to know about the matters in this document, correct?**
A. I can't say I had a need to know basis because I was oftentimes told what was happening and what to do.
**Q. Right, but you needed to know what was going on to supervise Mr. Enos, correct?**
A. Yes, yeah.
**Q. Do you know whether he actually ever did this, he being Mr. Enos, ever went and worked at the juvenile detention on July 21st, 2014?**
A. I don't remember.
**Q. But your understanding is that Mr. Enos rejected this?**
A. That was my understanding, yes.
**Q. Mr. Enos never did get any of his cases back, correct, the ones that were assigned away?**
A. No. I don't believe he ever came back to work after his surgery. I don't remember.
**Q. Well, he went to do light duty in the library, correct?**
A. Uh-huh.
**Q. Do you know how long he did that?**



A. I believe it was from August until the time he had his surgery, end of August.
**Q. Do you know who actually obtained that work for him in the library?**
A. I already said either I called over there or human resources had made those arrangements.
**Q. Was that to fill a vacancy in the library, or was this placement there just extra help?**
A. Just extra help.
**Q. Do you know what the actual position was he was assigned to work in the library?**
A. I believe it was putting books back where they belong.
**Q. So he was lifting things, but you believe he was lifting within his weight restrictions?**
A. I don't know if he was lifting. I believe that that --
**Q. Putting books up?**
A. I believe that is what his role was. I don't know. I didn't observe him actually doing the job.
**Q. You never visited him and checked up on him?**
A. I did visit him.

**Q. How many times did you visit him at the library?**

A. I would probably go maybe once every two weeks or so, maybe once a week.

**Q. Can you describe the interaction you would typically have?**

A. Just checking in on John, seeing how he was doing. I didn't want him to feel isolated. He was obviously away from the department and all of that, so I wanted to just, you know, have that connection still.

MR. GEDDES: Okay. Do you guys need to take a quick break?

MS. PARKS: I do.

(Break taken at 11:36 a.m.)

BY MR. GEDDES:

**Q. I'd like to go back over the date of the second injury. That happened in June of 2014.**

**I may have asked the question incorrectly. Not on the same day of the injury, but after the date of the injury, on a different day, sometime in June or July, didn't you instruct Mr. Enos to escort juveniles, and he questioned the wisdom of that based on the threat that he perceived it might present to his safety, the result of which**



**you had complained about that, and then that resulted in Mr. Enos having to go to HR? Do you recall anything about that?**

A. Okay. I didn't understand that question.

MR. GEDDES: Is it possible to read that back.

(Question read back)

MS. SAUER-LAMB: Have him --

BY MR. GEDDES:

**Q. Transport?**

A. Transport juveniles after the second injury?

**Q. Yes, not on the same day.**

A. No, no, no, no. I don't --

MS. PARKS: You have answered his question. There is no question pending, Vicky.

BY MR. GEDDES:

**Q. No. I thought the question is pending?**

A. I don't recall.

**Q. Okay. Separate and apart from the three assignments that you have given testimony, when I say assignments, potential assignments, potential light duty assignments, however you want to characterize them, but the testimony you gave about those three options, were there other -- was there**



**consideration for other positions or light duty for Mr. Enos in the wake of his second workplace injury?**

A. Not that I recall, no.

**Q. Do you recall a staff meeting after Exhibit 8? Exhibit 8 is dated July 17th, so at some point after this memo was sent, do you recall that Mr. Enos still attended staff meetings on Monday? Do you recall that?**

A. I don't recall that specifically, no.

**Q. Do you recall after this memo was issued dated July 17, 2014, that Mr. Shick had told Mr. Enos at a staff meeting on a Monday prior to going to detention, meaning prior to July 21, 2014, that he said in the staff meeting there were no kids in the facility and asked that Mr. Enos help around the office for the time being? Do you recall that?**

A. I don't.

**Q. Did you miss staff meetings in June or July of 2014?**

A. I could have.

**Q. Did anyone ever say -- do you ever recall hearing or having it reported, words to the effect, that due to his workplace injuries, Mr. Enos was too much of a liability to keep employed at the county?**

A. No. Nobody ever said that to me.



**Q. Do you know when the county first considered separating Mr. Enos' employment after his second workplace injury?**

A. I don't.

**Q. As his supervisor, is that something that you would have ordinarily known?**

A. No.

**Q. Why not?**

A. Because I supervise the day-to-day operations of the department. Scott made the administrative decisions, so he would have been involved in those things, not me.

**Q. Would the judges have been involved with him typically?**

A. I don't know.

(Exhibit 9 marked for identification)

BY MR. GEDDES:

**Q. Okay. Have you seen this document before?**

A. I have not.

**Q. Well, the subject matter that is in this exhibit addresses the matter that John Enos has exhausted his FMLA. It's an e-mail from Sarah Christensen, a human resources tech, to someone**

**named Karen J. Barbee.**
**Sarah Christensen is addressing an issue regarding Mr. Enos exhausting or having exhausted his FMLA, and that she was looking for information of where he was in the workers' comp process, and when he might be evaluated to see if he will be able to perform his job duties or not.**
**Does that subject -- do you recall anything about that subject matter?**
A. Which subject matter?
**Q. About Mr. Enos having exhausted his FMLA. Do you recall a discussion or any information about that?**
A. The only thing I remember is Justina asking for his time cards, copies of his time cards.
**Q. Do you recall a discussion by anyone in January of 2015 as to the status of Mr. Enos' workers' compensation claim to evaluate whether he could perform his job duties or not?**
A. No. I wasn't part of those conversations.
**Q. Do you have an opinion one way or another whether Norma Santoyo is an honest person?**
A. I don't have an opinion. I don't know her very well.



**Q. Do you have any knowledge as to whether Norma Santoyo has a reputation for honesty in the community?**
A. I don't have that opinion. I mean, I don't have that knowledge. I didn't know her.
**Q. The top part of this exhibit, Exhibit 9, states that Karen would prefer to give a better estimate after they receive Dr. Morales' report.**
**Did you ever hear of a Dr. Morales in connection with Mr. Enos?**
A. That name doesn't sound familiar.
**Q. Now, I think you talked about wrist surgery. Do you know whether or not Mr. Enos had shoulder surgery?**
A. I don't. I just remember that he injured his shoulder. I don't remember it independently.
**Q. Do you recall whether Scott Shick or anyone at Douglas County was becoming impatient as to when Mr. Enos might return back to full duty?**
MS. PARKS: Objection. Calls for speculation.
MS. SAUER-LAMB: I don't know that independently.
BY MR. GEDDES:
**Q. Do you recall whether or not Douglas**



**County evaluated whether there was light duty for Mr. Enos at any time in the year 2015?**
A. I don't. I was only involved with the first one.
**Q. I'm sorry?**
A. I was only involved with the first light duty, you know, at the library. I don't know.
**Q. So you have no knowledge about the matter whatsoever?**
A. Huh-uh, no.
**Q. Was Mr. Enos instructed to return to work after he took off for his FMLA leave in late 2014, in October of 2014?**
A. Well, he had surgery.
**Q. He had surgery.**
A. Yeah.
**Q. Was he ever instructed to return to work after he had his surgery?**
A. I don't know. Not by me he wasn't.
**Q. Did you ever have any conversations with anyone about that?**
A. I don't recall specific conversation, no.
(Exhibit 10 marked for identification)



BY MR. GEDDES:
**Q. Have you seen this document before?**
A. It does not look familiar.
**Q. This document appears to be from Tahoe Fracture & Orthopedic Medical Clinic. This is a work/school excuse for Mr. Enos dated 1/28/15.**
**The document states that he may return to work with restrictions for three weeks, and below that, it reads that he can return to full duty in approximately three weeks.**
**Do you recall hearing that Mr. Enos was cleared for light duty on January 29th, 2015?**
A. I do not.
**Q. Do you recall hearing or knowing or learning that Dr. Eisenhower had released Mr. Enos to return to full duty in approximately three weeks?**
A. I do not.
**Q. What did you do, if anything, after Mr. Enos had surgery to ascertain when he might be returning to work?**
A. Actually, that wasn't my role, so I continued to supervise the probation officers.
**Q. So is it your testimony that you did nothing?**
A. I don't recall doing anything

specifically.
**Q. To your knowledge, did anyone at Douglas County Juvenile Probation Department expect Mr. Enos might return to full duty in approximately three weeks from January 28th, 2015?**
MS. PARKS: Objection. Calls for speculation.
MS. SAUER-LAMB: Yeah. I have no knowledge of that.
BY MR. GEDDES:
**Q. No one spoke to you about that?**
A. Not that I can recall.
**Q. Isn't it true that Mr. Enos actually reached out to you after his surgery and told you that his doctor released him back to light duty?**
A. I would go and visit John. I don't know if that came up in conversations. I don't remember specifically that conversation.
MS. PARKS: It's just what you recall.
MS. SAUER-LAMB: I don't recall specifically that conversation.
BY MR. GEDDES:
**Q. If Mr. Enos testified that he contacted you on or about January 28th, 2015 to inform you of his doctor's release of him back to light duty,**



**would you have any reason to disagree with him?**
A. I don't recall that conversation so.
**Q. That's not my question.**
MS. PARKS: Well, she has answered your question, Counsel.
BY MR. GEDDES:
**Q. My question is do you have any reason to disbelieve that?**
MS. PARKS: Your question is argumentative.
BY MR. GEDDES:
**Q. Go ahead and answer.**
MS. PARKS: Answer if you can, and if you can't --
MS. SAUER-LAMB: I have no recollection of that conversation.
BY MR. GEDDES:
**Q. You said that you visited him. What were you referring to?**
A. Well, I think I said earlier, I had John's birthday that year, and so he was recovering from surgery, so I went over and I visited him, gave him his birthday present and a card signed by everybody in the office. I believe I gave him a cupcake or rice crispy square because he loved



those. We visited a little bit, and I would take his time cards for him to sign.
**Q. Right. Did you have a discussion about when he might be coming back?**
A. I don't recall having that discussion.
**Q. Do you recall a phone call with Mr. Enos where he specifically asked you if he should report to the county library again for light duty after his surgery?**
A. No. I don't recall that conversation.
**Q. Do you recall telling Mr. Enos that you would need to check into the issue of when he could, or whether he could return to light duty at the library after his surgery?**
A. Well, if I don't recall the conversation, I probably can't recall giving him that answer.
**Q. Well, it doesn't necessarily have to be in that conversation.**
A. Okay.
**Q. Do you recall telling Mr. Enos on the subject of his return to the county library that you would have to look into that?**
A. I sound like a broken record. I don't recall that.
MS. PARKS: If you don't recall, you



don't.
MS. SAUER-LAMB: I don't recall it. I'm sorry.
BY MR. GEDDES:
**Q. Do you recall any communication with Sarah Christensen about whether Mr. Enos could return to light duty at the library after his surgery?**
A. I don't recall a conversation with her about that.
**Q. Do you recall whether Ms. Christensen ever communicated with Mr. Enos about the matter?**
MS. PARKS: Objection. Calls for speculation.
MS. SAUER-LAMB: I don't know if she did or did not.
BY MR. GEDDES:
**Q. Do you know if Mr. Shick had any involvement in figuring out if and when Mr. Enos could return to light duty at the library?**
A. I don't have any independent knowledge of that.
**Q. Do you know whether Judge Gibbons or Judge Young had any involvement in the question of whether Mr. Enos could return to light duty after**

**his surgery?**
A. I don't.
**Q. The same would be true for Norma Santoyo; is that correct?**
A. Yes.
(Exhibit 11 marked for identification)
BY MR. GEDDES:
**Q. Have you ever seen this document before?**
A. I have not seen this document, no.
**Q. Do you have any knowledge about anyone at Douglas County telling Mr. Enos that they could not accommodate his doctor's notes?**
MS. PARKS: Objection. Calls for speculation.
MS. SAUER-LAMB: I don't.
BY MR. GEDDES:
**Q. Do you have any knowledge about whether or when Mr. Enos' employee key card was discontinued?**
A. I do.
**Q. What do you know about that?**
A. I just -- I was advised by Mr. Shick that John's key card, access to the building was discontinued because he was advised that employees



on workmen's comp are not supposed to be in county buildings, and so I knew that his card -- I don't know if I knew that day or the next day, but I did have knowledge that it was discontinued or disabled.
**Q. Do you recall any other employees during your tenure with Douglas County ever being on workers' compensation?**
A. There was one, Tim White, back in early -- the late 80s, perhaps, that injured his back.
**Q. Anyone else?**
A. No -- excuse me, yes. Dominic Hastings-Molyneux injured himself, I believe, on a wilderness trip, but I don't think it was -- it didn't require surgery or anything like that.
**Q. But he had workers' comp benefits?**
A. I don't know that. I just know we filled out the paperwork for him. I don't know if --
**Q. Are you aware of any other employee --**
MS. PARKS: Let her finish her answer. Are you done with your answer?
BY MR. GEDDES:
**Q. Please finish.**
A. I just don't know if he ever had an extended period of time off. I don't recall.



**Q. Are you aware of any other employees on workers' compensation who had their key cards discontinued?**
A. No.
MS. PARKS: Objection. Calls for speculation.
BY MR. GEDDES:
**Q. Do you recognize the handwriting on Exhibit 11?**
A. I don't.
**Q. Did you ask Mr. Shick in that conversation why the key card had not been discontinued earlier?**
A. I did not.
**Q. Did you find it odd that Mr. Enos' key card was discontinued on the grounds that he had a workers' compensation claim when the workers' compensation claim had started long before the time of the key card being discontinued?**
A. I did find it odd.
**Q. Can you explain what you mean?**
A. I just didn't understand it for those exact reasons that you just mentioned.
**Q. You didn't follow-up with him or question it or have any discussions with anyone about that?**



A. That was not my role, no.
**Q. Was it your understanding then that the decision to discontinue his key card was a decision made by Mr. Shick?**
A. No. I believe I felt it was from human resources.
**Q. Anyone in particular at human resources?**
A. No. I don't know who contacted.
**Q. Do you believe that Judge Gibbons or Judge Young or Norma Santoyo was involved in that decision?**
A. I don't know.
MR. GEDDES: It's noon. Maybe this is a good time to take a lunch break. We can go off the record.
(Lunch break taken at 12:05 p.m.)
MR. GEDDES: Okay. We're back on the record. You said that you had something you wanted to talk about before we begin?
MS. SAUER-LAMB: Yes. As I was sitting at lunch, I was just thinking about all the questions and going back to the interview for the next chief deputy juvenile probation officer.
I do recall that we had a set of questions we asked everybody, and we did do a score,

so when I said I didn't remember, I remembered we did score each candidate based on the answers to the questions.

(Exhibit 12 marked for identification)

BY MR. GEDDES:

**Q. I'll give you a moment to look at that.**

A. Okay.

**Q. Have you seen this document before?**

A. I don't recall. No, it doesn't look familiar.

**Q. Did you have any conversations with anyone about Mr. Enos being required to return to work on February 17th, 2015 with full medical releases? Do you recall that?**

A. I recall hearing something about it, but I don't know where I heard it from, and I don't know if that was the day that I was instructed to call him, so I don't remember what day that was.

**Q. Did you have any involvement in matters requesting or requiring that Mr. Enos return to work as stated in paragraph 2 of this letter?**

A. I did not.

**Q. Do you have any knowledge as to -- your testimony is that you had some knowledge, but you're not sure where. Do you have any knowledge as to what prompted this letter?**

A. I don't.

**Q. To your knowledge, what was Mr. Shick's involvement in the matter set forth in Exhibit 12?**

A. I don't know what his knowledge was or involvement.

**Q. To your knowledge, was Judge Gibbons or Judge Young aware of the matter set forth in this letter?**

A. I don't know.

**Q. So you describe that you think this may relate to the phone call that you had to make to Mr. Enos.**

**Did you call Mr. Enos and tell him that he had to -- later, when he is employment separated, did you call him and tell him to come to work and pick up his belongings?**

A. Yes.

**Q. Did you tell him that he had to come to work during business hours?**

A. I don't recall specifically saying that, but I wouldn't be surprised, yes.

MS. PARKS: It's just what you recall.

MS. SAUER-LAMB: Yes. I don't recall saying that.

BY MR. GEDDES:

**Q. The second paragraph says that the leave entitlement under FMLA expired on January 21st, 2015, and this document is dated February 13th, 2015.**

**Do you know why this notice was provided after his FMLA had run out?**

MS. PARKS: Objection. Calls for speculation.

MS. SAUER-LAMB: I don't.

BY MR. GEDDES:

**Q. Now, you testified at the beginning of your deposition your understanding as to why Mr. Enos' employment had separated had to do with medical releases and returning with medical releases.**

**Did you have an understanding before you retired as to why it was necessary for Mr. Enos to obtain medical clearances?**

A. No. I think I stated that my understanding why he left employment was because his FMLA had run out, and he didn't have -- he wasn't released to come back to work fully.

**Q. My question, though, is as his supervisor, was it necessary that he obtain full medical releases in order for him to do his work?**

A. I don't know. I can't answer that.

**Q. If we look at Exhibit 10, which we talked about earlier, but this exhibit states that Mr. Enos could be expected to return to full duty in approximately three weeks?**

**Three weeks from the date this was written, January 28th, 2015, would be February 18th, 2018.**

**Yet Exhibit 12 requires that he return not later than the 17th, a day before his expected return, according to the medical records.**

**So my question is, isn't it true that this letter was an attempt to set up Mr. Enos to have a ruse to fire him before he was even expected to return?**

MS. PARKS: Objection. Argumentative, calls for speculation, lack of foundation.

MS. SAUER-LAMB: I don't know the answer to that.

BY MR. GEDDES:

**Q. But you had no knowledge of this letter at any time before your deposition today; is that correct?**

A. I don't recall ever seeing this letter.
**Q. Did anyone ask you for your opinion as Mr. Enos' supervisor as to whether or not he should be able to return to work after his surgery?**
A. No.
**Q. Do you know one way or another whether Mr. Enos attempted to show up to work on February 17th to report for duty, that is 2015?**
A. Yeah. I don't know if it was that day.
**Q. Well, what information or knowledge do you have on that?**
A. I just -- I remember -- I'm trying to -- how to phrase this?
I remember him wanting to come back to work, and I don't know if he actually physically came and then left, or if he was told not to until he had a doctor's note saying that he was ready to come back to full duty.
So I don't know the timeline. I don't know when that was, but I think it was in close proximity to this time period.
**Q. Do you know whether -- well, let's look at Exhibit 12, paragraph 2. Paragraph 2 reads, "Our records indicate your leave entitlement under the FMLA has expired effective January 21, 2015.**



**Accordingly, you are expected back at work and must return on February 17, 2015, at 8:00 a.m. You are expected to provide a full medical release prior to returning to work. Please deliver the release to human resources no later than February 17th, 2015 at 8:00 a.m."**
**Your testimony is that you're not sure exactly when it was, but that you believe in response to this, Mr. Enos tried to come back to work?**
MS. PARKS: Objection. Misstates her testimony.
MS. SAUER-LAMB: I don't know if it was in response to that.
BY MR. GEDDES:
**Q. But your testimony is that you believe Mr. Enos did try to return to work after his surgery?**
MS. PARKS: Objection. Asked and answered, misstates her testimony.
MS. SAUER-LAMB: I remember him -- I don't know if he actually came back to work or was wanting to come back to work, and I don't remember the date, but he needed to have the doctor's note or the doctor's report that he was fully cleared.



BY MR. GEDDES:
**Q. To your knowledge, at any time in 2015, did anybody consider, rather than terminate or have a separation of employment occur, that Mr. Enos might be transferred to a different position?**
A. I don't know.
**Q. Are you aware of any requests made by Mr. Enos in writing to have an extension of time from the deadline given to him to return to work with medical releases?**
A. No. I'm not aware of that.
**Q. As his supervisor, would that be important for you to know?**
MS. PARKS: Objection. Argumentative.
MS. SAUER-LAMB: Not under these circumstances because I wasn't involved in this part of his supervision.
BY MR. GEDDES:
**Q. Well, part of your job is to know what staff levels you have, correct?**
A. Well, staff levels, I was making sure the office was fully -- that there was people there, yes, but John was out on medical leave, so I wasn't part of that aspect of his supervision.
**Q. What was the workload like when Mr. Enos**



**was out on medical leave after the period of his surgery in 2014 through the end of your retirement in 2015?**
A. What do you mean, the workload?
**Q. In the office, caseload, workload?**
A. It varied, but it was about 10 to 12 cases per juvenile probation officer, not including the misdemeanors and the ancillary programs they all were running.
**Q. At that time in early 2015 through the end of your retirement, before Mr. Enos had separated from his employment, were you at all curious about when he might return?**
A. Was I curious? Yes.
**Q. Did you inquire into that?**
A. I don't recall a specific inquiry.
(Exhibit 13 marked for identification)
BY MR. GEDDES:
**Q. Have you seen this document before?**
A. I don't think so. I think I knew of it, but I don't think I actually saw it.
**Q. How did you know of it?**
A. I don't know how I knew of it.
**Q. When did you first learn of it?**

A. I don't know the time period. It was while I was still working at juvenile probation.
**Q. So the first paragraph or the first few lines of this Exhibit 13 reads, "On Friday, 2/13/15, a letter was delivered to my home at 4:45 p.m."**
**Do you have any information about that?**
A. No.
**Q. "I received it at 5:25 p.m. The letter informed me that I must provide the county with a doctor's release and return to work on 2/17 at 8:00 a.m.**
**I returned to work at 8:00 a.m. to Norma Santoyo's office at human resources, unable to get a full release from my doctor over the President's Day weekend."**
MS. PARKS: Objection. This document speaks for itself.
MR. GEDDES: That's great, but I'm asking questions.
MS. PARKS: Well, I'm just telling you reading the document into the record is not necessary in terms of asking her questions about it.
BY MR. GEDDES:
**Q. The portion that I just read, do you have any information about that?**



A. I don't.
**Q. The next line requests an extension of time in order to get more information from his doctor regarding his ability to return to full duty as a probation officer. Do you have any information about that?**
A. I don't.
**Q. The next line discusses county policies, and he specifically requests a leave of absence in order to receive necessary medical treatment for injuries he received while on the job and to recover from those injuries in order to return to his job as a probation officer at full capacity.**
**Do you have any knowledge about that?**
A. I don't.
**Q. Did you have any communications with anyone regarding any of these matters?**
A. The matters in this letter that John wrote? No.
**Q. The next section below that under an asterisk states that if it is found he is unable to return to full duty as a probation officer, he would accept any other position with the county that he could perform.**
**Do you have any information about that?**



MS. PARKS: Objection. Asked and answered.
BY MR. GEDDES:
**Q. Do you have any information about that?**
A. I don't.
**Q. Did you ever perform an investigation as to any other positions with the county that Mr. Enos could perform?**
A. I did not.
**Q. Are you aware of anyone doing that?**
A. No, I am not.
**Q. At that time, February of 2015, were you aware of other positions in the county that were open for which Mr. Enos would have qualified?**
A. I am not or I was not.
**Q. I want to make sure I understand your testimony. Your testimony is you're not aware one way or another?**
A. Right. That wasn't something I was aware of.
**Q. Do you know whether Mr. Enos attempted to get work clearances in response to the things that are stated in this letter?**
A. A work clearance from his doctor?
**Q. Let me be more specific. Look at Exhibit**



**12. Exhibit 12 references him getting releases, specifically a full medical release.**
**Do you know whether Mr. Enos actually attempted to get those releases?**
MS. PARKS: Objection. Calls for speculation.
MS. SAUER-LAMB: I don't know that he had attempted to.
BY MR. GEDDES:
**Q. Do you know whether any doctors provided releases to the county at the end of January 2015?**
MS. PARKS: Same objection. He is asking you if you know.
MS. SAUER-LAMB: Well, other than what you just provided to me, no, I did not know.
MR. GEDDES: Give me one second here. Let's mark this as the next exhibit.
(Exhibit 14 marked for identification)
BY MR. GEDDES:
**Q. These are separate documents.**
A. Okay.
**Q. Have you seen any of these documents that are Exhibit 14 before?**
A. I have not.

**Q. Exhibit 14, at the first page ending in DCO-1495, is a record from Specialty Health from Patricia Morales, MD, and in part, the document reads that the employee is able to lift up to 50 pounds and push up to 50 pounds and pull up to 50 pounds.**

**Were you aware that this medical release was provided on or about February 17th?**

MS. PARKS: Objection. Calls for speculation on the part of this witness.

MS. SAUER-LAMB: No, I was not.

BY MR. GEDDES:

**Q. Let's go to the next page, 1496. This document is from Tahoe Fracture Orthopedic. It's a work/school excuse for Mr. Enos dated February 18th, 2015.**

**The relevant portion of it from David E. Eisenhower is that he may return to work unrestricted as of today.**

**Were you aware at any time that David Eisenhower issued a medical document that stated he may return to work as of February 18th, 2015 unrestricted?**

A. No.

**Q. Let's turn to 1497. Do you know**



**whether -- well, let me take a step back.**

**Did anyone speak to you about the status of Mr. Enos' disability or workers' compensation benefits after he was terminated?**

A. Could you ask that again so I make sure I understand?

(Question read back)

MS. SAUER-LAMB: Yes.

BY MR. GEDDES:

**Q. Tell me about that.**

A. It was after I retired. I believe John had filed a lawsuit or something against workmen's comp, and what is your partner at Balkenbush? Bobby? Robert met with all of us who were part of that, so Scott Shick, myself, I think Norma was gone at the time, so it was whoever was the acting human resources person, Sarah Christensen, and I don't think anyone else was in the room, and he was talking about --

MS. PARKS: You're not to relay what Mr. Balkenbush said. That was in connection, I believe, with the litigated work comp case involving Mr. Enos. That would be subject to the attorney-client privilege.

MS. SAUER-LAMB: Yeah. That was what I



was talking about.

BY MR. GEDDES:

**Q. Well, let me ask this. I'm not interested in the communication, but as a result of that meeting, what happened, to your knowledge?**

A. I understood, months later, a settlement was reached.

**Q. Did you have an understanding that the county was challenging Mr. Enos' receipt of any benefits under workers' compensation as a result of the information contained in Exhibit 14, the work restriction releases that were sent?**

A. No.

**Q. As a supervisor of Mr. Enos, would you have objected to his returning to work, given the lifting of restrictions that are set forth in Exhibit 14?**

A. No. I would not have objected.

(Exhibit 15 marked for identification)

BY MR. GEDDES:

**Q. These are two separate documents, if you would take the time to look at them?**

**Have you seen either of the documents in Exhibit 15 before?**



A. I don't believe the first one. I may have seen the second one. It looks familiar.

**Q. Okay. Do you have any information relevant to Exhibit 15 regarding Mr. Shick having considered a request by Mr. Enos for a leave of absence dated February 17th, 2015, upon which Mr. Shick denied a request?**

A. I don't have any knowledge of that.

**Q. Did anyone discuss this matter with you?**

A. No.

**Q. On the second page, you said that you may have seen this. Do you recall seeing this before or after Mr. Enos' employment had separated with Douglas County?**

A. I don't remember.

**Q. Did you have any conversations with anyone about the matters set forth in this page of Exhibit 15?**

A. Just when Scott asked me to call John to come get his property.

**Q. You walked Mr. Enos out to his vehicle?**

A. I did not.

**Q. Did you ever have a conversation with Mr. Enos about a garage door opener?**

A. Whose garage door opener?

MS. PARKS: His question was, Did you ever have a conversation with Mr. Enos about a garage door opener?

MS. SAUER-LAMB: Yes. I believe so.

BY MR. GEDDES:

**Q. Tell us about that.**

A. I think John, and I don't know if it was that day or not, said he left his garage door opener in his county car, and he needed to get it, as I recall. Yeah, something about his garage door opener being in the county car.

**Q. Do you recall looking at surveillance video of the courthouse to determine whether or not Mr. Enos retrieved his garage door opener from a county vehicle?**

A. No.

**Q. Do you recall anyone doing that?**

A. No.

**Q. Do you recall having any communication with anyone about that?**

A. No. I mean, other than John talking about a garage door opener being in the car, no.

MR. GEDDES: Let's take a second here.

(Break taken at 1:23 p.m.)



BY MR. GEDDES:

**Q. I need to clarify a question that I asked.**

**When John came, after you told him to come pick up his stuff at the office, his termination wasn't yet effective. It was effective at 5:00 p.m. that day; is that correct?**

A. I don't know what day it was when he came.

**Q. Okay. With regard to surveillance, watching surveillance, are you aware of whether anybody at Douglas County conducted surveillance for the purpose of seeing if Mr. Enos had come to retrieve his garage door opener from any county vehicle?**

A. I'm not aware of any surveillance for that.

MR. GEDDES: Can you read back my question? I'm not sure her answer answered the question.

(Question read back)

MS. SAUER-LAMB: So the answer would be no.

BY MR. GEDDES:

**Q. So now when you read back the question, I**



**realize there was an error in my question.**

**Are you aware of whether anyone from the county reviewed surveillance tapes of the county building to determine, the county building being the juvenile probation building where he worked to determine whether or not Mr. Enos had attempted or did remove his garage door opener from a county vehicle?**

A. No.

**Q. Are you aware of any attempt by anyone at the county to find reasons to separate Mr. Enos' employment, separate and apart from the reasons that were stated, stated in Exhibit 15?**

MS. PARKS: Objection. Calls for speculation.

MS. SAUER-LAMB: No. I'm not aware.

BY MR. GEDDES:

**Q. To your knowledge, when did Judge Young first learn of Mr. Enos' separation of employment from Douglas County?**

MS. PARKS: Objection. Calls for speculation.

MS. SAUER-LAMB: I don't know.

BY MR. GEDDES:

**Q. To your knowledge, when did Judge Gibbons**



**first learn of Mr. Enos' separation of employment from Douglas County?**

MS. PARKS: Same objection.

MS. SAUER-LAMB: I don't know.

BY MR. GEDDES:

**Q. Do you know when the decision to separate Mr. Enos' employment was first determined at the county?**

MS. PARKS: Objection. Calls for speculation.

MS. SAUER-LAMB: No, I don't.

(Exhibit 16 marked for identification)

BY MR. GEDDES:

**Q. Take a moment and look at this.**

A. Okay.

**Q. Have you seen any of the pages of Exhibit 16 before?**

A. I have not.

**Q. If you look at the last page, PLF-2316, the name that is signed under employer is Kathy Jo Kidd.**

**Now, I had asked you earlier about Kathy Jo Kidd. Does reviewing this document refresh your recollection as to who Kathy Jo Kidd is?**

A. No.
**Q. On PLF-2316, this is dated May 2nd of 2016. By that time, you had already retired; is that correct?**
A. Yes.
**Q. So you have no information regarding the matters set forth in this exhibit; is that correct?**
A. Yes.
MS. PARKS: Regarding all of the matters set forth in Exhibit 16?
MS. SAUER-LAMB: Yeah. I don't know anything about this.
BY MR. GEDDES:
**Q. Okay. I would like to focus on the time when you asked John to come down to the office, and when I say office, where is that office?**
A. It's at the Judicial and Law Enforcement Building in Minden, Nevada.
**Q. That is the same complex where the court is?**
A. Yes, the courts, yes.
**Q. Do you recall that you actually met with him on February 19th; that was the day that he came down?**
MS. PARKS: Objection. Asked and



answered.
MS. SAUER-LAMB: I don't know what day it was.
BY MR. GEDDES:
**Q. I asked you questions earlier about signing a release, and I want to be very precise in what I ask you.**
**Didn't you approach John during this last day when he came down, whenever that was, didn't you approach him and inform him that Scott Shick wanted him to sign paperwork that stated that John Enos was voluntarily resigning his position?**
MS. PARKS: Objection. Asked and answered.
MS. SAUER-LAMB: I don't recall that conversation, no.
BY MR. GEDDES:
**Q. If Mr. Enos testifies at trial that that conversation occurred, do you have any reason to disbelieve it?**
A. No.
**Q. If Mr. Enos testifies at trial that he refused to sign such paperwork, do you have any reason to disbelieve it?**
A. No.



**Q. Do you know a person named TJ?**
A. No.
**Q. Was TJ one of the security personnel or officers at the office?**
A. It was JT.
**Q. JT?**
A. Yes, JT Davis.
**Q. Isn't it true that when Mr. Enos came down on that last day as you instructed him to do that JT was present?**
A. Yes.
**Q. Why?**
A. Mr. Shick asked me to have law enforcement standing by.
**Q. Why?**
A. He just asked me. I don't know why he asked me.
**Q. Did you inquire as to why?**
A. No, I did not.
**Q. Was there a belief by anyone, to your knowledge, that Mr. Enos presented some kind of security threat?**
A. I did not feel that way. I don't know what other people felt.
**Q. So if there were such a document**



**presented to Mr. Enos at that time to sign, do you believe that JT would have been present?**
MS. PARKS: Objection. Lack of foundation.
BY MR. GEDDES:
**Q. Well, let's take a step back. You stated that JT was present when Mr. Enos came down?**
MS. PARKS: Objection. Asked and answered.
MS. SAUER-LAMB: Yes.
BY MR. GEDDES:
**Q. Do you believe that JT was in close proximity to you and Mr. Enos when he came down?**
A. Yes.
**Q. About how far away was he standing?**
A. From me?
**Q. Yeah.**
A. We had a wooden, like a bookcase or whatever it's called, and I was right here, and JT would have been right around the corner.
**Q. You're gesturing to the table, but can you speak in words, distance?**
A. JT would have been within two feet of me to my left side.
**Q. How far away was Mr. Enos from you?**

A. Well, John's office was probably six to eight feet from this table, so John was going in and out of his office, so at times, he was maybe two feet to my right, and other times, he was in his office.

**Q. From what you observed, was JT observing what Mr. Enos was doing at that time?**

A. I was engaging in conversation with JT because I did not want John to think that he was there for him.

I wanted John to think that we had just gotten a kid in custody or whatever, and JT was just hanging out, talking, conversing, which oftentimes, the deputies did, so I don't know what JT was observing or what he wasn't.

**Q. But you believe that he was close enough to you where if he intended to observe, he would have been able to witness your interactions with Mr. Enos?**

A. Yes.

**Q. In this regard, you believe that if a document was presented, we have already asked and you have already testified to, JT was in a position where he would have seen that?**

A. Yes.



**Q. Did you give Mr. Enos a hug before he left that day?**

A. Probably.

**Q. Do you recall doing that?**

A. I'm a hugger, so I don't recall specifically doing it, but I'm a hugger, so.

**Q. Did you have any -- what were your final words to Mr. Enos as he left that day?**

A. Oh, I don't remember.

MR. GEDDES: Just give me a second here.

(Break taken at 1:38 p.m.)

BY MR. GEDDES:

**Q. Ms. Sauer-Lamb, I have just a few more questions here.**

**Do you recall having a meeting with Mr. Shick and Mr. Enos, and during the meeting, Mr. Shick asked Mr. Enos if he were recording the conversation?**

A. I do.

**Q. What do you recall about that?**

A. I don't remember why we were meeting, but I do remember, and I was kind of shocked when Scott asked that. Are you recording, and John said, Yes, I am, and I think it was his cell phone in his pocket.



**Q. Do you recall a conversation -- do you recall whether -- what happened after that?**

A. I think Scott told him to turn off the recording.

**Q. Do you recall Mr. Shick asking Mr. Enos why he was recording the conversation?**

A. I don't remember him asking that.

**Q. Do you recall Mr. Enos telling Mr. Shick in your presence that the reason why he was recording it was because Mr. Enos did not trust Mr. Shick and that Mr. Enos thought that Mr. Shick was trying to fire him?**

A. I remember the trust or something to that effect, but I don't remember the firing part of it, but I do remember John giving or stating why he was doing it.

**Q. Did you ever have any conversations with anyone, other than what we have just described here, about the matter?**

A. Other than with Mr. Shick?

**Q. Uh-huh.**

A. I don't think so, no.

**Q. Do you recall after Mr. Enos' last day, and after he had left the employment of the county, that he had micro -- let me take a step back.**



**You had a micro-cassette recorder that you would use from time to time, correct? Do you know what I mean when I say micro-cassette?**

A. I know what you're talking about. The little ones.

**Q. The little Dictaphones, you would talk into it?**

A. No.

**Q. You never used those?**

A. I never used those.

**Q. You never used them to record, for example, what songs you wanted to have for a wedding or a birthday or something?**

A. On a micro-recorder?

**Q. Micro-cassette tapes?**

A. No. I had a big tape recorder when I was younger.

**Q. What kind of -- let me ask you this. Did Mr. Enos have a micro-cassette recorder?**

A. I believe he did, yes.

**Q. Did all of the officers have those?**

A. I don't believe so.

**Q. Do you have any information as to why Mr. Enos had that, had a micro-cassette recorder?**

A. I don't remember why he had it.

**Q. Do you know what the micro-cassettes look like that go into those recorders?**

A. They're very small little --

**Q. You're holding your hand up, gesturing a size. Can you describe it in words?**

A. Well, I'm trying to eyeball it. Maybe two inches, little two-inch.

**Q. Do you recall that after Mr. Enos had left his employment, separated from employment with the county, anyone from the county had returned his tapes after he had left? Do you recall that?**

A. No.

**Q. Do you know one way or another whether anyone actually listened to any tapes, micro-cassette tapes by Mr. Enos?**

A. Not that I'm aware of.

**Q. Is Mr. Shick currently employed by the county?**

A. I believe he is still the chief probation officer, yes.

MR. GEDDES: Okay. I'll go ahead and pass the witness.

MS. PARKS: I have no questions.

MR. GEDDES: Thank you very much.

Let me just say this. You have 30 days,



and during that period, the court reporter will send to you a copy of the transcript.

You have an opportunity to review the transcript and make any changes to any errors in the transcript.

My admonition here would simply be this. If it's a grammar or a change that doesn't seem to change the substance or nature of your testimony, I, at trial, probably won't have much to say to a jury about that, but I just want to caution you that if in looking at changes that you made to the record, if we believe that they're substantive changes or you're trying to change your testimony, I would likely comment on that to a jury, again, to argue that you're not credible.

You do what is necessary to protect the truth and correct what errors you find, but I wanted to give you that admonition.

(Deposition concluded at 1:53 p.m.)



STATE OF NEVADA )
) ss.
COUNTY OF WASHOE )

I, KATE MURRAY, a duly commissioned and licensed court reporter, Washoe County, State of Nevada, do hereby certify:

That I reported the taking of the deposition of VICTORIA SAUER-LAMB, commencing on Wednesday, October 10th, 2018, at 8:54 a.m.

That prior to being examined, the witness was duly sworn to testify to the truth. That I thereafter transcribed my said shorthand notes into typewriting and that the typewritten transcript of said deposition is a complete, true and accurate transcription of said shorthand notes.

I further certify that I am not a relative or employee of an attorney or counsel of any of the parties, nor a relative or employee of an attorney or counsel involved in said action, nor a person financially interested in the action.

DATED: At Reno, Nevada this 22nd day of October, 2018.

KATE MURRAY, CCR #599



ERRATA SHEET

I declare under penalty of perjury that I have read the foregoing _______ pages of my testimony, taken on _________________________ (date) at __________________(city), _________________(state),

and that the same is a true record of the testimony given by me at the time and place herein above set forth, with the following exceptions:

| Page | Line | Should read: | Reason for Change: |
|---|---|---|---|
| ___ | ___ | _________________________ | __________________ |
| | | _________________________ | __________________ |
| ___ | ___ | _________________________ | __________________ |
| | | _________________________ | __________________ |
| ___ | ___ | _________________________ | __________________ |
| | | _________________________ | __________________ |
| ___ | ___ | _________________________ | __________________ |
| | | _________________________ | __________________ |
| ___ | ___ | _________________________ | __________________ |
| | | _________________________ | __________________ |

ERRATA SHEET

Page Line Should read: Reason for Change:

___ ___ ________________________ ________________
________________________ ________________
___ ___ ________________________ ________________
________________________ ________________
___ ___ ________________________ ________________
________________________ ________________
___ ___ ________________________ ________________
________________________ ________________
___ ___ ________________________ ________________
________________________ ________________
___ ___ ________________________ ________________
________________________ ________________
___ ___ ________________________ ________________
________________________ ________________
___ ___ ________________________ ________________
________________________ ________________
___ ___ ________________________ ________________
________________________ ________________

Date: __________ ____________________________

Signature of Witness

____________________________

Name Typed or Printed